**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 19-cv-0124-WJM-SKC
*Consolidated with Civil Action No. 19-cv-0758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, individually and on
behalf of all others similarly situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

---

This securities fraud action arises out of alleged false and misleading statements

made by Maxar Technologies, Inc. ("Maxar"), and its former executives, Howard L.

Lance, and Anil Wirasekara (collectively, "Defendants") regarding the operational and

financial results of Maxar and its subsidiaries.  Plaintiff Oregon Laborers Employers

Pension Trust Fund brings this action pursuant to Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act") on

behalf of itself and other purchasers of Maxar securities between March 26, 2018 and

January 6, 2019 (the "Class Period").  (ECF No. 44 ¶ 1.)

Currently before the Court is Defendants' Motion to Dismiss the Consolidated

Complaint ("Motion to Dismiss") pursuant to Federal Rules of Civil Procedure 9(b) and

12(b)(6).  (ECF No. 51.)  For the reasons explained below, the Motion is granted in part

and denied in part.

## I. BACKGROUND

The following factual summary is drawn from Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF No. 44), except where otherwise stated.[1]  The Court assumes the allegations contained in the Complaint are true for the purpose of deciding the Motion to Dismiss.  *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plaintiff is a multi-employer defined benefit plan that provides benefits to retired laborers pursuant to collective bargaining agreements.  (¶ 21.)[2]  Plaintiff purchased and sold Maxar common stock between March 26, 2018 and December 7, 2018.  (ECF No. 44 at 103.)

Maxar is a space technology company traded on the New York Stock Exchange ("NYSE") and Toronto Stock Exchange ("TSX") under the ticker symbol "MAXR."  (¶ 4.) During the Class Period, Maxar consisted of four business units: (1) MacDonald,

---

[1] Defendants have attached numerous documents to their Motion to Dismiss and request that the Court take judicial notice of these documents.  (ECF No. 52.)  A court has discretion to consider documents attached to a Rule 12(b)(6) motion to dismiss if the documents are referenced in a complaint, are central to a plaintiff's claims, and are indisputably authentic.  *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997); *Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) ("*GFF Corp.* did not purport to decide whether consideration of materials appended to a motion to dismiss is mandatory or discretionary . . . We agree with our sister circuits that . . . the court has discretion to consider such materials.").  As Plaintiff points out, Defendants have only selected certain documents referenced in the Complaint to submit to the Court.  (ECF No. 53 at 5 n.3.)  The Court declines to look beyond the four corners of the Complaint to consider this select universe of documents at the motion to dismiss stage.  Should either party file a motion for summary judgment after discovery has concluded, the Court will consider such a motion on a complete evidentiary record.

[2] Citations to paragraph numbers, without more, *e.g.* (¶__), are to paragraphs in Plaintiff's Complaint.  (ECF No. 44.)

Dettwiler & Associates Ltd.; (2) Space Systems/Loral ("SSL"); (3) DigitalGlobe; and (4) Radiant Solutions.  (¶ 22.)

Lance served as Maxar's President, Chief Executive Officer ("CEO"), and Chairman of the Maxar's Board of Directors between May 2016 and January 2019. (¶ 23.)  Wirasekara served as Maxar's Interim Chief Financial Officer ("CFO") between February 26, 2018 and August 15, 2018.  (¶ 24.)  Plaintiff alleges that during the Class Period, both Lance and Wirasekara regularly participated in Maxar's earnings calls and certified the accuracy of Maxar's financial statements each quarter.  (¶¶ 23–24.)  They also had "ultimate authority and control over the Company's public statements, including the contents of regulatory filings, and whether and how to communicate the contents of the filings to the investing public."  (*Id.*)

Plaintiff contends that Defendants have made three categories of fraudulent statements.  The Court will describe each category of statements below.

**A.      Statements Regarding Spacecom's Selection of Maxar to Build the AMOS-8 Satellite**

1.      Announcement Regarding the AMOS-8 Project

Maxar acquired geostationary communication satellite manufacturer SSL in 2012.  (¶¶ 4, 22.)  While each GEO award order can generate hundreds of millions of dollars in revenue, the manufacturing process is capital-intensive and profit margins are slim.  (¶ 57.)  Accordingly, to stay afloat, the GEO satellite business requires a pipeline of orders.  (*Id.*)  However, SSL, which operated largely within the commercial market for satellites, had not won a GEO satellite award from a government customer since 2001. (¶ 56.)  Moreover, following a market downturn in 2015 and 2016, SSL had only won

two GEO satellite awards in all of 2017.  (¶ 85.)

On March 26, 2018, Maxar announced two new GEO satellite orders.  (¶ 113.)

One of those orders was by Spacecom, an Israeli company, for a satellite designated

"AMOS-8."  (*Id.*)  Maxar issued a press release titled "Spacecom Selects Maxar

Technologies' SSL to Build AMOS-8 Communications Satellite with Advanced

Capabilities."  (¶ 155.)  This press release states, among other things, that

> Spacecom (TASE:SCC), operator of the AMOS satellite
> fleet, today announced it has chosen SSL, a Maxar
> Technologies company . . . to build its AMOS-8 advanced
> communications satellite. . . .
>
> "SSL is dedicated to delivering advanced space systems
> and services that inform, entertain and connect people
> around the globe," said Dario Zamarian, group president of
> SSL. . . .  "We are honored to be selected to manufacture
> this satellite, which will enable access for underserved
> people in Europe, Africa and the Middle East to high-speed,
> reliable data – a connection essential in today's digital world
> to understand what is happening across the planet and
> participate fully in the global community."
>
> The AMOS-8 geostationary communications satellite will be
> co-located with AMOS-8.  A contract option has been signed
> between Spacecom and SpaceX for AMOS-8's scheduled
> launch in the second half of 2020.
>
> "AMOS-8 will bring additional high-quality capacity to expand
> our offerings and provide our partners with the abilities to
> add new and exciting services," said David Pollack, CEO
> and president of Spacecom. "Spacecom is dedicated to
> delivering reliable and cost-effective services that are
> enjoyed and relied upon by millions of people and
> businesses. We are eager to work together with SSL to
> develop this new satellite."

(¶ 114.)

SSL's public Facebook and Twitter accounts posted announcements regarding

4

the AMOS-8 award as well, stating: "2018 is off to a great start for SSL with two contracts to build GEO satellites announced today. Thank you B-SAT and Spacecom for placing your trust in SSL!" (¶¶ 115, 156.)

Plaintiff alleges that these statements were false and misleading when made because "they gave the investing public the misleading impression that AMOS-8 was a definitive award." (¶ 160.) In reality, the agreement between Spacecom and SSL allowed Spacecom to withdraw from the deal within 60 days without penalty and was not effective until SSL received the first payment from Spacecom. (*Id.*) Moreover, Spacecom did not have financing to pay for the AMOS-8 at the time of the March 26, 2018 announcement, and Spacecom was reliant on future bond offerings to fund AMOS-8. (¶¶ 116, 160.)

