## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA

      Defendants.

---

## DEFENDANTS' AMENDED ANSWER TO PLAINTIFF'S
## CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
## FEDERAL SECURITIES LAWS

---

Defendants' Maxar Technologies Inc. ("Maxar" or the "Company"), Howard L. Lance, and Anil Wirasekara (collectively, "Defendants"), by and through their undersigned counsel, hereby answer and respond to Plaintiff Oregon Laborers Employee Pension Trust Fund's ("Plaintiff") Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"). Unless otherwise stated, Defendants deny each and every allegation in the Amended Complaint. Defendants have included below headings and subheadings from the Amended Complaint for ease of reference only and do not construe them as requiring a separate response. To the extent that any heading or subheading is construed to contain allegations requiring a response, Defendants deny said heading or subheading.[1]

## PRELIMINARY STATEMENT

This case arises out of routine business challenges that Maxar faced in its efforts to acquire new business lines and integrate those business lines with existing operations. Far from supporting a claim for violations of the federal securities laws, Maxar's public filings contemporaneously disclosed these challenges to investors, including Plaintiff, in many of the same public filings that Plaintiff challenges in this case.

The Amended Complaint primarily focuses on Maxar's financial statements, which Plaintiff contends were false and misleading because the Company failed to take an impairment on certain business assets, *i.e.*, the "GeoComm business." But as a matter of public record, Maxar consistently disclosed the declining state of the GeoComm business. In fact, Defendants disclosed the very "indicators of impairment" on which Plaintiff relies in claiming that Maxar's financial statements were false or misleading during the Class Period. In any event, it is beyond dispute

---

[1] All responses in this Answer are made as of the date of its filing. Defendants reserve the right to amend and/or supplement any responses in this Answer to the extent Defendants receive or become aware of additional facts and/or evidence through discovery.

that the decision regarding whether – *and when* – to take an impairment of a business asset is complicated and it involves the exercise of accounting judgment. The financial statements at issue here were audited by a "Big Four" accounting firm, and to date, have never been restated. Moreover, when a well-known short seller issued a report suggesting that an impairment of the GeoComm business was imminent (one of the alleged "corrective disclosures" pled in this case), the Audit Committee – aided by the Company's independent auditor and outside subject matter experts – undertook a comprehensive review. At the conclusion of this review, the Company and its outside advisors determined, and Maxar publicly announced, that there were no material errors in the Company's financial statements and public disclosures. The fact that Maxar took an impairment months later does not amount to a violation of the federal securities laws. Plaintiff's allegations therefore amount to nothing more than "fraud by hindsight," which is impermissible as a matter of law.

In addition, Plaintiff claims that Maxar's public statements regarding a contract with Israeli satellite operator Spacecom to construct a satellite called AMOS-8 were false and misleading when made. Notably, the Company's March 26, 2018 statements concerning AMOS-8 were dismissed at the pleadings stage, leaving at issue only Defendants' May 9, 2018 statements about AMOS-8.[2] Contrary to Plaintiff's allegations, however, Defendants' statements regarding AMOS-8 were in fact *true* when made. Indeed, Maxar was selected to build AMOS-8, but due to subsequent geopolitical developments outside of Maxar's control (events which were disclosed to investors), the project was never completed. The fact that the contract ultimately fell through does not render

---

[2] The Court's September 11, 2020 Order (Dkt. No. 73) (the "MTD Order") also dismissed three alleged misstatements related to the Company's WorldView-4 satellite. (*Id*. at 39.) As a result, the Class Period now spans from May 9, 2018 to October 31, 2018.

2

Maxar's earlier statements about the Company's selection to build AMOS-8 (*e.g.*, the statements at issue here) false or misleading when made.

With the benefit of this context, Defendants hereby respond to each of the individual allegations set forth in the Amended Complaint, and advances their affirmative defenses as set forth below.

## INTRODUCTION AND OVERVIEW

1.      Defendants admit that the Amended Complaint purports to be a putative securities class action brought on behalf of purchasers of Maxar securities against Defendants, and that Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). To the extent any of the allegations in Paragraph 1 are pled in support of claims that were dismissed by the MTD Order, no response is required. Except as expressly admitted, Defendants deny the allegations in Paragraph 1.

2.      Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 2 and on that basis deny the allegations.

3.      Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 3 and on that basis deny the allegations.

4.      Defendants admit that Maxar is incorporated in Delaware, has its principal executive offices in Westminster, Colorado, and trades on the New York Stock Exchange and the Toronto Stock Exchange under the ticker symbol "MAXR." Defendants admit that Space Systems Loral ("SSL") manufactures geostationary communications satellites. Except as expressly admitted, Defendants deny the allegations in Paragraph 4.

5.      Defendants deny the topic sentence and the allegations in Part (a) and (b) of Paragraph 5. The allegations in Part (c) of Paragraph 5 are pled in support of claims regarding WorldView-4. As noted, the Court dismissed these allegations in the MTD Order. Accordingly,

3

Active/52642481.1

no response to the allegations in Part (c) of Paragraph 5 is required.  Except as expressly admitted, Defendants deny the allegations in Paragraph 5.

6.    Defendants admit that the market for satellites has undergone changes over the years prior to and during the Class Period.  Except as expressly admitted, Defendants deny the allegations in Paragraph 6.

7.    Defendants admit that the Company issued a press release on March 26, 2018 which stated in part that "Spacecom…operator of the AMOS satellite fleet, today announced it has chosen SSL, a Maxar Technologies company…to build it AMOS-8 advanced communications satellite." Defendants admit that the Company posted information concerning the AMOS-8 project on the @sslmda Twitter account on March 26, 2018 which stated in part: "2018 is off to a great start for SSL with two contracts to build GEO satellites announced today. Thank you B-SAT and Spacecom for placing your trust in SSL."  Defendants admit that on May 9, 2018, during the first quarter 2019 ("1Q18") Earnings Call, Mr. Lance stated in part: "Israeli satellite operator Spacecom selected SSL to build the AMOS-8 satellite. This will deliver state-of-the-art broadcast, broadband, and data services from its 4-degree West hotspot to Europe, Africa, and the Middle East. AMOS-8 will include flexible, high-powered Ku-Band and Ka-band payloads with steerable antennas to enable Spacecom to deliver a number of value-added services."  Except as expressly admitted, Defendants deny the allegations in Paragraph 7.

8.    Defendants admit that on May 9, 2018, the Company filed 1Q18" financial results with the Securities and Exchange Commission ("SEC") and Canadian Securities Administrators. Defendants admit that these filings reported that the Company's net assets included $1.692 million of intangible assets, $100.5 million in inventories, $1.066 million in Property, Plant, & Equipment

4

("PP&E"), earnings as $31 million and net earnings-per-share ("EPS") as $0.55.  Except as expressly admitted, Defendants deny the allegations in Paragraph 8.

9.    Defendants admit that on July 31, 2018, the Company filed its second quarter 2018 ("2Q18") financial results with the SEC and Canadian Securities Administrators.  Defendants admit that these filings reported that the Company's net assets included $1.673.4 million of intangible assets, $95.3 million in inventories, $1.060 million in PP&E, net losses of $18.6 million and a net loss per share of $0.33.  Except as expressly admitted, Defendants deny the allegations in Paragraph 9.

10.    Defendants deny the allegations in Paragraph 10.

11.    Defendants admit that Spruce Point Capital Management, LLC ("Spruce Point") published a report dated August 7, 2018.  Defendants admit that Slide 60 of the Spruce Report is titled, "Asset Impairment Likely" and states, in part, "Maxar's balance sheet is inflated with goodwill and overcapitalized intangible assets.  We expect it will write down the value of these inflated assets by at least $2.24 billion to fair value after its evaluation of strategic alternatives results in no means to maximize value."  Defendants admit that Maxar issued a press release on August 7, 2018, and that the press release states, in part, "The report…released today by Spruce Point Capital Management contains a number of inaccurate claims and misleading statements." Defendants admit that the Company's stock closed at $44.41 on August 6, 2018, and $38.44 on August 7, 2018, with a reported volume of 2,884,900 shares.  Defendants deny the remaining allegations in Paragraph 11.

12.    Defendants admit that the Company issued a press release on August 24, 2018 and that the press release states, in part,

> Specifically, the [audit] committee conducted a thorough and independent review that addressed claims made by the hedge fund's report prior to issuing this response.

5

> The audit committee conducted its review with the assistance of external advisors including its independent auditor, KPMG LLP, and independent third-party subject matter experts.
> …
> However, our analysis is not complete and, accordingly, we are unable to estimate the amount of the possible impairment or write-down at this time.

Defendants admit that the Company's stock closed at $34.15 on August 23, 2018, and $33.92 on August 24, 2018, with a reported volume of 912,000 shares. Defendants deny the remaining allegations in Paragraph 12.

13.     Defendants admit that in September 2018, *The Jerusalem Post* published an article titled, "Israel to Subsidize New Home-Grown Communications Satellite" that stated in part: "The government will subsidize the development and construction of a new Israeli-built communication satellite, the Science and Technology Ministry announced on Monday." Defendants admit that on September 25, 2018, *Space News* published an article titled, "Spacecom Cancels Amos-8 Contracts with SSL and SpaceX" that stated in part: "Spacecom notified the Tel Aviv Stock Exchange that it would not be making an Amos-8 down payment that was due Sept. 25, rendering the manufacturing agreement with SSL null." Except as expressly admitted, Defendants deny the allegations in Paragraph 13.

14.     Defendants admit that the Company recognized a $383.6 million charge during the third quarter of 2018 ("3Q18"). Defendants admit that Maxar filed a Form 6-K with the SEC on October 31, 2018 and that Form 6-K stated:

> **Impairment of Non-Financial Assets**
> Non-financial assets are tested annually for impairment in the fourth quarter or whenever there is an indication that an asset may be impaired. Non-financial assets that do not generate independent cash flows are grouped together into a cash generating unit ("CGU"), which represent the level at which largely independent cash flows are generated. An impairment loss is recognized in earnings to the extent that the carrying value of an asset, CGU or group of CGUs exceeds its recoverable amount. Impairment is first evaluated by management at the CGU level, absent allocated goodwill.

6

The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS-8 satellite, a key program with the Israeli government. By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds. For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.

In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed. In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels. Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

The aggregation of the above factors resulted in an impairment trigger being identified as at August 31, 2018 at the GeoComm CGU. The Company first performed an impairment test of the GeoComm CGU. The impairment test of the GeoComm CGU evaluated the non-financial assets held by the Company based on an asset group level, absent allocated goodwill. Assets were aggregated to the level in which independent cash flows could be generated for their respective groupings. The carrying values of these asset groups were compared against their fair value less costs of disposal for possible impairment and an impairment loss of $345.9 million related to property, plant and equipment and intangible assets was recorded for the three months ended September 30, 2018.

Goodwill is tested annually in the fourth quarter or whenever there is an indication that an asset may be impaired. The Company performs its goodwill impairment testing based on three groups of Cash Generating Unit's ("CGU's") representing its three operating segments as this is the lowest level at which management monitors goodwill. The GeoComm CGU represents a material portion of the Space Systems segment, and as such, the Company identified an indicator of goodwill impairment

Active/52642481.1

at the Space Systems segment. The Space Systems segment is comprised of multiple CGU's, which include the GeoComm CGU, Smallsat CGU and numerous CGU's within the MDA Canada business. The goodwill impairment test yielded no impairment, as the fair value of the Space Systems segment exceeded its carrying value by 87%.

Except as expressly admitted, Defendants deny the allegations in Paragraph 14.

15.    The allegations in the last sentence of Paragraph 15 regarding WorldView-4 are pled in support of claims that were dismissed by the MTD Order, and no response is required. Except as expressly admitted, Defendants deny the remaining allegations in Paragraph 15.

16.    The allegations in Paragraph 16 regarding WorldView-4 are pled in support of claims that were dismissed by the MTD Order, and no response is required. Except as expressly admitted, Defendants deny the allegations in Paragraph 16.

17.    Defendants deny the allegations in Paragraph 17.

**JURISDICTION AND VENUE**

18.    The allegations in Paragraph 18 constitute a conclusion of law to which no response is required. To the extent a response is required, Defendants admit that the Amended Complaint purports to assert claims for violations of Section 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and that jurisdiction over the Exchange Act clams is conferred by Section 27 of the Exchange Act. Defendants deny the allegations in Paragraph 18 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims.

19.    Defendants admit that venue is proper in this district. Defendants deny the allegations in Paragraph 19 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims.

20.    The allegations in Paragraph 20 constitute a conclusion of law to which no response is required. To the extent a response is required, Defendants admit that the Amended Complaint purports that Defendants used means and instrumentalities of interstate commerce in connection

8

with the acts alleged in the Amended Complaint. Defendants deny the allegations in Paragraph 20 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims.

## PARTIES

21.     Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 21 and on that basis deny the allegations.

22.     Defendants admit that Maxar is a Delaware corporation headquartered in Westminster, Colorado. Defendants admit during the Class Period, Maxar consisted of four business units: MacDonald, Dettwiler & Associates Ltd. ("MDA"), SSL, DigitalGlobe, and Radiant Solutions. Defendants admit that MDA was founded in 1969. Defendants admit that MDA acquired SSL in 2012. Defendants admit that MDA acquired DigitalGlobe in October 2017. Defendants admit that MDA was renamed Maxar Technologies Ltd. Defendants admit that effective December 31, 2017, the Company changed its presentation currency from the Canadian dollar to the United States dollar, and relocated its headquarters to DigitalGlobe's offices in Colorado. Defendants admit that Maxar incorporated under the laws of the State of Delaware in January 2019. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 22 and on that basis deny the allegations.

23.     Defendants admit that Mr. Lance served as the Company's President and Chief Executive Officer between May 2016 and January 2019. Defendants admit that Mr. Lance entered into an agreement pursuant to which he agreed to provide consulting services to the Company until January 2020. Defendants admit that Mr. Lance participated on certain Company earning calls. Defendants admit that Mr. Lance certified certain statements filed with the SEC. These certifications speak for themselves. The allegations in the last sentence of Paragraph 23 constitute a conclusion of law to which no response is required. To the extent a response is required,

9

Active/52642481.1

Defendants admit that the Amended Complaint purports that Mr. Lance had ultimate authority and control over the Company's public statements, including the contents of regulatory filings, and whether and how to communicate contents of the filings to the investing public. Defendants deny the allegations in the last sentence of Paragraph 23 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims. Except as expressly admitted, Defendants deny the allegations in Paragraph 23.

24.     Defendants admit that Mr. Wirasekara served as the Company's Interim Chief Financial Officer ("CFO") between February 26, 2018 and August 15, 2018, and as CFO of MDA from 1994 to October 2017. Defendants admit that Mr. Wirasekara participated on certain Company earnings calls. Defendants admit that Mr. Wirasekara certified certain statements filed with the SEC. Defendants admit that Mr. Wirasekara's professional affiliations include the Chartered Institute of Management Accountants (United Kingdom), The Society of Management Accountants of British Columbia, and the Institute of Chartered Accountants (Sri Lanka) and that Mr. Wirasekara is a graduate of the Chartered Institute of Marketing and Management (United Kingdom). The allegations in the last sentence of Paragraph 24 constitute a conclusion of law to which no response is required. To the extent a response is required, Defendants admit that the Amended Complaint purports that Mr. Wirasekara had ultimate authority and control over the Company's public statements, including the contents of regulatory filings, and whether and how to communicate contents of the filings to the investing public. Defendants deny the allegations in the last sentence of Paragraph 24 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims. Except as expressly admitted, Defendants deny the allegations in Paragraph 24.

