**Court File No./N° du dossier du greffe:** CV-19-00631107-00CP



Electronically issued
Délivré par voie électronique : 15-Nov-2019
Toronto

Court File No.:

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

**CHARLES O'BRIEN and JAMES RAE**

Plaintiffs

- and -

**MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, ANIL WIRASEKARA,
BIGGS C. PORTER, NICK S. CYPRUS and KPMG LLP**

Defendants

Proceeding under the *Class Proceedings Act, 1992*

## STATEMENT OF CLAIM

TO THE DEFENDANTS

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the Plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a Statement of Defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the Plaintiff's lawyer or, where the Plaintiff does not have a lawyer, serve it on the Plaintiff, and file it, with proof of service in this court office, WITHIN TWENTY DAYS after this Statement of Claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your Statement of Defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a Statement of Defence, you may serve and file a Notice of Intent to Defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your Statement of Defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU.  IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

IF YOU PAY THE PLAINTIFF'S CLAIM, and $5,000.00 for costs, within the time for serving and filing your statement of defence you may move to have this proceeding dismissed by the court.  If you believe the amount claimed for costs is excessive, you may pay the plaintiff's claim and $400.00 for costs and have the costs assessed by the court.

TAKE NOTICE: THIS ACTION WILL AUTOMATICALLY BE DISMISSED if it has not been set down for trial or terminated by any means within five years after the action was commenced unless otherwise ordered by the court.

Date    November 15, 2019       Issued by _____

                                              Local Registrar

                        Address of    Superior Court of Justice
                        court office:  393 University Avenue, 10th Flr.
                                       Toronto, ON M5G 1E6

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

**TO:**        **Maxar Technologies Inc.**
1300 W. 120th Avenue
Westminster, Colorado
United States of America  80234

**AND TO:**   **Howard L. Lance**
c/o Maxar Technologies Inc.
1300 W. 120th Avenue
Westminster, Colorado
United States of America  80234

**AND TO:**   **Anil Wirasekara**
c/o Maxar Technologies Inc.
1300 W. 120th Avenue
Westminster, Colorado
United States of America  80234

**AND TO:**   **Biggs C. Porter**
c/o Maxar Technologies Inc.
1300 W. 120th Avenue
Westminster, Colorado
United States of America  80234

**AND TO:**   **Nick S. Cyprus**
c/o Maxar Technologies Inc.
1300 W. 120th Avenue
Westminster, Colorado
United States of America  80234

**AND TO:**   **KPMG LLP**
Bay Adelaide Centre
333 Bay St #4600
Toronto, ON  M5H 2S5

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

## I.    DEFINED TERMS

1.    In this Statement of Claim, in addition to the terms that are defined elsewhere herein, the following terms have the following meanings:

(a)    "**2018 AIF**" means **Maxar**'s Annual Report on Form 10-K for **FY 2018**, filed on SEDAR on March 1, 2019;

(b)    "**AIF**" means Annual Information Form;

(c)    "**Audit Committee**" means the Audit Committee of **Maxar**'s Board of Directors;

(d)    "**CEO**" means Chief Executive Officer;

(e)    "**CFO**" means Chief Financial Officer;

(f)    "*CJA*" means the *Courts of Justice Act*, R.S.O 1990, c. C.43, as amended;

(g)    "**Class**" and "**Class Members**" mean all persons and entities, wherever they may reside or may be domiciled who, during the **Class Period**, acquired **Maxar**'s common shares and held some or all of such common shares as of the close of trading on August 6, 2018, October 30, 2018, January 6, 2019 and/or February 28, 2019, other than the **Excluded Persons**;

(h)    "**Class Period**" means the period from February 22, 2018 to February 28, 2019, inclusive;

(i)    "*CPA*" means the *Class Proceedings Act, 1992*, SO 1992, c 6;

(j)    "**DC&P**" means Disclosure Controls and Procedures;

(k)    "**Defendants**," each being a "**Defendant**," means **Maxar**, the **Individual Defendants** and **KPMG**;

(l)    "**DigitalGlobe**" means DigitalGlobe, Inc.;

(m)    "**Excluded Persons**" means **Maxar** and **KPMG** and their respective subsidiaries, affiliates, officers, directors, senior employees, legal representatives, heirs, predecessors, successors and assigns, the **Individual Defendants** and any member of the **Individual Defendants**' immediate families;

(n)    "**FY 2017**" means the three months and fiscal year ended on December 31, 2017;

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

(o)  "**FY 2018**" means the three months and fiscal year ended on December 31, 2018;

(p)  "**ICFR**" means Internal Controls over Financial Reporting;

(q)  "**IFRS**" means International Financial Reporting Standards;

(r)  "**Impugned Documents**," each being an "**Impugned Document**" means the following disclosure documents of **Maxar**:

(i)  Audited Financial Statements for the year ended December 31, 2017, filed on SEDAR on February 22, 2018;

(ii)  MD&A for the year ended December 31, 2017, filed on SEDAR on February 22, 2018;

(iii)  Form 52-109F1 Certification of Annual Filings executed by the Defendant, Howard L. Lance, filed on SEDAR on March 29, 2018;

(iv)  Form 52-109F1 Certification of Annual Filings executed by the Defendant, Anil Wirasekara, filed on SEDAR on March 29, 2018;

(v)  Management Information Circular filed on SEDAR on March 29, 2018;

(vi)  Interim Financial Statements for the three months ended March 31, 2018, filed on SEDAR on May 9, 2018;

(vii)  MD&A for the three months ended March 31, 2018, filed on SEDAR on May 9, 2018;

(viii)  Form 52-109F2 Certification of Interim Filings executed by the Defendant, Howard L. Lance, filed on SEDAR on May 9, 2018;

(ix)  Form 52-109F2 Certification of Interim Filings executed by the Defendant, Anil Wirasekara, filed on SEDAR on May 9, 2018;

(x)  Interim Financial Statements for the three and six months ended June 30, 2018, filed on SEDAR on July 31, 2018;

(xi)  MD&A for the three and six months ended June 30, 2018, filed on SEDAR on July 31, 2018;

(xii)  Form 52-109F2 Certification of Interim Filings executed by the Defendant, Howard L. Lance, filed on SEDAR on July 31, 2018;

(xiii)  Form 52-109F2 Certification of Interim Filings executed by the Defendant, Anil Wirasekara, filed on SEDAR on July 31, 2018;

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

(xiv)    Press release titled "Maxar Technologies Provides Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund," dated and filed on SEDAR on August 24, 2018;

(xv)    Interim Financial Statements for the three and nine months ended September 30, 2018, filed on SEDAR on October 31, 2018;

(xvi)    MD&A for the three and nine months ended September 30, 2018, filed on SEDAR on October 31, 2018;

(xvii)    Form 52-109F2 Certification of Interim Filings executed by the Defendant, Howard L. Lance, filed on SEDAR on October 31, 2018; and

(xviii)    Form 52-109F2 Certification of Interim Filings executed by the Defendant, Biggs C. Porter, filed on SEDAR on October 31, 2018;

in each case, where applicable, including all documents incorporated by reference therein;

(s)    "**Individual Defendants**," each being an "**Individual Defendant**," means Howard L. Lance, Anil Wirasekara, Biggs C. Porter and Nick S. Cyprus;

(t)    "**KPMG**" means the Defendant KPMG LLP (Canada), a registered accountant firm formed pursuant to the laws of Ontario;

(u)    "**KPMG U.S.**" means KPMG LLP (United States);

(v)    "**Misrepresentation**" means the statement made in the **Impugned Documents**, whether explicitly or implicitly, that the document fairly presented **Maxar**'s financial position and its financial performance;

(w)    "**Maxar**" means the defendant, Maxar Technologies Inc. and, as the context may require, it includes Maxar Technologies Inc.'s predecessor, Maxar Technologies Ltd.;

(x)    "**MD&A**" means Management's Discussion and Analysis;

(y)    "**NYSE**" means the New York Stock Exchange;

(z)    "*OSA*" means the Ontario *Securities Act,* RSO 1990, c S 5, as amended;

(aa)    "**Plaintiffs**" means the Plaintiff, Charles O'Brien and the Plaintiff, James Rae;

(bb)    "**Q1 2018**" means the three months ended on March 31, 2018;

(cc)    "**Q2 2018**" means the three and six months ended on June 30, 2018;

(dd)    "**Q3 2018**" means the three and nine months ended on September 30, 2018;

Electronically issued / Délivré par voie électronique : 15-Nov-2019     **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

(ee)  "**Securities Legislation**" means, collectively, the *OSA*, the *Securities Act*, RSA 2000, c S-4, as amended; the *Securities Act*, RSBC 1996, c 418, as amended; the *Securities Act*, CCSM c S50, as amended; the *Securities Act*, SNB 2004, c S-5.5, as amended; the *Securities Act*, RSNL 1990, c S-13, as amended; the *Securities Act*, SNWT 2008, c 10, as amended; the *Securities Act*, RSNS 1989, c 418, as amended; the *Securities Act*, S Nu 2008, c 12, as amended; the *Securities Act*, RSPEI 1988, c S-3.1, as amended; the *Securities Act*, RSQ c V-1.1, as amended; the *Securities Act*, *1988*, SS 1988-89, c S-42.2, as amended; and the *Securities Act*, SY 2007, c 16, as amended;

(ff)  "**SEDAR**" means the System for Electronic Document Analysis and Retrieval which is a filing system developed for the Canadian Securities Administration;

(gg)  "**TSX**" means the Toronto Stock Exchange; and

(hh)  "**WorldView-4**" means the imaging satellite called WorldView-4, which **Maxar** acquired as part of its acquisition of **DigitalGlobe** in October 2017. **Maxar** announced the loss of the satellite on January 7, 2019.

## II.   CLAIM

2.  The Plaintiffs claim:

(a)  an order pursuant to the *CPA* certifying this action as a class proceeding and appointing the Plaintiffs as the Representative Plaintiffs for the Class;

(b)  an order granting leave to proceed with the statutory liability claims under Part XXIII.1 of the *OSA* and, if necessary, the corresponding provisions of the other Securities Legislation;

(c)  a declaration that the Impugned Documents contained the Misrepresentation, and that the Misrepresentation was a misrepresentation within the meaning of the *OSA* and, if necessary, the other Securities Legislation and/or common law;

(d)  a declaration that the Impugned Documents contained one or more of the misrepresentations pleaded herein to have been made by the Defendants, which were misrepresentations within the meaning of the *OSA* and, if necessary, the other Securities Legislation;

(e)  a declaration that the loss of WorldView-4 was a material change within the meaning of the *OSA* and, if necessary, the other Securities Legislation, and that Maxar failed to timely disclose the loss of WorldView-4;

(f)  a declaration that the Defendants owed the Class Members a duty of care, and that they breached that duty of care;

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

(g)    a declaration that Maxar is vicariously liable for the acts and omissions of its officers, directors and employees;

(h)    a declaration that KPMG is vicariously liable for the acts and omissions of its partners, associates and affiliates;

(i)    a declaration that the Defendants are liable to the Class Members statutorily and in common law;

(j)    damages in the sum of $700 million, or such other sum as this Court deems appropriate at trial;

(k)    an order directing a reference or giving such other directions as may be necessary to determine issues not determined in the trial of the common issues;

(l)    prejudgment and postjudgment interest, pursuant to sections 128 and 129 of the *CJA*;

(m)    costs of this action, plus pursuant to s. 26(9) of the *CPA,* the costs of notices and of administering the plan of distribution of the recovery in this action; and

(n)    such further and other relief as to this Honourable Court seems just.

## III.    OVERVIEW

3.    This securities class action arises out of Maxar's manipulative and improper accounting and financial reporting practices during the Class Period.  Through and as a result of those improper practices, Maxar reported false and/or misleading financial results, including improperly inflated assets, revenues, accounts receivable and other financial statement accounts.  Accordingly, contrary to the Defendants' assurances made to the Class, the Impugned Documents violated applicable accounting principles and securities law.

4.    The Defendants' misrepresentations were corrected over four corrective disclosures between August 2018 and February 2019, which gradually revealed to the market that Maxar's financial position and results as presented in the Impugned Documents were untrue.

Electronically issued / Délivré par voie électronique : 15-Nov-2019        **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

5.      The truth about Maxar's improper accounting practices began to emerge in August 2018, when Spruce Point Capital Management issued a research report raising concerns regarding Maxar's financial reporting practices. Maxar was, however, quick to reject the report's allegations as "misleading," representing to its investors and the public that it stood by its financial reporting. After having purportedly conducted a review of the allegations and Maxar's financial reporting, Maxar's Board of Directors—assisted by the Defendant, KPMG— "reaffirmed its full confidence in the Company's management team," and the veracity of Maxar's financial reports.

