## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-0124-WJM-SKC
*Consolidated with Civil Action No. 19-cv-0758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf of All Others Similarly Situated,

    Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA,

    Defendants.

---

## JOINT DISCOVERY DISPUTE REPORT

---

Pursuant to the Court's Order Setting Discovery Briefing (Dkt. 127), Plaintiff Oregon Laborers Employers Pension Trust Fund ("Plaintiff") and Defendants Maxar Technologies Inc., Howard L. Lance, and Anil Wirasekara ("Defendants," and collectively with Plaintiff, the "Parties"), hereby submit this Joint Discovery Dispute Report.

## I.    NAMES OF ATTORNEYS WHO PARTICIPATED IN THE DISCOVERY CONFERRALS

The following attorneys participated in the telephonic conferrals among the Parties:

1.    *Attorneys for* Defendants.  Brittany Rogers, Jonathan Waxman, and Kate Ikehara.

2.    *Attorneys for Plaintiff*.  Trig Smith, Nicole Gilliland, Henry Rosen, Patton Johnson, and Spence Burkholz.

3.    Attorneys for plaintiff in the related case pending in Santa Clara County Superior Court, In re Maxar Technologies *Inc. Shareholder Litigation*, Case No. 19CV357070 (the "State Action"), also participated in discovery conferrals related to the deposition coordination protocol.

## II.    DATE CONFERRAL CONFERENCES WERE HELD AND AMOUNT OF TIME THE PARTIES CONFERRED

### A.    Telephonic Conferrals Regarding Deposition Coordination Protocol

1.    *December 1, 2021*.  Approximately fifty minutes.

2.    *December 20, 2021*.  Approximately twenty minutes.

3.    *January 4, 2022*.  Approximately one hour.

### B.    Telephonic Conferrals Regarding Plaintiff's Request for 26 Depositions

1.    *December 30, 2021*.  Approximately forty minutes.

## III.    MATTERS THAT WERE RESOLVED BY AGREEMENT

**Defendants' Position**: As the Court is aware, there is a related case pending in the Santa Clara County Superior Court in California, *In re Maxar Technologies Inc. Shareholder*

*Litigation*, Case No. 19CV357070, involving substantially similar allegations.[1]  For two months, the Parties and the State Action plaintiff negotiated the terms of a deposition coordination protocol in order to facilitate the deposition process across the two cases, avoid duplicative depositions to the extent practicable (including multiple depositions of the same witness absent good cause), and resolve or narrow the issues required to be escalated to the Court.  Protocol ¶ 1.

Before Friday, January 7, 2022, Defendants were under the impression that both sets of plaintiffs had agreed to the framework of the protocol and most of the key terms.  But on Friday, January 7, 2022 at 4:37pm (PT), three days before this brief was to be filed, Plaintiff started to question several provisions about which there was previously no dispute and to call into doubt Plaintiff's willingness to participate in a coordination protocol at all.  Defendants continue to believe that there is general agreement about the protocol framework (Ex. A) and many of the key terms.  But there are now several critical aspects of the protocol applicable to depositions in this action that require the Court's intervention.[2]  The italicized terms in Exhibit A reflect the remaining disputes, whereas the non-italicized terms reflect terms agreed among the Parties and the State Action plaintiff.

## IV.    SPECIFIC MATTERS THAT REMAIN TO BE HEARD AND DETERMINED

### A.    Deposition Coordination Protocol

The Parties disagree about whether: (1) the protocol needs to address Plaintiff's request to take 26 depositions, and if so, whether Plaintiff has good cause to take 26 depositions, Protocol ¶ 9; (2) counsel may converse with their clients during deposition breaks, Protocol ¶ 18; (3) Plaintiff can participate in depositions and use the resulting testimony without having those

---

[1] In light of the similarities between the State and Federal Actions, Defendants filed a notice of related case on October 18, 2021.  (Dkt. 119).

[2] The Parties are not asking this Court to impose any terms on the State Action plaintiff.  If any terms remain in dispute with the State Action plaintiff after this Court issues an order on the disputes before it, the parties in the State Action will resolve those disputes before Judge Kulkarni in the Santa Clara County Superior Court.

depositions count against the deposition limits in this case, Protocol ¶ 8; (4) the protocol should apply to corporate depositions, and if so, whether there should be a presumptive limit on the number of hours for a corporate deposition, Protocol ¶¶ 5(c), (e), 13; (5) the protocol should apply to expert depositions where the expert has been designated to offer opinions in both the Federal and State Actions, Protocol ¶¶ 1, 5(d); (6) a percipient witness may be deposed more than once in either of the Federal or State Actions, Protocol ¶ 3; and (7) absent a good cause showing, Plaintiff may use deposition testimony from depositions it fails to cross-notice or subpoenas, Protocol ¶ 6.  The Parties have met and conferred on these issues but have not reached any agreement.

### B.      Plaintiff's Request to Take 26 Depositions

The Parties further disagree about whether: (1) Plaintiff has made a particularized showing to justify exceeding the ten deposition limit set by Federal Rule of Civil Procedure 30(a)(2)(A)(i) and this Court's Scheduling Order (Dkt. 77) at 7 ("Each side is limited to 10 depositions."); (2) Plaintiff has demonstrated a sufficient need to take 26 depositions; and (3) costs should be shifted for depositions in excess of ten, consistent with the 1993 Advisory Committee Note to Federal Rule of Civil Procedure 30(a)(2).  The Parties have met and conferred on these issues but have not reached any agreement.

## V.     DEFENDANTS' POSITIONS REGARDING REMAINING DISPUTES

### A.      Deposition Coordination Protocol

The Parties recognize the potential benefits of deposition coordination and agree that a protocol is proper under fair terms.  The Parties and the State Action plaintiff have thus agreed on most of the key terms in the protocol.  But Plaintiff has attempted to use the protocol as a means to expand its rights beyond discovery permissible under the Federal Rules of Civil Procedure and this Court's October 28, 2020 Scheduling Order.  For example, without having

taken a single deposition, Plaintiff has attempted to use the protocol as an opportunity to evade the 10 deposition limit set by this Court. *See* Scheduling Order (Dkt. 77.) And Plaintiff argues that the protocol should allow Plaintiff to participate in the State Action plaintiff's depositions, including by asking questions at those depositions, without having those depositions count against its limits in this action. But the purpose of the protocol is to facilitate coordination without materially expanding or limiting any Parties' rights. Accordingly, Defendants request that this Court enter the deposition protocol with Defendants' proposed terms in all areas of dispute.

### 1. Deposition Protocols are Widely Accepted as Appropriate and Optimal to Coordinate Discovery Between Overlapping Actions.

The Federal Rules of Civil Procedure and the California Rules of Court serve similar functions: "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1; *see* Cal. R. Court 1.5 ("The rules and standards of the California Rules of Court must be liberally construed to ensure the just and speedy determination of the proceedings that they govern."). To achieve this purpose, courts often require parties to coordinate discovery in related matters pending in state and federal courts. The Federal Judicial Center's Manual for Complex Litigation explains that "[s]tate and federal judges, faced with the lack of a comprehensive statutory scheme, have undertaken innovative efforts to coordinate parallel or related litigation so as to reduce the costs, delays, and duplication of effort that often stem from such dispersed litigation." Federal Judicial Center, Manual for Complex Litigation § 20.31 (4th ed. 2004, May 2021 Update). Indeed, "[v]irtually all judges and attorneys who have participated in cases involving intersystem coordination agree that duplicative discovery— serving the same interrogatories on the same parties, taking depositions on the same matters of the same witnesses, and producing the same documents and physical evidence in two courts rather than a common depository—is enormously wasteful." William W. Schwarzer, Nancy E.

5

Weiss & Alan Hirsch, *Judicial Federalism In Action: Coordination of Litigation in State and Federal Courts*, 78 Va. L. Rev. 1689, 1707 (1992). Cross-jurisdiction coordination can extend to various aspects of discovery in order to promote efficiency, conserve resources, avoid inconsistent pretrial rulings, and prevent duplicative efforts.[3]

Courts often require coordination of "scheduling and cross-noticing joint federal-state depositions." Federal Judicial Center, *Manual for Complex Litigation* § 20.313. For example, in *In re General Motors LLC Ignition Switch Litg.*, the U.S. District Court for the Southern District of New York entered a deposition coordination protocol, similar to the one the Parties have proposed here, in related state and federal matters "to minimize the expense and inconvenience of this litigation by providing for a single deposition of any witness common to the various proceedings." 2015 WL 13820855, at *2 (S.D.N.Y. Feb. 23, 2015). *See also* Ex. B, Order No. 7: Coordination of State and Federal Discovery Regarding Phase I F.R. Civ.P. 30(b)(6) Depositions, 2010, *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation* Case No. 8:10ML2151 JVS (FMOx), Dkt. 293, filed Aug. 26 (ordering coordinated Rule 30(b)(6) depositions and their equivalents in related state and federal actions "to promote judicial efficiency and economy"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2006 WL 196943, at *1 (D. Minn. Jan. 6, 2006) ("In order to avoid duplicative discovery and to prevent the unnecessary expenditure of judicial resources and the resources of the parties, steps should be taken to encourage counsel in related

---

[3] *See, e.g.*, *In re: Zyprexa Prods. Liab. Litig.*, 260 F.R.D. 13, 15 (E.D.N.Y. 2009) ("In connection with settlement and all related processes, this court and the Special Settlement Master will fully cooperate with any state judge conducting a related Attorney General case who wishes to participate."); *In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 124414, at *1 (E.D. Pa. Feb. 10, 1999) (ordering coordination of discovery between state and federal diet drug litigation); *Atl. Mut. v. IT Corp.*, 842 F. Supp. 910, 913 (M.D. La. 1994) ("Defendant makes an appropriate suggestion that discovery in this action be coordinated with discovery in the state court action.").

state court proceedings to coordinate their depositions with MDL No. 05–1708 (DWF/AJB) depositions.”).

There is significant overlap between the allegations in this action and in the State Action, which means significant overlap in relevant witnesses.  Plaintiffs in both cases challenge Maxar's accounting practices as applied to its geosynchronous communications ("GeoComm") business.  Specifically, plaintiffs in both actions allege that Maxar did not timely write down its GeoComm assets based on alleged "indicators of impairment."  *Compare* Ex. C, State Action Compl. ¶¶ 47, 59, 88, *with Oregon Laborers* Compl. ¶¶ 5–6, 60 (Dkt. 44.)  These "indicators" are largely consistent across the two cases.  Both plaintiffs cite the deteriorating GeoComm market, Maxar's strategic goals for its GeoComm business, and GeoComm's business levels. *Compare* Ex. C, State Action Compl. ¶¶ 47, 53, 55, 63–64, 73, *with* Oregon Laborers Compl. ¶¶ 60–61, 70–73, 76–77, 80–86 (Dkt. 44.)  As a result, Plaintiff and the State Action plaintiff intend to depose many of the same witnesses from Maxar's current or former executive teams, accounting teams, and GeoComm line of business.  Their combined witness list underscores the overlap—each one of the individuals on Plaintiff's proposed list also appears on the combined proposed list.  *Compare* Ex. D, Plaintiff's Proposed List , *with* Ex. E, Plaintiff and State Action Plaintiff Combined List.

### 2.      The Proposed Deposition Coordination Protocol is Efficient and Fair.

Due to the significant overlap between the allegations in this action and the State Action, and for purposes of efficiency and fairness, Defendants proposed a draft deposition coordination protocol on November 8, 2021.  *See* Ex. F, Nov. 8, 2021 Email Proposal.  Both the Plaintiff here and State Action plaintiff agreed that coordination and protocol was appropriate under fair terms. Defendants intend for the final protocol to be entered as an order by both this Court and the court

7

presiding over the State Action.[4]  As proposed, the protocol's framework requires Plaintiff here to coordinate with the State Action plaintiff.  Either plaintiff can notice or subpoena depositions they wish to take, and if they want to participate in a deposition noticed or subpoenaed by the other plaintiff, they are able to participate according to the procedural rules applicable in their respective case.  If, however, either plaintiff elects not to participate in a particular deposition, then that plaintiff may not later seek to depose the same witness (absent good cause).  Any deposition that Plaintiff elects to participate in will count against the limits ordered by the Court.

The goal of the protocol, as proposed, is to facilitate coordination without materially restricting *or* expanding any Party's rights.  For example, the protocol allows Plaintiff to freely select its depositions and specifies that Plaintiff will have seven hours of time on the record in each coordinated deposition—i.e., the allotted time under the Federal Rules.  *See* Protocol ¶ 12. All the protocol requires is that Plaintiff's counsel work with counsel in the State Action on scheduling, which should not present a problem, as plaintiffs' counsel in the two cases routinely work together.  Indeed, David Hall, one of the lead lawyers in the State Action, practiced with Lead Counsel at Robbins Geller for over six years.  *See* Ex. G, David Hall LinkedIn.  The State Action plaintiff has also voiced his support for coordination.  *See* Ex. H, Jan. 3, 2022 Email from McCurdy Plaintiffs' Counsel ("The State Action Plaintiffs share Defendants' goal to seek to reach agreement on a protocol shortly.").

The Parties have had held several productive meet and confers regarding the protocol's terms.  But the primary sticking point has been Plaintiff's insistence that the protocol address not only coordination procedures, but also the number of depositions available to Plaintiff.  In other words, Plaintiff has attempted to use this as an opportunity to extract a concession in the form of an increase in its overall deposition limits.  Defendants request that the Court order a deposition

---

[4] Any disputes with the State Action plaintiff over terms applicable to him will be addressed by the court presiding over that action.

coordination protocol for this case, reject Plaintiff's attempt to fuse two unconnected issues (coordination and deposition limits), and adopt Defendants' proposals on disputed terms.

### 3. The Deposition Coordination Protocol Should Not Address Plaintiff's Deposition Limits.

The deposition coordination protocol is not the vehicle for modifying this Court's previous Order limiting each party in this case to 10 depositions. The protocol is a durable document that functions whether Plaintiff's deposition limit is 10, 12, 15, or any other number. The proposed deposition coordination protocol does not affect the deposition limits imposed by the Federal Rules or this Court. *See* Deposition Protocol ¶ 9 (Defendants Propose: "Nothing in this protocol alters, changes, or impacts the provisions of Federal Rule of Civil Procedure 30(a)(2)(A)(i).").  The Court has already ordered that Plaintiff is limited to 10 depositions. *See* October 28, 2020 Scheduling Order (Dkt. 77.)  If Plaintiff can make a particularized showing that it needs additional depositions at a later date, Defendants will meet and confer in good faith with Plaintiff at that time.  And if the Court permits more than 10 depositions in this case, either by agreement of the Parties or on Plaintiff's request based on the necessary showing, the Protocol will still apply.  But this is not the time, and the Protocol is not the place, to address Plaintiff's request for increased deposition limits, and Plaintiff should not be rewarded with additional depositions for stymieing the coordination process over the last two months.

### 4. The Court Should Adopt Defendants' Proposed Language for the Disputed Terms.

For each disputed term of the protocol, Defendants' proposals aim to maximize efficiency, eliminate ambiguity, and accommodate the Parties' expressed goals.

***Number of Depositions.***  As explained above, the primary dispute over the protocol has been Plaintiff's insistence on including a provision that revises the Court's Scheduling Order to increase the number of depositions available to Plaintiff.  But coordination procedures and

deposition limits are separate concepts.  Defendants have thus proposed, "Nothing in this protocol alters, changes, or impacts the provisions of Federal Rule of Civil Procedure 30(a)(2)(A)(i)."  Protocol ¶ 9.  Of course, Plaintiff can move the Court for an order allowing additional depositions if such depositions become necessary.  But no depositions have been taken yet.  And the protocol, which provides a framework for deposition coordination, need not include a provision that addresses Plaintiff's request to take 26 depositions—the protocol applies irrespective of the particular limit set by this Court.  Accordingly, the Court should adopt Defendants' proposal in paragraph 9—nothing in the Protocol impacts Federal Rule of Civil Procedure 30(a)(2)(A)(i)—and strike Plaintiff's request for a term allowing it to take 26 depositions.  This would be without prejudice to Plaintiff seeking at a later time to increase its deposition limit based on the required showing.

In a related attempt to use the protocol to expand its access to deposition testimony, Plaintiff seeks to delete a critical provision aimed at preserving the Court-ordered limits on depositions in this case: "A Common Interest Deposition,[5] no matter which party initially notices or subpoenas it, shall count as a deposition in both the State Action and the Federal Action." Protocol ¶ 8.  The purpose of this provision is to prevent Plaintiff from using the State Action plaintiff's separate limits to its advantage.  This Court has ordered a 10-deposition limit.  If this Plaintiff elects to participate in and wants to use the testimony from a particular deposition— coordinated or not—it should count against Plaintiff's limit.  The text of the provision simply confirms that, if either plaintiff elects to participate in a deposition (making it a Common Interest Deposition), it counts against that plaintiff's limits, whatever the applicable limit is in each case.

---

[5] Common Interest Deposition is defined, in part, as:  "All depositions noticed or subpoenaed in the Federal Action that the State Action Plaintiff elects to subpoena or cross-notice; All depositions noticed or subpoenaed in the State Action that the Federal Action plaintiff elects to subpoena or cross-notice."  The Parties have not agreed to other aspects of the definition of a Common Interest Deposition, which relate to whether the term applies to depositions of corporate representatives or experts designated in both the Federal and State Actions.

This makes sense because both Plaintiff and the State Action plaintiff anticipate participating in Common Interest Depositions, both will have an opportunity to ask several hours of questions at Common Interest Depositions, and may use testimony from Common Interest Depositions.  Protocol ¶¶ 5–7, 12.  These provisions hold true regardless of who notices the Common Interest Deposition first.  Accordingly, Common Interest Depositions—i.e., depositions that both Plaintiff and the State Action plaintiff participate in—should count as depositions in both the State Action and the Federal Action.  To the extent Plaintiff does not want a "State Action deposition" to count against its limits, Plaintiff simply need not notice and participate in the deposition.  But if Plaintiff chooses to notice and participate in a State Action deposition, it becomes a Common Interest deposition that counts against the limits in both actions.

Plaintiff has taken the incredible position that it should be able to participate in and use the testimony elicited in any deposition that the State Action plaintiff initiates, even beyond the deposition limits imposed by the Federal Rules and this Court.  But that is the very purpose of a deposition limit.  If Plaintiff has its way, the protocol would allow it to participate in depositions beyond the limit imposed by the Court.

Plaintiff also wants the ability to use deposition testimony from depositions taken in either case, irrespective of whether Plaintiff has served a deposition notice or subpoena, and irrespective of Plaintiff's deposition limits here.  Protocol ¶ 6.  In other words, Plaintiff would like to use testimony from depositions taken in the State Action as if those depositions were taken here.  This is yet another one of Plaintiff's attempts to skirt its deposition limits.  Plaintiff's proposal serves no other purpose.

Finally, consistent with the Parties' desire to "avoid duplicative depositions to the extent practicable (including multiple depositions of the same witness absent good cause)," Protocol ¶ 1, Defendants seek to make clear that percipient witnesses may be deposed only once in the

Related Actions[6] "*or either one of them*." Protocol ¶ 3. This provision is necessary to safeguard witnesses from seriatim depositions, which is one of the animating principles of the protocol in the first place. And since both Plaintiff and the State Action plaintiff otherwise have the ability to participate in depositions subject to the applicable limits set by the presiding court, the provision does nothing to restrict Plaintiff's rights. Protocol ¶¶ 5a–b, 7.

*Applicability of Protocol to Experts*. Defendants propose that the protocol apply to expert depositions where an expert has been designated to provide testimony in both of the cases. Plaintiff, on the other hand, wants to limit the protocol to fact witness depositions without any justification. Protocol ¶ 1, 5(d). Plaintiff's proposal once again creates inefficiencies and ambiguities, and it would theoretically give Plaintiff two chances to participate in depositions of Defendants' experts.

If an expert has been designated to offer testimony in both matters, that expert will undoubtedly be deposed by both Plaintiff and the State Action plaintiff. Courts routinely recognize the utility of coordinating expert discovery across cases, *see In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 13820855, at *3 (applying deposition coordination protocol to experts common in various actions), and doing so here would be the most efficient and economical path forward.

*Applicability of Protocol to Corporate Representatives*. For two months of the Parties' negotiations, the protocol being negotiated applied to corporate depositions and Plaintiff never mentioned the term. Three days ago, Plaintiff suddenly objected. Plaintiff now argues that because it has not served a deposition notice under Federal Rule of Civil Procedure 30(b)(6) regarding substantive deposition topics, the protocol need not address corporate representative depositions. Plaintiff's argument makes no sense. Plaintiff also has not served deposition subpoenas on Maxar's employees or former employees, and Plaintiff does not contend

---

[6] Related Actions is defined collectively as this action and the State Action.

coordination is premature or unnecessary for those depositions.  Whether or not Plaintiff, in fact, elects to take a corporate deposition pursuant to Federal Rule of Civil Procedure 30(b)(6) is not what matters.  The point of the proposed term is that, if Plaintiff does elect to take a corporate deposition, it needs to be coordinated with the State Action.  Again, coordination of corporate depositions is favored in complex litigation, and should be ordered here.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 13820855, at *3 (applying deposition coordination protocol to corporate representative depositions); Ex. B, Order No. 7: Coordination of State and Federal Discovery Regarding Phase I F.R. Civ.P. 30(b)(6) Depositions, 2010, *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation* Case No. 8:10ML2151 JVS (FMOx), Dkt. 293, filed Aug. 26 (ordering coordination of corporate representative depositions).  If Plaintiff decides to forego a corporate deposition, there is no harm in including a provision that becomes moot.

Relatedly, there is a dispute about whether there should be a limit on the number of hours for a corporate deposition.  Protocol ¶ 13.  Plaintiff asks this Court to eliminate ***any*** hours cap on corporate depositions.  *Id*.  But Plaintiff's proposal is inconsistent with the Federal Rules, which apply a presumptive seven-hour limit applies to corporate depositions.  *See* Fed. R. Civ. P. 30(d)(1).  Defendants thus request that the Court reject Plaintiff's latest attempt to side-step the limits that otherwise govern Plaintiff's ability to take deposition testimony.

***Witness Availability.***  Plaintiff requested that witnesses sitting for multi-day depositions be made available on consecutive days.  Defendants have agreed to use good-faith efforts to make witnesses represented by O'Melveny available on back-to-back calendar days.  Protocol ¶ 18.  Many of the relevant witnesses no longer work for Maxar and have full-time jobs with other organizations, so their schedules are not within Maxar's control.  In the event that witnesses cannot be available for two back-to-back calendar days during the requested

timeframe, Defendants have agreed that, absent a showing of good cause, they will propose two dates within a five day period. *Id*.

These reasonable scheduling arrangements have not satisfied Plaintiff. Instead, preemptively accusing defense counsel of trying to engage in improper coaching of witnesses, Plaintiff seeks to restrict contact between defense counsel and their clients during depositions. *See* Protocol ¶ 18 (Plaintiff's proposal: "During the pendency of each deposition, there shall be no contact between counsel and the witness concerning the substance of the witness's first day of testimony.").

Plaintiff's proposal directly conflicts with clear authority from this district. *See Cannon v. Time Warner NY Cable LLC*, 2015 WL 2194620, at *1 (D. Colo. May 7, 2015) ("[T]here is no bar on attorney consultation with a client during the client's deposition, as a general matter—so long as no question is pending."); *McKinley Infuser, Inc. v. Zdeb*, 200 F.R.D. 648, 650 (D. Colo. 2001) (holding that the truth-finding function of deposition "is adequately protected if deponents are prohibited from conferring with their counsel while a question is pending; other consultations, during periodic deposition breaks, luncheon and overnight recesses, and more prolonged recesses ordinarily are appropriate"). Defense counsel intends to comply with all applicable rules governing interactions with clients and witnesses, but Plaintiff's unduly restrictive proposal is not based on reasoned authority. On the contrary, Plaintiff has only offered *Perry v. Leeke*, 488 U.S. 272 (1989), to support its position—a case involving a criminal defendant's Sixth Amendment right to assistance of counsel. There, the U.S. Supreme Court simply held that "the Federal Constitution does not compel every trial judge to allow the [criminal] defendant to consult with his lawyer while his testimony is in progress if the judge decides that there is a good reason to interrupt the trial for a few minutes." *Id*. at 284-85. *Perry* has no conceivable relation to this case.

14

### B.     Plaintiff's Request to Take 26 Depositions.

Plaintiff's insistence that the protocol address the number of depositions available to it has resulted in a dispute that is not ripe for the Court's intervention.  Without having taken a single deposition, Plaintiff asks this Court for nearly triple the number of depositions previously set by this Court in its Scheduling Order.  But because Plaintiff has not taken any depositions, let alone exhausted its ten deposition limit, Plaintiff's purported need for additional depositions is wholly speculative and premature.  "Most courts hold that in order to make a 'particularized showing,' moving parties must, at a minimum, 'ordinarily exhaust their allowed number of depositions before making a request for additional' depositions."  *See Acosta v. Sw. Fuel Mgmt., Inc.*, 2017 WL 8941165, at *7 (C.D. Cal. Sept. 19, 2017).

Plaintiff's proposed deponent list includes witnesses who are identified to testify about the same topics without differentiation, as well as witnesses who are not even relevant to this action.  Plaintiff's request is thus excessive, duplicative, unduly burdensome, and not proportional to the needs of the case, particularly when Plaintiff has not yet taken any depositions.  The Court should reject Plaintiff's request to exceed the ten deposition limit, without prejudice to Plaintiff requesting additional depositions if they become necessary at a later date.

### 1.     Plaintiff Has Not Made a Particularized Showing to Exceed Ten Depositions

"A party seeking to exceed the presumptive limit [of ten depositions] bears the burden of making a 'particularized showing' of the need for additional depositions."  *Thykkuttathil v. Keese*, 294 F.R.D. 597, 600 (W.D. Wash. 2013).  Plaintiff has made no such showing, instead offering a high-level summary of topics without explaining why any particular witness's testimony is uniquely necessary.

First, Plaintiff attempts to downplay the significance of this Court's Scheduling Order that limits each side to ten depositions. *See* October 28, 2020 Scheduling Order. But as another court in this district has recognized, a party must demonstrate good cause to depart from deposition limits set in a scheduling order. *See Medcorp, Inc. v. Pinpoint Techs., Inc.*, 2009 WL 1049758, at *5 (D. Colo. Apr. 20, 2009) ("A party may seek amendment of a Scheduling Order by making a showing of good cause for the amendment."). Plaintiff cannot make that showing "merely by demonstrating that many people could have discoverable information," *id.*—a fact that is true across the board in federal cases.

Here, the transcript from the hearing on the Scheduling Order reflects that Plaintiff did not have a basis to request more than 10 depositions as of the October 28, 2020 scheduling conference, and it does not have one now. *See* Hearing Transcript at 4 ("If we have a basis for more, then we'll first meet and confer with Defendants and then seek leave of Court, if necessary."). By the time of the October 28, 2020 conference, Plaintiff had already served its initial disclosures identifying 20 witnesses between Defendants and current and former Maxar individuals, the majority of whom are on Plaintiff's proposed list of 26 deponents. *Compare* Ex. I, Plaintiff's October 21, 2020 Initial Disclosures at 2–4, *with* Ex. D, Plaintiff's Proposed Deponent List.

