**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA,

      Defendants.

---

**JOINT DISCOVERY DISPUTE REPORT**

---

4868-8830-6704.v1

Plaintiff Oregon Laborers Employers Pension Trust Fund ("Plaintiff") and Defendants Maxar Technologies Inc., Howard L. Lance, and Anil Wirasekara ("Defendants," and collectively with Plaintiff, the "Parties") hereby submit this Joint Discovery Dispute Report pursuant to the Court's Minute Order re: [129] Statement filed by Oregon Laborers Employers Pension Trust Fund (Dkt. 134), and as Defendants contend, the Court's Order Setting Discovery Briefing (Dkt. 127).

## I. NAMES OF ATTORNEYS WHO PARTICIPATED IN THE DISCOVERY CONFERRALS

The following attorneys participated in the telephonic conferrals among the Parties:

1. Attorneys for Defendants: Brittany Rogers, Jonathan Waxman and Kate Ikehara.

2. Attorneys for Plaintiff: Trig Smith, Nicole Gilliland, Christopher Stewart, Henry Rosen, Patton Johnson and Spence Burkholz.

3. Attorneys for plaintiff in the related case pending in Santa Clara County Superior Court in California, *In re Maxar Technologies Inc. Shareholder Litigation*, Case No. 19CV357070 (the "State Action"), also participated in discovery conferrals related to the deposition coordination protocol.[1]

## II. DATE TELEPHONIC CONFERENCES WERE HELD AND AMOUNT OF TIME THE PARTIES CONFERRED

1. December 1, 2021: Approximately fifty minutes.

2. December 20, 2021: Approximately twenty minutes.

3. December 30, 2021: Approximately forty minutes.

4. January 4, 2022: Approximately one hour.

---

[1] Defendants filed a Notice of Related Cases on October 18, 2021. (Dkt. 119.)

- 1 -

4868-8830-6704.v1

5.      February 23, 2022:  Approximately one hour.

6.      February 25, 2022:  Approximately thirty minutes.

## III.    MATTERS THAT WERE RESOLVED BY AGREEMENT

As the Court is aware, the State Action is a consolidated class action alleging violations of the Securities Act of 1933, which Defendants assert involves substantially similar allegations. Defendants proposed entering into a deposition coordination protocol ("Protocol"), among the Parties and the State Action plaintiff, in order to facilitate the deposition process, avoid duplicative depositions to the extent practicable (including multiple depositions of the same witness absent good cause), and resolve or narrow the issues required to be escalated to the Court.  Plaintiff agreed in principle that deposition cooperation among the Parties and State Action plaintiff might be appropriate, and has worked to agree on a Protocol with Defendants.  The Parties and the State Action plaintiff have agreed on the majority of terms in the Protocol.

## IV.    SPECIFIC MATTERS THAT REMAIN TO BE HEARD AND DETERMINED

### A.    Deposition Coordination Protocol

The Parties disagree about whether the Protocol should: (1) address Plaintiff's request to take 26 percipient witness depositions (Protocol, ¶9); and (2) prevent Defendants' counsel from having any contact with a witness concerning the substance of the witness's first day of testimony during the pendency of the deposition (*id*., ¶18).

### B.    Plaintiff's Request to Take 26 Depositions

The Parties disagree about whether: (1) Plaintiff has sufficient good cause to expand the 10 deposition presumptive limit set out in Federal Rule of Civil Procedure 30(a)(2)(A)(i) and this

- 2 -

Court's Scheduling Order (Dkt. 77); and (2) costs should be shifted for percipient witness depositions in excess of 10.

## V. DETAILED EXPLANATION OF THE REASONS WHY AGREEMENT COULD NOT BE REACHED

### A. Defendants' Positions Regarding Remaining Disputes

The Parties recognize the potential benefits of deposition coordination and agree that a protocol is proper under fair terms. The Parties and the State Action plaintiff have agreed on most of the key terms in the Protocol. One roadblock remains, however: Plaintiff has attempted to use the Protocol as a means to expand its rights beyond discovery permissible under the Federal Rules of Civil Procedure and this Court's October 28, 2020 Scheduling Order (Dkt. 77) (the "October 2020 Order"). Without having taken a single deposition, Plaintiff has tried to use the Protocol to circumvent the 10 deposition limit set by this Court. *See* October 2020 Order at 7 ("Each side is limited to 10 depositions."). But the purpose of the Protocol is to facilitate coordination and promote efficiency. Any requests for modification of the October 2020 Order should be addressed separately under the Court's established procedures and applicable legal standards. Accordingly, Defendants request that this Court enter the Protocol (Defs. Ex. A) with Defendants' proposed terms without prejudice to any Parties' ability to seek modifications of the  October 2020 Order under the applicable procedures and legal standards.

#### 1. Deposition Protocols are Widely Accepted as Appropriate and Optimal to Coordinate Discovery Between Overlapping Actions.

To help secure the "just, speedy, and inexpensive determination of every action," Fed. R. Civ. P. 1, courts often require parties to coordinate discovery in related matters pending in state and federal courts. *See, e.g.*, *In re General Motors LLC Ignition Switch Litg.*, 2015 WL 13820855, at *2 (S.D.N.Y. Feb. 23, 2015) (entering a deposition coordination protocol "to minimize the expense and

- 3 -

inconvenience of this litigation by providing for a single deposition of any witness common to the various proceedings"). The Federal Judicial Center's Manual for Complex Litigation explains that "[s]tate and federal judges, faced with the lack of a comprehensive statutory scheme, have undertaken innovative efforts to coordinate parallel or related litigation so as to reduce the costs, delays, and duplication of effort that often stem from such dispersed litigation." Federal Judicial Center, Manual for Complex Litigation § 20.31 (4th ed. 2004, May 2021 Update).

Here, there is significant overlap between the allegations in this action and in the State Action. Plaintiffs in both cases challenge Maxar's accounting practices as applied to its geosynchronous communications ("GeoComm") business. Specifically, plaintiffs in both actions allege that Maxar did not timely write down its GeoComm assets based on alleged "indicators of impairment." *Compare* Defs. Ex. B, State Action Compl. ¶¶ 47, 59, 88, *with Oregon Laborers* Compl. ¶¶ 5–6, 60 (Dkt. 44.) These "indicators" are largely consistent across the two cases. Both plaintiffs cite the deteriorating GeoComm market, Maxar's strategic goals for its GeoComm business, and GeoComm's business levels. *Compare* Defs. Ex. B, State Action Compl. ¶¶ 47, 53, 55, 63–64, 73, *with* Oregon Laborers Compl. ¶¶ 60–61, 70–73, 76–77, 80–86 (Dkt. 44.) As a result, both plaintiffs intend to depose nearly all of the same witnesses from Maxar's current or former executive teams, accounting teams, and GeoComm line of business. Their respective witness lists underscore the overlap—Plaintiff wants to depose every single Maxar witness (current or former employee) on the State Action plaintiff's proposed list with one addition. *Compare* Defs. Ex. C, Plaintiff's Proposed List, *with* Defs. Ex. D, State Action Plaintiff's Proposed List.

- 4 -

### 2.    The Proposed Deposition Coordination Protocol is Efficient and Fair.

The goal of the Protocol,[2] as proposed, is to facilitate coordination without materially restricting *or* expanding any Party's rights.  For example, the Protocol allows Plaintiff to freely select its depositions and specifies that Plaintiff will have seven hours of time on the record in each coordinated deposition—i.e., the allotted time under the Federal Rules.  *See* Protocol ¶ 13.  The main requirement is that Plaintiff's counsel work with counsel in the State Action on scheduling.  *See id.* ¶ 18.  If, however, either plaintiff elects not to participate in a particular deposition, then that plaintiff may not later seek to depose the same witness (absent good cause).  *See id.* ¶ 7.  Any deposition that Plaintiff elects to participate in will count against the limits ordered by the Court.  *See id.* ¶ 8.

The primary sticking point has been Plaintiff's insistence that the Protocol address not only coordination procedures, but also the number of depositions available to Plaintiff.  In other words, Plaintiff has attempted to use this as an opportunity to increase in its overall deposition limits. Defendants' proposals for the disputed terms in the Protocol aim to maximize efficiency, eliminate ambiguity, and accommodate the Parties' expressed goals, and should be adopted.  If Plaintiff wants to move this Court to modify its October 2020 Order, that is a separate matter.  Defendants request that the Court order a deposition coordination protocol for this case, reject Plaintiff's attempt to fuse two unconnected issues (coordination and deposition limits), and adopt Defendants' proposals on disputed terms.

### 3.    The Protocol Should Not Address Plaintiff's Deposition Limits.

The Court has already ordered that Plaintiff is limited to 10 depositions.  *See* October 2020 Order.  The Protocol is not the appropriate vehicle for modifying this Court's Order because the

---

[2]    The parties in the State Action submitted a nearly identical proposed protocol for the Hon. Sunil Kulkarni of the Santa Clara County Superior Court to consider and approve.  That proposal is attached as Defs. Ex. E.

4868-8830-6704.v1

Protocol is a durable document that functions whether Plaintiff's deposition limit is 10, 12, 15, or any other number: it does not, and should not, affect the deposition limits imposed by the Federal Rules or this Court. *See* Protocol ¶ 10. If Plaintiff can make a particularized showing that it needs additional depositions at a later date, Defendants will meet and confer in good faith with Plaintiff at that time. If the Court permits more depositions, the Protocol will still apply. But this is not the time, and the Protocol is not the place, to address Plaintiff's request for increased deposition limits, and Plaintiff should not be rewarded with additional depositions for stymieing the coordination process for over three months.

Because coordination procedures and deposition limits are separate concepts, Defendants have proposed, "Nothing in this protocol alters, changes, or impacts the provisions of Federal Rule of Civil Procedure 30(a)(2)(A)(i)." Protocol ¶ 10. Plaintiff, by contrast, has proposed that "it shall be allowed to take up to 26 depositions of percipient witnesses in this case" even though it has not yet taken any depositions and certainly has not made any showing of good cause to modify the limits reaffirmed in the Court's October 2020 Order. *Id*. The Protocol, which provides a framework for deposition coordination, need not include a provision that addresses Plaintiff's request to take 26 depositions—the Protocol applies irrespective of the particular limit set by this Court. Accordingly, the Court should adopt Defendants' proposal in paragraph 10 and strike Plaintiff's request for a term allowing it to take 26 depositions at this time.

### a. Plaintiff Has Not Made a Particularized Showing to Exceed Ten Depositions.

Plaintiff's insistence that the Protocol address the number of depositions available to it has resulted in a dispute that is not ripe for the Court's intervention. Without having taken a single deposition, Plaintiff asks this Court for nearly triple the number of depositions previously set by this Court. But because Plaintiff has not taken any depositions, let alone exhausted its 10 deposition limit, Plaintiff's purported need for additional depositions is wholly speculative and premature.

- 6 -

4868-8830-6704.v1

"Most courts hold that in order to make a 'particularized showing,' moving parties must, at a minimum, 'ordinarily exhaust their allowed number of depositions before making a request for additional' depositions." *Acosta v. Sw. Fuel Mgmt., Inc.*, 2017 WL 8941165, at *7 (C.D. Cal. Sept. 19, 2017); *see Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2006 WL 6487632, at *6 (D.N.J. Aug. 22, 2006) (failure to exhaust available depositions prevents an "informed determination of whether their proposed additional depositions would satisfy the standard promulgated in Federal Rules 30(a)(2)(A) and 26(b)(2).").

"A party seeking to exceed the presumptive limit [of 10 depositions] bears the burden of making a 'particularized showing' of the need for additional depositions." *Thykkuttathil v. Keese*, 294 F.R.D. 597, 600 (W.D. Wash. 2013). Plaintiff has made no such showing.

First, Plaintiff attempts to downplay the significance of this Court's prior order. *See* October 2020 Order. But as another court in this district has recognized, a party must demonstrate good cause to depart from deposition limits set in a scheduling order. *See Medcorp, Inc. v. Pinpoint Techs., Inc.*, 2009 WL 1049758, at *5 (D. Colo. Apr. 20, 2009) ("A party may seek amendment of a Scheduling Order by making a showing of good cause for the amendment."). Plaintiff cannot make that showing "merely by demonstrating that many people could have discoverable information," *id*., as that is true across the board in federal cases.

Here, the transcript from the hearing on the October 2020 Order reflects that Plaintiff did not have good cause to take more than 10 depositions in October 2020, and it does not have good cause now. *See* Hearing Transcript at 4 ("If we have a basis for more, then we'll first meet and confer with Defendants and then seek leave of Court, if necessary."). By the time of the October 28, 2020 conference, Plaintiff had already served its initial disclosures identifying 20 witnesses between Defendants and current and former Maxar individuals, the majority of whom are now on Plaintiff's

proposed list of 26 deponents. *Compare* Defs. Ex. F, Plaintiff's October 21, 2020 Initial Disclosures at 2–4, *with* Defs. Ex. C, Plaintiff's Proposed Deponent List.

All that has changed since Plaintiff lacked good cause for additional depositions in October 2020 is that Plaintiff has received: (1) document productions; and (2) Defendants' Amended Initial Disclosures, which list *one* additional Maxar witness. Based on the produced documents and Amended Initial Disclosures, Plaintiff argues that there are more than 10 individuals who have information relevant to the case. But plaintiffs in most complex cases can make the same argument, yet the 10 deposition limit in the Federal Rules is regularly enforced. Indeed, "the mere fact that more than ten individuals may have discoverable information in a case does not mean that taking more than ten depositions makes sense." *Lawson v. Spirit AeroSystems, Inc.*, 2020 WL 1285359, at *8 (D. Kan. Mar. 18, 2020). "The purpose of the limitation in [Rule 30(a)] is to force counsel to think long and hard about who they want to depose and to depose only those who are really important." *Id.* Plaintiff has failed to do so here. *See id.* (rejecting plaintiff's request for additional depositions despite defendant's identification of 16 potential witnesses in initial disclosures and proposed deponents' inclusion on produced documents because plaintiff failed to show that the proposed witnesses were not duplicative).

Plaintiff simply does not have good cause to justify tripling its deposition limits. Taking a close look at just three of Plaintiff's proposed witnesses shows why:[3]

***John Celli.*** Plaintiff has argued that it needs to depose Mr. Celli based on his knowledge of challenges in the GeoComm business. But Mr. Celli retired in June 2017, nearly one year *before* the class period even began. Plaintiff has not cited any emails from Mr. Celli during the relevant time

---

[3]   The Court's February 17, 2022 Minute Order (Dkt. 134) prohibits the parties from including exhibits with extraneous argument. Defendants have not included an exhibit that responds to the evidence cited by Plaintiff in its improper January 10, 2022 submission, but would be happy to do so if it would aid the Court.

- 8 -

period, let alone any documents relevant to the challenged statements in this matter. And in any event, the 2017 documents that Plaintiff previously cited to support a deposition of Mr. Celli include several other witnesses on Plaintiff's proposed list. *See, e.g.*, MAXAR_0035500 (email chain involving including Paul Estey and Dario Zamarian); MAXAR_0017485 (email chain with Howard Lance that identifies Rich Currier, another proposed witness, as having responsibility for forecasting).

***Edward Chou.*** Plaintiff has argued that it needs to depose Mr. Chou because he was purportedly involved in the preparation of various accounting-related documents. But because Plaintiff has not taken a single deposition to understand the accounting procedures at Maxar, Plaintiff fails to grasp Mr. Chou's role—largely gathering information at the direction of others. The documents Plaintiff has cited to justify his deposition do not suggest otherwise. *See, e.g.*, MAX0000039 (accounting policy memorandum dated December 31, 2012—approximately six years before the class period—which notes that Mr. Chou had non-substantive discussions with KPMG regarding corporate organization and testing methodologies); MAXAR_0067663 (non-substantive email where Mr. Chou simply attaches a goodwill impairment test).

***Angela Lau.*** Plaintiff has argued that it needs to depose Ms. Lau because she was involved in tax planning analysis in 2018. Taxes are not an issue framed by the pleadings. The same external consultant, Duff & Phelps, supported Maxar's 2018 tax planning and its year-end 2017 impairment analysis, but the work was distinct. In any event, Plaintiff has only pointed to Ms. Lau's signature on the 2018 Duff & Phelps engagement letter to support its quest to take her deposition. *See, e.g.*, DP_Maxar_005593 ("Please find attached the signed engagement letter."). Plaintiff has not cited a single document reflecting any substantive involvement by Ms. Lau in issues relevant to this litigation.

4868-8830-6704.v1

These are just examples, but they underscore Plaintiff's overreach based on documents produced to date.

> **b.     Plaintiff's Deposition List is Overly Broad, Cumulative, and Duplicative.**

It is not surprising that Plaintiff is unable to make a particularized showing of good cause to take 26 depositions.  Plaintiff's proposed list includes witnesses who are identified to testify about the same topics without differentiation, as well as witnesses who are not even relevant to this action. Plaintiff's request is thus excessive, duplicative, unduly burdensome, and not proportional to the needs of the case.

Plaintiff's proposed list includes witnesses with only a passing connection to the case, as well as many witnesses whose work at Maxar and its predecessor companies overlaps with one another. "[P]arties are not entitled to go on a fishing expedition through discovery on the chance that the greater the number of depositions they take, the more likely it is that the deponents will remember or provide key information." *Medcorp,* 2009 WL 1049758, at *5.  Yet that appears to be Plaintiff's primary argument here.

First, Plaintiff's proposed list includes many individuals who are not necessary witnesses because: (1) they were not employed at Maxar or its predecessor companies at any point during the time period relevant to Plaintiff's claims (like former operating company CEO, John Celli, who left over a year before Plaintiff alleges that impairments should have been taken); or (2) they appear to lack a meaningful connection to Plaintiff's substantive allegations, which should become clear once Plaintiff begins taking depositions.

Second, Plaintiff's list includes many cumulative witnesses.  Plaintiff provided a summary of the testimony it seeks to elicit from each, and the duplication is clear on the face of that summary. *See* Defs. Ex. C, Plaintiff's Proposed List.  For example, Plaintiff seeks to depose at least:

- 10 -

4868-8830-6704.v1

- Four different witnesses (Rich Currier, Paul Estey, William McCombe, and Tina Radabaugh) about the retention and work of Bain & Company in 2017— a year before the class period and a subject only tangentially connected to Plaintiff's claims;

- Three different witnesses (John Celli, Rich Currier, and Dario Zamarian) about GeoComm challenges in the business and industry;

- Several duplicative witnesses within particular accounting teams (Jose Torres, Jill Windrum, Lance Weber, Darren Hoegler, Edward Chou, and Paul Wilkinson);

- Three different witnesses (Paul Estey, Bruce Stephenson, and Tina Radabaugh) on corporate strategy; and

- Three different Maxar CFOs (Anil Wirasekara, an interim CFO for a period of 6 months, William McCombe, and Biggs Porter—an individual who joined Maxar only *after* Plaintiff claims impairments should have been taken), plus several members of various teams reporting to them who worked together and do not appear to possess unique information.

Where, as here, a party seeks cumulative or duplicative testimony, courts regularly reject motions to increase deposition limits. The *Lawson* decision from Kansas is instructive. *Lawson v. Spirit AeroSystems, Inc.*, 2020 WL 1285359, at *8 (D. Kan. Mar. 18, 2020). There, the plaintiff sought to take fourteen fact depositions—almost half of the number Plaintiff is asking to take now. Although the *Lawson* plaintiff demonstrated that the additional witnesses might have relevant information, including because they appeared on documents produced by defendant and in defendants' initial disclosures, the court denied the plaintiff's request because he failed to show that the proposed witnesses were not duplicative. *See Lawson*, 2020 WL 1285359, at *6–8 ("Lawson has not shown that Reed and Mapel would provide testimony on subject matter that Crossman and Rabe are not already covering. Their depositions therefore appear to be unreasonably cumulative and

- 11 -

duplicative."). Like in *Lawson*, the Court should reject Plaintiff's request because its proposed list is cumulative and duplicative.

Plaintiff's suggestion in its improper January 10, 2022 submission that it needs more depositions because a "plethora" of witnesses authored various documents is unavailing. In *Alaska Elec. Pension Fund v. Pharmacia Corp.*, the court rejected a similar argument in a securities class action suit. Like Plaintiff here, the Alaska Electrical Pension Fund argued that plaintiffs needed more depositions due to the complexity of the case, and specifically, because each of the proposed deponents "saw and heard different events relevant to plaintiffs' claims." *Alaska Elec. Pension Fund*, 2006 WL 6487632, at \*5. The court rejected plaintiffs' request, explaining that "Plaintiffs must be mindful that the particular information sought in additional depositions must also be necessary to their case, and thus not cumulative or duplicative of other testimony." *Id*. In doing so, the court highlighted areas of "significant overlap" in plaintiffs' proposed list, including "Plaintiffs['] wish to depose all of the authors" of a study relevant to plaintiffs' claims. *Id*. Like in *Alaska Elec. Pension Fund*, Plaintiff has failed to demonstrate that its proposed depositions will not be cumulative or duplicative. And without having deposed a single witness, Plaintiff cannot make that showing. *See id*. at \*4 ("[T]he complexity of the case underscores the Court's role in ensuring that the massive volume of potentially relevant information does not become an obstacle to efficient resolution of the matter. The Court best satisfies this role by evaluating any motion for leave to take additional depositions against the backdrop of information already obtained in permitted depositions.").

Having failed to show the need to take 26 fact depositions, Plaintiff's request should be denied without prejudice to Plaintiff requesting additional depositions if they become necessary at a later date. *See Radiant Glob. Logistics, Inc. v. BTX Air Express of Detroit, LLC*, 2020 WL 1933818, at \*4 (E.D. Mich. Apr. 22, 2020) (denying request for additional depositions despite the fact that

- 12 -

additional witnesses "authored these critical documents and/or were involved in these events" because parties had "ample opportunity for discovery without the necessity of additional depositions").

### c.    Cost Shifting Should be Ordered for Depositions In Excess of 10

If the Court permits Plaintiff to take more than 10 depositions, particularly at this juncture when Plaintiff has yet to take a single deposition, Defendants request that the Court enter a cost-shifting order for the excess depositions, consistent with the 1993 Advisory Committee Note to Federal Rule of Civil Procedure 30(a)(2).  *See San Francisco Health Plan v. McKesson Corp.*, 264 F.R.D. 20, 21 (D. Mass. 2010) (ordering that the party seeking additional depositions "shall pay the reasonable costs, including attorney's fees, incurred by the [opposing party] with respect to the additional four depositions.").  Defendants request that the order cover costs and attorneys' fees for attending and preparing for the excess depositions.  *See Advanced Sterilization Prods., etc. v. Jacob*, 190 F.R.D. 284, 287 (D. Mass. 2000) (party may recover from counsel for opposing party the "reasonable costs, including attorney's fees, incurred in taking the eleventh and twelfth depositions"—i.e., depositions exceeding the 10 deposition limit).

### 4.    Plaintiff's Request to Limit Attorney-Client Communications Finds No Support in the Law or Circumstances of the Case

Plaintiff initially requested that witnesses sitting for multi-day depositions be made available on consecutive days.  Defendants agreed to use good-faith efforts to make witnesses represented by O'Melveny available on back-to-back calendar days.  Protocol ¶ 19.  But many of the relevant witnesses no longer work for Maxar and have full-time jobs with other organizations, so their schedules are not within Maxar's control.  In the event that witnesses cannot be available for two back-to-back calendar days during the requested timeframe, Defendants have agreed that, absent a

- 13 -

showing of good cause, they will propose two dates within a five day period. *Id*. These reasonable scheduling arrangements have not satisfied Plaintiff.