2.   The Fate of AMOS-8 is Put Into Question

After the AMOS-8 project was announced, Israeli Aerospace Industries ("IAI"), an Israeli state-owned manufacturer, attempted to outmaneuver Spacecom by seeking a contract directly with the Israeli government that "would displace the SSL order." (¶¶ 117–18.) Israel initially appeared to be receptive to IAI's offer, which led the technology journal *Calcalist* to publish an article on April 30, 2018 titled "Israeli Government Intervention Likely to Void Deal with U.S. Satellite Contractor Loral":

> In a filing to the Tel Aviv Stock Exchange on Monday, Spacecom, . . . announced it has received a letter from a government official on Sunday, informing the company that the state intends to "work towards placing a satellite by [IAI]," a stateowned company, at the geostationary position intended for AMOS-8, which belongs to Israel.
>
> The announcement could mean that Israel plans to launch its own satellite through IAI, cutting Spacecom out of the

5

> loop. It may also mean Spacecom can find its way back into
> the deal if it commissions the satellite from IAI.  In both
> scenarios, American Loral loses the contract.

(¶ 120.)  Nonetheless, shortly thereafter, on May 9, 2018, Lance stated the following

during Maxar's earnings call for the first quarter of 2018:

> We were very pleased to report in the quarter that we were
> awarded 2 new GEO communications satellites . . . . Israeli
> satellite operator [Spacecom] selected SSL to build the
> AMOS-8 satellite.  This will deliver state-of-the-art broadcast,
> broadband and data services from its 4-degree West
> hotspot to Europe, Africa, and the Middle East . . .

(¶ 157.)  On that same day, Maxar also listed the AMOS-8 contract in (1) a press

release under the heading "Notable bookings in the Space Systems segment

announced in the first quarter of 2018"; and (2) its earnings slide deck under the

headings "Q1: Key accomplishments and order activity" and "Space Systems – Q1

results."  (¶ 158.)  As with the prior statements regarding the AMOS-8 contract, Plaintiff

alleges that these statements were false and misleading when made because "they

gave the investing public the misleading impression that AMOS-8 was a definitive

award."  (¶ 160.)

      3.    The AMOS-8 Deal Falls Through

Less than two weeks later, on May 22, 2018, *DefenseNews* reported that

"[f]ollowing Spacecom's decision to go with the Palo Alto-based [SSL], the [Israeli]

Ministry of Science, Technology and Space released a statement in April saying the

government had informed Spacecom it 'stands by its original position in favor of a 'blue

and white' [Israel-made] satellite."  (¶ 122.)

Thereafter, on May 27, 2018, *Calcalist* reported that Spacecom had failed to

make its initial payment for AMOS-8: "According to the original agreement announced on March 25, the deal should have become void when Spacecom failed to pay within 60 days, meaning by Friday [May 25, 2018]." (¶ 123.) Nonetheless, SSL agreed to extend the down payment deadline by 30 days. (*Id.*)

Plaintiff alleges that unbeknownst to investors, after Spacecom failed to make its initial payment, "Maxar's management prohibited the SSL Program Manager assigned to AMOS-8 to proceed with the project" and "declined to purchase the parts needed to build AMOS-8." (¶ 124.) Moreover, at some point between June 10 and June 29, 2018, Maxar "quietly removed the AMOS-8 award from its webpage listing GEO awards" but "did not issue any press releases or otherwise make any public statements at that time regarding AMOS-8." (¶ 127.)

On June 25, 2018, *Calcalist* reported that Spacecom again missed its payment deadline. (¶ 126.) SSL agreed to a second extension, this time of 60 days, until September 25, 2018. (*Id.*)

On September 3, 2018, the Israeli Ministry of Science and Technology announced that AMOS-8 would be built in Israel and funded by the Israeli government. (¶ 181.) The next day, Maxar's stock price on the NYSE dropped from $31.05 per share at the close on August 31, 2018 to close at $29.34 on September 4, 2018, a drop of 5.5%. (¶ 182.)

On September 25, 2018, Spacecom formally announced that it would not be making its down payment to Maxar under the AMOS-8 contract. (¶ 183.) On September 26, 2018, Maxar's stock price on the NYSE dropped from $34.81 per share at the close on September 25, 2018, to close at $33.18 on September 26, 2018, a drop

of 4.7%.  (¶ 184.)

## B.    Statements Regarding the WorldView-4 Satellite

DigitalGlobe launched an imaging satellite called WorldView-4 into orbit in November 2016.  (¶ 143.)  After Maxar acquired DigitalGlobe in October 2017, it became the owner and operator of the WorldView-4 satellite.  (*Id.*)  This satellite, which was the "flagship of the Digitalglobal fleet," generated roughly $85 million in revenue for Maxar in 2018.  (*Id.*)

The WorldView-4 satellite utilizes three control moment gyroscopes ("CMGs"), which control the orientation of the satellite and allow Maxar to "point WorldView-4 in any direction with an extremely high degree of precision needed for the purpose of on-demand imaging."  (¶ 144.)  If the CMGs fail, the WorldView-4 satellite becomes "useless for high-resolution digital imaging, *i.e.*, its sole revenue-generating function." (*Id.*)

The United States Space Surveillance Network ("SSN") detects, identifies, and tracks all artificial objects orbiting the Earth, including the WorldView-4 satellite. (¶ 146.)  SSN records and updates parameters describing each object's shape, size, and orientation in the form of a two-line element ("TLE") dataset.  (*Id.*)  The "TLE data does not include the performance of the individual components of a satellite, which is information known only to the [Maxar]."  (*Id.*)

On October 12, 2018, the "TLE data abruptly became erratic and volatile compared to that of its operational history, demonstrating a loss of stability that has never been restored."  (¶ 148.)  Plaintiff alleges that Defendants did not disclose the

8

WorldView-4's loss of stability and instead "made a series of material misstatements and omissions giving investors the false and misleading impression that the WorldView-4 was still operational."  (¶ 149.)  For example, on October 31, 2018, the Company failed to disclose the WorldView-4 failure as a material subsequent event.  (¶¶ 150, 171.)  The next month, Lance made several statements representing that the WorldView-4 remained a functioning satellite that presented future business opportunities.  (¶¶ 151, 172–73.)  Plaintiff contends that these statements were "false and misleading when made because, despite knowing that the WorldView-4 had lost stability beginning no later than October 12, 2018, Defendants gave investors the impression that WorldView-4 was still a fully-functioning satellite capable of supplying high-resolution imagery to customers on demand."  (¶ 174.)