**IFRS PROVISIONS REGARDING ASSET IMPAIRMENT**

25.    Defendants admit that during the Class Period, Maxar prepared, reported, and certified its consolidated financial statements in accordance with International Financial Reporting Standards ("IFRS").    Defendants admit that pronouncements issued by the International Accounting Standards Board's ("IASB") predecessor are designated "International Accounting Standards" ("IAS"), which were adopted by IASB and are applicable under IFRS.  Except as expressly admitted, Defendants deny the allegations in Paragraph 25.

**IFRS: Purpose and Scope (IAS 1)**

26.    Defendants admit that IAS set forth standards for preparation of general purposes financial statements.  Defendants admit that Plaintiff purports to quote IAS 1.1, 1.2, 1.7 and 1.9. IAS 1.1, 1.2, 1.7 and 1.9 speak for themselves.  Except as expressly admitted, Defendants deny the allegations in Paragraph 26.

27.    Defendants admit that Plaintiff purports to quote IAS 1.15.  IAS 1.15 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 27.

28.    Defendants admit that Plaintiff purports to quote IAS 1.16.  IAS 1.16 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 28.

**IFRS: Impairments of Intangible Assets
and Property, Plant, and Equipment (IAS 36)**

29.    Defendants admit that the intangible assets attributed to the Company's GeoComm business consisted of, among other things, technologies, software, trade names, and customer relationships.  Defendants admit that the Company acquired SSL in 2012.  Defendants further admit that Maxar issued a Form 6-K press release on August 24, 2018.  The Form 6-K stated in part:

11

Active/52642481.1

> The Company capitalizes certain internally developed technology as intangible assets under IFRS.  Under GAAP, certain of these expenditures on internally developed technology will be accounted for as period expenses.  The Company capitalized approximately $56 million of these expenditures in 2017 and expects to capitalize approximately $60 million in 2018 under IFRS.  The vast majority of these expenses relate to projects in the GEO communications satellite line of business, such as digital payload, electric propulsion and roll-out solar array development programs, and are reported in the Space Systems segment.  The Company expects that future development expenses for GEO communications satellites will be significantly lower, thereby reducing the impact on future EBITDA differences between IFRS and GAAP. . . . As more fully discussed below, the Company does not expect a significant near-term recovery for the GEO communications satellite market, which continues to see weak demand. Declining revenues in the GEO communications satellite line of business and RCM program have continued to offset solid revenue growth elsewhere in the segment. . . . The Company is exploring strategic alternatives regarding the future of its GEO communications satellite line of business and has continuously implemented actions to right size the business to maximize near-term profitability.

Defendants deny the allegations in Paragraph 29.

30.    Defendants admit that the PP&E of the GeoComm business consisted of, among other things, land and land improvements, buildings, leasehold improvements, testing equipment, vehicles, computer hardware, and furniture and fixtures.  Defendants admit that in its Audited Annual Financial Statements for 2012, the Company reported $301,814 (in thousands) in PP&E from its acquisition of SSL.  Except as expressly admitted, Defendants deny the allegations in Paragraph 30.

31.    Defendants admit that during the Class Period, Maxar's accounting treatment and evaluation of the GeoComm intangible assets and PP&E were generally governed by IAS 36, *Impairment of Assets.*

32.    Defendants admit that Plaintiff purports to quote IAS 36.1.  IAS 36.1 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 32.

12

33.     Defendants admit that Plaintiff purports to quote IAS 36.8 and 36.9.  IAS 36.8 and 36.9 speak for themselves.  Except as expressly admitted, Defendants deny the allegations in Paragraph 33.

34.     Defendants admit that Plaintiff purports to quote IAS 36.12.  IAS 36.12 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 34.

35.     Defendants admit that Plaintiff purports to quote IAS 36.13.  IAS 36.13 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 35.

36.     Defendants admit that Plaintiff purports to quote IAS 36.14.  IAS 36.14 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 36.

37.     Defendants admit that Plaintiff purports to summarize IAS 36.  IAS 36 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 37.

38.     Defendants admit that Plaintiff purports to quote IAS 36.6 and 36.55.  IAS 36.6 and 36.55 speak for themselves.  Except as expressly admitted, Defendants deny the allegations in Paragraph 38.

39.     Defendants admit that Plaintiff purports to quote IAS 36.22 and 36.6.  IAS 36.6 and 36.22 speak for themselves.  Except as expressly admitted, Defendants deny the allegations in Paragraph 39.

40.     Defendants deny the allegations in Paragraph 40.

**IFRS: Impairment of Inventories (IAS 2)**

41.     Defendants admit that Plaintiff alleges that during the Class Period IFRS standard IAS 2, *Inventories*, governed the Company's accounting treatment and testing of its inventories. IAS 2 speaks for itself.  Defendants admit that the inventories of the GeoComm business consisted

13

of, among other things, materials, components, and supplies used in satellite construction.  Except as expressly admitted, Defendants deny the allegations in Paragraph 41.

42.    Defendants admit that Plaintiff purports to quote IAS 2.9.  IAS 2.9 speaks for itself. Except as expressly admitted, Defendants deny the allegations in Paragraph 42.

43.    Defendants admit that Plaintiff purports to quote IAS 2, 2.28 and 36.  IAS 2, 2.28 and 36 speak for themselves.  Except as expressly admitted, Defendants deny the allegations in Paragraph 43.

44.    Defendants admit that Plaintiff purports to summarize IAS 2 and 2.30.  IAS 2 and 2.30 speak for themselves.  Except as expressly admitted, Defendants deny the allegations in Paragraph 44.

45.    Defendants admit that Plaintiff purports to summarize IAS 2.34.  IAS 2.34 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 45.

**IFRS: Events After the Reporting Period (IAS 10)**

46.    Defendants admit that Maxar was required each quarter during the Class Period to consider events after the reporting period that could impact the accuracy of its financial statements and disclosures.  Except as expressly admitted, Defendants deny the allegations in Paragraph 46.

47.    Defendants admit that during the Class Period, the Company's accounting and disclosures for events that occurred after the reporting period were governed by IAS 10, *Events after the Reporting Period*.  IAS 10 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 47.

48.    Defendants admit that Plaintiff purports to quote IAS 10.3.  IAS 10.3 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 48.

49.    Defendants deny the allegations in Paragraph 49.

14

50.    Defendants admit that Plaintiff purports to quote IAS 10.9.  IAS 10.9 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 50.

51.    Defendants deny the allegations in Paragraph 51.

52.    Defendants admit that Plaintiff purports to quote IAS 10.19.  IAS 10.19 speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 52.

53.    Defendants deny the allegations in Paragraph 53.

## EVIDENCE OF IMPAIRED GEOCOMM ASSETS

**Space Systems Loral and the Global GeoComm Market**

54.    Defendants admit that SSL designs and manufactures satellites.  Except as expressly admitted, Defendants deny the allegations in Paragraph 54.

55.    Defendants admit that allegations in Paragraph 55 are generally true.  Except as expressly admitted, Defendants deny the allegations in Paragraph 55.

56.    Defendants admit that SSL builds geostationary communications satellites for commercial services including, among other services, direct-to-home television, video content distribution, broadband internet, and mobile communications.  Defendants lack knowledge or information sufficient to admit or deny the allegations in the last sentence of Paragraph 56 and on that basis deny the allegations.  Except as expressly admitted, Defendants deny the allegations in Paragraph 56.

57.    Defendants admit that certain of SSL's GEO contracts are valued above a hundred million dollars and that the business of building and operating imaging satellites is capital intensive.  Except as expressly admitted, Defendants deny the allegations in Paragraph 57.

58.    Defendants admit that SSL was not awarded GEO Satellite, LEO Satellite, or Other Spacecraft contracts in 2002.  Defendants admit that SSL filed for bankruptcy in 2003 and emerged

15

from bankruptcy in 2005.  Defendants admit that on July 21, 2013, *Via Satellite* published an article titled "Loral Looks Beyond Bankruptcy."  The article states, in part:

> Onerous obstacles faced by Loral, according to its officials, include:
>
> - Overcapacity in the existing global satellite universe that created a severe drought in new satellite orders;
> - A collapse of the capital markets that hampered the ability of many Loral customers to raise capital for planned projects and hindered the company's own plans to raise capital; and
> - Significant reductions in FSS demand from telecommunications providers, particularly from Internet-related companies.

Except as expressly admitted, Defendants deny the allegations in Paragraph 58.

59.    Defendants lack knowledge or information sufficient to admit or deny the allegations in the first sentence of Paragraph 59 and on that basis deny the allegations.  Defendants admit that MDA acquired SSL in 2012 for approximately $1.1 billion in cash, dividends, and other payments. Defendants admit that in its Audited Financial Statements for 2012, the Company reported $318,717 (in thousands) in definite life intangible assets from its acquisition of SSL. Defendants admit that SSL was awarded nine GEO Satellite awards in 2014.  Except as expressly admitted, Defendants deny the allegations in Paragraph 59.

60.    Defendants admit that the GEO market declined in 2015 and 2016.  Defendants admit that SSL was awarded five GEO awards in 2015 and four GEO awards in 2016.  Except as expressly admitted, Defendants deny the allegations in Paragraph 60.

61.    Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 61 and on that basis deny the allegations.

62.    Defendants admit that Mr. Lance made remarks during a November 2016 earnings call.  Defendants admit that Mr. Lance stated in part:

> Order activity for the industry in total is at 12 GEO satellites year-to-date with 4 awards to SSL. We now believe 2016 will likely be on par with 2015 at around 16

16

satellite orders for the industry. The overall market remains below historic averages for the second year as satellite operators delay awards to consider competing technologies and to assess regional excess capacity and their profitability issues. But we remain bullish on the long-term health of the satellite industry where new orders will include replacement satellites as well as those to serve increasing customer demands. We continue to invest in next-generation technology and capabilities to serve these markets.

Except as expressly admitted, Defendants deny the allegations in Paragraph 62.

63.    Defendants admit that Mr. Lance responded to questions from analysts during a November 2016 earnings call.  Defendants admit that during a November 2016 earning call, in response to a question from an analyst at BMO Capital Markets Equity Research, Lance replied in part:

So we're certainly focused on revenue, but I think our real focus is maintaining adequate levels of EBITDA through this cycle. We've seen now the second year in a row where the market is below where it normally is. We think it's going to spring back. I wish I could call that recovery for you more precisely. At this point we're saying 2017 or 2018, but we know that there is demand that's starting to back up and we believe at some point that's going to be released. So I think if we could maintain solid profitability through the bottom of the cycle, I think we'll see nice leverage on the way up as we start growing again.

Except as expressly admitted, Defendants deny the allegations in Paragraph 63.

64.    Defendants admit that Mr. Wirasekara made remarks during a November 2016 earnings call.  Defendants admit that Mr. Wirasekara stated in part:

In the Communications segment, revenues this quarter were $355 billion -- $355 million compared to $384 million for the same period in 2015. Revenues were negatively impacted by the lower number of satellite contracts awarded over the last 18 months and consequently, by the lower number of active satellite programs in the higher revenue-generating stage of the program cycle as compared to a year ago. We expect this trend to continue for the next few quarters until satellite order intake levels return to near-historical averages.

Except as expressly admitted, Defendants deny the allegations in Paragraph 64.

17

65.    Defendants admit that Mr. Lance responded to questions from analysts during a

May 2017 earnings call.  Defendants admit that during an earnings call in May 2017, an individual

from National Bank Financial, Inc., Research Division asked:

> Yes. In your opening statements, you talked about the operators taking some time
> to make decisions here. How much do you think that has to do with them taking
> time here to evaluate some of the new technologies? And I guess related to that, if
> they are doing that, how are those new technologies change your -- or potentially
> change your revenue model for the business going forward?

Defendants admit that Lance replied:

> Yes, I think that there is a couple dimensions to this. But largely, it has to do with
> operators trying to predict supply and demand in the market during the life of the
> next satellite that they want to buy. So replacement satellites are going to be less of
> an issue. The issue is around new satellites with added capacity. And so the business
> models are closely evaluating what's the impact of a LEO constellation. What's the
> impact of a very large or multiple large high-throughput satellites that may be
> launched and have a much lower cost per gigabit? And how will my satellite
> configuration in my region compete with those? So I think it's -- that would be the
> way you should think about the work that's going on. And because these
> technologies are so new, the LEO, large constellation in comms, very new, hard to
> put in precise terms what will be the competitive advantage or not versus the
> traditional GEO approach. And then the very large high-throughput satellite
> alternative. So I just think they are being cautious with their CapEx because they're
> making essentially an 18-year commitment, 3 years to build the satellite and 15
> years to operate it, and they're trying to get a feel for the trends. And in my view,
> they're waiting kind of as long as they can. But at some point, replacement satellites
> will have to go in orbit, and we absolutely expect that to pick up. It's also causing,
> though, some of the new operators who have entered the market over the last 5
> years and are now thinking about their follow-on satellite orders to work through
> all of that. So it's a pretty complex business planning challenge that our customers
> have. We've not been able to predict this very well. Nor has anyone else in the
> market. All of the consultants have also continued to kind of fall short. But we've
> just entered around the last 3 months of detailed discussions with our customers
> and are feeling still very positive about the long-term opportunity in the market,
> given that we expect to rebound from a pretty low level. Having said that, as we've
> commented earlier on the call, we are diversifying this business. And ultimately,
> we want a business that is a satellite manufacturer for lots of different markets,
> customers and types of satellites so that we're less dependent just on the GEO comm
> piece.

Except as expressly admitted, Defendants deny the allegations in Paragraph 65.

18

66.    Defendants admit that MDA issued a press release in February 2017 and announced that it entered into a definitive merger agreement, pursuant to which MDA will acquire DigitalGlobe for US $35.00 per share in a combination of cash and stock.  The transaction values DigitalGlobe at an equity value of approximately C $3.1 billion (US $2.4 billion), and an enterprise value of C $4.7 billion (US $3.6 billion), including assumption of DigitalGlobe's C $1.6 billion (US $1.2 billion) in net debt.  The transaction has been unanimously approved by the boards of directors of both companies, and is expected to close in the second half of 2017.  Defendants admit that Mr. Lance made remarks about the DigitalGlobe acquisition at a later point in time, as addressed below.  Except as expressly admitted, Defendants deny the allegations in Paragraph 66.

67.    Defendants admit that MDA completed the acquisition of DigitalGlobe in October 2017, at which time the Company rebranded itself as Maxar Technologies, Ltd. and adopted the stock ticker "MAXR" on the NYSE and TSX.  Defendants admit that the Company announced plans to reorganize its corporate and operating structure to ensure that the parent of DigitalGlobe was incorporated in the U.S. by the end of 2019.  Except as expressly admitted, Defendants deny the allegations in Paragraph 67.