6.      Soon enough, however, Maxar would shock the market by making a series of surprise corrections to its financial reporting. First, on October 31, 2018, Maxar announced that it was taking impairment and other losses totalling US$383.6 million. Subsequently, on February 28, 2019, Maxar announced that it was taking impairment and other losses totalling approximately US$1.1 billion. Along the way, Maxar gradually revealed to the market its problematic revenue recognition practices, which impacted the company's revenues, losses and margins, as well as further issues with its accounts receivable. These disclosures culminated in the finding of the company and its new auditors KPMG U.S., announced on March 1, 2019, that Maxar's internal controls suffered from several material weaknesses and were ineffective.

7.      Over the course of the twelve-month Class Period from February 2018 through February 2019, Maxar saw the departures of a CFO, after having been in the job for a mere five months, a CEO, and a set of auditors. It, furthermore, wrote down its assets' value by more than US$1 billion. And it initiated and unsuccessful concluded the process to sell a prominent part of its historical line of business, which it called off after a suitable buyer could not be found.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

8.      In the meantime, Maxar lost one of its main operating assets and revenue generators, the high-tech and highly valued WorldView-4 satellite.  Maxar, however, improperly failed to disclose the loss of the satellite in a timely fashion, as the law required it to do.

9.      From February 2018 through February 2019, Maxar lost approximately $4 billion, or 90%, of its market capitalization.  The Class lost hundreds of millions of dollars, because the Defendants manipulated Maxar's financial statements, and failed to truthfully disclose the information the investors were entitled to know pursuant to Maxar's continuous disclosure obligations under the Securities Legislation.

10.     The Plaintiffs have brought this action on their own behalf and on behalf of the Class to recover compensation for the damages or losses they have suffered as a result of Defendants' misrepresentations and their breaches of their duties.  Through this action, the Plaintiffs also seek to enhance corporate accountability, promote and encourage good governance amongst corporate Canada and deter similar conduct by others.

## IV.     THE PARTIES

### A. *The Plaintiffs*

11.     The Plaintiff, Charles O'Brien, is an individual investor, resident in the Province of Quebec.  He acquired Maxar's common shares at various points in time during the Class Period, and held those common shares as at the end of the Class Period.  Mr. O'Brien has incurred a significant loss on his investment in Maxar common shares.

12.     The Plaintiff, James Rae, is an individual resident in the Province of Quebec.  He acquired Maxar's common shares in July 2018, and continued to hold those shares as at the end

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

of the Class Period.  Mr. Rae has incurred a significant loss on his investment in Maxar's common shares.

### B. *Maxar*

13.     The Defendant Maxar is a space and geospatial intelligence and technology company.

14.     Maxar is the successor to Maxar Technologies Ltd.  ("**Maxar Canada**").  Formerly known as MacDonald, Dettwiler and Associates Ltd. ("**MDA**"), Maxar Canada was incorporated in 1969.  Over the past decade, Maxar Canada has undergone several major corporate transactions.  In May 2016, MDA continued under the British Columbia *Business Corporations Act*.  On October 5, 2017, MDA acquired the U.S.-based DigitalGlobe, an Earth imagery company, and changed its name to Maxar Canada.  Contemporaneously, Maxar Canada's common shares were listed for trading on the NYSE.

15.     The Defendant Maxar was incorporated in its current form under the laws of the State of Delaware on December 12, 2018, in furtherance and as part of the company's United States domestication plan.  Pursuant to a series of transactions effected as of January 1, 2019, Maxar became the ultimate parent company of Maxar Canada and the successor to Maxar Canada, including in relation to its liabilities as pleaded herein.

16.     In this pleading, as the context may require, the term "Maxar" refers to the reporting entity including Maxar Canada, as appropriate.

17.     At all material times relevant to this action, Maxar's common shares were listed for trading on the TSX and the NYSE under ticker symbol "MAXR."

Electronically issued / Délivré par voie électronique : 15-Nov-2019          **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

18.    At all material times relevant to this action, Maxar was a Canadian company governed by the British Columbia *Business Corporations Act*, and domiciled in British Columbia.

19.    Maxar's headquarters are currently located in Westminster, Colorado.

20.    At all material times relevant to this action, Maxar has been and it continues to be a reporting issuer and a responsible issuer in Ontario and the other Canadian Provinces.  Maxar's principal securities regulator is currently the Ontario Securities Commission.

21.    As a reporting issuer in Ontario, Maxar was required throughout the Class Period to issue and file on SEDAR:

(a)    within 45 days of the end of each quarter, quarterly interim financial statements prepared in accordance with IFRS;

(b)    within 90 days of the end of the fiscal year, annual financial statements prepared in accordance with IFRS;

(c)    contemporaneously with each of the above, a MD&A of each of the above financial statements. MD&As are a narrative explanation of how the company performed during the period covered by the financial statements, and of the company's financial condition and future prospects.  The MD&A must discuss important trends and risks that have affected the financial statements, and trends and risks that are reasonably likely to affect them in future; and

(d)    within 90 days of the end of the fiscal year, an AIF, including material information about the company and its business at a point in time in the context of its historical and possible future development. AIFs are an annual disclosure document intended to provide material information about the company and its business at a point in time in the context of its historical and future development.  The AIF must describe the company, its operations and prospects, risks and other external factors that impact the company specifically.

22.    At all material times during the Class Period, Maxar was (and it currently is) a registrant with the United States Securities and Exchange Commission.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

### C. *The Individual Defendants*

23.    At all material times relevant to this action, the Defendant Howard L. Lance was President, CEO and a director of Maxar.  Lance joined Maxar (then known as MDA) in May 2016.  On January 14, 2019, Maxar reported that Lance "ha[d] resigned from his roles as President and Chief Executive Officer and as a Director of Maxar," effective January 13, 2019.

24.    At all material times relevant to this action, Lance was a director and an officer of Maxar within the meaning of the *OSA*.  During the Class Period, Lance certified each of the Impugned Documents that are annual or quarterly disclosures of Maxar.  Additionally, as a member of Maxar's Board of Directors, Lance participated in the approval process with respect to the release of the Impugned Documents.  Lance made the misrepresentations pleaded herein or adopted those misrepresentations as being of his own by virtue of his actions and/or omissions in relation to the release of the Impugned Documents.

25.    The Defendant Anil Wirasekara was CFO of MDA prior to its acquisition of DigitalGlobe in October 2017.  Subsequently, he became a senior financial executive with Maxar.  Effective February 26, 2018, Wirasekara was appointed the interim CFO of Maxar.  This appointment was announced on February 26, 2018, in conjunction with Maxar's announcement that its then-CFO, William McCombe, had stepped down effective immediately.  Wirasekara acted as Maxar's interim CFO until on or about August 15, 2018, when the Defendant Biggs C. Porter was appointed Maxar's CFO.

26.    Wirasekara has professional accounting training, designations and affiliations, including with The Society of Management Accountants of British Columbia, among other professional associations.

Electronically issued / Délivré par voie électronique : 15-Nov-2019      **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

27.     At the relevant times, Wirasekara was an officer of Maxar within the meaning of the *OSA*. In his role as Maxar's interim CFO, Wirasekara certified Maxar's disclosures for FY 2017, Q1 2018 and Q2 2018, which are Impugned Documents. Wirasekara made the misrepresentations pleaded herein or adopted those misrepresentations as being of his own by virtue of his actions and/or omissions in relation to the release of the relevant Impugned Documents.

28.     The Defendant Biggs C. Porter was appointed CFO of Maxar effective August 15, 2018, and he currently continues to hold that position. Porter is a certified public accountant.

29.     At the relevant times during the Class Period, Porter was an officer of Maxar within the meaning of the *OSA*. In his role as Maxar's CFO, Porter certified Maxar's disclosures for Q3 2018, which are Impugned Documents. Porter made the misrepresentations pleaded herein or adopted those misrepresentation as his own by virtue of his actions and/or omissions in relation to the release of the relevant Impugned Documents.

30.     At all material times relevant to this action, the Defendant Nick S. Cyprus was a director of Maxar and Chairman of the Audit Committee of Maxar's Board of Directors. Cyprus joined Maxar's Board of Directors on October 5, 2017, following Maxar's acquisition of DigitalGlobe. Prior to that, Cyprus was a director of DigitalGlobe and a member of DigitalGlobe's Board of Directors' Audit Committee. Cyprus is a certified public accountant.

31.     As a member and Chairperson of the Audit Committee, Cyprus had duties to "assure[] that the Company's financial statements fairly present[ed] the consolidated financial position of the Company and the results of its operations," according to Maxar. Additionally, Cyprus had duties to oversee risks relating to financial statements, financial reporting process, accounting,

Electronically issued / Délivré par voie électronique : 15-Nov-2019     **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

audit, the internal audit function and Maxar's Code of Ethics.   Cyprus's duties as a member and Chairman of the Audit Committee are particularized in the Audit Committee Charter and Maxar's Management Information Circular dated March 29, 2018, which is an Impugned Document.

32.    At all material times relevant to this action, Cyprus was a director of Maxar within the meaning of the *OSA*.  As a member of Maxar's Board of Directors, Cyprus participated in the approval process with respect to the release of the Impugned Documents.  Cyprus made the misrepresentations pleaded herein or adopted those misrepresentations as being of his own by virtue of actions and/or omissions in relation to the release of the Impugned Documents.

### D. *KPMG*

33.    The Defendant KPMG is a chartered professional accountants' firm formed in accordance with the laws of Ontario.  KPMG's headquarter is located in Toronto, Ontario, and it has offices and operations across Canada.

34.    KPMG served as the independent auditor of Maxar since 2002 until it resigned and was replaced by KPMG U.S. effective as of July 29, 2018.  Following its resignation, KPMG continued to perform professional services up to and including at least the release of Maxar's 2018 AIF on March 1, 2019, in which KPMG issued an audit report with respect to Maxar's FY 2017 financial statements.

35.    In its capacity as Maxar's long-standing independent auditors, KPMG has performed various engagements with respect to Maxar's financial reporting and other disclosure and corporate matters, including audits of Maxar's annual financial statements and reviews of

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

Maxar's interim financial statements. Additionally, in conjunction with its engagements in relation to Maxar's financial statements, KPMG performed professional work, and it was associated with, Maxar's MD&As, as well as Maxar's press release issued on August 24, 2018, which are Impugned Documents. KPMG is an expert within the meaning of the *OSA*.

36. In fiscal years 2017 and 2018, respectively, KPMG and, as applicable, its affiliates including KPMG U.S., earned professional fees of $5,681,500 and US$6,113,618 from Maxar.

## V.   THE EVENTS OUT OF WHICH THIS ACTION ARISES

### A. *Maxar's Business and the Unfavourable Environment in Which It Operates*

37. Maxar is a provider of advanced space technology solutions for commercial and government markets, including satellites, Earth imagery, geospatial data and analytics.

38. At all relevant times during the Class Period, Maxar had three reportable operating segments: (a) Space Systems; (b) Imagery; and (c) Services. Through these business segments, Maxar purported to provide a wide range of products and services, including communication satellites and satellite subsystems, space-based, ground-based and airborne surveillance and intelligence solutions, as well as high-resolution Earth-imagery products and services.

Space Systems

39. In the Space Systems segment, Maxar is a supplier of space-based and ground-based infrastructure and information solutions. Through these business activities, Maxar purports to design, manufacture and integrate communication and imaging satellites, satellite payloads and

antenna subsystems, space-based and airborne surveillance solutions, robotic systems and associated ground infrastructure and support services.

40.    Over the past several years, Maxar's revenues generated from its Space Systems business activities have declined year-over-year.  For fiscal years 2016, 2017 and 2018, respectively, Maxar reported that Space Systems generated, respectively, US$1,421 million, US$1,270 million and US$1,129 million of its consolidated revenues.

41.    According to Maxar, its Space Systems business activities are undertaken within "a highly competitive industry."  Success of these business activities is contingent on "relationships, technical capabilities and engineering expertise, product reliability, cost and ability to meet delivery schedules," according to Maxar.

42.    Within the Space Systems business and assets, at all material times, Maxar had (and it continues to have) satellite manufacturing operations and facilities in Palo Alto, California. Through its Palo Alto manufacturing facilities, Maxar purports to be a manufacturer and supplier of geostationary communication satellites to commercial satellite operators worldwide. These activities are predominantly carried out through Maxar's wholly owned subsidiary, Space Systems/Loral, LLC, a company incorporated under the laws of the State of Delaware, and its related entities.

43.    Over the past several years, Maxar's business within the Space Systems segment, most notably in relation to its geostationary satellite manufacturing activities, has been negatively affected due to adverse market conditions and environment, which was reflected in a negative trend and the year-over-year decline in Maxar's revenues.  The negative trend and unfavourable market conditions were, in a nutshell, due to three interrelated factors:

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

    (a)    competing technologies and adverse market conditions;

    (b)    an overall decline in the market in terms of both number and dollar value of the geostationary communication satellites orders; and

    (c)    the satellite operators' delays in making award decisions.