The only thing that has changed since Plaintiff lacked good cause for additional depositions when it served its Initial Disclosures about eight days before the scheduling conference with this Court is that Plaintiff has received document productions. But all Plaintiff's counsel has said now is that its requested witnesses are on many emails. Plaintiffs in most complex cases can make the same argument, yet the ten-deposition limit in the Federal Rules is regularly enforced. Indeed, "the mere fact that more than ten individuals may have discoverable information in a case does not mean that taking more than ten depositions makes sense." *Lawson v. Spirit AeroSystems, Inc.*, 2020 WL 1285359, at *8 (D. Kan. Mar. 18, 2020). "The

16

purpose of the limitation in [Rule 30(a)] is to force counsel to think long and hard about who they want to depose and to depose only those who are really important." *Id*. Plaintiff has failed to do so here. *See id*. (rejecting plaintiff's request for additional depositions despite proposed deponents' inclusion on produced documents because plaintiff failed to show that the proposed witnesses were not duplicative).

Accordingly, Plaintiff's counsel's admission that it lacked good cause to exceed ten depositions at the time of Plaintiff's initial disclosures is fatal to Plaintiff's request for 26 depositions at this juncture.

### 2. Plaintiff's Deposition List is Overly Broad, Cumulative, and Duplicative.

It is not surprising that Plaintiff is unable to make a particularized showing of good cause to take 26 depositions. Plaintiff's proposed list includes witnesses with only a passing connection to the case, as well as many witnesses whose work at Maxar and its predecessor companies overlaps with one another. "[P]arties are not entitled to go on a fishing expedition through discovery on the chance that the greater the number of depositions they take, the more likely it is that the deponents will remember or provide key information." *Medcorp,* 2009 WL 1049758, at *5. Yet that appears to be Plaintiff's primary argument here.

First, Plaintiff's proposed list includes many individuals who are not necessary witnesses because: (1) they were not employed at Maxar or its predecessor companies at any point during the time period relevant to Plaintiff's claims (like former operating company CEO, John Celli, who left over a year before Plaintiff alleges that impairments should have been taken); or (2) they lack a meaningful connection to Plaintiff's substantive allegations, which will become clear once Plaintiff begins taking depositions.

17

Second, Plaintiff's list includes many cumulative witnesses.  Plaintiff provided a summary of the testimony it seeks to elicit from each, and the duplication is clear on the face of that summary.  For example, Plaintiff seeks to depose at least:

- Four different witnesses (Rich Currier, Paul Estey, William McCombe, and Tina Radabaugh) about the retention and work of consultant Bain & Company in 2017— a year before the relevant time period in this action and a subject only tangentially connected to Plaintiff's claims;

- Three different witnesses (John Celli, Rich Currier, and Dario Zamarian) about GeoComm challenges in the business and industry;

- Several duplicative witnesses within particular accounting teams (Jose Torres, Jill Windrum, Lance Weber, Darren Hoegler, Edward Chou, and Paul Wilkinson);

- Three different witnesses (Paul Estey, Bruce Stephenson, and Tina Radabaugh) on corporate strategy; and

- Three different Maxar CFOs (Anil Wirasekara, an interim CFO for a period of 6 months, William McCombe, Biggs Porter—an individual who joined Maxar only *after* Plaintiff claims impairments should have been taken), plus several members of various teams reporting to them who worked together and do not appear to possess unique information.

Where, as here, a party seeks cumulative or duplicative testimony, courts regularly reject motions to increase deposition limits. The *Lawson* decision from Kansas is instructive.  2020 WL 1285359, at *8.  There, the plaintiff sought to take fourteen fact depositions—almost half of the number Plaintiff is asking to take now.  Although the *Lawson* plaintiff demonstrated that the additional witnesses might have relevant information, including because they appeared on documents produced by defendant and were identified in defendant's initial disclosures, the court denied the plaintiff's request because he failed to show that the proposed witnesses were not

18

duplicative. *See Lawson*, 2020 WL 1285359, at *6–8 ("Lawson has not shown that Reed and Mapel would provide testimony on subject matter that Crossman and Rabe are not already covering. Their depositions therefore appear to be unreasonably cumulative and duplicative."). Like in *Lawson*, the Court should reject Plaintiff's request because its proposed list is cumulative and duplicative.

Having failed to show the need to take 26 fact depositions, Plaintiff's request should be denied.

### 3.    Defendants Request Cost Shifting for Any Depositions In Excess of Ten

If the Court permits Plaintiff to take more than ten depositions, particularly at this juncture when Plaintiff has yet to take a single deposition, Defendants respectfully request that the Court enter a cost-shifting order for the excess depositions. *See San Francisco Health Plan v. McKesson Corp.*, 264 F.R.D. 20, 21 (D. Mass. 2010) (ordering that the party seeking additional depositions "shall pay the reasonable costs, including attorney's fees, incurred by the [opposing party] with respect to the additional four depositions."). Defendants request that the order cover costs and attorneys' fees for attending and preparing for the excess depositions. *See Advanced Sterilization Prods., etc. v. Jacob*, 190 F.R.D. 284, 287 (D. Mass. 2000) (party may recover from counsel for opposing party the "reasonable costs, including attorney's fees, incurred in taking the eleventh and twelfth depositions"—i.e., depositions exceeding the ten deposition limit).

DATED:  January 10, 2022                    Respectfully submitted,

                                            *Matthew W. Close*
                                            Matthew W. Close
                                            Brittany Rogers
                                            O'Melveny & Myers LLP
                                            400 South Hope Street, 18th Floor
                                            Los Angeles, CA 90071-2899
                                            Telephone: (213) 430-6000

Facsimile: (213) 430-6407
brogers@omm.com
mclose@omm.com


Jerome H. Sturhahn
Milton L. Smith
Peter G. Koclanes
Sherman & Howard LLC
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Telephone: (303) 297-2900
Facsimile: (303) 298-0940
jsturhahn@shermanhoward.com
msmith@shermanhoward.com
pkoclanes@shermanhoward.com

*Attorneys for Defendants Maxar Technologies,
Inc., Howard L. Lance and Anil Wirasekara*

20

# DEFENDANTS' EXHIBIT A

**[PROPOSED] PROTOCOL GOVERNING COORDINATION OF DEPOSITIONS**

**I.      APPLICABILITY OF PROTOCOL**

1.      The deposition coordination protocol is intended to facilitate the deposition process, avoid duplicative depositions to the extent practicable (including multiple depositions of the same witness absent good cause), and resolve or narrow the issues required to be escalated to the Court.  The terms of this protocol shall apply to all depositions [Plaintiffs Propose: "*of percipient witnesses*"; Defendants Propose: *do not add "of percipient witnesses"*] taken in the class actions filed in the United States District Court for the District of Colorado, *Oregon Laborers v. Maxar Techs., et al.* (Case No. 19-cv-124) ("Federal Action") and the Superior Court of Santa Clara County, *McCurdy v. Maxar Techs., et al.* (Case No. 19-cv-357070) ("State Action") (collectively, the "Related Actions").

2.      Nothing in this Order will preclude any Party from seeking to modify it later for good cause shown.  Prior to doing so, however, counsel will meet and confer in a good-faith effort to reach agreement as to the appropriate scope of any modifications or revisions.

**II.      NUMBER AND LENGTH OF DEPOSITIONS**

3.      A percipient witness may be deposed only once in the Related Actions [Defendants Propose: *or either one of them* / Plaintiffs Propose: *do not add "or either one of them"*] after the date of entry of the deposition coordination protocol, except by stipulation of the parties or by Order of the proper Court on a showing of good cause.

4.      The Parties agree to meet and confer prior to any such deposition for the purposes of determining whether it can be completed in a single day.

5.      "Common Interest Depositions" shall include:

a.      All depositions noticed or subpoenaed in the Federal Action that the State Action Plaintiff elects to subpoena or cross-notice;

b.      All depositions noticed or subpoenaed in the State Action that the Federal Action plaintiff elects to subpoena or cross-notice;

c.    [Defendants Propose: *All depositions of Defendants (including of corporate representatives) or their current and former employees*; / Plaintiffs Propose: *All depositions of Maxar Technology Inc.'s ("Maxar") current and former employees*]

d.    [Defendants Propose: *Expert depositions where the expert has been designated to offer opinions in both of the Related Actions.* / Plaintiffs Propose: *do not add "Expert depositions where the expert has been designated to offer opinions in both of the Related Actions."*]

e.    [Plaintiffs Propose:  *All State Action depositions of Maxar's corporate representatives.* / Defendants Propose: *do not add  "All State Action depositions of Maxar's corporate representatives."*]

6.    [Defendants Propose: *Absent a good cause showing, the Federal Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the State Action at least five calendar days before the deposition is scheduled means that no testimony resulting from the State Action subpoena or notice may be used in the Federal Action.  Absent a good cause showing, the State Action Plaintiff's failure to  subpoena or cross-notice a deposition taking place in the Federal Action at least five calendar days before the deposition is scheduled means that no testimony resulting from the Federal Action subpoena or notice may be used in the State Action.* / Plaintiffs Propose: *do not add paragraph*.]

7.    Absent a good cause showing, the Federal Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the State Action means the witness may not be re-deposed in the Federal Action.  Absent a good cause showing, the State Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the Federal Action means that the witness may not be re-deposed in the State Action.

8.    [Defendants Propose: *A Common Interest Deposition, no matter which party initially notices or subpoenas it, shall count as a deposition in both the State Action and the Federal Action.*  / Plaintiffs Proposes: *do not add paragraph*.]

- 2 -

MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

9.      [Defendants Propose: *Nothing in this protocol alters, changes, or impacts the provisions of Federal Rule of Civil Procedure 30(a)(2)(A)(i)*. / Plaintiffs Propose: *Plaintiffs in the Federal Action shall be allowed to take up to 26 depositions of percipient witnesses in this case.*]

10.     Nothing in this protocol is intended to place presumptive limits on the number of depositions available to the State Action Plaintiff.

11.     The Parties reserve their respective rights to ask the Superior Court presiding over the State Action to expand or limit the number of depositions available in the State Action based on any applicable grounds.  Defendants believe that the reasonableness and appropriateness of the total number of depositions taken in the State Action shall be assessed based in part on the total number of Common Interest Depositions subpoenaed, noticed, or cross-noticed by the State Action Plaintiff.

12.     The Parties agree to limit each Common Interest Deposition to no more than 14 hours total, with the Federal Action Plaintiff limited to no more than 7 hours of time absent leave from the Federal Court.  In addition, for party-related witnesses, the defending party will have an additional hour, on top of the 14-hour limit, to conduct its examination.  Any exceptions would require a specific showing of good cause.

13.     [Defendants Propose: *For the deposition of a corporation, the 14-hour total applies to the entire corporate deposition.  Accordingly, if Plaintiffs spend 7 hours questioning one witness designated as a corporate representative, they have 7 hours remaining for any additional corporate representatives.*  Plaintiffs Propose: *For the deposition of a corporation, the 14-hour total does not apply.  This paragraph does not apply to the Federal Action plaintiff*.]

14.     Any noticing party or cross-noticing party is entitled to minute-for-minute re-cross following any examination by the defending party.

15.     The Parties agree to limit each day of Common Interest Depositions to 7 hours total record time each day, unless all Parties and witnesses agree otherwise.

**III.    DEPOSITION PROCEDURE**

16.     Counsel in the State Action shall be served with all deposition notices or subpoenas issued in the Federal Action, and vice versa.  E-mail service shall suffice.

- 3 -

17.     The Parties will cooperate in good faith to schedule a Common Interest Deposition so that the need to coordinate the availability of counsel does not unreasonably delay the scheduling of depositions.

18.     For witnesses represented by O'Melveny & Myers whose depositions, subject to the limitations in this protocol, will go beyond one day, Defendants agree to use good-faith efforts to make witnesses available for two back-to-back calendar days; in the event that such a witness is not reasonably available for two back-to-back calendar days in the requested timeframe, Defendants agree that, absent a showing of good cause, they will propose two dates within a five-day period during which the witness and defense counsel can be available.  [Plaintiffs Propose: *During the pendency of each deposition, there shall be no contact between counsel and the witness concerning the substance of the witness's first day of testimony.* / Defendants Propose: *do not add "During the pendency of each deposition, there shall be no contact between counsel and the witness concerning the substance of the witness's first day of testimony."*]

19.     Counsel for Plaintiffs in the Related Actions shall meet and confer prior to any Common Interest Deposition and shall reach agreement regarding allocation of Plaintiffs' deposition questioning time.

20.     Objection of one counsel to a question will preserve that objection on behalf of all other counsel and therefore counsel shall avoid repeating objections.

21.     Any objection to relevance or admissibility of documents used as deposition exhibits are not waived, and are preserved pending a later ruling by the Court or by the trial judge.

22.     Any document produced in one of the Related Actions and introduced as an exhibit during a Common Interest Deposition will be deemed produced in all the Related Actions, subject to objections served in either the State or Federal Actions.

23.     Defense counsel shall not seek discovery of communications between counsel for the Federal Action and State Action plaintiffs regarding deposition coordination.

MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

- 5 -

IT IS SO ORDERED.

ENTERED this _____ day of _____, 2022.

_____
HON. S. KATO CREWS
U.S. MAGISTRATE JUDGE

# DEFENDANTS'
# EXHIBIT B

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORIA**

IN RE: TOYOTA MOTOR CORP.
UNINTENDED ACCELERATION
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

This document relates to:

ALL CASES

Case No.:  8:10ML2151 JVS (FMOx)

**ORDER NO. 7: COORDINATION OF
STATE AND FEDERAL
DISCOVERY REGARDING PHASE I
F.R.CIV.P. 30(b)(6) DEPOSITIONS**

In order to avoid duplicative depositions, the parties and the Court endorse the cross-noticing of depositions in this MDL and in related state court and federal court actions involving allegations of unintended acceleration in Toyota vehicles ("Related Actions") where practical and where such a procedure will not result in undue delay in this MDL litigation.  This Order and the coordinated discovery it proposes are intended to promote judicial efficiency and economy "so as to reduce costs, delays and duplication of effort that often stem from such disbursed litigation" while minimizing "conflicts that distract from the primary goal of resolving the parties' disputes." Annotated Manual for Complex Litigation, Fourth, Section 20.3 (2010). Accordingly, the Court enters this Order to govern coordination of depositions taken during Phase I discovery in this MDL proceeding. Coordination of depositions in later phases of discovery shall be governed by a separate order.

1. Plaintiffs' Co-Lead Counsel, members of Plaintiffs' Lead Counsel or Liaison Counsel Committees, Defendants' Lead Counsel, or counsel in Related State Court Actions may cross-notice any of the 30(b)(6) deposition(s) noticed to be taken as part of Phase I discovery in this MDL proceeding. In order to facilitate cross-noticing, whenever a party in this MDL notices a 30(b)(6) deposition during Phase I, counsel for that party shall provide the notice to Federal—State Liaison Counsel by e-mail or

1

facsimile on the same day that the notice is served on the deponent. Upon receipt of any such notice, Federal—State Liaison Counsel shall provide the notice (via e-mail, facsimile, or mail) to counsel in Related Actions.

2. Any cross-notices must be served within five (5) days after service of the initial notice to be effective. The cross-notice shall specifically identify the subject matter topics being cross-noticed.  (See ¶ 8, infra.)

3. If a party in this MDL proceeding cross-notices a 30(b)(6) deposition, it shall provide the notice to Plaintiffs' Lead Counsel Committee, Plaintiffs' Liaison Counsel Committee, and Federal—State Liaison Counsel by e-mail or facsimile at the same time the cross-notice is served on the deponent's counsel. If a party in a Related Action cross-notices a 30(b)(6) deposition, it shall provide the notice to Federal—State Liaison Counsel by e-mail or facsimile on the same day the notice is served on the deponent. Upon receipt of any such notice, Federal—State Liaison Counsel shall provide the notice to Plaintiffs' Co-Lead Counsel and Defendants' Lead Counsel. If a party in this MDL proceeding objects to that cross-notice, the party issuing the cross-notice shall have seven (7) days after service thereof, to notify the Court or Special Master(s) of the dispute by letter electronically filed via CM/ECF, which will provide notice of such filing to all counsel of record. The letter shall ask the Court or Special Master(s) to convene a conference call to dispose of the dispute as soon as it can be scheduled. The burden shall be on the party objecting to the cross-notice to demonstrate that the cross-notice should be quashed.

4.  In order to ensure that the location for the deposition will accommodate the number of parties and attorneys in attendance, any state court plaintiffs' counsel that plans to attend a deposition shall notify Plaintiffs' Co-Lead Counsel of their intent to attend at least five (5) days before the date of the deposition.  Mere late notice of

2

LEGAL02/32096591v2

intent to attend a deposition shall not be a basis for exclusion.

5.    No party to Related Actions may add new topics to the 30(b)(6) depositions beyond those provided for in this MDL proceeding. However, counsel for plaintiffs in Related State Court Actions are free to submit proposed questions to Plaintiffs' Co-Lead Counsel (with copies to Federal—State Liaison Counsel) that relate to topics that have been designated in any notice or cross-notice.

6.    At any cross-noticed deposition, Plaintiffs' Co-Lead Counsel shall have the authority to designate counsel for plaintiffs who shall conduct such deposition. Time allocated to counsel in Related Actions shall be in accordance with Order No. 5, as amended.   In no event shall any cross-noticing of the deposition for use in a Related Action delay the taking of any Rule 30(b)(6) deposition noticed by Plaintiffs' Co-Lead Counsel in this MDL proceeding.

7.    Counsel for parties in Related Actions may obtain copies of transcripts, video recordings, and exhibits from any deposition taken during Phase I discovery in this MDL proceeding, subject to the following: To the extent that any portion of any Phase I deposition or exhibit used in such deposition has been designated as "Confidential" or "Highly Confidential," then counsel for parties in Related State Court Actions shall not be entitled to obtain copies of "Confidential" or "Highly Confidential" portions of transcripts, video recordings, or exhibits unless and until counsel have signed the "Agreement Concerning Information Covered by Protective Order," which is attached as Exhibit A to the Stipulated Protective Order, filed by the Court on July 16, 2010 (Docket No. 244).

8.    Counsel for plaintiffs in Related Actions are not required or compelled to participate in any Phase I  Rule 30(b)(6) depositions.  The effect participation of

3

LEGAL02/32096591v2

counsel for plaintiffs in Related Actions in such depositions  shall have in their separate actions shall be determined by the courts presiding over those separate actions.  With respect to all matters concerning the use of the Phase I  Rule 30(b)(6) depositions in the Related Actions, including without limitation procedural compliance, evidentiary matters, and any another aspects of the law of the separate fora, those matters shall be determined by the courts presiding over those separate actions.

    IT IS SO ORDERED.

Dated: August 26, 2010

                                                  _____
                                                  James V. Selna,
                                                  United States District Judge

4

LEGAL02/32096591v2

SUBMITTED BY:


By:   /s/ Cari K. Dawson

CARI K. DAWSON (GA SBN 213490)
ALSTON + BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Telephone:  (404) 881-7766
Facsimile:   (404) 253-8567
Email:  cari.dawson@alston.com


By:   /s/ Lisa Gilford

LISA GILFORD (CA SBN 171641)
ALSTON + BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, CA 90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100
Email:  lisa.gilford@alston.com

***Lead Defense Counsel for Economic Loss Cases***


By:   /s/  Vincent Galvin, Jr.

VINCENT GALVIN, JR. (CA SBN 104448)
**BOWMAN AND BROOKE**
1741 Technology Drive, Suite 200
San Jose, CA 95110
E-mail:  vincent.galvin@bowmanandbrooke.com


By:   /s/ Joel Smith

JOEL SMITH (SC SBN 5266)
**BOWMAN AND BROOKE**
1441 Main Street, Suite 1000
Columbia, SC 29201
E-mail:  joel.smith@bowmanandbrooke.com

***Lead Defense Counsel for Personal
Injury/Wrongful Death Cases***

5

LEGAL02/32096591v2

# DEFENDANTS' EXHIBIT C

Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

David W. Hall (SBN 274921)
dhall@hedinhall.com
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

*Lead Counsel for Plaintiff and the Putative Class*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

| | |
|---|---|
| IN RE: MAXAR TECHNOLOGIES, INC. SHAREHOLDER LITIGATION | Lead Case No. 19CV357070 |
| | <u>CLASS ACTION</u> |
| This Document Relates To: ALL ACTIONS | DATE ACTION FILED: 10/21/2019 |
| | DEPT. 1 |
| | JUDGE: HON. BRIAN C. WALSH |
| | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933** |
| | <u>DEMAND FOR JURY TRIAL</u> |

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**INTRODUCTION**

1.      Plaintiff Michael McCurdy, individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Maxar Technologies Inc. and Maxar Technologies Ltd. ("Maxar"), MacDonald, Dettwiler and Associates Ltd. ("MDA"),[1] and DigitalGlobe, Inc. ("DigitalGlobe"), as well as media and analyst reports about the Company and Company press releases.    Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

**SUMMARY OF THE ACTION**

2.      In October 2017, Maxar, a satellite manufacturer, acquired and merged with DigitalGlobe, a satellite imagery company (the "Merger").  In connection with the Merger, Maxar issued approximately 21.5 million new shares of Maxar common stock directly to DigitalGlobe shareholders, all pursuant to a materially false and misleading F-4 registration statement (the "Registration Statement") and prospectus (collectively, with documents incorporated therein, the "Offering Materials").

3.      Plaintiff is a former DigitalGlobe shareholder who received Maxar common stock issued pursuant to the Offering Materials in exchange for his DigitalGlobe shares.  On behalf of similarly situated former DigitalGlobe shareholders who received Maxar shares pursuant to the false and misleading Offering Materials, Plaintiff asserts strict-liability claims under §§11, 12, and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act") against Maxar, certain current and former Maxar officers and directors, and certain former DigitalGlobe officers and directors.

---

[1] Maxar Technologies Ltd. and MDA are the legal predecessors to Maxar Technologies Inc.  MDA became Maxar Technologies Ltd. upon its merger DigitalGlobe in October 2017, and Maxar Technologies Ltd. became Maxar Technologies, Inc. in January 2019.  For readability, the name "Maxar" is used for all three of these entities, and includes their predecessors and successors in interest, parents, subsidiaries, and divisions.

- 1 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4.      In violation of the Securities Act, SEC implementing regulations, common law duties, applicable International Financial Reporting Standards ("IFRS"), and Defendants' own express commitments and undertakings, the Offering Materials contained numerous untrue statements of material fact and omitted material facts both required by governing regulations and necessary to make the statements made not misleading.  The Offering Materials overstated Maxar's assets, earnings, and other financial results, trends, and metrics by recording property, plant and equipment (PPE), inventory and development assets far in excess of realizable value and thereby inflating earnings.  The Offering Materials should have reflected the impairment in the value of Maxar's geosynchronous satellite communications ("GeoComm") segment. Maxar reported artificially inflated earnings in the Offering Materials when Maxar should have reported losses.

5.      During the two years preceding the Merger, Maxar's GEO business had collapsed, with demand for satellite broadband Internet falling precipitously as a result of lower-cost terrestrial competition like fiber optic connections and high-speed cellular networks.  As the satellite market shrank 45%, Maxar's GeoComm segment revenues dropped 20%, and the future looked even worse, with the number of GeoComm contract awards also falling rapidly.  In early 2017, several months *before the Merger*, the bleak GeoComm market outlook led Maxar to quietly retain management consulting firm Bain & Co. ("Bain") for a "restructuring project" intended to assess the diminished value and prospects for its GeoComm segment and advise whether it was worthwhile for Maxar to even stay in the business at all.  On Bain's negative internal assessment of GeoComm's value and prospects, Maxar undertook mass layoffs — firing 334 employees (including 66 critical engineers) between February and June 2017 alone, slashing new business development budgets for GeoComm satellite proposals, and steeply curtailing operations at its GeoComm facility in Palo Alto, all with an eye toward selling off its GeoComm segment or otherwise exiting the market entirely.

6.      Each of these glaring indicators of impairment existed and was known to Defendants months before the October 2017 Merger.  Yet none were disclosed in the Offering Materials, and none were accounted for in the Maxar financial results, metrics, and trends incorporated into the Offering Materials.  Had Defendants complied with governing IFRS accounting standards to timely

- 2 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

and accurately test and accrue impairment (and its own representations that it continuously monitored and tested impairment of intangible assets) and recorded GeoComm segment assets at realizable value, by the time of the Merger Maxar would have already recorded millions of dollars in impairment charges to its reported inventories, intangible assets, and property, plant, and equipment ("PP&E"). Thus, in stark contrast to the inflated asset values, purported earnings, and other false and misleading financial results and metrics touted in the Offering Materials, Maxar in truth had suffered (and was obligated to report) a net loss.

7.      With these misrepresentations and omissions in the Offering Materials, Defendants were able to complete the Merger. But the truth ultimately emerged. In late October 2018, after initially downplaying a damaging short-seller report, Maxar was forced to admit to **over $383 million in impairment losses and inventory obsolescence in its GeoComm segment** and a consequent **$432 million net loss**. Investors and analysts were shocked. The price of Maxar stock plummeted. By the commencement of this action, Maxar common stock has traded as low as $3.96 per share, an approximately **93% decline since the Merger**. Plaintiff and other ordinary shareholders suffered severe losses as a result.

## **JURISDICTION AND VENUE**

8.      This Court has original subject matter jurisdiction under the California Constitution, Article VI, Section 10. Removal is barred by Section 22 of the 1933 Act.

9.      This Court has personal jurisdiction, and venue is proper under California Code of Civil Procedure §§ 395 and 410.10, because Defendants and their agents reside, are headquartered, or at all relevant times were headquartered in California; conducted the Merger in California; and affirmatively solicited the subject securities and Registration Statement to investors in California, including during roadshows conducted in California, and those contacts with California have a substantial connection to the claims alleged herein. At all times relevant to the Merger, Maxar's principal executive offices were located in California. The predecessor to Maxar's GeoComm segment is Maxar's Space Systems/Loral LLC ("SSL") subsidiary. SSL was a standalone company and went bankrupt in 2003. After it emerged from bankruptcy, it was acquired by Maxar, becoming Maxar's GeoComm segment. Maxar's GeoComm and related satellite

- 3 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

communications business was at all relevant times headquartered in Palo Alto, California, as are Maxar's satellite manufacturing and R&D operations, including the facilities and business segments central to the misrepresentations and omission alleged herein. As stated in the Registration Statement, as of the Merger, Maxar's California headquarters was also the official mailing address for nearly all the Individual Defendants (as defined below), namely Howard L. Lance, Robert L. Phillips, Dennis H. Chookaszian, Lori B. Garver, Joanne O. Isham, Anil Wirasekara, C. Robert Kehler, Brian G. Kenning, and Eric Zahler. At all relevant times, SSL MDA Holdings, Inc., Maxar's wholly owned subsidiary and a holding company for Maxar operating subsidiaries, was headquartered in California. At all relevant times, Merlin Merger Sub, Inc., the wholly owned subsidiary Maxar formed for the purpose of effecting the Merger (and into which DigitalGlobe was merged to become a wholly owned subsidiary of Maxar), was also headquartered in California. Maxar's authorized representative in the United States, Michelle D. Kley, signed the Registration Statement on behalf of Maxar in California.

## PARTIES

10.     Plaintiff Michael McCurdy acquired Maxar common stock pursuant to the Offering Materials, in exchange for his former DigitalGlobe shares via Merger, and was damaged thereby.

11.     Defendant Maxar specializes in the manufacture of satellites and provision of satellite-related services. Maxar's common stock trades on the New York Stock Exchange under the ticker symbol "MAXR." At the time of the Merger, Maxar was incorporated under the laws of British Columbia and maintained its principal executive offices in California. In October 2017, in connection with the Merger, Maxar issued approximately 21.5 million shares of Maxar common stock directly to former shareholders of DigitalGlobe common and preferred stock, all pursuant to the Offering Materials.