Instead, preemptively accusing defense counsel of trying to engage in improper coaching of witnesses, Plaintiff seeks to restrict contact between defense counsel and their clients during depositions. *See* Protocol ¶ 19 (Plaintiff's proposal: "During the pendency of each deposition, there shall be no contact between counsel and the witness concerning the substance of the witness's first day of testimony."). Plaintiff's proposal directly conflicts with clear authority from this district. *See Cannon v. Time Warner NY Cable LLC*, 2015 WL 2194620, at *1 (D. Colo. May 7, 2015) ("[T]here is no bar on attorney consultation with a client during the client's deposition, as a general matter—so long as no question is pending."); *McKinley Infuser, Inc. v. Zdeb*, 200 F.R.D. 648, 650 (D. Colo. 2001) (holding that the truth-finding function of deposition "is adequately protected if deponents are prohibited from conferring with their counsel while a question is pending; other consultations, during periodic deposition breaks, luncheon and overnight recesses, and more prolonged recesses ordinarily are appropriate"). Defense counsel intends to comply with all applicable rules governing interactions with clients and witnesses, but Plaintiff's unduly restrictive proposal is not based on reasoned authority. On the contrary, Plaintiff has only offered *Perry v. Leeke*, 488 U.S. 272 (1989), to support its position—a case involving a criminal defendant's Sixth Amendment right to assistance of counsel. There, the U.S. Supreme Court simply held that "the Federal Constitution does not compel every trial judge to allow the [criminal] defendant to consult with his lawyer while his testimony is in progress if the judge decides that there is a good reason to interrupt the trial for a few minutes." *Id*. at 284-85. *Perry* has no conceivable relation to this case.

- 14 -

### B.      Plaintiff's Positions

Plaintiff agrees in principle that a deposition cooperation protocol among the parties in this action and State Action could be appropriate.  However, a cooperation agreement implies that some cooperation and benefit would inure to all parties and be fair.  Here, Plaintiff has agreed to terms in the proposed Protocol that: (1) lengthen the time it will take to complete discovery in this action; and (2) tie case deadlines to the State Action, which is fundamentally different than this action.  For example, the State Action plaintiff must show falsity for statements made in 2017 (with no scienter under §11 of the Securities Act of 1933), while Plaintiff here, pursuant to §10(b) of the Securities and Exchange Act of 1934, must show falsity in 2018 and prove that Defendants either intentionally or recklessly made false statements.  But while negotiating the Protocol, Defendants have insisted that Plaintiff be limited to ten depositions, misleadingly claiming that this Court has already ruled on that question.  Defendants' position is without merit as the Court was informed during the initial status conference that the Parties would address the question of the number depositions at a later stage in the proceedings.  Further, Defendants' Rule 26(a)(1) initial disclosures identify well over ten witnesses that they might call to trial.

Plaintiff further believes Defendants have wielded the Protocol as a mechanism to delay Plaintiff's discovery.  Plaintiff has been ready to commence depositions since November 2021, the same time Defendants' new counsel, O'Melveny & Meyers, first entered their appearance after Defendants' previous counsel suddenly and mysteriously withdrew.  And now, Defendants have informed Plaintiff that they will not schedule any depositions until April to allow for ***both Courts, including the court in the State Action***, to "weigh in" on these matters.  Defendants' February 17, 2022 email.

- 15 -

4868-8830-6704.v1

### 1. Plaintiff Has Demonstrated Sufficient Good Cause to Take 26 Depositions

When a party seeks to take more than ten depositions, the "court must grant leave to the extent consistent with Rule 26(b)(1) and (2)." Fed. R. Civ. P. 30(a)(2); *see* Fed. R. Civ. P. 30 advisory committee's note to 2000 amendment ("The party seeking a court order to . . . alter the limitations, is expected to show good cause to justify such an order."). "Rule 26 of the Federal Rules of Civil Procedure provides that a party may discover any nonprivileged matter relevant to the party's claim or defense, as long as it is proportional to the needs of the case." *Yater v. Powderhorn Ski Co. LLC*, No. 17-cv-01298-LTB-NYW, 2018 WL 776361, at *4 (D. Colo. Feb. 8, 2018).[4] "This principle of broad discovery is intended to allow the parties to learn as much as they can about each other's claims and defenses in advance of trial." *Von Schwab v. AAA Fire & Cas. Ins. Co.*, No. 1:14-cv-00183-CMA-NYW, 2015 WL 1840123, at *2 (D. Colo. Apr. 21, 2015).[5]

It is axiomatic that "[s]ecurities actions are generally large and complex cases involving difficult financial and accounting issues" that are "'notoriously difficult and unpredictable'" to prove. *In re Dell Inc.*, No. A-06-CA-726-SS, 2010 WL 2371834, at *7, *16 (W.D. Tex. June 11, 2010). District courts regularly order, and indeed parties typically agree to, increasing the number of

---

[4]    Unless otherwise noted, citations are omitted and emphasis is added throughout. All "¶_" and "¶¶_" references are to Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 44) (the "Complaint"). Additionally, all capitalized terms in §V.A., not otherwise defined herein, have the same meaning as set forth in the Complaint.

[5]    Plaintiff chose to engage in further investigation and discussions with Defendants before requesting an increase to the presumptive deposition limit. *See* October 28, 2020 Hearing Transcript at 4:6-18. Defendants now seek to penalize Plaintiff for its decision, arguing that raising the limit is governed by the standard for modifying a Court's Scheduling Order. In any case, Plaintiff satisfies both standards. Under Rule 16, a party may modify the deposition limits set in a scheduling order upon a showing of good cause and the judge's consent. Fed. R. Civ. P. 16(b)(4); *Curtis v. Lever Up Inc.*, No. 20-cv-01873-DDD-NYW, 2021 WL 4947283, at *8 (D. Colo. Oct. 8, 2021) ("'District courts are "afforded wide discretion" to apply the "good cause" standard under Rule 16(b).'").

fact depositions in these cases.[6]  As one court stated in connection with its securities case, a "moving party must show need for additional depositions, but 'counsel's judgment about [how many depositions] it needed is entitled to a good deal of deference.'"  *In re Weatherford*, 2013 WL 5762923, at *2 (alteration in original).  This is not a simple case amenable to ten or fewer depositions.  Further, Defendants are fully aware that it is unreasonable to limit Plaintiff to a mere ten depositions when Defendants' own Rule 26(a)(1) initial disclosures reveal that they may rely on more than ten witnesses at trial.  But Plaintiff understands Defendants will present any argument to limit Plaintiff to as few depositions as possible given the depth of inculpating evidence collected.

As the Court is aware, this litigation concerns an alleged accounting fraud concerning Maxar's failure to take a timely charge for impaired intangible assets, property, plant and equipment ("PP&E"), and inventory associated with Maxar's GeoCom business unit.  *See* ECF No. 69 at 22, 26; ¶¶157-158, 163-164, 168-169 (false statements alleged).  Plaintiff must prove that the defendant CEO, CFO and Maxar acted with scienter, which will take circumstantial evidence, including what information and documents other individuals showed them or discussed with them.  Plaintiff must also establish that Defendants violated technical accounting provisions governing when a company must evaluate an asset when circumstances indicated it is impaired.  Certainly Defendants will contend they complied with the applicable accounting rules, which requires numerous internal

---

[6]    *See, e.g.*, *In re Weatherford Int'l Sec. Litig.*, No. 11 Civ. 1646(LAK)(JCF), 2013 WL 5762923, at *3 (S.D.N.Y. Oct. 24, 2013) (26 depositions); *Sec. & Exch. Comm'n v. Zachariah*, No. 08-60698-CIV-JOHNSON, 2009 WL 10669546, at *3 (S.D. Fla. May 21,2009) ("it is illogical to think that ten depositions would suffice"); Joint Report Regarding Contents of Scheduling Order at 4, *Buettgen v. Harless*, No. 3:09-cv-00791-K (N.D. Tex. Oct. 7, 2011) (ECF No. 137) (parties' 30 deposition agreement); Pretrial Order, *In Re: Lehman Bros. Sec. and ERISA Litig.*, No. 09-md-02017 (S.D.N.Y. Jan. 23, 2013) (ECF No. 1130) (80 days); Order, *Bettis v. Envision Healthcare Corp., et al.*, No. 3:17-CV-01112 (M.D. Tenn. July 14, 2021) (ECF No. 318) (50 depositions).

- 17 -

accountants who purportedly applied their personal professional judgment. Further, Defendants will be relying on the advice they received from technical valuation experts (*e.g.*, Duff & Phelps ("DP")) and outside accounting firms, including PriceWaterhouseCoopers ("PwC"), KPMG Canada and KPMG US. It goes without saying that establishing a violation of applicable accounting rules *and* disproving such defenses is complex and militates in favor of a liberal expansion of the presumptive ten deposition limit.

Against this backdrop, *for this case*, Plaintiff has carefully selected 26 individuals, based on documents produced in discovery, who have unique information that is highly relevant to Plaintiff's claims and Defendants' defenses. *See* Plaintiff's Exhibit A ("PEx. A") (attached hereto).

**Individual Defendants**. Defendants do not oppose the depositions of Messrs. Howard L. Lance and Anil Wirasekara.

**Maxar's CFOs**. Maxar had three CFOs during the relevant period in this case, all of whom possess critical knowledge of the events during different time periods in this case. Biggs Porter is identified in Defendants' initial disclosures, and in any event, Plaintiff seeks his deposition for independent reasons. *See id.* at 13-14. Wirasekara, as noted above, is a named defendant. Defendants do not want Plaintiff to depose William McCombe. But he abruptly left Maxar in February 2018, before he would have been required to sign Maxar's 2017 year-end financial results, and has unique direct knowledge of, *inter alia*, the Company's year-end 2017 impairment testing completed in early 2018 and efforts by Maxar to obfuscate GeoCom's dismal financial performance through its change of reporting segments in late 2017 and early 2018. *Id.* at 12-13.

**Maxar's Accountants**. Plaintiff seeks to depose the following Maxar accountants, and any objection must take into account that *this is an accounting fraud case involving technical*

- 18 -

*accounting provisions*.  Jose Torres was Maxar's Chief Accounting Officer.  Defendants cannot seriously claim a deposition should not be allowed for a Chief Accounting Officer who after reviewing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ or who notes that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ when the Company was claiming the assets were not impaired.  *Id.* at 16-18.

Jill Windrum, Technical Accounting Director, is identified by Defendants in their Rule 26(a)(1) disclosures.  She was heavily involved in Maxar's SEC filings, and in particular the year-end 2017 impairment testing and 1Q18 and 2Q18 quarterly impairment reviews.  *Id.* at 20-21.  She possesses highly relevant information and wrote key documents concerning Plaintiff's claims.  For example, regarding the 3Q18 impairment disclosure, Windrum wrote ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

Darren Hoegler was Maxar's assistant controller and in February 2018, ***prior to the Class Period***, he personally received a DP assessment indicating that Maxar's Communications Segment (which included SSL) was impaired.  *Id.* at 10.  This evidence is damning and who he shared and discussed this with must be explored at deposition.

Theresa Harrah, SSL's assistant controller, was also a main point of contact for KPMG Canada and KPMG US.  *Id.* at 9.  Plaintiff must be allowed to ask Harrah about the information provided to Maxar's auditors, as Defendants must prove in their good faith reliance defense that Maxar made a "complete disclosure" of all material evidence to its auditors.  *United States S.E.C. v. Meltzer*, 440 F. Supp. 2d 179, 189 (E.D.N.Y. 2006).  ***Harrah's ESI was also deleted***, after this case was filed, and her account of what those documents contained is necessary.

- 19 -

Paul Wilkinson was a consultant and employee who has knowledge about, *inter alia*, how Maxar was realigning its reporting segments in early 2018 in an obvious effort to obfuscate GeoCom's dismal financial condition, and appears to have had direct contact with defendant Lance on this key issue. PEx. A at 19-20. Defendants did not oppose Plaintiff's motion for issuance of letters rogatory in connection with his deposition in Canada (ECF No. 130), which the Court granted (ECF No. 135) and issued, finding that he should be deposed (ECF No. 136 at 2).

**Maxar's Audit Committee Chairman**. Nick Cyprus, Chair of Maxar's Audit Committee, is the only board member Plaintiff seeks to depose. PEx. A at 4-5. Indeed, his own statements regarding the Audit Committee's investigation and response to the Spruce Point report is necessary.

**SSL Presidents and Executives**. SSL is the Maxar business division at the center of this litigation. Accordingly, Plaintiff needs to depose the individuals responsible for SSL: John Celli (outgoing President); Dario Zamarian (President during the Class Period); Rich Currier (Senior Vice President of SSL business development); and Paul Estey (SSL Chief Operating Officer). These individuals made scores of their own damning statements regarding obvious impairment of GeoCom in 2017 and 2018 (*see id.* at 1-7 and 22-23):



4868-8830-6704.v1

- ██████████████████████████████████████████████████████████████████████████████████████████████.

**Key Maxar Officers and Managers**.  Plaintiff has good cause to depose three employees, each with unique roles and information.  Jason Gursky, Vice President of Investor Relations, has unique information concerning investors.  *Id.* at 7-9.  For example, he reported to defendant Lance that analysts wanted Maxar to ████████████████████████████████████████ *Id.* at 7.  Another email he wrote on ██████████████████████████████████████████ ████████████████████████████████████████████ *Id.* at 8.

Bruce Stephenson, Chief Strategy Officer, is a key executive with complete knowledge of the Company's tactics, strategies and competitive position throughout the relevant time period.  His observations, as well as his communications with Defendants, are key to understanding the full picture of Maxar's strategy and competitive position.  *Id.* at 15-16.

Angela Lau, Senior Vice President of Finance and Corporate Strategy, oversaw a key DP engagement.  She has vital information concerning DP's 1Q18 valuation of the SSL business unit, which used a significantly higher discount rate of 11%, compared to a 7.5% discount rate used only a quarter earlier.  This increase in the rate resulted is a massive decrease in SSL's fair market value showing that the GeoCom assets were impaired no later than 1Q18.  *Id.* at 11-12.

Edward Chou, Senior Manager of Corporate Finance, is unique given his significant responsibilities in SSL's budgeting and forecasting.  *Id.* at 2.  For example, in April 2018, he was tasked by defendant Lance to highlight how GeoCom created a drag on Maxar's 1Q18 financial results.  *Id.* at 3.

**KPMG Canada, KPMG US and Duff &Phelps**. Defendants will use KPMG Canada, KPMG US and DP to support their good faith reliance defense and have made no objection to Plaintiff's deposition picks. Judd Schneider, Michael Kraehnke and Phil Dowad are, respectively, the individuals identified by Defendants for these organizations in Defendants' Amended Initial Disclosures and Plaintiff's support to take their depositions is included in Plaintiff's Exhibit A.

**Bain & Co.** The Complaint contains a specific allegation regarding Bain's work in 2017 regarding SSL – that is, Bain was brought in to determine if the Company should stay in the GEO industry at all. *See* ¶70. In May 2018, Tina Radabaugh ("Radabaugh") sent an email to defendant Lance stating, ███████████████████████████████████████

███ Plaintiff will need to depose Radabaugh about these critical Bain documents (particularly to lay a hearsay exception foundation for critical Bain documents).

**PriceWaterhouseCoopers**. PwC was hired by Maxar in 2Q18 in connection with an assessment of SSL's obsolete inventory and again in 3Q18 for impairment testing of SSL's long-lived assets. Lance Weber worked at PwC and was then hired as Maxar's Segment Controller immediately after Maxar publically disclosed the $383 million GeoCom impairment charge. He will be a critical witness over this period and issues related to PwC. *Id.* at 18-19.

**Financial Reporting Advisors**. Scott Taub works for Financial Reporting Advisors ("FRA") and is an accounting expert who Maxar consulted with on multiple accounting issues, including Maxar's reporting segments and its investigation of the Spruce Point report. PEx. A at 28-29. FRA's advice must be explored on these key issues and to fully understand any defenses.

**Joele Frank**. Joele Frank consulted Maxar in responding to investors regarding the Spruce Point allegations, including collecting information from investors who were upset with Maxar's

- 22 -

initial response.  *Id*. at 29-30.  Joele Frank's testimony, therefore, will be directly relevant to Plaintiff's allegations of loss causation and materiality.

**Consultants for the Sale of GeoCom**.  PJT Partners and Goldman Sachs are highly relevant because Maxar had retained the organizations as ███████████████████████████████████ ████████████████████████.  *Id*. at 30.  ████████████████████████████████, and in fact, documents show that Maxar was assessing strategic alternatives as early as late 2017, which contradicts Defendants' October 31, 2018 corrective disclosures.  *See* ¶188 ("The Company commenced an effort in the third quarter of 2018 to assess strategic alternatives.").

In addition to Plaintiff's good cause to take each of these individual's deposition, Defendants have not met their burden to show that 26 depositions would be unduly burdensome.  "The burden of demonstrating relevance remains on the party seeking discovery" but when discovery is relevant, "the party resisting discovery has the burden of showing undue burden or expense." *Landry v. Swire Oilfield Servs., L.L.C.*, 323 F.R.D. 360, 381 (D.N.M. 2018).[7]  Plaintiff understands that Defendants generally object to the deponents because they include deponents who purportedly: (1) were not employed by Maxar during the relevant time period; (2) have no connection to Plaintiff's substantive allegations; and (3) are being called to testify about overlapping subjects without differentiation. However, Defendants have avoided providing Plaintiff with specific objections to most all of Plaintiff's requested deponents, and Plaintiff has shown good cause for each individual's deposition.

---

[7]  *See Laryngeal Mask Co. Ltd. v. Ambu A/S*, No. 3:07-CV-01988 DMS (NLS), 2009 WL 10672436, at *4 (S.D. Cal. July 17, 2009) (Allowing additional depositions, and stating that "[u]nder the liberal discovery principles of the Federal Rules, the party opposing discovery 'must carry a heavy burden' of showing why the discovery should not be had.").

4868-8830-6704.v1

As previously noted, Defendants' Rule 26(a)(1) initial disclosures identify 13 individuals they may rely on to prove their defenses at trial. And, they have inappropriately incorporated by reference those individuals identified in Plaintiff's initial disclosures.

Likewise, Defendants' threat to have the Court shift costs for any deposition over ten is not supported. Certainly, this case is not one that presents the "unusual circumstances" where it would be appropriate to shift "the ordinary burden of litigation to the opposing party." *Clayton v. Velociti, Inc.*, No. CIV A 08-2298-CM/GLR, 2009 WL 1033738, at \*3 (D. Kan. Apr. 17, 2009).[8]

Defendants' general objections should be rejected for the following main reason: Most, if not all, of the witnesses ***authored a wealth of damning evidence*** regarding the fact that GeoCom had been impaired for a year or longer than Defendants represented. *See* PEx. A. Plaintiff cannot help the fact that there is so much powerful evidence in this case.

> **2. The Court Should Order Common Interest Deponents to Show Up for Back-to-Back Days, or Instruct Defense Counsel Not to Discuss the Substance of the First Day's Deposition While the Second Day Is Pending**

Plaintiff is asking that defense counsel not communicate with a deponent regarding the substance of that deponent's first day of deposition testimony while the deposition remains pending, which can be up to five days. Consistent with Rule 30(c)'s requirement that depositions "proceed as they would at trial," Plaintiff initially requested that Common Interest deponents appear for depositions on back-to-back days. *See, e.g.*, *Perry v. Leeke*, 488 U.S. 272, 273 (1989) (the judge

---

[8]   The cases Defendants have cited to Plaintiff are exactly this unusual type of circumstance. In *Advanced Sterilization Prods., etc. v. Jacob*, 190 F.R.D. 284, 286-87 (D. Mass. 2000), finding it "unfair" that the party never sought leave to take more than ten depositions, the Court constructed a "remedy" for the violations. In *S.F. Health Plan v. McKesson Corp.*, 264 F.R.D. 20, 21 (D. Mass. 2010), the court did not believe that it was "appropriate . . . to second-guess the need for additional depositions," but 30 depositions were already given, so it allowed 11 more and shifted costs after 35.

must "be allowed the discretion to maintain the status quo during a brief recess in which there is a virtual certainty that any conversation between the witness and his lawyer would relate exclusively to his ongoing testimony").  Defendants rejected the request claiming that scheduling back-to-back days for the witnesses they represent would be too difficult and that Defendants would only commit to no more than five days between the first and second day of a witness's deposition.

Plaintiff's concerns here are reasonable: That witnesses would discuss the substance of their first day's testimony with counsel over a five-day gap, that a five-day gap will become the rule versus the exception, and that given that the State Action plaintiff intends to participate in any deposition that the Plaintiff notices, it will take nearly twice as long to complete depositions.  If Defendants' concern is simply an inability to schedule a Common Interest Depositions on back-to-back days, Defendants should agree not to discuss the substance of the first day's testimony with the witnesses they represent.  Accordingly, Plaintiff asks the Court to issue an Order that Common Interest Depositions be held on back-to-back days or that the substance of the first day's deposition should not be discussed while the deposition is pending.

DATED:  February 28, 2022

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
SPENCER A. BURKHOLZ
HENRY ROSEN (017965)
TRIG R. SMITH
CHRISTOPHER D. STEWART
NICOLE Q. GILLILAND
PATTON L. JOHNSON

s/ Patton L. Johnson
PATTON L. JOHNSON

- 25 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
henryr@rgrdlaw.com
trigs@rgrdlaw.com
cstewart@rgrdlaw.com
ngilliland@rgrdlaw.com
pjohnson@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

DATED:  February 28, 2022

O'MELVENY & MYERS LLP
MATTHEW W. CLOSE
BRITTANY ROGERS


s/ Matthew W. Close
MATTHEW W. CLOSE

400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
Telephone: 213/430-6000
213/430-6407 (fax)
brogers@omm.com
mclose@omm.com

JEROME H. STURHAHN
MILTON L. SMITH
PETER G. KOCLANES
SHERMAN & HOWARD LLC
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Telephone:  303/297-2900
303/298-0940 (fax)
jsturhahn@shermanhoward.com
msmith@shermanhoward.com
pkoclanes@shermanhoward.com

*Attorneys for Defendants Maxar Technologies, Inc., Howard L. Lance and Anil Wirasekara*

- 26 -

# DEFENDANTS' EXHIBITS

# DEFENDANTS' EXHIBIT A

**[PROPOSED] PROTOCOL GOVERNING COORDINATION OF DEPOSITIONS**

**I.    APPLICABILITY OF PROTOCOL**

1.    The deposition coordination protocol is intended to facilitate the deposition process, avoid duplicative depositions to the extent practicable (including multiple depositions of the same witness absent good cause), and resolve or narrow the issues required to be escalated to the Court.  The terms of this protocol shall apply to all Common Interest Depositions (as defined below) taken in the class actions filed in the United States District Court for the District of Colorado, *Oregon Laborers v. Maxar Techs., et al.* (Case No. 19-cv-124) ("Federal Action") and the Superior Court of Santa Clara County, *McCurdy v. Maxar Techs., et al.* (Case No. 19-cv-357070) ("State Action") (collectively, the "Related Actions").

2.    Nothing in this Order will preclude any Party from seeking to modify it later for good cause shown.  Prior to doing so, however, counsel will meet and confer in a good-faith effort to reach agreement as to the appropriate scope of any modifications or revisions.

**II.    NUMBER AND LENGTH OF DEPOSITIONS**

3.    A percipient witness may be deposed only once in the Related Actions or either one of them after the date of entry of the deposition coordination protocol, except by stipulation of the parties or by Order of the proper Court on a showing of good cause.

4.    The Parties agree to meet and confer prior to any such deposition for the purposes of determining whether it can be completed in a single day.

5.    "Common Interest Depositions" shall include:

a.    All depositions noticed or subpoenaed in the Federal Action that the State Action Plaintiff elects to subpoena or cross-notice;

b.    All depositions noticed or subpoenaed in the State Action that the Federal Action plaintiff elects to subpoena or cross-notice;

c.    Subject to paragraph 8, below, all depositions of Defendants (including of corporate representatives) or their current and former employees; and

MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

d.      Expert depositions where the expert has been designated by a Defendant[1] to offer opinions in both of the Related Actions.

6.      Absent a good cause showing, the Federal Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the State Action at least five calendar days before the deposition is scheduled means that no testimony resulting from the State Action subpoena or notice may be used in the Federal Action.  Absent a good cause showing, the State Action Plaintiff's failure to  subpoena or cross-notice a deposition taking place in the Federal Action at least five calendar days before the deposition is scheduled means that no testimony resulting from the Federal Action subpoena or notice may be used in the State Action.

7.      Absent a good cause showing, the Federal Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the State Action means the witness may not be re-deposed in the Federal Action.  Absent a good cause showing, the State Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the Federal Action means that the witness may not be re-deposed in the State Action.