On January 7, 2019, Maxar announced that the WorldView-4 satellite "experienced a failure in its [CMGs], preventing the satellite from collecting imagery due to the loss of an axis of stability" and that it "believes that WorldView-4 will likely not be recoverable and will no longer produce usable imagery."  (¶¶ 16, 152, 198.)  Plaintiff alleges, however, that in its public statements Maxar has been evasive about when the WorldView-4 satellite actually became inoperative.  (¶ 153.)  Dan Jablonsky, who succeeded Lance as Maxar CEO, stated in February 2019 that the WorldView-4 satellite "became inoperable at the first of the quarter."  (*Id.*)  However, in its annual report published in March 2019, Maxar reported that the WorldView-4 satellite failed "[d]uring December 2018."  (*Id.*)

On January 7, 2019, Maxar's stock price on the NYSE dropped from $11.72 per share at the close on January 4, 2019, to close at $8.03 on January 7, 2019, a drop of

24.9%.  (¶¶ 16, 199, 215.)  The stock dropped another $2.00 per share on January 8, 2019.  (¶¶ 200, 216.)

Plaintiff contends that "Defendants were motivated to conceal the failure of WorldView-4 until the 'domestication' of [Maxar] as a U.S. entity, a process that concluded only five days before Maxar announced the CMG malfunction."  (¶ 154.)

## C.   Statements Regarding Maxar's Impairment of its GeoComm Assets

Maxar is obligated to comply with the IFRS accounting standards issued by the International Accounting Standards Board.  (¶ 25.)  Pursuant to International Accounting Standard ("IAS") 36, Maxar must assess whether its intangible assets are impaired, *i.e.*, if their "carrying amount" [book value] exceed the amount to be recovered thorough the use or sale of the assets at the end of each reporting period.  (¶¶ 31–33.)  This assessment considers whether there are any "impairment indicators" from internal or external sources of information, including

- observable indications that the asset's value has declined during the period significantly more than what would be expected as a result of the passage of time or normal use;

- significant changes with an adverse effect on the entity during the period in the technological, market, economic, or legal environment in which the entity operates;

- significant changes with an adverse effect on the entity have taken place, including the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs, or plans to dispose of an asset before the previously expected date; and

- internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected.

(¶ 34.)  According to IAS 36, if there are any indications of impairment present, "an

10

entity is required to test for impairment by determining an asset's" recoverable amount. (¶ 37.)

    1.    <u>Declining Global Demand for GEO Satellites</u>

When it acquired SSL in 2012, Maxar acquired approximately $300 million in property, plant, and equipment ("PP&E"), and $320 million in intangible assets directly related to the GEO satellite business. (¶ 59.) Between 2005 and 2014, "commercial satellite operators awarded 20–22 orders per year worldwide on average." (¶ 59.) Between 2005 and 2016, SSL averaged between five and six contracts per year, and had never won fewer than four contracts in a given year. (¶ 86.) In 2014, SSL signed "a record nine GEO [satellite] contracts." (¶ 59.)

Global demand for GEO satellites began decreasing in 2015 and 2016 as a result of market saturation and technological shifts that favored cheaper LEO communications technology. (¶¶ 60–61.) SSL's GEO satellite awards dropped during this period, with five awards in 2015 and four awards in 2016. (¶ 60.)

Despite the drop in global demand for two years in a row, Lance remained optimistic that the GEO market would recover and return to its historical averages. Throughout 2016 and early 2017, he made a series of statements to investors indicating that he remained "bullish on the long-term health of the satellite industry." (¶¶ 62–63, 65.) Wirasekara likewise stated that he expected Maxar's revenues to improve when "satellite order intake levels return to near historical averages." (¶ 64.)

Nonetheless, Maxar laid off at least 334 SSL employees in February and June 2017, which constituted SSL's highest reductions in headcount to date. (¶¶ 71–73.) By mid-2017, Lance began telling reporters that he no longer expected the GEO satellite

market to return to its previous levels.  (¶¶ 76–78, 81–82.)

Plaintiff alleges that by the end of 2017, "all signs pointed to a structural collapse in the GEO market, not merely a temporary downturn."  (¶ 84.)  An article in *Space Intel Report* reported that "[i]n 2017, the global commercial geostationary-orbit satellite market demand was seven or eight units, depending on who's counting, down 70% from what used to be considered a normal year.  SSL won two of these."  (*Id.*)

At New York Investor Day in March 2018, Lance informed investors that the GEO business had been a "drag" on Maxar's finances and "shared projections demonstrating that the GEO business would continue to negatively impact Maxar's revenue and earnings for years to come."  (¶¶ 97, 103.)  He explained that the GEO satellite revenue has "[d]eclined over 20% each year for two years" and that there is "negative growth in the GEO market."  (¶¶ 98, 101.)  During the question and answer portion of the presentation, Lance admitted that Maxar had concluded that the market would not recover at all, and based on that conclusion the Company had decided to slash its own GEO manufacturing output capacity to save money on fixed costs. (¶ 106.)  Wirasekara likewise informed investors that "[w]hen you look at 2016 to 2018, the [GEO satellite] market declined by about 45%.  That was a large segment of our business."  (¶ 102.)

2.    Maxar's Results for the First Quarter of 2018

Plaintiff alleges that despite the "flurry of red flags prior to and during the [first quarter of 2018]," Maxar did not report an impairment charge.  (¶ 112.)  At the end of the first quarter, Defendants reported assets including approximately $1.7 billion of intangible assets, $1.1 billion in PP&E, and $100 million in inventory, as well as net

earnings of $31 million and net earnings per share of $0.55.  (¶¶ 8, 163–64.)

According to Plaintiff, Defendants' statements regarding its financial reports were "false and misleading when made" because they "failed to disclose the impaired value" of the GEO business unit.  (¶ 165.)

During the May 8, 2018 earnings call, Lance admitted that "we remain in this view in 2018 that we're probably about 50% where this market would be, let's say, at its nominal level of around 20 awards."  (¶ 110.)  Wirasekara likewise stated that "the step down in award values and continued weakness in the [GEO satellite] market since 2015 continued to flow through as lower revenues in the current quarter."  (¶ 111.)

### 3.   Maxar's Results for the Second Quarter of 2018

The GEO satellite market did not improve in the second quarter of 2018 either. Among other things, Spacecom failed to make payment on the AMOS-8 satellite by the original May 25, 2018 deadline, or the June 25, 2018 extended deadline.  (¶¶ 123, 126.) Maxar terminated an additional 109 SSL employees in June 2018.  (¶ 131.)

During a closed-door meeting in June 2018, Maxar's management informed an analyst that "its outlook for the [GEO satellite] market had has become more cautious than it had been just six months ago."  (¶ 128.)  It also informed the analyst that Maxar was considering various scenarios to "mitigat[e] its exposure to the GEO market," including "[e]xiting the GEO business altogether."  (*Id.*)  Following a news article stating that Maxar was considering exiting the GEO satellite business, Maxar confirmed in a written statement that it was considering its "strategic alternatives" due to "material satellite order declines in recent years."  (¶ 129.)

When Maxar announced its earnings for the second quarter of 2018 on July 31,

2018, Lance recognized that Maxar does not "expect a significant recovery for [the GEO satellite] market, with industry orders likely to be at the low end of the 8 to 12 awards range this year 2018." (¶ 133.)  He then admitted again that Maxar was "examining a range of strategic alternatives." (*Id.*)  He stated:

> So at a minimum, we're downsizing, continuing to cut staff to align with the workload.  Cutting our footprint, making available some of our owned facilities for sale and moving into as small a footprint as possible on a go-forward basis.