68.    Defendants admit that the DigitalGlobe acquisition increased Maxar's intangible assets and the PP&E reported on its balance sheet.  Defendants admit that in its consolidated financial statements for the year ended December 31, 2016, the Company reported PP&E of $360 million, and intangible assets of $331.6 million.  Defendants admit that in its consolidated financial statements for the year ended December 31, 2017, the Company reported PP&E of $1.054.9 billion, and intangible assets of $1.753.4 billion.  Except as expressly admitted, Defendants deny the allegations in Paragraph 68.

19

69.     Defendants admit that in its consolidated financial statements for the year ended December 31, 2016, the Company reported $600.7 million in long-term debt.  Defendants admit that in the Company's consolidated financial statements for the year ended December 31, 2017, the Company reported $2.961 billion in long-term debt.  Defendants further admit that on March 8, 2018, the Company stated that "[d]eleveraging remains the primary objective as **100% of excess FCF** is used to pay down debt and **keep leverage well below current covenants**."  Except as expressly admitted, Defendants deny the allegations in Paragraph 69.

**Early Indicators of Impairment:**
**GeoComm Restructuring Project**

70.     Defendants admit that the Company filed a Form 6-K with the SEC on February 22, 2018.  Defendants admit that according to the Form 6-K, the Company spent $17.4 million in 2017 on a "restructuring project" initiated "[i]n response to changes in the geostationary communications satellite market" and of that amount, $5.5 million was spent on consulting fees and $11.9 million on employee severance.  Defendants admit that in 2016, the Company reported no material GEO consulting fees, and $3.6 million on severance in the GEO business.  Defendants admit that the Company retained management consulting firm Bain & Co. in 2017.  Except as expressly admitted, Defendants deny the allegations in Paragraph 70.

71.     Defendants admit that SSL laid off 161 employees in February 2017.  Defendants lack knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 71 and on that basis deny the allegations.

72.     Defendants admit that SSL laid off 173 employees in June 2017.  Defendants admit that on June 22, 2017, *Space News* published an article titled, "Lack of satellite orders triggers layoffs at Space Systems Loral."  Defendants admit that *SpaceNews* reported that "Space Systems Loral has laid off a number of employees at its California satellite manufacturing facility" and that

20

"SSL has not announced an order for a commercial geostationary communications satellite since July 2016." Defendants admit that the article states that "in a statement to *SpaceNews*, SSL president John Celli stated 'We have seen an extended slowdown in orders for GEO satellites across the industry . . . . With fewer satellites coming into the factory we have to make reductions to remain competitive.'" Except as expressly admitted, Defendants deny the allegations in Paragraph 72.

73.    Defendants admit that SSL laid off 334 employees in 2017, 122 employees in 2016, and 90 employees in 2015. Defendants lack knowledge or information sufficient to admit or deny the allegations regarding layoffs in 2014. Except as expressly admitted, Defendants deny the allegations in Paragraph 73.

74.    Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 74 and on that basis deny the allegations.

75.    Defendants admit that *Space News* published an article in June 2017 that stated that "John Celli retired as president of Space Systems Loral", that Celli was president of the spacecraft manufacturing company for 11 years, that he worked at SSL for 36 years in total, and that "MDA appointed Dario Zamarian, an operating adviser at the private equity firm Blackstone, as group president." Except as expressly admitted, Defendants deny the allegations in Paragraph 75.

76.    Defendants deny the allegations in Paragraph 76.

77.    Defendants admit that during the July 28, 2017 earnings call, an analyst asked:

Great. And then just following on Richard's question. There's obviously a lot of changes that are going on in the industry right now. Can you just talk about what you see as the biggest near-term opportunity for MDA SSL and then longer term in terms of the satellite market?

Defendants admit that Mr. Lance responded:

21

Well, I don't know that any one opportunity jumps out. Obviously, the ability to close on the order that we've been selected for is very important just in terms of not only the scale but what it will allow us to do in driving some new technologies that we think will port well across lots of other proposals. We just remain focused on trying to be very, very close partners with our customers. And they're going through a path where they're trying to figure out what's the answer, and I'm very pleased that they've engaged us more often than not to help them figure it out. But I don't think of any one major catalyst there. I think that we will see the market gradually rebound. I don't know that it will ever get back to 22 satellites a year, but as I said earlier, the question is less around numbers and from our standpoint, more around the dollars. So booking a $500 million Canadian satellite is like booking about 3 kind of, of the average satellites. So the quantity probably becomes less important. The capacity in on-orbit is what's going to be important. And I would say what happens with LEO is probably -- will make a difference from a standpoint of if 1 or 2 other companies decide to invest in major LEO constellations and we're involved in 1 of those as a prime, obviously, that would be a huge step-up multi-year program because, as you know, the life of the LEO satellites is much lower. So that's kind of the way I look at it. Hopefully, that's added enough color to your question.  All right. Well, thank you very much for joining us this morning on the call. Have a good day.

Except as expressly admitted, Defendants deny the allegations in Paragraph 77.

78.    Defendants admit that on August 8, 2017, Mr. Lance presented at the Jeffries

Global Industrials Conference in New York City.  Defendants admit that an attendee asked:

I have a question on the SSL business - just a question on the SSL business. As we all know, the commercial satellite CapEx outlook has been a little bit soft. Just wondering, given that side of the business has lower margin, higher fixed costs, as the market stayed soft or potentially softens further, how much room is there to cut cost or how should investors think about it if they come into margin really down?

Defendants admit that Mr. Lance responded:

Well, I think there are several elements to that. Number one, the diversification of SSL going forward is the key to, it continuing to be viable, to grow again and to contribute profits to the Corporation. The way we currently report, we only report the communication satellites in the Communications segment. The rest of SSL is reported in the other segment. So, we're going to be looking at a segmentation going forward and whether that's the best way to do it.

But we're not counting on a huge rebound in the commercial communications market.  Our growth is going to come from the remote sensing satellites we're going to build and from the U.S. government satellites. Now, if we get a rebound, we'll

22

benefit from that, but I'm not counting on it. I think that we will see a recovery, but we're going to plan pretty conservatively.

And as a result, we've really right-sized the workforce there for the current level of business. We've had two reductions enforced in 2017. So, that's why while the revenue is down that business continues to contribute nicely to our profitability. But going forward, will that part of the business be a growth engine? I think remains to be seen. I still believe 2018 and 2019 will be above 2017, but we're not going to take that for granted and we're driving hard on the diversification. Thank you.

Except as expressly admitted, Defendants deny the allegations in Paragraph 78.

79.    Defendants admit that certain Maxar representatives attended the World Satellite Business Week conference in Paris, France in September 2017, including SSL President Dario Zamarian.  Except as expressly admitted, Defendants deny the allegations in Paragraph 79.

80.    Defendants admit that during a November 2, 2017 earnings call Mr. Lance stated in part:

"The Communications segment revenue was 18% lower than the prior year period, highlighting the continuing weakness in the GEO concept markets."  Defendants admit that Mr. Lance further stated in part: "While we continue to forecast a modest uptick in industry awards in 2018 and 2019, due to the needs to replace aging GEO satellites, the total market is unlikely to return to historic levels. This is due to the amount of new satellite broadband capacity scheduled to be launched and brought online over the next 5 years. This includes large GEO satellites as well as new MEO and LEO constellations planning to launch at the beginning of the next decade."

Except as expressly admitted, Defendants deny the allegations in Paragraph 80.

81.    Defendants admit that during the November 2, 2017 earnings call, Mr. Lance responded to a question and stated:

Yes, I really think that the right way to think of this going forward is dollar value, so it would be both. If you looked at a historic market of 20 to 22 awards, sometimes reaching as high as CAD 4 billion, we don't see it getting back to that level. I'd like to think that the industry has kind of bottomed out. We do have a strong pipeline in 2018. But as I've said before, we are not counting on a lot of order growth in the GEO ComSat area. If we get it, great; it'll be upside to our plans. So we're not counting on it. We are expecting continued growth from our diversification efforts and Earth observation and U.S. Government programs.

Except as expressly admitted, Defendants deny the allegations in Paragraph 81.

23

82.    Defendants admit that during the November 2, 2017 earnings call, Mr. Lance

responded to a question and stated:

> Well, as you said, Thanos -- thanks for the question, but it's a little early to be talking about 2018. What I will say from a color perspective is we expect that the GEO ComSat business from a reported revenue and earnings standpoint is going to be under continued pressure. We certainly see offsets on the positive side from the diversification. But we would also add a reminder that the RCM program in Canada is going to end. We're going to launch those satellites and finish that program. So that's going to provide a little bit of additional downward pressure. Our view is DigitalGlobe will continue to contribute growth. And we're trying to go through now with our combined teams and pull all of that together in terms of an outlook and some guidance that we would expect to provide as part of the Q4 call. So today, that's really as far as I can go. As you know, we just closed the transaction and we have a lot of financial analysis and work to do, and, of course, meeting and providing that information to our board before we can provide any definitive guidance. I do view, though, 2018 as a bit of a transitional year. I'm very positive and continue to be upbeat on the long-term growth potential for Maxar Technologies in its new form in 2019 and '20 and beyond. But that's about as far as we can go today. I'm sorry.

Except as expressly admitted, Defendants deny the allegations in Paragraph 82.

83.    Defendants admit that during the November 2, 2017 earnings call, William

McCombe stated in part:

> I'll now review Maxar's third quarter results with a comparison to the same period last year. Consolidated revenues for the third quarter were CAD 421 million compared to CAD 496 million for the same period last year. The Communications segment contributed CAD 256 million, down from CAD 355 million for the third quarter of last year due to a lower level of construction activity of geostationary communication satellites.
>
> While the value of our geostationary satellite awards has been relatively stable this year versus 2016 and 2015, there was a step down in award values beginning in 2015, which is manifesting itself in lower revenues in the current and recent quarters. The company has invested in diversification into new market segments to offset this effect. This is reflected in the Surveillance and Intelligence segment where revenue showed strong growth, increasing 17% to CAD 165 million from CAD 141 million for the same period of last year.

Except as expressly admitted, Defendants deny the allegations in Paragraph 83.

24

84.    Defendants admit that on February 28, 2018, *Space Intel Report* published an article titled, "Maxar Struggles to Adjust to a Satellite Market Whose Tables Have Turned." Defendants lack knowledge or information sufficient to admit or deny the remainder of the allegations in Paragraph 84 and on that basis deny the allegations.

85.    Defendants admit that the chart in Paragraph 85 reflects SSL's annual GEO awards from 2000 to 2017.

86.    Defendants admit that on February 28, 2018, *Space Intel Report* published an article. Defendants lack knowledge or information sufficient to admit or deny the allegations in the third sentence of Paragraph 86 and on that basis deny the allegations. Except as expressly admitted, Defendants deny the allegations in Paragraph 86.

87.    Defendants deny the allegations in Paragraph 87.

**Indicators of Impairment:**
**First Quarter of 2018 (1Q18)**

88.    Defendants admit that the "Galaxy-30" satellite was awarded to Orbital ATK, Inc. Except as expressly admitted, Defendants deny the allegations in Paragraph 88.

89.    Defendants deny the allegations in Paragraph 89.

90.    Defendants admit the allegations in Paragraph 90.

91.    Defendants admit that during a February 22, 2018 earnings call, an analyst asked:

Fair enough. And maybe my last question, Howard, on the commercial GEO side. Any signs of life? I know you mentioned in your prepared remarks the outlook is still sort of uncertain, but in your discussions with customers, is it sort of status quo? Or have you seen any changes in their tone in recent weeks of any sort?

Defendants admit that Mr. Lance replied:

Well, I believe that 2017, which I think only had 7 or 8 GEO awards for the industry, depending on how you count those and whether you include China or not, is a low watermark. Our internal outlook for the market is a bit stronger than that, but maybe in the 10% to 14% range for '18 and '19. So we're not counting on a big

25

> bounce or recovery in that market. Our growth is going to come from kind of reaching the bottom point on GEO and then leveraging all of our capabilities around U.S. government and the LEO markets. We've become much more active, obviously in SSL supporting the Legion program at DigitalGlobe. We see lots of other opportunities in both commercial and government areas, and we're going to be talking a lot about the outlook beyond '18 at our Investor Days so that investors can get a feel for the kinds of things that are out there. We don't have to win them all. We win a few and we're going to see the uptick that we're all looking forward to in the Space Systems segment in '19 and beyond. And when we see that, added with the continued growth in Imagery and Services, we'll start to create the value proposition that we are all working for.

Except as expressly admitted, Defendants deny the allegations in Paragraph 91.

92.    Defendants admit that during a February 22, 2018 earnings call, Mr. McCombe stated:

> Please turn to Slide 6 where we present our Q4 pro forma results. Total company revenues declined 7% year-over-year in the quarter. Our Imagery business recorded strong revenue growth year-over-year; however, this was more than offset by declines in the Space Systems segment where the step-down in award values in the GEO ComSat market since 2015 continued to flow through as lower revenue in the current quarter together with a lower level of planned activity on the RCM project for the Canadian government. Adjusted EBITDA margins, however, increased over 240 basis points, driven by the mix of segment earnings and cost controls.

Except as expressly admitted, Defendants deny the allegations in Paragraph 92.

93.    Defendants admit that during a February 22, 2018 earnings call, Mr. McCombe stated in part: "Space Systems experienced a 15% year-over-year pro forma revenue decline in Q4 as increases in our U.S. Government business were more than offset by declines in the commercial satellite revenues and on the Canadian RCM project." Defendants admit that Mr. McCombe also stated in part:

> We expect total company pro forma year-over-year revenues to decline 2% to 4% in 2018, as compared to 2017, driven by declines in our Space Systems segment, in part offset by continuing solid growth in the Imagery and Services segments. Our Space Systems business continues to feel the impact of the stepdown in GEO Comsat award values that began in 2015. We have seen these award value stabilize at lower levels in the last couple of years, thus providing a backdrop for a potential stabilization of the segment's revenue streams in the coming years.

26

Except as expressly admitted, Defendants deny the allegations in Paragraph 93.

94. Defendants admit that Mr. McCombe was named Executive Vice President, Chief Financial Officer of MDA in October 2017. Defendants admit that Mr. McCombe previously served as Senior Vice President and CFO of SSL MDA Holdings, Inc. between 2016 and 2017. Except as expressly admitted, Defendants deny the allegations in Paragraph 94.

95. Defendants admit that Mr. McCombe resigned in February 2018. Except as expressly admitted, Defendants deny the allegations in Paragraph 95.

96. Defendants admit that Mr. Wirasekara became Interim CFO after Mr. McCombe's departure. Defendants admit that Mr. McCombe did not certify certain regulatory filings that were prepared shortly before he resigned. Defendants admit that Mr. Wirasekara certified financial statements on March 29, 2018. Except as expressly admitted, Defendants deny the allegations in Paragraph 96.

97. Defendants admit that the Company held the New York Investor Day conference on March 8, 2018. Defendants admit that Mr. Lance made remarks during the March 8, 2018 Investor Day conference. Except as expressly admitted, Defendants deny the allegations in Paragraph 97.