44.    Those conditions were acknowledged by MDA's then-new CEO, the Defendant Lance, on an earnings call held on November 1, 2016:

> The overall market remains below historic averages for the second year. The satellite operators delay awards to consider competing technologies and to assess regional excess capacity and their profitability issues.

45.    On MDA's November 1, 2016 earnings call, MDA's then-CFO, the Defendant Wirasekara also acknowledged the negative market trend:

> Revenues were negatively impacted by the lower number of satellite contracts awarded over the last 18 months, and consequently by the lower number of active satellite programs in the higher revenue-generating stage of the program cycle as compared to a year ago. We expect this trend to continue for the next few quarters until satellite order intake levels return to near historical averages.

46.    Indeed, the negative market trend was also acknowledged in MDA's MD&A for the fiscal year ended December 31, 2016, filed on SEDAR on February 23, 2017:

> Revenues from the Communications segment decreased year over year. In 2016, revenues were negatively impacted by a lower number of satellite contracts awarded to the Company over the last two years, resulting in fewer satellites under construction in the second half of the year compared to 2015. The number of awards in the geostationary communication satellite market remained below its historical average for a second year as satellite operators delayed awards to consider competing technologies and to assess regional capacity and pricing issues. The Company continues to maintain the leading market share position for both traditional geostationary and high throughput satellites, but since the overall market awards have decreased, the Company has achieved fewer awards during

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

2015 and 2016 than in prior years. The Company expects this lower level of revenue to continue until such time as growth in the communication satellite market improves.

47.     During FY 2017, MDA announced and, subsequently, completed the acquisition of DigitalGlobe.  The acquisition of DigitalGlobe significantly altered and reshaped the business, operations and corporate structure of the company.  MDA accordingly changed its name to Maxar, became a registrant with the United States Securities and Exchange Commission, listed its securities on the NYSE, and set in motion a corporate United States domestication plan, which was completed effective January 1, 2019.

48.     Nonetheless, Maxar's historical business line, the Space Systems segment, continued to grapple with the negative market trend, which continued to adversely impact Maxar's Space Systems business and results.  On an earnings call held on November 2, 2017, the Defendant Lance acknowledged the continuing adverse impact of the market conditions:

> The Communications segment revenue was 18% lower than the prior-year period, highlighting the continuing weakness in the [GeoComm] sat markets. […] While we continue to forecast a modest uptick in industry awards in 2018 and 2019 due to the needs to replace aging GEO satellites, the total market is unlikely to return to historic levels.

49.     On the same earnings call held on November 2, 2017, in response to a question from Thanos Moschopoulos, an analyst with BMO Capital Markets Equity Research, the Defendant Lance further acknowledged: "we expect that the GEO ComSat business from a reported revenue and earnings standpoint is going to be under continued pressure."

50.     Maxar's FY 2017 annual report, filed on SEDAR on March 29, 2018, reflected similar industry-wide and Maxar-specific concerns regarding the changing market trends as those which the company and its senior management had recognized since 2016:

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

Although the total dollar value of geostationary communication satellite awards to the company has remained relatively stable since 2015, there has been a step down in total number and dollar value of awards compared to historical averages prior to 2015. Revenues have decreased year-over-year as programs awarded prior to 2015 have been completed and have been replaced by this lower level of award value since 2015. Satellite operators in the communications satellite industry have continued to delay award decisions to evaluate geostationary and other competing satellite system architectures and other changes in the industry. The Company is confident in its ability to adapt to changes in customer demand and maintain its leading market share position in the face of evolving technology trends.

51.    Maxar's disclosures during 2016 and 2017, as such, acknowledge the following unfavourable market conditions, which were negatively impacting the company's Space Systems business activities:

(a)    since 2015, there had been "a step down in total number and dollar value of awards compared to historical averages prior to 2015";

(b)    as a result, the company's revenues "ha[d] decreased year-over-year";

(c)    the year-over-year decline in Maxar's revenue was due to the completion of the programs awarded to Maxar prior to 2015, which had not been replaced with an equal level of new awards since 2015, due to historically low demand;

(d)    satellite operators in the communications industry continued to delay award decisions; and

(e)    all these conditions reflected the impact of competing technologies, the availability of different satellite system architecture, as well as "other changes in the industry."

52.    The unfavourable market environment and the negative market trend since 2015 negatively impacted Maxar's Space Systems' business segment, and eventually brought about significant asset impairment charges announced by Maxar in Q3 and as of year-end 2018. As

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

further pleaded herein, the Plaintiffs claim that Maxar improperly delayed taking impairment charges on its business and assets in violation of IFRS and its own accounting policies. As a result, Maxar improperly reported overstated assets during the Class Period.

53.     The overstatement of Maxar's assets during the Class Period was a misrepresentation of material facts to investors, contrary to Part XXIII.1 of the *OSA* and the other Securities Legislation.

Imagery

54.     In the Imagery segment, Maxar is a supplier of integrated high resolution electro-optical and radar imagery sourced from Maxar's own satellite constellation as well as third-party providers.

55.     For fiscal years 2016, 2017 and 2018, Maxar reported that the Imagery segment generated, respectively, US$42 million, US$230 million and US$845 million of its consolidated revenue. Of note, the increase in Imagery segment's revenues in 2017 and 2018 was in large part due to the acquisition of DigitalGlobe in October 2017, which is further discussed below.

Services

56.     In the Services segment, Maxar provides geospatial information, applications and analytic services to national security and commercial customers, complementing Maxar's Imagery and other sources of geospatial data such as satellite imagery, weather and oceanographic data, elevation and social media.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

57.    For fiscal years 2016, 2017 and 2018, respectively, Maxar reported that the Services

segment generated, respectively, US$100 million, US$144 million and US$266 million of its

consolidated revenue.  The increase in the Services segment's revenues in 2017 and 2018 was

also due to the acquisition of DigitalGlobe in October 2017, which is further discussed below.

### B. Acquisition of DigitalGlobe

58.    On February 24, 2017, MDA announced that it was acquiring DigitalGlobe in a

purportedly breakthrough transaction aimed to "creat[e] industry leader in end-to-end space

systems, earth imagery and geospatial solutions."   In conjunction with that announcement,

MDA issued a press release which contained the following statements by the Defendant Lance:

> "Today's announcement creates a new company that will lead the industry,
> offering space systems and imaging solutions from inception to execution,
> able to make design decisions with our customer's needs in mind," said
> Howard L. Lance, president and chief executive officer of MDA. "This
> combination has the scale, resources and technology to serve the large and
> increasingly complex needs of government and commercial customers
> globally. By combining MDA and DigitalGlobe, we are significantly
> expanding our total addressable market by broadening both companies'
> capabilities and facilitating future growth."

59.    MDA completed the acquisition of DigitalGlobe on October 5, 2017 and,

contemporaneously, changed in name to Maxar and listed its common shares on the NYSE.  In

conjunction with the announcement of the completion of the acquisition, the Defendant Lance

was quoted as saying the following:

> "Today is a very exciting day for our customers, partners, employees and
> shareholders," said Howard L. Lance, president and chief executive officer
> of MDA. "Together, in partnership with the outstanding team at
> DigitalGlobe, our combined company will offer an unmatched suite of
> solutions, benefit from increased scale and a more diversified revenue
> base, and drive increased value by leveraging the sales channels of both
> companies. The combination of our strong, diversified core businesses will

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

create expanded opportunities for team members and customers alike. I am very excited to get to work with the new leadership team to drive top and bottom line growth and future success.

60.    The acquisition of DigitalGlobe redefined Maxar as a corporate entity.

61.    Following the completion of the DigitalGlobe acquisition, Maxar underwent significant managerial and directorial changes, including the following:

(a)    William McCombe, previously Senior Vice President and CFO of SSL MDA Holdings, a wholly-owned Maxar subsidiary, was appointed CFO of Maxar;

(b)    Walter S. Scott, DigitalGlobe's founder, was appointed Maxar's Chief Technology Officer;

(c)    Nick S. Cyprus, formerly a director of DigitalGlobe, was appointed a director of Maxar and a member of the Audit Committee;

(d)    Howell M. Estes, formerly a director of DigitalGlobe, was appointed a director of Maxar, and a member of the Board's Human Resources and Management Compensation Committee; and

(e)    L. Roger Mason, formerly a director of DigitalGlobe, was appointed a director of Maxar and a member of the Audit Committee and the Governance and Nominating Committee of Maxar's Board of Directors.

62.    The acquisition transaction valued DigitalGlobe at an equity value of approximately US$2.33 billion, and an enterprise value of approximately US$3.6 billion, including Maxar's assumption of DigitalGlobe's US$1.2 billion in net debt.  In its audited financial statements for FY 2017, which is an Impugned Document, Maxar set out the allocation of the purchase price of DigitalGlobe as follows:

Electronically issued / Délivré par voie électronique : 15-Nov-2019     **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

|  | October 5, 2017 |
|---|---|
| Cash paid | $ 1,131.0 |
| Shares issued | 1,063.4 |
| Merger consideration to be settled | 3.1 |
| Liability to dissenting shareholders | 114.9 |
| Issuance of replacement equity-settled awards | 15.8 |
| **Purchase consideration** | **2,328.2** |
| **Assets** | |
| Cash and cash equivalents | $ 170.6 |
| Trade and other receivables | 142.2 |
| Financial assets, other | 13.4 |
| Current tax assets | 0.1 |
| Non-financial assets | 93.4 |
| Property, plant and equipment | 695.8 |
| Definite life intangible assets | 1,439.8 |
| | 2,555.3 |
| **Liabilities** | |
| Trade and other payables | $ 83.2 |
| Current tax liabilities | 2.7 |
| Provisions | 1.4 |
| Employee benefits | 29.1 |
| Non-financial liabilities | 354.0 |
| Deferred tax liabilities | 149.6 |
| Long-term debt | 1,276.0 |
| | 1,896.0 |
| **Fair value of net identifiable assets acquired** | **659.3** |
| **Goodwill** | **$ 1,668.9** |

63.    The "property, plant and equipment" and "definite life intangible assets" items set out above included, most notably, a constellation of 5 imaging satellites owned and operated by DigitalGlobe, which were valued by DigitalGlobe prior to the acquisition as follows:

| | | June 30, 2017 | | | December 31, 2016 | | |
|---|---|---|---|---|---|---|---|
| (in millions) | Depreciable Life (in years) | Gross Carrying Amount | Accumulated Depreciation | Net Carrying Amount | Gross Carrying Amount | Accumulated Depreciation | Net Carrying Amount |
| GeoEye-1 | 9.0 | $ 211.8 | $ (187.1) | $ 24.7 | $ 211.8 | $ (165.9) | $ 45.9 |
| WorldView-1 | 13.0 | 473.2 | (383.4) | 89.8 | 473.2 | (370.1) | 103.1 |
| WorldView-2 | 13.0 | 463.2 | (287.7) | 175.5 | 463.2 | (271.7) | 191.5 |
| WorldView-3 | 11.5 | 649.5 | (155.3) | 494.2 | 649.5 | (127.1) | 522.4 |
| WorldView-4 | 10.5 | 884.2 | (35.1) | 849.1 | — | — | — |
| Satellites, net | | $ 2,681.9 | $ (1,048.6) | $ 1,633.3 | $ 1,797.7 | $ (934.8) | $ 862.9 |

64.    Following the acquisition of DigitalGlobe, Maxar reclassified the value of the acquisition assets, impairing the fair value of property, plant and equipment assets from their carrying value on DigitalGlobe's books of US$2,118.5 million to US$872.3 million. Contemporaneously, Maxar increased the fair value of the intangible assets acquired from DigitalGlobe from US$266.9 million to US$1,619 million.

65.    These asset valuation figures included, among other assets, the five imaging satellites whose net book value was written down by Maxar from US$1.57 billion to $569 million as of the acquisition date of October 5, 2017.

66.    The effect of the foregoing asset valuation and classification was an impairment charge in the amount of US$1 billion (or 64%) on the book value of the five satellites. Maxar's August 24, 2018 press release, which is an Impugned Document, elaborates on the underlying rationale for this approximately US$1 billion impairment charge as follows:

> In a business combination, all assets, liabilities and contingent liabilities acquired or assumed are recorded at their fair market values at the date of acquisition. The Company used independent third-party specialists to calculate fair value of its assets using current replacement costs and their remaining useful life. This valuation process resulted in $1.57 billion in net book value of on-orbit assets on the DigitalGlobe balance sheet being written down to $569 million fair market value on the Company's balance sheet at the time of the transaction closing. The valuation was driven by a significant reduction in current replacement cost estimates. The WorldView 1 and WorldView 2 satellites had combined original costs of $936 million. This compares with estimated WorldView Legion Block 1 replacement costs of approximately $600 million. WorldView 3 and WorldView 4 had combined original costs of $1.5 billion. This compares with estimated WorldView Legion Block 2 replacement costs of approximately $400-$500 million. The Company's balance sheet depreciation of current on-orbit assets now more closely matches the future expected capital expenditures for the replacement satellites. The significant improvements in capital efficiency from the Company's WorldView Legion constellation will help provide the next leg of growth in the Company's imagery business at much lower levels of cash capital expenditures and at a much higher ROIC than previous on-orbit investments.