12.     Defendant Howard L. Lance was, at all relevant times, President, Chief Executive Officer, and a Director of Maxar. Defendant Lance reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

- 4 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

13.    Defendant Anil Wirasekara was, at all relevant times, Executive Vice President and Chief Financial Officer of Maxar.  Defendant Wirasekara reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

14.    Defendant Angela Lau was, at all relevant times, Senior Vice President, Finance and Corporate Secretary of Maxar.  Defendant Lau reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

15.    Defendant Robert L. Phillips was, at all relevant times, Chairman of the Board of Directors of Maxar.  Defendant Phillips reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

16.    Defendant Dennis H. Chookaszian was, at all relevant times, a Director on Maxar's Board.  Defendant Chookaszian reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

17.    Defendant Lori B. Garver was, at all relevant times, a Director on Maxar's Board. Defendant Garver reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

18.    Defendant Joanne O. Isham was, at all relevant times, a Director on Maxar's Board. Defendant Isham reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

19.    Defendant C. Robert Kehler was, at all relevant times, a Director on Maxar's Board. Defendant Kehler reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

- 5 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

20.    Defendant Brian G. Kenning was, at all relevant times, a Director on Maxar's Board. Defendant Kenning reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

21.    Defendant Eric Zahler was, at all relevant times, a Director on Maxar's Board. Defendant Zahler reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

22.    Defendant Jeffrey R. Tarr was, at all relevant times, President and Chief Executive Officer of DigitalGlobe.  Defendant Tarr reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials

23.    The Defendants named in ¶¶ 12-22 are referred to herein as the "Individual Defendants."  The Individual Defendants each signed or were identified as incoming officers or directors in the Registration Statement, solicited the purchase securities issued pursuant thereto, planned and contributed to the Merger and Registration Statement, and attended promotions to meet with and present favorable information to Maxar and DigitalGlobe investors, all motivated by their own and the Company's financial interests.

**GOVERNING IFRS PROVISIONS**

24.    At all relevant times, Maxar prepared, reported, and certified its consolidated financial statements subject to IFRS.  Promulgated by the International Accounting Standards Board ("IASB"), IFRS are the accounting profession's principles, conventions, rules, and procedures that define accepted international accounting practices.  Pronouncements issued by IASB's predecessor are designated "International Accounting Standards" ("IAS"), which were adopted by IASB and remain part of IFRS.

25.    Relevant IAS standards in place at the time the Offering Materials were issued include the following.

- 6 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

26.    **IAS 1: Presentation of Financial Statements**. IAS 1 prescribes the "overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content," *see* IAS 1.1, which apply to all "general purpose financial statements" prepared and presented "in accordance with International Financial Reporting Standards (IFRSs)." IAS 1.2. "General purpose financial statements . . . are those intended to meet the needs of users who are not in a position to require an entity to prepare reports tailored to their particular information needs." IAS 1.7. "The objective of financial statements is to provide information about the financial position, financial performance, and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS 1.9.

27.    Under these governing standards, a company's "[f]inancial statements **shall** present fairly the financial position, financial performance and cash flows of an entity.

> Fair presentation **requires** the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the [Conceptual] Framework [for Financial Reporting]. The application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation."

IAS 1.15. "An entity whose financial statements comply with IFRSs **shall** make an explicit and unreserved statement of such compliance in the notes. An entity **shall not** describe financial statements as complying with IFRSs unless they comply with all the requirements of IFRSs." IAS 1.16.

28.    **IAS 36: Impairments of Intangible Assets and Property, Plant, and Equipment.** "The objective of [IAS 36] is to prescribe the procedures that an entity applies to ensure that its assets are carried at no more than their recoverable amount."   An asset is carried at more than its recoverable amount if its "carrying amount' ['book value'] exceeds the amount to be recovered through use or sale of the asset ['fair value'].  If this is the case, the asset is described as impaired and the Standard **requires** the entity to recognise an impairment loss."  "An asset is impaired when its carrying amount exceeds its recoverable amount." IAS 36.8.  "An entity **shall** assess at the end of each reporting period whether there is **any** indication that an asset may be impaired." IAS 36.9. "[IAS 36.12 to 36.14] describe some indications that an impairment loss may have occurred. If **any**

- 7 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

of those indications is present, an entity is *required* to make a formal estimate of recoverable amount . . . .”

29.    Maxar had both intangible assets and PP&E for which it failed correctly to record impairment.  The overwhelming majority of both Maxar's intangible assets and its PP&E were attributable to its GeoComm segment.

30.    The intangible assets attributed to Maxar's GeoComm segment consisted of technology, software, trade names, and customer relationships.  Maxar capitalized intangible assets of $320 million upon acquiring SSL in 2012, and it subsequently recorded additional internal development and external purchases.  For example, in 2017 and 2018, Maxar capitalized internally developed technology by approximately $116 million, the "vast majority" of which "relate[d] to projects in the GEO communications satellite line of business, such as digital payload, electric propulsion and roll-out solar array development programs." As of June 30, 2017, Maxar reported the value of its total intangible assets (the vast majority of which were attributable to its GeoComm segment) at approximately $440 million.[2]

31.    The GeoComm segment's PP&E consisted of land and land improvements, buildings, leasehold improvements, testing equipment, vehicles, computer hardware, and furniture and fixtures. The Company's acquisition of SSL added approximately $300 million of PP&E to the balance sheet, primarily in the areas of land, buildings, and equipment.  As of June 30, 2017, Maxar reported the value of its PP&E (of which the vast majority was attributable to its GeoComm segment) at approximately $475 million.

---

[2] At all relevant times leading up to the Merger, Maxar reported its financial results in Canadian Dollars.  In the quarter following the Merger, the third quarter of 2017 ("3Q17"), Maxar began reporting its financial results in U.S. Dollars, with the exception of dividend payments that remained denominated in Canadian Dollars. And as part of the reorganization following the Merger, the GeoComm cash-generating unit was re-categorized from the "Communications" to "Space Systems" reporting segments. Neither change affected the Company's accounting and disclosure requirements under IFRS.

- 8 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

32.      Maxar's capitalization as of June 30, 2017 of $440 million in intangible assets and $475 million in PP&E was materially misleading because of Maxar's failure to correctly record impairments for these assets, especially those assets attributable to its GeoComm segment.

33.      IAS 36.12 states that "[i]n assessing whether there is *any* indication that an asset may be impaired, an entity *shall* consider, *as a minimum*, the following indications":

**External sources of information**

(a) there are observable indications that the asset's value has declined during the period significantly more than would be expected as a result of the passage of time or normal use.

(b) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the **technological, market**, economic or legal environment in which the entity operates or in the market to which an asset is dedicated.

\*\*\*

**Internal sources of information**

(e) evidence is available of obsolescence or physical damage of an asset.

(f) significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used. These changes include the asset becoming idle, **plans to discontinue or restructure the operation to which an asset belongs**, plans to dispose of an asset before the previously expected date, and reassessing the useful life of an asset as finite rather than indefinite.

(g) evidence is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected.

34.      But, as IAS 36.13 prescribes, "[t]he list in paragraph 12 is not exhaustive," for "[a]n entity may identify other indications that an asset may be impaired and these would also *require* the entity to determine the asset's recoverable amount." Beyond the "internal" indicators above, IAS 36.14 states that "[e]vidence from internal reporting that indicates that an asset may be impaired includes the existence of":

(a) cash flows for acquiring the asset, or subsequent cash needs for operating or maintaining it, that are significantly higher than those originally budgeted;

(b) **actual net cash flows or operating profit or loss flowing from the asset that are significantly worse than those budgeted**;

- 9 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

(c) a significant decline in budgeted net cash flows or operating profit, or a significant increase in budgeted loss, flowing from the asset; or

(d) operating losses or net cash outflows for the asset, when current period amounts are aggregated with budgeted amounts for the future.

35.    Critically, under IAS 36, *if any impairment indicator is present*, then an *entity is required to test for impairment* by determining an asset's or cash-generating unit's ("CGU") recoverable amount.[3]  Under IAS 36.22, if it is not possible to estimate the recoverable amount of an individual asset, the entity must determine the recoverable amount "for the cash-generating unit to which the assets belong."[4]

36.    According to Maxar, the GeoComm segment was the level of asset grouping that generated independent cash flows, and thus the GeoComm segment was a CGU for purposes of evaluating indicators of impairment and impairment testing.  In contrast, the assets attributed to the Company's small-satellite line of business were grouped in the small satellite ("SmallSat") CGU, and thus treated separately from the GeoComm CGU.

37.    Maxar's reported assets, earnings, earnings per share ("EPS"), and other purported financial results and representations in the Offering Materials were false and misleading because Maxar failed to record the impairment losses in the GeoComm CGU as a result of the numerous and glaring impairment indicators described herein. Defendants violated IAS 36 by ignoring impairment indicators and failing to timely account for an impairment loss to Maxar's GeoComm

---

[3] Under IAS 36, "recoverable amount" is defined as the higher of an asset's or CGU's "fair value" less costs of disposal (the fair value method) and its "value in use" (the cash flow method). And IAS 36.6 defines "[f]air value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The fair value method determines what the market says the asset or CGU could sell for less costs of disposal. "Value in use" is "the present value of the future cash flows expected to be derived from an asset or cash-generating unit." The value in use method is based on a discounted future cash flows valuation of the asset or CGU.  Per IAS 36.55, the discount rate applied to the future cash flows is a pre-tax rate that reflects current market assessments of "(a) the time value of money; and (b) the risks specific to the asset for which the future cash flow estimates have not been adjusted."

[4] Under IAS 36.6, a "CGU" is "the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets and groups of assets."

- 10 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

assets – including corresponding reductions in earnings and EPS – when the book value of those assets exceeded their respective fair value by hundreds of millions of dollars.

38.  **IAS 2: Inventories.** At all relevant times, IAS 2 governed Maxar's accounting treatment and testing of its inventories, including required impairment loss. The inventories of Maxar's GeoComm segment consisted of materials, components, and supplies used in satellite construction.

39.  Under IAS 2.9, the value of an entity's inventories "***shall*** be measured at the lower of cost and net realisable value," and under IAS 2.6, "net realisable value" is the "estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale." Per IAS 2.10, "[t]he cost of inventories ***shall*** comprise all costs of purchase, costs of conversion and other costs incurred in bringing the inventories to their present location and condition."

40.  Accordingly, each quarter, Maxar was required to assess its GeoComm inventory assets to ensure they were not overstated, *i.e.*, that inventory cost did not exceed "net realisable value." As to "net realisable value," IAS 2.28 explains that "[t]he cost of inventories ***may not*** be recoverable if those inventories are damaged, if they have become wholly or partially obsolete, or if their selling prices have declined," and further that "[t]he practice of writing inventories down below cost to net realisable value is consistent with the view that assets should not be carried in excess of amounts expected to be realised from their sale or use." IAS 2 and IAS 36 are thus consistent in requiring that assets (*e.g.*, intangibles, PP&E, inventories) are not overvalued, are appropriately tested for recoverability on a timely basis, and that "no major difference exists between IAS 2 and the requirements included in IAS 36." *See* IAS 36.

41.  IAS 2 also requires that, when determining "[e]stimates of net realisable value," an entity must consider events occurring after a reporting period (*i.e.*, subsequent events) to the extent such events confirm conditions existing at the end of the reporting period. Specifically, IAS 2.30 states:

> Estimates of net realisable value are based on the most reliable evidence available at the time the estimates are made, of the amount the inventories are expected to realise. These estimates take into consideration fluctuations of price or cost directly relating

- 11 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

to events occurring after the end of the period to the extent that such events confirm conditions existing at the end of the period.

And under IAS 2.34, "[t]he amount of any write-down of inventories to net realisable value and all losses of inventories *shall* be recognised as an expense in the period the write-down or loss occurs."

42.    Thus, just as Maxar was required to record an impairment loss to GeoComm's intangible assets and PP&E under IAS 36, Maxar was required to timely write down the net realizable value of its impaired GeoComm inventories under IAS 2.  By failing to, Maxar also violated IAS 2.

**BEFORE THE MERGER, MAXAR'S BUSINESS WAS ALREADY IMPAIRED**

43.    Maxar's GeoComm segment traces back to Maxar's 2012 acquisition of SSL, which was founded in 1957 and has historically specialized in the manufacture of large geostationary communications satellites. These "GEO" satellites are geosynchronous, meaning that their orbit matches the Earth's rotation, causing them to appear stationary to an observer. They orbit thousands of miles from Earth and can relay radio, television, or Internet services to a fixed region of the world over many years.  By comparison, satellites in low earth orbit ("LEO") – such as those used in high-resolution imaging – are only a few hundred miles above the Earth and orbit several times a day.

44.    With the close of the Cold War, SSL turned away from government and military contracts and toward the commercial market for radio and television.  Each commercial GEO satellite contract could earn hundreds of millions of dollars in revenue, but the manufacturing process was capital-intensive, leading to low margins compared to other space industry businesses. To remain viable, SSL's GEO business required a sufficient pipeline of orders and volume of production.

45.    The pipeline dried up in 2002, as its annual awards fell to zero, and SSL consequently declared bankruptcy in 2003.  According to a *Via Satellite* article titled "Loral Looks Beyond Bankruptcy," the root of SSL's financial difficulties was overcapacity in the global satellite market and declining demand from Internet-related telecommunications providers.  SSL would emerge from bankruptcy in 2005, and the GEO market recovered until 2014.

- 12 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

46. Maxar acquired SSL in 2012, and soon thereafter it recorded approximately $300 million in PP&E and $320 million in intangible assets directly related to the GeoComm segment. Immediately following Maxar's acquisition, the company's GEO business appeared profitable; in 2014, Maxar's GeoComm segment secured a significant nine GEO contracts.

47. But 2015 and 2016 saw year-over-year declines in the number of contracts awarded to Maxar's GeoComm segment, down to only five in 2015 and four in 2016. Defendants knew that these declines were indicative of a structural shift in the market for communications technology. Consumers were moving away from satellite-based internet, television, and radio services, and they were turning instead to Internet-based "streaming" services, undergirded by fiber optic connections and high-speed cellular networks. As a result, the satellite market as a whole found itself fully saturated and—in view of declining demand—with excess capacity for satellite manufacturing. To complicate matters, Maxar's GEO satellites in particular fell out of favor as remaining demand refocused on smaller, cheaper, and more flexible LEO satellites.

48. While Maxar acknowledged that global demand had dropped in both 2015 and 2016, Defendant Howard Lance, who had taken over as CEO in May 2016, nevertheless aggressively pushed a Company line that the GEO market would soon recover. For example, on a November 2016 earnings call, Defendant Lance stated that Maxar was "bullish on the long-term health of the satellite industry":

> The overall market remains below historic averages for the second year. The satellite operators delay awards to consider competing technologies and to assess regional excess capacity and their profitability issues. But we remain bullish on the long-term health of the satellite industry, where new orders will include replacement satellites, as well as those to serve increasing customer demands.

49. On the same call, in response to analyst questions, Defendant Lance said: "We see now the second-year in a row where the market is below where it normally is. We think it's going to spring back."

50. Defendant Anil Wirasekara, then CFO, stated on the same call that Maxar expected "satellite order intake levels [to] return to near historical averages":

> Revenues were negatively impacted by the lower number of satellite contracts awarded over the last 18 months, and consequently by the lower number of active

- 13 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

satellite programs in the higher revenue-generating stage of the program cycle as compared to a year ago. We expect this trend to continue for the next few quarters until satellite order intake levels return to near historical averages.

51.     In February 2017, Maxar announced that it was seeking to acquire DigitalGlobe, which used satellites to provide customers with high-resolution images of the earth's surface, in a $2.4 billion debt-financed, stock-and-cash transaction. In contrast to Maxar's declining GEO business that had accounted for a bulk of the company's revenue, the imaging business on which DigitalGlobe was focused was less capital-intensive and provided better margins.  Moreover, by contrast to the GEO market, the space imaging market was still growing.  As Defendant Lance described it, the acquisition of DigitalGlobe was meant to give Maxar "new legs for growth."

52.     But those "new legs" came at a great cost: a massively increased debt load.  As a result of the merger, Maxar's total debt would increase 500%—from $600 million before to $3 billion. The dramatic increase in Maxar's debt burden further decreased the likelihood of profitability for Maxar.

53.     By the time Maxar announced its acquisition plans in early 2017, the company's internal assessment of its GeoComm prospects was already bleak. In fact, the Company had already retained management consultant Bain & Co. to assess the diminished value and prospects of its GeoComm segment.  Bain informed Maxar that it needed to take dramatic and urgent action, and Maxar did—undertaking mass layoffs, slashing budgets, and shrinking operations of its GeoComm facility in Palo Alto.  Maxar was thus aware of the impairment of its GeoComm-related assets long before the merger, and company officials were preparing for a fire sale of these assets or even to exit the GEO business entirely.

54.     Despite knowing that its GeoComm segment was severely impaired, Defendants continued to tout the bullish line of a GEO market recovery just around the corner.  For example, on a May 2017 earnings call, in response to analyst questions regarding the future of the GEO market, Defendant Lance stated: "[W]e've just entered around the last three months of detailed discussions with our customers and are feeling still very positive about the long-term opportunity in the market given that we expect to rebound from a pretty low level."

- 14 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

55. But even as Defendant Lance preached optimism to investors, there was simply no empirical data suggesting a return to normal for the GEO business generally, given the market's growing preference for LEO and terrestrial alternatives, and for Maxar's GeoComm segment in particular, given its excess capacity, lack of new orders, and layoffs—all of which combined to make it less likely each day that Maxar could salvage its GeoComm segment.

### MAXAR'S FALSE AND MISLEADING OFFERING MATERIALS

56. On April 27, 2017, Defendants filed with the SEC on Form F-4 a draft registration statement to register the Maxar shares to be issued and exchanged for DigitalGlobe shares in the Merger. The draft registration statement was amended in response to SEC comments, including comments emphasizing the importance of adequately disclosing material events, uncertainties, and trends and accurate and complete risk factors, as required by SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303") and § 229.105 ("Item 105").

57. On June 2, 2017, Defendants filed an amendment to the registration statement. On June 16, 2017, the SEC initially declared the amended Registration Statement effective.  On June 22, 2017, Defendants filed a prospectus on Form 424B3 for the Maxar shares issued in the Merger.

58. On October 5, 2017, Defendants completed the Merger, issuing approximately 21.5 million shares of Maxar common stock directly to former shareholders of DigitalGlobe common and preferred stock as follows: each former share of DigitalGlobe common stock and/or Series A convertible preferred stock issued and outstanding immediately before the Merger was converted to 0.3132 shares of newly issued Maxar common stock (plus cash consideration).  Each of these new shares of Maxar common stock issued pursuant to the Offering Materials.  On October 4, 2017, the market price for Maxar common stock closed at $54.57 per share.

59. The Offering Materials contained untrue statements of material fact and omitted material facts both required to be stated therein and necessary to make the statements therein not misleading.  Most significantly, the Offering Materials overstated Maxar's assets, net earnings, net EPS, and other financial results, trends, and metrics by failing to account for the already severely impaired value of Maxar's GeoComm segment.

- 15 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

60.     For example, the Offering Materials reported the value of Maxar's total assets as over $3.3 billion, and, for the three-month period ending March 31, 2017 and the year ended December 31, 2016, reported materially overstated net earnings, net EPS, and other false and misleading financial results, metrics, and trends as follows:

| | Three months ended March 31, | | Year ended December 31, |
|---|---|---|---|
| | 2017 | 2016 | 2016 |
| | (in millions of Canadian dollars, except per share amounts) | | |
| Net earnings (attributed to common equity shareholders) | 5.9 | 40.7 | 139.6 |
| Earnings per common share | | | |
| Basic | $ 0.16 | $ 1.12 | $ 3.84 |
| Diluted | 0.15 | 1.10 | 3.74 |
| Dividends declared per common share | 0.37 | 0.37 | 1.48 |

61.     The Offering Materials further reported, for the three- and six-month periods ending June 30, 2017, materially overstated net earnings of $31.7 million and overstated net EPS of $0.87, as well as other false and misleading financial results, metrics, and trends as follows:

| | Note | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|---|
| | | 2017 | 2016 | 2017 | 2016 |
| Net earnings | | $ 25,844 | $ 25,289 | $ 31,729 | $ 65,955 |
| Net earnings per common share: | | | | | |
| Basic | 10 | $ 0.71 | $ 0.70 | $ 0.87 | $ 1.82 |
| Diluted | 10 | 0.70 | 0.69 | 0.87 | 1.80 |

62.     These representations regarding Maxar's purported assets, net earnings, net EPS, and other financial results, metrics, and trends, were false and misleading because they failed to account for the already severely impaired value of the Company's GeoComm assets.  Over the two years preceding the Merger, Maxar's GEO business had collapsed, with demand for satellite broadband Internet falling precipitously in response to lower-cost terrestrial competition like fiber optic connections and high-speed cellular networks. But Maxar continued to report assets at values

- 16 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

in excess of realizable value and capitalized intangible assets at a far higher rate (upwards of 500% higher) than industry peers,[5] and thereby underreported expenses and inflating earnings.

63.    As the satellite market shrank 45% in the two years preceding the Merger, GeoComm revenues dropped 20%, and the future looked even worse, with the number of GEO contract awards falling precipitously.  The market contraction was not attributable mere seasonality; The last time GEO orders had fallen at this rate, the predecessor of Maxar's GeoComm segment, SSL, had been forced into bankruptcy.

64.    Maxar's awareness both of clear industry trends and the implications for its own GeoComm segment led the company in early 2017 to retain management consultant Bain to assess the diminished value and prospects of Maxar's GeoComm segment, and on Bain's negative assessment proceeded to lay off 334 employees (including 66 of the most critical engineers) between February and June 2017, slash new business development budgets for GeoComm satellite proposals, and downsize GeoComm operations—all steps geared towards an ultimate exit from the GeoComm segment.

65.    Had Maxar complied with the governing IFRS standards—and its own statements concerning monitoring of business segments and assessment of impairment charges—to evaluate these numerous and glaring indicators of an impairment loss and timely and accurately test and accrue required impairment charges, Maxar would have reported **not earnings, but rather a net loss** (and basic loss per share) for the both the three-month period ending March 31, 2017 and the three- and six-month periods ending June 30, 2017.

66.    The Offering Materials also misrepresented that Maxar had recorded "all assets, liabilities and contingent liabilities acquired or assumed . . . at their fair values at the date of acquisition," and further that "the Company performs a goodwill impairment test . . . **whenever there is an indication of impairment**" and "tests intangible assets for impairment when events or

---

[5] For example, while industry peers Orbital ATK (n/k/a Northrup Grumman) and the Boeing Company respectively capitalized technology and R&D at a rate of 6% and 13% of gross intangibles, Maxar capitalized its own technology and in process R&D at **over 50%** of gross intangibles.

- 17 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

changes in circumstances indicate that an asset might be impaired." Further, the Offering Materials misrepresented that internally developed technologies met the accounting criteria to be capitalized:

MDA continues to face strong competition, particularly in the communications satellite market. To successfully compete in this market, MDA conducts extensive MDA-funded research and development activities. Costs associated with these activities may either be capitalized as internally developed technologies or expensed as incurred depending on certain accounting criteria. For the year ended December 31, 2016, a higher portion of these costs met the accounting criteria to be capitalized, thereby increasing adjusted operating EBITDA when comparing year over year.

***

Investments in technology and software were higher in the three months ended March 31, 2017 as MDA capitalized higher levels of costs relating to the internal development of key technologies, including the digital payload program.

***

For the three months ended March 31, 2017, MDA capitalized development of technology and software of $23.7 million. For the years ended December 31, 2016, December 31, 2015 and December 31, 2014, MDA capitalized development of technology and software of $81.2 million, $48.7 million and $34.7 million, respectively. Investments in technology and software were higher in the three months ended March 31, 2017 and fiscal year 2016 as MDA capitalized higher levels of costs relating to the internal development of key technologies, including its digital payload program.

***

Research costs are expensed in the period incurred. Development costs are capitalized and recorded as an intangible asset if technical feasibility has been established and it is considered probable that the Company will generate future economic benefits from the asset created on completion of development. The costs capitalized include materials, direct labour, directly attributable overhead expenditures and borrowing costs on qualifying assets. Other development costs are expensed in the period incurred.

67.    These representations were false and misleading because: (1) Maxar's GeoComm segment assets were recorded at far in excess of realizable value; (2) Maxar had capitalized intangible assets at a far higher rate than industry peers, in order to inflate earnings and thereby inflate its stock price; (3) Maxar had repeatedly failed to perform impairment tests despite the existence of numerous and glaring external and internal indicators of impairment; and (4) even

- 18 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

though Maxar's GeoComm segment was already severely impaired, the company had failed to account for the negative financial results, metrics, and trends incorporated into the Offering Materials. Indeed, had Defendants adhered to their commitment in the Offering Materials to perform impairment tests "whenever there is an indication of impairment," consistent with governing IFRS accounting standards to timely and accurately test and record impairment losses, Maxar would have, by the time of the Merger, recorded hundreds of millions of dollars in impairment losses to its reported inventories, intangible assets, and PP&E. The result would have been a reported *net loss* rather than the profits Maxar reported instead.

68. The Offering Materials also misrepresented that Maxar's incorporated "financial statements [were] prepared in accordance with IFRS," and that Maxar had not applied any changes in "methods of accounting, except in accordance with changes in IFRS."

69. These representations were false and misleading because, as detailed above, Maxar's incorporated financial statements were not prepared in accordance with IFRS. Rather, Maxar's reported assets, earnings, EPS, and other purported financial results and representations failed to account for numerous and glaring impairment indicators. Maxar violated IAS 36 by ignoring impairment indicators and failing to timely account for an impairment charge to Maxar's GeoComm assets – including corresponding reductions in earnings and EPS – when the book value of those assets exceeded their fair value by hundreds of millions of dollars. And just as Maxar was required to take an impairment charge to GeoComm's intangible assets and PP&E under IAS 36, Maxar was required to timely write-down the net realizable value of its impaired GeoComm inventories under IAS 2. By failing to do so, Maxar also violated IAS 2. Thus, contrary to its representations in the Offering Materials, Maxar's incorporated financial statements violated IFRS.

70. The Offering Materials also purported to warn of numerous risks that, "*if*" occurring, "*may*" or "*could*" adversely affect the Company—all while failing to disclose that these very "risks" had in fact already materialized at the time of the Merger. For example, the Offering materials stated as follows:

- 19 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

- "[Maxar]'s financial performance is dependent on its ability to generate a sustainable order rate for its satellite manufacturing operations. . . . The cyclical nature of the commercial satellite market *could negatively impact* [Maxar]'s ability to accurately forecast customer demand. The markets that [Maxar] serves *may not grow* in the future and [Maxar] may not be able to maintain adequate gross margins or profits in these markets. . . . If [Maxar] fails to anticipate such changes in demand, its business, results of operations and financial position *could be adversely affected*."

- "Changes in the estimates and assumptions used *could have a material impact* on the amount of goodwill recorded and the amount of depreciation and amortization expense recognized in earnings for depreciable assets in future periods."

- "The unaudited pro forma condensed combined financial information of DigitalGlobe and [Maxar] . . . *may not be indicative* of the results of operations or financial condition of [Maxar] following the merger."

71.    The Offering Materials further represented as follows:

The undersigned registrant hereby undertakes:

***

To reflect in the prospectus any facts or events arising after the effective date of the registration statement . . . which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement . . .

72.    These representations, commitments, undertakings, and risk disclosures were false and misleading because the so-called "risks" that purportedly "could" or "may" occur had in fact already occurred at the time of the Merger.  Maxar had over-capitalized intangible assets (at a rate upwards of 500% higher than industry peers) to inflate earnings. Further, over the two years preceding the Merger, Maxar's GEO business had already collapsed.  Demand for satellite broadband Internet had fallen precipitously in response to lower-cost terrestrial competition. The satellite market had already declined 45%, GeoComm revenues had already dropped 20%, and the number of GEO contract awards had already fallen at a rate not seen since SSL filed for bankruptcy thirteen years earlier.  Maxar already had in hand Bain's negative internal assessment of the GeoComm segment diminished value and prospects. The bleak writing was already on the wall,

- 20 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

and Maxar had already responded in early 2017 with its "restructuring project" of layoffs and other cuts.