8.      A Common Interest Deposition, no matter which Related Actions' plaintiff initially notices or subpoenas it, shall count as a deposition in both the State Action and the Federal Action for the purpose of assessing deposition limits or necessity (e.g., burden, cumulativeness, and proportionality), so long as the other Related Actions' plaintiff cross-notices it.

9.      Common Interest Depositions of experts under Section 5.d. shall not count as a deposition for the purpose of assessing deposition limits under this agreement.

10.      [Defendants Propose: *Nothing in this protocol alters, changes, or impacts the provisions of Federal Rule of Civil Procedure 30(a)(2)(A)(i)* / Plaintiff Proposes: *Plaintiffs in the Federal Action shall be allowed to take up to 26 depositions of percipient witnesses in this case*

11.      Nothing in this protocol is intended to place presumptive limits on the number of depositions available to the State Action Plaintiff.

---

[1]    "Defendant" means any defendant in the State or Federal Actions.

- 2 -

12.    The Parties reserve their respective rights to ask the Superior Court presiding over the State Action to expand or limit the number of depositions available in the State Action based on any applicable grounds.  Defendants believe that the reasonableness and appropriateness of the total number of depositions taken in the State Action shall be assessed based in part on the total number of Common Interest Depositions subpoenaed, noticed, or cross-noticed by the State Action Plaintiff.

13.    The Parties agree to limit each Common Interest Deposition to no more than 14 hours total, with the Federal Action Plaintiff limited to no more than 7 hours of time absent leave from the Federal Court.  In addition, for party-related witnesses, the defending party will have an additional hour, on top of the 14-hour limit, to conduct its examination.  Any exceptions would require a specific showing of good cause.

14.    For the deposition of a corporation in the State Action, a 28-hour total applies to the entire corporate deposition.  Accordingly, if Plaintiffs spend 7 hours questioning one witness designated as a corporate representative, the State Action Plaintiff has 21 hours remaining for any additional corporate representatives.

15.    Any noticing party or cross-noticing party is entitled to minute-for-minute re-cross following any examination by the defending party.

16.    The Parties agree to limit each day of Common Interest Depositions to 7 hours total record time each day, unless all Parties and witnesses agree otherwise.

**III.    DEPOSITION PROCEDURE**

17.    Counsel in the State Action shall be served with all deposition notices or subpoenas issued in the Federal Action, and vice versa.  E-mail service shall suffice.

18.    The Parties will cooperate in good faith to schedule a Common Interest Deposition so that the need to coordinate the availability of counsel does not unreasonably delay the scheduling of depositions.

19.    For witnesses represented by O'Melveny & Myers whose depositions, subject to the limitations in this protocol, will go beyond one day, Defendants agree to use good-faith efforts to make witnesses available for two back-to-back calendar days; in the event that such a witness

- 3 -

MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

is not reasonably available for two back-to-back calendar days in the requested timeframe, Defendants agree that, absent a showing of good cause, they will propose two dates within a five-day period during which the witness and defense counsel can be available.  [Plaintiff Proposes: *During the pendency of each deposition, there shall be no contact between counsel and the witness concerning the substance of the witness's first day of testimony.* / Defendants Propose: *do not add "During the pendency of each deposition, there shall be no contact between counsel and the witness concerning the substance of the witness's first day of testimony."*]

20.    Counsel for Plaintiffs in the Related Actions shall meet and confer prior to any Common Interest Deposition and shall reach agreement regarding allocation of Plaintiffs' deposition questioning time.

21.    Objection of one counsel to a question will preserve that objection on behalf of all other counsel and therefore counsel shall avoid repeating objections.

22.    Any objection to relevance or admissibility of documents used as deposition exhibits are not waived, and are preserved pending a later ruling by the Court or by the trial judge.

23.    Any document produced in one of the Related Actions and introduced as an exhibit during a Common Interest Deposition will be deemed produced in all the Related Actions, subject to objections served in either the State or Federal Actions.

24.    Defense counsel shall not seek discovery of communications between counsel for the Federal Action and State Action plaintiffs regarding deposition coordination.

IT IS SO ORDERED.

ENTERED this _____ day of _____, 2022.

_____
HON. S. KATO CREWS
U.S. MAGISTRATE JUDGE

- 4 -

MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

# DEFENDANTS'
# EXHIBIT B

Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

David W. Hall (SBN 274921)
dhall@hedinhall.com
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

*Lead Counsel for Plaintiff and the Putative Class*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

| | |
|---|---|
| IN RE: MAXAR TECHNOLOGIES, INC. SHAREHOLDER LITIGATION | Lead Case No. 19CV357070 |
| | CLASS ACTION |
| This Document Relates To: ALL ACTIONS | DATE ACTION FILED: 10/21/2019 |
| | DEPT. 1 |
| | JUDGE: HON. BRIAN C. WALSH |
| | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933** |
| | DEMAND FOR JURY TRIAL |

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**INTRODUCTION**

1.    Plaintiff Michael McCurdy, individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Maxar Technologies Inc. and Maxar Technologies Ltd. ("Maxar"), MacDonald, Dettwiler and Associates Ltd. ("MDA"),[1] and DigitalGlobe, Inc. ("DigitalGlobe"), as well as media and analyst reports about the Company and Company press releases.    Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

**SUMMARY OF THE ACTION**

2.    In October 2017, Maxar, a satellite manufacturer, acquired and merged with DigitalGlobe, a satellite imagery company (the "Merger").  In connection with the Merger, Maxar issued approximately 21.5 million new shares of Maxar common stock directly to DigitalGlobe shareholders, all pursuant to a materially false and misleading F-4 registration statement (the "Registration Statement") and prospectus (collectively, with documents incorporated therein, the "Offering Materials").

3.    Plaintiff is a former DigitalGlobe shareholder who received Maxar common stock issued pursuant to the Offering Materials in exchange for his DigitalGlobe shares.  On behalf of similarly situated former DigitalGlobe shareholders who received Maxar shares pursuant to the false and misleading Offering Materials, Plaintiff asserts strict-liability claims under §§11, 12, and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act") against Maxar, certain current and former Maxar officers and directors, and certain former DigitalGlobe officers and directors.

---

[1] Maxar Technologies Ltd. and MDA are the legal predecessors to Maxar Technologies Inc.  MDA became Maxar Technologies Ltd. upon its merger DigitalGlobe in October 2017, and Maxar Technologies Ltd. became Maxar Technologies, Inc. in January 2019.  For readability, the name "Maxar" is used for all three of these entities, and includes their predecessors and successors in interest, parents, subsidiaries, and divisions.

- 1 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

4.      In violation of the Securities Act, SEC implementing regulations, common law duties, applicable International Financial Reporting Standards ("IFRS"), and Defendants' own express commitments and undertakings, the Offering Materials contained numerous untrue statements of material fact and omitted material facts both required by governing regulations and necessary to make the statements made not misleading.  The Offering Materials overstated Maxar's assets, earnings, and other financial results, trends, and metrics by recording property, plant and equipment (PPE), inventory and development assets far in excess of realizable value and thereby inflating earnings.  The Offering Materials should have reflected the impairment in the value of Maxar's geosynchronous satellite communications ("GeoComm") segment. Maxar reported artificially inflated earnings in the Offering Materials when Maxar should have reported losses.

5.      During the two years preceding the Merger, Maxar's GEO business had collapsed, with demand for satellite broadband Internet falling precipitously as a result of lower-cost terrestrial competition like fiber optic connections and high-speed cellular networks.  As the satellite market shrank 45%, Maxar's GeoComm segment revenues dropped 20%, and the future looked even worse, with the number of GeoComm contract awards also falling rapidly.  In early 2017, several months **before the Merger**, the bleak GeoComm market outlook led Maxar to quietly retain management consulting firm Bain & Co. ("Bain") for a "restructuring project" intended to assess the diminished value and prospects for its GeoComm segment and advise whether it was worthwhile for Maxar to even stay in the business at all.  On Bain's negative internal assessment of GeoComm's value and prospects, Maxar undertook mass layoffs — firing 334 employees (including 66 critical engineers) between February and June 2017 alone, slashing new business development budgets for GeoComm satellite proposals, and steeply curtailing operations at its GeoComm facility in Palo Alto, all with an eye toward selling off its GeoComm segment or otherwise exiting the market entirely.

6.      Each of these glaring indicators of impairment existed and was known to Defendants months before the October 2017 Merger.  Yet none were disclosed in the Offering Materials, and none were accounted for in the Maxar financial results, metrics, and trends incorporated into the Offering Materials.  Had Defendants complied with governing IFRS accounting standards to timely

- 2 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

and accurately test and accrue impairment (and its own representations that it continuously monitored and tested impairment of intangible assets) and recorded GeoComm segment assets at realizable value, by the time of the Merger Maxar would have already recorded millions of dollars in impairment charges to its reported inventories, intangible assets, and property, plant, and equipment ("PP&E"). Thus, in stark contrast to the inflated asset values, purported earnings, and other false and misleading financial results and metrics touted in the Offering Materials, Maxar in truth had suffered (and was obligated to report) a net loss.

7.     With these misrepresentations and omissions in the Offering Materials, Defendants were able to complete the Merger. But the truth ultimately emerged. In late October 2018, after initially downplaying a damaging short-seller report, Maxar was forced to admit to **over $383 million in impairment losses and inventory obsolescence in its GeoComm segment** and a consequent **$432 million net loss**. Investors and analysts were shocked. The price of Maxar stock plummeted. By the commencement of this action, Maxar common stock has traded as low as $3.96 per share, an approximately **93% decline since the Merger**. Plaintiff and other ordinary shareholders suffered severe losses as a result.

## JURISDICTION AND VENUE

8.     This Court has original subject matter jurisdiction under the California Constitution, Article VI, Section 10. Removal is barred by Section 22 of the 1933 Act.

9.     This Court has personal jurisdiction, and venue is proper under California Code of Civil Procedure §§ 395 and 410.10, because Defendants and their agents reside, are headquartered, or at all relevant times were headquartered in California; conducted the Merger in California; and affirmatively solicited the subject securities and Registration Statement to investors in California, including during roadshows conducted in California, and those contacts with California have a substantial connection to the claims alleged herein. At all times relevant to the Merger, Maxar's principal executive offices were located in California. The predecessor to Maxar's GeoComm segment is Maxar's Space Systems/Loral LLC ("SSL") subsidiary. SSL was a standalone company and went bankrupt in 2003. After it emerged from bankruptcy, it was acquired by Maxar, becoming Maxar's GeoComm segment. Maxar's GeoComm and related satellite

- 3 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

communications business was at all relevant times headquartered in Palo Alto, California, as are Maxar's satellite manufacturing and R&D operations, including the facilities and business segments central to the misrepresentations and omission alleged herein. As stated in the Registration Statement, as of the Merger, Maxar's California headquarters was also the official mailing address for nearly all the Individual Defendants (as defined below), namely Howard L. Lance, Robert L. Phillips, Dennis H. Chookaszian, Lori B. Garver, Joanne O. Isham, Anil Wirasekara, C. Robert Kehler, Brian G. Kenning, and Eric Zahler. At all relevant times, SSL MDA Holdings, Inc., Maxar's wholly owned subsidiary and a holding company for Maxar operating subsidiaries, was headquartered in California. At all relevant times, Merlin Merger Sub, Inc., the wholly owned subsidiary Maxar formed for the purpose of effecting the Merger (and into which DigitalGlobe was merged to become a wholly owned subsidiary of Maxar), was also headquartered in California. Maxar's authorized representative in the United States, Michelle D. Kley, signed the Registration Statement on behalf of Maxar in California.

**PARTIES**

10. Plaintiff Michael McCurdy acquired Maxar common stock pursuant to the Offering Materials, in exchange for his former DigitalGlobe shares via Merger, and was damaged thereby.

11. Defendant Maxar specializes in the manufacture of satellites and provision of satellite-related services. Maxar's common stock trades on the New York Stock Exchange under the ticker symbol "MAXR." At the time of the Merger, Maxar was incorporated under the laws of British Columbia and maintained its principal executive offices in California. In October 2017, in connection with the Merger, Maxar issued approximately 21.5 million shares of Maxar common stock directly to former shareholders of DigitalGlobe common and preferred stock, all pursuant to the Offering Materials.

12. Defendant Howard L. Lance was, at all relevant times, President, Chief Executive Officer, and a Director of Maxar. Defendant Lance reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

- 4 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

13.     Defendant Anil Wirasekara was, at all relevant times, Executive Vice President and Chief Financial Officer of Maxar. Defendant Wirasekara reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

14.     Defendant Angela Lau was, at all relevant times, Senior Vice President, Finance and Corporate Secretary of Maxar. Defendant Lau reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

15.     Defendant Robert L. Phillips was, at all relevant times, Chairman of the Board of Directors of Maxar. Defendant Phillips reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

16.     Defendant Dennis H. Chookaszian was, at all relevant times, a Director on Maxar's Board. Defendant Chookaszian reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

17.     Defendant Lori B. Garver was, at all relevant times, a Director on Maxar's Board. Defendant Garver reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

18.     Defendant Joanne O. Isham was, at all relevant times, a Director on Maxar's Board. Defendant Isham reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

19.     Defendant C. Robert Kehler was, at all relevant times, a Director on Maxar's Board. Defendant Kehler reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

- 5 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

20.    Defendant Brian G. Kenning was, at all relevant times, a Director on Maxar's Board. Defendant Kenning reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

21.    Defendant Eric Zahler was, at all relevant times, a Director on Maxar's Board. Defendant Zahler reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials.

22.    Defendant Jeffrey R. Tarr was, at all relevant times, President and Chief Executive Officer of DigitalGlobe.  Defendant Tarr reviewed, contributed to, and signed the Registration Statement, and solicited DigitalGobe shareholders to participate in the Merger and exchange their DigitalGlobe shares for new Maxar shares issued pursuant to the Offering Materials

23.    The Defendants named in ¶¶ 12-22 are referred to herein as the "Individual Defendants."  The Individual Defendants each signed or were identified as incoming officers or directors in the Registration Statement, solicited the purchase securities issued pursuant thereto, planned and contributed to the Merger and Registration Statement, and attended promotions to meet with and present favorable information to Maxar and DigitalGlobe investors, all motivated by their own and the Company's financial interests.

**GOVERNING IFRS PROVISIONS**

24.    At all relevant times, Maxar prepared, reported, and certified its consolidated financial statements subject to IFRS.  Promulgated by the International Accounting Standards Board ("IASB"), IFRS are the accounting profession's principles, conventions, rules, and procedures that define accepted international accounting practices.  Pronouncements issued by IASB's predecessor are designated "International Accounting Standards" ("IAS"), which were adopted by IASB and remain part of IFRS.

25.    Relevant IAS standards in place at the time the Offering Materials were issued include the following.

- 6 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

26.    **IAS 1: Presentation of Financial Statements**. IAS 1 prescribes the "overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content," *see* IAS 1.1, which apply to all "general purpose financial statements" prepared and presented "in accordance with International Financial Reporting Standards (IFRSs)." IAS 1.2. "General purpose financial statements . . . are those intended to meet the needs of users who are not in a position to require an entity to prepare reports tailored to their particular information needs." IAS 1.7. "The objective of financial statements is to provide information about the financial position, financial performance, and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS 1.9.

27.    Under these governing standards, a company's "[f]inancial statements **shall** present fairly the financial position, financial performance and cash flows of an entity.

> Fair presentation **requires** the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the [Conceptual] Framework [for Financial Reporting]. The application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation."

IAS 1.15. "An entity whose financial statements comply with IFRSs **shall** make an explicit and unreserved statement of such compliance in the notes. An entity **shall not** describe financial statements as complying with IFRSs unless they comply with all the requirements of IFRSs." IAS 1.16.

28.    **IAS 36: Impairments of Intangible Assets and Property, Plant, and Equipment.** "The objective of [IAS 36] is to prescribe the procedures that an entity applies to ensure that its assets are carried at no more than their recoverable amount."   An asset is carried at more than its recoverable amount if its "carrying amount' ['book value'] exceeds the amount to be recovered through use or sale of the asset ['fair value'].  If this is the case, the asset is described as impaired and the Standard **requires** the entity to recognise an impairment loss."  "An asset is impaired when its carrying amount exceeds its recoverable amount." IAS 36.8.  "An entity **shall** assess at the end of each reporting period whether there is **any** indication that an asset may be impaired." IAS 36.9. "[IAS 36.12 to 36.14] describe some indications that an impairment loss may have occurred. If **any**

- 7 -

of those indications is present, an entity is **required** to make a formal estimate of recoverable amount . . . .”

29.    Maxar had both intangible assets and PP&E for which it failed correctly to record impairment.  The overwhelming majority of both Maxar's intangible assets and its PP&E were attributable to its GeoComm segment.

30.    The intangible assets attributed to Maxar's GeoComm segment consisted of technology, software, trade names, and customer relationships.  Maxar capitalized intangible assets of $320 million upon acquiring SSL in 2012, and it subsequently recorded additional internal development and external purchases.  For example, in 2017 and 2018, Maxar capitalized internally developed technology by approximately $116 million, the "vast majority" of which "relate[d] to projects in the GEO communications satellite line of business, such as digital payload, electric propulsion and roll-out solar array development programs." As of June 30, 2017, Maxar reported the value of its total intangible assets (the vast majority of which were attributable to its GeoComm segment) at approximately $440 million.[2]

31.    The GeoComm segment's PP&E consisted of land and land improvements, buildings, leasehold improvements, testing equipment, vehicles, computer hardware, and furniture and fixtures. The Company's acquisition of SSL added approximately $300 million of PP&E to the balance sheet, primarily in the areas of land, buildings, and equipment.  As of June 30, 2017, Maxar reported the value of its PP&E (of which the vast majority was attributable to its GeoComm segment) at approximately $475 million.

---

[2] At all relevant times leading up to the Merger, Maxar reported its financial results in Canadian Dollars.  In the quarter following the Merger, the third quarter of 2017 ("3Q17"), Maxar began reporting its financial results in U.S. Dollars, with the exception of dividend payments that remained denominated in Canadian Dollars. And as part of the reorganization following the Merger, the GeoComm cash-generating unit was re-categorized from the "Communications" to "Space Systems" reporting segments. Neither change affected the Company's accounting and disclosure requirements under IFRS.

- 8 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

32.    Maxar's capitalization as of June 30, 2017 of $440 million in intangible assets and $475 million in PP&E was materially misleading because of Maxar's failure to correctly record impairments for these assets, especially those assets attributable to its GeoComm segment.

33.    IAS 36.12 states that "[i]n assessing whether there is *any* indication that an asset may be impaired, an entity *shall* consider, *as a minimum*, the following indications":

**External sources of information**

(a) there are observable indications that the asset's value has declined during the period significantly more than would be expected as a result of the passage of time or normal use.

(b) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the **technological, market**, economic or legal environment in which the entity operates or in the market to which an asset is dedicated.

***

**Internal sources of information**

(e) evidence is available of obsolescence or physical damage of an asset.

(f) significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used. These changes include the asset becoming idle, **plans to discontinue or restructure the operation to which an asset belongs**, plans to dispose of an asset before the previously expected date, and reassessing the useful life of an asset as finite rather than indefinite.

(g) evidence is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected.

34.    But, as IAS 36.13 prescribes, "[t]he list in paragraph 12 is not exhaustive," for "[a]n entity may identify other indications that an asset may be impaired and these would also *require* the entity to determine the asset's recoverable amount." Beyond the "internal" indicators above, IAS 36.14 states that "[e]vidence from internal reporting that indicates that an asset may be impaired includes the existence of":

(a) cash flows for acquiring the asset, or subsequent cash needs for operating or maintaining it, that are significantly higher than those originally budgeted;

(b) **actual net cash flows or operating profit or loss flowing from the asset that are significantly worse than those budgeted**;

- 9 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

(c) a significant decline in budgeted net cash flows or operating profit, or a significant increase in budgeted loss, flowing from the asset; or

(d) operating losses or net cash outflows for the asset, when current period amounts are aggregated with budgeted amounts for the future.

35.    Critically, under IAS 36, *if any impairment indicator is present*, then an *entity is required to test for impairment* by determining an asset's or cash-generating unit's ("CGU") recoverable amount.[3]  Under IAS 36.22, if it is not possible to estimate the recoverable amount of an individual asset, the entity must determine the recoverable amount "for the cash-generating unit to which the assets belong."[4]

36.    According to Maxar, the GeoComm segment was the level of asset grouping that generated independent cash flows, and thus the GeoComm segment was a CGU for purposes of evaluating indicators of impairment and impairment testing.  In contrast, the assets attributed to the Company's small-satellite line of business were grouped in the small satellite ("SmallSat") CGU, and thus treated separately from the GeoComm CGU.

37.    Maxar's reported assets, earnings, earnings per share ("EPS"), and other purported financial results and representations in the Offering Materials were false and misleading because Maxar failed to record the impairment losses in the GeoComm CGU as a result of the numerous and glaring impairment indicators described herein. Defendants violated IAS 36 by ignoring impairment indicators and failing to timely account for an impairment loss to Maxar's GeoComm

[3] Under IAS 36, "recoverable amount" is defined as the higher of an asset's or CGU's "fair value" less costs of disposal (the fair value method) and its "value in use" (the cash flow method). And IAS 36.6 defines "[f]air value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The fair value method determines what the market says the asset or CGU could sell for less costs of disposal. "Value in use" is "the present value of the future cash flows expected to be derived from an asset or cash-generating unit." The value in use method is based on a discounted future cash flows valuation of the asset or CGU.  Per IAS 36.55, the discount rate applied to the future cash flows is a pre-tax rate that reflects current market assessments of "(a) the time value of money; and (b) the risks specific to the asset for which the future cash flow estimates have not been adjusted."

[4] Under IAS 36.6, a "CGU" is "the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets and groups of assets."

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

assets – including corresponding reductions in earnings and EPS – when the book value of those assets exceeded their respective fair value by hundreds of millions of dollars.

38.    **IAS 2: Inventories.** At all relevant times, IAS 2 governed Maxar's accounting treatment and testing of its inventories, including required impairment loss. The inventories of Maxar's GeoComm segment consisted of materials, components, and supplies used in satellite construction.

39.    Under IAS 2.9, the value of an entity's inventories "***shall*** be measured at the lower of cost and net realisable value," and under IAS 2.6, "net realisable value" is the "estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale." Per IAS 2.10, "[t]he cost of inventories ***shall*** comprise all costs of purchase, costs of conversion and other costs incurred in bringing the inventories to their present location and condition."

40.    Accordingly, each quarter, Maxar was required to assess its GeoComm inventory assets to ensure they were not overstated, *i.e.*, that inventory cost did not exceed "net realisable value." As to "net realisable value," IAS 2.28 explains that "[t]he cost of inventories ***may not*** be recoverable if those inventories are damaged, if they have become wholly or partially obsolete, or if their selling prices have declined," and further that "[t]he practice of writing inventories down below cost to net realisable value is consistent with the view that assets should not be carried in excess of amounts expected to be realised from their sale or use." IAS 2 and IAS 36 are thus consistent in requiring that assets (*e.g.*, intangibles, PP&E, inventories) are not overvalued, are appropriately tested for recoverability on a timely basis, and that "no major difference exists between IAS 2 and the requirements included in IAS 36." *See* IAS 36.

41.    IAS 2 also requires that, when determining "[e]stimates of net realisable value," an entity must consider events occurring after a reporting period (*i.e.*, subsequent events) to the extent such events confirm conditions existing at the end of the reporting period. Specifically, IAS 2.30 states:

> Estimates of net realisable value are based on the most reliable evidence available at the time the estimates are made, of the amount the inventories are expected to realise. These estimates take into consideration fluctuations of price or cost directly relating

- 11 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

to events occurring after the end of the period to the extent that such events confirm conditions existing at the end of the period.

And under IAS 2.34, "[t]he amount of any write-down of inventories to net realisable value and all losses of inventories **shall** be recognised as an expense in the period the write-down or loss occurs."

42.    Thus, just as Maxar was required to record an impairment loss to GeoComm's intangible assets and PP&E under IAS 36, Maxar was required to timely write down the net realizable value of its impaired GeoComm inventories under IAS 2.  By failing to, Maxar also violated IAS 2.