(¶ 134.)

Despite the continued market deterioration, Maxar did not report impairment charges in the second quarter or 2018.  At the end of the second quarter, Maxar continued to report approximately $1.7 billion in intangible assets and $1.1 in PP&E, as well as $95 million of inventory.  (¶¶ 9, 168–69.)  Maxar's earnings, however, dropped to a net loss of $18.6 million and net earnings per share were -$0.33.  (*Id.*)

According to Plaintiff, Defendants' statements regarding these financial reports were "false and misleading when made" because they "failed to disclose the impaired value" of the GEO business unit.  (¶ 170.)

4.    The Spruce Point Report

On August 7, 2018, Spruce Point Capital Management, LLC ("Spruce Point") issued a report questioning Maxar's financial health and the Company's accounting practices, concluding that the intangible assets of the GEO satellite business were likely materially impaired by hundreds of millions of dollars  (¶¶ 11, 175.)  Maxar's share price on the NYSE fell by $5.34, or 13.44% to close at $38.44 on August 7, 2018.  (¶¶ 11, 176.)  The following day, Maxar's share price fell another $1.82, or 4.55%.  (¶ 178.)

Maxar published a press release after trading closed on August 7, 2018, claiming that Spruce Point's report "contains a number of inaccurate claims and misleading statements."  (¶ 177.)  It stated that Maxar "recently reaffirmed its full year 2018 guidance for revenue and cash flow from operations, while increasing its full-year adjusted [earnings per share] outlook" and "believes that the Company remains positioned for future growth."  (*Id.*)  Plaintiff claims that Maxar did not disclose, however, that the Spruce Point report "resulted in the opening of an investigation by the Company's Audit Committee" which would be assisted by new certified public accountants and "independent" third-party consultants.  (*Id.*)

About three weeks later, on August 24, 2018, Defendants issued a new press release which recognized that an impairment charge was possible.  (¶ 179.)  That day, Maxar's share price on the NYSE dropped from $35.92 per share at the close of August 22, 2018 to close at $33.92 on August 24, 2018, a drop of 5.6%.  (¶ 180.)

5.    <u>Maxar Takes an Impairment Charge</u>

When it issued its 3Q18 results on October 31, 2018, Maxar recognized impairment losses of $345.9 million and an inventory obsolescence charge of $37.7 million related to the GEO satellite business.  (¶ 187.)  Maxar represented that "[f]or the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present."  (¶¶ 140, 188.)  According to Maxar, "[i]n the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts."  (¶ 188.)  Maxar cited numerous impairment indicators supposedly absent in the first two quarters of 2018:

- The [GEO] cash generating unit ("CGU") "forecasted it would have a significantly different mix of programs at the beginning of the year," "predicted it would be awarded approximately three to four contracts for [GEO] satellites," and "[b]y the end of Q2 2018, the Company was still confident in its prediction of three to four [GEO] satellite builds."

- "[I]ndustry and macroeconomic factors had declined substantially from earlier forecasts."

- "By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed."

- "[I]t became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8."

- "The Company does not expect the long-term outlook for the [GEO satellite] business to rebound significantly from current year award levels."

- "Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume."

- "As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its [GEO satellite] business, including a potential sale, and implemented a major restructuring initiative to right size the [GEO satellite] business for its current environment."

(¶¶ 14, 188.)  Plaintiff contends, however, that "each and every one of the above-noted factors, and others, were present, evident, and known to Defendants during the first two quarters of 2018."  (¶ 14.)

As a result of this news, Maxar's stock price on the NYSE dropped from $27.07 per share at the close of October 30, 2018, to close at $14.91 on October 31, 2018, a

drop of 44.9%.  (¶ 194.)

## II.  LEGAL STANDARD

**A.      Rule 12(b)(6) Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  In reviewing a motion to dismiss under Rule 12(b)(6), the Court will "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177.  "[T]o withstand a motion to dismiss, a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'"  *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ("*Twombly*")).  This means that "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief.  'Factual allegations must be enough to raise a right to relief above the speculative level.'"  *Id.* (quoting *Twombly,* 550 U.S. at 545 & 556).  The plaintiff "does not need detailed factual allegations" but must plead more than merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Id.*  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177 (quoting *Twombly*, 550 U.S. at 556).

**B.      Section 10(b) and Pleading Requirements Under the Private Securities Litigation Reform Act**

"Section 10(b) of the Securities Exchange Act of 1934 . . . prohibits making any

material misstatement or omission in connection with the purchase or sale of any security." *Haliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). While not explicit in the statute, the courts have "long recognized" an implied private cause of action to enforce Section 10(b) and its implementing regulations. *Id.*

While complaints in civil actions usually require a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), a plaintiff alleging a Section 10(b) claim bears a "heavy burden at the pleading stage," *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). A Section 10(b) complaint must allege that

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") raised the pleading standard on the first and third elements of a federal securities fraud claim, namely, falsity and scienter, beyond what had been required by Rule 8(a) or Rule 9(b).[3] *Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *4 (D. Colo. Mar. 14, 2018); *Adams*, 340 F.3d at 1096 (recognizing the PSLRA pleading requirements for state of

---

[3] Prior to the passage of the PSLRA, Rule 9(b) governed securities fraud claims, and required that "circumstances constituting fraud . . . be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally." *Adams*, 340 F.3d at 1095 (quoting Fed. R. Civ. P. 9(b)).

mind are more stringent than rule 9(b), so the "PSLRA supersedes [the] part of Rule 9(b)" allowing for general allegations of state of mind).  The PSLRA requires that a plaintiff plead falsity by specifying each allegedly misleading statement, the reason why the statement is misleading, and, if made on information and belief, all facts on which that belief is formed.  *Adams*, 340 F.3d at 1095.  For scienter, the complaint must state with particularity, for each act or omission, facts giving rise to a strong inference that the defendant acted with an intent to defraud or recklessness.  *Id.* at 1095–96, 1105.

### III.  ANALYSIS

Defendants argue that the Complaint fails to adequately plead each of the three categories of purported misstatements: (1) statements related to Maxar's contract with Spacecom to build the AMOS-8 satellite; (2) Maxar's financial statements in the first and second quarters of 2018; and (3) statements regarding the WorldView-4 satellite. (ECF No. 51 at 1.)  Specifically, Defendants contend that the Complaint fails to allege with factual particularity that each set of statements was false or misleading when made, that either Lance or Wirasekara had acted with an intent to defraud, or that there was loss causation.[4]  (*Id.* at 1–4.)

### A.    Material False or Misleading Statements

The PSLRA imposes "specific and more stringent pleading requirements on complaints alleging securities fraud under Section 10(b)."  *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1139 (D. Colo. 2011).  The PSLRA requires that

---

[4] Defendants do not make arguments challenging (1) the materiality of the alleged false or misleading statements; (2) that statements were made in connection with the sale of securities; or (3) that Plaintiff's reliance on the statements.  The Court therefore will not analyze whether Plaintiff has sufficiently pled these elements of its § 10(b) claim.