98. Defendants admit that during the March 8, 2018 Investor Day conference, Mr. Lance stated in part:

> First slide I want to show you on the top line growth is look at the magnitude of the decline in the last 2 years in this yellow or gold portion of the bar. That's the GEO Comsat and RCM revenue, declined over 20% each year for 2 years. Now I'm very proud, actually, of our company and the emphasis we focused on cost. The fact that we've had this kind of headwinds and decline and have essentially maintained our EBITDA, there aren't many companies that accomplish that. So if you don't think we know how to cut costs, we know how to match staffing with revenue, I've done that my whole 40-year career. We know how to do that. But we also know the value gets created from the top line, which ultimately drives margin expansion.

27

Defendants admit that the slide included in Paragraph 98 is included in the slide deck for the New

York Investor Day conference on March 8, 2018.  Except as expressly admitted, Defendants deny

the allegations in Paragraph 98.

99.    Defendants admit that during the March 8, 2018 Investor Day conference, Mr.

Lance stated:

> When you put that into a slide that shows '16, '17, '18 and then the next couple of years, you see our view that we're at a point of inflection. As the declines in GEO reach bottom, and then as we see the RCM program ending, we pave the way to see the underlying growth come through, which we believe is going to be positive and generate greater earnings, greater cash flow and the potential for increased margins.

Defendants admit that the slide included in Paragraph 99 is included in the slide deck for the New

York Investor Day conference on March 8, 2018.

Except as expressly admitted, Defendants deny the allegations in Paragraph 99.

100.    Defendants admit that during the March 8, 2018 Investor Day conference, Mr.

Lance stated in part:

> This is kind of a good news, bad news slide looking at GEO Comsat because it used to be a little larger part of the business. But the point of the slide today is we've really had it marginalized both as a result of its decline and the rest of the business growing and the combination with DigitalGlobe now giving us new legs for growth as Maxar combined company.

Defendants admit that the slide included in Paragraph 100 is included in the slide deck for the New

York Investor Day conference on March 8, 2018.  Except as expressly admitted, Defendants deny

the allegations in Paragraph 100.

101.    Defendants admit that during the March 8, 2018 Investor Day conference Mr.

Lance stated in part:

> Our outlook and aspirations for growth are pretty strong for the next 5 years and we think are supported by the tailwinds in the markets and opportunities for market share increases and opportunities from synergies. We are giving you a sense of how we think about the

28

core growing 4% to 6% by segment. We actually have negative growth in the GEO market, although certainly not 20% a year. And we just do not see that happening. But strong growth, double digits in the segments of SmallSATs and MDA.

Defendants admit that the slide included in Paragraph 101 is included in the slide deck for the New York Investor Day conference on March 8, 2018. Except as expressly admitted, Defendants deny the allegations in Paragraph 101.

102. Defendants admit the allegations in Paragraph 102.

103. Defendants admit that during the March 8, 2018 Investor Day conference, Mr. Lance stated in part:

Well, I don't think at 4x leverage we're in trouble, first of all. But you also need to understand, we've got 3 or 4 other very easy places we can go if we want to generate more cash. We've got facilities that we could sell and lease back that we own. We've got $200 million of Orbital receivables that we've not securitized yet. So there's lots of places we can go if the EBITDA doesn't grow at the rate that we are talking about. I think the other point I would make, and that I made on Tuesday, so I'll just repeat it, we are committed to every business paying their own way. I'm not going to allow the GEO Com product line to be a drag on **the company going forward.** That either bottoms out or it grows. In the meantime, Dario will talk about his factory, the future work and how we are reconstructing the whole facility to deal not with 25 GEO satellites, but with a combination of fewer GEO satellites and lots of SmallSATs. So we're looking at lots of ways that we can take out cost to further lower our breakeven. To Anil's point, we are making money in that product line having declined significantly from where we were. Now I'm not in control of the markets. Things can always happen. But what we're trying to articulate is there's just not a lot of downside left in that business, and there's a commitment to make that product line pay its own way like the rest of our products do and that we have 3 or 4 other levers we could pull in 2018, if we want to generate some additional cash that would help us to pay down the debt a little faster, reduce the leverage a little faster.

Except as expressly admitted, Defendants deny the allegations in Paragraph 103.

104. Defendants admit that during the March 8, 2018 Investor Day conference, Mr. Lance stated:

Well, this year, we're seeing sequential declines of, as I showed, over 20% in the top line. We have some sequential declines in EBITDA in that product line but certainly not to the extent of 20%. So we haven't reached the bottom in terms of

29

losing $2 for every $2 we lose at the top. There's still a lot of fixed cost that Dario and I both look at and they're described by our team as fixed cost, very few things are really fixed. It just causes you to do a reset in the way you run the factory, the way you think about support costs and so on. And we've had such large declines that these aren't incremental steps we're taking. It's really a retooling of how we're organized in the factory and what the support and overhead costs are. So I hope that answers your question. Yes?

105.    Defendants admit the allegations in Paragraph 105.

106.    Defendants admit that during the March 8, 2018 Investor Day conference, Mr.

Lance responded to the question in Paragraph 105 as follows:

Yes. I don't know off the top of my head what the percentage is. Fixed costs have probably not come down linearly with revenue. Direct costs have. We've taken out, over the last 18 months, probably 450 people.  We didn't want to do that, but obviously the volume wasn't there to support it. We have had step-function reductions in fixed costs, but I would say the next wave of that is what Dario and his team are looking at right now. Fixed costs tend to come out more like a stairstep whereas direct labor can come out more linearly. But we were hopeful -- 2020 hindsight, which you'd always love to have, we were hopeful the market was going to rebound a little more. And I think it's only during the last 6 to 9 months that after doing a lot of external market study, we've concluded that the market is going to stay at this level, we think, or maybe slightly above it as some of these replacements come along. And so we were hesitant to go in and take out large chunks of fixed costs because if the volume goes up, you need those. But we've now made the decision to do that.

Except as expressly admitted, Defendants deny the allegations in Paragraph 106.

107.    Defendants admit that during the March 8, 2018 Investor Day conference, Mr.

Zamarian stated in part:

But the bottom line on this chart is that in the past, when we had about 15, 16 awards a year, we are predicting that either on a hybrid basis or a HTS digital-based satellites, we could look forward to anywhere between 8 to 12 a year type satellites, of which about half of that is going to be a replacement type satellite.

Except as expressly admitted, Defendants deny the allegations in Paragraph 107.

108.    Defendants admit that Mr. Lance made remarks at the J.P. Morgan Aviation,

Transportation & Industrials conference in New York on March 13, 2018.  Defendants lack

30

knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 108 and on that basis deny the allegations.

109.    Defendants admit that the contract to build a broadband satellite for the European Organisation of Telecommunications by Satellite S.A. designated "Konnect VHTS" was not awarded to SSL.  Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 109 and on that basis deny the allegations.

110.    Defendants admit that the Company held an earnings call on or around May 9, 2018.  Defendants admit that an attendee asked: "Thank you. The second one would just be where are we now at, guys, in terms of some of the efficiency efforts that you were going to do at Palo Alto in terms of adjusting volumes? Obviously, you've got Legion coming in there. Are we at the tail end of that? What's sort of left to be done there?"  Defendants admit that Mr. Lance responded:

> No. We continue to, every quarter, try and align our direct labour with the work to be done in the factory. Part of the decline in the GEO market has been picked up by small sat work by different commercial customers, including DigitalGlobe or work for the US Government. We also, though, continue to have a number of satellites in the factory that are finishing up and that remain to be launched. And so there is opportunity for further rationalization of those resources.
>
> Again, we look at it every quarter. And we also continue to look at, as I said at Investor Day, other ways that we can better align our costs longer term with what we believe will be a sustained lower level of GEO market orders. So lots of continued work going on. Nothing further to announce today, but we continue to do that work. And you should expect to see continued adjustments as the year progresses to try and keep our costs—and in line with new orders and with work in the factory, and as we've said before, to continue to be profitable and successful at the bottom of the cycle.

Except as expressly admitted, Defendants deny the allegations in Paragraph 110.

111.    Defendants admit that during the earnings call on or around May 9, 2018, Mr. Wirasekara stated in part:

> Please turn to Slide 17 where we present year-over-year comparisons for the first quarter—please turn to Slide 7. As Howard suggested earlier, the total company

31

revenues declined in the quarter but is in line with our expectations. The Imagery and Services segments recorded strong revenue growth. However, this was more than offset by declines in the Space System segment where the stepdown in award values and continued weakness in the GEO comsat market since 2015 continued to flow through as lower revenues in the current quarter.

Except as expressly admitted, Defendants deny the allegations in Paragraph 111.

**Indicators of Impairment:**
**Second Quarter of 2018 (2Q18)**

112.    Defendants deny the allegations in Paragraph 112.

113.    Defendants admit that on March 26, 2018 the Company announced two new GEO orders in a press release and on social media.  These two GEO orders related to a project for the Broadcasting Satellite System Corporation of Japan ("B-SAT") and Israel's Spacecom.  Except as expressly admitted, Defendants deny the allegations in Paragraph 113.

114.    Defendants admit the allegations in Paragraph 114.

115.    Defendants admit that the Company posted information concerning the B-SAT and AMOS-8 projects on the @sslmda Twitter account on March 26, 2018 and stated: "2018 is off to a great start for SSL with two contracts to build GEO satellites announced today. Thank you B-SAT and Spacecom for placing your trust in SSL."  Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 115 and on that basis deny the allegations. Paragraph 115.

116.    Defendants admit that on October 31, 2018, the Company filed a Form 6-K with the SEC.  Defendants further admit that the Form 6-K stated:

The Company announced in Q1 2018 that Space Systems/Loral, LLC ("SSL"), a wholly owned subsidiary of Maxar, was selected by Spacecom to build its AMOS-8 advanced communications satellite. In September 2018, this contract became void when the customer did not make the initial payment and it became evident that the Spacecom would not achieve financing on the project. The voiding of this contract did not have an impact on the Company's backlog, as it was not a definitive award and was not included in backlog.

32

Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 116 and on that basis deny the allegations.

117.    Defendants admit the allegations in the fourth sentence of Paragraph 117. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 117 and on that basis deny the allegations.

118.    Defendants admit the allegations in the second sentence of Paragraph 118. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 118 and on that basis deny the allegations.

119.    Defendants admit that on April 9, 2018, *Globes* published an article regarding AMOS-8. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 119 and on that basis deny the allegations. Except as expressly admitted, Defendants deny the allegations in Paragraph 119.

120.    Defendants admit the allegations in the second sentence of Paragraph 120. Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 120 and on that basis deny the allegations.

121.    Defendants admit that the Company held an earnings call on May 9, 2018. Defendants admit that Mr. Lance made remarks quoted in the second sentence of Paragraph 121. Except as expressly admitted, Defendants deny the allegations in Paragraph 121.

122.    Defendants admit that on May 22, 2018, *DefenseNews* published an article concerning, among other things, statements purportedly made by the Israeli Ministry of Science, Technology and Space. Defendants admit that Plaintiff accurately quotes a portion of the article. Except as expressly admitted, Defendants deny the allegations in Paragraph 122.

33

123.    Defendants admit that on May 27, 2018, *Calcalist* published an article titled, "Spacecom Postpones Deal With California-Based Satellite Manufacturer Loral."  Defendants admit that the article states in part, "According to the original agreement announced on March 25, the deal should have become void when Spacecom failed to pay within 60 days, meaning by Friday."  Except as expressly admitted, Defendants deny the allegations in Paragraph 123.

124.    Defendants deny the allegations in Paragraph 124.

125.    Defendants admit the allegations in the first sentence of Paragraph 125.  Defendants admit that Plaintiff accurately quotes a portion of the June 19, 2018, article titled "Space Odyssey: Why Does Israel Need a Blue-and White Communications Satellite?" published by *Haaretz.* Except as expressly admitted, Defendants deny the allegations in Paragraph 125.

126.    Defendants admit that on June 25, 2018, *Calcalist* published an article titled, "For the Second Time: Spacecom Postpones Deal With U.S. Satellite Manufacturer Loral."  Defendants admit that the article states that Space Systems/Loral agreed to defer payment for a second time, until September 25, 2018.  Except as expressly admitted, Defendants deny the allegations in Paragraph 126.

127.    Defendants admit that the Company did not issue press releases on June 10, 2018 and June 29, 2018.  Except as expressly admitted, Defendants deny the allegations in Paragraph 127.

128.    Defendants admit that a meeting took place in June 2018 at Maxar's Colorado headquarters.  Defendants admit that BMO Capital Markets analyst Thanos Moschopoulous participated in the meeting.  Except as expressly admitted, Defendants deny the allegations in Paragraph 128.

34

129.    Defendants admit that on July 24, 2018, *SpaceNews* published an article titled,

"Maxar considering exiting GEO satellite manufacturing business."  Defendants further admit that

in a response to *SpaceNews*, Maxar stated:

> We have experienced material satellite order declines in recent years, as a result of end market supply and demand factors and additional capacity coming on orbit from [high-throughput satellites] and [low-Earth-orbit] constellations. . . . SSL has responded appropriately to manage its workforce and costs during this challenging time. As previously stated, we are continuing to review strategic alternatives for our GEO communications satellite business to improve its financial performance. No final decision has been made. At the same time, we continue to see strong growth in our US Government and LEO communications and Earth observation businesses and remain encouraged regarding the potential in these markets.

Except as expressly admitted, Defendants deny the allegations in Paragraph 129.

130.    Defendants admit that on September 16, 2018, *SpaceNews* published a subsequent

report titled "SSL's Amos-8 contract in doubt as Maxar eyes a GEO exit."  Defendants admit that

Paragraph 130 accurately quotes the article in part.  Except as expressly admitted, Defendants deny

the allegations in Paragraph 130.

131.    Defendants admit that in June 2018, the Company underwent a restructuring,

pursuant to which 109 SSL employees were laid off.  Defendants lack knowledge or information

sufficient to admit or deny the truth of the remaining allegations in Paragraph 131 and on that basis

deny the allegations.

132.    Defendants admit that in June 2018, the Company underwent a restructuring, under

which certain employees were laid off.  Defendants admit that in 2018, Airbus SE was selected by

Eutelsat to build two "HOTBIRD" satellites.  Defendants lack knowledge or information sufficient

to admit or deny the other allegations in Paragraph 132 and on that basis deny the allegations.

133.    Defendants admit that the Company held an earnings call on July 31, 2018.

Defendants further admit that during the earnings call, Mr. Lance stated:

> Total Company revenues increased 4 percent sequentially from Q1 to Q2, but declined 4 percent year over year on a pro forma basis, as expected, due to the continued declines in our GEO communications satellite line of business and the close-to-finished Canadian RCM program. Revenue from the remainder of Maxar increased 5 percent year over year in the quarter, demonstrating continued strong fundamentals across the rest of the Company. . . . We've already discussed the Telesat LEO award, which could be the first step in a multibillion dollar production program for Maxar. So where does that leave the GEO communications market? As we've discussed at length in the past, industry orders fell significantly in 2015, and have remained at those low levels ever since. At this point, we do not expect a significant recovery for this market, with industry orders likely to be at the low end of the 8 to 12 awards range this year, 2018.
>
> From our perspective, industry growth clearly is moving in the direction of LEO and LEO constellations, with the demand for GEO primarily driven by the replacement needs of existing satellites.
>
> As such, we are examining a range of strategic alternatives for our GEO comsat line of business. We continue to align our workforce size with the operations and engineering work to be done. We continue to exit leased buildings and consolidate our footprint on the Palo Alto campus. We are establishing a separate organization structure, and bringing in new talent to focus on execution of the US government and commercial smallsats growth opportunities in a new facility in San Jose, with a healthy pipeline of smallsat and US government opportunities that we believe will lead to sustained growth well into the 2020s.
>
> All of these actions are aimed at maximizing long-term value for our shareholders and bringing best-in-class solutions to our customers.