> [underline added.]

67.    Maxar's explanation constitutes an acknowledgement that:

(a)    the geostationary communication satellites are replaceable with the constellation of smaller and much cheaper satellites, such as the WorldView Legion blocks;

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

(b)    critically, due to the evolving technology trends and competing satellite structures, the fair value of the geostationary communication satellites would be significantly lower than their manufacturing costs; therefore,

(c)    it was appropriate to impair the net book value of the satellites by US$1 billion as of October 2017.

68.    The considerations and circumstances underpinning Maxar's decision to take the significant impairment charge on the five DigitalGlobe satellites represents an indication that the recoverable amount of its assets should be assessed, pursuant to the IFRS requirements. Specifically, the decline in the DigitalGlobe satellites is an observable indication or adverse change with respect to satellites which should have driven Maxar to assess and reduce the book value of its own assets relating to the Space Systems business activities as early as year-end 2017 and throughout FY 2018.

## C. *Subsequent Events*

69.    On February 22, 2018 (the date on which the Class Period starts), Maxar released its disclosure documents for FY 2017, which are Impugned Documents. In those disclosures, among other things, Maxar reported year-over-year decline in its Space Systems business unit, most notably in relation to its geostationary communication satellite manufacturing activities.

70.    On February 26, 2018, a few days before Maxar's important Investor's Day events in Toronto and New York City, Maxar announced that its then-CFO, William McCombe, had stepped down effective immediately. McCombe was replaced by the Defendant Wirasekara as Maxar's interim CFO. Of note, Maxar filed a Material Change Report in relation to these managerial changes on February 26, 2018.

71.    On May 9, 2018, Maxar released its disclosure documents for Q1 2018, which are Impugned Documents.  As part of these disclosures, Maxar reported that its revenue was negatively affected "by continued challenging conditions in the geostationary communication satellite market," resulting in "lower revenues from geostationary communication satellite construction activity compared to the first quarter of 2017."

72.    On July 12, 2018, Maxar announced that the Defendant Porter would be joining its senior management team as Maxar's Executive Vice President and CFO effective August 15, 2018.  The Defendant Porter assumed that responsibility on or about August 15, 2018, replacing the Defendant Wirasekara as Maxar's CFO.

73.    On July 24, 2018, space technology news outlets reported that Maxar was contemplating exiting the geostationary communication satellite manufacturing market.  Maxar confirmed the rumors, stating that the pressure on its geostationary communication satellite manufacturing business due to market conditions had led it to consider strategic alternatives.  In an email statement to spacenews.com, Maxar elaborated that its decision to initiate the strategic review with respect to its geostationary communication satellite business unit was driven by its "hav[ing] experienced material satellite order declines in recent years as a result of end market supply and demand factors," among other unfavourable market conditions.

74.    On July 31, 2018, Maxar released its disclosure documents for Q2 2018, which are Impugned Documents.  As part of these disclosures, among other things, Maxar reported that it "continu[ed] to review strategic alternatives for its geostationary communication satellite business to improve its financial performance."  Maxar furthermore reported that its revenues

had been negatively impacted as a result of the continued decline in the geostationary

communication satellite line of business.  Maxar's Q2 2018 MD&A elaborated as follows:

> Although the total dollar value of geostationary communication satellite
> awards to the Company has remained relatively stable since 2015, there
> has been a step down in total number and dollar value of awards compared
> to historical averages prior to 2015. Revenues have decreased year-over-
> year as programs awarded prior to 2015 have been completed and have
> been replaced by this lower level of award value since 2015. Many satellite
> operators in the communications industry have continued to defer new
> satellite construction awards to evaluate geostationary and other
> competing satellite system architectures and other market factors.

75.    On Maxar's Q2 2018 earnings call held on July 31, 2018, once again, the Defendant

Lance acknowledged the negative market trends which had negatively impacted Maxar's

business for several years:

> As we've discussed at length in the past, industry orders fell significantly
> in 2015 and have remained at those low levels ever since.  At this point,
> we do not expect a significant recovery for this market, with industry
> orders likely to be at the low end of the 8 to 12 awards range this year,
> 2018.  From our perspective, industry growth clearly is moving in the
> direction of LEO and LEO constellations, with the demand for GEO
> primarily driven by replacement needs of existing satellites.  As such, we
> are examining a range of strategic alternatives for our GEO comsat line of
> business.  We continue to align our workforce size with the operations and
> engineering work to be done.  We continue to exit leased buildings and
> consolidate our footprint on the Palo Alto campus.

76.    Of note, although it is currently unknown when Maxar initiated the "strategic review,"

on the July 31, 2018 earnings call, the Defendant Lance confirmed that "It ha[d] been ["actively

in process"] for a while."

77.    On August 7, 2018, Spruce Point Capital Management ("**Spruce Point**") issued a short

seller's report on Maxar.  Based on a review of Maxar's disclosures and market research, the

Electronically issued / Délivré par voie électronique : 15-Nov-2019       **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

report provided the opinion that Maxar had engaged in a number of improper financial reporting and disclosure practices.

78.     On the same date, August 7, 2018, Maxar issued a rebuttal press release titled "Maxar Technologies Responds to Misleading Short Sell Report." In that press release, Maxar stated that Spruce Point's report contained "a number of inaccurate claims and misleading statements," further elaborating as follows:

> Maxar continues to execute against its strategy, and recently reaffirmed its full year 2018 guidance for revenue and cash flow from operations, while increasing its full-year adjusted EPS outlook. Maxar believes that the Company remains positioned for future growth. Management and the Board of Directors are focused on delivering enhanced value for all Maxar shareholders.
>
> Maxar continues to be fully committed to transparency in all of its investor presentations and financial reports. Please refer to the Company's disclosure materials filed with Canadian and U.S. securities regulatory authorities, which are available online under the Company's SEDAR profile at www.sedar.com, under the Company's EDGAR profile at www.sec.gov or on the Company's website at www.maxar.com, for more information.

79.     On August 24, 2018, Maxar issued a rebuttal press release titled "Maxar Technologies Provides Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund," which is an Impugned Document. In that press release, Maxar responded to the allegations raised by Spruce Point, and further stated:

> **In response to the accounting claims made in the report, the audit committee of the Board of Directors undertook a review of the elements of the Company's financial statements and disclosures associated with Spruce Point's claims and found no material errors in the previously issued financial statements and disclosures under IFRS.** The audit committee takes seriously any claims regarding the Company's financial reporting. Specifically, the committee conducted a thorough and independent review that addressed claims made by the hedge fund's report prior to issuing this response. The audit committee conducted

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

its review with the assistance of external advisors including its independent auditor, KPMG LLP, and independent third-party subject matter experts.

**The Board of Directors has reaffirmed its full confidence in the Company's management team.** The Board fully supports the management team as they successfully manage the execution of the Company's strategies for growth and value creation for the benefit of all shareholders.

**The Company continues to articulate a clear strategy for future growth and value creation.** At the Company's Investor Days in March 2018, and reaffirmed since that time on its quarterly conference calls, at investor conferences and in its public filings, the Company has charted a clear course of action for future growth. Company management is focused on delivering value to investors, customers and employees through four key strategic initiatives […]

[bold in the original]

80. On October 31, 2018, Maxar released its disclosure documents for Q3 2018, which are Impugned Documents. As part of those disclosures, Maxar reported, among other things, impairment losses and inventory obsolescence charges totalling US$383.6 million related to its geostationary communication satellite manufacturing business. Additionally, Maxar reported that it "continue[d] to review strategic alternatives for its geostationary communication satellite business to improve its financial performance," and that it was "in active discussions with potential buyers of the business."

81. On January 2, 2019, Maxar reported that it had completed its U.S. domestication plan, pursuant to which it became the ultimate parent company of Maxar Canada, succeeded Maxar Canada as a reporting issuer and its shares were listed for trading on the TSX and the NYSE. As part of these transactions and developments, Maxar transitioned its accounting and financial reporting framework from IFRS to United States generally accepted accounting principles.

Electronically issued / Délivré par voie électronique : 15-Nov-2019        **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

82.     On January 7, 2019, Maxar reported that WorldView-4 had experienced a failure in its control moment gyros, preventing the satellite from collecting imagery due to the loss of an axis of stability.   In conjunction with this disclosure, Maxar further reported that, in 2018, WorldView-4 had generated revenues of approximately US$85 million and that, as of December 31, 2018, it together with its related assets had a net book value of approximately US$155 million.

83.     On January 14, 2019, Maxar announced that its former President and CEO, the Defendant Lance, had resigned from his positions effective as of January 13, 2019.  Lance was replaced by Daniel L. Jablonsky, previously President of DigitalGlobe, who currently remains Maxar's President and CEO.

84.     On February 28, 2019, Maxar reported its FY 2018 financial results disclosing, among other things, that it was taking impairment losses of approximately US$1.1 billion relating to its various business segments and their related assets.  Additionally, Maxar reported that it had concluded the review of the strategic alternatives with respect to its geostationary communication satellite business, and had determined to not sell that business unit.  According to Maxar, "[a]fter careful consideration, we concluded that the GEO Comsat business will generate more value as part of Maxar compared to the alternatives that were evaluated."

85.     On March 1, 2019, Maxar released its FY 2018 fulsome disclosure documents, including its 2018 AIF.  As part of these disclosures, Maxar and its auditors KPMG U.S. reported, among other things, that they had identified material weaknesses in Maxar's ICFR.  The material weaknesses related to "an insufficient complement of trained resources, ineffective continuous risk assessment, and ineffective control activities related to percentage-of-completion revenue

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

and cost of sales, measurement and disclosure of income taxes, and commitment and contingency disclosures have been identified and included in management's assessment." As a result of these material weaknesses, Maxar's management and KPMG U.S. determined that, as of December 31, 2018, Maxar failed to maintain effective ICFR.

86.     On February 22, 2018, Maxar's common shares closed at $74.76 on the TSX. On March 1, 2019, Maxar's common shares closed at $7.76 on the TSX. Over the course of the Class Period—from February 2018 to February 2019—Maxar lost approximately 90% of its stock price and market capitalization, representing hundreds of millions of dollars of damages to the Class Members.

## VI.     THE DEFENDANTS' MISREPRESENTATIONS

### A. *The Misrepresentation and other misrepresentations in Maxar's financial disclosures*

#### i.     The Misrepresentation

87.     At all material times during the Class Period, Maxar purported to prepare and present its financial statements in accordance with IFRS.

88.     IFRS required that Maxar's financial statements and related disclosures that included those financial statements must fairly present, in all material respects, Maxar's financial position, financial performance and cash flows.

89.     In the Impugned Documents that are financial statements and/or MD&As of Maxar, the Defendants made the Misrepresentation: the representation, whether explicitly or implicitly,

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

that the Impugned Document complied with IFRS and that it fairly presented Maxar's financial position and financial performance for the pertinent reporting period.

90.     The Misrepresentation was false and/or misleading.  As a result of the improper financial reporting and accounting practices set out below, the Impugned Documents failed to comply with IFRS.  As a result, they failed to fairly present Maxar's financial position and financial performance for the reporting periods to which they related.

    ii.     Maxar overstated the value of its assets

91.     The Impugned Documents that are financial statements and MD&As of Maxar contained representations and disclosures regarding the value of Maxar's assets which, among other things, were derived from the purported value of the following balance sheet items:

(a)     Inventories;

(b)     Property, plant and equipment;

(c)     Intangible assets; and

(d)     Goodwill.

92.     Under the terms of its accounting policies as well as IFRS, at all material times during the Class Period, Maxar was required to comply with the following:

(a)     as of the end of each reporting period, Maxar was required to take depreciation charges against its financial assets;

(b)     if objective evidence indicated that a loss event which negatively affected the estimated future cash flows of the financial assets had occurred, Maxar was required to take impairment charges against the financial assets corresponding

Electronically issued / Délivré par voie électronique : 15-Nov-2019          **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

to the portion of the carrying value of those assets that exceeded their fair value; and

(c)    with respect to goodwill and its nonfinancial assets, Maxar was required to test those assets for impairment annually or whenever events or changes in circumstances indicated that the carrying value of the asset needed to be reduced.

93.    During the Class Period, Maxar failed to comply with the above policies and accounting requirements. It failed to depreciate or impair its financial assets and goodwill properly when, in the circumstances based on objective evidence, it knew or ought to have known that their carrying value should be reduced. As a result, the Impugned Documents reported improperly inflated values for Maxar's inventories, property, plant and equipment, intangible assets and goodwill.