73.     Maxar's GeoComm segment was thus already severely impaired.  Yet Maxar failed to account for the impairment loss in its financial statements, metrics, and trends incorporated into the Offering Materials, and thus Maxar violated the governing IFRS standards. Had Maxar complied with accounting standards (as well as its own affirmative commitments in the Offering Materials) to timely and accurately test and record required impairment losses, Maxar would have reported *not earnings, but rather a net loss* (and basic loss per share) for the both the three and six month periods ending March 31, 2017 and June 30, 2017.  As such, the financial information touted in the Offering Materials was materially false and misleading.

74.     Defendants were required to disclose this materially adverse information in the Offering Materials for at least five independent reasons.  First, Defendants had affirmative duties to speak truthfully and completely and to disclose all information necessary to ensure the statements made in the Offering Materials were not misleading.  Defendants' failure to disclose and account for the numerous and glaring external and internal indicators of GeoComm's impairment losses rendered the incorporated representations of Maxar's purported assets, earnings, and other financial results, metrics, and trends—as well as the numerous other positive affirmations of Maxar's GeoComm segment, finances, impairment testing, and financial prospects contained in the Offering Materials—incomplete, inaccurate, and materially misleading.

75.     Second, Item 303 required disclosure of any known events or uncertainties that had caused or were reasonably likely to cause Maxar's disclosed financial information not to be indicative of future operating results.  Maxar's overcapitalization of assets and artificially inflated reported earnings, the collapse of Maxar's GEO business, the already severe yet unaccounted-for impairment losses of Maxar's GeoComm segment, Bain's negative internal assessment of the GeoComm segment's value and prospects, the mass layoffs, reduced spending and other undisclosed "restructuring" efforts Maxar had implemented in response, including its undisclosed plan to sell off the GeoComm segment and exit the GEO business entirely, and the existing

- 21 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

decimation of the GEO market, had all in fact already materially and adversely affected Maxar's current and future financial results.

76.    Third, Item 105 required, in the "Risk Factor" section of the Offering Materials, a discussion of the most significant factors that make the offering risky or speculative, and that each risk factor adequately describe the risk.  Maxar's discussions of risk factors did not even mention, much less adequately describe, the risks posed by the numerous undisclosed external and internal indicators of impairment losses in Maxar's GeoComm segment; Maxar's longstanding overcapitalization of intangible assets to artificially inflate reported earnings; the collapse of Maxar's GEO business and its market; the severe impairment of Maxar's GeoComm segment; Bain's negative internal assessment of the GeoComm segment's value and prospects;  the resulting mass layoffs, reduced spending, and other "restructuring" efforts Maxar had already instituted; Maxar's undisclosed plan to sell off its GeoComm segment and exit the GEO business entirely; the resulting negative financial consequences for Maxar's financial results; or the likely and consequent material adverse effects on the Company's future financial results and prospects.

77.    Fourth, Defendants' failure to disclose the foregoing material information rendered false and misleading the Offering Materials' many references to known risks that "*if*" occurring "*may*" or "*could*" affect the Company.  These "risks" were not mere possibilities. They had already materialized by the time of the Merger.

78.    Fifth, Defendants' failure to disclose and account for the numerous external and internal indicators of GeoComm's impairment losses rendered the Offering Materials materially misleading and violated Maxar's duty to update, including violating the Offering Materials' express commitment that Maxar would update the prospectus to reflect any facts or events arising after the initial effective date of the registration statement that, individually or in the aggregate, represented a fundamental change in the information set forth in the Offering Materials.  The undisclosed and unaccounted-for impairment losses of Maxar's GeoComm segment represented a fundamental change from the overstated assets, earnings, and other Maxar financial results, metrics, and trends set forth in the Offering Materials. Indeed, contrary to the purported "earnings" set forth in the Offering Materials, Maxar had suffered (and should have reported) a net loss.

- 22 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**THE FALSE AND MISLEADING STATEMENTS AND OMSSIONS WERE MATERIAL**

79.    With the foregoing misrepresentations and omissions in the Offering Materials, Defendants were able to complete the Merger.  But by the commencement of this action, the price of Maxar common stock had suffered sharp declines, having traded as low as $3.96 per share, A *93% decline since the Merger*.  Plaintiff and other ordinary shareholders suffered severe losses as a result of Defendants' misconduct.

80.    On August 7, 2018, short seller Spruce Point Capital accused Maxar of having misleadingly inflated its earnings.  Later that same day, Maxar responded with a press release titled "Maxar Technologies Responds to Misleading Short Sell Report," which forcefully disputed Spruce Point's analysis:

> The report on Maxar Technologies Ltd. . . . released today by Spruce Point Capital Management **contains a number of inaccurate claims and misleading statements**. Maxar believes **it is a direct attempt by a short-seller to profit, at the expense of Maxar shareholders, by manipulating Maxar's stock price.**
>
> Maxar continues to execute against its strategy, and recently reaffirmed its full year 2018 guidance for revenue and cash flow from operations, while increasing its full-year adjusted EPS outlook. Maxar believes that the Company remains positioned for future growth. Management and the Board of Directors are focused on delivering enhanced value for all Maxar shareholders.
>
> Maxar continues to be fully committed to transparency in all of its investor presentations and financial reports. Please refer to the Company's disclosure materials filed with Canadian and U.S. securities regulatory authorities, which are available online under the Company's SEDAR profile at www.sedar.com, under the Company's EDGAR profile at www.sec.gov or on the Company's website at www.maxar.com, for more information.

81.    Maxar's August 7, 2018 press release also underscored that Maxar had "recently reaffirmed its full-year 2018 guidance for revenue and cash flow from operations, while increasing its full-year adjusted EPS outlook," and further touted that Maxar "continues to execute on its strategy" and "remains positioned for future growth."  Yet, Maxar's press release failed to disclose that the Spruce Point report had in fact already resulted in both (1) the firing of Maxar's prior certified public accountant and (2) the opening of an internal investigation into the alleged

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

accounting improprieties by the Company's Audit Committee – which would be assisted by the Maxar's newly hired certified public accountants and "independent" third-party consultants.

82.    On August 24, 2018, Maxar issued another press release titled "Maxar Technologies Provides Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund." Maxar's purported "Comprehensive Response" came after the Audit Committee's internal (and still undisclosed) investigation into Spruce Point's allegations had commenced and after Maxar had fired its prior certified public accountant. In this press release, among other things, Maxar continued to dispute much of the Spruce Point analysis. And while it acknowledged the possible impairment of its GeoComm segment in the future, it downplayed the mere "possibility" as one that "might" or "could" occur under "certain [] scenarios" that were far from certain and still only under "consideration."  Maxar also reassured investors that its previously issued financial statements remained valid:

> In response to the accounting claims made in the report, the audit committee of the Board of Directors undertook a review of the elements of the Company's financial statements and disclosures associated with Spruce Point's claims and found no material errors in the previously issued financial statements and disclosures under IFRS.

As such, Maxar continued to misleadingly portray impairment as a mere possibility, when in truth Maxar's GeoComm segment was already impaired and had been for at least months before the Merger.

83.    Then, on October 31, 2018, Defendants shocked the market with Maxar's severely disappointing 3Q18 financial and operational results.  Rather than a profit, as market analysts were led to expect, Maxar announced a *$432 million net loss*, largely *attributed to impairment losses and inventory obsolescence in its GeoComm segment*.  Even without the impairment, Maxar still lost more than $49 million.  In an accompanying press release that day, Maxar revealed GeoComm-related impairment and inventory charges totaling $383.6 million, as follows:

> "We recognized impairment losses of $345.9 million and an inventory obsolescence charge of $37.7 million related to the GEO Comsat business this quarter. This non-cash charge reflects the decline in the business and our decision to evaluate strategic alternatives for GEO Comsat." [quoting CFO Biggs Porter]

- 24 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

***

During the three months ended September 30, 2018 the Company recognized impairment losses of $345.9 million and inventory obsolescence of $37.7 million related to the GeoComm business.

And in its 3Q18 Management's Discussion and Analysis ("MD&A"), Maxar further described the GeoComm impairment and inventory charges as follows:

**Impairment of Non-Financial Assets**

Non-financial assets are tested annually for impairment in the fourth quarter or whenever there is an indication that an asset may be impaired. Non-financial assets that do not generate independent cash flows are grouped together into a cash generating unit ("CGU"), which represent the level at which largely independent cash flows are generated. An impairment loss is recognized in earnings to the extent that the carrying value of an asset, CGU or group of CGUs exceeds its recoverable amount. Impairment is first evaluated by management at the CGU level, absent allocated goodwill.

The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS-8 satellite, a key program with the Israeli government. By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds. For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.

In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed. In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. ***The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels. Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume***. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

- 25 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

The aggregation of the above factors resulted in an impairment trigger being identified as at August 31, 2018 at the GeoComm CGU. The Company first performed an impairment test of the GeoComm CGU. The impairment test of the GeoComm CGU evaluated the non-financial assets held by the Company based on an asset group level, absent allocated goodwill. Assets were aggregated to the level in which independent cash flows could be generated for their respective groupings. The carrying values of these asset groups were compared against their fair value less costs of disposal for possible impairment and an impairment loss of $345.9 million related to property, plant and equipment and intangible assets was recorded for the three months ended September 30, 2018.

*** 

**Inventory Obsolescence**

. . . The Company was previously holding inventory on hand in anticipation of awards to be won during the second half of 2018 and for the AMOS 8 program. The impacts from the loss of AMOS 8 and inability to obtain the forecasted awards culminated during the third quarter of 2018. These factors compelled the Company to re-evaluate its inventory reserves for inventory that was previously pegged to forecasted usage.

All GeoComm inventory subject to discernment over future use based on forecasts was assessed for possible obsolescence. The result of the re-assessment of future usage of the on-hand inventory was an incremental inventory obsolescence reserve of $37.7 million for the three months ended September 30, 2018.

84.    That same day, Maxar held a conference call with analysts and investors, during which Defendant Lance stated as follows:

Market trends at the U.S. and international government levels remain very positive, with growing budgets to fund increased space investments. The global threat environment is persistent, and that's driving higher spending levels in key areas that we can address. All of our business segments will benefit from the trends noted on this slide.

The legacy GEO Comsat market, of course, is an exception, and it remains weak, with industry orders at the lowest level in recent history. The severity and persistence of this market downturn led us to announce the pursuit of strategic alternatives for the GEO product line at the end of July. We are in active discussions, continue to expect to announce a definitive direction for this business by the end of the year.

85.    On the same call, Maxar's then-CFO Biggs Porter ("Porter") stated that Maxar had incurred year-over-year losses as a direct result of the impairment and inventory charges:

IFRS EPS was a loss of $7.31 versus a gain of $0.34 in the third quarter of 2017, ***driven largely by the $384 million in noncash impairment inventory obsolescence***

- 26 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*charges related to the GEO Comsat business*. As Howard mentioned earlier, the current state of this market, together with other factors, necessitated an analysis of the carrying value of the GEO Comsat assets on our balance sheet. This led to an impairment loss of $346 million related to property, plant and equipment and intangible assets and an inventory obsolescence reserve of $38 million during this quarter.

\*\*\*

On an IFRS basis, we posted a loss of $7.29 year-to-date versus a gain of $0.98 in 2017. Again, *the major driver of the decline was the impairment and inventory charges* I mentioned earlier.

86.    Later on the call, an analyst with RBC Capital Markets asked Defendant Lance: "First off, related to the – your current thinking on the review of the GEO business. Just wondering if you can elaborate any more – offer any more color on the items under consideration. What's looking most interesting?" Defendant Lance responded:

Steve, I can't be specific, but I can tell you we're in a number of discussions, and *our primary path remains to sell the business*. So we have multiple interested parties. We are in discussions and we're still hopeful to have an answer that we can announce between now and the end of the year.

And when asked about the negative impact GeoComm had had on Maxar's earnings, Defendant Lance responded:

*It's significantly negative*. I think we can certainly say that . . . But I've said now for a few quarters that we are now trending in GEO toward a loss. *We are trending and now having the impact of pretty significant negative cash flows*.

87.    In response, the price of Maxar common stock *immediately plummeted 45%*, from a close of $27.07 on October 30, 2018 down to close of $14.91 per share on October 31, 2018, on unusually high trading volume.

88.    In sum, while it was only in late October 2018 that Maxar finally came clean, in truth, Maxar's GeoComm segment was already severely impaired, and each of the individual indicators of that impairment was already known to Maxar, well before the Merger:

| Market Factors | "[F]alling satellite-based broadband pricing, and alternative LEO and MEO technologies have negatively impacted the Company's GEO communications satellite line of business." (8/24/18) |
|---|---|

- 27 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

|  |  |
|---|---|
|  | "Non-cash write- downs or an impairment of assets could occur as a result of . . . industry outlook. . . ."  (8/24/18)

"[T]he GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. . . .  By August 2018, there were only five winnable programs across the industry for the entire year. . . ."  (10/31/18)

"The legacy GEO Comsat market, of course, is an exception, and it remains weak, with industry orders at the lowest level in recent history. The severity and persistence of this market downturn. . . ."  (10/31/18)

"[T]he current state of this market, together with other factors, necessitated an analysis of the carrying value of the GEO Comsat assets on our balance sheet."  (10/31/18) |
| **Restructuring / Layoffs** | "[T]he reorganization as part of its U.S. Access Plan . . ."  (8/24/2018)

"The Company . . . has continuously implemented actions to right size the business."  (8/24/18)

"[C]ash costs for certain employee severance. . . ."  (8/24/18)

"[T]he Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business."  (10/31/18) |
| **Reduced Orders** | "[T]he continued decline in the GEO communications satellite business. . . ."  (8/24/18)

"The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels."  (10/31/18)

"Lower award volumes. . . ."  (10/31/18) |
| **Strategic Alternatives / Departure from Market Segment** | "The Company is exploring strategic alternatives regarding the future of its GEO communications satellite. . . ."  (8/24/18)

"The strategic alternatives under consideration include partnering with another satellite manufacturer to gain scale benefits, the sale of the GEO satellite line of business, or the exit of the GEO satellite line of business. . . ."  (8/24/18) |

- 28 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

|  | "[T]he Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale. . . ." (10/31/18)<br><br>"The severity and persistence of this market downturn led us to announce the pursuit of strategic alternatives for the GEO product line at the end of July. We are in active discussions, continue to expect to announce a definitive direction for this business by the end of the year." (10/31/18) |
|---|---|
| **Sale of Assets** | "The monetization of the Company's real estate assets. . . ." (8/24/18) |
| **Problems with Cash Flow** | "[U]nder-absorbed overhead costs have contributed to reduced profitability and negative cash flows in the Space Systems segment." (8/24/2018)<br><br>"[N]on-cash write- downs or an impairment of assets could occur as a result of lower future revenue expectations. . . ." (8/24/18)<br><br>"But I've said now for a few quarters that we are now trending in GEO toward a loss. We are trending and now having the impact of pretty significant negative cash flows." (10/31/18) |
| **Overcapacity** | "The Company's facilities in Palo Alto, CA are significantly over-sized for today's market. . . ." (8/24/18)<br><br>"Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume." (10/31/18) |
| **Impairment Loss and Inventory Obsolescence** | "All GeoComm inventory subject to discernment over future use based on forecasts was assessed for possible obsolescence." (10/31/18) |

89.    In a November 1, 2018 article, analysts with the Globe and Mail (Canada) summarized the revelation and market reaction as follows:

Maxar Technologies Ltd., the former MacDonald Dettwiler & Associates Inc., *saw its share price collapse* on Wednesday on an earnings miss and *a writedown that was an acknowledgment that one of its satellite businesses may never recover*.

Maxar shares declined almost 45 per cent to close at $19.68, trading at record lows in the session. It is now almost 80 per cent below its 52-week high of $86.67.

The *investor reaction threatens to immolate the promise of the 2017 merger* that combined the storied Canadian defence firm Macdonald Dettwiler with DigitalGlobe, a Colorado imagery business.

- 29 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

. . .

*The writedown also validates the attack by U.S. short-selling firm Spruce Point Capital Management* . . .

Spruce Point took on Maxar on Aug. 7, after the shares closed at $57.25. The firm suggested the company's preferred profit measures and the accounting choices made to arrive at them obscured weak cash flow that threatened the company's dividend and even its solvency. *It suggested an impairment charge was likely*.

In a detailed response later in the summer, Maxar said it had conducted a review of its accounting, found no errors and was confident in its future—but would review its businesses for potential impairment, a process that resulted in Wednesday's charge.

*Maxar lost US$432.5-million*, or US$7.31 a share, *in large part owing to US$383.6-million in impairment charges as it wrote down the value of its GeoComm satellite business*. But even on profit numbers that exclude the bad stuff, the company greatly disappointed: Its adjusted earnings per share of 75 US cents missed analyst consensus by nearly 30 per cent, and its sales of US$508.2-million were nearly 10 per cent below consensus.

The writedown came, Maxar said in a securities filing, when it lost confidence . . . Now, Maxar "*does not expect the longterm outlook for the GeoComm business to rebound* significantly from current year award levels."

Unfortunately, it has *fixed costs from a major complex in Palo Alto, Calif., that are weighing it down as satellite sales fall*. The company is trying to sell both the real estate and the entire GeoComm business. . .

90.    In December 2018, Maxar further announced the sale of 4.5 acres of Palo Alto real estate (the former home of its GeoComm satellite design and production engineers), the proceeds of which CFO Porter claimed would be used to "*pay down Maxar debt*."

91.    Then, in January 2019, Defendant Lance resigned as CEO, President, and member of the Board of Directors, with former DigitalGlobe president Dan Jablonsky taking his place. According to Howard Estes, Chair of the Board of Directors, Defendant Lance had to go, "[g]iven the company's performance in 2018 and *the loss of over 90% of our value* in the marketplace."

## CLASS ACTION ALLEGATIONS

92.    Plaintiff brings this putative class action on behalf of all former DigitalGlobe shareholders who received Maxar common stock pursuant to the Offering Materials (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal

- 30 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

93.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are likely thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Maxar, DigitalGlobe, or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

94.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

95.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

96.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Securities Act;

(b)    whether the Offering Materials contained untrue statements of material fact and omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

97.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 31 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**TIMELINESS OF PLAINTIFF'S CLAIMS**

98.    Exercising reasonable diligence, Plaintiff could not have discovered that Maxar made material misrepresentations and omissions in violation of the law any earlier than October 31, 2018. On that date, Maxar released its 3Q18 financial and operational results and an accompanying press release reporting a $432 million net loss largely attributable to impairment losses and inventory obsolescence in its GeoGomm segment. Maxar also announced that it did not expect "the long-term outlook for the GeoComm business to rebound significantly from current year award levels." Maxar common stock immediately declined 45% on the news, from a close of $27.07 on October 30, 2018 down to close of $14.91 per share on October 31, 2018. Until October 31, 2018, Defendants had exclusive knowledge that Maxar's GeoComm business was severely impaired, that disclosure of the extent of the impairment would impact the trading price of Maxar common stock, and suppressed and concealed the information relevant to impairment and the impact of full disclosure known to it.

99.    On August 7, 2018, short seller Spruce Capital accused Maxar of inflating earnings. Maxar responded immediately, issuing a press release the same day dismissing the report as "misleading," "inaccurate," and "a direct attempt by a short-seller to profit, at the expense of shareholders, by manipulating Maxar's stock price." In the same press release, Maxar touted its prospects, "reaffirmed its full year 2018 guidance for revenue and cash flow from operations," and stated it was "positioned for future growth."

100.    Maxar followed up on August 24, 2018 with a second press release titled "Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund." In the "Comprehensive Response" Maxar further refuted the Spruce allegations, downplaying the risk of GeoComm impairment as a "possibility" that "might" or "could" occur based on a variety of factors that had yet to manifest. The Company also stated that it had conducted an investigation and reassured investors that there were "no material errors in the previously issued financial statements and disclosures under IFRS."

- 32 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

101.    Prior to the publication of Maxar's 3Q18 financial and operational results and press release, Plaintiff did not discover, and could not reasonably have discovered, the factual bases for these claims for relief.

102.    On October 21, 2019, Plaintiff filed a complaint in this Court.

103.    In consequence of the foregoing, all claims asserted in this complaint are timely.

**FIRST CAUSE OF ACTION**

**For Violation of § 11 of the Securities Act**
**Against All Defendants**

104.    Plaintiff incorporates all the foregoing by reference.

105.    This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

106.    The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

107.    Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

108.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

109.    By reason of the conduct herein alleged, each Defendant violated, or controlled an employee or other person who violated, § 11 of the Securities Act.

110.    Plaintiff acquired Maxar shares pursuant to the Registration Statement.

111.    Plaintiff and the Class have sustained damages.  The value of Maxar common stock has declined substantially subsequent to and due to Defendants' violations.

112.    At the time of their acquisition of Maxar shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts

- 33 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### Against All Defendants

113.   Plaintiff incorporates all the foregoing by reference.

114.   By means of the defective Prospectus, Defendants promoted and sold Maxar shares to Plaintiff and other members of the Class.

115.   The prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased Maxar shares pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no failure to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

116.   Plaintiff did not know, nor in the exercise of reasonable diligence could he have known, of the untruths and omissions contained in the prospectus at the time Plaintiff acquired Maxar shares.

117.   By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Maxar shares pursuant to the prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the common stock offered pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to Defendants sued herein. Class members who have sold their shares seek damages to the extent permitted by law.

- 34 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

## THIRD CAUSE OF ACTION

### For Violation of § 15 of the Securities Act
### Against All Defendants

118.    Plaintiff incorporates all the foregoing by reference.

119.    This Cause of Action is brought pursuant to § 15 of the Securities Act against the Defendants.

120.    The Individual Defendants were controlling persons of Maxar by virtue of their positions as directors or senior officers of Maxar and DigitalGlobe.  The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of Maxar and DigitalGlobe.  The Company controlled the Individual Defendants and all of Maxar and DigitalGlobe's employees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Certifying this class action, appointing Plaintiff as a Class Representative, and appointing Lead Counsel Hedin Hall LLP and Girard Sharp LLP as Class Counsel on behalf of the Class;

B.    Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands trial by jury.

- 35 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

DATED:  April 30, 2020

Respectfully submitted,

/s/ *Daniel C. Girard*

Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

David W. Hall (SBN 274921)
dhall@hedinhall.com
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

Frank S. Hedin (SBN 291289)
fhedin@hedinhall.com
**HEDIN HALL LLP**
1395 Brickell Ave., Suite 1140
Miami, FL 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801

*Lead Counsel for Plaintiff and the Putative Class*

- 36 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

# DEFENDANTS' EXHIBIT D

## Waxman, Jonathan

| | |
|---|---|
| **From:** | Trig Smith <TrigS@rgrdlaw.com> |
| **Sent:** | Tuesday, December 28, 2021 8:29 PM |
| **To:** | Rogers, Brittany |
| **Cc:** | Close, Matthew W.; Waxman, Jonathan; Spence Burkholz; Henry Rosen; Nicole Gilliland; Patton Johnson; Brad Sader |
| **Subject:** | RE: Maxar Securities Litigation - Deposition Coordination Protocol |
| **Attachments:** | Maxar Deponent List.pdf |

[EXTERNAL MESSAGE]

Counsel:

We would be more than happy to jump on a call to Judge Crews' chambers at your convenience tomorrow.  We disagree with your position on the ripeness of the number of deponents and we intend to bring that issue to the clerk's attention during the call.  We look forward to receiving the invite.

Attached please find plaintiff's most recent deponent list, which removes all unique selections by the State Action plaintiff and adds our client's and the class's non-party selections.