### BEFORE THE MERGER, MAXAR'S BUSINESS WAS ALREADY IMPAIRED

43.    Maxar's GeoComm segment traces back to Maxar's 2012 acquisition of SSL, which was founded in 1957 and has historically specialized in the manufacture of large geostationary communications satellites. These "GEO" satellites are geosynchronous, meaning that their orbit matches the Earth's rotation, causing them to appear stationary to an observer. They orbit thousands of miles from Earth and can relay radio, television, or Internet services to a fixed region of the world over many years.  By comparison, satellites in low earth orbit ("LEO") – such as those used in high-resolution imaging – are only a few hundred miles above the Earth and orbit several times a day.

44.    With the close of the Cold War, SSL turned away from government and military contracts and toward the commercial market for radio and television.  Each commercial GEO satellite contract could earn hundreds of millions of dollars in revenue, but the manufacturing process was capital-intensive, leading to low margins compared to other space industry businesses. To remain viable, SSL's GEO business required a sufficient pipeline of orders and volume of production.

45.    The pipeline dried up in 2002, as its annual awards fell to zero, and SSL consequently declared bankruptcy in 2003.  According to a *Via Satellite* article titled "Loral Looks Beyond Bankruptcy," the root of SSL's financial difficulties was overcapacity in the global satellite market and declining demand from Internet-related telecommunications providers.  SSL would emerge from bankruptcy in 2005, and the GEO market recovered until 2014.

- 12 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

46.    Maxar acquired SSL in 2012, and soon thereafter it recorded approximately $300 million in PP&E and $320 million in intangible assets directly related to the GeoComm segment. Immediately following Maxar's acquisition, the company's GEO business appeared profitable; in 2014, Maxar's GeoComm segment secured a significant nine GEO contracts.

47.    But 2015 and 2016 saw year-over-year declines in the number of contracts awarded to Maxar's GeoComm segment, down to only five in 2015 and four in 2016.  Defendants knew that these declines were indicative of a structural shift in the market for communications technology. Consumers were moving away from satellite-based internet, television, and radio services, and they were turning instead to Internet-based "streaming" services, undergirded by fiber optic connections and high-speed cellular networks.  As a result, the satellite market as a whole found itself fully saturated and—in view of declining demand—with excess capacity for satellite manufacturing.  To complicate matters, Maxar's GEO satellites in particular fell out of favor as remaining demand refocused on smaller, cheaper, and more flexible LEO satellites.

48.    While Maxar acknowledged that global demand had dropped in both 2015 and 2016, Defendant Howard Lance, who had taken over as CEO in May 2016, nevertheless aggressively pushed a Company line that the GEO market would soon recover. For example, on a November 2016 earnings call, Defendant Lance stated that Maxar was "bullish on the long-term health of the satellite industry":

> The overall market remains below historic averages for the second year. The satellite operators delay awards to consider competing technologies and to assess regional excess capacity and their profitability issues. But we remain bullish on the long-term health of the satellite industry, where new orders will include replacement satellites, as well as those to serve increasing customer demands.

49.    On the same call, in response to analyst questions, Defendant Lance said: "We see now the second-year in a row where the market is below where it normally is. We think it's going to spring back."

50.    Defendant Anil Wirasekara, then CFO, stated on the same call that Maxar expected "satellite order intake levels [to] return to near historical averages":

> Revenues were negatively impacted by the lower number of satellite contracts awarded over the last 18 months, and consequently by the lower number of active

- 13 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

satellite programs in the higher revenue-generating stage of the program cycle as compared to a year ago. We expect this trend to continue for the next few quarters until satellite order intake levels return to near historical averages.

51.    In February 2017, Maxar announced that it was seeking to acquire DigitalGlobe, which used satellites to provide customers with high-resolution images of the earth's surface, in a $2.4 billion debt-financed, stock-and-cash transaction. In contrast to Maxar's declining GEO business that had accounted for a bulk of the company's revenue, the imaging business on which DigitalGlobe was focused was less capital-intensive and provided better margins.  Moreover, by contrast to the GEO market, the space imaging market was still growing.  As Defendant Lance described it, the acquisition of DigitalGlobe was meant to give Maxar "new legs for growth."

52.    But those "new legs" came at a great cost: a massively increased debt load.  As a result of the merger, Maxar's total debt would increase 500%—from $600 million before to $3 billion. The dramatic increase in Maxar's debt burden further decreased the likelihood of profitability for Maxar.

53.    By the time Maxar announced its acquisition plans in early 2017, the company's internal assessment of its GeoComm prospects was already bleak. In fact, the Company had already retained management consultant Bain & Co. to assess the diminished value and prospects of its GeoComm segment.  Bain informed Maxar that it needed to take dramatic and urgent action, and Maxar did—undertaking mass layoffs, slashing budgets, and shrinking operations of its GeoComm facility in Palo Alto.  Maxar was thus aware of the impairment of its GeoComm-related assets long before the merger, and company officials were preparing for a fire sale of these assets or even to exit the GEO business entirely.

54.    Despite knowing that its GeoComm segment was severely impaired, Defendants continued to tout the bullish line of a GEO market recovery just around the corner.  For example, on a May 2017 earnings call, in response to analyst questions regarding the future of the GEO market, Defendant Lance stated: "[W]e've just entered around the last three months of detailed discussions with our customers and are feeling still very positive about the long-term opportunity in the market given that we expect to rebound from a pretty low level."

- 14 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

55. But even as Defendant Lance preached optimism to investors, there was simply no empirical data suggesting a return to normal for the GEO business generally, given the market's growing preference for LEO and terrestrial alternatives, and for Maxar's GeoComm segment in particular, given its excess capacity, lack of new orders, and layoffs—all of which combined to make it less likely each day that Maxar could salvage its GeoComm segment.

**MAXAR'S FALSE AND MISLEADING OFFERING MATERIALS**

56. On April 27, 2017, Defendants filed with the SEC on Form F-4 a draft registration statement to register the Maxar shares to be issued and exchanged for DigitalGlobe shares in the Merger. The draft registration statement was amended in response to SEC comments, including comments emphasizing the importance of adequately disclosing material events, uncertainties, and trends and accurate and complete risk factors, as required by SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303") and § 229.105 ("Item 105").

57. On June 2, 2017, Defendants filed an amendment to the registration statement. On June 16, 2017, the SEC initially declared the amended Registration Statement effective. On June 22, 2017, Defendants filed a prospectus on Form 424B3 for the Maxar shares issued in the Merger.

58. On October 5, 2017, Defendants completed the Merger, issuing approximately 21.5 million shares of Maxar common stock directly to former shareholders of DigitalGlobe common and preferred stock as follows: each former share of DigitalGlobe common stock and/or Series A convertible preferred stock issued and outstanding immediately before the Merger was converted to 0.3132 shares of newly issued Maxar common stock (plus cash consideration). Each of these new shares of Maxar common stock issued pursuant to the Offering Materials. On October 4, 2017, the market price for Maxar common stock closed at $54.57 per share.

59. The Offering Materials contained untrue statements of material fact and omitted material facts both required to be stated therein and necessary to make the statements therein not misleading. Most significantly, the Offering Materials overstated Maxar's assets, net earnings, net EPS, and other financial results, trends, and metrics by failing to account for the already severely impaired value of Maxar's GeoComm segment.

- 15 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

60.    For example, the Offering Materials reported the value of Maxar's total assets as over $3.3 billion, and, for the three-month period ending March 31, 2017 and the year ended December 31, 2016, reported materially overstated net earnings, net EPS, and other false and misleading financial results, metrics, and trends as follows:

| | Three months ended March 31, | | Year ended December 31, |
|---|---|---|---|
| | 2017 | 2016 | 2016 |
| | (in millions of Canadian dollars, except per share amounts) | | |
| Net earnings (attributed to common equity shareholders) | 5.9 | 40.7 | 139.6 |
| Earnings per common share | | | |
| Basic | $    0.16 | $    1.12 | $    3.84 |
| Diluted | 0.15 | 1.10 | 3.74 |
| Dividends declared per common share | 0.37 | 0.37 | 1.48 |

61.    The Offering Materials further reported, for the three- and six-month periods ending June 30, 2017, materially overstated net earnings of $31.7 million and overstated net EPS of $0.87, as well as other false and misleading financial results, metrics, and trends as follows:

| | Note | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|---|
| | | 2017 | 2016 | 2017 | 2016 |
| Net earnings | | $    25,844 | $    25,289 | $    31,729 | $    65,955 |
| Net earnings per common share: | | | | | |
| Basic | 10 | $    0.71 | $    0.70 | $    0.87 | $    1.82 |
| Diluted | 10 | 0.70 | 0.69 | 0.87 | 1.80 |

62.    These representations regarding Maxar's purported assets, net earnings, net EPS, and other financial results, metrics, and trends, were false and misleading because they failed to account for the already severely impaired value of the Company's GeoComm assets.  Over the two years preceding the Merger, Maxar's GEO business had collapsed, with demand for satellite broadband Internet falling precipitously in response to lower-cost terrestrial competition like fiber optic connections and high-speed cellular networks. But Maxar continued to report assets at values

- 16 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

in excess of realizable value and capitalized intangible assets at a far higher rate (upwards of 500% higher) than industry peers,[5] and thereby underreported expenses and inflating earnings.

63.    As the satellite market shrank 45% in the two years preceding the Merger, GeoComm revenues dropped 20%, and the future looked even worse, with the number of GEO contract awards falling precipitously.  The market contraction was not attributable mere seasonality; The last time GEO orders had fallen at this rate, the predecessor of Maxar's GeoComm segment, SSL, had been forced into bankruptcy.

64.    Maxar's awareness both of clear industry trends and the implications for its own GeoComm segment led the company in early 2017 to retain management consultant Bain to assess the diminished value and prospects of Maxar's GeoComm segment, and on Bain's negative assessment proceeded to lay off 334 employees (including 66 of the most critical engineers) between February and June 2017, slash new business development budgets for GeoComm satellite proposals, and downsize GeoComm operations—all steps geared towards an ultimate exit from the GeoComm segment.

65.    Had Maxar complied with the governing IFRS standards—and its own statements concerning monitoring of business segments and assessment of impairment charges—to evaluate these numerous and glaring indicators of an impairment loss and timely and accurately test and accrue required impairment charges, Maxar would have reported ***not earnings, but rather a net loss*** (and basic loss per share) for the both the three-month period ending March 31, 2017 and the three- and six-month periods ending June 30, 2017.

66.    The Offering Materials also misrepresented that Maxar had recorded "all assets, liabilities and contingent liabilities acquired or assumed . . . at their fair values at the date of acquisition," and further that "the Company performs a goodwill impairment test . . . **whenever there is an indication of impairment**" and "tests intangible assets for impairment when events or

---

[5] For example, while industry peers Orbital ATK (n/k/a Northrup Grumman) and the Boeing Company respectively capitalized technology and R&D at a rate of 6% and 13% of gross intangibles, Maxar capitalized its own technology and in process R&D at ***over 50%*** of gross intangibles.

- 17 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

changes in circumstances indicate that an asset might be impaired." Further, the Offering Materials misrepresented that internally developed technologies met the accounting criteria to be capitalized:

> MDA continues to face strong competition, particularly in the communications satellite market. To successfully compete in this market, MDA conducts extensive MDA-funded research and development activities. Costs associated with these activities may either be capitalized as internally developed technologies or expensed as incurred depending on certain accounting criteria. For the year ended December 31, 2016, a higher portion of these costs met the accounting criteria to be capitalized, thereby increasing adjusted operating EBITDA when comparing year over year.

> ***

> Investments in technology and software were higher in the three months ended March 31, 2017 as MDA capitalized higher levels of costs relating to the internal development of key technologies, including the digital payload program.

> ***

> For the three months ended March 31, 2017, MDA capitalized development of technology and software of $23.7 million. For the years ended December 31, 2016, December 31, 2015 and December 31, 2014, MDA capitalized development of technology and software of $81.2 million, $48.7 million and $34.7 million, respectively. Investments in technology and software were higher in the three months ended March 31, 2017 and fiscal year 2016 as MDA capitalized higher levels of costs relating to the internal development of key technologies, including its digital payload program.

> ***

> Research costs are expensed in the period incurred. Development costs are capitalized and recorded as an intangible asset if technical feasibility has been established and it is considered probable that the Company will generate future economic benefits from the asset created on completion of development. The costs capitalized include materials, direct labour, directly attributable overhead expenditures and borrowing costs on qualifying assets. Other development costs are expensed in the period incurred.

67. These representations were false and misleading because: (1) Maxar's GeoComm segment assets were recorded at far in excess of realizable value; (2) Maxar had capitalized intangible assets at a far higher rate than industry peers, in order to inflate earnings and thereby inflate its stock price; (3) Maxar had repeatedly failed to perform impairment tests despite the existence of numerous and glaring external and internal indicators of impairment; and (4) even

- 18 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

though Maxar's GeoComm segment was already severely impaired, the company had failed to account for the negative financial results, metrics, and trends incorporated into the Offering Materials.  Indeed, had Defendants adhered to their commitment in the Offering Materials to perform impairment tests "whenever there is an indication of impairment," consistent with governing IFRS accounting standards to timely and accurately test and record impairment losses, Maxar would have, by the time of the Merger, recorded hundreds of millions of dollars in impairment losses to its reported inventories, intangible assets, and PP&E.  The result would have been a reported ***net loss*** rather than the profits Maxar reported instead.

68.    The Offering Materials also misrepresented that Maxar's incorporated "financial statements [were] prepared in accordance with IFRS," and that Maxar had not applied any changes in "methods of accounting, except in accordance with changes in IFRS."

69.    These representations were false and misleading because, as detailed above, Maxar's incorporated financial statements were not prepared in accordance with IFRS.  Rather, Maxar's reported assets, earnings, EPS, and other purported financial results and representations failed to account for numerous and glaring impairment indicators.  Maxar violated IAS 36 by ignoring impairment indicators and failing to timely account for an impairment charge to Maxar's GeoComm assets – including corresponding reductions in earnings and EPS – when the book value of those assets exceeded their fair value by hundreds of millions of dollars.  And just as Maxar was required to take an impairment charge to GeoComm's intangible assets and PP&E under IAS 36, Maxar was required to timely write-down the net realizable value of its impaired GeoComm inventories under IAS 2.  By failing to do so, Maxar also violated IAS 2.  Thus, contrary to its representations in the Offering Materials, Maxar's incorporated financial statements violated IFRS.

70.    The Offering Materials also purported to warn of numerous risks that, "***if***" occurring, "***may***" or "***could***" adversely affect the Company—all while failing to disclose that these very "risks" had in fact already materialized at the time of the Merger. For example, the Offering materials stated as follows:

- 19 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

- "[Maxar]'s financial performance is dependent on its ability to generate a sustainable order rate for its satellite manufacturing operations. . . . The cyclical nature of the commercial satellite market *could negatively impact* [Maxar]'s ability to accurately forecast customer demand. The markets that [Maxar] serves *may not grow* in the future and [Maxar] may not be able to maintain adequate gross margins or profits in these markets. . . . If [Maxar] fails to anticipate such changes in demand, its business, results of operations and financial position *could be adversely affected*."

- "Changes in the estimates and assumptions used *could have a material impact* on the amount of goodwill recorded and the amount of depreciation and amortization expense recognized in earnings for depreciable assets in future periods."

- "The unaudited pro forma condensed combined financial information of DigitalGlobe and [Maxar] . . . *may not be indicative* of the results of operations or financial condition of [Maxar] following the merger."

71.    The Offering Materials further represented as follows:

The undersigned registrant hereby undertakes:

\*\*\*

To reflect in the prospectus any facts or events arising after the effective date of the registration statement . . . which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement . . .

72.    These representations, commitments, undertakings, and risk disclosures were false and misleading because the so-called "risks" that purportedly "could" or "may" occur had in fact already occurred at the time of the Merger.  Maxar had over-capitalized intangible assets (at a rate upwards of 500% higher than industry peers) to inflate earnings. Further, over the two years preceding the Merger, Maxar's GEO business had already collapsed.  Demand for satellite broadband Internet had fallen precipitously in response to lower-cost terrestrial competition. The satellite market had already declined 45%, GeoComm revenues had already dropped 20%, and the number of GEO contract awards had already fallen at a rate not seen since SSL filed for bankruptcy thirteen years earlier.  Maxar already had in hand Bain's negative internal assessment of the GeoComm segment diminished value and prospects. The bleak writing was already on the wall,

- 20 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

and Maxar had already responded in early 2017 with its "restructuring project" of layoffs and other cuts.

73.    Maxar's GeoComm segment was thus already severely impaired.  Yet Maxar failed to account for the impairment loss in its financial statements, metrics, and trends incorporated into the Offering Materials, and thus Maxar violated the governing IFRS standards. Had Maxar complied with accounting standards (as well as its own affirmative commitments in the Offering Materials) to timely and accurately test and record required impairment losses, Maxar would have reported **not earnings, but rather a net loss** (and basic loss per share) for the both the three and six month periods ending March 31, 2017 and June 30, 2017.  As such, the financial information touted in the Offering Materials was materially false and misleading.

74.    Defendants were required to disclose this materially adverse information in the Offering Materials for at least five independent reasons.  First, Defendants had affirmative duties to speak truthfully and completely and to disclose all information necessary to ensure the statements made in the Offering Materials were not misleading.  Defendants' failure to disclose and account for the numerous and glaring external and internal indicators of GeoComm's impairment losses rendered the incorporated representations of Maxar's purported assets, earnings, and other financial results, metrics, and trends—as well as the numerous other positive affirmations of Maxar's GeoComm segment, finances, impairment testing, and financial prospects contained in the Offering Materials—incomplete, inaccurate, and materially misleading.

75.    Second, Item 303 required disclosure of any known events or uncertainties that had caused or were reasonably likely to cause Maxar's disclosed financial information not to be indicative of future operating results.  Maxar's overcapitalization of assets and artificially inflated reported earnings, the collapse of Maxar's GEO business, the already severe yet unaccounted-for impairment losses of Maxar's GeoComm segment, Bain's negative internal assessment of the GeoComm segment's value and prospects, the mass layoffs, reduced spending and other undisclosed "restructuring" efforts Maxar had implemented in response, including its undisclosed plan to sell off the GeoComm segment and exit the GEO business entirely, and the existing

- 21 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

decimation of the GEO market, had all in fact already materially and adversely affected Maxar's current and future financial results.

76.    Third, Item 105 required, in the "Risk Factor" section of the Offering Materials, a discussion of the most significant factors that make the offering risky or speculative, and that each risk factor adequately describe the risk.  Maxar's discussions of risk factors did not even mention, much less adequately describe, the risks posed by the numerous undisclosed external and internal indicators of impairment losses in Maxar's GeoComm segment; Maxar's longstanding overcapitalization of intangible assets to artificially inflate reported earnings; the collapse of Maxar's GEO business and its market; the severe impairment of Maxar's GeoComm segment; Bain's negative internal assessment of the GeoComm segment's value and prospects;  the resulting mass layoffs, reduced spending, and other "restructuring" efforts Maxar had already instituted; Maxar's undisclosed plan to sell off its GeoComm segment and exit the GEO business entirely; the resulting negative financial consequences for Maxar's financial results; or the likely and consequent material adverse effects on the Company's future financial results and prospects.

77.    Fourth, Defendants' failure to disclose the foregoing material information rendered false and misleading the Offering Materials' many references to known risks that "*if*" occurring "*may*" or "*could*" affect the Company.  These "risks" were not mere possibilities. They had already materialized by the time of the Merger.

78.    Fifth, Defendants' failure to disclose and account for the numerous external and internal indicators of GeoComm's impairment losses rendered the Offering Materials materially misleading and violated Maxar's duty to update, including violating the Offering Materials' express commitment that Maxar would update the prospectus to reflect any facts or events arising after the initial effective date of the registration statement that, individually or in the aggregate, represented a fundamental change in the information set forth in the Offering Materials.  The undisclosed and unaccounted-for impairment losses of Maxar's GeoComm segment represented a fundamental change from the overstated assets, earnings, and other Maxar financial results, metrics, and trends set forth in the Offering Materials. Indeed, contrary to the purported "earnings" set forth in the Offering Materials, Maxar had suffered (and should have reported) a net loss.

- 22 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**THE FALSE AND MISLEADING STATEMENTS AND OMSSIONS WERE MATERIAL**

79.    With the foregoing misrepresentations and omissions in the Offering Materials, Defendants were able to complete the Merger.  But by the commencement of this action, the price of Maxar common stock had suffered sharp declines, having traded as low as $3.96 per share, A *93% decline since the Merger*.  Plaintiff and other ordinary shareholders suffered severe losses as a result of Defendants' misconduct.

80.    On August 7, 2018, short seller Spruce Point Capital accused Maxar of having misleadingly inflated its earnings.  Later that same day, Maxar responded with a press release titled "Maxar Technologies Responds to Misleading Short Sell Report," which forcefully disputed Spruce Point's analysis:

> The report on Maxar Technologies Ltd. . . . released today by Spruce Point Capital Management *contains a number of inaccurate claims and misleading statements*. Maxar believes *it is a direct attempt by a short-seller to profit, at the expense of Maxar shareholders, by manipulating Maxar's stock price.*
>
> Maxar continues to execute against its strategy, and recently reaffirmed its full year 2018 guidance for revenue and cash flow from operations, while increasing its full-year adjusted EPS outlook. Maxar believes that the Company remains positioned for future growth. Management and the Board of Directors are focused on delivering enhanced value for all Maxar shareholders.
>
> Maxar continues to be fully committed to transparency in all of its investor presentations and financial reports. Please refer to the Company's disclosure materials filed with Canadian and U.S. securities regulatory authorities, which are available online under the Company's SEDAR profile at www.sedar.com, under the Company's EDGAR profile at www.sec.gov or on the Company's website at www.maxar.com, for more information.

81.    Maxar's August 7, 2018 press release also underscored that Maxar had "recently reaffirmed its full-year 2018 guidance for revenue and cash flow from operations, while increasing its full-year adjusted EPS outlook," and further touted that Maxar "continues to execute on its strategy" and "remains positioned for future growth."  Yet, Maxar's press release failed to disclose that the Spruce Point report had in fact already resulted in both (1) the firing of Maxar's prior certified public accountant and (2) the opening of an internal investigation into the alleged

- 23 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

accounting improprieties by the Company's Audit Committee – which would be assisted by the Maxar's newly hired certified public accountants and "independent" third-party consultants.

82. On August 24, 2018, Maxar issued another press release titled "Maxar Technologies Provides Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund." Maxar's purported "Comprehensive Response" came after the Audit Committee's internal (and still undisclosed) investigation into Spruce Point's allegations had commenced and after Maxar had fired its prior certified public accountant. In this press release, among other things, Maxar continued to dispute much of the Spruce Point analysis. And while it acknowledged the possible impairment of its GeoComm segment in the future, it downplayed the mere "possibility" as one that "might" or "could" occur under "certain [] scenarios" that were far from certain and still only under "consideration."  Maxar also reassured investors that its previously issued financial statements remained valid:

> In response to the accounting claims made in the report, the audit committee of the Board of Directors undertook a review of the elements of the Company's financial statements and disclosures associated with Spruce Point's claims and found no material errors in the previously issued financial statements and disclosures under IFRS.

As such, Maxar continued to misleadingly portray impairment as a mere possibility, when in truth Maxar's GeoComm segment was already impaired and had been for at least months before the Merger.

83. Then, on October 31, 2018, Defendants shocked the market with Maxar's severely disappointing 3Q18 financial and operational results.  Rather than a profit, as market analysts were led to expect, Maxar announced a *$432 million net loss*, largely *attributed to impairment losses and inventory obsolescence in its GeoComm segment*.  Even without the impairment, Maxar still lost more than $49 million.  In an accompanying press release that day, Maxar revealed GeoComm-related impairment and inventory charges totaling $383.6 million, as follows:

> "We recognized impairment losses of $345.9 million and an inventory obsolescence charge of $37.7 million related to the GEO Comsat business this quarter. This non-cash charge reflects the decline in the business and our decision to evaluate strategic alternatives for GEO Comsat." [quoting CFO Biggs Porter]

- 24 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

***

During the three months ended September 30, 2018 the Company recognized impairment losses of $345.9 million and inventory obsolescence of $37.7 million related to the GeoComm business.