> [i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> > (A) made an untrue statement of material fact; or
> >
> > (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).  A court must then evaluate whether "the facts alleged in a complaint . . . , taken as a whole, [ ] support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading."  *Adams*, 340 F.3d at 1099.  In applying this standard, the Tenth Circuit has directed courts to evaluate six factors:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Id.*  After considering these enumerated factors and "measuring the nature of the facts alleged against these indicia, [if] a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's

statements." *Id.*

    1.    <u>Statements Regarding the AMOS-8 Contract</u>

Plaintiff alleges that Defendants' statements regarding the AMOS-8 contract were false or misleading because they "gave the investing public the misleading impression that AMOS-8 was a definitive award." (¶¶ 116, 160.) Plaintiff contends that Defendants failed to disclose that, in reality: (1) the AMOS-8 contract was not effective until SSL received its first payment from Spacecom; (2) that Spacecom did not have financing in place to pay SSL to build AMOS-8 and was entirely reliant on future bond offerings to fund the satellite; and (3) the AMOS-8 contract included a provision that allowed Spacecom to withdraw from the deal within 60 days without penalty. (*Id.*)

Defendants argue that their statements regarding the AMOS-8 were true and that they never represented that the AMOS-8 was a "definitive award." (ECF No. 51 at 11.) They claim that Plaintiff "cannot point to a single fact to suggest that either party had any reservations about the success of the deal" when it was announced and that Plaintiff's allegations are mere "fraud by hindsight." (*Id.*)

Absent a duty to disclose, a corporation is not required to disclose a fact merely because a reasonable investor would like to know that fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). However, "at the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (emphasis in original); *United States v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013) (where a party "*elects* to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information" (emphasis in

original)).

The Court finds that the facts alleged in the Complaint, taken as a whole, support a reasonable belief that Defendants' statements regarding the AMOS-8 contract were misleading.  *See Adams*, 340 F.3d at 1099.  By the time Defendants made their March 26 and May 9, 2018 statements, the GEO satellite market had already deteriorated significantly.  In light of the fact that SSL had only won two GEO satellite awards in all of 2017 (¶ 85), the announcement of two new GEO satellite awards was a significant disclosure.  An investor could reasonably believe that Defendants' decision to announce the AMOS-8 contract—without also disclosing that there were financial contingencies and hurdles that could doom the project, and that Spacecom could withdraw without penalty from the contract for any reason within 60 days—was misleading.

Moreover, even assuming Defendants did not have any reservations about the success of the AMOS-8 deal at the time it was announced on March 26, 2018, the fate of the deal had surely been thrown into question before Defendants issued their May 9, 2018 statements.  On April 30, 2018, *Calcalist* had published an article titled "Israeli Government Intervention Likely to Void Deal with U.S. Satellite Contractor Loral." (¶ 120.)  That article raised two possible scenarios in which SSL would lose the AMOS-8 contract.  (*Id.*)  Nonetheless, Defendants continued to describe the AMOS-8 contract as a "notable booking" and "key accomplishment" without disclosing that the contract had significant contractual caveats that could allow SSL to be cut from the deal.  The Court therefore finds that the Complaint adequately pleads that Defendants' statements regarding the AMOS-8 contract were misleading.

22

2.     Statements Regarding the WorldView-4 Satellite

Plaintiff claims that Defendants' statements regarding WorldView-4's continued operational status and capabilities between October 31 and November 28, 2018 were false or misleading.  (¶¶ 149–51, 171–73.)  According to Plaintiff, these statements gave investors the impression that WorldView-4 was still a fully-functioning satellite "despite knowing that WorldView-4 had lost stability beginning no later than October 12, 2018."  (¶ 174.)

Defendants argue that their statements were not false or misleading when made because the component failure which rendered WorldView-4 inoperable did not manifest until months after October 12, 2018.  (ECF No. 51 at 13–15.)  The Court agrees.

Plaintiff's Complaint alleges that on October 12, 2018, the TLE data obtained from the SSN became "erratic and volatile as compared to its operational history, demonstrating that a loss of stability that has never been restored."  (¶ 148.)  However, Plaintiff does not plausibly allege that the CMGs have any impact on TLE data.  Nor does Plaintiff explain how or why the erratic TLE data should have alerted Defendants to the possibility that the CMGs would later fail.  To the contrary, Plaintiff acknowledges that "TLE data does not include the performance of individual components of the satellite, which is information known only to the Company."  (¶ 146.)

The Court finds that Plaintiff has failed to sufficiently allege particular facts from which a reasonable person would believe that Defendants' statements regarding WorldView-4's operational capacity were false or misleading when made.  Accordingly, Plaintiff's Section 10(b) claim is dismissed without prejudice to the extent it relies on

23

statements regarding the WorldView-4 satellite.[5]

3.   Maxar's Financial Statements and Statements Regarding Impairment

Plaintiff alleges that the specific reported dollar values of intangible assets, PP&E, inventory, and EPS were false when issued in Maxar's financial statements for the first and second quarters of 2018 because Maxar had overstated the value of the GEO satellite business by failing to take a timely impairment charge.  (¶¶ 161, 163–64, 166, 168–69.)  Defendants argue that Plaintiff's *post hoc* disagreement about the timing of Maxar's decision to take an impairment charge on its GEO satellite assets does not amount to fraud, and that Maxar's decision to take an impairment charge in the third quarter of 2018 does not render its financial statements in the first and second quarters of 2018 false.  (ECF No. 51 at 12.)  As the Ninth Circuit has explained,

> The fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false. . . . In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood.

*In re GlenFed, Inc. Sec. Litig*, 42 F.3d 1541, 1549 (9th Cir. 1994) (emphasis in original).

The Court agrees fully that Defendants' decision to take an impairment in the third quarter of 2018 does not automatically render its earlier financial statements false. However, this is not what Plaintiff alleges.  Plaintiff instead alleges specific facts concerning Maxar's underlying financial conditions, GEO satellite industry trends, and

---

[5]  Because Plaintiff has not adequately alleged that Defendants' statements regarding WorldView-4 were false or misleading when made, the Court need not address Defendants' remaining arguments relating to these statements.

other red flags suggesting that Maxar should have taken an impairment *prior to* the third quarter of 2018, which renders its earlier financial statements false.  (¶¶ 165, 170.)

Under IAS 36, Maxar was required to test for impairment if there were *any* indications of impairment present in the first or second quarters of 2018.  (¶¶ 33–34, 37.)  Indicators of impairment include: (1) "observable indications that the asset's value has declined during the period," (2) "significant changes with an adverse effect on the entity . . . in the technological, market, economic or legal environment in which the entity operates . . ." or changes which "include the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs," and (3) internal evidence suggesting that the economic performance of an asset is worse than expected.  (¶ 34.)