Except as expressly admitted, Defendants deny the allegations in Paragraph 133.

134.    Defendants admit that Mr. Lance responded to questions from analysts during the July 31, 2018 earnings call.  Defendants further admit that during the earnings call, Mr. Lance responded to questions and stated:

> It's actively in process now. It has been for a while. I won't predict again, and we haven't made any determination what the final outcome will be, but it's fair to say we're looking at a range of options, all of it trying to accomplish one thing: position Maxar for growth and value creation going forward.
>
> We do not believe at this point we'll see much in the way of a market recovery for GEO. So at a minimum, we're downsizing, continuing to cut staff to align with the workload, cutting our footprint, making available some of our owned facilities for sale, and moving into a small a footprint as possible on a go-forward basis. . . . Yeah. I don't that think our view has changed. I think the words we used and have used since March is that we expected a bottoming. And that's really referring to our revenue from this sector. So as we launch more satellites than we book, our revenue has been coming down quarter and quarter and

36

quarter for some time. So the bottoming occurs when we essentially reach kind of a steady state from a revenue standpoint, and we believe that we're just about there.

The orders this year that the industry is now . . . that we're expecting for the industry is very much on par with last year. I think last year it was about seven. We think it's going to be around eight or so this year. And that results in a limited amount of bookings, and revenue continues to decline.

So I don't think our view of that has really changed since the March time frame. We continue to look at alternatives, as we've discussed, and we will in the near future reach a conclusion with this business on how we go forward.

Except as expressly admitted, Defendants deny the allegations in Paragraph 134.

135.    Defendants admit the allegations in Paragraph 135.

136.    Defendants admit that during the July 31, 2018 earnings call, an analyst asked,

"[o]n the Space Systems segment if you were to exclude GEO com and RCM, what would the

margins be for that business?"  Defendants further admit that Mr. Lance replied:

> Higher. I don't mean to be flip about that, but I think it's fair to say that most aerospace defence contractors have margins in the mid-teens.  So that's kind of the benchmark that's out there; sometimes lower, sometimes higher, but longer term that's certainly kind of a benchmarking target that we would think about in the Space Systems segment more broadly.
>
> We've enjoyed higher margins in that at times, largely because of stronger success on some of the legacy MDA programs. And I think that for long-term planning that's probably not a bad position to take.  Clearly we're being held down today by the margins in the GEO business, which are not at that level.

Except as expressly admitted, Defendants deny the allegations in Paragraph 136.

137.    Defendants admit the allegations in Paragraph 137.

138.    Defendants admit that on the July 31, 2018 earnings call, Mr. Wirasekara stated in

part:

> Space Systems experienced a 3 percent year-over-year revenue decline in Q2, as growth in our US government and smallsat businesses were more than offset by the decline in the GEO communications satellite business and our work on the Canadian RCM program that is nearing completion.

37

The increase in US government business demonstrates that our diversification strategy implemented in 2016 is working, and that once the RCM project winds down and the GEO concept market stabilizes, this segment should return to growth.

Except as expressly admitted, Defendants deny the allegations in Paragraph 138.

139.    Defendants admit that on July 31, 2018, the Company filed a Form 6-K with the SEC.  Defendants further admit that the Form 6-K stated:

During the three and six months ended June 30, 2018, the Company incurred employee severance and enterprise improvement costs of $12.2 million and $12.6 million, respectively, compared to $4.8 million and $15.5 million for the same periods of 2017.  These costs were primarily related to employment termination within our Space Systems segment. These restructuring actions were undertaken in response to fluctuations in the geostationary communication market and to align with our new strategy.

Except as expressly admitted, Defendants deny the allegations in Paragraph 139.

140.    Defendants admit that on October 31, 2018, the Company filed a Form 6-K with the SEC.  Defendants further admit that the Form 6-K stated:

**Impairment of Non-Financial Assets**

Non-financial assets are tested annually for impairment in the fourth quarter or whenever there is an indication that an asset may be impaired. Non-financial assets that do not generate independent cash flows are grouped together into a cash generating unit ("CGU"), which represent the level at which largely independent cash flows are generated. An impairment loss is recognized in earnings to the extent that the carrying value of an asset, CGU or group of CGUs exceeds its recoverable amount. Impairment is first evaluated by management at the CGU level, absent allocated goodwill.

The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS-8 satellite, a key program with the Israeli government. By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds.  For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.

38

In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed. In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels. Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

The aggregation of the above factors resulted in an impairment trigger being identified as at August 31, 2018 at the GeoComm CGU. The Company first performed an impairment test of the GeoComm CGU. The impairment test of the GeoComm CGU evaluated the non-financial assets held by the Company based on an asset group level, absent allocated goodwill. Assets were aggregated to the level in which independent cash flows could be generated for their respective groupings.  The carrying values of these asset groups were compared against their fair value less costs of disposal for possible impairment and an impairment loss of

$345.9 million related to property, plant and equipment and intangible assets was recorded for the three months ended September 30, 2018.

Goodwill is tested annually in the fourth quarter or whenever there is an indication that an asset may be impaired. The Company performs its goodwill impairment testing based on three groups of Cash Generating Unit's ("CGU's") representing its three operating segments as this is the lowest level at which management monitors goodwill. The GeoComm CGU represents a material portion of the Space Systems segment, and as such, the Company identified an indicator of goodwill impairment at the Space Systems segment. The Space Systems segment is comprised of multiple CGU's, which include the GeoComm CGU, Smallsat CGU and numerous CGU's within the MDA Canada business. The goodwill impairment test yielded no impairment, as the fair value of the Space Systems segment exceeded its carrying value by 87%.

Except as expressly admitted, Defendants deny the allegations in Paragraph 140.

39

**Summary of Impairment Indicators**

141.    Defendants deny the allegations in Paragraph 141.  To the extent Paragraph 141 purports to summarize allegations set forth in other paragraphs of the Amended Complaint, Defendants incorporate by reference the responses to those allegations as if fully set forth in the response to Paragraph 141.

142.    Defendants admit that on October 31, 2018, the Company filed a Form 6-K with the SEC.  Defendants further admit that that the Form 6-K stated:

> The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS-8 satellite, a key program with the Israeli government.  By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds.  For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.

Except as expressly admitted, Defendants deny the allegations in Paragraph 142.

## THE FAILURE OF WORLDVIEW-4

143.    The allegations in Paragraph 143 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 143 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 143.

144.    The allegations in Paragraph 144 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 144.  To the extent a response is required, Defendants deny the allegations in Paragraph 144.

40

145. The allegations in Paragraph 145 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no response to the allegations in Paragraph 145 is required. To the extent a response is required, Defendants deny the allegations in Paragraph 145.

146. The allegations in Paragraph 146 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no response to the allegations in Paragraph 146 is required. To the extent a response is required, Defendants deny the allegations in Paragraph 146.

147. The allegations in Paragraph 147 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no response to the allegations in Paragraph 147 is required. To the extent a response is required, Defendants deny the allegations in Paragraph 147.

148. The allegations in Paragraph 148 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no response to the allegations in Paragraph 148 is required. To the extent a response is required, Defendants deny the allegations in Paragraph 148.

149. The allegations in Paragraph 149 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no response to the allegations in Paragraph 149 is required. To the extent a response is required, Defendants deny the allegations in Paragraph 149.

150. The allegations in Paragraph 150 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no

Active/52642481.1

response to the allegations in Paragraph 150 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 150.

151.    The allegations in Paragraph 151 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 151 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 151.

152.    The allegations in Paragraph 152 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 152 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 152.

153.    The allegations in Paragraph 153 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 153 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 153.

154.    The allegations in Paragraph 154 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 154 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 154.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

155.    Defendants admit that on March 26, 2018, the Company issued a press release titled "Spacecom Selects Maxar Technologies' SSL to Build AMOS-8 Communications Satellite with Advanced Capabilities."  Defendants admit the allegations contained in the second and third

42

sentences of Paragraph 155.  Except as expressly admitted, Defendants deny the allegations in Paragraph 155.

156.    Defendants admit that the Company posted information to SSL's Twitter account "@sslmda" on March 26, 2018 and stated: "2018 is off to a great start for SSL with two contracts to build GEO satellites announced today. Thank you B-SAT and Spacecom for placing your trust in SSL."  Defendants lack knowledge or information sufficient to admit or deny the remainder of the allegations in the first sentence of Paragraph 156 and on that basis deny the allegations. Defendants admit that the Company issued a press release on March 26, 2018 titled, "Spacecom Selects Maxar Technologies' SSL to Build AMOS-8 Communications Satellite with Advanced Capabilities."  Except as expressly admitted, Defendants deny the allegations in Paragraph 156.

157.    Defendants admit that the Company held its 1Q18 earnings call on May 9, 2018. Defendants admit that Mr. Lance stated in part:

> We were very pleased to report in the quarter that we were awarded two new GEO communications satellites. Broadcasting Satellite System Corporation, or B-SAT, is the leading broadcast satellite operator in Japan and selected SSL to build a direct-to-home television satellite to ensure exceptional ultra-high definition video distribution for the 2020 Tokyo Olympics.

Defendants admit that Mr. Lance further stated  in part:

> SSL launched a similar satellite for B-SAT in November of 2017, ahead of schedule, and we believe there is no greater endorsement of our capabilities than repeat orders from satisfied customers. Israeli satellite operator Spacecom selected SSL to build the AMOS-8 satellite. This will deliver state-of-the-art broadcast, broadband, and data services from its 4-degree West hotspot to Europe, Africa, and the Middle East. AMOS-8 will include flexible, high-powered Ku-Band and Ka-band payloads with steerable antennas to enable Spacecom to deliver a number of value-added services.

Except as expressly admitted, Defendants deny the allegations in Paragraph 157.

43

158.    Defendants admit the Company issued a press release on May 9, 2018.  Defendants admit that within its May 9, 2018 press release, the following is listed under the heading "Notable bookings in the Space Systems segment announced in the first quarter of 2018":

- A contract with NASA's Jet Propulsion Laboratory to design and build critical equipment for a spacecraft that will explore *E*uropa, one of Jupiter's moons.
- A contract to provide a broadcast satellite for Broadcasting Satellite System Corporation (B-SAT). As the leading broadcasting satellite operator in Japan, B-SAT will use the Direct-to-Home (DTH) television satellite to ensure exceptional ultra-high definition video distribution for the 2020 Tokyo Olympics.
- Spacecom, operator of the AMOS satellite fleet, announced it has chosen Space Systems/Loral, LLC, a wholly owned subsidiary of Maxar, to build its AMOS-8 advanced communications satellite. The satellite will deliver state-of-the-art broadcast, broadband and data services from Spacecom's 4°degrees West 'hot spot' to Europe, Africa and the Middle East.
- A contract with an unnamed international customer where MDA will provide turnkey, unmanned aircraft system surveillance services. The contract includes options for additional years.

Defendants admit that within its May 9, 2018 First Quarter 2018 Earnings Call Slide deck, the following is listed under the heading "Q1: Key accomplishments and order activity":

- Imagery Segment
  - 69th consecutive month meeting performance criteria on USG Enhanced View contract
  - Global EGD USG contract funding in place
  - IDI renewals on track
  - Technology and automotive contracts accelerating
  - Rapid Access Program and Secure Watch enhancements launched
- Space Systems Segment
  - Hispasat 30W-6 successful launch
  - Selected by B-SAT in Japan and Spacecom in Israel to build GEO communications satellites
  - Europa and Unmanned contract awards illustrate continued USG momentum
- Service Segment
  - NGA and US Army contracts
  - Product development underway to address new markets, including commercial and IDI

Defendants admit that within its May 9, 2018 First Quarter 2018 Earnings Call Slide deck, the following is listed under the heading "Space Systems – Q1 results":

44

- Gross revenue driven by lower y/y GEO Comsat and RCM program revenue, partially offset by increases in Small Sat and US Government revenue
  - GEO and RCM combined down ~30%
  - SSL SmallSats and USG up 92%
  - MDA revenue ex-RCM up 7%
- Margins driven by the timing of ITCs and the establishment and retirement of provisions
- SSL GEO awards (B-SAT and Spacecom) and Europa (USG)
- DA orders including Canadian and International Unmanned

Except as expressly admitted, Defendants deny the allegations in Paragraph 158.

159. The allegations in Paragraph 159 constitute a conclusion of law to which no response is required. To the extent a response is required, Defendants admit that the Amended Complaint purports that Mr. Lance and Mr. Wirasekara had ultimate authority over statements contained in paragraphs 155-158, including their contents and whether and how to communicate the contents to the investing public. Defendants deny the allegations in Paragraph 159 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's claims.

160. Defendants deny the allegations in Paragraph 160.

161. Defendants admit that on May 9, 2018, the Company released its quarterly financial statements for 1Q18. Defendants admit that the Company filed these financial statements on the electronic reporting systems of both the SEC and the Canadian Securities Administrators. Defendants admit that on October 31, 2018, the Company filed a Form 6-K with the SEC. Defendants further admit that the Form 6-K stated:

> The Company announced in Q1 2018 that Space Systems/Loral, LLC ("SSL"), a wholly owned subsidiary of Maxar, was selected by Spacecom to build its AMOS-8 advanced communications satellite. In September 2018, this contract became void when the customer did not make the initial payment and it became evident that the Spacecom would not achieve financing on the project. The voiding of this contract did not have an impact on the Company's backlog, as it was not a definitive award and was not included in backlog.

Except as expressly admitted, Defendants deny the allegations in Paragraph 161.

45

162.    Defendants admit that Mr. Lance and Mr. Wirasekara signed and filed Form 52-109F2 (Certification of Interim Filings – Full Certificate) with Canadian regulators, which included attestations regarding the Company's 1Q18 filings.  The Form 52-109F2 stated in part:

1. **Review**: I have reviewed the interim financial report and interim MD&A, (together, the "interim filings") of Maxar Technologies Ltd. (the "issuer") for the interim period ended March 31, 2018.

2. *No misrepresentations*: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

3. *Fair presentation*: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

4. **Responsibility**: The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.

Except as expressly admitted, Defendants deny the allegations in Paragraph 162.

163.    Defendants admit the allegations in Paragraph 163.

164.    Defendants admit the allegations in Paragraph 164.

165.    Defendants deny the allegations in Paragraph 165.

166.    Defendants admit that on July 31, 2018, the Company released its quarterly financial statements for 2Q18, a news release, and Management Discussion & Analysis ("MD&A").  Defendants admit that the Company filed these materials on the electronic reporting system of both the SEC and the Canadian Securities Administrators.  The allegations in the last sentence of Paragraph 166 constitute a conclusion of law to which no response is required.  To the

46

extent a response is required, Defendants admit that the Amended Complaint purports that Mr.