94.    In FY 2017, Q1 2018 and Q2 2018, Maxar improperly failed to record any impairment charges with respect to its financial assets or goodwill. IFRS and Maxar's own accounting policies required such impairment charges to be taken in each of those reporting periods. As described herein, as at year-end FY 2017 as well as of each Q1 and Q2 2018, there was "objective evidence" indicating that the carrying value of the financial assets and goodwill had to be reduced.

95.    That objective evidence included both general market conditions as well as Maxar-specific circumstances, including the following:

(a)    evolving technology trends, resulting in increased competition and pressure on Maxar's Space Systems' business;

(b)    the decline in the number and value of geostationary communication satellite manufacturing orders awarded globally since 2015;

(c)    the decline in the number of orders awarded to Maxar;

(d)    the year-over-year decline in Maxar's Space Systems revenues;

(e)    the corporate restructuring process, which Maxar began to undertake in the first half of 2017;

(f)    the replacement, in June 2017, of Space Systems' long-time president John Celli with Dario Zamarian, a private equity advisor with no background in the space systems business;

(g)    a series of lay-offs of a significant number of Space Systems employees, including lay-offs of an unprecedented number of critical engineers and other employees;

(h)    the acquisition of DigitalGlobe, which redefined Maxar as a company and brought about significant operational and structural changes to the company;

(i)    the significant impairment charge on the net book value of DigitalGlobe's property, plant and equipment as at the closing of the acquisition in October 2017; and

(j)    Maxar's initiation of a review of the "strategic alternatives" and its pursuit of the divestiture process in relation to geostationary communication satellite business, due to its having "experienced material satellite order declined in recent years," according to Maxar. This process was first rumored and then confirmed by Maxar in July 2018. In February 2019, Maxar announced that it has had unsuccessfully concluded that process, indicating that it had been unable to find a suitable buyer for the assets.

96.    Maxar's failure to take an impairment charge on its assets as at year-end FY 2017, Q1 2018 and Q3 2018 was a violation of IFRS and Maxar's own accounting principles.

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

97.     As of Q3 2018, on October 31, 2018, Maxar reported impairment and inventory obsolescence charges of respectively, US$345.5 million and US$37.7 million. Those charges pertained to Maxar's geostationary communication satellite business unit. Maxar's Q3 2018 MD&A elaborated on the circumstances that resulted in these impairment charges as follows:

> In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed. In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels. Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

98.     The foregoing description alludes to the general market conditions and Maxar-specific circumstances that existed at all material times during, and indeed prior to, the Class Period, namely:

(a)     the step down in the total number and dollar value of awards over the course of several years since 2015;

(b)     the operators' delays in making award decisions; and

(c)     the competition and pressure imposed on Maxar's business as a result of evolving technology and negative market trends.

Electronically issued / Délivré par voie électronique : 15-Nov-2019        **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

99.    The situation of Maxar's failed contract to manufacture the satellite called "AMOS-8"

is illustrative of the industry-wide and Maxar-specific conditions that negatively impacted

Maxar's geostationary communication satellites manufacturing business.

100.    On March 26, 2018, Maxar announced that it had been selected by the Israeli Space

Communication Ltd ("**Spacecom**"), the operator of the AMOS satellite fleet, to build its

AMOS-8 satellite.  Maxar enthusiastically advertised the AMOS-8 order on its social media,

and soon added it to its webpage, touting the significance of the order to Maxar's business.

However, unbeknownst to investors, Maxar would later reveal in its MD&A for Q3 2018 (filed

on SEDAR on October 31, 2018) that the AMOS-8 order was not a definitive award, and it

became void and null as Spacecom did not achieve financing and did not make the initial

payment to Maxar.  Maxar's Q3 2018 MD&A, elaborated as follows:

> The Company announced in Q1 2018 that Space Systems/Loral, LLC
> ("SSL"), a wholly owned subsidiary of Maxar, was selected by Spacecom
> to build its AMOS-8 advanced communications satellite. During Q3 2018,
> it became evident that Spacecom would not achieve financing on the Amos
> 8 project. In September 2018, the customer did not make the initial
> payment, and the contract became null and void. The voiding of this
> contract did not have an impact on the Company's backlog, as it was not a
> definitive award and was not included in backlog.

101.    Although as of Q3 2018 Maxar reported an impairment charges of US$383.6 million,

Maxar improperly failed to take adequate impairment charges as of Q3 2018.  As a result, it had

to take further, significant impairment charges of US$1.1 billion as at December 31, 2018.  In

its 2018 AIF, Maxar elaborated on the circumstances that resulted in the US$1.1 billion

impairment charges as follows:

> The outlook on our geostationary satellite manufacturing business
> ("GeoComm") declined substantially during the year ended December 31,
> 2018 and negatively impacted our Space Systems segment. At the

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

beginning of the year, we forecasted the GeoComm business would be awarded three to four contracts for GeoComm satellites, or approximately thirty percent of the overall 2018 industry awards. However, during the second half of the year, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. We were awarded one contract during 2018, and industry awards were lower than expected. Due to the decline in the GeoComm market, and the uncertainty surrounding the future of our GeoComm business, we recognized net impairment losses of $232 million and inventory impairment of $66 million for the year ended December 31, 2018.

[…]

The Company identified triggering events for impairment during the second half of 2018 related to intangible assets of its GeoComm business, a reporting unit in the Space Systems segment. At the beginning of the year, the Company forecasted it would be awarded three to four contracts for GeoComm satellites, or approximately thirty percent of the overall 2018 industry awards. During the second half of the year, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. Due to the decline in the GeoComm market, and the uncertainty surrounding the future of the Company's GeoComm business, an impairment loss was recognized, primarily due to future cash flows associated with the intangible assets not being sufficient to cover the total book value of those assets. For the year ended December 31, 2018, the Company recognized impairment losses of $53 million, $47 million, $20 million and $2 million related to the technology, trade name, software, and customer relationship intangible assets of the GeoComm business, respectively.

102.    The foregoing description alludes to the general market conditions and Maxar-specific circumstances that existed at all material times during, and indeed prior to, the Class Period, namely:

(a)    the step down in the total number and dollar value of awards over the course of several years since 2015;

(b)    the operators' delays in making award decisions; and

(c)    the competition and pressure imposed on Maxar's business as a result of evolving technology and negative market trends.

Electronically issued / Délivré par voie électronique : 15-Nov-2019     **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

103.     As part of Maxar's 2018 AIF disclosures, Maxar and KPMG U.S. reported that they had identified material weaknesses in Maxar's ICFR, including in relation to "an insufficient complement of trained resources and ineffective continuous risk assessment," which rendered Maxar's ICFR ineffective.   These material weaknesses contributed to Maxar's improper accounting with respect to the value of its assets, and its reporting of improperly inflated assets during the Class Period.

iii.     <u>Maxar engaged in improper revenue recognition practices and reported inflated revenues</u>

104.     The Impugned Documents that are financial statements and MD&As of Maxar contain disclosures with respect to Maxar's revenues purportedly earned in the pertinent reporting periods.

105.     As a result of the improper revenue recognition practices particularized herein, during the Class Period, Maxar improperly recognized and reported revenues that contravened IFRS. As a result, Maxar's reported revenues during the Class Period were improperly inflated, false and/or misleading, in violation of IFRS.

106.     Under IFRS, revenue may only be recognized and reported in the financial statements when it is earned and realizable.  Generally, this requirement is met when all the following four criteria are met:

(a)     there is persuasive evidence of an arrangement;

(b)     delivery has occurred or services have been rendered;

(c)     the price is fixed or determinable; and

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

(d)    collectability is reasonably assured.

107.    At all material times during the Class Period, Maxar maintained accounting policies applicable to revenue recognition within the activities of its various business segments. Maxar purported to comply with its stated policies when recognizing revenue from its various business activities.

108.    Under the policies applicable to the satellite construction activities within Maxar's Space Systems business unit, Maxar purported to apply the "percentage of completion" revenue recognition method. Under this methodology, at the end of each reporting period, Maxar purports to estimate and recognize revenues from the construction projects based on their percentage of completion. The determination of the percentage of completion would be made based on the costs incurred during the relevant period compared to the total estimated costs of the construction project.

109.    Revenue recognition based on the percentage of completion methodology is dependent on Maxar's ability to accurately and reliably estimate the costs and progress of the construction work. Maxar's own accounting policies acknowledge that "[t]he percentage of completion method places considerable importance on accurate estimates of the extent of progress towards completion." If Maxar was unable to accurately estimate the progress of the construction activities—and, indeed, it was unable to do so—it was not permitted under IFRS and ought not to have recognized revenue based on the percentage of completion methodology.

110.    Maxar violated IFRS as well as its stated accounting policies respecting revenue recognition. Based on the percentage of completion revenue recognition methodology, Maxar improperly recognized and reported inflated revenues from the satellite construction activities

within its Space System business when the progress and costs of the construction work could not be accurately and reliably measured.

111.    In addition, or alternatively, Maxar under-estimated the costs of construction, which resulted in greater percentage of completion and, therefore, greater revenues for the relevant reporting periods.  As a result of its over-recognition of revenues and under-recognition of costs, Maxar improperly reported inflated revenues in the Impugned Documents.

112.    In addition, or alternatively, Maxar failed to take proper provisions and/or reserves with respect to revenue for contingencies, which resulted in the reporting of improperly inflated revenues in the Impugned Documents.

113.    As a result of these improper revenue recognition practices, the Impugned Documents reported revenues that violated one or more of the revenue recognition criteria under IFRS and were false and/or misleading.

114.    On October 31, 2018, in conjunction with the release of its Q3 2018 financial results, Maxar recorded various impairment charges totalling US$345.9 million.  Part of those impairment charges pertained directly or indirectly to, and/or resulted from, revenues that Maxar had improperly recognized and reported previously in its FY 2017, Q1 2018 and/or Q2 2018 financial statements and related disclosures.

115.    Of note, also on October 31, 2018, Maxar disclosed that it had experienced delivery and quality issues with respect to certain satellite components provided by an unidentified supplier. As a result of those issues, Maxar reported that its construction projects would be delayed by weeks or months.

Electronically issued / Délivré par voie électronique : 15-Nov-2019      **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

116.    On an earnings call held on October 31, 2018, the Defendant Lance acknowledged the impact of those developments on Maxar's revenue recognition, further acknowledging that Maxar had to adjust revenues previously recognized on the basis of the percentage of completion methodology.  According to Lance:

> What hit us this quarter has to do with some significant supplier delivery and quality issues that have had the effect of creating rework and extending the delivery on some of the satellites by a few weeks or in some cases a few months. <u>And so under percent completion accounting not only is all of that increasing our cost base, but it's stretching out the programs. And so we've to adjust the cost to-date which in some cases causes you to take both the negative revenue and the negative profit yet in the quarter. So that the world under a percent completion accounting and the new item in the quarter had to do with a primarily one supplier issue but it was for components that were almost on every single satellite that we had to rework.</u>

[underline added]

117.    Furthermore, in response to a question from Moschopoulos, Lance acknowledged that as a result of those developments and their impact on Maxar's revenue recognition, Maxar had to reassess the profit margins on some of its projects:

> **Thanos Moschopoulos**
>
> So just to clarify then based on your prior commentary, it sounds like GEO Comsat had maybe a negative 40 million impact in the quarter. Would that be a right ballpark?
>
> **Biggs Porter**
>
> It's a little -- it's probably a little on the high side. But if you look at as I said Space Systems variance last year and this year, it's actually driven by GEO Comsat, so it's significant.
>
> **Howard Lance**
>
> It's significantly negative. I think we can certainly say that Thanos and our goal here was to provide a little more transparency and clarity around those numbers <u>but we have had some programs slip from small margin to a loss</u>

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

and you take the whole accumulated loss in the current quarter under percent completion accounting. So it exacerbates the quarter.

[underline added]

118.    Lance's statements on the earnings call held on October 31, 2018, are some of the indications of Maxar's improper revenue recognition activities during the Class Period:

(a)    as a result of the purported quality and delivery issues respecting the satellite components, Maxar was required to "adjust the cost to-date," and to take "both the negative revenue and the negative profit," indicating negative adjustments to revenues and profits as a result of previously-under-accrued manufacturing costs;

(b)    as a result of the foregoing, in some instances, Maxar had to reverse the revenue and recognize a contract loss instead of profit on previously recognized revenue; and

(c)    according to Lance, these negative impacts resulted from Maxar's use of the "percent [of] completion accounting" with respect to revenue recognition on its satellite manufacturing activities.

119.    Maxar released its 2018 AIF on March 1, 2019, in conjunction with which it recorded impairment losses totalling US$1.1 billion.  Part of those impairment charges pertained directly or indirectly to, and/or resulted from, revenues that Maxar had improperly recognized and reported previously in its FY 2017, Q1 2018, Q2 2018, and/or Q3 2018 financial statements and related disclosures.