Best regards,

Trig Smith

1

**FOR DISCUSSION PURPOSES ONLY**
**DRAFT MAXAR DEPONENT LIST**
**As of:  December 28, 2021**

| Name | Relevance |
|---|---|
| Anderson, Jeremy | Former SSL CFO, resigned around the end of 2017.  Has knowledge of GeoCom's accounting practices, financial results and forecasting prior to his departure.  Prior to his departure, Anderson led a 45-person finance and accounting organization at SSL and was responsible for full cycle P&L and cash flow activities.  For example, Anderson presented monthly financial performance of SSL, which included the performance of GeoCom.  Anderson interacted with Maxar's 2017 auditor KPMG Canada, including signing management representation letters on behalf of SSL. |
| Brkic, Mladen | Was hired as the new CFO for SSL around July 2018.  Has knowledge of issues that arose regarding Maxar's impairment assessments and GeoCom's challenges.   For example, Brkic had conversations with Maxar senior management regarding GeoCom revenue and earnings misses during 2018.   When the Company did disclose its $383 million impairment charge in October 2018, Brkic also provided feedback on the drafts of Maxar's impairment disclosure. |
| Celli, John | SSL President (pre-Zamarian) for 11 years, and worked at SSL for 36 years in total. He has personal knowledge of the industry challenges for GeoCom and GeoCom's tactics/strategies throughout the relevant time period.   Celli communicated directly with Senior Management regarding these issues.  Celli retired in June 2017 when the Company announced a record-breaking lay-off of 173 employees in Palo Alto, CA and is quoted in the Complaint concerning the slowdown in orders for GEO satellites being the cause for reductions at Maxar. ¶72  External factors such as industry slowdowns and internal factors such as layoffs are alleged to be indicators of impairment that Maxar ignored. |

| Name | Relevance |
|---|---|
| Choo, Zhe | Choo is involved in the preparation of Maxar financial statements, assessing accounting standards including impairment, and the Company's debt covenants. Choo also asked questions of and provided information to Duff & Phelps, who conducted goodwill analyses for Maxar. Choo was heavily involved in Duff and Phelps' valuation work it completed to help Maxar conduct goodwill impairment testing for year-end 2017, a critical issue in this case. |
| Chou, Edward | Senior Manager of Finance. Involved in the preparation of Maxar's 3Q 2017 impairment test, including discussion regarding management's underlying assumptions. Chou was also heavily involved in the preparation of Maxar's year-end 2017 impairment testing. Chou is an important witness for understanding SSL's forecasting process given his role in FP&A. Chou was also involved in Maxar opportunistic change of its operating segments (or cash generating units) at the time of the DigitalGlobe acquisition, a highly relevant issue for Maxar's impairment testing in this case. |
| Currier, Rich | SVP GeoCom business development for the entire Class Period, 2013-2019. He has direct knowledge regarding GeoCom's challenges, including of presentations concerning these issues made directly to defendant Lance. He also prepared SSL's operating plans and discussed SSL's outlook and related industry trends with the Board. He personally interacted with Bain in 2017 and analyzed their assessments. Further, Mr. Currier met with customers, trying to win business for Maxar, and documents show intimate knowledge of the AMOS 8 contract, one of the major issues in this case. |
| Cyprus, Nick | Chair of the Audit Committee. Knowledge of Audit Committee investigation into Spruce Point allegations. Identified in Defendants' interrogatory responses as a person that was involved in the audit committee review and as a person that was involved in drafting, editing, |

| Name | Relevance |
|---|---|
| | reviewing, or approving the impairment disclosure language in the Company's October 31, 2018 Form 6-K. |
| Davies, Mike | Director of FP&A at SSL and took on additional responsibilities as SSL's Controller when the former Controller left.  As SSL Controller, Davies managed SSL's accounting function and team of 12 people.  As a result, he has knowledge of GeoCom's accounting practices, financial results and forecasting. . |
| Estey, Paul | As former Executive Director SSL, and current COO, Mr. Etsy has personal knowledge of the operations of SSL, including execution of the backlog, completion of cost reduction projects and management of manpower.  Estey was intricately involved in strategy and steering committee meetings, communicating and working directly with the individual defendants.  Mr. Estey was directly involved in strategizing how to sell SSL and personally interacted with Bain in 2017.  Mr. Estey is also listed in defendants' Rule 26(a)(1) disclosures as an individual likely to have discoverable information that defendants may use in support of their defenses. |
| Gotla, Nauzer | Gotla was Maxar's Head of Internal Audit.  Has knowledge of Maxar's internal control structure and challenges including the material weaknesses disclosed at year-end 2018 that were in part due to SSL's deficiencies.  Gotla has knowledge of the 2018 summary of internal control deficiencies, which concluded that Maxar management failed to provide evidence they were reviewing the management assumptions of the Company's impairment tests, including any evaluation of the discount rate and forecasted cash flows. |
| Gursky, Jason | Mr. Gursky is VP of Investor Relations, and has served in this role since 2017, coming to Maxar from Citigroup where he was a U.S. aerospace and defense analyst Mr. Gursky heavily involved in messages Maxar put out |

| Name | Relevance |
|------|-----------|
|  | to the street, writing scripts and Q&A responses with defendants. Gursky's contact information is part of Maxar's August 24, 2018 press release regarding the Spruce Point report, which is alleged to be among the reason why defendants misrepresentations regarding their accounting came to light. In addition, Gursky has information about investor, analyst and media accounts related to other underlying allegations such as the AMOS 8 contract and the strategic alternatives for SSL. Mr. Gursky is also listed in defendants' Rule 26(a)(1) as an individual likely to have discoverable information that defendants may use in support of their defenses. |
| Hanafy, Yasir | SSL Director of Financial Planning & Analysis was responsible for key areas such as revenue and estimates at completion that impact whether Maxar's assets were impaired. Hanafy was involved in revenue estimates, including whether new GeoCom awards and backlog would materialize. Accordingly, he has personal knowledge of facts related to alleged impairment indicators, including cash flow forecasts and financials distributed to senior management regarding GeoCom. |
| Harrah, Theresa | SSL's assistant controller. Has knowledge of SSL accounting and internal controls, including impairment procedures. Harrah has knowledge of whether any impairment testing was done of SSL's long-lived assets prior to the merger with DigitalGlobe. Also, Harrah was a main contact at SSL for KPMG Canada's 2017 audit, including the fulfillment of KPMG Canada's Client (PBC) Request List. Harrah was also involved in the internal control deficiencies at SSL in 2018 and will have knowledge about the accounting considerations for elimination of GeoCom personnel. |
| Hoegler, Darren | Was MDA's Corporate Assistant Controller, until he was replaced at the end of March 2018. He has knowledge of MDA's |

| Name | Relevance |
|---|---|
|  | impairment assessments prior to the DigitalGlobe acquisition. He was also involved in the impairment testing at year-end 2017 prior to his departure. Also, Hoegler has knowledge concerning proposed and actual changes to Maxar's change in operating segments, including setting up the reporting segments in such a manner that it would allow Defendants to conceal from investors the actual operating results for the GeoCom business during 2018. |
| Lance, Howard | Named individual defendant. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Lau, Angela | Lau was the Sr. V.P. of Finance and Corporate Strategy. Lau had a critical role for a March 2018 engagement where Duff and Phelps was hired to assist the Company in its initial tax planning requirements for its U.S. domestication. As part of that engagement, Duff and Phelps estimated the fair market value of Maxar's SSL business as part of Maxar's goodwill impairment testing several times between late 2017 and early 2018. |
| McCombe, William | Former CFO of Maxar, from October 2017 until February 2018. Mr. McCombe has personal knowledge of issues surrounding new segment structure, GeoCom financial performance, why Bain was brought in, impairment testing procedures and new reporting segment structure during 2017 and early 2018. Mr. McCombe attended and presented at board meetings and investor conference calls. He was responsible for budgets and providing financial updates to defendant Lance. He also discussed SSL's financials, the satellite market and DigitalGlobe business combination with analysts and investors. |
| Porter, Biggs | New Maxar CFO in 3Q18. As CFO Mr. Porter had responsibility over finance and accounting, and accordingly has personal knowledge of the impairment charge taken in 3Q18. Mr. Porter was responsible for |

| Name | Relevance |
|---|---|
|  | Maxar's review of whether its assets were impaired and ultimate decision to take an impairment, including the testing done during 3Q18 (including with PwC), the decisions made at the c-suite regarding the impairment and disclosures to the public. He also was involved in issues surrounding Maxar's concerns with its debt covenants, selling its GeoCom real estate, as well as the desire to sell GeoCom. He is also identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Santoro, Michael | Santoro was SSL VP of Finance and Interim CFO after Jeremy Anderson left. He was involved in SSL's financial performance and discussions on the direction of the business. Santoro is also involved in SSL's forecasting process, including its deteriorating cash flow projections. Santoro also has knowledge of the challenges with GeoCom obsolete inventory. Santoro was involved in GeoCom strategic alternative discussions, including discussions with Bain that included the fundamental shift in the GeoCom industry towards digital payloads and lower orbit, smaller satellites.. |
| Stephenson, Bruce | Maxar Chief Strategy Officer until he left the company in 2019. Has knowledge regarding the Company's GeoCom business, including tactics, strategies and competitive position throughout the relevant time period. Interacted with the Maxar executive team including Howard Lance and Dario Zamarian regarding GeoCom performance and outlook and internal guidance. Mr. Stephenson also has direct knowledge of several indicators of impairment that arose in 2017. He also presented to the Board on GeoCom strategic alternatives and Project Gold. |
| Torres, Jose | Maxar's Chief Accounting Officer after the Merger with DigitalGlobe. Has direct knowledge of accounting and factual issues, including Maxar's impairment testing (or lack thereof in the first 2 quarters of 2018) in each |

| Name | Relevance |
|---|---|
|  | quarter for 2018. Torres reviewed the quarterly impairment checklist each quarter that was prepared by Jill Windrum. Torres was also directly involved in Maxar's responses to the Spruce Point report, as well as Maxar's accounting treatment for the GeoCom impaired assets and obsolete inventory. Torres also has knowledge regarding DigitalGlobe's due diligence of GeoCom prior to the merger.. |
| Weber, Lance | Weber worked in PwC's Valuation group on engagements for Maxar and later was hired as the Segment Controller at Maxar. Weber will be a critical witness that worked both as a consultant for Maxar when he was at PwC and then was later hired as a new accountant for Maxar. When Weber was at PwC, he helped Maxar's accounting department draft accounting memos and impairment disclosure language, as well as assess SSL's inventory reserves and capitalized R&D. He had constant interactions with Maxar's top corporate accountants, Windrum and Torres. Also, he helped Maxar quantify its 3Q18 impairment charges of GeoCom's intangible assets and fixed assets. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Wilkinson, Paul | Former SSL employee and SSL consultant. Knowledge of most accounting and factual issues in the case. Has knowledge of segment reporting realignment issues post-merger. For example, he was involved in responding to analyst questions regarding accounting changes post-merger. |
| Windrum, Jill | One of Maxar's technical accountants along with Jose Torres. Windrum has knowledge of the accounting factual issues between year-end 2017 and 3Q18 in this the case. Windrum prepared the quarterly impairment checklist each quarter that was then reviewed by Jose Torres. Windrum was heavily involved in the year-end 2017 impairment testing, including the review of the Duff and Phelps' work. |

| Name | Relevance |
|---|---|
| | Windrum was a main contact for Maxar's external auditor KPMG, as well as consultants Duff and Phelps and PwC. Windrum was involved in Maxar's 3Q18 impairment disclosure made on October 31, 2018, including critical edits that were made to the disclosure in the drafting process. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Wiresekara, Anil | Named individual defendant. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Zamarian, Dario | SSL CEO from June 2017 to April 2019. Author of numerous relevant documents regarding GeoCom's challenges and assessment of strategic alternatives for GeoCom. Was personally involved in finding potential purchasers for GeoCom and has personal knowledge of various indicators of impairment for GeoCom. Zamarian often directly communicated those facts the defendant Lance. |
| KPMG Canada (witness: Phil Dowad) | Maxar's auditor during the 2017 audit and 1Q18 review of Maxar's financial statements. During the 2017 audit, Maxar's impairment testing and valuation procedures for GeoComm were a "focal point" of KPMG Canada annual audit. Defendants have asserted a reliance on the professional advice of KPMG Canada to defend this action. |
| KPMG US (witness: Michael Kraehnke) | KPMG US was Maxar's auditor during 2Q18, 3Q18 financial statement reviews and the 2018 audit of Maxar's financial statements. KPMG US was involved in the investigation of Spruce Point's allegations of accounting fraud in August 2018, as well as the Company's accounting treatment of the GeoCom impairment and inventory obsolescence issues disclosed to investors on October 31, 2018. Defendants have asserted the defense of reliance on the professional advice of KPMG US to defend this action |

| Name | Relevance |
|---|---|
| Duff & Phelps (witness: Judd Schneider) | Duff & Phelps performed several valuations of GeoCom in late 2017 and early 2018. In April 2018, for example, Duff & Phelps delivered a valuation report of GeoCom to Maxar, which indicated that the fair value of GeoCom was hundreds of millions of dollars less than the respective book value of the assets. In addition, Duff & Phelps will provide testimony regarding whether the assumptions it used in its various valuations were those of Maxar management or those of Duff & Phelps. Plaintiff also anticipates Defendants will be asserting reliance on the work of Duff & Phelps. |
| PwC (witness: Tom Ouimette) | PwC began assessing SSL assets (e.g., inventory and capitalized R&D expenditures) for potential impairment no later than June 2018. In June 2018, PwC issued its report regarding this work and noted, *inter alia*, it appeared Maxar "does not regularly assess for triggering events" of impairment. PwC was also involved in "Project Gold," the code-name attributed to Maxar's strategic effort to sell GeoCom. Project Gold was commenced sometime prior to June 15, 2018. Plaintiff also anticipates that Defendants will be asserting reliance on the work of PwC. |
| Bain & Co. (witness: Tina Radabaugh) | Consulted Defendants and other key executives regarding the need to "reinvent" and potentially exit GeoCom due to, inter alia, changes in customer demand, continued depressed overall demand and relative uncompetitive position with respect to Maxar's digital payload offering. This work commenced in early 2017 and Bain continued to consult Maxar regarding GeoCom throughout the class period, including working on Project Gold. Bain was also present during the April 2018 meeting with defendants Lance and Wiresakara where GeoCom strategic, including selling GeoCom, were openly discussed. |
| Financial Reporting Advisors (witness: Scott Taub) | Chairman of the Maxar's Audit Committee brought Financial Reporting Advisors ("FRA") in to act as an advisor to the Audit |

| Name | Relevance |
|---|---|
|  | Committee for purposes of investigating the Spruce Point allegations of accounting fraud. FRA was directly involved in how the Company would disclose the impairment charges for GeoCom long-lived assets and inventory obsolescence. |
| Joele Frank (witness: Kara Brickman) | Joele Frank assisted Maxar with its investor relations and public relations response to the Spruce Point allegations on August 7, 2018, Defendants more fulsome response to Spruce point on August 24, 2018, and investors and Maxar employees' responses to the disclosure of the alleged fraud. Joel Frank, for example, presented recommended strategy and potential tactics to respond to Spruce Point. Deliverables of Joele Frank's work included proving Maxar aid in crafting crisis communications, a CEO plan, developing key messages for Maxar's IR team and monitoring investor feedback to Maxar news. |
| PJT Partners and/or Goldman Sachs (witness, unknown at this time) | Were responsible for identifying potentially interested parties to acquire GeoCom from Maxar. This was part of Project Gold, commended sometime prior to mid-June 2018. These entities were only capable of finding one party who had potential interest in the GeoCom business or parts of its assets. |

# DEFENDANTS'
# EXHIBIT E

## Waxman, Jonathan

| | |
|---|---|
| **From:** | Trig Smith <TrigS@rgrdlaw.com> |
| **Sent:** | Tuesday, December 7, 2021 6:52 PM |
| **To:** | Rogers, Brittany |
| **Cc:** | Close, Matthew W.; Waxman, Jonathan; Dhall@hedinhall.com; 'Adam Polk'; Armen Zohrabian; Makenna Cox; Spence Burkholz; Henry Rosen; Nicole Gilliland; Patton Johnson; Brad Sader |
| **Subject:** | Maxar -- Plaintiffs' Proposed Deposition List |
| **Attachments:** | MAXAR DEPONENT LIST III.docx |

[EXTERNAL MESSAGE]

Hi Brittany:

Attached for discussion purposes only is the State and Federal Action Plaintiffs' proposed deposition witness list.  Consistent with our prior meet and confer discussions, we have excluded all non-party deponents from the list.  Further, we believe that O'Melveny will first need to identify all persons on the list that O'Melveny is or will be representing so that Plaintiffs and Defendants will both be able to maximize the efficiency of discovery in the case.  We look forward to additional discussion among counsel regarding this issue.

To the extent you have any questions in the interim, please let us know.

Best regards,


**Trig Smith**



655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

    


**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

**FOR DISCUSSION PURPOSES ONLY**
**DRAFT MAXAR DEPONENT LIST**
**As of: December 7, 2021**

| Name | Relevance |
|---|---|
| Maxar PMK Deposition | *See* September 7, 2021 letter from Girard Sharp to Latham Watkins. |
| Andersen, Jeremy | Former SSL CFO, resigned in January 2018. Has knowledge of GeoCom's accounting practices, financial results and forecasting prior to his departure. |
| Bortner, Andrea | Chief Human Resources Officer. Knowledge concerning layoffs, which Plaintiff alleges was an indicator of impairment. She was part of the working group in connection with the DigitalGlobe merger and participated in Board-level meetings concerning the merger. |
| Brinton, Turner | Director of Public Relations. Brinton was listed as the Media contact for Maxar's response to the Spruce Point report. In addition to Spruce Point related information, Brinton has knowledge of information about investor, analyst and media accounts related to the underlying allegations. |
| Brkic, Mladen | CFO for SSL. Has knowledge of issues that arose regarding impairment accounting and GeoCom challenges. |
| Celli, John | SSL President (pre-Zamarian). Has knowledge of the industry challenges for GeoCom. Has knowledge regarding GeoCom tactics/strategies throughout the relevant time period. |
| Choo, Zhe | Choo is involved in the preparation of Maxar financial statements, assessing accounting standards including impairment, and the Company's debt covenants. Choo also provided information to Duff & Phelps. |
| Chou, Edward | Senior Manager of Finance. Involved in the preparation of Maxar's 3Q 2017 impairment test, including discussion regarding management's underlying assumptions. |
| Currier, Rich | SVP GeoCom business development 2013-2019. Author of numerous highly relevant documents regarding GeoCom's challenges. Personally interacted with Bain in 2017. |

| Name | Relevance |
|---|---|
| Cyprus, Nick | Chair of the Audit Committee.  Knowledge of Audit Committee investigation into Spruce Point allegations. |
| Davies, Mike | SSL Controller.  Has knowledge of GeoCom's accounting practices, financial results and forecasting prior to his departure. |
| Estey, Paul | Executive Director SSL.  Author of numerous relevant documents regarding GeoCom's challenges.  Personally interacted with Bain in 2017.   Personal knowledge of GeoCom strategic alternatives. |
| Georges, Stephanie | Chief Marketing Officer.   Involved in the drafting, editing, reviewing, and approving of the Company's responses to Spruce Point. In addition to Spruce Point related information, Georges has information about investor, analyst and media accounts related to the underlying allegations. |
| Gotla, Nauzer | SSL Internal Audit.   Has knowledge of Maxar's internal control structure and challenges including the SSL material weaknesses disclosed at year-end 2018. |
| Guetre, Lori | Sr. Director, Strategic Business Development. A member of MAXAR's working group in connection with the DigitalGlobe merger. She worked closely with Bain in 2017 (including regarding financial forecasts). And provided information regarding Maxar's financial condition and the GeoCom satellite market for Board-level presentations. |
| Gursky, Jason | VP, Investor Relations.  Involved in Maxar's response to Spruce Point allegations. Gursky's contact information is part of Maxar's August 24, 2018 press release.  In addition to Spruce Point related information, Gursky has information about investor, analyst and media accounts related to the underlying allegations. |
| Hanafy, Yasir | SSL Financial Planning & Analysis.   Has knowledge of facts related to alleged impairment indicators, including cash flow forecasts and financials distributed to senior management regarding GeoCom. |
| Harrah, Theresa | SSL assistant controller.  Has knowledge of SSL accounting and internal controls, including impairment procedures. |

| Name | Relevance |
|---|---|
| Hoegler, Darren | Corporate Assistant Controller. Involved in the impairment testing at year-end 2017. Also, has knowledge concerning Maxar's change in their operating segments post-merger. |
| Iyer, Neetha | SSL Payload Engineer. Has knowledge of Maxar's digital payload capabilities during the relevant time period. |
| Lance, Howard | Defendant; Maxar CEO May 2016 to Jan 2019 |
| Lau, Angela | Sr. V.P. Finance and Corporate Strategy. Defendants in California action. Engaged with the Board regarding the DigitalGlobe merger, drafted documents filed with the SEC, analyzed Maxar's debt covenants and provided information to Duff & Phelps. |
| Lopshire, Lisa | SSL Corporate Counsel. Identified as having knowledge of AMOS-8. |
| McCombe, William | Former CFO of Maxar. Has knowledge of issues surrounding new segment structure, GeoCom financial performance, why Bain was brought in, impairment testing procedures and new reporting segment structure during 2017 and early 2018. |
| Poratto, Marissa | Maxar's Director of Investor Relations. Poratto is the media contact on numerous press releases including those announcing the Company's quarterly earnings conference calls. |
| Porter, Biggs | New Maxar CFO in 3Q18. Has knowledge of the impairment charge taken in 3Q18. Has knowledge of the impairment testing done at 3Q18. |
| Santoro, Michael | SSL VP of Finance and Interim CFO after Jeremy Andersen leaves. Is involved in SSL's financial performance and discussions on the direction of the business. |
| Shockey, Kathy | V.P. Business Development. Assessed and conveyed information concerning the GeoCom market to Maxar executives. |
| Stephenson, Bruce | Maxar Chief Strategy Officer. Has knowledge regarding the Company's GeoCom business, including tactics, strategies and competitive position throughout the relevant time period. Interacted with the Maxar executive team including Howard Lance and Dario Zamarian |

| Name | Relevance |
|---|---|
| | regarding GeoCom performance and outlook and internal guidance. |
| Torres, Jose | Maxar Chief Accounting Officer. Has knowledge of accounting and factual issues. Has knowledge regarding DigitalGlobe due diligence of GeoCom. |
| Vanturennout, Karel | Sr. V.P. Strategic Development. Assessed and communicated information regarding the state of the GeoCom market. |
| Weber, Lance | PwC valuations, drafted accounting memos and corrective disclosure language; Maxar Segment Controller December 2018-Present. |
| Wilkinson, Paul | Former SSL employee and SSL consultant. Knowledge of most accounting and factual issues in the case. Has knowledge of segment reporting realignment issues post-merger. |
| Windrum, Jill | Maxar technical accountant. Has knowledge and important witness for most accounting factual issues between 2017 and 3Q18 and standard application throughout the case. |
| Wiresekara, Anil | Defendant; Interim CFO February 26, 2018 through August 15, 2018 |
| Zamarian, Dario | Space Systems President. Author of numerous relevant documents regarding GeoCom's challenges and assessment of strategic alternatives for GeoCom. Was personally involved in finding potential purchaser for GeoCom. |

I:\Users\TrigS\Maxar\Discovery\MAXAR DEPONENT LIST.docx

# DEFENDANTS' EXHIBIT F

## Waxman, Jonathan

**From:**      Rogers, Brittany
**Sent:**      Friday, November 19, 2021 3:10 PM
**To:**        David W. Hall; Adam Polk; Armen Zohrabian; Makenna Cox; Trig Smith; Spence Burkholz; Henry
              Rosen; Nicole Gilliland; Brad Sader
**Cc:**        Close, Matthew W.; Waxman, Jonathan
**Subject:**   RE: Maxar Securities Litigation - Deposition Coordination Protocol
**Attachments:** Maxar_Securities_Litig_-_Proposed_Terms_for_Deposition_Protocol.docx


Following up on my email below.

Thank you,
Brittany

## O'Melveny

**Brittany Rogers**
brogers@omm.com
O: +1-213-430-8349

O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA  90071
Website | Bio

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Rogers, Brittany
**Sent:** Monday, November 8, 2021 2:12 PM
**To:** 'David W. Hall' <dhall@hedinhall.com>; Adam Polk <apolk@girardsharp.com>; Armen Zohrabian <azohrabian@hedinhall.com>; Makenna Cox <mcox@girardsharp.com>; Trig Smith <TrigS@rgrdlaw.com>; Spence Burkholz <SpenceB@rgrdlaw.com>; Henry Rosen <HenryR@rgrdlaw.com>; Nicole Gilliland <NGilliland@rgrdlaw.com>; Brad Sader <BSader@rgrdlaw.com>
**Cc:** Close, Matthew W. <mclose@omm.com>; Waxman, Jonathan <jwaxman@omm.com>
**Subject:** Maxar Securities Litigation - Deposition Coordination Protocol

Counsel,
As we have discussed separately with the state and federal plaintiffs' counsel, we believe that a deposition coordination protocol is necessary given the factual overlap between the two matters and the need to avoid duplicative depositions of the same witnesses.  Attached please find proposed terms for a deposition coordination protocol in the *McCurdy* and *Oregon Laborers* matters.  The attached protocol aims to establish parameters to encourage efficiency and avoid undue burden, while reasonably protecting the interests of all parties.  If the terms are acceptable to plaintiffs, we will prepare stipulations to be filed in each case.  We look forward to your thoughts.

Sincerely,
Brittany

## O'Melveny

**Brittany Rogers**

1

brogers@omm.com
O: +1-213-430-8349

O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA  90071
Website | Bio

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

# DEFENDANTS' EXHIBIT G

 David Hall



## David Hall

Attorney

San Francisco, California, United States · 340 connections

Join to Connect

 **Hedin Hall LLP**

 **University of California, Hastings
College of the Law**

## Activity

**Honored to be named partner at Miller Barondess, LLP, and excited to continue**

 David Hall



Steven Alvarado

Christopher Alvarez

Laura Bailey Brown

Jennifer Carroll

Andrew Crane

Ilanit Fischler

Krista Hurst

Anthony Isola

Sean Kingston

Edwina Kye

Nathan Low

Lisa McGlynn

Curtis Moore

Michelli Rivera

Nan Sato

**Very excited and honored to advance to partner at Fisher Phillips LLP. Congratulations to my other colleagues who were also promoted!**

Liked by David Hall



**I'm thrilled to share that I am joining MetaMap (formerly Mati) as its General Counsel, fresh off of their $70M Series B raise. I spent the last ~5...**

Liked by David Hall

Join now to see all activity

# Experience

 David Hall

Mar 2018 - Present · 3 years 11 months

San Francisco, CA

Litigator representing consumers and investors.

 **Associate**
Robbins Geller Rudman & Dowd LLP
Nov 2013 - Feb 2018 · 4 years 4 months

 **Law Clerk to the Honorable Irma E. Gonzalez**
United States District Court for the Southern District of California
Jun 2012 - Oct 2013 · 1 year 5 months

San Diego

 **Associate**
Robbins Geller Rudman & Dowd LLP
Sep 2010 - Jun 2012 · 1 year 10 months

# Education

 **University of California, Hastings College of the Law**
J.D.

2007 - 2010

 **New England Conservatory of Music**
B.M.

2001 - 2004

# Groups

 **Privacy and Data Security**
-

 David Hall



After approaching 5 years, today is my last day at Shopify. This 🚀 has been the ride of a lifetime. Corporate lawyers don't always get the luxury...

Liked by David Hall



For the third time in eleven years, a federal judge has certified a nationwide class in Robbins Geller's prosecution of Goldman Sachs for securities...

Liked by David Hall

 David Hall

**Partners Travis Downs and Debra Wyman are presenting at a first-of-its-kind event at Harvard Law School. https://bit.ly/3G9BV2d Register to join...**

Liked by David Hall



**Top law students often gravitate to large defense firms. But young lawyers can have enormous impact working on the plaintiffs' "side of the...**

Liked by David Hall

**Speaking to the Womens' Law Association at Harvard about one of our cases was an unforgettable experience.**

Liked by David Hall

**in** | David Hall



JUST IN → "a verdict that could set the tone for U.S. city and county governments that want to hold pharmacies accountable for their roles in the...

Liked by David Hall



Congratulations to Debra Wyman being named to Benchmark Litigation's 2021 Top 250 Women in Litigation list! Click here to read her full bio:...

Liked by David Hall

 David Hall

Today is the last day of National #ProBonoWeek and a great day to renew (or make) a commitment to increase access to justice for everyone. There are...

Liked by David Hall



Ditch the name. The transition for Berkeley/Boalt was totally fine, and Hastings would be fine if it's renamed UC Law School or whatever. In...

Liked by David Hall

I'm a student again at 53 at Yale School of Management! After all, the pursuit of happiness, knowledge, and growth should be never-ending. After...

Liked by David Hall

 David Hall



## Twitter Cuts $810M Deal To End Securities Suit On Eve Of Trial - Law360

Liked by David Hall



## Happy #CleanAirDayCA

Liked by David Hall

## View David's full profile

- See who you know in common
- Get introduced
- Contact David directly

Join to view full profile

# People also viewed

 David Hall

Valley Village, CA



### Solomon Chang

Attorney for San Diego Office of the Public Defender

San Diego, CA



### Frank Hedin

Attorney at Hedin Hall LLP

Miami, FL



### Steven Guess

Attorney

Mission Viejo, CA



### Andrew T Serafini PhD

Partner, Health & Life Sciences, Kilpatrick Townsend and Stockton LLP

Greater Seattle Area



### Amanda Sinclair

Certified Specialist Estate Planning, Trust & Probate Law

San Ramon, CA



### Eric Giardini

Director of Campus Resilience at University of San Francisco

San Francisco, CA



### Jae Park

Litigation and Dispute Resolution Partner at Dentons

San Diego, CA



### Nick Gianos

Product Partnerships at Atlassian

San Francisco Bay Area



### Negar Lencioni

Senior Director, Litigation & Compliance Counsel

Irvine, CA

Show more profiles ⌄

## Others named **David Hall**



### David Hall

 David Hall



**David Hall**

Career changer in teacher training - secondary English PGCE

London



**David Hall**

Owner, Hall and Moskow

Newburyport, MA



**David Hall**

Lead Learning Designer at ACU

Melbourne, VI



**David Hall**

Vice President at Regency Electric Company, Inc.

Jacksonville, FL

5747 others named David Hall are on LinkedIn

See others named **David Hall**

# Add new skills with these courses

 **Contracting for Creatives**

 **How to Analyze a Wholesale Deal in Real Estate**

 **Real Estate Analytics**

See all courses

# David's public profile badge

Include this LinkedIn profile on other websites

 **David Hall**

Attorney

 Partner at Hedin Hall LLP



David Hall



View profile

Linked**in**

View profile badges

Linked**in**  © 2022

About

Accessibility

User Agreement

Privacy Policy

Cookie Policy

Copyright Policy

Brand Policy

Guest Controls

Community Guidelines

Language ⌄

# DEFENDANTS' EXHIBIT H

Case No. 1:19-cv-00124-WJM-SKC    Document 129    filed 01/10/22    USDC Colorado
pg 104 of 176

## Waxman, Jonathan

| | |
|---|---|
| **From:** | Adam Polk <apolk@girardsharp.com> |
| **Sent:** | Monday, January 3, 2022 4:42 PM |
| **To:** | Rogers, Brittany; David W. Hall |
| **Cc:** | Armen Zohrabian; Makenna Cox; Close, Matthew W.; Waxman, Jonathan; Trig Smith; Nicole Gilliland; Spence Burkholz; Henry Rosen; Patton Johnson |
| **Subject:** | Re: Maxar Securities Litigation - Deposition Coordination Protocol |

[EXTERNAL MESSAGE]

Thanks for your email Brittany, and for adding the Federal Plaintiffs to the chain. For coordination related emails, we request that Defendants continue to communicate with the federal and state plaintiffs jointly.