And in its 3Q18 Management's Discussion and Analysis ("MD&A"), Maxar further described the GeoComm impairment and inventory charges as follows:

**Impairment of Non-Financial Assets**

Non-financial assets are tested annually for impairment in the fourth quarter or whenever there is an indication that an asset may be impaired. Non-financial assets that do not generate independent cash flows are grouped together into a cash generating unit ("CGU"), which represent the level at which largely independent cash flows are generated. An impairment loss is recognized in earnings to the extent that the carrying value of an asset, CGU or group of CGUs exceeds its recoverable amount. Impairment is first evaluated by management at the CGU level, absent allocated goodwill.

The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS-8 satellite, a key program with the Israeli government. By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds. For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.

In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed. In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. ***The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels. Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume***. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

- 25 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

The aggregation of the above factors resulted in an impairment trigger being identified as at August 31, 2018 at the GeoComm CGU. The Company first performed an impairment test of the GeoComm CGU. The impairment test of the GeoComm CGU evaluated the non-financial assets held by the Company based on an asset group level, absent allocated goodwill. Assets were aggregated to the level in which independent cash flows could be generated for their respective groupings. The carrying values of these asset groups were compared against their fair value less costs of disposal for possible impairment and an impairment loss of $345.9 million related to property, plant and equipment and intangible assets was recorded for the three months ended September 30, 2018.

\*\*\*

**Inventory Obsolescence**

. . . The Company was previously holding inventory on hand in anticipation of awards to be won during the second half of 2018 and for the AMOS 8 program. The impacts from the loss of AMOS 8 and inability to obtain the forecasted awards culminated during the third quarter of 2018. These factors compelled the Company to re-evaluate its inventory reserves for inventory that was previously pegged to forecasted usage.

All GeoComm inventory subject to discernment over future use based on forecasts was assessed for possible obsolescence. The result of the re-assessment of future usage of the on-hand inventory was an incremental inventory obsolescence reserve of $37.7 million for the three months ended September 30, 2018.

84.    That same day, Maxar held a conference call with analysts and investors, during which Defendant Lance stated as follows:

Market trends at the U.S. and international government levels remain very positive, with growing budgets to fund increased space investments. The global threat environment is persistent, and that's driving higher spending levels in key areas that we can address. All of our business segments will benefit from the trends noted on this slide.

The legacy GEO Comsat market, of course, is an exception, and it remains weak, with industry orders at the lowest level in recent history. The severity and persistence of this market downturn led us to announce the pursuit of strategic alternatives for the GEO product line at the end of July. We are in active discussions, continue to expect to announce a definitive direction for this business by the end of the year.

85.    On the same call, Maxar's then-CFO Biggs Porter ("Porter") stated that Maxar had incurred year-over-year losses as a direct result of the impairment and inventory charges:

IFRS EPS was a loss of $7.31 versus a gain of $0.34 in the third quarter of 2017, ***driven largely by the $384 million in noncash impairment inventory obsolescence***

- 26 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*charges related to the GEO Comsat business*. As Howard mentioned earlier, the current state of this market, together with other factors, necessitated an analysis of the carrying value of the GEO Comsat assets on our balance sheet. This led to an impairment loss of $346 million related to property, plant and equipment and intangible assets and an inventory obsolescence reserve of $38 million during this quarter.

***

On an IFRS basis, we posted a loss of $7.29 year-to-date versus a gain of $0.98 in 2017. Again, *the major driver of the decline was the impairment and inventory charges* I mentioned earlier.

86.    Later on the call, an analyst with RBC Capital Markets asked Defendant Lance: "First off, related to the – your current thinking on the review of the GEO business. Just wondering if you can elaborate any more – offer any more color on the items under consideration. What's looking most interesting?" Defendant Lance responded:

Steve, I can't be specific, but I can tell you we're in a number of discussions, and *our primary path remains to sell the business*. So we have multiple interested parties. We are in discussions and we're still hopeful to have an answer that we can announce between now and the end of the year.

And when asked about the negative impact GeoComm had had on Maxar's earnings, Defendant Lance responded:

*It's significantly negative*. I think we can certainly say that . . . But I've said now for a few quarters that we are now trending in GEO toward a loss. *We are trending and now having the impact of pretty significant negative cash flows*.

87.    In response, the price of Maxar common stock *immediately plummeted 45%*, from a close of $27.07 on October 30, 2018 down to close of $14.91 per share on October 31, 2018, on unusually high trading volume.

88.    In sum, while it was only in late October 2018 that Maxar finally came clean, in truth, Maxar's GeoComm segment was already severely impaired, and each of the individual indicators of that impairment was already known to Maxar, well before the Merger:

| Market Factors | "[F]alling satellite-based broadband pricing, and alternative LEO and MEO technologies have negatively impacted the Company's GEO communications satellite line of business." (8/24/18) |
|---|---|

- 27 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

| | |
|---|---|
| | "Non-cash write- downs or an impairment of assets could occur as a result of . . . industry outlook. . . ."  (8/24/18)<br><br>"[T]he GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. . . .  By August 2018, there were only five winnable programs across the industry for the entire year. . . ."  (10/31/18)<br><br>"The legacy GEO Comsat market, of course, is an exception, and it remains weak, with industry orders at the lowest level in recent history. The severity and persistence of this market downturn. . . ."  (10/31/18)<br><br>"[T]he current state of this market, together with other factors, necessitated an analysis of the carrying value of the GEO Comsat assets on our balance sheet."  (10/31/18) |
| **Restructuring / Layoffs** | "[T]he reorganization as part of its U.S. Access Plan . . ."  (8/24/2018)<br><br>"The Company . . . has continuously implemented actions to right size the business."  (8/24/18)<br><br>"[C]ash costs for certain employee severance. . . ."  (8/24/18)<br><br>"[T]he Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business."  (10/31/18) |
| **Reduced Orders** | "[T]he continued decline in the GEO communications satellite business. . . ."  (8/24/18)<br><br>"The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels."  (10/31/18)<br><br>"Lower award volumes. . . ."  (10/31/18) |
| **Strategic Alternatives / Departure from Market Segment** | "The Company is exploring strategic alternatives regarding the future of its GEO communications satellite. . . ."  (8/24/18)<br><br>"The strategic alternatives under consideration include partnering with another satellite manufacturer to gain scale benefits, the sale of the GEO satellite line of business, or the exit of the GEO satellite line of business. . . ."  (8/24/18) |

- 28 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

|  | |
|---|---|
|  | "[T]he Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale. . . ."  (10/31/18)<br><br>"The severity and persistence of this market downturn led us to announce the pursuit of strategic alternatives for the GEO product line at the end of July. We are in active discussions, continue to expect to announce a definitive direction for this business by the end of the year."  (10/31/18) |
| **Sale of Assets** | "The monetization of the Company's real estate assets. . . ."  (8/24/18) |
| **Problems with Cash Flow** | "[U]nder-absorbed overhead costs have contributed to reduced profitability and negative cash flows in the Space Systems segment."  (8/24/2018)<br><br>"[N]on-cash write- downs or an impairment of assets could occur as a result of lower future revenue expectations. . . ."  (8/24/18)<br><br>"But I've said now for a few quarters that we are now trending in GEO toward a loss.  We are trending and now having the impact of pretty significant negative cash flows."  (10/31/18) |
| **Overcapacity** | "The Company's facilities in Palo Alto, CA are significantly over-sized for today's market. . . ."  (8/24/18)<br><br>"Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume."  (10/31/18) |
| **Impairment Loss and Inventory Obsolescence** | "All GeoComm inventory subject to discernment over future use based on forecasts was assessed for possible obsolescence."  (10/31/18) |

89.    In a November 1, 2018 article, analysts with the Globe and Mail (Canada) summarized the revelation and market reaction as follows:

Maxar Technologies Ltd., the former MacDonald Dettwiler & Associates Inc., *saw its share price collapse* on Wednesday on an earnings miss and *a writedown that was an acknowledgment that one of its satellite businesses may never recover*.

Maxar shares declined almost 45 per cent to close at $19.68, trading at record lows in the session. It is now almost 80 per cent below its 52-week high of $86.67.

The *investor reaction threatens to immolate the promise of the 2017 merger* that combined the storied Canadian defence firm Macdonald Dettwiler with DigitalGlobe, a Colorado imagery business.

- 29 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

. . .

*The writedown also validates the attack by U.S. short-selling firm Spruce Point Capital Management* . . .

Spruce Point took on Maxar on Aug. 7, after the shares closed at $57.25. The firm suggested the company's preferred profit measures and the accounting choices made to arrive at them obscured weak cash flow that threatened the company's dividend and even its solvency. *It suggested an impairment charge was likely*.

In a detailed response later in the summer, Maxar said it had conducted a review of its accounting, found no errors and was confident in its future—but would review its businesses for potential impairment, a process that resulted in Wednesday's charge.

*Maxar lost US$432.5-million*, or US$7.31 a share, *in large part owing to US$383.6-million in impairment charges as it wrote down the value of its GeoComm satellite business*. But even on profit numbers that exclude the bad stuff, the company greatly disappointed: Its adjusted earnings per share of 75 US cents missed analyst consensus by nearly 30 per cent, and its sales of US$508.2-million were nearly 10 per cent below consensus.

The writedown came, Maxar said in a securities filing, when it lost confidence . . . Now, Maxar "*does not expect the longterm outlook for the GeoComm business to rebound* significantly from current year award levels."

Unfortunately, it has *fixed costs from a major complex in Palo Alto, Calif., that are weighing it down as satellite sales fall*. The company is trying to sell both the real estate and the entire GeoComm business. . .

90. In December 2018, Maxar further announced the sale of 4.5 acres of Palo Alto real estate (the former home of its GeoComm satellite design and production engineers), the proceeds of which CFO Porter claimed would be used to "*pay down Maxar debt*."

91. Then, in January 2019, Defendant Lance resigned as CEO, President, and member of the Board of Directors, with former DigitalGlobe president Dan Jablonsky taking his place. According to Howard Estes, Chair of the Board of Directors, Defendant Lance had to go, "[g]iven the company's performance in 2018 and *the loss of over 90% of our value* in the marketplace."

## CLASS ACTION ALLEGATIONS

92. Plaintiff brings this putative class action on behalf of all former DigitalGlobe shareholders who received Maxar common stock pursuant to the Offering Materials (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal

- 30 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

93.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are likely thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Maxar, DigitalGlobe, or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

94.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

95.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

96.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Securities Act;

(b)    whether the Offering Materials contained untrue statements of material fact and omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

97.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 31 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**TIMELINESS OF PLAINTIFF'S CLAIMS**

98.     Exercising reasonable diligence, Plaintiff could not have discovered that Maxar made material misrepresentations and omissions in violation of the law any earlier than October 31, 2018. On that date, Maxar released its 3Q18 financial and operational results and an accompanying press release reporting a $432 million net loss largely attributable to impairment losses and inventory obsolescence in its GeoGomm segment. Maxar also announced that it did not expect "the long-term outlook for the GeoComm business to rebound significantly from current year award levels." Maxar common stock immediately declined 45% on the news, from a close of $27.07 on October 30, 2018 down to close of $14.91 per share on October 31, 2018. Until October 31, 2018, Defendants had exclusive knowledge that Maxar's GeoComm business was severely impaired, that disclosure of the extent of the impairment would impact the trading price of Maxar common stock, and suppressed and concealed the information relevant to impairment and the impact of full disclosure known to it.

99.     On August 7, 2018, short seller Spruce Capital accused Maxar of inflating earnings. Maxar responded immediately, issuing a press release the same day dismissing the report as "misleading," "inaccurate," and "a direct attempt by a short-seller to profit, at the expense of shareholders, by manipulating Maxar's stock price." In the same press release, Maxar touted its prospects, "reaffirmed its full year 2018 guidance for revenue and cash flow from operations," and stated it was "positioned for future growth."

100.     Maxar followed up on August 24, 2018 with a second press release titled "Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund." In the "Comprehensive Response" Maxar further refuted the Spruce allegations, downplaying the risk of GeoComm impairment as a "possibility" that "might" or "could" occur based on a variety of factors that had yet to manifest. The Company also stated that it had conducted an investigation and reassured investors that there were "no material errors in the previously issued financial statements and disclosures under IFRS."

- 32 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

101. Prior to the publication of Maxar's 3Q18 financial and operational results and press release, Plaintiff did not discover, and could not reasonably have discovered, the factual bases for these claims for relief.

102. On October 21, 2019, Plaintiff filed a complaint in this Court.

103. In consequence of the foregoing, all claims asserted in this complaint are timely.

### FIRST CAUSE OF ACTION

**For Violation of § 11 of the Securities Act**
**Against All Defendants**

104. Plaintiff incorporates all the foregoing by reference.

105. This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

106. The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

107. Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

108. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

109. By reason of the conduct herein alleged, each Defendant violated, or controlled an employee or other person who violated, § 11 of the Securities Act.

110. Plaintiff acquired Maxar shares pursuant to the Registration Statement.

111. Plaintiff and the Class have sustained damages. The value of Maxar common stock has declined substantially subsequent to and due to Defendants' violations.

112. At the time of their acquisition of Maxar shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts

- 33 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### Against All Defendants

113.    Plaintiff incorporates all the foregoing by reference.

114.    By means of the defective Prospectus, Defendants promoted and sold Maxar shares to Plaintiff and other members of the Class.

115.    The prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff and the other members of the Class who purchased Maxar shares pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no failure to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

116.    Plaintiff did not know, nor in the exercise of reasonable diligence could he have known, of the untruths and omissions contained in the prospectus at the time Plaintiff acquired Maxar shares.

117.    By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Maxar shares pursuant to the prospectus sustained substantial damages in connection with their purchases of the shares.  Accordingly, Plaintiff and the other members of the Class who hold the common stock offered pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to Defendants sued herein.  Class members who have sold their shares seek damages to the extent permitted by law.

- 34 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

## THIRD CAUSE OF ACTION

### For Violation of § 15 of the Securities Act
### Against All Defendants

118.     Plaintiff incorporates all the foregoing by reference.

119.     This Cause of Action is brought pursuant to § 15 of the Securities Act against the Defendants.

120.     The Individual Defendants were controlling persons of Maxar by virtue of their positions as directors or senior officers of Maxar and DigitalGlobe.  The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of Maxar and DigitalGlobe.  The Company controlled the Individual Defendants and all of Maxar and DigitalGlobe's employees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Certifying this class action, appointing Plaintiff as a Class Representative, and appointing Lead Counsel Hedin Hall LLP and Girard Sharp LLP as Class Counsel on behalf of the Class;

B.     Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands trial by jury.

- 35 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

DATED:  April 30, 2020

Respectfully submitted,

/s/ *Daniel C. Girard*

Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

David W. Hall (SBN 274921)
dhall@hedinhall.com
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

Frank S. Hedin (SBN 291289)
fhedin@hedinhall.com
**HEDIN HALL LLP**
1395 Brickell Ave., Suite 1140
Miami, FL 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801

*Lead Counsel for Plaintiff and the Putative Class*

- 36 -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

# DEFENDANTS' EXHIBIT C

## Waxman, Jonathan

| | |
|---|---|
| **From:** | Trig Smith <TrigS@rgrdlaw.com> |
| **Sent:** | Tuesday, December 28, 2021 8:29 PM |
| **To:** | Rogers, Brittany |
| **Cc:** | Close, Matthew W.; Waxman, Jonathan; Spence Burkholz; Henry Rosen; Nicole Gilliland; Patton Johnson; Brad Sader |
| **Subject:** | RE: Maxar Securities Litigation - Deposition Coordination Protocol |
| **Attachments:** | Maxar Deponent List.pdf |

[EXTERNAL MESSAGE]

Counsel:

We would be more than happy to jump on a call to Judge Crews' chambers at your convenience tomorrow.  We disagree with your position on the ripeness of the number of deponents and we intend to bring that issue to the clerk's attention during the call.  We look forward to receiving the invite.

Attached please find plaintiff's most recent deponent list, which removes all unique selections by the State Action plaintiff and adds our client's and the class's non-party selections.

Best regards,

Trig Smith

1

**FOR DISCUSSION PURPOSES ONLY**
**DRAFT MAXAR DEPONENT LIST**
**As of:  December 28, 2021**

| Name | Relevance |
|---|---|
| Anderson, Jeremy | Former SSL CFO, resigned around the end of 2017.  Has knowledge of GeoCom's accounting practices, financial results and forecasting prior to his departure.  Prior to his departure, Anderson led a 45-person finance and accounting organization at SSL and was responsible for full cycle P&L and cash flow activities.  For example, Anderson presented monthly financial performance of SSL, which included the performance of GeoCom.  Anderson interacted with Maxar's 2017 auditor KPMG Canada, including signing management representation letters on behalf of SSL. |
| Brkic, Mladen | Was hired as the new CFO for SSL around July 2018.  Has knowledge of issues that arose regarding Maxar's impairment assessments and GeoCom's challenges.  For example, Brkic had conversations with Maxar senior management regarding GeoCom revenue and earnings misses during 2018.  When the Company did disclose its $383 million impairment charge in October 2018, Brkic also provided feedback on the drafts of Maxar's impairment disclosure. |
| Celli, John | SSL President (pre-Zamarian) for 11 years, and worked at SSL for 36 years in total. He has personal knowledge of the industry challenges for GeoCom and GeoCom's tactics/strategies throughout the relevant time period.  Celli communicated directly with Senior Management regarding these issues. Celli retired in June 2017 when the Company announced a record-breaking lay-off of 173 employees in Palo Alto, CA and is quoted in the Complaint concerning the slowdown in orders for GEO satellites being the cause for reductions at Maxar. ¶72  External factors such as industry slowdowns and internal factors such as layoffs are alleged to be indicators of impairment that Maxar ignored. |

| Name | Relevance |
|---|---|
| Choo, Zhe | Choo is involved in the preparation of Maxar financial statements, assessing accounting standards including impairment, and the Company's debt covenants. Choo also asked questions of and provided information to Duff & Phelps, who conducted goodwill analyses for Maxar. Choo was heavily involved in Duff and Phelps' valuation work it completed to help Maxar conduct goodwill impairment testing for year-end 2017, a critical issue in this case. |
| Chou, Edward | Senior Manager of Finance. Involved in the preparation of Maxar's 3Q 2017 impairment test, including discussion regarding management's underlying assumptions. Chou was also heavily involved in the preparation of Maxar's year-end 2017 impairment testing. Chou is an important witness for understanding SSL's forecasting process given his role in FP&A. Chou was also involved in Maxar opportunistic change of its operating segments (or cash generating units) at the time of the DigitalGlobe acquisition, a highly relevant issue for Maxar's impairment testing in this case. |
| Currier, Rich | SVP GeoCom business development for the entire Class Period, 2013-2019. He has direct knowledge regarding GeoCom's challenges, including of presentations concerning these issues made directly to defendant Lance. He also prepared SSL's operating plans and discussed SSL's outlook and related industry trends with the Board. He personally interacted with Bain in 2017 and analyzed their assessments. Further, Mr. Currier met with customers, trying to win business for Maxar, and documents show intimate knowledge of the AMOS 8 contract, one of the major issues in this case. |
| Cyprus, Nick | Chair of the Audit Committee. Knowledge of Audit Committee investigation into Spruce Point allegations. Identified in Defendants' interrogatory responses as a person that was involved in the audit committee review and as a person that was involved in drafting, editing, |

| Name | Relevance |
|---|---|
|  | reviewing, or approving the impairment disclosure language in the Company's October 31, 2018 Form 6-K. |
| Davies, Mike | Director of FP&A at SSL and took on additional responsibilities as SSL's Controller when the former Controller left. As SSL Controller, Davies managed SSL's accounting function and team of 12 people. As a result, he has knowledge of GeoCom's accounting practices, financial results and forecasting. . |
| Estey, Paul | As former Executive Director SSL, and current COO, Mr. Etsy has personal knowledge of the operations of SSL, including execution of the backlog, completion of cost reduction projects and management of manpower. Estey was intricately involved in strategy and steering committee meetings, communicating and working directly with the individual defendants. Mr. Estey was directly involved in strategizing how to sell SSL and personally interacted with Bain in 2017. Mr. Estey is also listed in defendants' Rule 26(a)(1) disclosures as an individual likely to have discoverable information that defendants may use in support of their defenses. |
| Gotla, Nauzer | Gotla was Maxar's Head of Internal Audit. Has knowledge of Maxar's internal control structure and challenges including the material weaknesses disclosed at year-end 2018 that were in part due to SSL's deficiencies. Gotla has knowledge of the 2018 summary of internal control deficiencies, which concluded that Maxar management failed to provide evidence they were reviewing the management assumptions of the Company's impairment tests, including any evaluation of the discount rate and forecasted cash flows. |
| Gursky, Jason | Mr. Gursky is VP of Investor Relations, and has served in this role since 2017, coming to Maxar from Citigroup where he was a U.S. aerospace and defense analyst Mr. Gursky heavily involved in messages Maxar put out |

| Name | Relevance |
|---|---|
|  | to the street, writing scripts and Q&A responses with defendants. Gursky's contact information is part of Maxar's August 24, 2018 press release regarding the Spruce Point report, which is alleged to be among the reason why defendants misrepresentations regarding their accounting came to light. In addition, Gursky has information about investor, analyst and media accounts related to other underlying allegations such as the AMOS 8 contract and the strategic alternatives for SSL. Mr. Gursky is also listed in defendants' Rule 26(a)(1) as an individual likely to have discoverable information that defendants may use in support of their defenses. |
| Hanafy, Yasir | SSL Director of Financial Planning & Analysis was responsible for key areas such as revenue and estimates at completion that impact whether Maxar's assets were impaired. Hanafy was involved in revenue estimates, including whether new GeoCom awards and backlog would materialize. Accordingly, he has personal knowledge of facts related to alleged impairment indicators, including cash flow forecasts and financials distributed to senior management regarding GeoCom. |
| Harrah, Theresa | SSL's assistant controller. Has knowledge of SSL accounting and internal controls, including impairment procedures. Harrah has knowledge of whether any impairment testing was done of SSL's long-lived assets prior to the merger with DigitalGlobe. Also, Harrah was a main contact at SSL for KPMG Canada's 2017 audit, including the fulfillment of KPMG Canada's Client (PBC) Request List. Harrah was also involved in the internal control deficiencies at SSL in 2018 and will have knowledge about the accounting considerations for elimination of GeoCom personnel. |
| Hoegler, Darren | Was MDA's Corporate Assistant Controller, until he was replaced at the end of March 2018. He has knowledge of MDA's |

| Name | Relevance |
|---|---|
| | impairment assessments prior to the DigitalGlobe acquisition. He was also involved in the impairment testing at year-end 2017 prior to his departure. Also, Hoegler has knowledge concerning proposed and actual changes to Maxar's change in operating segments, including setting up the reporting segments in such a manner that it would allow Defendants to conceal from investors the actual operating results for the GeoCom business during 2018. |
| Lance, Howard | Named individual defendant. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Lau, Angela | Lau was the Sr. V.P. of Finance and Corporate Strategy. Lau had a critical role for a March 2018 engagement where Duff and Phelps was hired to assist the Company in its initial tax planning requirements for its U.S. domestication. As part of that engagement, Duff and Phelps estimated the fair market value of Maxar's SSL business as part of Maxar's goodwill impairment testing several times between late 2017 and early 2018. |
| McCombe, William | Former CFO of Maxar, from October 2017 until February 2018. Mr. McCombe has personal knowledge of issues surrounding new segment structure, GeoCom financial performance, why Bain was brought in, impairment testing procedures and new reporting segment structure during 2017 and early 2018. Mr. McCombe attended and presented at board meetings and investor conference calls. He was responsible for budgets and providing financial updates to defendant Lance. He also discussed SSL's financials, the satellite market and DigitalGlobe business combination with analysts and investors. |
| Porter, Biggs | New Maxar CFO in 3Q18. As CFO Mr. Porter had responsibility over finance and accounting, and accordingly has personal knowledge of the impairment charge taken in 3Q18. Mr. Porter was responsible for |