Plaintiff alleges that at the time Maxar issued its financial statements for the first quarter of 2018:

- global demand for GEO satellites had dropped over 20% each year for two years as a result of market saturation and technological shifts (¶¶ 60–61, 98);

- Maxar had conducted its largest ever layoffs of SSL employees (¶¶ 71–73);

- Lance had begun telling reporters that he no longer expected that the GEO satellite market would return to its previous levels (¶¶ 76–78, 82);

- Lance referred to the GEO satellite business as a "drag" on Maxar's finances that would "continue to negatively impact Maxar's revenue and earnings for years to come" (¶¶ 97, 103);

- Maxar had decided to slash its GEO manufacturing output capacity to save money on fixed costs (¶ 106); and

- Wirasekara informed investors that the GEO satellite market had declined by about 45% (¶ 102).

By the time Maxar announced its earnings for the second quarter of 2018, Spacecom had also missed two payments on the AMOS-8 satellite (¶¶ 123, 126), Maxar had terminated another 109 SSL employees (¶ 131), and Maxar began considering ways to "mitigat[e] its exposure to the GEO market"—including possibly "[e]xiting the GEO business altogether" (¶ 128).

For purposes of the Motion to Dismiss, the Court finds that Plaintiff has sufficiently alleged that Defendants' decision to neither test for impairment nor take an impairment in the first and second quarters of 2018 led to a false overstatement of Maxar's reported dollar values of intangible assets, PP&E, inventory, and EPS in its financial statements.  *See In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 955 (N.D. Cal. 2017) (finding plaintiffs adequately pled falsity for impairment determination where significant stock decline had taken place in prior quarters); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491–92 (S.D.N.Y. 2004) (plaintiffs adequately alleged that the financial statements were false where planes were losing substantial value and the company failed to recognize the impairment of that value); *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *7 (M.D. Tenn. Apr. 19, 2018) (finding plaintiff adequately alleged falsity in light of numerous red flags suggesting impairment was necessary).

**B.     Scienter**

To establish scienter, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter in this context requires "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness." *Adams*, 340 F. 3d at 1105 (internal quotation marks omitted). Recklessness is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (internal quotation marks omitted).

A court inquires "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The court "must take into account plausible opposing inferences." *Id.* However, it will not allow allegations of "fraud by hindsight," *i.e.*, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they did." *City of Philadelphia*, 264 F.3d at 1260.

1.     Statements Regarding the AMOS-8 Contract

Defendants argue that Plaintiff alleges insufficient evidence that "Lance or Wirasekara knew (or were reckless in not knowing) that their earlier statements about the agreement at the time it was executed were false or misleading." (ECF No. 51 at 16.) They further argue that there is "nothing suggesting that either Lance or Wirasekara *knew* that the AMOS-8 contract was 'illusory' at the time of the disclosures

27

at issue, that they *knew* that Spacecom would not obtain the necessary funding, or that they *knew* that the Israeli government would later decide to fund the project."  (*Id.* at 15–16 (internal citations omitted).)

Defendants may not at the time have known that the AMOS-8 contract would unravel; however, Plaintiff has adequately alleged that Defendants knew that the contract had significant contractual caveats—specifically that (1) the AMOS-8 contract was not effective until SSL received its first payment from Spacecom; (2) Spacecom did not have financing in place to pay SSL to build AMOS-8 and was entirely reliant on future bond offerings to fund the satellite; and (3) the AMOS-8 contract included a provision that allowed Spacecom to withdraw from the deal within 60 days without penalty.  (¶¶ 116, 160.)

Nonetheless, Plaintiff has failed to plausibly allege that there was a basis for Defendants to suspect that the AMOS-8 contract may fall apart when Defendants first announced the deal on March 26, 2018.  As a result, the Court concludes that Plaintiff has inadequately alleged that Defendants' March 26, 2018 statements, *at the time they were made*, were made recklessly, or with the intent to deceive, manipulate, or defraud.

However, by the time Defendants made statements regarding the AMOS-8 contract on May 9, 2018, the relevant contractual landscape had changed dramatically. By then, IAI had already announced that it was seeking to sign a contract directly with the Israeli government that would displace the SSL order, and *Calcalist* had published a news story indicating that Israeli government intervention was "likely to void" the AMOS-8 contract.  (¶¶ 118–20.)  This information significantly altered the chance that the AMOS-8 contract would fail, and it increased the potential danger that investors who

28

were not told about the financial contingencies in the contract would be misled.

Moreover, Lance and Wirasekara's own statements demonstrate that they had been actively monitoring the financial performance of SSL and trends within the GEO satellite industry.  (*See, e.g.*, ¶¶ 90, 98, 100–04, 106, 108.)  Given their close monitoring of the GEO satellite market and the low number of GEO satellite contracts actually awarded in a given year, it is reasonable to infer that Lance and Wirasekara had knowledge of the material terms and contingencies associated with the AMOS-8 contract.  *See Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1154 (D. Colo. 2019) (finding plausible scienter allegations based on statements where executives were personally involved in monitoring key financial metrics).

The Court finds that Plaintiff's allegations, taken together, give rise to a strong inference of scienter with regard to Defendants' May 9, 2018 statements about the AMOS-8 contract.  More specifically, the Complaint sufficiently alleges that Defendants acted recklessly in not disclosing the AMOS-8 contract's financial caveats and contingencies, given that their decision to present the AMOS-8 as a done deal presented a clear danger of misleading investors about the likelihood that the deal would go through, despite emerging evidence to the contrary.

2.    Maxar's Financial Statements and Statements Regarding Impairment

Defendants argue that Plaintiff has not pleaded facts that would suggest that the failure to take the impairment was done with the fraudulent intent to mislead investors. (ECF No. 51 at 16.)  They argue that, to the contrary, Defendants were transparent and consistent in their disclosures regarding the deteriorating values of the GEO satellite

assets throughout the Class Period.  (*Id.*)

It is well-established that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."  *City of Philadelphia*, 264 F.3d at 1261.  It is only where "such allegations are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim."  *Id.*; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (recognizing that "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness").

Plaintiff argues that its allegations establish that Defendants knew of, and ignored, numerous indicators of impairment when they issued their financial statements for the first and second quarters of 2018.  (ECF No. 57 at 14.)  It argues that it is Defendants' contemporaneous awareness of these indicators that gives rise to the strong inference of scienter.  *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007)  (finding inference of scienter where plaintiffs have "cited contemporaneous circumstances (none of which changed), of which [defendants] were aware, and which made their failure to take an earlier valuation allowance tantamount to conscious misbehavior"); *Davidco Inv'rs, LLC v. Anchor Glass Container Corp.*, 2006 WL 547989, at *17 (M.D. Fla. Mar. 6, 2006) (recognizing need to write-down was so apparent to the defendants that a "failure to take earlier write-downs amounted to fraud"); *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 321 F. Supp. 2d 1342, 1352 (N.D. Ga. 2004) (same).