Lance and Mr. Wirasekara had ultimate authority and control over the Company's public

statements, including the contents of regulatory filings, and whether and how to communicate

contents of the filings to the investing public. Defendants deny the allegations in the last sentence

of Paragraph 166 to the extent they purport to assert that there is a basis in fact or law for Plaintiff's

claims. Except as expressly admitted, Defendants deny the allegations in Paragraph 166.

167.    Defendants admit that Mr. Lance and Mr. Wirasekara signed and filed Form 52-

109F2 (Certification of Interim Filings – Full Certificate) with Canadian regulators, which

included attestations regarding the Company's 2Q18 filings. The Form 52-109F2 stated in part:

> 1. **Review**: I have reviewed the interim financial report and interim MD&A, (together, the "interim filings") of Maxar Technologies Ltd. (the "issuer") for the interim period ended June 30, 2018.
>
> 2. **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.
>
> 3. **Fair presentation**: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.
>
> 4. **Responsibility**: The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*, for the issuer.

Except as expressly admitted, Defendants deny the allegations in Paragraph 167.

168.    Defendants admit the allegations in Paragraph 168.

169.    Defendants admit the allegations in Paragraph 169.

47

170.    Defendants deny the allegations in Paragraph 170.

171.    Defendants admit that the Company filed its 3Q18 financial statements with the SEC and Canadian securities regulators on October 31, 2018.  Defendants admit that underneath a heading titled "Cautionary Note Regarding Forward-Looking Statements," it stated in part:

> The risks that could cause actual results to differ materially from current expectations include, but are not limited to: . . . . loss of, or damage to, a satellite before the end of its expected operational life and the failure to obtain data or alternate sources of data for the Company's products.

Except as expressly admitted, Defendants deny the allegations in Paragraph 171.

172.    The allegations in Paragraph 172 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 172 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 172.

173.    The allegations in Paragraph 173 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 173 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 173.

174.    The allegations in Paragraph 174 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 174 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 174.

## THE TRUTH EMERGES

175.    Defendants admit that Spruce Point issued a report on August 7, 2018 regarding Maxar.  Defendants admit that a slide titled "Asset Impairment Likely" states, in part, "Maxar's balance sheet is inflated with goodwill and overcapitalized intangible assets. We expect it will

48

write down the value of these inflated assets by at least $2.4 billion to fair value after its evaluation of strategic alternatives results in no means to maximize value." Defendants admit that the slide also contains an excerpt of Mr. Lance's statement from a July 31, 2018 conference call. Except as expressly admitted, Defendants deny the allegations in Paragraph 175.

176. Defendants admit the Company's stock closed at $44.41 on August 6, 2018, and $38.44 on August 7, 2018, with a reported volume of 2,884,900 shares. Defendants deny the remaining allegations in Paragraph 176.

177. Defendants admit the allegations in Paragraph 177.

178. Defendants admit that the Company's stock closed at $38.44 on August 7, 2018, and $36.69 on August 8, 2018, with a reported volume of 863,000 shares. Defendants deny the remaining allegations in Paragraph 178.

179. Defendants admit that Maxar issued a press release on August 24, 2018 at 6:00 a.m. titled, "Maxar Technologies Provides Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund." Defendants admit that Plaintiff accurately quotes the press release, in part, in Paragraph 179. Except as expressly admitted, Defendants deny the allegations in Paragraph 179.

180. Defendants admit that the Company's stock closed at $35.92 on August 22, 2018, and $34.15 on August 23, 2018, with a reported volume of 493,800 shares. Defendants further admit that the Company's stock closed at $33.92 on August 24, 2018, with a reported volume of 912,000. Defendants deny the remaining allegations in Paragraph 180.

181. Defendants deny the allegations in Paragraph 181.

Active/52642481.1

182. Defendants admit that the Company's stock closed at $31.05 on August 31, 2018, and $29.34 on September 4, 2018, with a reported volume of 663,200 shares. Defendants deny the remaining allegations in Paragraph 182.

183. Defendants admit the allegations in Paragraph 183.

184. Defendants admit that the Company's stock closed at $34.81 on September 25, 2018, and $33.18 on September 26, 2018, with a reported volume of 1,302,800 shares. Defendants deny the remaining allegations in Paragraph 184.

185. Defendants admit that Maxar issued a press release on October 9, 2018 titled, "Maxar Technologies Advances Planned U.S. Domestication." Defendants admit that Maxar "announced that it is advancing its domestication into the United States and expects to complete this process in January 2019, subject to securityholder approval." Defendants admit that the press release contains a quote from Howard Lance which states

> U.S. domestication has been planned for many years as part of the Company's U.S. Access Plan. Today's announcement represents an important milestone for Maxar and will further advance our efforts to service and compete for future U.S. government contracts. U.S. domestication will accelerate our growth trajectory and better position Maxar's corporate structure to support our business strategy.

Defendants admit that the press release further states that "The Company committed to U.S. domestication no later than December 31, 2019 as part of its closing of its acquisition of DigitalGlobe on October 5, 2017." Defendants further admit that the press release stated that a special meeting of securityholders will be held on November 16, 2018 to consider and vote on the proposed plan. Except as expressly admitted, Defendants deny the allegations in Paragraph 185.

186. Defendants admit the allegations in Paragraph 186.

187. Defendants admit the allegations in Paragraph 187.

50

188.    Defendants admit that the Company's Form 6-K contained a section titled MD&A.

Defendants admit that the MD&A stated in part:

**Impairment of Non-Financial Assets**

Non-financial assets are tested annually for impairment in the fourth quarter or whenever there is an indication that an asset may be impaired. Non-financial assets that do not generate independent cash flows are grouped together into a cash generating unit ("CGU"), which represent the level at which largely independent cash flows are generated. An impairment loss is recognized in earnings to the extent that the carrying value of an asset, CGU or group of CGUs exceeds its recoverable amount. Impairment is first evaluated by management at the CGU level, absent allocated goodwill.

The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS-8 satellite, a key program with the Israeli government. By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds. For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.

In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed. In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels. Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

The aggregation of the above factors resulted in an impairment trigger being identified as at August 31, 2018 at the GeoComm CGU. The Company first performed an impairment test of the GeoComm CGU. The impairment test of the

51

GeoComm CGU evaluated the non-financial assets held by the Company based on an asset group level, absent allocated goodwill. Assets were aggregated to the level in which independent cash flows could be generated for their respective groupings. The carrying values of these asset groups were compared against their fair value less costs of disposal for possible impairment and an impairment loss of $345.9 million related to property, plant and equipment and intangible assets was recorded for the three months ended September 30, 2018.

Goodwill is tested annually in the fourth quarter or whenever there is an indication that an asset may be impaired. The Company performs its goodwill impairment testing based on three groups of Cash Generating Unit's ("CGU's") representing its three operating segments as this is the lowest level at which management monitors goodwill. The GeoComm CGU represents a material portion of the Space Systems segment, and as such, the Company identified an indicator of goodwill impairment at the Space Systems segment. The Space Systems segment is comprised of multiple CGU's, which include the GeoComm CGU, Smallsat CGU and numerous CGU's within the MDA Canada business. The goodwill impairment test yielded no impairment, as the fair value of the Space Systems segment exceeded its carrying value by 87%.

**Inventory Obsolescence**

The significant decrease in the Company's GeoComm forecast and declining macroeconomic environment in which the GeoComm business operates also caused a significant decrease in the forecasted usage of inventory held by the Company. The Company was previously holding inventory on hand in anticipation of awards to be won during the second half of 2018 and for the AMOS 8 program. The impacts from the loss of AMOS 8 and inability to obtain the forecasted awards culminated during the third quarter of 2018. These factors compelled the Company to re-evaluate its inventory reserves for inventory that was previously pegged to forecasted usage.

All GeoComm inventory subject to discernment over future use based on forecasts was assessed for possible obsolescence. The result of the re-assessment of future usage of the on-hand inventory was an incremental inventory obsolescence reserve of $37.7 million for the three months ended September 30, 2018.

189.    Defendants admit that the allegations in Paragraph 189.

190.    Defendants admit that during the 3Q18 earnings call Mr. Porter stated in part:

IFRS EPS was a loss of $7.31 versus a gain of $0.34 in the third quarter of 2017, driven largely by the $384 million in noncash impairment inventory obsolescence charges related to the GEO Comsat business. As Howard mentioned earlier, the current state of this market, together with other factors, necessitated an analysis of

52

the carrying value of the GEO Comsat assets on our balance sheet. This led to an impairment loss of $346 million related to property, plant and equipment and intangible assets and an inventory obsolescence reserve of $38 million during this quarter.

Defendants admit that Mr. Porter also stated in part:

On an IFRS basis, we posted a loss of $7.29 year-to-date versus a gain of $0.98 in 2017. Again, the major driver of the decline was the impairment and inventory charges I mentioned earlier.

Except as expressly admitted, Defendants deny the allegations in Paragraph 190.

191.    Defendants admit that Steven Arthur, RBC Capital Markets, asked during the 3Q18 earnings call:

First off related to your current thinking on the review of the GEO business, just wondering if you can elaborate anymore, offer any more colour on the items under consideration, what's looking most interesting? And as well, what kind of drag, if you can say, was the GEO business on earnings and cash flow in the quarter?

Defendants admit that Lance responded:

Steve, I can't be specific, but I can tell you we're in a number of discussions. And our primary path remains to sell the business. So we have multiple interested parties, we are in discussions, and we're still hopeful to have an answer that we can announce between now and the end of the year. With regard to the specifics of the GEO Comsat business, I think for the first time on one of the slides we've broken out for you the business ex-GEO, so that will give you a sense between the reported numbers and the numbers we've identified. There is a little bit of intercompany sales, as you know, between our MDA company, which is providing sub systems for SSL, so those are not factored in. But you can see that it's very low profitability on a year-to-date basis, much lower than the prior year on a year-to-date basis. And when you exclude the impact of orbital receivable income, even on an IFRS basis this product line is making very, very little money.

Except as expressly admitted, Defendants deny the allegations in Paragraph 191.

192.    Defendants admit that the following exchange took place during the 3Q18 earnings call:

Thanos Moschopoulos - BMO: Hi. Good morning. Just to clarify an accounting point. If you have contracts in GEO that are expected to lose money over the life of the contract, would you recognize of the losses over that life up front? And then

53

recognize the contract at zero margin going forward? Or would the losses be recognized on a go-forward basis?

Biggs Porter: Any time you have a contract that is at a loss, you recognize it at that point in time, if that's your question. It's not something you defer to the future.

Thanos Moschopoulos: No, that's what I thought. So just to clarify then, based on your prior commentary it sounds like GEO Comsat had maybe a negative 40 million impact in the quarter. Would that be the right ballpark?

Biggs Porter: It's a little … that's probably a little on the high side. But if you look at, as I said, Space Systems variance last year to this year it's really driven by GEO Comsat. So it's significant.

Howard Lance: It's significantly negative I think we can certainly say that, Thanos. And our goal here was to provide a little more transparency and clarity around those numbers. But we have had some programs flip from small margin to a loss. And you take the whole accumulated loss in the current quarter under percent completion accounting, so it exacerbates the quarter. And again, we say this every quarter, but we would encourage investors to look at trends rather than at one-quarter activity because these programs do move around. But I've said now for a few quarters that we are now trending in GEO toward a loss. We are trending and now having the impact of pretty significant negative cash flows. And as we move from IFRS to GAAP, that will worsen somewhat because the impact of capitalized R&D. So this is part of the explanation of what's going on in the quarter.

Except as expressly admitted, Defendants deny the allegations in Paragraph 192.

193.    Defendants admit that during the 3Q18 earnings call, Robert Spingarn asked in part:

And then separately, Biggs, you've not been there that long either, just about a quarter. I wanted to ask, to what extent you've had your chance to do your deep dive and maybe reset any kind of expectations above and beyond the charge that we saw today in GEO? Do you still plan to do some kind of significant review that could result in some changes? Or has that already happened in these results?

Defendants admit that Mr. Porter responded, in part:

There's no plan for me to do anything beyond what we've looked at this quarter. I mean, every quarter it's my obligation to look at everything and make sure that we're doing everything right, whether it's in accordance with IFRS or in accordance with GAAP. So that just will never change, and that's not something that is optional.  But we did everything that we should do this quarter. We looked at it hard, and I think we, of course, then stand behind that from the standpoint of believing that we've captured what was supposed to be captured.

Except as expressly admitted, Defendants deny the allegations in Paragraph 193.

194.    Defendants admit that the Company's stock closed at $27.07 on October 30, 2018, and $14.91 on October 31, 2018, with a reported volume of 3,363,300 shares.  Defendants deny the remaining allegations in Paragraph 194.

195.    Defendants admit the allegations in Paragraph 195.

196.    Defendants admit that the Company issued a press release on December 21, 2018 that stated it "received approval from its bank lenders on December 21, 2018, to amend the Company's credit agreement ("Amended Agreement")."  Defendants admit that the Amended Agreement increases the maximum consolidated debt leverage ratio.  Except as expressly admitted, Defendants deny the allegations in Paragraph 196.

197.    Defendants admit the allegations in Paragraph 197.

198.    The allegations in Paragraph 198 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 198 is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 198.

199.    The allegations in Paragraph 199 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no response to the allegations in Paragraph 199 is required.  To the extent a response is required, Defendants admit that on the Company's stock closed at $11.72 on January 4, 2019, and $8.03 on January 7, 2019, with a reported volume of 2,797,300 shares.  Defendants deny the remaining allegations in Paragraph 199.

200.    The allegations in Paragraph 200 are pled in support of claims regarding WorldView-4.  The Court dismissed these allegations in the MTD Order.  Accordingly, no

55

response to the allegations in Paragraph 200 is required.  To the extent a response is required, Defendants admit that the Company's stock closed at $8.03 on January 7, 2019, and $6.03 on January 8, 2019, with a reported volume of 11,143,100 shares.  Defendants deny the remaining allegations in Paragraph 200.

201.    Defendants admit that Mr. Lance resigned as CEO, President, and member of the Board of Directors in January 2019.   Defendants admit that Dan Jablonsky, President of DigitalGlobe, replaced Mr. Lance as CEO, President, and member of the Board of Directors. Defendants admit that Gen. Estes made remarks in a Schedule 14A, filed with the SEC on March 28, 2019.  Defendants admit that Gen. Estes stated in part:

> In early 2019 with the change in our domestication from Canada to the U.S. and with the change in governance of the Board, it was a natural question for directors to ask… "Do we have the right CEO?" Given the company's performance in 2018 and the loss of over 90% of our value in the marketplace, the directors decided it was time to put new leadership at the head of the company and unanimously selected Dan Jablonsky as our new CEO. This was not a knee jerk reaction but rather a well thought out decision which the directors felt was essential to rebuild lost confidence in our company, its leadership and its Board.

Except as expressly admitted, Defendants deny the allegations in Paragraph 201.