120.    In Maxar's 2018 AIF, Maxar and KPMG U.S. reported that they had identified material weaknesses in Maxar's ICFR, including in relation to "ineffective control activities related to percentage-of-completion revenue and cost of sales," which rendered Maxar's ICFR ineffective.  Those material weaknesses contributed to Maxar's improper revenue recognition

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

practices and the reporting of improperly inflated, false and/or misleading revenues during the Class Period.

iv.    <u>Maxar reported inflated accounts receivable</u>

121.    As a result of Maxar's improper revenue recognition practices and its reporting of improperly inflated revenues, Maxar also reported improperly inflated accounts receivable in the Impugned Documents.

122.    Additionally, in its financial statements for FY 2017, Q1 2018 and Q2 2018, Maxar failed to take allowances, provisions or reserves with respect to its accounts receivable.  In the Impugned Documents, Maxar reported improperly inflated accounts receivable as a result of its failure to record proper allowances for doubtful accounts and/or proper reserves and/or provisions for contingencies.

123.    On October 31, 2018 and February 28, 2019, Maxar reported respectively, impairment charges totalling US$345.9 million and US$1.1 billion.  Part of those impairment charges pertained directly or indirectly to, and/or resulted from, Maxar's improperly inflated accounts receivable.

124.    Additionally, in its 2018 AIF, Maxar reported an impairment charge of US$22 million with respect to its accounts receivable specifically relating to Maxar's "orbital receivables." This is a further acknowledgement of the inappropriate inflation of Maxar's accounts receivable in the Impugned Documents.

125.    The foregoing impairment and other charges announced on October 31, 2018 and February 28, 2019, were recorded as a result of the reporting of improperly inflated, false and/or

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

misleading accounts receivable in the Impugned Documents during the Class Period. Those announcements, as such, were corrective of the Defendants' misrepresentations regarding Maxar's accounts receivable in the Impugned Documents.

> v.    Maxar reported inflated financial statement accounts as a result of improper revenue recognition and improper reporting on the value of its assets

126.    During the Class Period, Maxar's misstated revenue figures were the basis of calculation of many of its other important financial statement accounts, including most prominently: net income or loss under IFRS and net earnings or loss per share under IFRS. As a result of its improper revenue accounting during the Class Period, all of those accounts were misstated and were false and/or misleading.

127.    Additionally, at all material times during the Class Period, Maxar used several key non-IFRS financial metrics to report on its financial performance. Those non-IFRS financial metrics were used by various stakeholders to evaluate and ascertain the financial performance and value of Maxar. They included: (a) adjusted earnings; (b) adjusted EBIDTA; and (c) adjusted earnings per share. As a result of improper revenue accounting practices in relation to revenue recognition and/or Maxar's failure to improperly take appropriate depreciation or other impairment charges on its assets, these non-IFRS figures were also misstated, and were false and/or misleading.

128.    Contemporaneously with the reporting of its FY 2018 financial disclosures on February 28, 2019, Maxar ceased reporting adjusted earnings and adjusted earnings per share.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

129.    Although Maxar currently continues to report "adjusted EBITDA," it has changed the definition of this financial metric.  On an earnings call held on February 28, 2019, Maxar's CFO, the Defendant Porter, appeared to acknowledge that the reporting of the adjusted EBITDA per the Class-Period definition impaired the accessibility of Maxar's financial disclosures to their intended audience and users.  According to Porter:

> [W]e've also changed our definition of adjusted EBITDA, in order to provide a simpler view of our financial results. Most notably, we are no longer excluding the expensing of stock-based compensation from adjusted EBITDA.

### B.    *Misrepresentations regarding Maxar's internal controls*

130.    At all material times during the Class Period, Maxar and its senior management were required to design, implement and maintain proper and effective internal controls in order to ensure its disclosures were proper and reliable.  However, at no time during the Class Period, did Maxar maintain proper and/or effective internal controls.

131.    The internal controls are comprised of the following inter-related control procedures and systems:

(a)    ICFR: the objective of ICFR is to provide reasonable assurance with respect to the reliability of financial reporting and the financial statements in accordance with IFRS; and

(b)    DC&P: the objective of DC&P is to ensure the proper flow of information to management such that material information is timely and properly disclosed at the relevant reporting period.

Electronically issued / Délivré par voie électronique : 15-Nov-2019     **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

132.   Maxar's Class Period Impugned Documents contained statements made explicitly or impliedly that Maxar implemented and maintained proper and effective internal controls. Those representations were false and/or misleading.

133.   Maxar's MD&A for FY 2017 represented as follows:

> As required by NI 52-109 and pursuant to Exchange Act Rules 13a-15(f) and 15d-15(f), the Chief Executive Officer and the Chief Financial Officer of the Company have evaluated the effectiveness of the internal controls over financial reporting as at December 31, 2017 using the framework established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, they have concluded that the design and operation of the Company's internal controls over financial reporting were effective as at December 31, 2017.

134.   This representation was false and/or misleading.

135.   Maxar's management information circular issued and filed on SEDAR on March 29, 2018, contained representations regarding Maxar's internal control, including that "**Maxar has robust internal processes and a strong internal control environment designed to identify and manage risks**" (bold in the original). This representation was false and/or misleading.

136.   Maxar's MD&As for each of Q1, Q2 and Q3 2018 contained statements substantially as follows:

> There were no changes in the Company's internal controls over financial reporting that occurred in the quarter ended [] that have materially affected, or are reasonably likely to materially affect, the Company's internal controls over financial reporting. Management is in the process of assessing the effectiveness of internal control over financial reporting for the acquired DigitalGlobe business.

137.   When read in conjunction with Maxar's conclusion in its FY 2017 disclosures that its internal controls were effective, it was implied in the above statements that Maxar maintained

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

proper and effective internal controls as of those quarterly reporting periods. Those representations were false and/or misleading.

138. In Maxar's 2018 AIF, Maxar and its auditors KPMG U.S. identified material weaknesses in Maxar's internal controls. They accordingly concluded that, as of December 31, 2018, Maxar's internal controls were ineffective.

139. Specifically, the adverse report of KPMG U.S. to Maxar's shareholders, dated March 1, 2019, which was included in the 2018 AIF, identified the following material weaknesses:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Material weaknesses related to an insufficient complement of trained resources, ineffective continuous risk assessment, and ineffective control activities related to percentage-of-completion revenue and cost of sales, measurement and disclosure of income taxes, and commitment and contingency disclosures have been identified and included in management's assessment.

140. Maxar's 2018 AIF, further elaborated on the material weaknesses as follows:

> [M]anagement identified the following material weaknesses in the Company's internal control over financial reporting as of December 31, 2018.
>
> *Insufficient Complement of Personnel.* Management did not maintain a sufficient complement of trained resources to fully support the significant business changes and the related impacts on the internal control over financial reporting.
>
> *Insufficient Identification and Assessment of Changes.* Management did not have an effective continuous risk assessment process that was responsive to the rapid rate of change.
>
> As a consequence of the underlying root causes related to personnel and risk assessment, the Company did not have effective control activities related to the design, operation, and documentation of process-level controls over: (i) the cost-to-cost method used to determine the percentage-

of-completion method affecting revenue and cost of sales (ii) the measurement and disclosures of current and deferred income taxes and related valuation allowance and (iii) commitment and contingency disclosures.

141.   According to Maxar, part of the "root causes" of the identified material weaknesses pertained, directly or indirectly, to the circumstances around the acquisition of DigitalGlobe, which was completed on October 5, 2017 as well as its revenue accounting based on the percentage of completion methodology.

142.   Maxar's internal controls suffered from substantially the same material weaknesses, and they were ineffective, as at December 31, 2017 and throughout the Class Period.

## C.   *False and/or misleading certifications of annual and interim filings*

143.   In conjunction with the release of Maxar's annual and quarterly disclosures during the Class Period, the Defendants Lance, Wirasekara and Porter issued certifications, which are Impugned Documents.

144.   Lance's and Wirasekara's certifications of Maxar's FY 2017 annual filings stated, among other things, that:

(a)   they had reviewed the FY 2017 disclosures;

(b)   based on their knowledge, having exercised reasonable diligence, the disclosures did not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made;

(c)   based on their knowledge, having exercised reasonable diligence, the disclosures together with the other financial information included in the annual filings fairly

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

presented in all material respects Maxar's financial condition, financial performance and cash flows;

(d)   they had designed proper DC&P, or caused it to be designed under their supervision, in order to provide reasonable assurance that material information relating to Maxar was made known to them and that information required to be disclosed by Maxar under securities legislation was recorded, processed summarized and reported in a timely fashion within the reporting period;

(e)   they had designed proper ICFR, or caused it to be designed under their supervision, in order to provide reasonable assurance regarding the reliability of Maxar's financial reporting and the preparation of financial statements for external purposes in accordance with applicable accounting standards; and

(f)   they had evaluated Maxar's DC&P and ICFR, or caused them to be evaluated under their supervision, and concluded that they were effective, as reported in the disclosure documents based on that evaluation.

145.   Those representations were false and/or misleading.

146.   Additionally, Lance certified Maxar's interim filings for each of Q1 through Q3 of 2018, Wirasekara certified Maxar's interim filings for each of Q1 and Q2 2018 and Porter certified Maxar's interim filings for Q3 2018.  In those certifications, Lance, Wirasekara and Porter stated, among other things, that:

(a)   they had reviewed the relevant interim disclosures of Maxar;

(b)   based on their knowledge, having exercised reasonable diligence, the disclosures did not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made;

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

(c)     based on their knowledge, having exercised reasonable diligence, the disclosures together with the other financial information included in the annual filings fairly presented in all material respects Maxar's financial condition, financial performance and cash flows;

(d)     they had designed proper DC&P, or caused it to be designed under their supervision, in order to provide reasonable assurance that material information relating to Maxar was made known to them and that information required to be disclosed by Maxar under securities legislation was recorded, processed summarized and reported in a timely fashion within the reporting period; and

(e)     they had designed proper ICFR, or caused it to be designed under their supervision, in order to provide reasonable assurance regarding the reliability of Maxar's financial reporting and the preparation of financial statements for external purposes in accordance with applicable accounting standards.

147.    Those representations were false and/or misleading.

### D. *The August 24, 2018 Press Release*

148.    Following the issuance of Spruce Point's report, Maxar issued and filed on SEDAR the press release titled "Maxar Technologies Provides Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund," dated August 24, 2018, which is an Impugned Document.

149.    In that press release, among other things, Maxar stated:

> **In response to the accounting claims made in the report, the audit committee of the Board of Directors undertook a review of the elements of the Company's financial statements and disclosures associated with Spruce Point's claims and found no material errors in the previously issued financial statements and disclosures under IFRS.** The audit committee takes seriously any claims regarding the Company's financial reporting. Specifically, the committee conducted a

thorough and independent review that addressed claims made by the hedge fund's report prior to issuing this response. The audit committee conducted its review with the assistance of external advisors including its independent auditor, KPMG LLP, and independent third-party subject matter experts.

**The Board of Directors has reaffirmed its full confidence in the Company's management team.** The Board fully supports the management team as they successfully manage the execution of the Company's strategies for growth and value creation for the benefit of all shareholders.

[bold in the original]

150.   These statements and representations were false and/or misleading in that:

(a)   There were significant issues around Maxar's financial reporting and disclosures as well as its control processes and environment which, among other things, brought about Maxar's significant impairment charges and other adverse disclosures made on October 31, 2018 and February 28, 2019;

(b)   If, as the press release represented, the Audit Committee had conducted a "thorough" review, it would have uncovered at least some of the issues subsequently disclosed on October 31, 2018 and/or February 28, 2019. The impugned press release is however silent on those issues. This suggests that either the Audit Committee failed to conduct a "thorough" review of the financial reporting issues, or it improperly failed to disclose in the press release all material information regarding its investigations, findings and/or conclusions;

(c)   Contrary to Maxar's assertion, any review performed by the Audit Committee assisted by KPMG and/or KPMG U.S. would not have been an "independent" review. It was improper for the Audit Committee to undertake this review, since the members of the Audit Committee had a conflict of interests in reviewing and affirming the veracity of Maxar's disclosures and financial statements previously approved for release by them. Participation of the Defendant KPMG and/or KPMG U.S. in this review was also inappropriate as KPMG had a conflict of

Electronically issued / Délivré par voie électronique : 15-Nov-2019      **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

interests in reviewing and affirming the veracity of Maxar's disclosures and financial statements previously issued under its auspices; and

(d)    Contrary to the assertions in the press release, Maxar's Board had no reasonable basis to "reaffirm[] its *full confidence* in the Company's management team" (emphasis added).  Of note, the Defendant Lance would leave Maxar within a few months following the issuance of this press release.

### E.  *Failure to timely disclose the failure of WorldView-4*

151.    At all material times during the Class Period, WorldView-4 was one of the main assets of Maxar, and one of its major revenue drivers.  Maxar reported the failure of WorldView-4 on January 7, 2019.  Maxar's 2018 AIF, released on March 1, 2019, however, claimed that WorldView-4 had failed in December 2018.