The State Action Plaintiffs share Defendants' goal to seek to reach agreement on a protocol shortly. We note, however, our continued disagreement with your characterization of our discussions. We have enjoyed a professional working relationship to-date and hope to continue it going forward.

The federal and state plaintiffs will respond more fully to your Friday emails in due course. For now, however, we note that the exclusion of parties' from the deposition exhibits provisions appears to have been inadvertent, and not contemplated by the parties. Trig's December 7 email was clear that the language regarding exhibits introduced in nonparty depositions was intended as an "addition" to the provision, which previously encompassed exhibits introduced in party depositions. We look forward to discussing.  But assuming, as you suggest, that Defendants' original proposal was to apply the deposition exhibit provision to both party and non-party depositions, and that the change to only non-parties was inadvertent, we see no reason to delay correcting that language back to what we all intended.

Best,

Adam

1

# DEFENDANTS' EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA,

      Defendants.

---

**LEAD PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF
CIVIL PROCEDURE 26(a)(1)**

---

Cases\4851-4234-5422.v1-10/21/20

## I.    PRELIMINARY STATEMENT

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Lead Plaintiff Oregon Laborers Employers Pension Trust Fund ("Lead Plaintiff") submits its initial disclosures.  These initial disclosures are made without waiver of the attorney-client privilege or work product protection and are not a concession that such information is relevant or admissible at trial.

These initial disclosures are based on information reasonably available to Lead Plaintiff at this time.  Lead Plaintiff's investigation is continuing, and discovery may reveal additional documents, individuals and/or entities likely to have discoverable information that Lead Plaintiff may use to support the claims contained in its Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 44) (the "Complaint").  Lead Plaintiff reserves the right to modify or supplement the information contained in these initial disclosures.

## II.    PERSONS WHO MAY HAVE DISCOVERABLE INFORMATION UNDER RULE 26(a)(1)(A)(i)

Lead Plaintiff believes the individuals and entities named herein may have discoverable information, as that term is used in Federal Rule of Civil Procedure 26(a)(1)(A)(i), concerning the allegations in the Complaint.  These disclosures are made based upon information reasonably available to Lead Plaintiff at this stage of the litigation and without prejudice to Lead Plaintiff's rights to identify or rely on facts provided by additional witnesses, as discovery is ongoing.

### A.    Lead Plaintiff

Lead Plaintiff, through its administrator Ryan Stephens, is likely to have discoverable information concerning the transactional records that support its losses in connection with the purchase or sale of Maxar Technologies, Inc. ("Maxar" or the "Company") common stock on behalf of Lead Plaintiff.  Lead Plaintiff may be contacted through its undersigned counsel.

- 1 -

**B.     Defendants**

Defendants Maxar, Howard L. Lance and Anil Wirasekara (collectively, "Defendants") are

likely to have discoverable information regarding the subject matter of Lead Plaintiff's claims as

alleged in the Complaint and any purported defenses:

| NAME | CONTACT INFORMATION |
|------|---------------------|
| Maxar Technologies, Inc.<br><br>Howard L. Lance<br><br>Anil Wirasekara | c/o Latham Watkins LLP<br><br>Kristin Murphy<br>650 Town Center Drive, 20th Floor<br>Costa Mesa, CA 92626<br>714/755-8287<br><br>Brian Glennon<br>Eric Pettis<br>355 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071<br>213/891-7593 |

**C.     Current and Former Directors, Executives and Employees of Maxar**

The following current and former directors, executives, employees and representatives of

Maxar may have information that Lead Plaintiff may use to support the claims alleged in the

Complaint, including, *inter alia*, the following general categories of information: Maxar's financial

accounting practices with respect to monitoring indicators of impairment and performing impairment

testing per International Financial Reporting Standard ("IFRS") accounting standards; Defendants'

statements and omissions as alleged in the Complaint; market reaction to Defendants' statements and

omissions as alleged in the Complaint; Defendants' knowledge of the indicators of impairment to

geostationary communications satellite ("GeoComm") business assets as set forth in the Complaint;

Defendants' knowledge of the risks and contingencies associated with the GeoComm construction

contract for AMOS-8; the reasons Maxar suffered or expected to suffer the stock price declines

- 2 -

Cases\4851-4234-5422.v1-10/21/20

alleged in the Complaint; Maxar's policies and practices regarding the preparation, approval and dissemination of Maxar's statements regarding GeoComm's value, results, awards and contracts, including AMOS-8; the efficiency of the market for Maxar's common stock; damages suffered by investors as a result of Defendants' alleged false and misleading statements and/or omissions; any denials or affirmative defenses set forth in Defendants' Answer to Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 74) (the "Answer"); and any other matters relevant to the allegations in the Complaint:

| NAME | CONTACT INFORMATION |
|---|---|
| Dario Zamarian | |
| David Bernstein | |
| Dennis H. Chookaszian | |
| Kathy Shockey | |
| Jason Gursky | |
| Jeffrey S. Guy | |
| John Celli | |
| Jose A. Torres, Jr. | |
| Mike Santoro | |

- 3 -

Cases\4851-4234-5422.v1-10/21/20

| NAME | CONTACT INFORMATION |
|---|---|
| Nancy S. Coleman | |
| Nick Cyprus | |
| Paul Estey | |
| Rich Currier | |
| Turner Brinton | |
| Wendy Lewis | |
| William McCombe | |
| Yasir Hanafy | |

### D.  Additional Non-Parties

The following individuals and entities may have information that Lead Plaintiff may use to support the claims alleged in the Complaint, as described below.

### 1.  Advisors, Consultants and Professional Services Providers

The following advisors, consultants and professional service providers, as well as current and former employees of the same, may have information regarding, *inter alia*: Maxar's financial accounting practices with respect to monitoring indicators of impairment and performing impairment testing per IFRS accounting standards; Defendants' statements and omissions as alleged in the Complaint; market reaction to Defendants' statements and omissions as alleged in the Complaint;

- 4 -

Defendants' knowledge of the indicators of impairment to GeoComm business assets as set forth in the Complaint; Defendants' knowledge of the risks and contingencies associated with the AMOS-8 contract; the reasons Maxar suffered or expected to suffer the stock price declines alleged in the Complaint; Maxar's policies and practices regarding the preparation, approval and dissemination of Maxar's statements regarding GeoComm's value, results, awards and contracts, including AMOS-8; the efficiency of the market for Maxar's common stock; damages suffered by investors as a result of Defendants' alleged false and misleading statements and/or omissions; any denials or affirmative defenses set forth in Defendants' Answer; and any other matters relevant to the allegations in the Complaint:

| NAME | CONTACT INFORMATION |
|---|---|
| KPMG LLP (United States) | 17th Street, Suite 800<br>Denver, CO 80202<br>303/296 2323 |
| KPMG LLP (Canada) | 777 Dunsmuir Street, P.O. Box 10426<br>Vancouver BC V7Y 1K3 Canada<br>604/691-3000 |
| Bain & Company, Inc. | 131 Dartmouth Street<br>Boston, MA 02116<br>617/572-2000 |

## 2.      Former Customers and Business Partners

Space Communication Ltd. ("Spacecom"), and its employees, officers, directors and affiliates may have discoverable information which Lead Plaintiff may use to support the claims alleged in the Complaint concerning the AMOS-8 contract:

| NAME | CONTACT INFORMATION |
|---|---|
| Space Communication Ltd. | Menachem Begin 7<br>Ramat-Gan 52521 Israel<br>+972-3-755-1000 |

- 5 -

### 3.    Analyst Firms and Fund Managers

The following analyst firms and fund managers, and their employees, officers, directors and affiliates may have discoverable information which Lead Plaintiff may use to support the claims alleged in the Complaint concerning Maxar securities:

| NAME | CONTACT INFORMATION |
|---|---|
| BMO Capital Markets Corp. | 3 Times Square<br>New York, NY 10036<br>212/885-4000 |
| Credit Suisse Securities (USA) LLC | 11 Madison Avenue, 24th Floor<br>New York, NY 10010<br>212/325-2000 |
| CIBC World Markets, Inc. | 300 Madison Ave<br>New York, NY 10017<br>212/856-4000 |
| RBC Capital Markets, LLC | 200 Vesey Street, 9th Floor<br>New York, NY 10281<br>212/428-6200 |
| The Bank of Nova Scotia (Scotiabank) | 250 Vesey Street, 23rd & 24th Floors<br>New York, NY 10281<br>212/225-5000 |
| Spruce Point Capital Management LLC | 1740 Broadway, 15th Floor<br>New York, NY 10019<br>212/519-9813 |
| BlackRock Institutional Trust Co., N.A. | 400 Howard Street<br>San Francisco, CA 94105<br>415/670-2000 |
| Douglas C. Lane & Associates, Inc. | 777 Third Avenue, 38th Floor<br>New York, NY 10017<br>212/262-7670 |
| Shapiro Capital Management LLC | 3060 Peachtree Road NW, Suite 1555<br>Atlanta, GA 30305<br>404/842-9600 |
| T. Rowe Price Associates, Inc. | 100 East Pratt Street<br>Baltimore, MD 21202<br>410/345-2000 |
| The Vanguard Group, Inc. | 100 Vanguard Boulevard<br>Malvern, PA 19355<br>610/669-1000 |

Cases\4851-4234-5422.v1-10/21/20

### 4.  Investment Manager

The following investment manager may have discoverable information concerning the purchase and sale of Maxar common stock on behalf of Lead Plaintiff:

| NAME | CONTACT INFORMATION |
|---|---|
| Elk Creek Partners, LLC | 44 Cook Street<br>Denver, CO 80206<br>720/381-1160 |

**III.  COPY OR DESCRIPTION BY CATEGORY OF DOCUMENTS AND TANGIBLE THINGS RELEVANT TO FACTS ALLEGED IN THE PLEADINGS UNDER FED. R. CIV. P. 26(a)(1)(A)(ii)**

Lead Plaintiff (through its counsel) discloses that it has in its possession, custody or control: (a) publicly available documents; (b) documents referenced in the Complaint; and (c) records identifying and concerning its transactions in Maxar common stock.

**IV.  COMPUTATION OF DAMAGES UNDER RULE 26(a)(1)(A)(iii)**

The calculation of damages in this case will be the subject of expert analysis.  The disclosure of the identity, report and opinion of any such expert(s) will be made in accordance with the Federal Rules of Civil Procedure, the Local Rules, the schedule agreed to by the parties and the orders of the Court.  Lead Plaintiff reserves the right to seek any available damages, as well as any equitable relief to which it is entitled.

Lead Plaintiff's attorneys' fees and costs are being incurred on an ongoing basis, and Lead Plaintiff is presently unable to state the amount for this claim.

Because the accrual of pre-judgment interest is ongoing and accrual of post-judgment interest will not begin to accrue until after the judgment is obtained, Lead Plaintiff is unable to calculate the amount owed at this time.

- 7 -

Lead Plaintiff reserves the right to seek any other damages to which it is legally entitled in

this action.

## V.     ANY INSURANCE AGREEMENT UNDER WHICH AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY ALL OR PART OF A JUDGMENT UNDER RULE 26(a)(1)(A)(iv)

The information sought by this portion of Federal Rule of Civil Procedure 26(a)(1)(A)(i) is

inapplicable to Lead Plaintiff.

DATED:  October 21, 2020                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SPENCER A. BURKHOLZ
                                            HENRY ROSEN (017965)
                                            TRIG R. SMITH
                                            DEBASHISH BAKSHI


                                                    s/ TRIG R. SMITH
                                                  TRIG R. SMITH

                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)
                                            spenceb@rgrdlaw.com
                                            henryr@rgrdlaw.com
                                            trigs@rgrdlaw.com
                                            dbakshi@rgrdlaw.com

                                            *Lead Counsel for Lead Plaintiff*

## DECLARATION OF SERVICE BY E-MAIL

I, CASEY REIS, not a party to the within action, hereby declare that on October 21, 2020, I served the attached LEAD PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1) on the parties in the within action by e-mail addressed as follows:

## COUNSEL FOR DEFENDANTS:

| NAME | FIRM | E-MAIL |
|---|---|---|
| Jerome H. Sturhahn<br>Milton L. Smith<br>Peter G. Koclanes | SHERMAN & HOWARD L.L.C.<br>633 Seventeenth Street,<br>Suite 3000<br>Denver, CO 80202<br>Telephone: 302/297-2900<br>303/298-0940 (fax)<br><br>*Attorneys for Defendants Maxar Technologies Inc., Howard L. Lance, and Anil Wirasekara* | msmith@shermanhoward.com<br>pkoclanes@shermanhoward.com<br>jsturhahn@shermanhoward.com |
| Brian T. Glennon<br>Eric C. Pettis | LATHAM & WATKINS LLP<br>355 South Grand Avenue,<br>Suite 1000<br>Los Angeles, CA 90071<br>Telephone: 213/891-7593<br>213/891-8763 (fax)<br><br>*Attorneys for Defendants Maxar Technologies Inc., Howard L. Lance, and Anil Wirasekara* | brian.glennon@lw.com<br>eric.pettis@lw.com |
| Kristin N. Murphy | LATHAM & WATKINS LLP<br>650 Town Center Drive, 20th Floor<br>Costa Mesa, CA 92626<br>Telephone: 714/755-8287<br>714/755-8290 (fax)<br><br>*Attorneys for Defendants Maxar Technologies Inc., Howard L. Lance, and Anil Wirasekara* | kristin.murphy@lw.com |

Cases\4851-4234-5422.v1-10/21/20

**COUNSEL FOR PLAINTIFFS:**

| NAME | FIRM | E-MAIL |
|------|------|--------|
| Spencer A. Burkholz<br>Henry Rosen<br>Trig R. Smith<br>Debashish Bakshi | ROBBINS GELLER<br>RUDMAN & DOWD LLP<br>655 West Broadway,<br>Suite 1900<br>San Diego, CA 92101 Telephone:<br>619/231-1058<br>619/231-7423 (fax)<br><br>*Lead Counsel for Lead Plaintiff* | spenceb@rgrdlaw.com<br>henryr@rgrdlaw.com<br>tsmith@rgrdlaw.com<br>dbakshi@rgrdlaw.com |

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 21, 2020, at San Diego, California.

s/ CASEY REIS
CASEY REIS

Cases\4851-4234-5422.v1-10/21/20

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA,

      Defendants.

---

**PLAINTIFF'S DETAILED EXPLANATION OF THE REASONS
WHY AGREEMENT COULD NOT BE REACHED**

---

4889-0905-8825.v1

**TABLE OF CONTENTS**

**Page**

I.   PREAMBLE ...............................................................................................................1

II.  SUMMARY OF THE ACTION...............................................................................1

III. There Is Little to No Cooperation Being Offered by Defendants Under the Terms
     of the Deposition Cooperation Protocol ..................................................................3

IV.  Even If Defendants Were Not Seeking to Limit Plaintiff to 10 Depositions, There
     Are Other Points of Contention Between the Parties Concerning the Deposition
     Cooperation Protocol ...............................................................................................4

V.   Whether the Court Enters a Deposition Cooperation Protocol Order or Not,
     Plaintiff Should Be Allowed to Take 26 Depositions in the Federal Case...........5

     A.   Defendants Have No Reasonable Basis to Argue that Plaintiff Should Be
          Limited to 10 Depositions............................................................................6

     B.   Plaintiff Has Made a Sufficient Showing of Good Cause for 26 Deponents...........7

          1.   Plaintiff Is Entitled to Depose Those Individuals Identified on
               Defendants' Incomplete Initial Disclosures....................................................9

          2.   Plaintiff Has Shown Sufficient Good Cause to Depose Maxar's
               Three CFOs.........................................................................................9

          3.   Plaintiff Has Shown Sufficient Good Cause to Depose Individuals
               with Knowledge of Bain's Work for Maxar...............................................11

          4.   Defendants' Objections to the Remaining Proposed Deponents
               Have Been Vague and Non-Specific, but Plaintiff Has Nonetheless
               Shown Good Cause...................................................................................12

          5.   Plaintiff Has Shown Good Cause to Depose the Maxar
               "Accountant Deponents" ...........................................................................13

          6.   Plaintiff Has Shown Good Cause to Depose SSL's President –
               Dario Zamarian – and a Reasonable Cross-Section of SSL's Senior
               Management.............................................................................................17

          7.   Plaintiff Has Shown Good Cause to Depose Angela Lau, Maxar's
               Senior Vice President of Finance and Corporate Strategy..........................19

          8.   Plaintiff Has Shown Good Cause to Depose Edward Chou,
               Maxar's Senior Manager of Corporate Finance.........................................19

- i -

**Page**

9.      Plaintiff Has Shown Good Cause to Depose Maxar's Public
        Relations Firm, Joele Frank ........................................................................20

10.     Plaintiff Has Shown Good Cause to Depose PJT Partners/Goldman
        Sachs ...........................................................................................................20

4889-0905-8825.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Baird v. Blackrock Institutional Tr. Co., N.A.*,
  330 F.R.D. 241 (N.D. Cal. 2019)..............................................................................7

*Bettis v. Envision Healthcare Corp.*,
  3:17-CV-01112 (M.D. Tenn. July 14, 2021) ............................................................7

*Genentech, Inc. v. Insmed Incorporation*,
  442 F. Supp. 2d 838 (N.D. Cal. 2006) .....................................................................6

*In Re: Lehman Bros. Sec. and ERISA Litig.*,
  No. 09-md-02017 (S.D.N.Y. Jan. 23, 2013)..............................................................7

*MedCorp, Inc. v. Pinpoint Techs., Inc.*,
  No. 08-cv-00867, 2008 U.S. Dist. LEXIS 104421
  (D. Colo. Dec. 12, 2008).........................................................................................8

*Perry v. Leeke*,
  488 U.S. 272 (1989).................................................................................................5

*Pirnik v. Fiat Chrysler Autos. N.V., et al.*,
  No. 1:15-cv-07199 (S.D.N.Y. May 14, 2018) ...........................................................7

*Royal Crest Dairy, Inc. v. Cont'l W. Ins. Co.*,
  20-cv-01443-RM-KLM, 2021 U.S. Dist. LEXIS 64242
  (D. Colo. Jan. 20, 2021)..........................................................................................7

*S. F. Health Plan v. McKesson Corp.*,
  264 F.R.D. 20 (D. Mass. 2010)................................................................................8

*Tessera, Inc. v. Sony Corp.*,
  No. C11-04399 EJD (HRL), 2012 U.S. Dist. LEXIS 94739
  (N.D. Cal. July 9, 2012)...........................................................................................8

*U.S. S.E.C. v. Meltzer*,
  440 F. Supp. 2d 179 (E.D.N.Y. 2006) ....................................................................14

4889-0905-8825.v1

**Page**

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 16......................................................................................................................8
    Rule 16(b)(4).............................................................................................................8
    Rule 26.................................................................................................................7, 8
    Rule 26 (a)(1)......................................................................................................3, 6
    Rule 26(b)(1)........................................................................................................7, 8
    Rule 26(b)(2)............................................................................................................7
    Rule 30(a)(2)............................................................................................................7

4889-0905-8825.v1

## I.    PREAMBLE

On January 9, 2022, it became apparent that the parties would be unable to even agree on what matters were resolved by agreement and the specific matters that remain to be heard and determined pursuant to the discovery dispute process detailed in this Court's Practice Standards for Civil Cases.  Rather than respond to Defendants' eleventh-hour accusations that Plaintiff had been purportedly acting in bad faith, Plaintiff would like to inform the Court about the material issues Plaintiff believes are in dispute and must be determined.[1]  First, the parties disagree whether the proposed Deposition Cooperation Protocol proposed by Defendants is even appropriate here.  Second, even if the Court were inclined to enter a cooperation protocol order, Plaintiff contends Defendants have no basis to include the provision limiting Plaintiff to 10 depositions.  Third, if the Court were inclined to enter a cooperation protocol order, Plaintiff contends the order should include a provision precluding defense counsel from discussing the substance of the first day of testimony in a "Common Interest" deposition while the second day of the deposition is pending.

## II.    SUMMARY OF THE ACTION

As the Court is aware, Plaintiff has alleged that Defendants failed to take a timely impairment charge for the GeoCom satellite business because Defendants knew the business had been suffering from several indicators of impairment prior to and throughout the Class Period.  *See* ECF No. 69, at 24-25 ("Plaintiff instead alleges specific facts concerning Maxar's underlying financial conditions, GEO satellite industry trends, and other red flags suggesting that Maxar should have taken an impairment ***prior to*** the third quarter of 2018.") (emphasis in original).

---

[1]    "Plaintiff" is Lead Plaintiff Oregon Laborers Employers Pension Trust Fund and "Defendants" are Maxar Technologies, Inc. ("Maxar" or the "Company"), Howard L. Lance and Anil Wirasekara.

- 1 -

The documents produced by Defendants concerning that allegation have surprised Plaintiff in terms of how they inculpate all Defendants, as well as the sheer volume of the unique and damning evidence.[2] Plaintiff is confident that it will be able to persuade the finder of fact that Defendants not only deliberately avoided taking an impairment charge for GeoCom beginning in late 2017 and throughout the Class Period, but Defendants also blatantly misapplied International Financial Reporting Standards ("IFRS") to facilitate their unlawful conduct. Plaintiff will also persuade the finder of fact that Defendants' explanation of the facts and circumstances that eventually led to the $383 million impairment charge disclosed on October 31, 2018 are contradicted by the evidence in this case.

Plaintiff has also alleged that Defendants misled investors regarding the contingent nature of the early 2018 AMOS-8 satellite award. Defendants desperately sought to publicly announce the award in early 2018 to assuage investors' concerns about the sustained collapse in demand for geostationary satellites. And, as Maxar senior management foresaw in late 2017, Maxar would most likely ██████████████████████████████████████████████████████ ██████████████████████████████████████. And, to the surprise of investors months later, the contract was, in fact, awarded to IAI.

Given the large number of Maxar personnel who have direct knowledge of information highly relevant to the claims and defenses in this case, Plaintiff agrees in principal that deposition cooperation among the parties in the Federal and State Actions might be appropriate, but not if it

---

[2]    Just a smattering of that evidence is quoted in Exhibit A, attached hereto. Exhibit A lists each of the 26 deponents Plaintiff seeks to depose in alphabetical order and provides a detailed good cause justification for each deponent, including specific examples of documents and/or statements *each proposed witness authored or made*.

- 2 -

includes the term Defendants are attempting to impose on Plaintiff: ***The Federal Action Plaintiff***

***must be limited to a total of 10 depositions, period***.  As demonstrated below, that position is largely

baseless and Defendants have known that for over a year.  In any event, the position is certainly well

outside of what Plaintiff understands to be cooperation.

**III.    There Is Little to No Cooperation Being Offered by Defendants Under the
Terms of the Deposition Cooperation Protocol**

Defendants' proposed protocol is nothing more than an attempt to kneecap Plaintiff's case.

Indeed, on December 31, 2021, Defendants informed Plaintiff that if "Plaintiff persists in its efforts

to secure an increase [above 10 depositions], Defendants intend to seek a cost shifting order . . . ."[3]

During the January 4, 2022 meet and confer, and in a January 6, 2022 email, Defendants confirmed

that Plaintiff's case must be limited to 10 depositions, regardless if they are Common Interest

Depositions or just the Federal Plaintiff's picks.

As Plaintiff's counsel repeatedly noted during the meet and confer process, a cooperation

agreement implies that some benefits would inure to all parties.  Here, Defendants' proposal does

nothing but reduce Defendants' burden by doffing it off on Plaintiff.  And, what did Defendants

offer in exchange for Plaintiff's indication they may accept some of that burden?  Simply,

Defendants informed Plaintiff that it cannot take more than 10 depositions, and if Plaintiff even

brings a number above 10 to the Court's attention, Defendants will seek cost sanctions.

---

[3]    Defendants' threat is an empty one.  As discussed, *supra*, Defendants already know that
Plaintiff's list of deponents would be above 10 by operation of the number of individuals Defendants
have identified in their Rule 26 (a)(1) initial disclosures (nine), as well as the numerous yet to be
identified accounting and finance professionals Defendants will rely upon to support of their good
faith reliance defense.  As this Court is aware, moreover, during the October 28, 2020 Scheduling
Conference, the parties represented that once documents were produced, they would meet and confer
regarding expanding the 10 deposition limit.  *See* Transcript of Proceedings, October 28, 2020
Scheduling Conference at 4:3-18; ECF No. 77.

4889-0905-8825.v1

And why would Plaintiff agree to the protocol if participating in a State Action deposition would otherwise reduce Plaintiff's federal deposition number allotment?  The answer is simple: Plaintiff would not participate in State Action depositions at all.  Again, the Hobson's choice Defendants have left Plaintiff with certainly does not indicate that Defendants' intent was to extend the offer of cooperation to Plaintiff in this case.[4]

IV.     **Even If Defendants Were Not Seeking to Limit Plaintiff to 10 Depositions, There Are Other Points of Contention Between the Parties Concerning the Deposition Cooperation Protocol**

Plaintiff is fully aware of the case law within the District that generally disfavors precluding attorneys from generally communicating with the clients during breaks in testimony.  Notably, Plaintiff is not asking the Court to issue an order precluding Defendants from speaking with deponents they represent while a deposition is pending.  However, Plaintiff is asking that counsel not communicate with the deponent ***about the substance*** of the first day of deposition while the deposition remains pending.

While the parties were negotiating the protocol, Plaintiff requested that Defendants add a term that would require Common Interest deponents to appear for depositions on back-to-back days.  Of course, Defendants rejected Plaintiff's request.  Defendants did, however, offer to use their "good faith efforts" to schedule the Common Interest deponents on back-to-back days, but would only commit that there would be no more than five days between the first and second day of deposition.  Plaintiff then explained to Defendants its concern that it did not want to afford Defendants the

---

[4]     Further, the State Action Plaintiffs are not subject to deposition limits.  Yet, Defendants' cooperation agreement ***bars*** the Federal Plaintiff from the benefits of that rule difference.  If the Court elects to have a hearing on this matter, Plaintiff suggests that the Court inquire of Defendants' counsel as to whether their clients intend to similarly argue for deposition limits in the State case. Defendants have refused to indicate one way or the other to date.

- 4 -

opportunity to discuss the substance of the first day's testimony with counsel while the rest of the testimony is pending.

In addition, Plaintiff is concerned that the five-day split between the first and second day of a Common Interest deposition will become the rule versus the exception.  Accordingly, Plaintiff is also concerned that a five-day gap will not only invite improper coaching of testimony, but also will further lengthen the amount of time it takes the parties to complete depositions in the Federal case.

Accordingly, Plaintiff asks the Court to either order Common Interest Depositions to be held on back-to-back days or issue an order precluding counsel from discussing the substance of the Common Interest deponent's first day's deposition while the deposition is pending.  *See e.g., Perry v. Leeke*, 488 U.S. 272, 273 (1989) (noting "although it may be appropriate to permit such consultation in individual cases, the trial judge must nevertheless be allowed the discretion to maintain the *status quo* during a brief recess in which there is a virtual certainty that any conversation between the witness and his lawyer would related exclusively to his ongoing testimony").