| Name | Relevance |
|---|---|
|  | Maxar's review of whether its assets were impaired and ultimate decision to take an impairment, including the testing done during 3Q18 (including with PwC), the decisions made at the c-suite regarding the impairment and disclosures to the public.  He also was involved in issues surrounding Maxar's concerns with its debt covenants, selling its GeoCom real estate, as well as the desire to sell GeoCom.  He is also identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Santoro, Michael | Santoro was SSL VP of Finance and Interim CFO after Jeremy Anderson left.  He was involved in SSL's financial performance and discussions on the direction of the business.  Santoro is also involved in SSL's forecasting process, including its deteriorating cash flow projections.  Santoro also has knowledge of the challenges with GeoCom obsolete inventory.  Santoro was involved in GeoCom strategic alternative discussions, including discussions with Bain that included the fundamental shift in the GeoCom industry towards digital payloads and lower orbit, smaller satellites.. |
| Stephenson, Bruce | Maxar Chief Strategy Officer until he left the company in 2019.  Has knowledge regarding the Company's GeoCom business, including tactics, strategies and competitive position throughout the relevant time period.  Interacted with the Maxar executive team including Howard Lance and Dario Zamarian regarding GeoCom performance and outlook and internal guidance.  Mr. Stephenson also has direct knowledge of several indicators of impairment that arose in 2017.  He also presented to the Board on GeoCom strategic alternatives and Project Gold. |
| Torres, Jose | Maxar's Chief Accounting Officer after the Merger with DigitalGlobe.  Has direct knowledge of accounting and factual issues, including Maxar's impairment testing (or lack thereof in the first 2 quarters of 2018) in each |

| Name | Relevance |
|---|---|
|  | quarter for 2018. Torres reviewed the quarterly impairment checklist each quarter that was prepared by Jill Windrum. Torres was also directly involved in Maxar's responses to the Spruce Point report, as well as Maxar's accounting treatment for the GeoCom impaired assets and obsolete inventory. Torres also has knowledge regarding DigitalGlobe's due diligence of GeoCom prior to the merger.. |
| Weber, Lance | Weber worked in PwC's Valuation group on engagements for Maxar and later was hired as the Segment Controller at Maxar. Weber will be a critical witness that worked both as a consultant for Maxar when he was at PwC and then was later hired as a new accountant for Maxar. When Weber was at PwC, he helped Maxar's accounting department draft accounting memos and impairment disclosure language, as well as assess SSL's inventory reserves and capitalized R&D. He had constant interactions with Maxar's top corporate accountants, Windrum and Torres. Also, he helped Maxar quantify its 3Q18 impairment charges of GeoCom's intangible assets and fixed assets. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Wilkinson, Paul | Former SSL employee and SSL consultant. Knowledge of most accounting and factual issues in the case. Has knowledge of segment reporting realignment issues post-merger. For example, he was involved in responding to analyst questions regarding accounting changes post-merger. |
| Windrum, Jill | One of Maxar's technical accountants along with Jose Torres. Windrum has knowledge of the accounting factual issues between year-end 2017 and 3Q18 in this the case. Windrum prepared the quarterly impairment checklist each quarter that was then reviewed by Jose Torres. Windrum was heavily involved in the year-end 2017 impairment testing, including the review of the Duff and Phelps' work. |

| Name | Relevance |
|---|---|
|  | Windrum was a main contact for Maxar's external auditor KPMG, as well as consultants Duff and Phelps and PwC.  Windrum was involved in Maxar's 3Q18 impairment disclosure made on October 31, 2018, including critical edits that were made to the disclosure in the drafting process. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Wiresekara, Anil | Named individual defendant.  Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Zamarian, Dario | SSL CEO from June 2017 to April 2019. Author of numerous relevant documents regarding GeoCom's challenges and assessment of strategic alternatives for GeoCom.  Was personally involved in finding potential purchasers for GeoCom and has personal knowledge of various indicators of impairment for GeoCom.  Zamarian often directly communicated those facts the defendant Lance. |
| KPMG Canada (witness:  Phil Dowad) | Maxar's auditor during the 2017 audit and 1Q18 review of Maxar's financial statements. During the 2017 audit, Maxar's impairment testing and valuation procedures for GeoComm were a "focal point" of KPMG Canada annual audit.  Defendants have asserted a reliance on the professional advice of KPMG Canada to defend this action. |
| KPMG US (witness:  Michael Kraehnke) | KPMG US was Maxar's auditor during 2Q18, 3Q18 financial statement reviews and the 2018 audit of Maxar's financial statements. KPMG US was involved in the investigation of Spruce Point's allegations of accounting fraud in August 2018, as well as the Company's accounting treatment of the GeoCom impairment and inventory obsolescence issues disclosed to investors on October 31, 2018. Defendants have asserted the defense of reliance on the professional advice of KPMG US to defend this action |

| Name | Relevance |
|---|---|
| Duff & Phelps (witness: Judd Schneider) | Duff & Phelps performed several valuations of GeoCom in late 2017 and early 2018. In April 2018, for example, Duff & Phelps delivered a valuation report of GeoCom to Maxar, which indicated that the fair value of GeoCom was hundreds of millions of dollars less than the respective book value of the assets. In addition, Duff & Phelps will provide testimony regarding whether the assumptions it used in its various valuations were those of Maxar management or those of Duff & Phelps. Plaintiff also anticipates Defendants will be asserting reliance on the work of Duff & Phelps. |
| PwC (witness: Tom Ouimette) | PwC began assessing SSL assets (e.g., inventory and capitalized R&D expenditures) for potential impairment no later than June 2018. In June 2018, PwC issued its report regarding this work and noted, *inter alia*, it appeared Maxar "does not regularly assess for triggering events" of impairment. PwC was also involved in "Project Gold," the code-name attributed to Maxar's strategic effort to sell GeoCom. Project Gold was commenced sometime prior to June 15, 2018. Plaintiff also anticipates that Defendants will be asserting reliance on the work of PwC. |
| Bain & Co. (witness: Tina Radabaugh) | Consulted Defendants and other key executives regarding the need to "reinvent" and potentially exit GeoCom due to, inter alia, changes in customer demand, continued depressed overall demand and relative uncompetitive position with respect to Maxar's digital payload offering. This work commenced in early 2017 and Bain continued to consult Maxar regarding GeoCom throughout the class period, including working on Project Gold. Bain was also present during the April 2018 meeting with defendants Lance and Wiresakara where GeoCom strategic, including selling GeoCom, were openly discussed. |
| Financial Reporting Advisors (witness: Scott Taub) | Chairman of the Maxar's Audit Committee brought Financial Reporting Advisors ("FRA") in to act as an advisor to the Audit |

| Name | Relevance |
|---|---|
| | Committee for purposes of investigating the Spruce Point allegations of accounting fraud. FRA was directly involved in how the Company would disclose the impairment charges for GeoCom long-lived assets and inventory obsolescence. |
| Joele Frank (witness: Kara Brickman) | Joele Frank assisted Maxar with its investor relations and public relations response to the Spruce Point allegations on August 7, 2018, Defendants more fulsome response to Spruce point on August 24, 2018, and investors and Maxar employees' responses to the disclosure of the alleged fraud. Joel Frank, for example, presented recommended strategy and potential tactics to respond to Spruce Point. Deliverables of Joele Frank's work included proving Maxar aid in crafting crisis communications, a CEO plan, developing key messages for Maxar's IR team and monitoring investor feedback to Maxar news. |
| PJT Partners and/or Goldman Sachs (witness, unknown at this time) | Were responsible for identifying potentially interested parties to acquire GeoCom from Maxar. This was part of Project Gold, commended sometime prior to mid-June 2018. These entities were only capable of finding one party who had potential interest in the GeoCom business or parts of its assets. |

# DEFENDANTS'
# EXHIBIT D

## Kemp, Stephen

| | |
|---|---|
| **From:** | Makenna Cox <mcox@girardsharp.com> |
| **Sent:** | Friday, February 4, 2022 4:37 PM |
| **To:** | Waxman, Jonathan |
| **Cc:** | Close, Matthew W.; Rogers, Brittany; Ikehara, Kate M.; Adam Polk; David W. Hall; Armen Zohrabian |
| **Subject:** | Re: Maxar |

[EXTERNAL MESSAGE]

Jonathan,

We maintain our disagreement with Defendants' characterization of the record. The parties' continued back and forth regarding the preservation of certain custodial documents best exemplifies why we need a PMK deposition on these topics. Time is of the essence.  Especially so given that the deposition may require the need to conduct follow up discovery. Defendants have deleted custodial files—in some instances after litigation commenced and after a litigation hold had been placed on the custodial files—calling into serious question their preservation efforts and the sufficiency of their discovery efforts in this case to date.

As Plaintiff has repeatedly stated, there is no excuse for delaying the PMK depositions. Defendants' purported need to coordinate is an insufficient pretext for delay. The parties have committed to undertake every reasonable effort to avoid duplication. Unsatisfied, Defendants have sought to use the protocol to impose an hours cap on organizational depositions in the state case, which is in direct conflict with the California Code of Civil Procedure. Plaintiff has been asking for dates and witness identities in response to the PMK deposition since September. While your predecessors had committed to producing a PMK for deposition in January, since your engagement, you have effectively delayed this case. The result is that 6 months after the deposition notice, we still don't have names, dates, or identities.

We have significant concerns about the impact of Defendants' delays on the case schedule. Defendants have yet to respond to Plaintiff's January 28 letter concerning the second RFPs.  Fact discovery closes mid-July, yet Defendants have not identified a single available date for deposition.

Reserving all rights to amend or supplement, based on documents produced to date, Plaintiff intends to depose the following individuals:

- Andersen, Jeremy
- Bortner, Andrea
- Brinton, Turner
- Brkic, Mladen
- Celli, John
- Choo, Zhe
- Chou, Edward
- Currier, Rich
- Cyprus, Nick
- Estey, Paul
- Georges, Stephanie
- Guetre, Lori
- Gursky, Jason
- Hanafy, Yasir
- Hoegler, Darren
- Lance, Howard

1

- Lau, Angela
- McCombe, William
- Poratto, Marissa
- Porter, Biggs
- Shockey, Kathy
- Stephenson, Bruce
- Torres, Jose
- Vanturennout, Karel
- Weber, Lance
- Wilkinson, Paul
- Windrum, Jill
- Wiresekara, Anil
- Zamarian, Dario

On or before Monday, February 14, Plaintiff requests that you provide the following information:

1. Which of the foregoing witnesses does OMM represent?
2. Available dates for each of the witnesses OMM represents.
3. The identities and dates for the PMK depositions, with topics 16 and 17 phased ahead of the substantive topics.

Separately, please note that Paul Wilkinson is on our list. In addition to confirming whether OMM represents Mr. Wilkinson, please advise as to which years Mr. Wilkinson worked for Maxar, and whether Maxar has retained emails he sent from any Maxar account (*e.g.*, pwilikinson@mdalimited.ca) or other ESI Ms. Wilkinson generated, sent or received.

Our IDC regarding deposition coordination is set for February 17. Other than the dispute concerning Defendants' attempt to impose an improper hours limit on PMK depositions, pending the Court's order on that protocol, we will agree to follow Defendants' proposals (maintaining our positions and reserving all rights).  In light of the case schedule, and the parties' already protracted discussions concerning defense depositions in this case (Plaintiff's deposition occurred more than half a year ago), further delay of finalizing deposition logistics is unwarranted. To the extent witnesses on our list overlap with witnesses on the federal plaintiff's list, we are open to coordination of dates.

We look forward to discussing these issues with you on Monday's call.

Best,
Makenna

2

# DEFENDANTS' EXHIBIT E



Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
Thomas L. Watts (SBN 308853)
tomw@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

David W. Hall (SBN 274921)
dhall@hedinhall.com
Armen Zohrabian (SBN 230492)
azohrabian@hedinhall.com
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

*Co-Lead Counsel for Plaintiff and the Class*

Matthew W. Close (S.B. # 188570)
mclose@omm.com
Brittany Rogers (S.B. # 274432)
brogers@omm.com
Jonathan B. Waxman (S.B. # 294851)
jwaxman@omm.com
Kate M. Ikehara (S.B. # 313431)
kikehara@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 18th Floor Los
Angeles, California 90071-2899
Telephone: +1 213 430 6000
Facsimile: +1 213 430 6407

*Attorneys for Defendants Maxar Technologies,
Inc., Howard L. Lance, Anil Wirasekara,
Angela Lau, Robert L. Phillips, Dennis H.
Chookaszian, Lori B. Garver, Joanne O.
Isham, Robert Kehler, Brian G. Kenning, and
Eric Zahler*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| IN RE MAXAR TECHNOLOGIES, INC. SHAREHOLDER LITIGATION | Case No. 19CV357070 |
| | CLASS ACTION |
| This Document Relates To: | DATE ACTION FILED: 10/21/2019 |
| ALL ACTIONS | DEPT. 1 |
| | JUDGE:  HON. SUNIL R. KULKARNI |
| | **[PROPOSED] PROTOCOL GOVERNING COORDINATION OF DEPOSITIONS** |

1

[PROPOSED] MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

**[PROPOSED] PROTOCOL GOVERNING COORDINATION OF DEPOSITIONS**

**I.    APPLICABILITY OF PROTOCOL**

1.    The deposition coordination protocol is intended to facilitate the deposition process, avoid duplicative depositions to the extent practicable (including multiple depositions of the same witness absent good cause), and resolve or narrow the issues required to be escalated to the Court. Subject to paragraph 8, below, the terms of this protocol shall apply to all depositions taken in the class actions filed in the United States District Court for the District of Colorado, *Oregon Laborers v. Maxar Techs., et al.* (Case No. 19-cv-124) ("Federal Action") and the Superior Court of Santa Clara County, *McCurdy v. Maxar Techs., et al.* (Case No. 19-cv-357070) ("State Action") (collectively, the "Related Actions").

2.    Nothing in this Order will preclude any Party from seeking to modify it later for good cause shown.  Prior to doing so, however, counsel will meet and confer in a good-faith effort to reach agreement as to the appropriate scope of any modifications or revisions.

**II.    NUMBER AND LENGTH OF DEPOSITIONS**

3.    A percipient witness may be deposed only once in the Related Actions or either one of them after the date of entry of the deposition coordination protocol, except by stipulation of the parties or by Order of the proper Court on a showing of good cause.

4.    The Parties agree to meet and confer prior to any such deposition for the purposes of determining whether it can be completed in a single day.

5.    "Common Interest Depositions" shall include:

    a.    All depositions noticed or subpoenaed in the Federal Action that the State Action Plaintiff elects to subpoena or cross-notice;

    b.    All depositions noticed or subpoenaed in the State Action that the Federal Action plaintiff elects to subpoena or cross-notice;

    c.    Subject to paragraph 8, below, all depositions of Defendants (including of corporate representatives) or their current and former employees;

2

[PROPOSED] MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

d.    Expert depositions where the expert has been designated to offer opinions in both of the Related Actions.

6.    Absent a good cause showing, the Federal Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the State Action at least five calendar days before the deposition is scheduled means that no testimony resulting from the State Action subpoena or notice may be used in the Federal Action.  Absent a good cause showing, the State Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the Federal Action at least five calendar days before the deposition is scheduled means that no testimony resulting from the Federal Action subpoena or notice may be used in the State Action.[1]

7.    Absent a good cause showing, the Federal Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the State Action means the witness may not be re-deposed in the Federal Action.  Absent a good cause showing, the State Action Plaintiff's failure to subpoena or cross-notice a deposition taking place in the Federal Action means that the witness may not be re-deposed in the State Action.

8.    A Common Interest Deposition, no matter which party initially notices or subpoenas it, shall count as a deposition in both the State Action and the Federal Action for the purpose of assessing deposition limits or necessity (e.g., burden, cumulativeness, and proportionality), so long as the other party cross-notices it.

9.    As to the Federal Action, nothing in this protocol alters, changes, or impacts the provisions of Federal Rule of Civil Procedure 30(a)(2)(A)(i).

10.    As to the State Action, nothing in this protocol is intended to place presumptive limits on the number of depositions available to the State Action Plaintiff.

11.    The Parties reserve their respective rights to ask the Superior Court presiding over the State Action to expand or limit the number of depositions available in the State Action based on

---

[1] Defendants agree to notify the Federal and State Plaintiffs of a deposition or subpoena notice served in either case within two calendar days of receiving the notice.

[PROPOSED] MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

any applicable grounds. Defendants believe that the reasonableness and appropriateness of the total number of depositions taken in the State Action shall be assessed based in part on the total number of Common Interest Depositions subpoenaed, noticed, or cross-noticed by the State Action Plaintiff.

12.     The Parties agree to limit each Common Interest Deposition to no more than 14 hours total, with the Federal Action Plaintiff limited to no more than 7 hours of time absent leave from the Federal Court. In addition, for party-related witnesses, the defending party will have an additional hour, on top of the 14-hour limit, to conduct its examination. Any exceptions would require a specific showing of good cause.

13.     Absent a good cause showing, the presumptive limit for the deposition of a corporation in the State Action will be 28 hours. Accordingly, if Plaintiffs spend 14 hours questioning one witness designated as a corporate representative, they have 14 hours remaining for any additional corporate representatives.

14.     Any noticing party or cross-noticing party is entitled to minute-for-minute re-cross following any examination by the defending party.

15.     The Parties agree to limit each day of Common Interest Depositions to 7 hours total record time each day, unless all Parties and witnesses agree otherwise.

**III.     DEPOSITION PROCEDURE**

16.     Counsel in the State Action shall be served with all deposition notices or subpoenas issued in the Federal Action, and vice versa. E-mail service shall suffice.

17.     The Parties will cooperate in good faith to schedule a Common Interest Deposition so that the need to coordinate the availability of counsel does not unreasonably delay the scheduling of depositions.

18.     For witnesses represented by O'Melveny & Myers whose depositions, subject to the limitations in this protocol, will go beyond one day, Defendants agree to use good-faith efforts to make witnesses available for two back-to-back calendar days; in the event that such a witness is not reasonably available for two back-to-back calendar days in the requested timeframe, Defendants

4

[PROPOSED] MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

agree that, absent a showing of good cause, they will propose two dates within a five-day period during which the witness and defense counsel can be available.

19.    Counsel for Plaintiffs in the Related Actions shall meet and confer prior to any Common Interest Deposition and shall reach agreement regarding allocation of Plaintiffs' deposition questioning time.

20.    Objection of one counsel to a question will preserve that objection on behalf of all other counsel and therefore counsel shall avoid repeating objections.

21.    Any objection to relevance or admissibility of documents used as deposition exhibits are not waived, and are preserved pending a later ruling by the Court or by the trial judge.

22.    Any document produced in one of the Related Actions and introduced as an exhibit during a Common Interest Deposition will be deemed produced in all the Related Actions, subject to objections served in either the State or Federal Actions.

23.    Defense counsel shall not seek discovery of communications between counsel for the Federal Action and State Action plaintiffs regarding deposition coordination.

IT IS SO ORDERED.

ENTERED this _____ day of _____, 2022.

_____
HONORABLE SUNIL R. KULKARNI

5
[PROPOSED] MAXAR SECURITIES DEPOSITION COORDINATION PROTOCOL

# DEFENDANTS' EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA,

      Defendants.

---

**LEAD PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF
CIVIL PROCEDURE 26(a)(1)**

---

Cases\4851-4234-5422.v1-10/21/20

## I.    PRELIMINARY STATEMENT

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Lead Plaintiff Oregon Laborers Employers Pension Trust Fund ("Lead Plaintiff") submits its initial disclosures. These initial disclosures are made without waiver of the attorney-client privilege or work product protection and are not a concession that such information is relevant or admissible at trial.

These initial disclosures are based on information reasonably available to Lead Plaintiff at this time. Lead Plaintiff's investigation is continuing, and discovery may reveal additional documents, individuals and/or entities likely to have discoverable information that Lead Plaintiff may use to support the claims contained in its Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 44) (the "Complaint"). Lead Plaintiff reserves the right to modify or supplement the information contained in these initial disclosures.

## II.    PERSONS WHO MAY HAVE DISCOVERABLE INFORMATION UNDER RULE 26(a)(1)(A)(i)

Lead Plaintiff believes the individuals and entities named herein may have discoverable information, as that term is used in Federal Rule of Civil Procedure 26(a)(1)(A)(i), concerning the allegations in the Complaint. These disclosures are made based upon information reasonably available to Lead Plaintiff at this stage of the litigation and without prejudice to Lead Plaintiff's rights to identify or rely on facts provided by additional witnesses, as discovery is ongoing.

### A.    Lead Plaintiff

Lead Plaintiff, through its administrator Ryan Stephens, is likely to have discoverable information concerning the transactional records that support its losses in connection with the purchase or sale of Maxar Technologies, Inc. ("Maxar" or the "Company") common stock on behalf of Lead Plaintiff. Lead Plaintiff may be contacted through its undersigned counsel.

- 1 -

Cases\4851-4234-5422.v1-10/21/20

**B.    Defendants**

Defendants Maxar, Howard L. Lance and Anil Wirasekara (collectively, "Defendants") are

likely to have discoverable information regarding the subject matter of Lead Plaintiff's claims as

alleged in the Complaint and any purported defenses:

| NAME | CONTACT INFORMATION |
|---|---|
| Maxar Technologies, Inc.<br><br>Howard L. Lance<br><br>Anil Wirasekara | c/o Latham Watkins LLP<br><br>Kristin Murphy<br>650 Town Center Drive, 20th Floor<br>Costa Mesa, CA 92626<br>714/755-8287<br><br>Brian Glennon<br>Eric Pettis<br>355 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071<br>213/891-7593 |

**C.    Current and Former Directors, Executives and Employees of Maxar**

The following current and former directors, executives, employees and representatives of

Maxar may have information that Lead Plaintiff may use to support the claims alleged in the

Complaint, including, *inter alia*, the following general categories of information: Maxar's financial

accounting practices with respect to monitoring indicators of impairment and performing impairment

testing per International Financial Reporting Standard ("IFRS") accounting standards; Defendants'

statements and omissions as alleged in the Complaint; market reaction to Defendants' statements and

omissions as alleged in the Complaint; Defendants' knowledge of the indicators of impairment to

geostationary communications satellite ("GeoComm") business assets as set forth in the Complaint;

Defendants' knowledge of the risks and contingencies associated with the GeoComm construction

contract for AMOS-8; the reasons Maxar suffered or expected to suffer the stock price declines

- 2 -

Cases\4851-4234-5422.v1-10/21/20

alleged in the Complaint; Maxar's policies and practices regarding the preparation, approval and dissemination of Maxar's statements regarding GeoComm's value, results, awards and contracts, including AMOS-8; the efficiency of the market for Maxar's common stock; damages suffered by investors as a result of Defendants' alleged false and misleading statements and/or omissions; any denials or affirmative defenses set forth in Defendants' Answer to Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 74) (the "Answer"); and any other matters relevant to the allegations in the Complaint:

| NAME | CONTACT INFORMATION | |
|---|---|---|
| Dario Zamarian | | |
| David Bernstein | | |
| Dennis H. Chookaszian | | |
| Kathy Shockey | | |
| Jason Gursky | | |
| Jeffrey S. Guy | | |
| John Celli | | |
| Jose A. Torres, Jr. | | |
| Mike Santoro | | |

- 3 -

| NAME | CONTACT INFORMATION |
|------|---------------------|
| Nancy S. Coleman | |
| Nick Cyprus | |
| Paul Estey | |
| Rich Currier | |
| Turner Brinton | |
| Wendy Lewis | |
| William McCombe | |
| Yasir Hanafy | |

### D.    Additional Non-Parties

The following individuals and entities may have information that Lead Plaintiff may use to support the claims alleged in the Complaint, as described below.