The Court finds that Plaintiff's allegations, taken together, also give rise to a

strong inference of scienter with regard to Defendants' failure to take an impairment during the first and second quarters of 2018.  As explained above in Part III.A.3, among other things, by the first and second quarters of 2018 the GEO satellite market had declined by 45% without signs of recovery, SSL had conducted its largest-ever layoffs and slashed its manufacturing capacity, and Maxar was considering exiting the industry altogether.  (¶¶ 71–73, 76–78, 82, 102, 106, 128, 131.)  The number and severity of the red flags present during the first and second quarters of 2018 give rise to an inference of scienter sufficient to survive dismissal on a motion to dismiss.

Moreover, Maxar did not decide to conduct an impairment analysis on its own accord.  It only did so after its financial health and accounting practices were questioned by Spruce Point in its August 7, 2018 report.[6]  (¶¶ 11, 175.)  Maxar announced that impairment was possible less than three weeks later.  (¶ 179.)  When it finally announced impairment, it identified specific indicators of impairment that were supposedly not present in earlier reporting periods.  (¶ 188.)  Plaintiff's allegations, however, cast doubt on Defendants' own explanations as to why impairment was suddenly necessary in the third quarter of 2018:

> • Maxar represented that "[i]n the third quarter of 2018,
>   it became clear that industry and macroeconomic
>   factors had declined substantially from earlier

---

[6]  Defendants argue after the Spruce Point report was published, they "engaged outside experts, conducted a thorough investigation, and issued a [c]omprehensive [r]esponse."  (ECF No. 65 at 12.)  According to Defendants, this evidences a compelling inference that there was no fraud.  (*Id.*)  While the Court recognizes that Defendants did ultimately investigate whether impairment was required, they did not do so during the relevant time period for Defendants' allegedly fraudulent statements, *i.e.*, first and second quarters of 2018.  Moreover, Defendants' "comprehensive response" came *only after* their accounting decisions were publicly questioned and the market reacted negatively.  Thus, this evidence does not defeat Plaintiff's allegations and the corresponding strong inference of scienter at this stage of the litigation.

forecasts" and that it did not "expect the long-term outlook for the [GEO satellite] business to rebound significantly from current year award levels" (¶ 188; *but see* ¶¶ 98–99 (Lance admitted in March 2018 that GEO satellite revenues had decreased by 20% over the each of the prior years and that Maxar did not predict a recovery through 2020; ¶ 102 (Wirasekara recognized in March 2018 that the GEO satellite industry had declined 45%));

• Maxar stated that "it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8" (¶ 188; *but see* ¶ 120 (April 30, 2018 article suggesting that "Israeli Government Intervention Likely to Void Deal with [SSL]"); ¶¶ 123, 126 (Spacecom missed its first and second deadlines to make its initial payments for AMOS-8 in May and June 2018); ¶ 127 (Maxar deleted the AMOS-8 award from its webpage listing GEO awards in June 2018)); and

• Maxar alleged that "lower award volumes also contribute to reduce profitability from under-absorbed fixed indirect overhead costs" (¶ 188; *but see* ¶ 106 (in March 2018, Lance said that Maxar had decided to slash its own GEO manufacturing output capacity to save money on fixed costs)).

Defendants' explanations, as well as the size of the impairment taken—$383.6 million—give rise to a further inference of scienter that is at least as compelling as any inference to the contrary. *See In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d at 954–55 (finding adequate allegations of scienter based on lack of any explanation as to why, in just two months, Defendants recognized an impairment of the size claimed despite the absence of a significant intervening change in circumstances).[7]

---

[7] Plaintiff also alleges that Defendants were motivated to misstate the financial health of SSL and Maxar to avoid triggering a material adverse event under the terms of a October 2017 Credit Agreement.  (¶¶ 231–36.)  Although these allegations are not independently sufficient to

Accordingly, the Court finds that the Plaintiff's allegations regarding Maxar's first and second quarters of 2018, taken collectively, give rise to a strong inference of scienter.

**C.     Loss Causation**

"The securities laws are not meant to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) (internal quotation marks omitted).  A plaintiff must demonstrate that losses are "attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." *Id.*  On this element of a Section 10(b) claim, a plaintiff must only provide a short and plain statement of loss causation that gives the defendant fair notice of the claim and the grounds on which it rests.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); Fed. R. Civ. P. 8(a).

To plead loss causation, a plaintiff must allege that "corrective information was revealed and that this revelation caused the resulting decline."  *In re Williams*, 558 F.3d at 1140.  "Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops."  *Id.* at 1137.  However, "[t]o be corrective, the disclosure need not precisely mirror the earlier misrepresentation."  *Id.* at 1140.

---

establish scienter, *see City of Philadelphia*, 264 F.3d at 1269 (desire to maintain high credit ratings or raise capital is insufficient to raise inference of scienter), taken as a whole they serve to bolster the overall allegations of circumstantial evidence of scienter.

1.      Loss Causation Regarding the AMOS-8 Contract

Plaintiff has alleged two separate corrective disclosures regarding the AMOS-8 contract: (1) the Israeli Ministry of Science and Technology's September 3, 2018 announcement that the Israeli government intended to fund the development and construction of AMOS-8 in Israel (¶¶ 181–82, 212); and (2) Spacecom's September 25, 2018 filing with the Tel Aviv Stock Exchange in which it confirmed that it would not be making its down payment to Maxar under the AMOS-8 contract (¶ 183).

Defendants argue that the September 3, 2018 disclosure "did not correct any prior misstatements."  (ECF No. 51 at 24.)  As discussed above in Part III.A.I, Plaintiff has adequately alleged that Maxar's statements regarding the AMOS-8 were misleading as they failed to disclose key contractual provisions and contingencies.  The Court therefore finds that Plaintiff has adequately alleged loss causation with regard to the September 3, 2018 disclosure.  This disclosure signals that SSL and Spacecom's satellite would be displaced by IAI's satellite agreement with the Israeli government and that SSL's AMOS-8 contract was not guaranteed.  The disclosure was followed by a 5.5% decline of Maxar's stock price.  (¶ 182.)

Defendants further argue that Spacecom's September 25, 2018 statement is not corrective because the "public already knew that Maxar would not be building the AMOS-8."  (ECF No. 51 at 24.)  The Court disagrees.  Even assuming that the public "already knew" that Maxar was not building AMOS-8, it had not received confirmation that Spacecom would not pay its down payment, or that Spacecom was allowed to walk away from the deal without financial penalty.  *See West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 4838671, at *7 (D. Colo. Nov. 6, 2008) ("[L]oss

34

causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements." (quoting *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008))).  Moreover, the market reacted negatively to Spacecom's disclosure, and Maxar's stock dropped 4.7%.  (¶ 184.)

Accordingly, Plaintiff has alleged loss causation sufficient to survive dismissal at this stage of these proceedings.