202.    Defendants admit that the Company issued a press release titled, "Maxar Technologies Reports 2018 Year End Results" on February 28, 2019.  Defendants admit that the announcement states in part that the Company "recognized a net $883 million in impairment and other charges during the quarter, driven by the decline in our market value relative to book value, the loss of our World View-4 satellite, and the continuation of a weak GEO Comsat market." Defendants admit that the announcement states in part that "the Board has decided to reduce our quarterly dividend to $0.01, which follows the recent sale of a facility in Palo Alto and an amended credit agreement with our lenders. Combined, these actions demonstrate the meaningful steps we

56

are taking to strengthen Maxar's financial position and drive long-term value." Except as expressly admitted, Defendants deny the allegations in Paragraph 202.

203. Defendants admit that the Company filed a proxy statement with the SEC in March 2019. Defendants admit that the proxy statement included an Audit Committee Report that states in part:

> The Audit Committee's role is to assist the Board of Directors of Maxar in its oversight of: (i) the integrity of Maxar's financial statements; (ii) compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor.

> Given that the Company became a SEC registrant in 2017, it had until the year ended December 31, 2018 to ensure that its internal control over financial reporting is in compliance with the requirements of Section 404(a) of Sarbanes Oxley. During 2018, management documented its internal controls and completed its testing and evaluation of internal control over financial reporting. The Audit Committee met regularly with management and the independent auditor, KPMG U.S., to discuss the progress of the evaluation. Based on the Company's internal review, management identified material weaknesses in the Company's internal control over financial reporting as of December 31, 2018 related to an insufficient complement of trained resources, ineffective continuous risk assessment, and ineffective control activities related to percentage-of-completion revenue and cost of sales, measurement and disclosure of income taxes, and commitment and contingency disclosures have been identified and included in management's assessment.. No material errors were identified in the financial statements as a result of the material weaknesses. The Company's remediation plans are currently under development. The Audit Committee will continue to oversee the adequacy of Maxar's internal control over financial reporting, and will receive regular updates from management, the internal auditor and the independent auditor regarding the status of the remediation plans.

> The Audit Committee reviewed and discussed with management, the internal auditor and KPMG U.S, management's assessment of the effectiveness of Maxar's internal control over financial reporting and KPMG U.S's evaluation of Maxar's internal control over financial reporting. The Audit Committee reviewed and discussed with management and KPMG U.S., the audited financial statements for Maxar for the fiscal year ended December 31, 2018.

> The Audit Committee discussed with the independent auditors the materials required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the Public Company Accounting Oversight Board

57

("PCAOB"). In addition, the Audit Committee received from KPMG U.S. the written disclosures and the letter required by the applicable requirements of the PCAOB regarding the independent accountant's communications with the audit committee concerning independence. The Audit Committee reviewed these materials and discussed the firm's independence with KPMG U.S.

Based on such review and discussions, the Audit Committee recommended to the Board of Directors, and the Board approved for inclusion in Maxar's Annual Report and for filing with the SEC the audited financial statements of Maxar in its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 for filing with the SEC.

The Audit Committee also appointed KPMG U.S. as Maxar's independent auditors for the fiscal year ending December 31, 2019, and recommended to the Board of Directors that such appointment be submitted to our stockholders for ratification.

Except as expressly admitted, Defendants deny the allegations in Paragraph 203.

204.    Defendants admit that Jose A. Torres, Jr., the Company's Chief Accounting Officer during the Class Period, resigned from Maxar in March 2019.  Defendants admit that Carolyn Pittman assumed the role of Senior Vice President and Chief Accounting Officer effective July 29, 2019.  Except as expressly admitted, Defendants deny the allegations in Paragraph 204.

205.    Defendants admit that the Company was unable to secure a buyer of the GeoComm business.  Defendants admit that the Company was awarded BSAT-4b in 2018.  Defendants admit that Dario Zamarian separated from the Company in April 2019.  Defendants admit that the Company renamed its SSL satellite manufacturing business to Maxar Space Solutions.  Except as expressly admitted, Defendants deny the allegations in Paragraph 205.

206.    Defendants lack knowledge or information sufficient to admit or deny the allegations in Paragraph 206 and on that basis deny the allegations.

### LOSS CAUSATION/ECONOMIC LOSS

207.    Defendants deny the allegations in Paragraph 207.

208.    Defendants deny the allegations in Paragraph 208.

58

209.    Defendants deny the allegations in the first sentence of Paragraph 209.  Defendants admit that the Company's stock closed at $44.41 on August 6, 2018, and $38.44 on August 7, 2018, with a reported volume of 2,884,900 shares.  Defendants deny the remaining allegations in Paragraph 209.

210.    Defendants deny the allegations in the first sentence of Paragraph 210.  Defendants admit that the Company's stock closed at $38.44 on August 7, 2018, and $36.69 on August 8, 2018, with a reported volume of 863,000 shares.  Defendants deny the remaining allegations in Paragraph 210.

211.    Defendants deny the allegations in the first sentence of Paragraph 211.  Defendants admit that the Company's stock closed at $35.92 on August 22, 2018, and $34.15 on August 23, 2018, with a reported volume of 493,800 shares.  Defendants further admit that the Company's stock closed at $33.92 on August 24, 2018, with a reported volume of 912,000 shares.  Defendants deny the remaining allegations in Paragraph 211.

212.    Defendants deny the allegations in the first sentence of Paragraph 212.  Defendants admit that the Company's stock closed at $31.05 on August 31, 2018, and $29.34 on September 4, 2018, with a reported volume of 663,200 shares.  Defendants deny the remaining allegations in Paragraph 212.

213.    Defendants deny the allegations in the first sentence of Paragraph 213.  Defendants admit that the Company's stock closed at $34.81 on September 25, 2018, and $33.18 on September 26, 2018, with a reported volume of 1,302,800 shares.  Defendants deny the remaining allegations in Paragraph 213.

214.    Defendants deny the allegations in the first sentence of Paragraph 214.  Defendants admit that the Company's stock closed at $27.07 on October 30, 2018, and $14.91 on October 31,

59

2018, with a reported volume of 3,363,300 shares. Defendants deny the remaining allegations in Paragraph 214.

215.    The allegations in Paragraph 215 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no response to the allegations in Paragraph 215 is required. To the extent a response is required, Defendants admit that on the Company's stock closed at $11.72 on January 4, 2019, and $8.03 on January 7, 2019, with a reported volume of 2,797,300 shares. Defendants deny the remaining allegations in Paragraph 215.

216.    The allegations in Paragraph 216 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no response to the allegations in Paragraph 216 is required. To the extent a response is required, Defendants deny the allegations in Paragraph 216.

217.    The allegations in Paragraph 217 are pled in support of claims regarding WorldView-4. The Court dismissed these allegations in the MTD Order. Accordingly, no response to the allegations in Paragraph 217 is required. To the extent a response is required, Defendants deny the allegations in Paragraph 217.

218.    Defendants deny the allegations in Paragraph 218.

219.    Defendants deny the allegations in Paragraph 219.

## ADDITIONAL ALLEGATIONS OF SCIENTER

**CFO Turnover, Auditor Turnover and Audit
Committee Investigation of the Spruce Point Report**

220.    Defendants admit that Mr. McCombe was named Executive Vice President, Chief Financial Officer of MDA in October 2017. Defendants admit that Mr. McCombe previously

served as Senior Vice President and CFO of SSL MDA Holdings, Inc. between 2016 and 2017.

Except as expressly admitted, Defendants deny the allegations in Paragraph 220.

221.    Defendants admit that Mr. McCombe participated in Maxar's third quarter 2017

("3Q17") conference call in November 2017.  Defendants admit that Mr. McCombe stated in part:

> I'll now review Maxar's third quarter results with a comparison to the same period last year. Consolidated revenues for the third quarter were CAD 421 million compared to CAD 496 million for the same period last year. The Communications segment contributed CAD 256 million, down from CAD 355 million for the third quarter of last year due to a lower level of construction activity of geostationary communication satellites.
>
> While the value of our geostationary satellite awards has been relatively stable this year versus 2016 and 2015, there was a step down in award values beginning in 2015, which is manifesting itself in lower revenues in the current and recent quarters. The company has invested in diversification into new market segments to offset this effect. This is reflected in the Surveillance and Intelligence segment where revenue showed strong growth, increasing 17% to CAD 165 million from CAD 141 million for the same period of last year.
>
> This growth was primarily due to high revenues from revenues from contracts with the U.S. Government and other customers for scientific and research and development missions and for space and terrestrial robotic systems.

Except as expressly admitted, Defendants deny the allegations in Paragraph 221.

222.    Defendants admit that during the February 22, 2018 conference call, Mr. McCombe

stated in part: "Space Systems experienced a 15 percent year-over-year pro form revenue decline

in Q4, as increases in our US government business were more than offset by declines in the

commercial satellite revenues and on the Canadian RCM project."  Defendants admit that Mr.

McCombe later stated in part:

> We expect total company pro forma year-over-year revenues to decline 2 to 4 percent in 2018 as compared to 2017, driven by declines in our Space Systems segment, in part offset by continuing solid growth in the Imagery and Services segments. Our Space Systems business continues to feel the impact of the stepdown in GEO comsat award values that began in 2015. We have seen these award values stabilize at lower levels in the last couple of years, thus providing a backdrop for a potential stabilization of the segment's revenue standings (phon) in the coming

61

years. In addition, we expect continued growth in the US government and smallsat revenues.

Except as expressly admitted, Defendants deny the allegations in Paragraph 222.

223.    Defendants admit that Mr. McCombe resigned as CFO of Maxar on or about February 25, 2018.  Defendants admit that Mr. McCombe did not sign or certify certain financial statements upon the time of his departure.  Defendants admit that Mr. Wirasekara later certified certain financial statements.  Except as expressly admitted, Defendants deny the allegations in Paragraph 223.

224.    Defendants admit that the Company announced that Biggs Porter had been named as the Company's new CFO, effective August 15, 2018.  Except as expressly admitted, Defendants deny the allegations in Paragraph 224.

225.    Defendants admit that Spruce Point published a report dated August 7, 2018. Defendants admit that the Company issued a press release in response to the Spruce Point report on August 7, 2018 which stated in part: "The report…released today by Spruce Point Capital Management contains a number of inaccurate claims and misleading statements."  Defendants admit that it commenced an internal review into the allegations in the Spruce Point report assisted by the Company's auditor and third-party advisors.  Except as expressly admitted, Defendants deny the allegations in Paragraph 225.

226.    Defendants admit that the Company filed a Notice of Change of Auditor with the SEC and Canadian regulators on August 15, 2018 that stated in part: "KPMG Canada has resigned, upon the Corporation's request, as auditor of the Corporation effective July 29, 2018.  Defendants admit the allegations in the last sentence of Paragraph 226.  Except as expressly admitted, Defendants deny the allegations in Paragraph 226.

62

227.    Defendants admit that the Company issued a press release titled, "Maxar Technologies Provides Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund" on August 24, 2018 after the audit committee conducted its review with the assistance of external advisors including its independent auditor, KPMG LLP and independent third-party subject matter experts.  Except as expressly admitted, Defendants deny the allegations in Paragraph 227.

228.    Defendants admit that Mr. Porter discussed Maxar's third quarter results during the October 31, 2018 conference call and Robert Spingarn asked, in part,

> And then separately, Biggs, you've not been there that long either, just about a quarter. I wanted to ask, to what extent you've had your chance to do your deep dive and maybe reset any kind of expectations above and beyond the charge that we saw today in GEO? Do you still plan to do some kind of significant review that could result in some changes? Or has that already happened in these results?

Defendants admit that Mr. Porter responded, in part,

> There's no plan for me to do anything beyond what we've looked at this quarter. I mean, every quarter it's my obligation to look at everything and make sure that we're doing everything right, whether it's in accordance with IFRS or in accordance with GAAP. So that just will never change, and that's not something that is optional.

> But we did everything that we should do this quarter. We looked at it hard, and I think we, of course, then stand behind that from the standpoint of believing that we've captured what was supposed to be captured.

Except as expressly admitted, Defendants deny the allegations in Paragraph 228.

229.    Defendants admit that the Company disclosed $1,096 million in asset impairments on February 28, 2019.  Except as expressly admitted, Defendants deny the allegations in Paragraph 229.

230.    Defendants admit that the Company filed a Form 10-K filed on March 1, 2019 which states, in part:

63

**Evaluation of Disclosure Controls and Procedures**

We performed an evaluation of the effectiveness of our disclosure controls and procedures as of December 31, 2018. The evaluation was performed with the participation of senior management of each business segment and key corporate functions, under the supervision of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO). Based on this evaluation, the CEO and CFO concluded that our disclosure controls and procedures were not effective because of the material weaknesses in internal control over financial reporting described below.

Management, including our CEO and CFO, believes the consolidated financial statements included in this Annual Report on Form 10-K fairly represent in all material respects our financial condition, results of operations, and cash flows at and for the periods presented in accordance with U.S. GAAP.

The Company experienced many significant events and challenges during the reporting period including: (i) acceleration of U.S. domestication resulting in IFRS to U.S. GAAP conversion as of December 31st 2018, (ii) implementation of multiple critical financial reporting systems and the embedded user access configurations, (iii) significant, complex, non-routine transactions, (iv) unexpected high turnover of critical accounting and finance roles, and (v) an accelerated timeline (of less than a year from planning to effective execution) to become compliant with Section 404(a) of Sarbanes-Oxley for a significant portion of reporting units representing approximately 60% of total revenue.

Except as expressly admitted, Defendants deny the allegations in Paragraph 230.

**$3.2 Billion DigitalGlobe Acquisition Credit
Facility and Associated Debt Covenants**

231.    Defendants admit that the Company entered into a Restated Credit Agreement on

October 5, 2017 (which was subsequently amended and/or supplemented).  Defendants admit that

the Restated Credit Agreement dated October 5, 2017 defines material adverse event as follows:

(a) any material adverse change in the assets, properties, operations or condition, financial or otherwise, of the MDA Parties taken as a whole;
(b) as determined on the Closing Date and not thereafter, any material impairment or reduction in the ability (financial or otherwise) of an MDA Party or MDA Pledgor to fulfill any payment or other material obligation of (or applicable to) such MDA Party or MDA Pledgor to the Lenders; or
(c) any material impairment of the remedies of the Secured Parties under the Security.

Except as expressly admitted, Defendants deny the allegations in Paragraph 231.

64

232.    Defendants admit that the Company entered into a Restated Credit Agreement on October 5, 2017 (which was subsequently amended and/or supplemented).  Defendants admit that the Restated Credit Agreement stated in part:

> The Borrower will . . . promptly notify the Administrative Agent in writing of . . . any occurrence in respect of the assets, businesses, operations or condition, financial or otherwise of any MDA Party or MDA Pledgor (including an ERISA Event), that has or would reasonably be expected to have an MAE . . .

The Restated Credit Agreement also stated in part:

> Upon the occurrence of any Prepayment Event, the Borrower shall, within three Business Days after receipt of the Net Cash Proceeds of a Debt Incurrence Prepayment Event and within ten Business Days after the occurrence of any other Prepayment Event (or, in the case of Deferred Net Cash Proceeds, within ten Business Days after the Deferred Net Cash Proceeds Payment Date), in accordance with Section 2.3(2) below, prepay Borrowings under the Term Facilities in an aggregate principal amount equal to 100% of the Net Cash Proceeds from such Prepayment Event . . .