152.    Furthermore, there is reason to believe that, as early as October 2018, WorldView-4 either had failed or, alternatively, an adverse incident had happened to WorldView-4 which could reasonably result in a failure of the satellite.  Maxar ought to have disclosed the information regarding WorldView-4's condition in its Q3 2018 disclosures, released on October 31, 2018, but it did not.  Maxar's failure to disclose that information in its Q3 2018 disclosure documents constituted a misrepresentation.

153.    Furthermore, the failure of WorldView-4 constituted a change in the business and/or operations of Maxar which was reasonably expected to have a significant impact on the value or market price of Maxar's common shares.  It, accordingly, constituted a material change with respect to Maxar, as that term is defined in the *OSA*.  Maxar was required to disclose the failure of WorldView-4 forthwith, which it improperly failed to do.

Electronically issued / Délivré par voie électronique : 15-Nov-2019     **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

154.    The failure to timely disclose the failure of WorldView-4 is, furthermore, an indication of Maxar's improper and ineffective DC&P during the Class Period.

### F.  KPMG's misrepresentations

#### i.    FY 2017 audited financial statements and MD&A

155.    On February 22, 2018, KPMG issued an unqualified Independent Auditors' Report on Maxar's consolidated financial statement and its consolidated balance sheet, and its consolidated statements of earnings, comprehensive income, change in shareholders' equity and cash flows as of December 31, 2017.  The audit report of KPMG, dated February 22, 2018, was address to the shareholders of Maxar.

156.    KPMG's audit report contained the following statements:

(a)    "In our opinion, the consolidated financial statements present fairly, in all material respects, the consolidated financial position of Maxar Technologies Ltd. (formerly known as MacDonald, Dettwiler and Associates Ltd.) as at December 31, 2017, December 31, 2016 and January 1, 2016, and its consolidated financial performance and its consolidated cash flows for each of the years in the two year period ended December 31, 2017 in accordance with International Financial Reporting Standards";

(b)    "We conducted our audits in accordance with Canadian generally accepted auditing standards. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement";

(c)     "we consider internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances";

(d)     An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements"; and

(e)     "We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion."

157.    The foregoing statements and representations were false and/or misleading.

158.    As particularized herein, Maxar's FY 2017 financial statements did not comply with IFRS, and they failed to fairly represent Maxar's financial position and financial performance.

159.    Furthermore, as a result of several material weaknesses arising from, among other things, the significant changes in Maxar's business following the acquisition of DigitalGlobe and Maxar's revenue recognition practices, Maxar failed to maintain proper and effective internal controls as of December 31, 2017.

160.    The professional standards applicable to KPMG required it to understand Maxar's business and its environment, including the material weaknesses in Maxar's internal controls. KPMG was required to plan and perform the audit properly to respond to any risks of material misstatement of Maxar's financial statements, in order to achieve a high level of assurance that those financial statements were free from material misstatements whether caused by fraud or error. The professional standards required KPMG to obtain adequate proper evidence in support of its audit opinion, and to exercise due professional care and professional skepticism throughout. KPMG failed to comply with those professional standards.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

161.    Contrary to KPMG's representations in its audit report, in rendering the audit report, KPMG:

(a)    failed to comply with generally accepted auditing standards;

(b)    failed to properly review and consider Maxar's ICFR, including its material weaknesses, and their impact with respect to risks of material misstatements;

(c)    failed to properly plan and perform the audit procedure to provide the appropriate level of assurance that the financial statements were free from material misstatements; and

(d)    failed to obtain and/or rely on adequate appropriate evidence in performing its audit.

162.    As a result, KPMG's audit opinion that Maxar's FY 2017 financial statements complied with IFRS was false and/or misleading.

163.    Upon the completion of its audit of Maxar's FY 2017 financial statements, KPMG made presentations and representations to the Audit Committee in connection with the approval process of those Impugned Documents.  But for KPMG's audit and the representations it made to the Audit Committee, the FY 2017 Impugned Documents would not have been approved by Maxar's Board for release, and they would not have been released to the public and the Class.

164.    KPMG made the Misrepresentation in the FY 2017 financial statements and/or MD&A. By virtue of its professional engagement performed with respect to the MD&A, KPMG was associated with Maxar's MD&As, and implicated in the misrepresentations made therein.

ii.    Q1 and Q2 2018 interim financial statements and MD&As

165.    Maxar's Q1 and Q2 2018 interim financial statements and MD&As were purportedly prepared and presented in accordance with IFRS.  IFRS required that the financial statements fairly present Maxar's financial position and financial performance as of those reporting periods.  However, as pleaded herein, due to the misstatement of several financial statement accounts, Maxar's Q1 and Q2 2018 disclosures failed to fairly present Maxar's financial position and financial performance, in violation of IFRS.

166.    Maxar's Q1 and Q2 2018 interim financial statements and MD&As were reviewed by KPMG.  KPMG's review engagements in relation to Maxar's Q1 and Q2 2018 Impugned Documents required it to make inquiries and perform analytical and other procedures to satisfy itself that it had no reason to believe that the financial statements were misstated such that no modification was required to be made to those Impugned Documents.  If and to the extent KPMG identified areas of concern, it was required to perform further procedures as appropriate such that it be satisfied that the interim disclosures did not contain misstatements.  KPMG failed to comply with these professional standards in the conduct of its review engagements in respect of Maxar's Q1 and Q2 2018 interim disclosures.

167.    Upon the completion of the review of the Q1 and Q2 2018 Impugned Documents, KPMG made presentations and representations to the Audit Committee in connection with the approval process of those Impugned Documents.  But for KPMG's review work and the representations it made to the Audit Committee, the Q1 or Q2 2018 Impugned Documents would not have been approved by Maxar's Board for release, and they would not have been released to the public and the Class.

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

168.   In stating that the interim financial statements were prepared and presented in accordance with IFRS, Maxar's Q1 and Q2 2018 Impugned Documents included, summarized or quoted KPMG's opinions expressed to Maxar's Audit Committee in its review findings presentations it made to the Audit Committee.  Such representations and opinions of KPMG were false and/or misleading.

169.   Furthermore, by virtue of its professional work purportedly performed on the Q1 and Q2 2018 Impugned Documents, and its association with those Impugned Documents, KPMG made the Misrepresentation therein, whether explicitly or impliedly.

iii.   The impugned, false and/or misleading press release dated August 24, 2018

170.   Maxar's impugned press release dated August 24, 2018 contained the following statements in regard to KPMG's participation in the Audit Committee's purported review and its conclusion that the previously-issued financial statements of Maxar contained no material errors:

> **In response to the accounting claims made in the report, the audit committee of the Board of Directors undertook a review of the elements of the Company's financial statements and disclosures associated with Spruce Point's claims and <u>found no material errors in the previously issued financial statements and disclosures under IFRS.</u>** The audit committee takes seriously any claims regarding the Company's financial reporting. Specifically, the committee conducted a thorough and independent review that addressed claims made by the hedge fund's report prior to issuing this response. <u>The audit committee conducted its review with the assistance of</u> external advisors including its independent auditor, <u>KPMG LLP</u>, and independent third-party subject matter experts.

> [bold in the original; underline added]

Electronically issued / Délivré par voie électronique : 15-Nov-2019        **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

171.    These statements were included in Maxar's impugned press release on KPMG's knowledge and consent, and they included, summarized or quoted opinions expressed by KPMG to the Audit Committee in the course of their purportedly "thorough and independent" review of the allegations in respect of Maxar's financial reporting.

172.    These representations were false and/or misleading.

## VII.    CORRECTIVE DISCLOSURES

173.    The Defendants' misrepresentations were gradually corrected over four corrective disclosures on: (a) August 7, 2018; (b) October 31, 2018; (c) January 7, 2019; and, ultimately, (d) with the release of Maxar's 2018 AIF on February 28, 2019.

174.    On August 7, 2018, Spruce Point issued a short seller report, raising concerns regarding various aspects of Maxar's financial reporting and accounting practices.  Maxar was quick to issue a rebuttal to the Spruce Point report, which it called "misleading" and "a malicious attempt to […] manipulate[e] Maxar's stock price."  Nonetheless, Spruce Point's report partially corrected the Defendants' misrepresentations concerning Maxar's improper financial reporting and accounting practices.

175.    Following the issuance of Spruce Point's report on August 7, 2018, Maxar's stock price plummeted from $55.89 to $48.54 (or by 13%).

176.    Maxar's disclosures on October 31, 2018 were partially corrective of each of the misrepresentations particularized herein to have been made by Maxar, the Individual Defendants and/or KPMG, as they partially revealed to the public that:

Electronically issued / Délivré par voie électronique : 15-Nov-2019          **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

(a)    Maxar's Impugned Documents issued prior to that date failed to fairly present its financial position and financial performance, and that they misstated various financial statement and balance sheet accounts of Maxar as corrected by way of the impairment charges totalling US$383.6 million; and

(b)    Maxar's internal controls were defective, which brought about the significant impairment charges and additional disclosures of Maxar on October 31, 2018.

177.    Following Maxar's disclosures on October 31, 2018, Maxar's stock price plummeted from $35.49 to $19.68 (or by 45%).

178.    Maxar's disclosure on January 7, 2019 regarding the loss of WorldView-4 was, furthermore, corrective of the Maxar and Individual Defendants' failure to timely disclose the loss of that satellite.

179.    Following Maxar's disclosure on January 7, 2019, Maxar's stock price further plummeted from $15.75 to $10.62 (or by 33%).

180.    Maxar's disclosures on February 28, 2019 was furthermore corrective of each of the misrepresentations particularized herein to have been made by Maxar, the Individual Defendants and/or KPMG, as they further revealed to the public that:

(a)    Maxar's Impugned Documents issued prior to that date failed to fairly present its financial position and financial performance, and that they misstated various financial statement and balance sheet accounts of Maxar as corrected by way of the impairment charges totalling US$1.1 billion; and

(b)    Maxar's internal controls were defective, which brought about the significant impairment charges and additional disclosures of Maxar on February 28, 2019, including the disclosures regarding the weaknesses in Maxar's internal controls which rendered them ineffective.

Electronically issued / Délivré par voie électronique : 15-Nov-2019          **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

181.    Following Maxar's disclosures on January 7, 2019, Maxar's stock price plummeted from $9.60 to $7.76 (or by 20%).

## VIII.    RIGHTS OF ACTION

182.    The Plaintiffs incorporate, repeat and plead herein the pleadings of the facts, and asserts the following rights of action on his own behalf and on behalf of the other Class Members.

### A.    *Part XXIII.1 of the OSA (misrepresentations in the Impugned Documents)*

183.    As against each of the Defendants, the Plaintiffs assert statutory liability for damages pursuant to section 138.3(1) of the *OSA* and, if necessary, the concordant provisions of the other Securities Legislation.

184.    As particularized herein, each of the Impugned Documents contained one or more misrepresentations within the meaning of the *OSA*.

185.    Maxar is a reporting issuer and a responsible issuer for the purposes of Part XXIII.1.

186.    The Defendants Lance and Cyprus were directors of Maxar at the time each of the Impugned Documents was released.

187.    The Defendant Wirasekara was an officer of Maxar, and he certified Maxar's FY 2017, Q1 2018 and Q2 2018 disclosures.

188.    The Defendant Porter was an officer of Maxar, and he certified Maxar's Q3 2018 disclosures.

189.   The Defendant Porter also authorized, permitted or acquiesced in the release of Maxar's August 24, 2018 press release, which is an Impugned Document.

190.   With respect to the impugned August 24, 2018 press release, and as it concerns the liability of Maxar, Lance, Cyprus and Porter, these Defendants:

   (a)   knew at the time of the release of this press release that the document contained misrepresentations;

   (b)   at or before the time of the release of this press release, deliberately avoided acquiring knowledge that the document contained misrepresentations; and/or

   (c)   were, through action or failure to act, guilty of gross misconduct in connection with the release of this press release.

191.   During the Class Period, KPMG was an expert of Maxar within the meaning of the *OSA*.

192.   Maxar's FY 2017, Q1 2018 and Q2 2018 disclosers, as well as its impugned August 24, 2018 press release, contained one or more misrepresentations made by KPMG and:

   (a)   the misrepresentations were also contained in a report, statement or opinion made by KPMG, including in its audit report dated February 22, 2018 and its reports and presentations to the Audit Committee;

   (b)   the Impugned Documents included, summarized, summarized or quoted from KPMG's report, statements or opinions; and

   (c)   the Impugned Documents were released on KPMG's written consent, including by virtue of its engagement letters and/or its reports and/or presentations made to the Audit Committee.

193.   The Plaintiffs will seek leave of Court to pursue the statutory liability claim for damages against the Defendants for the misrepresentations contained in the Impugned Documents.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

### B. *Part XXIII.1 of the OSA (failure to timely disclose the failure of WorldView-4)*

194.    As against Maxar and the Defendants Lance, Cyprus and Porter, the Plaintiffs assert statutory liability for damages pursuant to section 138.3(4) of the *OSA* and, if necessary, the concordant provisions of the other Securities Legislation.