## V.      Whether the Court Enters a Deposition Cooperation Protocol Order or Not, Plaintiff Should Be Allowed to Take 26 Depositions in the Federal Case

Plaintiff understands that Defendants generally object to Plaintiff's list of 26 deponents because it includes proposed deponents:  (a) who were not employed by Maxar during the relevant time period (*e.g.*, John Celli and Jeremy Anderson);[5] (b) who have no connection to Plaintiff's

---

[5]      This appears to be another baseless objection given the fact that Defendants have produced highly relevant documents from these proposed deponents, who were also negotiated and agreed to by Defendants as custodians for the purpose of conducting searches of relevant electronically stored information.  In any event, Plaintiff informed Defendants that it had agreed to eliminate Jeremy Andersen from their proposed deponent list.

- 5 -

substantive allegations (*i.e.*, Nauzer Gotla and Angela Lau);[6] and (c) who purportedly are being called to testify about overlapping subjects without differentiation.

### A.    Defendants Have No Reasonable Basis to Argue that Plaintiff Should Be Limited to 10 Depositions

Most, if not all, of Defendants' opposition to Plaintiff's proposal for 26 depositions, including those of key non-parties, collapses in on itself based on a single fact:  Defendants already know that this case is not one that may be appropriately litigated with a mere 10 depositions. Defendants' Rule 26(a)(1) initial disclosures identify nine individuals they may rely on to support their defenses at trial.  Defendants have also recently noticed a document subpoena to Plaintiff's investment manager, presumably in an effort to depose the manager and improperly re-open the Court's prior ruling on class certification.

Further, well over a year ago, Defendants' prior counsel, Latham & Watkins, LLP, confirmed that Defendants had asserted the defense of good faith reliance on its auditors and outside accounting and financial advisors.  Plaintiff suspects that Defendants will rely at least upon KPMG Canada, KPMG US, Duff & Phelps, PwC, and other unidentified professionals in support of their defense. Yet, when informed by Plaintiff (while the parties were meeting and conferring regarding this dispute) that their initial disclosures appeared to be incomplete because Defendants had still not updated their disclosures to identify those professionals, Defendants stated they would investigate the matter, but would not supplement their Rule 26(a)(1) initial disclosures until January 31, 2022. In any event, unless Defendants abandon their good faith reliance defense, they have already indicated they will be relying on more than 10 witnesses.  *See Genentech, Inc. v. Insmed*

---

[6]    While Plaintiff disagrees with Defendants on their objection, Plaintiff informed Defendants that they nonetheless agreed to eliminate Nauzer Gotla.

4889-0905-8825.v1

*Incorporation*, 442 F. Supp. 2d 838, 848 (N.D. Cal. 2006) (allowing additional depositions because "[p]laintiffs had no control over how many firms provided opinions to Defendants and how many of Defendants' employees were privy to the opinions").

It is axiomatic that Plaintiff is entitled to depose all persons whom Defendants identify as potential trial witnesses. And, Defendants' list of potential trial witnesses is already in excess of 10.[7] Accordingly, Defendants' argument that Plaintiff should be limited to 10 depositions is baseless. Further, courts routinely allow plaintiffs to take more than ten depositions in securities and other cases that involve complex legal and factual issues. *See Pirnik v. Fiat Chrysler Autos. N.V., et al.*, No. 1:15-cv-07199 (ECF No. 200) (S.D.N.Y. May 14, 2018) (permitting plaintiffs in a securities class action to take 20 fact witness depositions over two months); *In Re: Lehman Bros. Sec. and ERISA Litig.*, No. 09-md-02017 (ECF No. 1130) (S.D.N.Y. Jan. 23, 2013) (granting plaintiffs 80 deposition days); *Bettis v. Envision Healthcare Corp.*, 3:17-CV-01112 (ECF No. 318) (M.D. Tenn. July 14, 2021) (allowing securities plaintiff to take 50 fact witness depositions).

**B.    Plaintiff Has Made a Sufficient Showing of Good Cause for 26 Deponents**

When a party seeks leave of court to take more than 10 depositions, the "court must grant leave to the extent consistent with Rule 26(b)(1) and (2)." Fed. R. Civ. P. 30(a)(2). And "[u]ltimately, the scope of discovery under Rule 26 is broad." *Royal Crest Dairy, Inc. v. Cont'l W.*

---

[7]    Defendants also improperly incorporated all individuals identified in Plaintiff's initial disclosures to the extent they may possess information that Defendants may use to support their defenses. *See Baird v. Blackrock Institutional Tr. Co., N.A.*, 330 F.R.D. 241, 244 (N.D. Cal. 2019) (holding that it is inappropriate for a defendant to "rely on the incorporation of Plaintiff's initial disclosures to satisfy its Rule 26 disclosure obligations"). Plaintiff identified 22 such witnesses (including KPMG Canada and KPMG LLP), but Defendants have not yet identified any individuals from Plaintiff's disclosures that they may rely on to support their defenses.

- 7 -

4889-0905-8825.v1

*Ins. Co.*, 20-cv-01443-RM-KLM, 2021 U.S. Dist. LEXIS 64242, at *31 (D. Colo. Jan. 20, 2021).

Under Rule 26, parties may obtain discovery of any non-privileged information that is both relevant

and proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).

Further, under Rule 16, a party may modify the deposition limits set in a scheduling order

upon a showing of good cause.  *See* Fed. R. Civ. P. 16(b)(4); *MedCorp, Inc. v. Pinpoint Techs., Inc.*,

No. 08-cv-00867, 2008 U.S. Dist. LEXIS 104421, at *3 (D. Colo. Dec. 12, 2008) ("A party may

seek amendment of a Scheduling Order by a showing of good cause."); *Tessera, Inc. v. Sony Corp.*,

No. C11-04399 EJD (HRL), 2012 U.S. Dist. LEXIS 94739, at *5 (N.D. Cal. July 9, 2012) ("Rule

16(b)(4)'s 'good cause' standard is not a stringent one.").  *See also S. F. Health Plan v. McKesson

Corp.*, 264 F.R.D. 20, 20-21 (D. Mass. 2010) (noting courts ought not second-guess a party's request

for additional depositions, particularly where the party has shown a good-faith basis for the need and

"opposing counsel is not always the best judge of the other party's needs in litigation").[8]

As demonstrated in Exhibit A (attached hereto) and below, Plaintiff's proposed deponents

easily satisfy both the relevance and proportionality requirements of Rule 26, as well as Rule 16's

good cause requirement.

---

[8]   Ironically, Defendants cited to this authority during the meet and confer process to threaten Plaintiff with cost sanctions if they "persisted" in seeking more than 10 depositions.  But that case has no resemblance to this action.  The parties in the *McKesson* litigation had already agreed Defendants could take 30 depositions, the court approved an additional 11, and importantly there was only one month left before the fact-discovery cut-off when the order was issued.  *Id.* at 20-21. This case certainly does not resemble the procedural posture of *McKesson*.  And, again, during the initial scheduling conference before this very Court, the parties informed Your Honor precisely how they intended to approach this issue.

- 8 -

4889-0905-8825.v1

### 1.    Plaintiff Is Entitled to Depose Those Individuals Identified on Defendants' Incomplete Initial Disclosures

On October 21, 2020, Defendants identified the following persons as those that they may rely on to support their defenses at trial:  (1) Anil Wirasekara ("Wirasekara") (defendant); (2) Ashley Smith; (3) Biggs Porter; (4) Howard Lance ("Lance") (defendant); (5) Jason Gursky; (6) Jill Windrum; (7) Lance Webber; (8) Nancy Coleman; and (9) Paul Estey.  With the exception of Nancy Coleman and Ashley Smith, each of these individuals are identified in Defendants' initial disclosures and are on Plaintiff's proposed deponent list.  Plaintiff need do no more to justify those depositions.

In addition, Defendants have made no objection to Plaintiff's deposition picks of key non-parties KPMG Canada, KPMG US and Duff & Phelps.  That is understandable given that Defendants will, at some point, specifically identify those individuals associated with these organizations in support of their good faith reliance defense.

### 2.    Plaintiff Has Shown Sufficient Good Cause to Depose Maxar's Three CFOs

Defendants objected to the fact that Plaintiff identified three Maxar Chief Financial Officers' ("CFO") as potential deponents.  This objection is as confusing as it is baseless.  As a threshold matter, the three CFO's identified by Plaintiff are William McCombe ("McCombe"), Biggs Porter and defendant Wirasekara.  *See* Ex. A at 11-14, 20.  Defendants themselves identified defendant Wirasekara and Biggs Porter in their initial disclosures.  Accordingly, Defendants objection here is that Plaintiff identified William McCombe as a potential witness because he did not appear to possess any unique information.

Defendants are mistaken.  As the CFO of Maxar, who quit in February 2018 and before he would be required to sign Maxar's 2017 year-end financial results, Mr. McCombe has unique direct

- 9 -

4889-0905-8825.v1

knowledge of the Company's impairment testing procedures at the end of 2017 and early 2018 and interaction with defendant Lance regarding the same. *Id.* at 11-13. Leading up to his departure, he authored several key documents and communicated them to ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████." *Id.* Mr. McCombe also interacted directly with ████████

████ in developing forecasts and budgets for SSL, including for 2018. *Id.* The top-level forecasts and budgets in this case are critical because the applicable accounting standards in this case point to changes in forecasts and budgets as being a potential indicator of impairment pursuant to IAS 36. *See* ¶¶34, 36.[9]

At the end of the day, moreover, Mr. McCombe is the author of numerous other relevant documents in the case. Ex. A at 12-13. Plaintiff is entitled to depose the author of those materials because Plaintiff wants to hear what the *author* was thinking at the time the communications were written. To the extent Defendants suggest Plaintiff could get that information from another witness, it would be unfounded.

Defendants also objected to Plaintiff's selection of SSL CFOs Jeremy Anderson, Michael Santoro and Mladen Brkic. However, on January 3, 2022, Plaintiff informed Defendants that they had eliminated those individuals from the proposed deposition list.

---

[9]    All "¶_" references are to Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 44) (the "Complaint"). All capitalized terms not otherwise defined herein, have the same meaning as set forth in the Complaint.

4889-0905-8825.v1

### 3.    Plaintiff Has Shown Sufficient Good Cause to Depose Individuals with Knowledge of Bain's Work for Maxar

On December 31, 2021, Defendants objected to Plaintiff including Rich Currier ("Currier"), Paul Estey ("Estey"), William McCombe, Michael Santoro ("Santoro") and Bain & Co. ("Bain") representative Tina Radabaugh ("Radabaugh") because the work Bain did for Maxar in 2017 is a "subject only tangentially connected to Plaintiff's claims." This objection too is without merit. First, and as previously mentioned, Plaintiff agreed to eliminate Mr. Santoro from the proposed deponent list. Second, Defendants have identified Mr. Estey as a potential defense witness in their initial disclosures. Third, Plaintiff has already made its good cause argument for the deposition of Mr. McCombe. Accordingly, Plaintiff will address proposed deponent Radabaugh. With regard to Mr. Currier, not only did he interact directly with Bain ███████████████████████ ███████████████████████████████████████████ ███████ (*see* Ex. A at 3-4), Mr. Currier's deposition is required by Plaintiff and the certified class for additional reasons noted below in this brief.

Plaintiff's allegations regarding Bain's work in this case are a far cry from being "tangentially connected to Plaintiff's claims." The operative complaint in this action contains a specific allegation regarding Bain's work in 2017 regarding SSL – that is, Bain was brought in by Maxar to determine if the Company should stay in the GEO industry at all. *See* ¶70. Plaintiff served a document subpoena on Bain and was shocked by the production's content and that Bain's involvement with the GeoCom business was sustained for most of 2018. For example, in ██████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

- 11 -

4889-0905-8825.v1



." Ex. A at 26s.  In May 2018, moreover, Ms. Radabaugh ." *Id.*[10]  Plaintiff will need to depose Ms. Radabaugh about the Bain documents (particularly to lay a hearsay exception foundation for critical Bain documents) because they are highly relevant to whether indicators of impairment existed at specific times prior to August 2018 (assessing strategic alternatives and technology change are specific indicators of impairment according to IAS 36, despite the fact that Defendants claimed on October 31, 2018 they did not even begin to assess strategic alternatives for GeoCom until August 2018).

*Id.*

Plaintiff has good cause to depose Ms. Radabaugh.  She was a top-line consultant, and presumably somewhat objective, who was brought in to assess .  Further, the documents identified in Exhibit A reflect only a few of the relevant documents authored by Bain representatives concerning the GeoCom debacle.  Plaintiff needs to lay a foundation for those documents with Ms. Radabaugh as well.

### 4.    Defendants' Objections to the Remaining Proposed Deponents Have Been Vague and Non-Specific, but Plaintiff Has Nonetheless Shown Good Cause

Defendants' December 31, 2021 objections to the remaining of Plaintiff's deposition picks are vague.  Plaintiff understands, however, that Defendants' general objection is that these picks would be cumulative/duplicative because the individuals purportedly have knowledge of facts in the same subject areas of interest in this case.  This objection should be rejected for the following

---

[10]    Unless otherwise noted, citations are omitted and emphasis is added throughout.

4889-0905-8825.v1

reason:  Most, it not all, of the witnesses discussed below *authored a wealth of damning evidence*

regarding the fact ███████████████████████████████████████████████████

██████████████████████████████ .  Again, the fact that there is so much powerful evidence

in this case *that is authored by a plethora of percipient witnesses* is really not Plaintiff's problem.

Indeed, these witnesses should be put under oath so they can testify about what they observed, what

they wrote, who they communicated to, and so on.

Defendants know this to be true:  Defendants have no basis to argue that they know these

proposed deponents' testimony would be purportedly "duplicative."  Indeed, the parties will have to

wait and see how these deponents testify before reaching that conclusion.  Again, Plaintiff

understands why Defendants so strenuously object to these witnesses.  They just want to prevent

Plaintiff from presenting its most compelling case at trial.

### 5.    Plaintiff Has Shown Good Cause to Depose the Maxar "Accountant Deponents"

Plaintiff seeks to depose the following Maxar accountants:  Theresa Harrah ("Harrah")

(SSL's assistant controller and technical accountant); Darren Hoegler ("Hoegler") (Maxar's assistant

controller); Jose Torres ("Torres") (Maxar's Chief Accounting Officer); Nick Cyprus ("Cyprus")

(Chair of Maxar's Audit Committee); and Paul Wilkinson ("Wilkinson") (either a former consultant

or employee of Maxar who consulted on impairment issues).  *See generally* Ex. A.

First, Defendants' objection to this group of proposed deponents should be viewed through

the following lens.  ***This is an accounting fraud case involving technical accounting provisions***

***and each of these individuals have direct knowledge*** ████████████████████████████

████████████████████████ .  Defendants do not dispute, moreover, that these individuals

have direct knowledge of the facts and circumstances that led to the third quarter 2018 ("3Q18")

- 13 -

impairment charge.

. Ex. A at 8-9.

. *Id.* Plaintiff seeks to ask Ms.

Harrah about all information provided to these professionals as Defendants must prove they provided

all material evidence to these organizations because it is an element of their good faith reliance

defense.  To establish the defense of good faith reliance on auditors or other professions, Defendants

must "'show that he/she/it made a complete disclosure, sought the advice as to the appropriateness of

the conduct, received advice that the conduct was appropriate, and relied on that advice in good

faith.'"  *U.S. S.E.C. v. Meltzer*, 440 F. Supp. 2d 179, 189 (E.D.N.Y. 2006).  Not only does Plaintiff

want to ask Ms. Harrah questions about the documents she *authored* (Ex. A at 8-9), but

Plaintiff certainly would

like to discuss that matter with her.[11]

Mr. Torres' knowledge of the alleged fraud is front and center in this action.  Mr. Torres'

damning statements – coming from Maxar's Chief Accounting Officer, no less – are reflected in

numerous documents and amply demonstrate good cause for his deposition.  Ex. A at 16-17.

Defendants cannot seriously claim a deposition is not warranted for a Chief Accounting Officer who

observes that "                        " on one of Maxar's historical

impairment testing memos, should not be deposed.  Ex. A at 16.  Nor can Defendants seriously

---

[11]   To date, Defendants have not communicated to Plaintiff whether they were able to reproduce
***all*** of Ms. Harrah's previously deleted ESI.  On October 1, 2021, this Court granted a six-month
extension to case deadlines due in large part to provide the parties enough time
ECF Nos. 114, 116.

- 14 -

suggest that Plaintiff should be precluded from deposing Mr. Torres about his observation ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. *Id.* at 17.

Mr. Hoegler should be deposed as well. ████████████████████████████

████████████████████████████████████████████████████████████

██████. Ex. A at 10. Who did he share that with? Who did he discuss it with? Did he inform

Maxar's auditors? Mr. Hoegler's evidence speaks for itself. This evidence strikes at the heart of

Defendants' good faith reliance defense. It is damning and it must be explored at deposition.

Defendants have no good faith objection to the deposition of Mr. Cyprus, the Chair of

Maxar's Audit Committee. Ex. A at 4-5. It was the Audit Committee who reviewed and

investigated the August 7, 2018 Spruce Point allegations. It was the Audit Committee who

interacted with Defendants' auditors, financial and legal advisors on how and when to respond to the

Spruce Point allegations. The Audit Committee was also directly involved in the messaging of

Maxar's August 24, 2018, "comprehensive" response to the Spruce Point allegations that

acknowledged GeoCom might be impaired. The Audit Committee also led the investigation –

triggered by the Spruce Point allegations – ████████████████████████████

████████████████████████████████████████████. *Id.* at 4-5. Indeed, Mr.

Cyrus's ***own statements*** regarding the Audit Committee's investigation must be addressed during

deposition.

Mr. Wilkinson has knowledge about, *inter alia*, how Maxar ████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████ Ex. A at 18. It also appears that he had direct contact

- 15 -

. *Id.* Notably, for the same time frame (early 2018),

Mr. Wilkinson will likely have knowledge ██████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████. Defendants know about this evidence. They do not want it to

see the light of day.

Defendants will certainly argue this is just too many accountants. They are wrong. Ms.

Harrah and Mr. Hoegler are technical accountants at Maxar who were responsible for impairment

testing procedures at GeoCom before the DigitalGlobe acquisition. And, the Company later

terminated ██████████████████████████████████████████████████

██████████████████████.

Mr. Torres (and Ms. Windrum who is already on Defendants' initial disclosures), on the

other hand, came to Maxar *after* the DigitalGlobe acquisition and their ███████████████

████████████████████████████████████████████████████████████. Mr.

Torres was the top accountant at Maxar during the Class Period. Mr. Torres' documents reflect he

was heavily involved with relevant issues including the appropriate accounting treatment for the

GeoCom impairment, as well as the appropriate application of IAS 36 leading up to the Company's

disclosure of the $383 million GeoCom impairment charge. And, certainly, a jury should hear why

Mr. Torres had concluded ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████. Ex. A at 17.

Each of these proposed deponents, moreover, will likely have knowledge regarding ██

████████████████████████████████████████████████████████████████████

- 16 -

█████████████████████████████████████████████████████████████████████████████

████████████████████████████ .

### 6.    Plaintiff Has Shown Good Cause to Depose SSL's President – Dario Zamarian – and a Reasonable Cross-Section of SSL's Senior Management

Defendants have similarly objected to Plaintiff's proposed depositions of Messrs. Zamarian, Celli, Currier and Stephenson on the basis that they have duplicative knowledge of the facts.  Even if that were true, which it is not, it misses the point.  Each of these individuals made ***scores of their own damning statements*** ████████████████████████████████████████ .  Defendants cannot seriously contend that Plaintiff have no good cause to depose these percipient witnesses about these statements:

- In late 2017, Mr. Zamarian, the President of SSL, ██████████████████████
  ████████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████ " Ex. A at 21.

- On March 22, 2018, Mr. Zamarian informed ████████████████████████████
  ████████████████████████████████████████████████████████████████████
  ████████ ." *Id.*

- On May 11, 2017, Mr. Celli observed ████████████████████████████████
  ████████████████████████████████████████████████████████████████████
  ████████████████████ " *Id.* at 1.

- On June 17, 2017, Mr. Celli evidently informed an industry magazine that ████
  ████████████████████████████████████████████████████████████████████
  ██████████████████████████████████████ ." *Id.* at 1- 2.

- On August 10, 2017, Mr. Currier observed: " ██████████████████████████
  ████████████████████████████████████████████████████████████████████
  ████████████████████████████ " *Id.* at 3-4.

- On November 19, 2017, Mr. Currier observed that ███████████ ██████████████████████████████████████████ ██████████ .” *Id.* at 4.

- On November 1, 2017, Mr. Stephenson observed, ██████████ ██████████████████████████████████████████ ██████ .” *Id.* at 15.

- On May 30, 2018, Mr. Stephenson informed ██████████ ██████████████████████████████████████████ .” *Id.*

The quotes above represent a mere sliver of the incriminating statements these percipient witnesses made as evidenced by Defendants' document production itself.

But there is an even more important reason to depose these individuals. Nearly all of the documents Plaintiff wishes to discuss with these proposed deponents are relevant to the "external" and "internal" indicators of impairment addressed in IAS 36. *See* ¶¶33-35. The impairment indicators under IAS 36 are broad and include, but are not limited to the following: (1) a decline in the state of the industry or negative technological disadvantages (IAS 36.12(b)), obsolescence issues or a significantly more than expected decrease in the asset's value (IAS 36.12(a), (e)), a significant decline in GeoCom's financial results or declines in the budgeting or forecasting for GeoCom (IAS 36.12(g), 36.14) and restructuring of GeoCom or plans to dispose of the asset sooner than expected (IAS 36.12(f)). Each of these witnesses needs to be questioned on their statements and whether they shared any of it with Maxar's accountants or its outside auditors. There can be little doubt that the select quotes above implicate a violation of IAS 36, a central allegation to Plaintiff's case.

4889-0905-8825.v1

**7.    Plaintiff Has Shown Good Cause to Depose Angela Lau, Maxar's Senior Vice President of Finance and Corporate Strategy**

As part of Plaintiff's document discovery directed to non-party Duff & Phelps, ██████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████.  Ex. A at 10-11.

Notably, Defendants have yet to produce that Duff & Phelps' assessment in the case, and Plaintiff has served a set of document requests on Defendants to obtain information regarding that missing assessment.  In any event, this assessment strikes at the heart of the claims and defenses in this action.  Ms. Lau also made several statements in documents regarding ████████████

██████████████████████████████████████████████████████████

████████.  *Id.*

**8.    Plaintiff Has Shown Good Cause to Depose Edward Chou, Maxar's Senior Manager of Corporate Finance**

Edward Chou's deposition is required because he was involved in the preparation ████████

██████████████████████████████████████████████████████████

████████████████████████████████████.  *Id.* at 2-3.  In February 2018, Mr. Chou informed ████████████████████████████████████████

██████████████████████████████████████████████████████████.  Ex. A at 2.  Mr. Chou also understands SSL's budgeting, forecasting and historical results given his

- 19 -

significant responsibilities in the forecasting, planning and analysis ("FPA") role, and reporting of

that work to Maxar's senior management. *Id.* For example, in April 2018, Mr. Chou █████████

████████████████████████████████████████████████████████████████████████████

█████████████. Ex. A at 3.

### 9. Plaintiff Has Shown Good Cause to Depose Maxar's Public Relations Firm, Joele Frank

Joele Frank ████████████████████████████████████████████████████████

████████████████████████. *Id.* at 27-28. Joele Frank also accumulated ██████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████. *Id.* Joele Frank's testimony, therefore, will be directly relevant to Plaintiff's allegations of

loss causation and materiality.

### 10. Plaintiff Has Shown Good Cause to Depose PJT Partners/Goldman Sachs[12]

PJT Partners and Goldman Sachs are relevant because ████████████████████████

████████████████." *Id.* at 28-29. ████████████████████████████████████

████████████████████████████████████████████████████████████████████. *Id.* This

evidence, as well as other earlier evidence of Defendants ████████████████████████

████████████████, is directly relevant to address Defendants' October 31, 2018 corrective

disclosures:

---

[12]    PJT and Goldman Sachs are represented by the same attorneys for purposes of their document productions. Plaintiff continues to negotiate their document productions and will only depose one of the two important non-parties after it assesses their relative document productions.

> [T]he Company ***commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business***, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

This statement is contradicted  (as discussed throughout Plaintiff's Exhibit A), ███████████████ ████████████████████████████████. Defendants will face a significant amount of evidence indicating that most, if not all, of the indicators of impairment that were purportedly identified in August 2018, had been existence for well over a year.

DATED:  January 10, 2022                    Respectfully submitted,

                                   s/ Trig R. Smith
                                   TRIG R. SMITH

                         ROBBINS GELLER RUDMAN
                           & DOWD LLP
                         SPENCER A. BURKHOLZ
                         HENRY ROSEN (017965)
                         TRIG R. SMITH
                         NICOLE Q. GILLILAND
                         PATTON L. JOHNSON
                         655 West Broadway, Suite 1900
                         San Diego, CA  92101
                         Telephone:  619/231-1058
                         619/231-7423 (fax)
                         spenceb@rgrdlaw.com
                         henryr@rgrdlaw.com
                         trigs@rgrdlaw.com
                         ngilliland@rgrdlaw.com
                         pjohnson@rgrdlaw.com

                         *Lead Counsel for Lead Plaintiff*

4889-0905-8825.v1

# EXHIBIT A

**EXHIBIT A**
**PLAINTIFF'S GOOD CAUSE FOR TAKING 26 DEPOSITIONS**

| Name | Plaintiff's Good Cause |
|---|---|
| Celli, John | SSL President (pre-Dario Zamarian) for 11 years, and worked at SSL for 36 years in total. He has personal knowledge of ███████████████████████████████████████████████████ ███████████████████████████████████████████████. Celli retired in June 2017 when the Company announced a record-breaking lay-off of 173 employees in Palo Alto, CA and is quoted in the Complaint concerning the slowdown in orders for GEO satellites being the cause for reductions at Maxar. ¶72.[1] ███████████████████████████████████████ ████████████████████████<br><br>Some specific examples of documents showing Celli's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A May 11, 2017 e-mail from Celli where, prior to the record setting June 2017 layoffs alleged in the Complaint, he states: ███████████████████ ████████████████████████████████████████ ███████████████████████████████████████ '" MAXAR_0016831;  ¶72;<br><br>• A May 27, 2017 e-mail from Celli to █████████████████: " ███████ " ██████████████ ████████.  MAXAR_0017485;<br><br>• A June 15, 2017 e-mail from the Senior Vice President of Business Development relaying his ███████ ████████████████████████████████████ " ███████████████████████████████████████ ████████."  MAXAR_0017983;<br><br>• A June 22, 2017 e-mail where Celli agrees ████████████ ███████████████████████: " |

---

[1] All "¶_" references are to Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 44) (the "Complaint").  All capitalized terms not otherwise defined herein, have the same meaning as set forth in the Complaint.