### 1.    Advisors, Consultants and Professional Services Providers

The following advisors, consultants and professional service providers, as well as current and former employees of the same, may have information regarding, *inter alia*: Maxar's financial accounting practices with respect to monitoring indicators of impairment and performing impairment testing per IFRS accounting standards; Defendants' statements and omissions as alleged in the Complaint; market reaction to Defendants' statements and omissions as alleged in the Complaint;

- 4 -

Defendants' knowledge of the indicators of impairment to GeoComm business assets as set forth in the Complaint; Defendants' knowledge of the risks and contingencies associated with the AMOS-8 contract; the reasons Maxar suffered or expected to suffer the stock price declines alleged in the Complaint; Maxar's policies and practices regarding the preparation, approval and dissemination of Maxar's statements regarding GeoComm's value, results, awards and contracts, including AMOS-8; the efficiency of the market for Maxar's common stock; damages suffered by investors as a result of Defendants' alleged false and misleading statements and/or omissions; any denials or affirmative defenses set forth in Defendants' Answer; and any other matters relevant to the allegations in the Complaint:

| NAME | CONTACT INFORMATION |
|---|---|
| KPMG LLP (United States) | 17th Street, Suite 800<br>Denver, CO 80202<br>303/296 2323 |
| KPMG LLP (Canada) | 777 Dunsmuir Street, P.O. Box 10426<br>Vancouver BC V7Y 1K3 Canada<br>604/691-3000 |
| Bain & Company, Inc. | 131 Dartmouth Street<br>Boston, MA 02116<br>617/572-2000 |

### 2.    Former Customers and Business Partners

Space Communication Ltd. ("Spacecom"), and its employees, officers, directors and affiliates may have discoverable information which Lead Plaintiff may use to support the claims alleged in the Complaint concerning the AMOS-8 contract:

| NAME | CONTACT INFORMATION |
|---|---|
| Space Communication Ltd. | Menachem Begin 7<br>Ramat-Gan 52521 Israel<br>+972-3-755-1000 |

- 5 -

Cases\4851-4234-5422.v1-10/21/20

### 3.    Analyst Firms and Fund Managers

The following analyst firms and fund managers, and their employees, officers, directors and affiliates may have discoverable information which Lead Plaintiff may use to support the claims alleged in the Complaint concerning Maxar securities:

| NAME | CONTACT INFORMATION |
|---|---|
| BMO Capital Markets Corp. | 3 Times Square<br>New York, NY 10036<br>212/885-4000 |
| Credit Suisse Securities (USA) LLC | 11 Madison Avenue, 24th Floor<br>New York, NY 10010<br>212/325-2000 |
| CIBC World Markets, Inc. | 300 Madison Ave<br>New York, NY 10017<br>212/856-4000 |
| RBC Capital Markets, LLC | 200 Vesey Street, 9th Floor<br>New York, NY 10281<br>212/428-6200 |
| The Bank of Nova Scotia (Scotiabank) | 250 Vesey Street, 23rd & 24th Floors<br>New York, NY 10281<br>212/225-5000 |
| Spruce Point Capital Management LLC | 1740 Broadway, 15th Floor<br>New York, NY 10019<br>212/519-9813 |
| BlackRock Institutional Trust Co., N.A. | 400 Howard Street<br>San Francisco, CA 94105<br>415/670-2000 |
| Douglas C. Lane & Associates, Inc. | 777 Third Avenue, 38th Floor<br>New York, NY 10017<br>212/262-7670 |
| Shapiro Capital Management LLC | 3060 Peachtree Road NW, Suite 1555<br>Atlanta, GA 30305<br>404/842-9600 |
| T. Rowe Price Associates, Inc. | 100 East Pratt Street<br>Baltimore, MD 21202<br>410/345-2000 |
| The Vanguard Group, Inc. | 100 Vanguard Boulevard<br>Malvern, PA 19355<br>610/669-1000 |

Cases\4851-4234-5422.v1-10/21/20

### 4.      Investment Manager

The following investment manager may have discoverable information concerning the purchase and sale of Maxar common stock on behalf of Lead Plaintiff:

| NAME | CONTACT INFORMATION |
|---|---|
| Elk Creek Partners, LLC | 44 Cook Street<br>Denver, CO 80206<br>720/381-1160 |

**III.    COPY OR DESCRIPTION BY CATEGORY OF DOCUMENTS AND TANGIBLE THINGS RELEVANT TO FACTS ALLEGED IN THE PLEADINGS UNDER FED. R. CIV. P. 26(a)(1)(A)(ii)**

Lead Plaintiff (through its counsel) discloses that it has in its possession, custody or control: (a) publicly available documents; (b) documents referenced in the Complaint; and (c) records identifying and concerning its transactions in Maxar common stock.

**IV.    COMPUTATION OF DAMAGES UNDER RULE 26(a)(1)(A)(iii)**

The calculation of damages in this case will be the subject of expert analysis.  The disclosure of the identity, report and opinion of any such expert(s) will be made in accordance with the Federal Rules of Civil Procedure, the Local Rules, the schedule agreed to by the parties and the orders of the Court.  Lead Plaintiff reserves the right to seek any available damages, as well as any equitable relief to which it is entitled.

Lead Plaintiff's attorneys' fees and costs are being incurred on an ongoing basis, and Lead Plaintiff is presently unable to state the amount for this claim.

Because the accrual of pre-judgment interest is ongoing and accrual of post-judgment interest will not begin to accrue until after the judgment is obtained, Lead Plaintiff is unable to calculate the amount owed at this time.

Cases\4851-4234-5422.v1-10/21/20

Lead Plaintiff reserves the right to seek any other damages to which it is legally entitled in

this action.

## V.    ANY INSURANCE AGREEMENT UNDER WHICH AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY ALL OR PART OF A JUDGMENT UNDER RULE 26(a)(1)(A)(iv)

The information sought by this portion of Federal Rule of Civil Procedure 26(a)(1)(A)(i) is

inapplicable to Lead Plaintiff.

DATED:  October 21, 2020              ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     SPENCER A. BURKHOLZ
                                     HENRY ROSEN (017965)
                                     TRIG R. SMITH
                                     DEBASHISH BAKSHI


                                           s/ TRIG R. SMITH
                                          TRIG R. SMITH

                                     655 West Broadway, Suite 1900
                                     San Diego, CA  92101
                                     Telephone:  619/231-1058
                                     619/231-7423 (fax)
                                     spenceb@rgrdlaw.com
                                     henryr@rgrdlaw.com
                                     trigs@rgrdlaw.com
                                     dbakshi@rgrdlaw.com

                                     *Lead Counsel for Lead Plaintiff*

Cases\4851-4234-5422.v1-10/21/20

## DECLARATION OF SERVICE BY E-MAIL

I, CASEY REIS, not a party to the within action, hereby declare that on October 21, 2020, I served the attached LEAD PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1) on the parties in the within action by e-mail addressed as follows:

## COUNSEL FOR DEFENDANTS:

| NAME | FIRM | E-MAIL |
|---|---|---|
| Jerome H. Sturhahn<br>Milton L. Smith<br>Peter G. Koclanes | SHERMAN & HOWARD L.L.C.<br>633 Seventeenth Street,<br>Suite 3000<br>Denver, CO 80202<br>Telephone: 302/297-2900<br>303/298-0940 (fax)<br><br>*Attorneys for Defendants Maxar Technologies Inc., Howard L. Lance, and Anil Wirasekara* | msmith@shermanhoward.com<br>pkoclanes@shermanhoward.com<br>jsturhahn@shermanhoward.com |
| Brian T. Glennon<br>Eric C. Pettis | LATHAM & WATKINS LLP<br>355 South Grand Avenue,<br>Suite 1000<br>Los Angeles, CA 90071<br>Telephone: 213/891-7593<br>213/891-8763 (fax)<br><br>*Attorneys for Defendants Maxar Technologies Inc., Howard L. Lance, and Anil Wirasekara* | brian.glennon@lw.com<br>eric.pettis@lw.com |
| Kristin N. Murphy | LATHAM & WATKINS LLP<br>650 Town Center Drive, 20th Floor<br>Costa Mesa, CA 92626<br>Telephone: 714/755-8287<br>714/755-8290 (fax)<br><br>*Attorneys for Defendants Maxar Technologies Inc., Howard L. Lance, and Anil Wirasekara* | kristin.murphy@lw.com |

Cases\4851-4234-5422.v1-10/21/20

**COUNSEL FOR PLAINTIFFS:**

| NAME | FIRM | E-MAIL |
|------|------|--------|
| Spencer A. Burkholz<br>Henry Rosen<br>Trig R. Smith<br>Debashish Bakshi | ROBBINS GELLER<br>RUDMAN & DOWD LLP<br>655 West Broadway,<br>Suite 1900<br>San Diego, CA 92101 Telephone:<br>619/231-1058<br>619/231-7423 (fax)<br><br>*Lead Counsel for Lead Plaintiff* | spenceb@rgrdlaw.com<br>henryr@rgrdlaw.com<br>tsmith@rgrdlaw.com<br>dbakshi@rgrdlaw.com |

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 21, 2020, at San Diego, California.

s/ CASEY REIS

CASEY REIS

Cases\4851-4234-5422.v1-10/21/20

# PLAINTIFF'S

# EXHIBIT A

**EXHIBIT A   [REDACTED]**
**PLAINTIFF'S GOOD CAUSE FOR TAKING 26 DEPOSITIONS**

| Name | Plaintiff's Good Cause |
|---|---|
| Celli, John | SSL President (pre-Dario Zamarian) for 11 years, and worked at SSL for 36 years in total. He has personal knowledge of the industry challenges for GeoCom and GeoCom's tactics/strategies throughout the relevant time period. Celli communicated directly with Senior Management regarding these issues. Celli retired in June 2017 when the Company announced a record-breaking lay-off of 173 employees in Palo Alto, CA and is quoted in the Complaint concerning the slowdown in orders for GEO satellites being the cause for reductions at Maxar. ¶72.[1] External factors such as industry slowdowns and internal factors such as layoffs are alleged to be indicators of impairment that Maxar ignored.<br><br>Some specific examples of documents showing Celli's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A May 11, 2017 e-mail from Celli where, █████████ MAXAR_0016831; ¶72;<br><br>• A May 27, 2017 e-mail from Celli ██████ █████. MAXAR_0017485;<br><br>• A June 15, 2017 e-mail from the Senior Vice President of Business Development relaying █████ MAXAR_0017983;<br><br>• A June 22, 2017 e-mail where Celli agrees that Maxar's written statement to *SpaceNews* regarding the |

---

[1]    All "¶_" references are to Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 44) (the "Complaint"). All capitalized terms not otherwise defined herein, have the same meaning as set forth in the Complaint.

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ███████████████████████████ MAXAR_0338324; ¶72; and<br><br>• A September 5, 2017 e-mail from Celli, ███████████████████████ ███████████ MAXAR_0035500. |
| Chou, Edward | A Senior Manager of Corporate Finance both at MDA and Maxar.  Chou was involved in and made numerous statements in documents that are relevant to Plaintiff's claims.  For example, Chou was involved in the preparation of Maxar's 3Q17 goodwill impairment test, including discussions regarding management's underlying assumptions.  Chou was also involved in the preparation of Maxar's year-end 2017 goodwill impairment testing.  Chou was a contact for KPMG Canada during the course of its audits regarding Maxar's impairment methodology.  Also, Chou is an important witness for understanding SSL's forecasting process given his role in SSL's financial planning and analysis.<br><br>Some specific examples of documents showing Chou's knowledge of facts relevant to Plaintiff's claims include:<br><br>• KPMG Canada discussing with Chou ████████████ ██████████████████████████████████<br><br>MAX0000039;<br><br>• A November 12, 2017 e-mail from Chou ████████████████████ after Maxar's closing of the DigitalGlobe acquisition, saying: ██████████████████ ████████████████████████████████████ MAXAR_0381316;<br><br>• A February 14, 2018 e-mail from Chou █████████████████ █████████ MAXAR_0067663;<br><br>• A February 16, 2018 e-mail from Chou ████████████████ ████████████████████████████ DP_Maxar_006101; |

- 2 -

| Name | Plaintiff's Good Cause |
|---|---|
| | • Chou is referenced in KPMG Canada's ███████████████████████████████ MAX0000877; and<br><br>• Chou had key responsibilities in Maxar's forecasting process, ███████████████████████████████ MAXAR_0042979. |
| Currier, Rich | Senior Vice President of SSL business development from 2013 to 2019. He has direct knowledge regarding GeoCom's financial and competitive challenges, including presentation of these issues to defendant Lance. He also prepared SSL's operating plans and discussed SSL's outlook and related industry trends with Maxar's Board. He personally interacted with Bain & Co. ("Bain") in 2017 and analyzed their assessments of GeoCom's challenges. Further, Currier met with customers, trying to win business for Maxar, and documents show intimate knowledge of the AMOS-8 contract, one of the major issues in this case.<br><br>Some specific examples of documents showing Currier's knowledge of facts relevant to Plaintiff's claims include:<br><br>• An April 17, 2017 e-mail from Currier stating: ███████████████████████████ MAXAR_0018168;<br><br>• An April 20, 2017 e-mail from Currier discussing the beginning of the ████████████████████████████ MAXAR_0016120;<br><br>• A June 2, 2017 e-mail from Currier stating: ████████████████████████████ MAXAR_0254772;<br><br>• An August 10, 2017 e-mail from Currier stating: ████████████████████████████ |

- 3 -

| Name | Plaintiff's Good Cause |
|------|------------------------|
| | ███████████████ MAXAR_0089842;<br><br>• A November 19, 2017 e-mail from Currier stating: ███████████████████ MAXAR_0089472;<br><br>• A March 30, 2018 e-mail from Currier stating: ███████████████████ MAXAR_0149943; and<br><br>• A May 21, 2018 e-mail from Currier stating: ███████████████████ MAXAR_0149791. |
| Cyprus, Nick | Chair of Maxar's Audit Committee. He has knowledge of the Audit Committee's investigation into Spruce Point's allegations. As the Audit Committee chair, he was involved in reviewing Maxar's 1Q18 and 2Q18 quarterly financial statements alleged by Plaintiff to be materially misstated. He is identified in Defendants' interrogatory responses as a person that was involved in the Audit Committee review and as a person that was involved in drafting, editing, reviewing or approving the impairment disclosure language in the Company's October 31, 2018 Form 6-K.<br><br>Some specific examples of documents showing Cyprus' knowledge of facts relevant to Plaintiff's claims include:<br><br>• A May 8, 2018 e-mail from Cyprus ██████████████████ MAXAR_0198444;<br><br>• An August 8, 2018 e-mail from Cyprus ███████ MAXAR_0073252;<br><br>• An August 14, 2018 e-mail from Cyprus ██████████ |

- 4 -

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████████ MAXAR_0073238;<br><br>• An August 22, 2018 e-mail from Cyprus ███████████████████████████████████████████████████████████████████████ FRA00000790; and<br><br>• Cyprus' line edits sent to consultant for an August 24, 2018 press release ███████ FRA00000865-866. |
| Estey, Paul | Former Executive Director of SSL, and COO of SSL since July 17, 2017. Estey has personal knowledge of the operations of SSL, including the status of GeoCom's satellite order backlog, completion of cost reduction projects and repeated reductions in the GeoCom workforce prior to and during the Class Period. Estey was intricately involved in strategy and steering committee meetings, communicating and working directly with the Individual Defendants. Estey was directly involved in strategizing how to sell SSL and personally interacted with Bain in 2017. Estey had direct knowledge of the AMOS-8 award, including the issues and contingencies associated with the award. Estey is also listed in Defendants' Rule 26(a)(1) disclosures as an individual likely to have discoverable information that Defendants may use in support of their defenses.<br><br>Some specific examples of documents showing Estey's knowledge of facts relevant to Plaintiff's claims include:<br><br>• An April 19, 2017 presentation by Estey informing other senior SSL executives that ██████████████ MAXAR_0170337;<br><br>• A June 2, 2017 e-mail from Estey summarizing notes from the ████████ ███████████████████████████████████████████████████ MAXAR_0018578; |

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|------|------------------------|
|  | <ul><li>A June 23, 2017 e-mail from Estey saying: ███ MAXAR_0052962;</li><li>A June 23, 2017 e-mail from Estey saying: ███ MAXAR_0052962. ███ MAXAR_0052963;</li><li>A July 18, 2017 e-mail from Estey saying: ███ MAXAR_0053004. With the presentation saying: ███ MAXAR_0053005;</li><li>A January 23, 2018 e-mail from Estey saying: ███ MAXAR_0145309;</li><li>A March 16, 2018 e-mail from Estey saying: ███ MAXAR_0052499;</li><li>A March 28, 2018 e-mail from Estey saying: ███ MAXAR_0145293;</li><li>An April 9, 2018 e-mail from Estey ███ MAXAR_0052482; and</li></ul> |

- 6 -

| Name | Plaintiff's Good Cause |
|---|---|
| | • A May 23, 2018 e-mail from Estey ▋▋▋ and ▋▋▋ MAXAR_0052252. |
| Gursky, Jason | Vice President of Investor Relations, and has served in this role since 2017, coming to Maxar from Citigroup where he was a U.S. aerospace and defense analyst. Gursky was heavily involved in messages Maxar put out to the street, writing scripts and Q&A responses with Defendants. Gursky's contact information is part of Maxar's August 24, 2018 press release regarding the Spruce Point report, which is alleged to be among the reasons why Defendants' misrepresentations regarding their accounting came to light. In addition, Gursky has information about investor, analyst and media accounts related to other underlying allegations such as the AMOS-8 contract and the strategic alternatives for SSL. Gursky communicated often to defendant Lance, including in the areas of investor messaging and concerns. Gursky is also listed in Defendants' Rule 26(a)(1) disclosures as an individual likely to have discoverable information that Defendants may use in support of their defenses.<br><br>Some specific examples of documents showing Gursky's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A January 18, 2018 e-mail from Gursky telling ▋▋▋ MAXAR_0044122;<br><br>• A February 27, 2018 e-mail from Gursky to ▋▋▋ MAXAR_0044228; |

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | • A May 4, 2018 e-mail from Gursky stating: ███████████████ MAXAR_0044800; <br><br> • A June 8, 2018 e-mail from Gursky regarding ████████████████ MAXAR_0045406; <br><br> • A July 31, 2018 e-mail from Gursky stating: ████████ MAXAR_0040232; <br><br> • An August 3, 2018 e-mail from Gursky to ████████████████ MAXAR_0045682; <br><br> • An August 24, 2018 e-mail from Gursky ████████████████ MAXAR_0045627; and <br><br> • An October 18, 2018 e-mail concerning Maxar's ████████████████ |

- 8 -

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
|  | ███████████████████████████████████████████<br>█████ MAXAR_0043477. |
| Harrah, Theresa | SSL's assistant controller. She has knowledge of SSL's accounting and internal controls, including any impairment procedures conducted at SSL. Harrah had involvement in and made numerous statements in documents that are relevant to Plaintiff's claims, including key documents that pertain to whether or not Maxar complied with the relevant accounting standards applicable to this case. Further, Harrah was a main contact at SSL for KPMG Canada and KPMG US, including her signing of auditor management representation letters on behalf of SSL management. Harrah was terminated, in part, for her role in the GeoCom accounting deficiencies. Harrah's documents were also deleted by Maxar after this action was commenced and Plaintiffs will want to seek testimony from Harrah about this issue.<br><br>Some specific examples of documents showing Harrah's knowledge of facts relevant to Plaintiff's claims include:<br><br>• On February 16, 2018, Harrah sent an e-mail ████████████████ ██████████████████████████████ MAXAR_0363560-565;<br><br>• A February 23, 2018 management representation letter ████████████ ████████ MAX0000889;<br><br>• A June 13, 2018 e-mail from Harrah establishing ████████ ████ PwC001518;<br><br>• Harrah was asked by █████████████████████████████ ██████████████████████████ MAXAR_0358228; and<br><br>• August 22, 2018 Audit Committee ████████████████████ █████████████████████████████████████ and ████████████ FRA00000814-816. |

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| Hoegler, Darren | MDA's and Maxar's Assistant Controller, until he left at the end of March 2018. He has knowledge of MDA's impairment assessments prior to the DigitalGlobe acquisition. He was also involved in the goodwill impairment analysis conducted at year-end 2017 with the help of Duff & Phelps. Also, Hoegler has knowledge concerning proposed and actual changes to Maxar's change in reportable segments after the closing of its acquisition of DigitalGlobe. After the Spruce Point report was issued on August 7, 2018, Hoegler, no longer with Maxar, started corresponding via his personal e-mail account and meeting with Maxar executives and accountants about the Spruce Point report.<br><br>Some specific examples of documents showing Hoegler's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A December 15, 2017 e-mail from Hoegler ███████ MAXAR_0065262;<br><br>• In a February 2018 memorandum written regarding the changes in Maxar's ███████ MAXAR_0001922;<br><br>• On February 18, 2018, Hoegler and his team received a ███████ DP_MAXAR_006101;<br><br>• On August 14, 2018, Hoegler e-mailed ███████ MAXAR_0417625; and<br><br>• On August 15, 2018, Hoegler e-mailed from his personal account to ███████ MAXAR_0413275. |

- 10 -

| Name | Plaintiff's Good Cause |
|---|---|
| Lance, Howard | Named Individual Defendant. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Lau, Angela | Senior Vice President of Finance and Corporate Strategy. Lau had involvement in and made numerous statements in documents that are relevant to Plaintiff's claims. For example, Lau had a critical role in a March 2018 engagement where Duff & Phelps was hired to assist the Company in its initial tax planning requirements for its U.S. domestication. This is an important analysis for proving Plaintiff's claims because, as part of that engagement, Duff & Phelps estimated the fair market value of Maxar's SSL business unit using a discounted cash flow ("DCF") approach, the same DCF approach that was used in Maxar's 2017 year-end goodwill impairment testing. The Duff & Phelps' analysis valued SSL, as of March 31, 2018, at a massive decrease in its fair market value compared to the value Maxar utilized for SSL in its year-end 2017 goodwill impairment testing. This Duff & Phelps' engagement from March 2018 will be a critical analysis for Plaintiffs to obtain deposition testimony on, given the drastic decrease in SSL's fair market value in only a span of three months, indicating the GeoCom assets were impaired no later than 1Q18. On December 21, 2021, Plaintiff served supplemental document requests on Defendants seeking discovery on this matter. Notably, the March 31, 2018 SSL valuation was produced by Duff & Phelps pursuant to subpoena, but Defendants did not produce the document pursuant to Plaintiff's first set of document requests.<br><br>Some specific examples of documents showing Lau's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A March 27, 2018 e-mail from Lau ███████████████████ DP_MAXAR_005593-606 at 597;<br>• An April 30, 2018 e-mail from Lau ███████████████████ DP_MAXAR_005695-724 at 698, 718; and |

- 11 -

| Name | Plaintiff's Good Cause |
|------|------------------------|
|  | • A May 4, 2018 e-mail from ███████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ DP_MAXAR_005728. |
| McCombe, William | Former CFO of Maxar from October 2017 until February 2018, and Senior Vice President and CFO of SSL MDA Holdings from 2016 to October 2017. McCombe has personal knowledge of issues regarding GeoCom's financial performance, impairment testing procedures and new reporting segment structure during 2017 and early 2018. McCombe attended and presented at Maxar's Board meetings and investor conference calls. He was responsible for budgets and providing financial updates to defendant Lance. He also discussed SSL's financials, the satellite market and the DigitalGlobe acquisition with consultants, analysts and investors.<br><br>Some specific examples of documents showing McCombe's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A May 24, 2017 e-mail from McCombe to ████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████ MAXAR_0017492;<br><br>• A July 7, 2017 e-mail from McCombe to ████████ ████████████████████████████████ ████████████████████████████████ MAXAR_0237073, 075;<br><br>• A December 14, 2017 e-mail from McCombe in response ████████ |

- 12 -

| Name | Plaintiff's Good Cause |
|------|------------------------|
| | ████████████████████████████████████████████ MAXAR_0077903; <br><br> • A February 2, 2018 email from McCombe to ████████████ ████ MAXAR_0073355. ████████ <br><br> MAXAR_0073356-358; and <br><br> • A February 5, 2018 e-mail and presentation from McCombe to defendant Lance regarding proposed segment reporting after the DigitalGlobe acquisition. MAXAR_0073339-340. |
| Porter, Biggs | New Maxar CFO in 3Q18. As CFO, Porter had responsibility over finance and accounting, and accordingly has personal knowledge of the $383 million impairment charge taken in 3Q18. Porter was responsible for Maxar's review of whether its assets were impaired and the ultimate decision to take an impairment, including the testing done during 3Q18 (including with PricewaterhouseCoopers, LLP ("PwC")), the decisions made at the c-suite regarding the impairment and disclosures to the public. He was also involved in issues surrounding Maxar's concerns with its debt covenants, selling its GeoCom real estate, as well as the desire to sell GeoCom. He is also identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. <br><br> Some specific examples of documents showing Porter's knowledge of facts relevant to Plaintiff's claims include: <br><br> • An August 7, 2018 e-mail from Porter ████████████ ████████████████████████████ MAXAR_0041986; <br><br> • An August 14, 2018 e-mail from Porter ████████████ ████████████████████████ MAXAR_0196247; |