2.      Loss Causation Regarding Impairment

Plaintiff alleges three corrective disclosures regarding Maxar's decision to take an impairment: (1) the August 7, 2018 Spruce Point Report; (2) Maxar's August 24, 2018 Press Release; and (3) Maxar's October 31, 2018 Form 6-K report.

a.      *August 7, 2018 Spruce Point Report*

Defendants argue the August 7, 2018 Spruce Point Report is legally insufficient to qualify as a corrective disclosure because it is based on publicly available information.  (ECF No. 51 at 22–23.)

Although the information in Spruce Point's report was derived from publicly-available information, Plaintiff has adequately alleged that the report reveals new information "in a practical sense."[8]  *Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,

---

[8] Defendants contend that Plaintiff's characterization of the Spruce Point report as "'corrective' notwithstanding the fact that it consisted solely of public information . . . flatly ignores the 'efficient market' theory upon which Plaintiff pleads its case."  (ECF No. 65 at 13.)  If the market had not reacted to the Spruce Road report, the Court would agree that the Spruce Point report was not corrective.  However, the Maxar's share price dropped 13.44% on August 7, 2018 (¶¶ 11, 176), a development from which one could reasonably infer that the market considered the Spruce Point report as containing new information.  *See Bricklayers & Trowel Trades Intern. Pension Fund v. Credit Suisse Sec. (USA) LLC,* 752 F.3d 82, 89 (1st Cir. 2014) ("once a misstatement or corrective disclosure is publicly known in an efficient market, courts will assume that the stock price reacts immediately").

2019 WL 2521834, at *7 (D. Colo. June 18, 2019) (analyst report revealed new information not reasonably available to ordinary market participants despite relying on public information); *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (recognizing that investment bank reports following newspaper articles could qualify as corrective disclosures); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (recognizing that "a short seller's report can constitute a corrective disclosure if the report reveals accurate information about a company that exposes actual misstatements by the company"); *In re Winstar Commc'ns*, 2006 WL 473885, at *12–15 (S.D.N.Y. Feb. 27, 2006) (plaintiffs adequately alleged loss causation based on a report by a short seller that the company had insufficient cash flow to fund its operations and would likely default on its credit obligations); *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *10 (C.D. Cal. Sept. 6, 2017) ("[T]he Court isn't willing to close the courthouse to any investor who was defrauded simply because the fraud was revealed by a short-seller—no matter how thorough the short-seller's research or how compelling the short-seller's conclusions.").

Accordingly, for purposes of the Motion to Dismiss, the Court finds that Plaintiff has adequately alleged that the Spruce Point report was a partial corrective disclosure which, when revealed, led to a 13.44% drop in Maxar's stock price.  (¶ 176.)

      b.    *Maxar's August 24, 2018 Press Release*

Defendants contend that Maxar's August 24, 2018 press release, which discloses that its Audit Committee was conducting a "thorough and independent review that addressed claims made by the hedge fund's report," cannot be a corrective

disclosure. (ECF No. 51 at 23.) In particular they argue that a company's investigation into allegations of fraud is in no way tantamount to an admission of fraud. (*Id.*)

The Court agrees that the August 24, 2018 press release would not qualify as a corrective disclosure if it merely announced an internal investigation. *See Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("[T]he commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b)" as it does not "reveal to the market that the company's previous statements were false or fraudulent."). This is not, however, what the press release announced. The press release informed investors, among other things, that

> [t]he Company expects that under certain . . . scenarios, non-cash write-downs or an impairment of assets could occur as a result of lower future revenue expectations, industry outlook and overall valuation of the GEO communications satellite line of business . . . We believe that, given the continued decline in the GEO satellite business, it is possible that an impairment or write-down will be recognized in the third quarter of 2018. However, our analysis is not complete and, accordingly, we are unable to estimate the amount of the possible impairment or write-down at this time.

(¶ 179.) Plaintiff has adequately alleged that this press release, which was followed by a further stock price drop of 5.6% (¶ 180), constituted a partial corrective disclosure. Although the press release does not state that Maxar's GEO satellite assets were impaired in earlier quarters, an investor could reasonably draw this inference. After all, the press release was issued less than a month after Maxar announced its second quarter results and cites many of the same factors present in prior quarters.

c.   *October 31, 2018 Form 6-K*

Defendants argue that the October 31, 2018 Form 6-K, which discloses that

Maxar had taken a $383.6 million impairment charge in the third quarter of 2018, is not

a corrective disclosure because it does not reveal that Maxar's accounting treatment for

the GEO satellite assets was incorrect in prior quarters.  (ECF No. 51 at 25.) The Court

disagrees.  Although the Form 6-K does not state that Maxar should have taken an

impairment in prior quarters, it does reveal that Maxar's GEO satellite assets were

impaired. *See In re Williams*, 558 F.3d at 1140 ("To be corrective, the disclosure need

not precisely mirror the earlier misrepresentation.")  This disclosure was followed by a

stock price drop of 44.9%.  (¶ 194.)

Accordingly, the Court finds that Plaintiff has adequately alleged loss causation

which provides Defendants fair notice of the claim and grounds upon which it rests.

*See Dura Pharm., Inc.*, 544 U.S. at 346.

**D.    Section 20(a) Claims**

Section 20(a) of the Exchange Act provides that

> Every person who, directly or indirectly, controls any person
> liable under any provision of this chapter or of any rule or
> regulation thereunder shall also be liable jointly and
> severally with and to the same extent as such controlled
> person is liable, unless the controlling person acted in good
> faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "[T]o state a prima facie case of control person liability, the plaintiff

must establish (1) a primary violation of the securities laws and (2) 'control' over the

primary violator by the alleged controlling person."  *City of Philadelphia*, 264 F.3d at

1270.

Defendants' argument to dismiss Plaintiff's Section 20(a) claim is derivative of

their Section 10(b) arguments.  As discussed above, the Court has dismissed Plaintiff's

Section 10(b) claim to the extent it arises out of statements made about the WorldView-4 satellite, as well as Defendants' March 26, 2018 statements regarding the AMOS-8 contract. The Court therefore also dismisses Plaintiff's Section 20(a) cause of action to the extent it arises out of these two specific bases.

## IV. CONCLUSION

For the reasons set for above, the Court ORDERS as follows:

1.    Defendants' Motion to Dismiss (ECF No. 51) is GRANTED IN PART AND DENIED IN PART.

2.    Defendants' Motion to Dismiss is GRANTED as follows:

    a.    Plaintiff's Sections 10(b) and 20(a) claims are DISMISSED WITHOUT PREJUDICE to the extent they relate to Defendants' statements regarding the WorldView-4 satellite; and

    b.    Plaintiff's Sections 10(b) and 20(a) claims are DISMISSED WITHOUT PREJUDICE to the extent they relate to Defendants' March 26, 2018 statements regarding the AMOS-8 contract;

3.    Defendants' Motion is DENIED in all other respects; and

4.    The parties are DIRECTED to jointly contact Magistrate Judge S. Kato Crew's chambers by no later than **September 15, 2020**  to set a Scheduling Conference, or such other proceedings as Judge Crews deems appropriate to move this action forward.

Dated this 11th day of September, 2020.

BY THE COURT:

_____

William J. Martinez
United States District Judge