Except as expressly admitted, Defendants deny the allegations in Paragraph 232.

233.    Defendants admit that Maxar filed a Form 6-K with the SEC on December 21, 2018, and that Form 6-K stated, in part that the Company "received approval from its bank lenders . . . to amend the Company's credit agreement ("Amended Agreement")" in order to "provide[] the Company additional financial flexibility with regard to its consolidated debt leverage ratio." Except as expressly admitted, Defendants deny the allegations in Paragraph 233.

234.    Defendants admit that the Company issued Forms 6-K for 4Q17, 1Q18, 2Q18 which contain net earnings and losses.  Defendants admit that for 1Q18, 2Q18, and 3Q18, the Company reported, $31.0 million in net earnings, a $18.6 million net loss, and a $432.5 million net loss, respectively.  Except as expressly admitted, Defendants deny the allegations in Paragraph 234.

65

235.    Defendants admit that during the Company's presentation at the Credit Suisse 6th Annual Industrials Conference on November 28, 2018, Robert Spingarn, Credit Suisse AG, Research Division, asked, in part,

> Right. And then while we're on that topic -- that, that certainly helps frame that. While we're on that topic, let's just maybe address the concern that's out there about the covenant ceilings and the kinds of leverage numbers that are there over the next couple years. I think we go from the high 4s to 4 to 3.5. You've talked now at a high level about being under 3, right. And so I just thought it would be useful to frame the ceilings relative to where you think you're going to be.

Defendants admit that Mr. Lance stated in response:

> Well, we were at 4.3x last quarter. We're closely managing all the other CapEx in the company, having good cash flow elsewhere.  And so the key to keeping leverage where it is and having no concerns about covenants is twofold. Number one, deal with the GEO product line. The GEO product line is cash flow negative. So you've got to get out of that business, either sell it or exit it and wind it down.  So that stops the bleeding from that business line and allows the rest of the company's positive free cash flow to be seen. Second, we have to make sure that we are very focused on our overall debt structure.  We're in conversations with our banks, as you would expect, such that we don't trigger any kind of covenants going forward.  Our current credit line has the covenant step down, I think, to 4.75 at the middle of next year. That's 8 months away. A long time between now and then to see what happens with GEO as well as to engage in those discussions.  And it then steps down, I think, the following year to around 3.5, 3.75. So clearly, we are in those discussions. We'll announce something when they are concluded, but right now, we're very pleased with what we have. From our banks, we believe they clearly understand we do not have a company problem.  We have a one product line problem that we're addressing.

Except as expressly admitted, Defendants deny the allegations in Paragraph 235.

236.    Defendants deny the allegations in Paragraph 236.

**Lance's and Wirasekara's Motivation to Maintain
Their Lucrative Position and Pay Package**

237.    Defendants admit that the Company issued a Management Proxy Circular dated March 29, 2018.  Defendants admit that the Management Proxy Circular states that during 2017 Maxar Technologies Ltd. granted Mr. Lance $849,038 in salary, $715,850 in annual cash

66

incentives, and 76,505 in stock options at an exercise price of $66.77.   Except as expressly admitted, Defendants deny the allegations in Paragraph 237.

238.    Defendants admit that the Company issued a Management Proxy Circular dated March 28, 2019.  Defendants admit that the Management Proxy Circular states that during 2018 Maxar Technologies Inc. paid Mr. Lance $1 million in salary and $917,500 in annual cash incentives, and that the Board did not issue equity awards to Mr. Lance.  Except as expressly admitted, Defendants deny the allegations in Paragraph 238.

239.    Defendants admit that the Company issued a Management Proxy Circular dated March 29, 2018.  Defendants admit that the Management Proxy Circular states that during 2017 Maxar Technologies Ltd. paid Mr. Wirasekara $257,119 in salary, $92,412 in annual cash incentives, and 12,564 in stock options at an exercise price of $66.77.  Except as expressly admitted, Defendants deny the allegations in Paragraph 239.

240.    Defendants admit that the Company issued a Management Proxy Circular dated March 28, 2019.  Defendants admit that the Management Proxy Circular states that during 2018 Maxar Technologies Inc. paid Mr. Wirasekara $258,519 in salary and $109,412 in annual cash incentives, and that the Board did not issue equity awards to Mr. Wirasekara.  Except as expressly admitted, Defendants deny the allegations in Paragraph 240.

241.    Defendants admit the allegations in the second sentence of Paragraph 241.  Except as expressly admitted, Defendants deny the allegations in Paragraph 241.

**Defendant Wirasekara's Experience with
IFRS Standards and Maxar Accounting**

242.    Defendants admit that Mr. Wirasekara understood the applicable accounting rules and standards.  Except as expressly admitted, Defendants deny the allegations in Paragraph 242.

67

Active/52642481.1

243.    Defendants admit that Mr. Wirasekara participated in calls and/or presentations where Mr. Lance discussed the GeoComm market and the Company's business prospects.  Except as expressly admitted, Defendants deny the allegations in Paragraph 243.

244.    Defendants admit that Mr. Wirasekara participated in a presentation at Investor Day on March 8, 2018.  Defendants admit that a slide in the presentation deck provides the following information:



Defendants admit that during the presentation, Mr. Wirasekara stated in part:

> When you look at 2016 to 2018, the GEO Com market declined by about 45%. That was a large segment of our business. The RCM contract, the RADARSAT Constellation Mission contract, was generating north of $100 million of revenue every year for the past 4 to 5 years. That's winding down. And in 2018, it has wound down almost completely as we launched those satellites.

Except as expressly admitted, Defendants deny the allegations in Paragraph 244.

68

245.    Defendants admit that Mr. Lance and Mr. Wirasekara were employed at Maxar at an overlapping period of time, and that both held management positions during certain periods. Defendants admit that the Company issued a press release on or around October 5, 2017 that states:

William McCombe has been appointed chief financial officer of Maxar Technologies. Anil Wirasekara, who previously served as Chief Financial Officer of MDA since 1994, will continue with the Company and serve as the senior financial executive, based in Canada. Mr. Wirasekara will continue to report to Mr. Lance, with a significant portfolio of executive responsibilities.Defendants admit that the press release also states:

Bill has done an outstanding job as chief financial officer of our operating company since his appointment in 2016. He is now ready to take on the public company duties as well," said Mr. Lance. "I am fortunate to have Anil continue to serve as my most trusted advisor across a multitude of issues, given his long experience and tenure with the Company.

Except as expressly admitted, Defendants deny the allegations in Paragraph 245.

246.    Defendants deny the allegations in the first sentence of Paragraph 246.  Defendants admit that during the October 31, 2018 conference call, Robert Spingarn asked, in part,

And then separately, Biggs, you've not been there that long either, just about a quarter. I wanted to ask, to what extent you've had your chance to do your deep dive and maybe reset any kind of expectations above and beyond the charge that we saw today in GEO? Do you still plan to do some kind of significant review that could result in some changes? Or has that already happened in these results?

Defendants admit that Biggs Porter responded, in part,

There's no plan for me to do anything beyond what we've looked at this quarter. I mean, every quarter it's my obligation to look at everything and make sure that we're doing everything right, whether it's in accordance with IFRS or in accordance with GAAP. So that just will never change, and that's not something that is optional.
But we did everything that we should do this quarter. We looked at it hard, and I think we, of course, then stand behind that from the standpoint of believing that we've captured what was supposed to be captured.

247.    Defendants deny the allegations in Paragraph 247.

69

**THE PRESUMPTION OF RELIANCE**

248.    Defendants deny the allegations in Paragraph 248.

249.    Defendants deny the allegations in Paragraph 249.

**CLASS ACTION ALLEGATIONS**

250.    Defendants admit that Plaintiff purports to bring a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all Class Period purchasers of Maxar common stock on the NYSE during the Class Period.  Defendants admit that Plaintiff purports to exclude from the Class Defendants, subsidiaries, business units and consolidated entities of Maxar, and any person who was an officer or director of Maxar or any of its subsidiaries, business units, consolidated entities ("Excluded Person" or "Excluded Persons"), members of the immediate family of any Excluded Person, all legal representative, heirs successors or assigns of any Excluded Person or any member of his or her immediate family, all entities in which any Excluded Person has or had controlling interest, and any person or entity claiming under any Excluded Person.

251.    Defendants deny the allegations in Paragraph 251.

252.    Defendants deny the allegations in Paragraph 252.

253.    Defendants deny the allegations in Paragraph 253.

254.    Defendants deny the allegations in Paragraph 254.

255.    Defendants deny the allegations in Paragraph 255.

256.    Defendants deny the allegations in Paragraph 256.

**COUNT I**

**Violations of §10(b) of the Exchange Act & Rule 10b-5**
**Against All Defendants**

257.    Defendants incorporate their answers to Paragraphs 1-256.

70

Active/52642481.1

258.    Defendants deny the allegations in Paragraph 258.

259.    Defendants deny the allegations in Paragraph 259.

260.    Defendants deny the allegations in Paragraph 260.

261.    Defendants deny the allegations in Paragraph 261.

262.    Defendants deny the allegations in Paragraph 262

263.    Defendants deny the allegations in Paragraph 263.

264.    Defendants deny the allegations in Paragraph 264.

265.    Defendants deny the allegations in Paragraph 265.

266.    Defendants deny the allegations in Paragraph 266.

## COUNT II

### Violations of §20(a) of the Exchange Act
### Against Defendants Lance and Wirasekara

267.    Defendants incorporate their answers to Paragraphs 1-266.

268.    Defendants deny the allegations in Paragraph 268.

269.    Defendants deny the allegations in Paragraph 269.

270.    Defendants deny the allegations in Paragraph 270.

271.    Defendants deny the allegations in Paragraph 271.

## PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to the relief requested.

## JURY DEMAND

Defendants acknowledge that Plaintiff requests a jury trial on issues so triable.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof that would otherwise rest on Plaintiff or the class,

Defendants plead the following affirmative defenses:

71

## FIRST AFFIRMATIVE DEFENSE

(Standing)

Plaintiff's claims against Defendants are barred, in whole or in part, because Plaintiff lacks standing to assert its claims against Defendants.

## SECOND AFFIRMATIVE DEFENSE

("Puffery" and/or Safe Harbor)

Plaintiff's claims are not actionable to the extent the alleged untrue statements of material fact, omissions of material fact, misleading statements, and/or other challenged statements constitute inactionable "puffery" and/or fall within one or both of the Safe Harbor provisions of the Reform Act, as codified at 15 U.S.C. § 77z-2(c).

## THIRD AFFIRMATIVE DEFENSE

(Prior Knowledge)

At the time of their acquisition of Maxar stock, Plaintiff and members of the class had actual or constructive knowledge of the allegedly untrue statements of all or some of the alleged omissions and misstatements or other wrongful conduct upon which Defendants' purported liability rests.

## FOURTH AFFIRMATIVE DEFENSE

(Materiality)

Certain matters alleged to be the subject of misrepresentations and omissions were publicly disclosed or were in the public domain, and as such were available to Plaintiff, members of the class, and/or the securities markets.

72

## FIFTH AFFIRMATIVE DEFENSE

(Assumption of Risk)

Plaintiff and members of the putative class knew or should have known of Maxar's financial condition and the risks associated with Maxar's business at the time of their acquisition of Maxar stock and assumed the risk that the value of the Maxar stock could decline.

## SIXTH AFFIRMATIVE DEFENSE

(Good Faith)

The Defendants at all times acted in good faith and did not directly or indirectly induce any acts constituting the alleged violations and causes of action. *See, e.g*., 15 U.S.C. §78t.

## SEVENTH AFFIRMATIVE DEFENSE

(Contribution and Indemnity)

Under principles of contribution and indemnity, persons or entities other than Defendants are wholly or partially responsible for the purported damages, if any, that Plaintiff and class members have sustained.

## EIGHTH AFFIRMATIVE DEFENSE

(Improper Class Action)

This action is not properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23.

## NINTH AFFIRMATIVE DEFENSE

(Proportionate Liability)

Any recovery for damages allegedly incurred by Plaintiff and members of the class, if any, is limited to the percentage of responsibility of Defendants in proportion to the total fault of all persons, whether or not named as parties to this action, who caused or contributed to Plaintiff's

73

alleged damages, if any, pursuant to the proportionate liability provisions of the Private Securities

Litigation Reform Act of 1995 (the "Reform Act"), as codified at 15 U.S.C. § 78u-4(f)(3)(A).

## TENTH AFFIRMATIVE DEFENSE

(Reduction in Damages)

Plaintiff's alleged damages are reduced by the amount it has recovered from other

Defendants or third parties in connection with the claims alleged in the Amended Complaint and

by the amount it received in connection with the sale of its Maxar securities.

## ELEVENTH AFFIRMATIVE DEFENSE

(Failure to Mitigate)

Plaintiff's claims against Defendants are barred, in whole or in part, by Plaintiff's failure

to mitigate its alleged damages.

## TWELFTH AFFIRMATIVE DEFENSE

(Lack of Impact on Market Price)

Plaintiff's claims against Defendants are barred, in whole or in part, because the purported

misstatements or omission alleged in the Amended Complaint did not affect the market price of

Maxar securities.

Defendants lack sufficient knowledge or information upon which to form a belief as to

whether there may be additional affirmative defenses available to them.  Defendants reserve the

right to plead additional affirmative and other defenses that may become available or apparent

during pretrial proceedings in this action and/or required by any amendments to the Amended

Complaint.

74

Dated: December 14, 2020

Respectfully Submitted,
SHERMAN & HOWARD L.L.C.

*/s/ Jerome H. Sturhahn*
Jerome H. Sturhahn
Milton L. Smith
Peter G. Koclanes
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Telephone: (302) 297-2900
Facsimile: (303) 298-0940
Email: msmith@shermanhoward.com
pkoclanes@shermanhoward.com
jsturhahn@shermanhoward.com

LATHAM & WATKINS LLP

*/s/ Brian T. Glennon*
Brian T. Glennon
Eric C. Pettis
355 S. Grand Ave., Suite 1000
Los Angeles, CA 90071
Telephone: (213) 891-7593
Facsimile: (213) 891-8763
Email: brian.glennon@lw.com
eric.pettis@lw.com

Kristin N. Murphy
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 755-8287
Facsimile: (714) 755-8290
Email: Kristin.murphy@lw.com

*Attorneys for Defendants Maxar Technologies
Inc., Howard L. Lance, and Anil Wirasekara*

75

## CERTIFICATE OF SERVICE

The undersigned certifies on this 14th day of December 2020, a true and correct copy of the foregoing **DEFENDANTS' AMENDED ANSWER TO PLAINTIFF'S CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** was filed with the Clerk of the Court using the CM/ECF system which will send notification of the filing to the following addresses:

ROBBINS GELLER RUDMAN & DOWD LLP
SPENCER A. BURKHOLZ
HENRY ROSEN
TRIG R. SMITH
DEBASHISH BAKSHI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
henryr@rgrdlaw.com
tsmith@rgrdlaw.com
dbakshi@rgrdlaw.com
Attorneys for **Plaintiffs**


 *s/ Judith J. Bulanowski*
Judith J. Bulanowski, Practice Assistant

76