195.    The failure of WorldView-4 constituted a material change with respect to Maxar, as defined in the *OSA*.  Accordingly, Maxar was required to disclose the failure of WorldView-4 forthwith, but it failed to do so.

196.    Additionally, Maxar was required to file a material change report as soon as practicable and in any event within ten days of the date on which WorldView-4 failed.  Through the end of the Class Period, Maxar never filed a material change report with respect to the failure of WorldView-4.

197.    Maxar is a reporting issuer and a responsible issuer for the purposes of Part XXIII.1 of the *OSA*.

198.    Lance, Cyprus and Porter authorized, permitted or acquiesced in the failure to make timely disclosure of the failure of WorldView-4.

199.    The Plaintiffs will seek leave of Court to pursue the statutory liability claim for damages against Maxar, Lance, Cyprus and Porter for the failure to timely disclose the loss of WorldView-4.

### C. *Negligent Misrepresentation*

200.    As against each Defendant, the Plaintiffs assert negligent misrepresentation.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

201.    For the purposes of this claim, the only misrepresentation which the Plaintiffs plead and rely on is the Misrepresentation.

202.    The Defendants made the Misrepresentation in each Impugned Document that is a financial statement or MD&A of Maxar, as particularized herein.  The Misrepresentation constituted a misrepresentation within the meaning of the *OSA*, the other Securities Legislation and/or common law.

203.    Maxar and each of the Individual Defendants, by virtue of their authority and positions within Maxar including with respect to its disclosures and financial reporting processes, owed duties to the Class to ensure Maxar's Impugned Documents fairly presented Maxar's financial position and financial performance.

204.    Those duties were informed by corporate and securities laws, including section 142 of the British Columbia *Business Corporations Act*, SBC 2002, c 57, as well as NI 51-102, NI 52-109 and NI 52-110.

205.    Maxar and the Individual Defendants' duties were also informed by Maxar's own policies and procedures including, without limitation, the Audit Committee Charter and Maxar's stated Code of Business Conduct and Ethics Practice, applicable to its directors, which required as follows:

> **Compliance with Laws and Regulations**
>
> Directors will comply with the laws, rules and regulations of the countries in which Maxar operates and will comply with the requirements of applicable securities regulatory authorities and stock exchanges.
>
> […]

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

**Conflicts of Interest**

Directors will avoid situations where personal interests could conflict or could appear to conflict with duties and responsibilities or the interests of Maxar as a whole. A conflict of interest may occur where involvement in any activity, with or without the involvement of a related party, prevents the proper performance of a director's duties for Maxar or creates or appears to create, a situation where judgement or ability to act in the best interests as a director of Maxar is affected.

When faced with an actual or potential conflict of interest situation, directors must follow obligations as set out in relevant statutes and Company by-laws and must inform the Chair of the Board of Directors of any such conflict. The Chair of the Board will ensure that directors are not involved in any decision or operation related to a conflict.

[…]

**Accuracy of Books and Records**

The books and records of Maxar must reflect in reasonable detail its transactions in a timely, fair and accurate manner to, among other things, permit the preparation of accurate financial statements in accordance with generally accepted accounting principles.

All business transactions that directors have participated on behalf of Maxar must be properly authorized, properly recorded and supported by accurate documentation in reasonable detail.

**Accounting, Auditing or Disclosure Concerns**

Maxar is required to provide full, fair, accurate, timely and understandable disclosure in reports and documents that are filed with, or submitted to, securities regulatory authorities and the Toronto Stock Exchange.

Directors have a duty to submit any good faith questions and concerns regarding questionable accounting, auditing, or disclosure matters or controls.

No information may be concealed from Maxar's external auditors, internal auditors, the Board of Directors or the Audit Committee of the Board of Directors. It is illegal to fraudulently influence, coerce, manipulate or mislead an external auditor who is auditing Maxar's financial statements.

[bold in the original]

Electronically issued / Délivré par voie électronique : 15-Nov-2019        **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

206. Maxar and the Individual Defendants violated the duties they owed to the Class as directors and/or officers of Maxar.

207. At all material times, KPMG was Maxar's independent auditor. In that role, KPMG owed duties to the Class, which were informed by securities laws, including NI 51-102 and NI 52-108.

208. KPMG's duties were also informed by the professional standards applicable to it, including generally accepted auditing standards, as well as the processes, duties and responsibilities set out in its engagement letters, its internal policies and procedures.

209. KPMG violated the duties it owed to the Class.

210. In and as a result of their breaches of the duties they owed the Class, the Defendants made the Misrepresentation to the Class.

211. The Defendants made the Misrepresentation to the Class for the purpose of attracting investment and inducing members of the public, including the Class, to purchase Maxar's common shares.

212. At all material times, the Defendants knew and intended that the Misrepresentation would be made to Maxar's investors, including the Class, which was known to the Defendants.

213. At all material times, the Defendants knew and intended that the Class would rely on the Misrepresentation to their detriment, which they did.

214. At all material times, the Defendants knew and intended that the Misrepresentation would be incorporated into the market value or price of Maxar's common shares.

Electronically issued / Délivré par voie électronique : 15-Nov-2019       **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

215.   At all material times, it was foreseeable to the Defendants that the Class would incur damages and losses as a result of reliance on the Misrepresentation.

216.   At all material times, the Defendants had exclusive access to information regarding Maxar's financial position and its financial performance.  As such, they were the primary source of information about Maxar's financial position and financial performance, which was relevant to the investment decision whether to purchase, hold or sell Maxar's common shares.  It was reasonable for the Class to rely on the Misrepresentation.

217.   The Plaintiffs and the other Class Members relied on the Misrepresentation in making their investment decisions in regard to Maxar's common shares and, as a result, incurred damages and losses.

## IX.   THE RELATIONSHIP BETWEEN THE MISREPRESENTATIONS AND THE PRICE OF MAXAR'S COMMON SHARES

218.   During the Class Period, the price of Maxar's common shares was directly affected by the issuance of the Impugned Documents and the information contained therein, including the Misrepresentation and the other misrepresentations pleaded herein.

219.   At all material times, the Defendants were aware of the effect of Maxar's disclosures on the price of its common shares.  The Defendants knew and intended that the material information they released regarding Maxar's financial position and its performance would be incorporated in the market value or price of Maxar's common shares.

Electronically issued / Délivré par voie électronique : 15-Nov-2019     **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

220.    The Impugned Documents were filed, among other places, with SEDAR and the TSX, and thereby became immediately available to, and were reproduced for inspection by, the Class, other members of the investing public, financial analysts and the financial press.

221.    Maxar routinely transmitted the documents referred to above to the financial press, financial analysts and certain prospective and actual holders of its securities.

222.    At all material times, Maxar maintained an investors' relations website at investor.maxar.com.  Through that website, Maxar regularly communicates various information to its current and prospective investors, including the Class, regarding Maxar's financial position and its financial results.  Among other information, this website contains copies of the Impugned Documents and other disclosure filings of Maxar.

223.    Maxar regularly communicated with public investors and financial analysts via established market communication mechanisms, including through regular disseminations of its disclosure documents and financial results, including through press releases on newswire services in Canada and the United States.  Furthermore, Maxar regularly held earnings and business update calls with analysts and other market participations, through which it further communicated to the market important information regarding its financial position, financial results and business.  Each time Maxar communicated new and material information, the price of Maxar's common shares was directly affected.

224.    Maxar was the subject of analysts' reports that incorporated certain of the material information contained in the Impugned Documents, including information regarding Maxar's revenue, assets as well as its key non-IFRS metrics.  Any recommendations to purchase Maxar's common shares in such reports were based, in whole or in part, upon that information.

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

225.    At all material times during the Class Period, Maxar's common shares were traded on the TSX and the NYSE, which are efficient and automated markets.  The price at which Maxar's common shares traded promptly incorporated material information from distributed by the Defendants, including the Misrepresentation and the other misrepresentations pleaded herein.

## X.    DAMAGES

226.    The Plaintiffs and the Class Members have suffered damages or losses as a result of the Defendants' conduct and the misrepresentations they made in the Impugned Documents.

227.    As a result of the Defendants' conduct and their misrepresentations, the Class Members acquired Maxar's common shares at artificially inflated prices.  Had the Defendants not made those misrepresentations, during the Class Period, Maxar's common shares would have traded at prices that reflected their true value.  Accordingly, had the Defendants not made the misrepresentations, the Plaintiffs and the Class Members would not have suffered damages or losses.

228.    The Plaintiffs and the Class Members suffered damages or losses as a result of the decline in the market price or value of Maxar's common shares as the Defendants' misrepresentations were gradually corrected on October 31, 2018, January 7, 2019 and February 28, 2019.

## XI.    VICARIOUS LIABILITY

229.    In addition to its direct liability, Maxar is vicariously liable for the acts and omissions of the Individual Defendants and its other officers, directors, and employees.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

230.    In addition to its direct liability, KPMG is vicariously liable for the acts and omissions of its partners, associates, auditors or other employees or affiliates.

## XII.    REAL AND SUBSTANTIAL CONNECTION WITH ONTARIO

231.    This action has a real and substantial connection with Ontario because, among other things:

(a)    Maxar is a reporting issuer in Ontario;

(b)    Maxar's common shares trade on the TSX, which is located in Toronto, Ontario;

(c)    The Impugned Documents and other disclosures of Maxar were disseminated in Ontario;

(d)    Maxar carries on business in Ontario;

(e)    A substantial portion of Class Members are located in Ontario;

(f)    A substantial portion of the damages sought in this action was sustained in Ontario;

(g)    Maxar's former auditor, the Defendant KPMG, is organized pursuant to the laws of Ontario and is headquartered in Toronto, Ontario.

## XIII.    RELEVANT LEGISLATION

232.    The Plaintiffs plead and rely on the *CJA*, the *CPA*, the *OSA* and the other Securities Legislation and the British Columbia *Business Corporations Act*.

Electronically issued / Délivré par voie électronique : 15-Nov-2019    **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

## XIV.    SERVICE OUTSIDE ONTARIO WITHOUT LEAVE

233.    The Plaintiffs may serve this Statement of Claim outside of Ontario without leave of

Court in accordance with Rule 17.02(a), (f), (g), (n) and (p).

Date: November 15, 2019

**Siskinds LLP**
Suite 302, 100 Lombard Street
Toronto, ON  M5C 1M3

**Michael G. Robb** (LSO #: 45787G)
Tel: 519-660-7872
Fax: 519-660-7873

**Sajjad Nematollahi** (LSO #: 62311B)
Tel: 416-594-4390
Fax: 416-594-4391

**Eva Markowski** (LSO #: 74162Q)
Tel: 519-672-2121
Fax: 519-672-6065

550 W. Merrill Street, Ste. 100
Birmingham, Michigan 48009
Tel: (248) 787-6078

**Andrew J. Morganti** (LSO #: 57895E)
amorganti@morgantilegal.com

**MORGANTI & CO., PC**
21 St. Clair Street E., Suite 102

Toronto, ON M4T 1L9
Tel: (647) 344-1900
Fax: (416) 352-7638

**Albert Pelletier (**LSO #: 46965R)
apelletier@morgantilegal.com

**Lawyers for the Plaintiffs**

Electronically issued / Délivré par voie électronique : 15-Nov-2019   **Court File No./N° du dossier du greffe:** CV-19-00631107-00CP

CHARLES O'BRIEN and JAMES RAE          MAXAR TECHNOLOGIES INC. *ET AL.*
                    Plaintiffs    and   Defendants                    Court File No.:

---

*ONTARIO*
## SUPERIOR COURT OF JUSTICE
Proceeding commenced at Toronto
Proceeding under the *Class Proceedings Act, 1992*

---

## STATEMENT OF CLAIM

---

**Siskinds LLP**                      550 W. Merrill Street, Ste. 100
Suite 302, 100 Lombard Street         Birmingham, Michigan 48009
Toronto, ON  M5C 1M3                  Tel: (248) 787-6078

**Michael G. Robb** (LSO #: 45787G)
Tel: 519-660-7872                     **Andrew J. Morganti** (LSO#
Fax: 519-660-7873                     57895E)
                                      amorganti@morgantilegal.com
**Sajjad Nematollahi** (LSO #: 62311B)
Tel: 416-594-4390                     **MORGANTI & CO., PC**
Fax: 416-594-4391                     21 St. Clair Street E., Suite 102
                                      Toronto, ON M4T 1L9
**Eva Markowski** (LSO #: 74162Q)
Tel: 519-672-2121
Fax: 519-672-6065                     Tel: (647) 344-1900
                                      Fax: (416) 352-7638

                                      **Albert Pelletier** (LSO#
                                      46965R)
                                      apelletier@morgantilegal.com

**Lawyers for the Plaintiffs**