- 1 -

| Name | Plaintiff's Good Cause |
|---|---|
| | ██████████████████████████████████████████ ” MAXAR_0338324; ¶72; and <br><br> • A September 5, 2017 e-mail from Celli, ██████████████████████████ ██████████████████████████ . MAXAR_0035500. |
| Chou, Edward | A Senior Manager of Corporate Finance both at MDA and Maxar.  Chou was involved in and made numerous statements in documents that are relevant to Plaintiff's claims.  For example, Chou was involved in the ████████████████████████████ Chou was also involved in the preparation of ████████████. Chou was a contact for █████████████████████. Also, Chou is an important witness for understanding ██████████████████████████████. <br><br> Some specific examples of documents showing Chou's knowledge of facts relevant to Plaintiff's claims include: <br><br> • ████████████████████ with ██████████████████████████████ MAX0000039; <br><br> • A November 12, 2017 e-mail from Chou to Bill McCombe ██████████████████████████████, saying: ██████████████████████████████ .” MAXAR_0381316; <br><br> • A February 14, 2018 e-mail from ████████████████████. MAXAR_0067663; <br><br> • A February 16, 2018 e-mail from ████████████████████ “██████████████████████████.” DP_Maxar_006101; |

- 2 -

| Name | Plaintiff's Good Cause |
|---|---|
| | • Chou is referenced in ██████████████████████████████ ███████████████████████████. MAX0000877; and<br><br>• Chou had key responsibilities in ███████████████ ████████████████████"█████████████████████ ████████████████████" MAXAR_0042979. |
| Currier, Rich | Senior Vice President of SSL business development from 2013 to 2019. He has direct knowledge regarding ████████████████████████████████████████████. He also prepared ████████████████████████████████. He personally interacted with █████████████████ █████████████████████████████████████████████.<br><br>Some specific examples of documents showing Currier's knowledge of facts relevant to Plaintiff's claims include:<br><br>• An April 17, 2017 e-mail from Currier stating: "████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████." MAXAR_0018168;<br><br>• An April 20, 2017 e-mail from Currier discussing the beginning of the ███████████████████ █████: "██████████████████████████████ ███████████████████████." MAXAR_0016120;<br><br>• A June 2, 2017 e-mail stating: "████████████ ████████████████████████████████████████ ████████████████████" MAXAR_0254772;<br><br>• An August 10, 2017 e-mail stating: "██████████ ████████████████████████████████████████ ████████████████████████████████████████ |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ██████████████████████ ███████████████████" MAXAR_0089842;<br><br>• A November 19, 2017 e-mail from Currier stating: "████████████████ ███████████████████████ ███████████████." MAXAR_0089472;<br><br>• A March 30, 2018 e-mail from Currier stating: ██████████████ █████████████████" MAXAR_0149943; and<br><br>• A May 21, 2018 e-mail from Currier stating: ████████████ █████████ " ███ ██████████████." MAXAR_0149791. |
| Cyprus, Nick | Chair of Maxar's Audit Committee. He has knowledge of the Audit Committee's investigation into Spruce Point's allegations. As the Audit Committee chair, he was involved ████████████████ █████████████ █████████████████████████ ████████████████.<br><br>Some specific examples of documents showing Cyprus' knowledge of facts relevant to Plaintiff's claims include:<br><br>• A May 8, 2018 e-mail from Cyprus to Maxar's ████████████ "████████████████████." MAXAR_0198444;<br><br>• An August 8, 2018 e-mail from Cyprus to ████████████████ ████. MAXAR_0073252;<br><br>• An August 14, 2018 e-mail from Cyprus in response to ██████████████: ████ █████████████ |

- 4 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████," █████████████<br>█████████. MAXAR_0073238;<br><br>• An August 22, 2018 e-mail from Cyprus to ████████████: "█████<br>████████████<br>████████████<br>████████████<br>████████████<br>████████████." FRA00000790; and<br><br>• Cyprus' ████████████<br>███. FRA00000865-866. |
| Estey, Paul | Former Executive Director of SSL, and COO of SSL since July 17, 2017. Estey has personal knowledge of ████████████<br>████████████<br>████████████ Estey was<br>████████████<br>████████████<br>██ Estey had direct knowledge of the ████████████<br>████████████<br>████████████.<br><br>Some specific examples of documents showing Estey's knowledge of facts relevant to Plaintiff's claims include:<br><br>• An April 19, 2017 presentation by Estey ████████████<br>████████████. MAXAR_0170337;<br><br>• A June 2, 2017 e-mail from Estey summarizing notes from the ████████████<br>██: "████████████<br>████████████<br>████████████<br>MAXAR_0018578; |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
|  | • A June 23, 2017 e-mail from Estey saying: "█████████████ ████." MAXAR_0052962;<br><br>• A June 23, 2017 e-mail from Estey saying: "██████████████████████████████████████████████." MAXAR_0052962. With the deck slides saying: "█████████████████████████████████████." MAXAR_0052963;<br><br>• A July 18, 2017 e-mail from Estey saying: "████████████████████████████████████████████████" MAXAR_0053004. With the presentation saying: "████████████████████████████████" MAXAR_0053005;<br><br>• A March 16, 2018 e-mail from Estey saying: "███████████████████████████████████████" MAXAR_0052499;<br><br>• A March 28, 2018 e-mail from Estey saying: "█████████████████████████████.'" MAXAR_0145293;<br><br>• An April 9, 2018 e-mail from Estey ████████████████████████████ "███████████." MAXAR_0052482; and<br><br>• A May 23, 2018 e-mail from Estey approving response to ████████████████████████; ████████████████████████████████ " and "████████████████████ |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|------|------------------------|
| | ███████████████████████████████████████ <br> ███████ MAXAR_0052252. |
| Gursky, Jason | Vice President of Investor Relations, and has served in this role since 2017, coming to Maxar from Citigroup where he was a U.S. aerospace and defense analyst. Gursky was ████████████████████████████████████ ████████████████████████ Gursky's contact information is part of Maxar's August 24, 2018 press release regarding the Spruce Point report. ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████. <br><br> Some specific examples of documents showing Gursky's knowledge of facts relevant to Plaintiff's claims include: <br><br> • A January 18, 2018 e-mail from Gursky telling ██████████████████ "███████████████" ███████████ "'[████ ██████" and "'[█████████████████████.'" MAXAR_0044122; <br> • A February 27, 2018 e-mail from Gursky to ██████████████ : "██████████████████████████████ ████████████████████████████████ ████████████████████████." MAXAR_0044228; <br> • A May 4, 2018 e-mail from Gursky stating: "█████████████ ██████████████████████████████████████ ██████████████████████████████" MAXAR_0044800; <br> • A June 8, 2018 e-mail from Gursky ████████████████ : ██████████████████████████████████████ ████████████████████████ |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ██████████████████████ .” MAXAR_0045406;<br><br>• A July 31, 2018 e-mail from Gursky stating: ███████████████████████████ ” MAXAR_0040232;<br><br>• An August 3, 2018 e-mail from Gursky to █████████████ : “ ████████████████████████████████████ .” MAXAR_0045682;<br><br>• An August 24, 2018 e-mail from Gursky to ████████████ : █████████████████████ ” MAXAR_0045627; and<br><br>• An October 18, 2018 e-mail concerning Maxar's ██████████████ “ ████████████████ ” MAXAR_0043477. |
| Harrah, Theresa | SSL's assistant controller. She has knowledge of SSL's accounting and internal controls, including any impairment procedures conducted at SSL. Harrah had involvement ████████████████████ . Further, Harrah was a main contact at ████████████████ |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|------|------------------------|
| | ████████████████████████████████████████████████████████████<br>████████████████████████████ .<br><br>Some specific examples of documents showing Harrah's knowledge of facts relevant to Plaintiff's claims include:<br><br>• On February 16, 2018, Harrah sent an e-mail █████████████████████████ ██████████████████ : "████████████████████ ████████████████" MAXAR_0363560-565;<br><br>• A February 23, 2018 management representation letter signed by Harrah regarding ████████ ████████ . MAX0000889;<br><br>• A June 13, 2018 e-mail from Harrah ████████████████████████████ ████ . PwC001518;<br><br>• Harrah was asked by ████████████████████████████ ███████████████████████ "██ ██████████████ ." MAXAR_0358228; and<br><br>• August 22, 2018 Audit Committee presentation which stated, ██████████████████ : "█ ████████████████████████████████ " and "███ ██████████████████ ." FRA00000814-816. |
| Hoegler, Darren | MDA's and Maxar's Assistant Controller, until he left at ████████████████ . He has knowledge of ████████████████████████████████████████████ ███████████████ Also, Hoegler has knowledge concerning ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ . |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|------|------------------------|
| | Some specific examples of documents showing Hoegler's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A December 15, 2017 e-mail from Hoegler to ███████████. MAXAR_0065262;<br><br>• In a February 2018 memorandum written regarding ███████ "██████" ██████ that stated: ████████████ MAXAR_0001922;<br><br>• On February 18, 2018, Hoegler and his team ████████████ : "████████████" DP_MAXAR_006101;<br><br>• On August 14, 2018, Hoegler e-mailed ████████████ "██████." MAXAR_0417625; and<br><br>• On August 15, 2018, Hoegler e-mailed from ████████ "████████" for "████████." Hoegler's "████████" are being ████████. MAXAR_0413275. |
| Lance, Howard | Named Individual Defendant. ████████████ |
| Lau, Angela | Senior Vice President of Finance and Corporate Strategy. Lau had involvement in and made numerous statements in documents that are relevant to Plaintiff's claims. For example, Lau ████████████ The |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .<br><br>Some specific examples of documents showing Lau's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A March 27, 2018 e-mail from Lau to ████████████████████████████ ██████████████████████████████████████████████ ." DP_MAXAR_005593-606 at 597;<br><br>• An April 30, 2018 e-mail from Lau to ████████████████████████ " That same day, ████████████████████████████████████████████████████████████████ . DP_MAXAR_005695-724 at 698, 718; and<br><br>• A May 4, 2018 e-mail from ████████████ to Lau providing questions about " ." including, "████████████████████████████████████████████████████████████████ ." DP_MAXAR_005728. |
| McCombe, William | Former CFO of Maxar from October 2017 until February 2018, and Senior Vice President and CFO of SSL MDA Holdings from 2016 to October 2017.  McCombe has personal knowledge of issues ████████████ |

- 11 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|------|------------------------|
|      | ███████████████████████████████████████████████████████████████████████████████████████ |
|      | Some specific examples of documents showing McCombe's knowledge of facts relevant to Plaintiff's claims include: |
|      | • An April 5, 2017 e-mail from McCombe to ███████████████████████████ : "█████████████████████████." MAXAR_0017457. Outline_includes "█████████████████████████████████ " " █████████████," " ██████████████████" and "█████████████████████████████." MAXAR_0017458; |
|      | • A May 24, 2017 e-mail from McCombe to ██████████████████ "███████" ██████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████." MAXAR_0017492; |
|      | • A December 14, 2017 e-mail from McCombe in response to ███████████████████ : "████████████████████████████." McCombe ██: "████████████████████████████████████████." MAXAR_0077903; |
|      | • A February 2, 2018 email from McCombe to ████████████████████████████████████: ██████████████████████████████████." MAXAR_0073355. The attachment shows that ████████████████████████████████████ MAXAR_0073356-358; and |

- 12 -

| Name | Plaintiff's Good Cause |
|------|------------------------|
| | • A February 5, 2018 e-mail and presentation from McCombe ██████████████████████ ████████████████████████. MAXAR_0073339-340. |
| Porter, Biggs | New Maxar CFO in 3Q18. As CFO, Porter had responsibility over finance and accounting, and accordingly has personal knowledge of the ███████████████████████████████████. Porter was responsible for Maxar's review of ████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████ Some specific examples of documents showing Porter's knowledge of facts relevant to Plaintiff's claims include: <br><br> • An August 7, 2018 e-mail from Porter to ████████████████████████: ███████████████████████████████████████████████████ ████████████████████████." MAXAR_0041986; <br><br> • An August 14, 2018 e-mail from Porter responding to ██████████ ███████████████████████████████, " ██████████████." MAXAR_0196247; <br><br> • An August 26, 2018 e-mail from Porter to █████████████████████: ██ ███████████████████████████████████████████████████ ████████████████." MAXAR_0063815; <br><br> • A September 12, 2018 e-mail ██████████████████████: ████████ ██████████." MAXAR_0063830; <br><br> • A September 26, 2018 e-mail from Porter to ███████████████████ ██████████████████████████████████████████████ "█ |

- 13 -

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████████████████████<br>██████████████████ ." MAXAR_0304122;<br><br>• An October 17, 2018 e-mail from Porter ██████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████ "<br>MAXAR_0063914;<br><br>• As alleged in the Complaint, on the October 31, 2018 conference call, Porter answered an analyst's question about the potential of more accounting charges for GeoCom in the future by stating: "I mean, every quarter, it's my obligation to look at everything and make sure that we're doing everything right, whether it's in accordance with IFRS or in accordance with GAAP, so that just will never change. And that's not something that is optional. But we did everything that we should do this quarter. We looked at it hard. And I think we, of course, then stand behind that from the standpoint of believing that we've captured what was supposed to be captured." ¶193;<br><br>• A November 5, 2018 e-mail from Porter ████████████<br>████████████████ : ██████████<br>██████████████████████████ ." MAXAR_0040655; and<br><br>• A December 6, 2018 e-mail from Porter saying: ██████████<br>████████████████████████████<br>██████████████████ ." MAXAR_0037439. |
| Stephenson, Bruce | Maxar Chief Strategy Officer until he left the Company in 2019. Stephenson has personal knowledge regarding the Company's ████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████████<br>████████████████████████ .<br><br>Some specific examples of documents showing Stephenson's knowledge of facts relevant to Plaintiff's claims include: |

- 14 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|------|------------------------|
|  | <ul><li>A May 2, 2017 Strategic ███████ ██: "████████████████████████████ ." MAXAR_0004120;</li><li>A November 1, 2017 ████████████████████████ : "████████████████ " " ████████████████ " and ████████ " MAXAR_0001243;</li><li>A November 13, 2017 e-mail from Stephenson to █████████████ : ████████████████████████████████████████████████████████████████ " " █████████████████████████████████████ ." MAXAR_0077977;</li><li>A May 17, 2018 e-mail from Stephenson to ██████████ " ████████ " " ████ "include, "████████████████████████████████████████████ ." MAXAR_0074830;</li><li>A May 29, 2018 e-mail confirming Stephenson's ████████████ : ████████████████████████████ " MAXAR_0075151;</li><li>A May 30, 2018 e-mail from Stephenson to █████████████ : "████████████████ ." MAXAR_0324445; and</li></ul> |

- 15 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | • A June 30, 2018 e-mail from Stephenson ███████████ : " ███████ ." MAXAR_0100950. |
| Torres, Jose | DigitalGlobe's Chief Accounting Officer ("CAO") and Maxar's CAO after the DigitalGlobe acquisition. Torres had involvement in and made numerous statements in documents that are relevant to Plaintiff's claims. ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████ .

Some specific examples of documents showing Torres' knowledge of facts relevant to Plaintiff's claims include:

• On December 15, 2017, Torres commented to ████████████ . ██████████ ." MAXAR_0065262;

• During 2018, Torres as CAO ████████████ ████████████ . KPMG-MAXAR-0002774-779;

• Torres reviewed the ████████████ . Maxar_0001788; Maxar_0001789;

• On May 2, 2018, Torres responded to ████████████ ." MAXAR_0043178;

• A July 16, 2018 e-mail from Torres ████████ : " ████████ " Maxar_0275766; |

- 16 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
|  | • On August 1, 2018, ███████████████████████ ███ : ██████████████████████████████████████ ██████████████████████████████████████████ " Maxar_0219791; and <br><br> • On August 9, 2018, ██████████████████████████ ███████ " ██████████████████████████████████ ████████████████████████████████████████ ." PwC015115. |
| Weber, Lance | Worked in PwC's Transaction Services group on engagements for Maxar and was later hired as the Segment Controller at Maxar immediately after Maxar publically disclosed the $383 million GeoCom impairment charge on October 31, 2018. Weber will be a critical witness that worked both ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████ . <br><br> Some specific examples of documents showing Weber's knowledge of facts relevant to Plaintiff's claims include: <br><br> • Weber was involved in ██████████████████████████ " ████ ." which stated: ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ ." PwC001563-626 at 611; |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | • The same June 2018 ███████████████████████████████████: "█████████████████████████████ ██████████████." PwC001563-626 at 605;<br><br>• On August 29, 2018 Weber wrote: "████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████" PwC013930;<br><br>• On October 22, 2018, Weber drafted "███████████████████████" for Maxar's █████████ ██████████████. PwC012314; and<br><br>• An October 24, 2018 e-mail from Weber in response to ██████████████████ ████████████████████████ "██████████ ████████████████████." PwC011805. |
| Wilkinson, Paul | SSL consultant and former SSL employee. Wilkinson has personal knowledge of ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████<br><br>Some specific examples of documents showing Wilkinson's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A January 19, 2018 e-mail from Wilkinson ████████████████████████ ██████████████████: ███████████████████████████████████████ █████████████████." MAXAR_0065596;<br><br>• A February 3, 2018 e-mail from Wilkinson saying: "███████████████████████ ███████████████████████████████████████ |

- 18 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████████████████████████████ ████████ " MAXAR_0200696;<br><br>• A February 17, 2018 e-mail from Wilkinson to ████████ : ████████████████████████████████████████████████ " DP_Maxar_006055; and<br><br>• An October 31, 2018 e-mail from Wilkinson, ████████████████████████ ," saying: " ████████████████ " MAXAR_0143317; In the same e-mail chain, Wilkinson on November 1, 2018 tells ████████ : " ████████████████████████ ." *Id.* |
| Windrum, Jill | One of Maxar's technical accountants along with Jose Torres. Windrum made numerous statements in documents and was involved in issues that are relevant to Plaintiff's claims. For example, ████████████████████████████████████████████████████████████████████████████████████████████ |

- 19 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|------|------------------------|
|  | Some specific examples of documents showing Windrum's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A February 27, 2018 e-mail from Windrum where she ████████ "████████." and the next day ████████ Maxar_0200602-603;<br><br>• An April 23, 2018 e-mail where Windrum is commenting ████████ "████████." MAXAR_0043164;<br><br>• 1Q18 and 2Q18 quarterly ████████. Maxar_0001788; Maxar_0001789;<br><br>• A December 18, 2017 e-mail from Windrum regarding ████████: "████████" MAXAR_0065276;<br><br>• An October 12, 2018 e-mail from Windrum stating ████████ "████████." MAXAR_0065394. ████████: "████████." MAXAR_0065399; and<br><br>• An October 23, 2018 e-mail from Windrum to ████████: "████████." PwC011805. |
| Wiresekara, Anil | Named Individual Defendant. ████████ |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|------|------------------------|
| Zamarian, Dario | SSL President from June 2017 to April 2019. Author of numerous relevant documents regarding ███████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████.<br><br>Some specific examples of documents showing Zamarian's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A November 13, 2017 e-mail from Zamarian saying: ███████████ ████████████████████████████████████ ██████." MAXAR_0077977;<br><br>• A December 3, 2017 e-mail from Zamarian saying: ██████████ ██████████████████████████████████████████████" MAXAR_0242340;<br><br>• A March 18, 2018 e-mail from Zamarian responding to the suggestion to "███████████" saying: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" MAXAR_0049851;<br><br>• A March 22, 2018 e-mail from Zamarian to ██████████████: "███████████████████████████████████████████████████████████." MAXAR_0072678;<br><br>• An April 4, 2018 e-mail from Zamarian saying: ███████████████████████████████████████████" MAXAR_0146751;<br><br>• An April 30, 2018 e-mail from Zamarian to ██████████████: ███████████████████████████████████████████" MAXAR_0146432; |

- 21 -

| Name | Plaintiff's Good Cause |
|---|---|
|  | • A May 4, 2018 e-mail from Zamarian, following an ██████████████████████████ " ████████████ " over the " ████████████████████████ ," saying: " ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ." MAXAR_0242659; and<br><br>• A July 6, 2018 e-mail from Zamarian in response to a request to ████████████████ ██████████████████████████████████ being told to investors saying: " ██████ ██████████████████████████████ ." MAXAR_0078589. |
| KPMG Canada (witness: Phil Dowad) | KPMG Canada was Maxar's auditor during the 2017 audit, 1Q18 quarterly review and part of the 2Q18 quarterly review. On July 29, 2018, only two days before Maxar issued its 2Q18 financial statements, KPMG Canada was replaced by KPMG US as Maxar's auditor. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████<br><br>Some specific examples of documents showing Dowad's and KPMG Canada's knowledge of facts relevant to Plaintiff's claims include:<br><br>• KPMG Canada's 2017 workpapers show ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ MAX0000883. ████████████████████████████████████████ *Id.*;<br><br>• An August 21, 2018 e-mail from Dowad providing ████████ ████████████████████████████████████████ . FRA00000749; and |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
|  | • An October 24, 2018 e-mail from Dowad to ██████████████ ████████ ██ :██████ ████████ ██████ ." KPMG-MAXAR-0008378.<br><br>Importantly, ████████████████████████████<br>████ *See* Defendants' Amended Answer to the Plaintiff's Consolidated Complaint which states: "The financial statements at issue here were audited by a 'Big Four' accounting firm, and to date, have never been restated." ECF No. 83 at 3. |
| KPMG US (witness: Michael Kraehnke) | KPMG US was Maxar's auditor during portions of the 2Q18 quarterly review, 3Q18 quarterly review and 2018 audit of Maxar's financial statements. Kraehnke ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████<br><br>Some specific examples of documents showing Kraehnke's and KPMG US's knowledge of facts relevant to Plaintiff's claims include:<br><br>• On August 21, 2018, Kraehnke provided comments on a ██████████████ ████████████████████████████████ ████████████████ ." FRA00000759-766 at 761;<br><br>• Regarding the 3Q18 GeoCom ██████████████████ ████████████████████████████████████████ ████████████████ " ██████ " [2018]. KPMG-MAXAR-0011874; |

| Name | Plaintiff's Good Cause |
|---|---|
|  | • In addition, Kraehnke was involved in ███████████████ ████████████████████████████. KPMG-MAXAR-0011847-852; and <br><br> • KPMG US also noted in its ████████████████ "█████████████████████████ ███████████████████████████████████." KPMG-MAXAR-0017080. <br><br> Importantly, Defendants have ████████████████████████ █████. <br><br> • *See* Defendants' Amended Answer to Plaintiff's Consolidated Complaint which states: "Moreover, when a well-known short seller issued a report suggesting that an impairment of the GeoComm business was imminent (one of the alleged 'corrective disclosures' pled in this case), the Audit Committee – aided by the Company's independent auditor and outside subject matter experts – undertook a comprehensive review. At the conclusion of this review, the Company and its outside advisors determined, and Maxar publicly announced, that there were no material errors in the Company's financial statements and public disclosures." ECF No. 83 at 2. |
| Duff & Phelps (witness: Judd Schneider) | Duff & Phelps is a key third-party in this litigation and ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████ |

- 24 -

| Name | Plaintiff's Good Cause |
|------|------------------------|
|  | Some specific examples of documents showing Schneider's and Duff & Phelps' knowledge of facts relevant to Plaintiff's claims include:<br><br>• A February 18, 2018 e-mail from Schneider stating: "██████████████████████████████████████ ██████████████████████████" DP_MAXAR_006047;<br><br>• A February 19, 2018 e-mail from Schneider stating: ██████████████████ █ ████████ ██ ██ ██ ██ ██ ██ ██ " DP_MAXAR_006068;<br><br>• Duff & Phelps issued an April 2, 2018 report titled "████████████████████████ ██████████," which ██████ █████ Maxar_0001608-642 at 639. ██████████████████████████ MAXAR_0067664;<br><br>• An April 24, 2018 e-mail from ██████████████████████: ██████ ████████████████████████████████ ████████████████████████████." DP_Maxar_005898; and<br><br>• ██████████████████████████ ██████████████████████████ ██████████████████████ DP_MAXAR_005695-724. ████████████████. *Id.* |
| Bain & Co. (witness: Tina Radabaugh) | Bain consulted Defendants and other key executives ██████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ |

- 25 -

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████████        ¶70. Radabaugh is a partner at Bain that was working with ██████████ ████████. <br><br> Some specific examples of documents showing Radabaugh's and Bain's knowledge of facts relevant to Plaintiff's claims include: <br><br> • A July 27, 2017 Bain presentation for ████████████: "████████████ ████████" BAIN-MAXAR_00001033. The same slide contained a graph showing ████████████ ████████. *Id.*; <br><br> • An October 16, 2017 Bain presentation at slide 4 states: "████████████ ████████." BAIN-MAXAR_00001324; <br><br> • An October 2017 Bain presentation for ████████████: "████████████ ████████." Slides 5 and 19 ████████████. BAIN-MAXAR_00001039; and <br><br> • A May 14, 2018 e-mail from Radabaugh ████████████ "████████" or "████████," Radabaugh stated: "████████████." MAXAR_0078563. |
| Financial Reporting Advisors (witness: Scott Taub) | Taub works for Financial Reporting Advisors ("FRA") and was consulted on ████████████ ████████████████████████████████████████ |

- 26 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ███████████████████████████████████ ████████████████████████████ . <br><br> Some specific examples of documents showing Taub's and FRA's knowledge of facts relevant to Plaintiff's claims include: <br><br> • On January 11, 2018, Jill Windrum reached out to Taub stating: ███████ ████████████████████████████████████████ ████████████████████████████████████ ."  MAXAR_0067678.  On January 12, 2018 Taub responded to Windrum with "███████████████████████████████████ ." *Id.*; <br><br> • On August 21, 2018, Taub in ██████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ." FRA00000880-887 at 882; and <br><br> • On August 23, 2018, Taub e-mailed comments to ████████ ████████████████████████████████████ ████████████████████████████████████ ." FRA00000876. |
| Joele Frank (witness: Kara Brickman) | Joele_Frank_assisted_Maxar_with_its ███████ ████████████████████████████████████ ████████████████████████████████████ |

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████████████████████<br><br>Some specific examples of documents showing Joele Frank's knowledge of facts relevant to Plaintiff's claims include:<br><br>• On August 7, 2018, while in the process of ████████ "████████ ." JFWBK_00002326;<br><br>• On August 7, 2018, a Joele Frank representative internally noted: ████████ ." JFWBK_00002674; and<br><br>• On August 27, 2018, a Joele Frank ████ : "████ ." JFWBK_00000705. |
| PJT Partners and/or Goldman Sachs (witness, unknown at this time) | PJT Partners and Goldman Sachs were responsible for ████████████ |

- 28 -

4887-0018-8681.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ██████████████████████████████████████████████████████████████████████████<br><br>Some specific examples of documents showing PJT Partners' and Goldman Sachs' knowledge of facts relevant to Plaintiff's claims include:<br><br>• A June 11, 2018 Maxar presentation titled "████████████████████" included a slide titled "████" that stated: "████████████" and "[g]████████████████████████████." MAXAR_0075642;<br><br>• A June 12, 2018 e-mail from ████████████████████ "████" ████████████████████████████. MAXAR_0239124-127; and<br><br>• A June 19, 2018 e-mail to the ████████████████: ██████████████████████████████████████ " MAXAR_0074893, responded: ████████████████████████████████████████████████." *Id.* |

- 29 -

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 10, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Trig R. Smith
TRIG R. SMITH

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  trigs@rgrdlaw.com

4889-0905-8825.v1

# Mailing Information for a Case 1:19-cv-00124-WJM-SKC Oregon Laborers Employers Pension Trust Fund et al v. Maxar Technologies Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey S. Abraham**
  jabraham@aftlaw.com

- **Jeffrey Allen Berens**
  jeff@jberenslaw.com,jeffreyberens@comcast.net

- **Spencer A. Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew W. Close**
  mclose@omm.com,matthew-close-5511@ecf.pacerpro.com,mleu@omm.com

- **Nicole Gilliland**
  ngilliland@rgrdlaw.com

- **Patton L. Johnson**
  pjohnson@rgrdlaw.com,TerreeD@rgrdlaw.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brittany Allison Rogers**
  brogers@omm.com

- **Henry Rosen**
  henryr@rgrdlaw.com,dianah@rgrdlaw.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,panderson@rgrdlaw.com,ChristC@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerome H. Sturhahn**
  jsturhahn@shermanhoward.com,efiling@shermanhoward.com,jbulanow@shermanhoward.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Phillup G  Newhope
,

Logan Durant
,

Case No. 1:19-cv-00124-WJM-SKC    Document 129    filed 01/10/22    USDC Colorado    pg 176 of 176

**Michael W Slaunwhite**

,