- 13 -

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | <ul><li>An August 26, 2018 e-mail from Porter ████████ ████████ MAXAR_0063815;</li><li>A September 12, 2018 e-mail containing notes to himself saying: ████████ ████████ MAXAR_0063830;</li><li>A September 26, 2018 e-mail from Porter to ████████ ████████ MAXAR_0304122;</li><li>An October 17, 2018 e-mail from Porter to ████████ ████████ MAXAR_0063914;</li><li>As alleged in the Complaint, on the October 31, 2018 conference call, Porter answered an analyst's question about the potential of more accounting charges for GeoCom in the future by stating: "I mean, every quarter, it's my obligation to look at everything and make sure that we're doing everything right, whether it's in accordance with IFRS or in accordance with GAAP, so that just will never change. And that's not something that is optional. But we did everything that we should do this quarter. We looked at it hard. And I think we, of course, then stand behind that from the standpoint of believing that we've captured what was supposed to be captured." ¶193;</li><li>A November 5, 2018 e-mail from Porter discussing ████████ ████████ MAXAR_0040655; and</li><li>A December 6, 2018 e-mail from Porter saying: ████████ ████████ MAXAR_0037439.</li></ul> |

- 14 -

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| Stephenson, Bruce | Maxar Chief Strategy Officer until he left the Company in 2019.  Stephenson has personal knowledge regarding the Company's GeoCom business, including tactics, strategies and competitive position throughout the relevant time period.  He regularly interacted with the Maxar executive team, including defendant Lance and Dario Zamarian, regarding GeoCom's performance, outlook and internal forecasting.  Stephenson also has direct knowledge of several indicators of impairment that arose in 2017 and the first two quarters of 2018, including Maxar's attempts to sell GeoCom prior to the issuance of the Spruce Point report.  He also reviewed and presented to Maxar's Board, GeoCom strategic alternatives and Project Gold.<br><br>Some specific examples of documents showing Stephenson's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A May 2, 2017 Strategic Planning Update presentation for SSL by Stephenson that states: ████████<br><br>████████ MAXAR_0004120;<br><br>• A November 1, 2017 Strategic Growth Plan Overview presentation by Stephenson that states: ████<br><br>████████<br><br>MAXAR_0001243;<br><br>• A November 13, 2017 e-mail from Stephenson ████<br><br>████████<br><br>████ MAXAR_0077977;<br><br>• A May 17, 2018 e-mail from Stephenson ████<br><br>████████ |

| Name | Plaintiff's Good Cause |
|------|------------------------|
| | ███ MAXAR_0074830; <br><br> • A May 29, 2018 e-mail confirming Stephenson's discussions ███ MAXAR_0075151; <br><br> • A May 30, 2018 e-mail from Stephenson to ███ MAXAR_0324445; <br><br> • A June 7, 2018 e-mail from Stephenson stating: ███ MAXAR_0075475; and <br><br> • A June 30, 2018 e-mail from Stephenson instructing employees ███ MAXAR_0100950. |
| Torres, Jose | DigitalGlobe's Chief Accounting Officer ("CAO") and Maxar's CAO after the DigitalGlobe acquisition. Torres had involvement in and made numerous statements in documents that are relevant to Plaintiff's claims. He has direct knowledge of accounting and factual issues, including Maxar's goodwill impairment analyses for year-end 2017 and each quarter for 2018. Torres as CAO was involved in preparing Maxar's SEC filings for its quarterly financial statements and was part of Maxar's Disclosure Committee. Torres was also directly involved in Maxar's responses to the Spruce Point report, as well as Maxar's accounting treatment for the GeoCom impaired assets and obsolete inventory. <br><br> Some specific examples of documents showing Torres' knowledge of facts relevant to Plaintiff's claims include: |

- 16 -

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | • On December 15, 2017, Torres commented ████████████████ ████████████████████████████ MAXAR_0065262; <br><br> • During 2018, Torres as CAO reviewed the ████████████ ███████████████████████████ KPMG-MAXAR-0002774-779; <br><br> • Torres reviewed the ████████████████████████. MAXAR_0001788; MAXAR_0001789; <br><br> • On May 2, 2018, Torres responded to ██████████████ ████████████████████████ MAXAR_0043178; <br><br> • A July 1, 2018 e-mail from Torres ████████████████ ████████████████████████████████████ MAXAR_0249747, 749. ████ MAXAR_0271493; <br><br> • A July 16, 2018 e-mail from Torres regarding ████████ ██████████████████████████ MAXAR_0275766; <br><br> • On August 1, 2018, only days before the ██████████ ████████████████████████ MAXAR_0219791; and |

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | • On August 9, 2018, only two days after ███████████ ███████████████████████" PwC015115. |
| Weber, Lance | Worked in PwC's Transaction Services group on engagements for Maxar and was later hired as the Segment Controller at Maxar immediately after Maxar publically disclosed the $383 million GeoCom impairment charge on October 31, 2018. Weber will be a critical witness that worked both as a consultant for Maxar when he was at PwC and then was later hired as a new accountant for Maxar. Despite Weber at the time being a consultant at PwC, he helped Maxar's accounting department draft accounting memos defending the timing of the GeoCom impairment charge, as well as drafted impairment disclosure language about the GeoCom impairment charge for the October 31, 2018 disclosure. Consequently, Weber is an important witness for Plaintiffs to depose to understand where and who he received the information from about the impairment drivers for the GeoCom impairment charge in order to draft Maxar's accounting memos. Weber also helped Maxar assess SSL's inventory obsolescence reserves and capitalized research and development (R&D). He had frequent interactions with Maxar's top corporate accountants, Jill Windrum and Jose Torres. Also, Weber led the PwC team in helping Maxar quantify its 3Q18 impairment charges of GeoCom's intangible assets and fixed assets. Weber has been identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses.<br><br>Some specific examples of documents showing Weber's knowledge of facts relevant to Plaintiff's claims include:<br><br>• Weber was involved in preparing a ████████████ ████████████████████████ PwC001563-626 at 611;<br>• The same June 2018 PwC presentation discussing ████████ PwC001563-626 at 605; |

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | • On August 29, 2018 Weber wrote: ██████████ ██████████ PwC013930; <br><br> • On October 22, 2018, Weber drafted ██████████ ██████████ PwC012314; and <br><br> • An October 24, 2018 e-mail from Weber in response to concerns ██████████ ██████████ PwC011805. |
| Wilkinson, Paul | SSL consultant and former SSL employee.  Wilkinson has personal knowledge of most accounting and factual issues in the case.  He has knowledge of segment reporting realignment issues after the acquisition of DigitalGlobe.  Wilkinson received and commented on Duff & Phelps' analyses sent to him concerning Maxar's year-end 2017 goodwill impairment testing.  Wilkinson has knowledge of SSL's deteriorating financial performance in 2018 and the impairment implications of that poor financial performance.  Wilkinson was also involved in responding to analyst questions regarding accounting changes and has insight into investor reactions and communications.  On February 22, 2022, the Court granted (ECF No. 135) and issued the letters rogatory finding that Wilkinson should be deposed (ECF No. 136 at 2). <br><br> Some specific examples of documents showing Wilkinson's knowledge of facts relevant to Plaintiff's claims include: <br><br> • A January 19, 2018 e-mail from Wilkinson discussing ██████████ ██████████ MAXAR_0065596; <br><br> • A February 17, 2018 e-mail from Wilkinson to ██████████ ██████████ DP_Maxar_006055; |

- 19 -

| Name | Plaintiff's Good Cause |
|---|---|
| | • A July 12, 2018 email from Wilkinson to ███████████ ████████████████████ MAXAR_0200678; and<br><br>• An October 31, 2018 e-mail from Wilkinson, ████████████████████████████ ██████ MAXAR_0143317; ████████████████████████ *Id.* |
| Windrum, Jill | One of Maxar's technical accountants along with Jose Torres. Windrum made numerous statements in documents and was involved in issues that are relevant to Plaintiff's claims. For example, Windrum prepared the 1Q18 and 2Q18 quarterly impairment checklists that were then reviewed by Jose Torres. Windrum was heavily involved in the year-end 2017 goodwill impairment testing, including the review of the Duff & Phelps' work. Windrum was a main contact for Maxar's external auditor KPMG Canada and KPMG US, as well as consultants Duff & Phelps and PwC. Plaintiff believes Maxar will be relying on these firms to support their defense of reliance on the advice of accounting and financial professionals. Also, Windrum has knowledge concerning proposed and actual changes to Maxar's change in reportable segments after its closing of the acquisition of DigitalGlobe. Windrum was also involved in the preparation of Maxar's SEC filings, including the 3Q18 impairment disclosure made on October 31, 2018. Further, in the process of drafting the October 31, 2018 GeoCom impairment disclosure, Windrum was intricately involved in the decision to remove from the disclosure any reference to the uncertain NASA funding for GeoCom as an impairment trigger, because the loss of any NASA funding had nothing to do with the GeoCom business. Finally, Windrum has been identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses.<br><br>Some specific examples of documents showing Windrum's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A December 18, 2017 e-mail from Windrum to ████████████ ██████████████████████████████ |

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████████████ MAXAR_0065276;<br><br>• A February 27, 2018 e-mail from Windrum ████████ ████████████ MAXAR_0200602-603;<br><br>• An April 23, 2018 e-mail where Windrum ████████ ████████ MAXAR_0043164;<br><br>• ████████████████ MAXAR_0001788; MAXAR_0001789;<br><br>• An October 12, 2018 e-mail from Windrum stating that in her ████████████████ MAXAR_0065394. ████████████████ MAXAR_0065399;<br><br>• An October 23, 2018 e-mail from Windrum ████████ ████ PwC011805; and<br><br>• A December 17, 2018 e-mail from Windrum to ████████ ████████████████ MAXAR_0064187. |

- 21 -

| Name | Plaintiff's Good Cause |
|------|------------------------|
| Wirasekara, Anil | Named Individual Defendant. Identified by Defendants in their Rule 26(a)(1) disclosures as having information Defendants may use in support of their defenses. |
| Zamarian, Dario | SSL President from June 2017 to April 2019. Author of numerous relevant documents regarding GeoCom's challenges and assessment of strategic alternatives for GeoCom. Was personally involved in finding potential purchasers for GeoCom and has personal knowledge of various indicators of impairment for GeoCom. Also, has knowledge of the AMOS-8 award, including the issues and contingencies associated with the award. Zamarian often directly communicated these facts to defendant Lance.<br><br>Some specific examples of documents showing Zamarian's knowledge of facts relevant to Plaintiff's claims include:<br><br>• A November 13, 2017 e-mail from Zamarian saying ▮▮▮ MAXAR_0077977;<br><br>• A December 3, 2017 e-mail from Zamarian saying: ▮▮▮ MAXAR_0242340;<br><br>• A March 18, 2018 e-mail from Zamarian responding ▮▮▮ MAXAR_0049851;<br><br>• A March 22, 2018 e-mail from Zamarian to ▮▮▮ MAXAR_0072678;<br><br>• An April 4, 2018 e-mail from Zamarian saying: ▮▮▮ MAXAR_0146751; |

- 22 -

| Name | Plaintiff's Good Cause |
|---|---|
| | • An April 30, 2018 e-mail from Zamarian to ███████ ████████████████████ MAXAR_0146432; <br><br> • A May 4, 2018 e-mail from Zamarian, ███████ ████████████████████ MAXAR_0242659; and <br><br> • A May 29, 2018 e-mail from Zamarian to ███████ ████████████████████ MAXAR_0078540. |
| KPMG Canada (witness: Phil Dowad) | KPMG Canada was Maxar's auditor during the 2017 audit, 1Q18 quarterly review and part of the 2Q18 quarterly review. On July 29, 2018, only two days before Maxar issued its 2Q18 financial statements, KPMG Canada was replaced by KPMG US as Maxar's auditor. Dowad was the lead audit partner working on the Maxar engagement for KPMG Canada. During the 2017 audit, Maxar's goodwill impairment testing and valuation procedures for SSL were a "focal point" of KPMG Canada's annual audit. Also, Dowad was involved in the investigation of Spruce Point's allegations of accounting fraud in August 2018, as well as the Company's disclosure of the $383 million GeoCom impairment charge. Dowad is also listed in Defendants' Rule 26(a)(1) disclosures as an individual likely to have discoverable information that Defendants may use in support of their defenses. Additionally, on February 22, 2022, the Court granted (ECF No. 135) and issued the letters rogatory finding that Dowad should be deposed (ECF No. 136 at 2). <br><br> Some specific examples of documents showing Dowad's and KPMG Canada's knowledge of facts relevant to Plaintiff's claims include: <br><br> • KPMG Canada's 2017 workpapers show that it used its ███████ ████████████████████ |

- 23 -

| Name | Plaintiff's Good Cause |
|---|---|
| | ███████████████████████████████████████ MAX0000883. ███████████████████████████████████████<br><br>███████████████████████████████████ *Id.*; ███<br><br>• An August 21, 2018 e-mail from ███████████████████████████████████ ███████████████ FRA00000749; and<br><br>• An October 24, 2018 e-mail from Dowad to ███████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ KPMG-MAXAR-0008378.<br><br>Importantly, Defendants have asserted a reliance on the professional advice of KPMG Canada to defend this action. *See* Defendants' Amended Answer to the Plaintiff's Consolidated Complaint which states: "The financial statements at issue here were audited by a 'Big Four' accounting firm, and to date, have never been restated." ECF No. 83 at 3. |
| KPMG US (witness: Michael Kraehnke) | KPMG US was Maxar's auditor during portions of the 2Q18 quarterly review, 3Q18 quarterly review and 2018 audit of Maxar's financial statements. Kraehnke was the lead audit partner working on the Maxar engagement for KPMG US. Kraehnke had involvement in and made numerous statements in documents that are relevant to Plaintiff's claims. For example, Kraehnke and his KPMG US team were involved in the investigation of Spruce Point's allegations of accounting fraud in August 2018, as well as the Company's accounting treatment of the GeoCom impairment and inventory obsolescence issues disclosed to investors on October 31, 2018. Further, KPMG US was Maxar's auditor at the time Maxar issued its 2Q18 financial statements, which Plaintiff alleges were materially misstated in violation of accounting standards. Kraehnke is also listed in Defendants' Rule 26(a)(1) disclosures as an individual likely to have discoverable information that Defendants may use in support of their defenses.<br><br>Some specific examples of documents showing Kraehnke's and KPMG US's knowledge of facts relevant to Plaintiff's claims include: |

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | • On August 21, 2018, Kraehnke provided comments ████████████████████████████████████ FRA00000759-766 at 761; <br><br> • Regarding the ████████████████████████████ KPMG-MAXAR-0011874; <br><br> • In addition, Kraehnke was involved in ████████████████████████ KPMG-MAXAR-0011847-852; and <br><br> • KPMG US also noted in its 2018 audit a ████████████████████████████ KPMG-MAXAR-0017080. <br><br> Importantly, Defendants have asserted the defense of reliance on the professional advice of KPMG US to defend this action. <br><br> • *See* Defendants' Amended Answer to Plaintiff's Consolidated Complaint which states: "Moreover, when a well-known short seller issued a report suggesting that an impairment of the GeoComm business was imminent (one of the alleged 'corrective disclosures' pled in this case), the Audit Committee – aided by the Company's independent auditor and outside subject matter experts – undertook a comprehensive review. At the conclusion of this review, the Company and its outside advisors determined, and Maxar publicly announced, that there were no material errors in the Company's financial statements and public disclosures." ECF No. 83 at 2. |
| Duff & Phelps (witness: Judd Schneider) | Duff & Phelps is a key third-party in this litigation and Scheider is a Managing Director from Duff & Phelps that was leading the Maxar engagements. Duff & Phelps performed several fair market valuations in 2017 and 2018 for Maxar that are important to Plaintiff's impairment allegations of this case. For example, in 1Q18 Duff & Phelps performed a December 31, 2017 valuation and issued an April 2, 2018 report that Maxar is using as |

- 25 -

| Name | Plaintiff's Good Cause |
|------|------------------------|
|  | a defense to the GeoCom impairment allegations. In addition, on April 30, 2018, Duff & Phelps sent a new March 31, 2018 valuation to Maxar, which indicated SSL's fair value had declined by hundreds of millions of dollars since the December 31, 2017 valuation, predominantly because SSL's discount rate was increased 350 basis points. Plaintiff seeks to take the deposition of Schneider to understand Duff & Phelps' analysis, including the assumptions that were provided by Maxar's management to facilitate Duff & Phelps' valuations. Further, Plaintiff also anticipates Defendants will be asserting the defense of reliance on the professional advice of Duff & Phelps. Schneider is also listed in Defendants' Rule 26(a)(1) disclosures as an individual likely to have discoverable information that Defendants may use in support of their defenses.<br><br>Some specific examples of documents showing Schneider's and Duff & Phelps' knowledge of facts relevant to Plaintiff's claims include:<br><br>• A February 18, 2018 e-mail from Schneider stating: ▉▉▉ DP_MAXAR_006047;<br><br>• A February 19, 2018 e-mail from Schneider stating: ▉▉▉ DP_MAXAR_006068;<br><br>• Duff & Phelps issued an ▉▉▉ MAXAR_0001608-642 at 639. ▉▉▉ MAXAR_0067664;<br><br>• An April 24, 2018 e-mail from ▉▉▉ DP_Maxar_005898; and<br><br>• On April 30, 2018, Duff & Phelps e-mailed a ▉▉▉ DP_MAXAR_005695-724. |

- 26 -

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | ████████████████████████ <br> ██████████ *Id.* |
| Bain & Co. (witness: Tina Radabaugh) | Bain consulted Defendants and other key executives regarding the need to "reinvent" and potentially exit GeoCom due to, *inter alia*, changes in customer demand, continued depressed overall demand and relative uncompetitive position with respect to Maxar's digital payload offering. This work commenced in early 2017 and Bain continued to consult Maxar regarding GeoCom throughout the class period, including working on Project Gold. Also, the Complaint filed in this case contained allegations related to Bain's review into GeoCom's challenges. ¶70. Radabaugh is a partner at Bain that was working with Maxar prior to and during the Class Period. <br><br> Some specific examples of documents showing Radabaugh's and Bain's knowledge of facts relevant to Plaintiff's claims include: <br><br> • A July 27, 2017 Bain presentation for SSL, ██████████████ ████████████████ BAIN- MAXAR_00001033. ██████████ <br> ██████████████████████████ *Id.*; <br><br> • An October 16, 2017 Bain presentation at slide 4 states: ████ ████████████████████████ BAIN- MAXAR_00001324; <br><br> • An October 2017 Bain presentation for SSL which slide 2 states: ████████████████████████████ ████████████████████████████ BAIN- MAXAR_00001039; and <br><br> • A May 14, 2018 e-mail from Radabaugh responding to ████ ████████████████████████████ MAXAR_0078563. |

- 27 -

| Name | Plaintiff's Good Cause |
|---|---|
| Financial Reporting Advisors (witness: Scott Taub) | Taub works for Financial Reporting Advisors ("FRA") and was consulted on multiple accounting issues pertinent to this case. For example, Jill Windrum reached out to Taub in January 2018 to inquire about accounting guidance pertinent to Maxar's considerations of changing its reportable segments after the DigitalGlobe acquisition. Maxar's decision to change its reportable segments after the DigitalGlobe acquisition is an important topic that is directly related to Maxar's year-end 2017 goodwill impairment testing. In addition, Nick Cyprus, Chairman of Maxar's Audit Committee, engaged FRA, and specifically Taub, to act as an advisor to the Audit Committee for purposes of investigating the Spruce Point allegations of accounting fraud. For example, Taub reviewed drafts of Maxar's Comprehensive Response to Spruce Point and provided comments back to Maxar on the draft press releases.<br><br>Some specific examples of documents showing Taub's and FRA's knowledge of facts relevant to Plaintiff's claims include:<br><br>• On January 11, 2018, Jill Windrum reached out to Taub stating: ▮▮▮ MAXAR_0067678. ▮▮▮ *Id.*;<br><br>• On August 21, 2018, Taub in reviewing ▮▮▮ FRA00000880-887 at 882; and<br><br>• On August 23, 2018, Taub e-mailed comments to ▮▮▮ |

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
|  | ████████████████████████████████████████ FRA00000876. |
| Joele Frank (witness: Kara Brickman) | Joele Frank assisted Maxar with its investor relations and public relations response to the Spruce Point allegations on August 7, 2018, Defendants more fulsome response to Spruce Point on August 24, 2018 and investors and Maxar employees' responses to the disclosure of the alleged fraud. Joele Frank, for example, advised that Maxar provide a more detailed response to Spruce Point after market feedback that Maxar's initial response to Spruce Point was not adequate. Deliverables of Joele Frank's work included providing Maxar aid in crafting crisis communications, a CEO plan, developing key messages for Maxar's investor relations team and monitoring investor feedback to Maxar news.<br><br>Some specific examples of documents showing Joele Frank's knowledge of facts relevant to Plaintiff's claims include:<br><br>• On August 7, 2018, while in the process of assisting Maxar with its ██████████ JFWBK_00002326;<br><br>• On August 7, 2018, a Joele Frank representative internally noted: ████████ JFWBK_00002674; and |

- 29 -

4876-9448-5009.v1

| Name | Plaintiff's Good Cause |
|---|---|
| | • On August 27, 2018, a Joele Frank representative, responding to tweets earlier in the day ██████████████████████ ████████████████████████████████████ JFWBK_00000705. |
| PJT Partners and/or Goldman Sachs (witness, unknown at this time) | PJT Partners and Goldman Sachs were responsible for identifying potentially interested parties to acquire GeoCom from Maxar. This was part of Project Gold and commenced sometime prior to mid-June 2018, contrary to Maxar's public disclosures that the strategic alternatives for GeoCom did not start until August 2018. These entities were only capable of finding one party who had potential interest in the GeoCom business or parts of its assets.

Some specific examples of documents showing PJT Partners' and Goldman Sachs' knowledge of facts relevant to Plaintiff's claims include:

• A June 11, 2018 Maxar presentation titled ████████ ██████████████████████████████████ MAXAR_0075642;

• A June 12, 2018 e-mail from █████████████████████ ████████████████████ MAXAR_0239124-127; and

• A June 19, 2018 e-mail to ███████████████████████ ██████████ MAXAR_0074893. ████████████████████ ████ *Id.* |

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on February 28, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Patton L. Johnson
PATTON L. JOHNSON

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: pjohnson@rgrdlaw.com

4868-8830-6704.v1

# Mailing Information for a Case 1:19-cv-00124-WJM-SKC Oregon Laborers Employers Pension Trust Fund et al v. Maxar Technologies Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey S. Abraham**
  jabraham@aftlaw.com

- **Jeffrey Allen Berens**
  jeff@jberenslaw.com,jeffreyberens@comcast.net

- **Spencer A. Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew W. Close**
  mclose@omm.com,matthew-close-5511@ecf.pacerpro.com,mleu@omm.com

- **Nicole Gilliland**
  ngilliland@rgrdlaw.com

- **Patton L. Johnson**
  pjohnson@rgrdlaw.com,panderson@rgrdlaw.com,TerreeD@rgrdlaw.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brittany Allison Rogers**
  brogers@omm.com

- **Henry Rosen**
  henryr@rgrdlaw.com,dianah@rgrdlaw.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,panderson@rgrdlaw.com,ChristC@rgrdlaw.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **Christopher Dennis Stewart**
  cstewart@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Jerome H. Sturhahn**
  jsturhahn@shermanhoward.com,efiling@shermanhoward.com,jbulanow@shermanhoward.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Phillup G  Newhope
,

Logan Durant
,

Michael W Slaunwhite
,