# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA,

      Defendants.

---

**LETTERS ROGATORY REQUESTING JUDICIAL ASSISTANCE
FROM THE SUPREME COURT OF BRITISH COLUMBIA**

---

4894-9105-5890.v1

| SENDER: | The Honorable S. Kato Crews, U.S. Magistrate Judge<br>District of Colorado<br>Byron G. Rogers Courthouse<br>1929 Stout Street<br>Denver, Colorado 80294<br>United States of America |
| --- | --- |
| AUTHORITY OF THE REQUESTED STATE | The Supreme Court of British Columbia<br>The Law Courts<br>800 Smithe Street<br>Vancouver, B.C., Canada<br>V62 2E1<br>Telephone: 604/660-2847 |
| PERSON TO WHOM EXECUTED REQUEST IS TO BE RETURNED: | Patton Johnson<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, California 92101<br>Telephone: 619/231-1058<br>619/231-7423 (fax)<br>pjohnson@rgrdlaw.com |

The United States District Court for the District of Colorado (the "Court") presents its compliments to the Supreme Court of British Columbia, and requests international judicial assistance to obtain material and necessary evidence to be used in the civil proceeding before this Court in the above-captioned action.

Pursuant to the *Canada Evidence Act*, R.S.C. 1985, c. C-5, Part II, §46(1), *The Evidence Act*, ch. E-11.2 and the *British Columbia Evidence Act*, R.S.B.C. 1996, Chapter 124, §53(1), this Court respectfully requests the assistance described herein as necessary to further the interests of justice. The assistance requested is that the Supreme Court of British Columbia compel Darren Hoegler ("Hoegler"), Edward Chou ("Chou") and Angela Lau ("Lau") (Hoegler, Chou and Lau are each a "Witness" and collectively "Witnesses") to be separately examined under oath in the proper and

- 1 -

4894-9105-5890.v1

usual process of the Supreme Court of British Columbia for purpose of giving evidence in this matter, by and in the presence, by remote means if necessary, of the attorneys or agents of the parties. This Court further requests that the Supreme Court of British Columbia cause the evidence of the Witnesses to be recorded verbatim by an Official Court Reporter using instantaneous transcript recording, and cause the Official Court Reporter to mark for identification any documents produced during the examination, to authenticate the transcripts of the examinations and any documents produced during the examinations, and to return the transcripts and documents by registered or certified mail to counsel of record for Lead Plaintiff Oregon Laborers Employers Pension Trust Fund ("Plaintiff").

Each Witness resides in British Columbia, Canada and are each represented by Defendants' counsel (identified below). On March 1, 2022, Defendants' counsel informed Plaintiff in writing that each Witness would not agree to be voluntarily examined.

This Court has determined that each Witness has personal knowledge regarding certain of the claims and that it is necessary for the purpose of justice and for the due determination of the matters in question between the parties in this proceeding that each Witness should be examined under oath. This Court has also determined that their testimony cannot be obtained without the assistance of the Supreme Court of British Columbia.

## I.    NAMES OF THE PERSONS TO BE DEPOSED

Darren Hoegler, who resides in British Columbia, Canada and whose work address is:

█████████████████████
███████████████████████

Edward Chou, who resides in British Columbia, Canada and whose work address is:

███████████████

- 2 -

4894-9105-5890.v1

███████████████████████

Angela Lau, who resides in British Columbia, Canada and whose work address is:

████████████████

██████████████████████

## A.     Plaintiff

Plaintiff represents a putative class of those who purchased or acquired Maxar Technologies,

Inc. ("Maxar" or the "Company") common stock traded on the New York Stock Exchange

("NYSE") between May 9, 2018 through October 30, 2018 inclusive (the "Class Period").  Plaintiff

may be contacted through its Counsel at the address listed below:

> ROBBINS GELLER RUDMAN & DOWD LLP
> Patton L. Johnson
> 655 West Broadway, Suite 1900
> San Diego, California 92101
> Telephone 619/231-1058
> 619/231-7423 (fax)
> pjohnson@rgrdlaw.com

## B.     Defendants

The Defendants in this action are Maxar, Howard L. Lance and Anil Wirasekara

("Defendants").  Defendants and each Witness may be contacted through their counsel at the address

listed below:

> O'MELVENY & MEYERS LLP
> Brittany Allison Rogers
> 400 South Hope Street, 18th Floor
> Los Angeles, CA 90071
> Telephone: 213/430-8349
> brogers@omm.com

4894-9105-5890.v1

## II.    NATURE OF THE PROCEEDINGS

This putative class action lawsuit, which was filed on January 14, 2019, asserts claims for securities fraud under United States federal securities laws, particularly §§10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.  On September 11, 2020, this Court entered an order granting in part and denying in part Defendants' motion to dismiss the allegations.  The parties are now in the fact discovery phase of the litigation, and their court-ordered deadline for completing all fact discovery in this action is June 17, 2022.

### A.    Plaintiff's Summary of the Allegations

The following allegations come from Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 44) ("Complaint"), attached hereto as Exhibit 1.[1]

Maxar is a space technology company incorporated in Delaware and headquartered in Westminster, Colorado.  During the Class Period, Maxar's common stock traded on the NYSE under the ticker symbol "MAXR."  Since 2012, through its subsidiary Space Systems/Loral ("SSL") in Palo Alto, California, the Company has manufactured geostationary communications satellites ("GEO" or "GeoComm").

In the years leading up to the Class Period, the market for large and expensive GEO satellites had undergone structural change.  By the beginning of the Class Period market forces had changed significantly, leading to Maxar's actual and potential customers turning away from GEO satellites in anticipation of smaller and cheaper low-earth orbit technologies.  The confluence of these industry-wide changes raised serious questions as to whether Defendants' financial statements accurately reported the true value of the Company's GeoComm line of business.  Knowing or recklessly

---

[1]    All "¶_" references are to the Complaint.

- 4 -

disregarding that Maxar's GeoComm line of business had all but collapsed, and its reported book value was significantly impaired, Defendants engaged in a fraudulent scheme to falsely and misleadingly assure Maxar investors that the value of the GeoComm business was far more favorable than what it was in reality.

On May 9, 2018, for example, Defendants informed investors that a key accomplishment for the first fiscal quarter of 2018 ("1Q18") bookings within the SSL segment included a geosynchronous satellite construction contract, known as AMOS-8, from Space Communications Ltd. ("Spacecom"). In an analyst conference call on the same day, Defendants reiterated these statements. At the time those statements were made, however, Defendants knew of, or recklessly disregarded, the fact that the AMOS-8 was not a definitive agreement. Plaintiff alleges the agreement between the Company and Spacecom included a provision that allowed Spacecom to withdraw from the deal within 60 days without penalty. At the time of the May 2018 announcements, Plaintiff further alleges that Spacecom did not have financing in place to pay SSL for building AMOS-8, and Spacecom was reliant on future bond offerings to fund the satellite purchase. Further, the AMOS-8 contract was not effective until SSL received the first payment from Spacecom. Plaintiff alleges Defendants should have disclosed these details, among others, when they spoke about the AMOS-8 award. And, Plaintiff alleges Defendants were motivated to conceal this information from market participants so they would not become concerned about the ongoing viability of the SSL segment and the GeoComm business unit.

On May 9, 2018 and July 31, 2018, the Company publicly disclosed its financial results for 1Q18 and the second fiscal quarter of 2018 ("2Q18"), respectively. Those financial statements contained specific dollar amounts for the carrying values of intangible assets, property, plant and

- 5 -

4894-9105-5890.v1

equipment ("PP&E"), inventory and net earnings per share ("EPS").  Plaintiff alleges those statements were materially false and misleading because Defendants, in violation of International Financial Reporting Standards (IFRS), failed to account for numerous indicators that GeoComm's long-lived assets and inventory were already impaired (and, thus, materially overstated on the Company's balance sheet).  One of those factors included the fact that the AMOS-8 GeoComm award was not a definitive award.  Had Defendants timely reported the alleged impairment to investors, the reported entries on Maxar's balance sheet (*e.g.*, intangible assets, PP&E and inventory) and income statement (*e.g.*, EPS) for each 1Q18 and 2Q18 would have been materially lower. KPMG LLP (Canada) ("KPMG Canada") was Maxar's independent auditor at the time the Company issued its 2017 annual financial results, and during 1Q18 and 2Q18.

On August 7, 2018, investment manager Spruce Point Capital Management, LLC ("Spruce Point") issued a report questioning Maxar's financial status and the Company's accounting practices. Among other observations, the report noted on a slide titled "Asset Impairment Likely" that "Maxar's balance sheet is inflated with goodwill and overcapitalized intangible assets."  ¶175. Spruce Point estimated that Maxar's intangibles were impaired by hundreds of millions of dollars. As a result of the Spruce Point report, the Company stock price dropped by 13.4%.  That evening, Maxar issued a press release in response to the Spruce Point report, which stated that the report "contains a number of inaccurate claims and misleading statements."  ¶177.

Immediately after Spruce Point issued its report, and unknown to investors, the Company opened an internal investigation concerning the allegations in the report.  On August 24, 2018, the Company issued a "comprehensive" response to the Spruce Point report, acknowledging the existence of the investigation and conceded:

4894-9105-5890.v1

> [A] non-cash write-downs or an impairment of assets could occur as a result of lower future revenue expectations, industry outlook and overall valuation of the GEO communications satellite line of business. . . . We believe that, given the continued decline in the GEO communications satellite business, it is possible that an impairment or write-down will be recognized in the third [fiscal] quarter of 2018.

¶179. As a result of this news, the Company's stock price dropped by 5.6%.

On September 3, 2018, the Israeli Ministry of Science and Technology announced that AMOS-8 would be built in Israel and funded by the Israeli government. As a result of this news, the Company's stock price dropped 5.5%. On September 25, 2018, Spacecom announced that it would not be making its down payment to Maxar for the AMOS-8 contract. As a result of this news, Maxar's stock price dropped by 4.7%.

On October 31, 2018, prior to the markets opening, Maxar issued its financial statements for the third fiscal quarter of 2018. Defendants disclosed that Maxar had recognized impairment losses of $383.6 million with respect to GeoComm's non-financial assets and obsolete inventory. As a result of this news, Maxar's stock price dropped by 44.9%.

## III. THE EVIDENCE SOUGHT BY PLAINTIFF IS MATERIAL TO THIS ACTION AND CANNOT BE OBTAINED WITHOUT THE ASSISTANCE OF THE SUPREME COURT OF BRITISH COLUMBIA

Plaintiff seeks testimony from three individuals who reside in British Columbia, Canada, each of whom have distinct, personal knowledge concerning the claims and defenses in this case.

***Darren Hoegler*** was Maxar's corporate controller and has knowledge of Maxar's impairment analysis conducted at year-end 2017. Maxar engaged the consultant Duff & Phelps to help with this analysis, and in February 2018, ***prior to the Class Period***, Hoegler personally received a Duff & Phelps' assessment indicating that Maxar's assets were impaired. In addition, Hoegler worked closely with Maxar's external auditor, KPMG Canada, and signed representation letters to

- 7 -

the auditor representing that the Company conducted impairment testing, assessing whether assets were impaired or whether there was any indication that assets were impaired. After leaving Maxar, Hoegler continued to consult with Company on issues at the center of this case. For example, Hoegler participated in Maxar management and Audit Committee meetings concerning the Spruce Point allegations (that revealed the alleged concealment of $383.6 million GeoComm impairment), which included Hoegler providing input on the actual accounting analysis. Plaintiff seeks Hoegler's testimony concerning these issues. In addition, if Defendants raise a defense of good faith reliance on Maxar's auditors and consultants, Hoegler's testimony will be key as to what information was, or was not, provided to them.

*Edward Chou* was Maxar's Senior Manager of Corporate Finance and was involved in or made numerous statements in documents that are relevant to Plaintiff's case. His role is unique given his significant responsibilities in SSL's budgeting and forecasting. For example, Chou was involved in Maxar realigning its reporting segments, which Plaintiff alleges was an obvious effort to obfuscate GeoComm's dismal financial condition. Chou presented analysis directly to the Defendant CEO and CFO and collected data for them on future cash flows and revenue, which are major inputs into Maxar's valuation models for determining whether its GeoComm assets were impaired. Chou is also referenced in KPMG Canada's workpapers as an individual they had discussions with during the course of the 2017 audit regarding Maxar's strategic growth plan in order to corroborate forecasts utilized by Maxar's valuation consultant. Accordingly, Plaintiff seeks Chou's testimony concerning when Defendants were aware of the deterioration of SSL's businesses and the reasonableness of inputs that were given to Maxar's auditors and consultants for purposes of

- 8 -

4894-9105-5890.v1

Maxar's impairment testing.  This information goes directly to both Plaintiff's claims and Defendants' defenses.

***Angela Lau*** was Maxar's Senior Vice President of Finance and Corporate Strategy.  Lau headed a key analysis, with the engagement of Duff & Phelps (separate from the one Hoegler received above), that is directly relevant to Plaintiff's allegations.  This analysis, with a valuation date of March 31, 2018, shows a massive decrease in the fair market value of SSL being used in the analysis as compared to what was being utilized in SSL's impairment testing and public reporting.  The reason for this discrepancy, *inter alia*, is the use of a higher discount rate (11%) compared to what was being used in public reporting (7.5%).  Lau has key information concerning Maxar's estimates and engagement with Duff & Phelps concerning this analysis.  Plaintiff seeks testimony concerning these issues, and believes that Lau has the personal and unique knowledge concerning these technical points.  Because an impairment must be taken when an asset is demonstrably impaired, the model used and reasons for certain assumptions is critical to this case.

In sum, these three individuals have unique information that goes to the heart of this case and this Court requests the assistance of the Supreme Court of British Columbia to secure their testimony.

## IV.   THE EVIDENCE SOUGHT WILL ONLY BE USED IN THIS FEDERAL ACTION

The parties have stipulated to, and this Court has entered, a protective order requiring the confidential treatment of evidence, including documents and testimony, secured during this action.  The protective order (ECF No. 81) (attached hereto at Exhibit 2), furthermore precludes the parties from using such evidence in other legal proceedings apart from this action, without the consent of the person or entity producing the materials.

- 9 -

4894-9105-5890.v1

## V.    RECIPROCITY

This Court is willing to provide reciprocity in judicial assistance to the Supreme Court of

British Columbia.

## VI.    REIMBURSEMENT FOR COSTS

The fees and costs incurred by service of subpoenas upon Hoegler, Chou and Lau will be

borne by Plaintiff in care of counsel at the address below:

ROBBINS GELLER RUDMAN & DOWD LLP
Patton L. Johnson
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone: 619/231-1058
619/231-7423 (fax)
pjohnson@rgrdlaw.com


DATED:_____


_____
THE HONORABLE S. KATO CREWS
UNITED STATES MAGISTRATE JUDGE

- 10 -

# EXHIBIT 1

Case No. 1:19-cv-00124-WJM-SKC Document 143-1 filed 03/16/22 USDC Colorado pg 14 of 135

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA

      Defendants.

---

## PLAINTIFF'S CONSOLIDATED COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

4829-0600-6183.v1

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND OVERVIEW ........................................................................................1

JURISDICTION AND VENUE .................................................................................................6

PARTIES ...................................................................................................................................6

IFRS PROVISIONS REGARDING ASSET IMPAIRMENT ....................................................8

    IFRS: Purpose and Scope (IAS 1) ...................................................................................8

    IFRS: Impairments of Intangible Assets and Property, Plant, and Equipment (IAS
    36) ...................................................................................................................................9

    IFRS: Impairment of Inventories (IAS 2) .....................................................................13

    IFRS: Events After the Reporting Period (IAS 10) ........................................................15

EVIDENCE OF IMPAIRED GEOCOMM ASSETS ...............................................................17

    Space Systems Loral and the Global GeoComm Market ...............................................17

    Early Indicators of Impairment: GeoComm Restructuring Project .................................21

    Indicators of Impairment: First Quarter of 2018 (1Q18) ...............................................28

    Indicators of Impairment: Second Quarter of 2018 (2Q18)............................................37

    Summary of Impairment Indicators ...............................................................................47

THE FAILURE OF WORLDVIEW-4 ......................................................................................50

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................53

THE TRUTH EMERGES ........................................................................................................61

LOSS CAUSATION/ECONOMIC LOSS ...............................................................................71

ADDITIONAL ALLEGATIONS OF SCIENTER....................................................................79

    CFO Turnover, Auditor Turnover and Audit Committee Investigation of the
    Spruce Point Report ......................................................................................................79

    $3.2 Billion DigitalGlobe Acquisition Credit Facility and Associated Debt
    Covenants......................................................................................................................82

- i -

Case No. 1:19-cv-00124-WJM-SKC Document 143/1 filed 03/16/22 USDC Colorado pg 16 of 135

**Page**

Lance's and Wirasekara's Motivation to Maintain Their Lucrative Position and Pay Package ..........................................................................................................85

Defendant Wirasekara's Experience with IFRS Standards and Maxar Accounting..........86

THE PRESUMPTION OF RELIANCE ........................................................................................88

CLASS ACTION ALLEGATIONS .............................................................................................89

COUNT I .....................................................................................................................................91

COUNT II ....................................................................................................................................94

PRAYER FOR RELIEF ..............................................................................................................96

JURY DEMAND .........................................................................................................................97

4829-0600-6183.v1

## INTRODUCTION AND OVERVIEW

1.      This is a securities class action brought on behalf of purchasers of Maxar Technologies, Inc. ("Maxar" or the "Company") securities between March 26, 2018 to January 6, 2019, inclusive (the "Class Period"), against Maxar, Howard L. Lance, Maxar's former Chief Executive Officer, and Anil Wirasekara, Maxar's former Interim Chief Financial Officer, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Lead Plaintiff, individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based upon the ongoing independent investigation of its counsel, Robbins Geller Rudman & Dowd LLP ("Counsel").  This investigation includes, *inter alia*, a review and analysis of: (a) public filings by Maxar with the Securities and Exchange Commission ("SEC") and the Canadian Securities Administrators; (b) public reports and news articles; (c) research reports by securities and financial analysts; (d) securities prices and price movements; (e) transcripts of investor calls and conferences conducted by Maxar executives; (f) interviews with former employees of Maxar; and (g) other publicly available material and data identified herein.

3.      Counsel's investigation of the facts underlying this action continues, and Counsel further believes that relevant facts are known only by Defendants[1] or are exclusively within their custody or control.  Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1]      "Defendants" refers to Maxar, Howard L. Lance and Anil Wirasekara.

- 1 -

4. Maxar is a space technology company incorporated in Delaware and headquartered in Westminster, Colorado. During the Class Period, Maxar's common stock traded on the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange ("TSX") under the ticker symbol "MAXR." Since 2012, through its subsidiary Space Systems/Loral ("SSL," "SS/L," or "Loral") in Palo Alto, California, the Company has manufactured geostationary communications satellites ("GEO" or "GeoComm"). Since 2017, through its subsidiary DigitalGlobe in Westminster, Colorado, the Company has operated a constellation of Earth observation satellites, including the satellite WorldView-4, which serve to capture high-resolution images of the planet's surface.

5. Lead Plaintiff alleges Defendants knowingly and/or recklessly issued false and misleading statements and omissions regarding: (a) the Company's financial reporting of GeoComm's materially impaired balance sheet assets; (b) a geosynchronous satellite construction contract known as AMOS-8 that proved to be illusory; and (c) the October 2018 failure of the WorldView-4 imagery satellite concealed from investors.

6. In the years leading up to the Class Period, the market for large, expensive, and high-orbit geosynchronous satellites had undergone structural change. As alleged herein, by the beginning of the Class Period, market forces had changed significantly, leading to Maxar's actual and potential customers turning away from geosynchronous satellites in favor of smaller, cheaper, and more flexible low-earth orbit ("LEO") communications technologies. The confluence of these industry-wide changes raised serious questions as to whether Defendants' financial statements accurately reported the true value and continued viability of the Company's GeoComm line of business. Knowing or recklessly disregarding that Maxar's GeoComm line of business had all but collapsed, and its reported book value was significantly impaired, Defendants engaged in a

- 2 -

4829-0600-6183.v1

fraudulent scheme to falsely and misleadingly assure Maxar investors that the value of the GeoComm business was much more favorable than what it was in reality.

7. Specifically, on March 26, 2018, Defendants publicly claimed in a press release and in social media posts that the Israeli-based company Space Communication Ltd. ("Spacecom") had awarded SSL the contract to build the geosynchronous satellite known as AMOS-8. Less than two months later, on May 9, 2018, Defendants reiterated to investors that they were very pleased to report that Spacecom selected SSL to build the AMOS-8 satellite.

8. On May 9, 2018, Defendants also filed their first quarter of 2018 ("1Q18") financial results with the SEC and Canadian Securities Administrators. The regulatory filings stated the Company's assets included $1.7 billion in intangible assets, $1.1 billion in property, plant, and equipment ("PP&E"), and $100 million in inventory. These filings also reported the Company's net earnings as $31 million and net earnings-per-share ("EPS") as $0.55.

9. On July 31, 2018, Defendants filed their second quarter of 2018 ("2Q18") financial results with the SEC and Canadian Securities Administrators. The regulatory filings stated the Company's assets included $1.7 billion in intangible assets, $1.1 billion in PP&E, and $95 million in inventory. These filings also reported the Company's net loss as $19 million and net EPS as -$0.33.

10. After Defendants made these statements, investors learned the truth about the value of the GeoComm business. Investors also learned the truth about how Defendants' statements about AMOS-8 obfuscated the collapse in the GeoComm business.

11. On August 7, 2018, a report by Spruce Point Capital Management, LLC ("Spruce Point") questioned Maxar's financial health and the Company's accounting practices. The Spruce Point report noted, *inter alia*, that the intangible assets of the GeoComm business were likely

- 3 -

materially impaired. Investors' response to the report was swift and severe. On August 7, 2018, Maxar's stock price fell over 13.0% on the NYSE on heavy trading volume. After the markets closed on August 7, 2018, Defendants issued a press release claiming that the Spruce Point report contained several misrepresentations and inaccuracies, but Defendants declined to specifically identify them. The next day, the Company's stock price continued to drop in response to the Spruce Point report.

12. On August 24, 2018, a few hours before the markets opened, Defendant issued another press release containing a more "comprehensive" response to the Spruce Point report. Defendants' press release stated that the Company's Audit Committee, the Company's new auditor and several outside experts had conducted a purportedly thorough investigation of the Spruce Point allegations. After this two-week investigation, however, Defendants confirmed that an impairment charge for GeoComm was likely. In response to this news, the Company's stock price on the NYSE dropped 5.6%, on heavy trading volume.

13. During September 2018, it was publicly disclosed that the Israeli government would be funding the AMOS-8 build, and that Spacecom had declined to make a down payment to Maxar for the satellite. In response to these disclosures, the Company's stock price experienced additional significant drops.

14. On October 31, 2018, the Company belatedly disclosed that GeoComm intangible assets, PP&E, and inventory were, in fact, impaired. As a result, Maxar was forced to take a $383.6 million charge to third quarter of 2018 ("3Q18") earnings. Defendants' October 31, 2018 disclosures identified specific indicators of impairment that were supposedly *not* present in the first two quarters of 2018:

- 4 -

4829-0600-6183.v1

- The GeoComm cash generating unit ("CGU") "forecasted it would have a significantly different mix of programs at the beginning of the year," "predicted it would be awarded approximately three to four contracts for geocomm satellites," and "[b]y the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds."

- "[I]ndustry and macroeconomic factors had declined substantially from earlier forecasts."

- "By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed."

- "[I]t became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8."

- "The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels."

- "Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume."

- "As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment."

In truth, and as alleged herein, each and every one of the above-noted factors, ***and others***, were present, evident, and known to Defendants during the first two quarters of 2018.

15. Investors were stunned with the 3Q18 impairment charge. In response to this news, the Company's stock price dropped by over 44.0% on the NYSE on heavy trading volume. Defendants also touted the capabilities of the WorldView-4 satellite, representing that it was still functioning, but said nothing about the fact that it had already suffered a mission-critical failure.

16. On January 7, 2019, Maxar finally disclosed that WorldView-4 had experienced a component failure leading to permanent instability, which prevented the satellite from collecting any

- 5 -

4829-0600-6183.v1

useful imagery. In response to this news, the Company's stock price on the NYSE dropped by over 24%, on heavy trading volume.

17. All told, Lead Plaintiff and investors who purchased or acquired Maxar stock during the Class Period suffered hundreds of millions of dollars in damages.

## JURISDICTION AND VENUE

18. Lead Plaintiff Oregon Laborers Employers Pension Fund ("Lead Plaintiff") asserts claims on behalf of itself and the Class under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction over the Exchange Act claims is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

19. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as Maxar's headquarters and principal executive offices are located within this District.

20. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21. Lead Plaintiff Oregon Laborers Employers Pension Fund is a multi-employer defined benefit plan that provides benefits to retired laborers pursuant to collective bargaining agreements. The fund has over $300 million in assets and more than 5,000 participants. Lead Plaintiff purchased Maxar common stock on NYSE as set forth in its certification attached hereto.

22. Defendant Maxar is a Delaware corporation headquartered in Westminster, Colorado. During the Class Period, Maxar consisted of four business units: MacDonald, Dettwiler &

- 6 -

4829-0600-6183.v1

Associates Ltd. ("MDA"), SSL, DigitalGlobe, and Radiant Solutions. The Company traces its

origins to 1969, with the founding of MDA in Vancouver, Canada. As a Canadian space technology

company, MDA is best known for prominent government projects such as the "Canadarm" robotic

arms on NASA's Space Shuttle and the International Space Station. In 2012, MDA bought U.S.

satellite manufacturer SSL based in Palo Alto, California. In October 2017, MDA acquired U.S.

space imaging company DigitalGlobe based in Westminster, Colorado. After the DigitalGlobe

acquisition, MDA rebranded itself "Maxar Technologies," switched its reporting currency from

Canadian to U.S. Dollars, and relocated its headquarters to DigitalGlobe's offices in Colorado (for

which Maxar received over $20 million in state and local tax rebates). In January 2019, the

Company became a U.S. entity incorporated in Delaware.

23. Defendant Howard L. Lance ("Lance") served as the Company's President and Chief

Executive Officer ("CEO") between May 2016 and January 2019. Lance also served as Chairman of

the Company's Board of Directors during the same period. Per the terms of his separation, Lance is

on retainer as a consultant to the Company until at least January 2020. Lance regularly participated

in Company earnings calls, and certified the accuracy of the Company's financial statements each

quarter, including during the Class Period. At all relevant times, Lance had ultimate authority and

control over the Company's public statements, including the contents of regulatory filings, and

whether and how to communicate the contents of the filings to the investing public.

24. Defendant Anil Wirasekara ("Wirasekara") served as the Company's Interim Chief

Financial Officer ("CFO") between February 26, 2018 and August 15, 2018. Wirasekara was also

the Company's CFO between 1996 and October 2017. Wirasekara regularly participated in

Company earnings calls, and certified the accuracy of the Company's financial statements each

- 7 -

quarter, including during the Class Period. Well versed in International Financial Reporting Standards ("IFRS"), Wirasekara's professional affiliations include the Chartered Institute of Management Accountants (United Kingdom), The Society of Management Accountants of British Columbia, and the Institute of Chartered Accountants (Sri Lanka). He is also a graduate of the Chartered Institute of Marketing and Management (United Kingdom). At all relevant times, Wirasekara had ultimate authority and control over the Company's public statements, including the contents of regulatory filings, and whether and how to communicate the contents of the filings to the investing public.

<b>IFRS PROVISIONS REGARDING ASSET IMPAIRMENT</b>

25. During the Class Period, Maxar prepared, reported, and certified its consolidated financial statements subject to IFRS. Promulgated by the International Accounting Standards Board ("IASB"), IFRS is the accounting profession's principles, conventions, rules, and procedures that define accepted international accounting practices. Pronouncements issued by IASB's predecessor are designated "International Accounting Standards" ("IAS"), which were adopted by IASB and remain part of IFRS.

**IFRS: Purpose and Scope (IAS 1)**

26. IAS 1, *Presentation of Financial Statements*, sets forth the "overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content," *see* IAS 1.1, and applies to all "general purpose financial statements" that are prepared and presented "in accordance with International Financial Reporting Standards (IFRSs)." IAS 1.2. "General purpose financial statements (referred to as 'financial statements') are those intended to meet the needs of users who are not in a position to require an entity to prepare reports

- 8 -

4829-0600-6183.v1

tailored to their particular information needs." IAS 1.7. "The objective of financial statements is to provide information about the financial position, financial performance, and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS 1.9.

27.     A company's "[f]inancial statements *shall* present fairly the financial position, financial performance and cash flows of an entity.  Fair presentation *requires* the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the [Conceptual] Framework [for Financial Reporting].  The application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation." IAS 1.15.

28.     "An entity whose financial statements comply with IFRSs *shall* make an explicit and unreserved statement of such compliance in the notes.  An entity *shall not* describe financial statements as complying with IFRSs unless they comply with all the requirements of IFRSs." IAS 1.16.

**IFRS: Impairments of Intangible Assets**
**and Property, Plant, and Equipment (IAS 36)**

29.     The intangible assets attributed to the Company's GeoComm business consisted of technologies, software, trade names, and customer relationships.  The Company capitalized these assets initially by acquiring SSL in 2012, and subsequently increased the book value of those assets via internal development and external purchases.  For example, in 2017 and 2018, the Company capitalized internally developed technology by approximately $116 million, the "vast majority" of which "relate[d] to projects in the GEO communications satellite line of business, such as digital payload, electric propulsion and roll-out solar array development programs." As of December 31,

- 9 -

2017, the Company valued GeoComm intangible assets at approximately $315 million on Maxar's balance sheet.

30.     The PP&E of the GeoComm business consisted of land and land improvements, buildings, leasehold improvements, testing equipment, vehicles, computer hardware, and furniture and fixtures.  The Company's acquisition of SSL added approximately $300 million of PP&E to the balance sheet, primarily in the areas of land, buildings, and equipment.

31.     During the Class Period, the Company's accounting treatment and evaluation of the GeoComm intangible assets and PP&E was governed by IAS 36, *Impairment of Assets*.

32.     IAS 36.1 states that "[t]he objective of this Standard is to prescribe the procedures that an entity applies to ensure that its assets are carried at no more than their recoverable amount." An asset is carried at more than its recoverable amount if its carrying amount ['book value'] exceeds the amount to be recovered through use or sale of the asset ['fair value'].  If this is the case, the asset is described as impaired and the Standard ***requires*** the entity to recognise an impairment loss."

33.     IAS 36.8 states that "[a]n asset is impaired when its carrying amount exceeds its recoverable amount.  IAS 36.9 states that "[a]n entity ***shall*** assess at the end of each reporting period whether there is ***any*** indication that an asset may be impaired."  "[IAS 36.12 to 36.14] describe some indications that an impairment loss may have occurred.  If ***any*** of those indications is present, an entity is ***required*** to make a formal estimate of recoverable amount . . . ."

34.     In relevant part, IAS 36.12 states that "[i]n assessing whether there is ***any*** indication that an asset may be impaired, an entity ***shall*** consider, ***as a minimum***, the following indications":

**External sources of information**

> (a) there are observable indications that the asset's value has declined during the period significantly more than would be expected as a result of the passage of time or normal use.

> (b) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal environment in which the entity operates or in the market to which an asset is dedicated.

*     *     *

**Internal sources of information**

> (e) evidence is available of obsolescence or physical damage of an asset.

> (f) significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used. These changes include the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs, plans to dispose of an asset before the previously expected date, and reassessing the useful life of an asset as finite rather than indefinite.

> (g) evidence is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected.

35.     IAS 36.13 further states that "[t]he list in paragraph 12 is not exhaustive," noting that "[a]n entity may identify other indications that an asset may be impaired and these would also *require* the entity to determine the asset's recoverable amount."

36.     Expanding on the "internal" indicators above, IAS 36.14 states that "[e]vidence from internal reporting that indicates that an asset may be impaired includes the existence of":

> (a) cash flows for acquiring the asset, or subsequent cash needs for operating or maintaining it, that are significantly higher than those originally budgeted;

> (b) actual net cash flows or operating profit or loss flowing from the asset that are significantly worse than those budgeted;

- 11 -

(c) a significant decline in budgeted net cash flows or operating profit, or a significant increase in budgeted loss, flowing from the asset; or

(d) operating losses or net cash outflows for the asset, when current period amounts are aggregated with budgeted amounts for the future.

37.     Under IAS 36, if any impairment indicator is present, then an entity is **required** to test for impairment by determining an asset's or CGU's recoverable amount. IAS 36 defines recoverable amount as the higher of an asset's or CGU's "fair value" less costs of disposal (the fair value method) and its "value in use" (the cash flow method).

38.     IAS 36.6 defines "[f]air value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The fair value method is what the market says the asset or CGU could sell for less costs of disposal. "Value in use" is defined as "the present value of the future cash flows expected to be derived from an asset or cash-generating unit." The value in use method is based on a discounted future cash flows valuation of the asset or CGU. Under IAS 36.55, the discount rate applied to the future cash flows is a pre-tax rate that reflects current market assessments of "(a) the time value of money; and (b) the risks specific to the asset for which the future cash flow estimates have not been adjusted."

39.     IAS 36.22 states that if it is not possible to estimate the recoverable amount of an individual asset, the entity should determine the recoverable amount "for the cash-generating unit [CGU] to which the assets belong." IAS 36.6 defines a CGU as "the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets and groups of assets." According to the Company, the GeoComm business was the level of asset grouping that generated independent cash flows, and therefore GeoComm was a CGU for the

- 12 -

4829-0600-6183.v1

purposes of evaluating indicators of impairment and impairment testing. In contrast, for example, the assets attributed to the Company's small-satellite line of business were grouped in the small satellite ("SmallSat") CGU, and thus treated separately from the GeoComm CGU.

40. Maxar's representation that "[f]or the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present" was false given the clear and obvious presence of the countless impairment indicators described herein. Defendants thus violated IAS 36 by ignoring the impairment indicators and failing to timely record an impairment charge to the GeoComm CGU assets – with corresponding reductions in earnings and EPS – when the book value of those assets exceeded their fair value by hundreds of millions of dollars.

**IFRS: Impairment of Inventories (IAS 2)**

41. During the Class Period, the IFRS standard IAS 2, *Inventories*, governed the Company's accounting treatment and testing of its inventories, including the requirement to take timely impairments. The inventories of the GeoComm business consisted of materials, components, and supplies used in satellite construction.[2]

42. IAS 2.9 states that the value of an entity's inventories "***shall*** be measured at the lower of cost and net realisable value," and IAS 2.6 defines "net realisable value" as the "estimated selling price in the ordinary course of business less the estimated costs of completion and the estimated costs necessary to make the sale." IAS 2.10 states "[t]he cost of inventories ***shall*** comprise all costs

---

[2] IAS 2.6 states inventories are assets either: (a) held for sale in the ordinary course of business; (b) in the process of production for such sale; or in Maxar's case (c) in the form of materials or supplies to be consumed in the production process or in the rendering of services.

- 13 -

4829-0600-6183.v1

Case 1:19-cv-00124-WJM-SKG Document 44 Filed 10/17/19 USDC Colorado Page 17 of 105
Case No. 1:19-cv-00124-WJM-SKG Document 143-1 filed 03/16/23 USDC Colorado
pg 30 of 135

of purchase, costs of conversion and other costs incurred in bringing the inventories to their present location and condition."

43. Each quarter, Maxar was required to ensure its GeoComm inventory assets were not overstated due to their "net realisable value" being below their costs. In describing "net realisable value," IAS 2.28 states that "[t]he cost of inventories *may not* be recoverable if those inventories are damaged, if they have become wholly or partially obsolete, or if their selling prices have declined," and that "[t]he practice of writing inventories down below cost to net realisable value is consistent with the view that assets should not be carried in excess of amounts expected to be realised from their sale or use." IAS 2 and IAS 36 are consistent in requiring that assets (*e.g.*, intangibles, PP&E, inventories) are not overvalued, appropriately tested for recoverability on a timely basis and that "no major difference exists between IAS 2 and the requirements included in IAS 36." *See* IAS 36.BCZ4.

44. IAS 2 also requires when determining "[e]stimates of net realisable value" to consider events occurring after a reporting period (*i.e.*, subsequent events) to the extent such events confirm conditions existing at the end of the reporting period. Specifically, IAS 2.30 states:

> Estimates of net realisable value are based on the most reliable evidence available at the time the estimates are made, of the amount the inventories are expected to realise. These estimates take into consideration fluctuations of price or cost directly relating to events occurring after the end of the period to the extent that such events confirm conditions existing at the end of the period.

45. IAS 2.34 states "[t]he amount of any write-down of inventories to net realisable value and all losses of inventories *shall* be recognised as an expense in the period the write-down or loss occurs." For the same reasons that the Company was required to take a charge to GeoComm's intangible assets and PP&E under IAS 36, Maxar was required to timely write-down the net

- 14 -

4829-0600-6183.v1

realizable value of its impaired GeoComm inventories under IAS 2. The Company failed to do so, and thus violated IAS 2.

**IFRS: Events After the Reporting Period (IAS 10)**

46. Maxar was also required each quarter during the Class Period to consider all events after the reporting period (*i.e.*, after March 31, 2018, after June 30, 2018, and after September 30, 2018) impacting the accuracy of its financial statements and related disclosures, including any events demonstrating indicators of impairment.

47. During the Class Period, the Company's accounting treatment and disclosures for events that occurred after the reporting period was governed by IAS 10, *Events after the Reporting Period*. IAS 10 prescribes "(a) when an entity should adjust its financial statements for events after the reporting period; and (b) the disclosures that an entity should give about the date when the financial statements were authorised for issue and about events after the reporting period."

48. IAS 10.3 defines events after the reporting period (hereinafter "subsequent events") as:

those events, favourable and unfavourable, that occur between the end of the reporting period and the date when the financial statements are authorised for issue. Two types of events can be identified:

(a) those that provide evidence of conditions that existed at the end of the reporting period (adjusting events after the reporting period); and

(b) those that are indicative of conditions that arose after the reporting period (non-adjusting events after the reporting period).

49. Defendants failed to identify or disclose subsequent events that were "evidence of conditions that existed at the end of the reporting period" that demonstrated the GeoComm CGU assets were impaired and required adjustments to the Company's financial statements.

- 15 -

4829-0600-6183.v1

50.     IAS 10.9 provides examples of adjusting events after the reporting period that can require adjustments to the current period financial statements and it specifically mentions examples regarding impairment and inventories:

> The following are examples of adjusting events after the reporting period that require an entity to adjust the amounts recognised in its financial statements, or to recognise items that were not previously recognised:
>
> \*     \*     \*
>
> (b) the receipt of information after the reporting period *indicating that an asset was impaired at the end of the reporting period*, or that the amount of a previously recognised impairment loss for that asset needs to be adjusted.  For example:
>
> \*     \*     \*
>
> (ii) the sale of inventories after the reporting period may give evidence about their net realisable value at the end of the reporting period.

51.     Defendants failed to abide by the requirements above in determining no impairment indicators were present in the GeoComm CGU assets for the three months ended March 31, 2018 and the six months ended June 30, 2018.  Further, Defendants for these same time periods failed to make any disclosures in their financial statements, as required by IAS 10.19, about subsequent events negatively impacting the financial condition and impairment of the GeoComm CGU assets.

52.     For example, IAS 10.19 states that "[i]f an entity receives information after the reporting period about conditions that existed at the end of the reporting period, it *shall* update disclosures that relate to those conditions, in the light of the new information."

53.     As alleged below, substantial evidence of impaired GeoComm assets existed prior to and throughout the Class Period.

## EVIDENCE OF IMPAIRED GEOCOMM ASSETS

**Space Systems Loral and the Global GeoComm Market**

54.    Since the onset of the Space Race, SSL and its predecessors specialized in manufacturing large and costly communications satellites that travel in a geostationary orbit.

55.    Satellites in geostationary orbit have three distinctive qualities. First, the satellite is "geosynchronous," meaning that its orbit matches Earth's rotation, *i.e.*, once per day. Second, the satellite appears stationary to an observer down on the planet's surface. These features allow a geostationary communications satellite to relay radio, television, or Internet services to a fixed region of the world over many years. Third, at about 22,000 miles away, GEO satellites orbit far from Earth. By comparison, satellites in LEO – such as those used in high-resolution imaging – are only a few hundred miles above us and orbit the Earth several times each day.

56.    After the Cold War, SSL turned its attention to the burgeoning commercial market for radio and television, rather than the needs of governments and militaries. Indeed, SSL has not won a GEO award from a government customer since 2001. In contrast, SSL's competitors, generally the space divisions of U.S. and European defense contractors, pursue both government and commercial opportunities.

57.    While each GEO award can earn SSL hundreds of millions of dollars in revenue, the manufacturing process required to fulfill a GEO order is capital-intensive, leading to slim profit margins compared to other lines of business in the space industry. To stay afloat, the GeoComm business therefore requires a sufficient pipeline of orders and volume of production.

58.    In 2002, SSL's annual awards shrank to zero and it was forced to declare bankruptcy the following year. According to an article by *Via Satellite* titled "Loral Looks Beyond

- 17 -

4829-0600-6183.v1

Bankruptcy," SSL's financial difficulties arose from overcapacity in the global satellite market and declining demand from Internet-related telecommunications providers.  SSL emerged from bankruptcy in 2005.

59.     From 2005 to 2014, the GEO market recovered and commercial satellite operators awarded 20-22 orders per year worldwide on average.  It was during that decade, in 2012, that the Company bought SSL for $1.1 billion in cash, dividends, and other payments.  As part of the SSL acquisition, the Company acquired approximately $300 million in PP&E and $320 million in intangible assets directly related to the GeoComm business.  And, in 2014 alone, SSL inked a record nine GEO contracts.

60.     Both 2015 and 2016, however, saw year-on-year declines in worldwide orders.  As a result, SSL's GEO awards also dropped, with five awards in 2015 and only four awards in 2016.

61.     Industry participants, including Defendants, knew why the market was shrinking: a paradigm shift in communications technology.  The market for satellite-based video distribution had become saturated, with little opportunity for growth.  "Cord cutting" consumers were gravitating to Internet-based television "streaming" services that did not involve premium programming or require special equipment.  Demand for satellite-based broadband Internet had fallen in response to lower-cost terrestrial competition, such as fiber optic connections and high-speed cellular networks, leading to excess capacity in the market.  And GEO itself was falling out of favor with the advent of smaller, cheaper, and more flexible LEO communications technology.

62.     While the Company acknowledged that global demand had dropped for two years in a row, newly appointed CEO Howard Lance was initially optimistic that the GEO market would

- 18 -

4829-0600-6183.v1

recover and return to historical averages. For example, on a November 2016 earnings call, defendant Lance stated the Company was "bullish on the long-term health of the satellite industry":

> The overall market remains below historic averages for the second year. The satellite operators delay awards to consider competing technologies and to assess regional excess capacity and their profitability issues. But we remain bullish on the long-term health of the satellite industry, where new orders will include replacement satellites, as well as those to serve increasing customer demands.

63. In response to an analyst's question on the same call, Lance stated: "We see now the second-year in a row where the market is below where it normally is. We think it's going to spring back."

64. Expressing the same optimism as Lance, CFO Anil Wirasekara stated on the same call that the Company expected revenue to improve when "satellite order intake levels return to near historical averages":

> Revenues were negatively impacted by the lower number of satellite contracts awarded over the last 18 months, and consequently by the lower number of active satellite programs in the higher revenue-generating stage of the program cycle as compared to a year ago. We expect this trend to continue for the next few quarters until satellite order intake levels return to near historical averages.

65. And on a May 2017 earnings call, in response to an analyst's question regarding the future of the GEO market, Lance stated: "[W]e've just entered around the last three months of detailed discussions with our customers and are feeling still very positive about the long-term opportunity in the market given that we expect to rebound from a pretty low level."

66. In February 2017, the Company announced that it was seeking to acquire Colorado-based space imaging provider DigitalGlobe in a $2.4 billion debt-financed transaction. In contrast to the sluggish and declining GEO business that accounted for a bulk of the Company's revenue,

- 19 -

4829-0600-6183.v1

DigitalGlobe was less capital-intensive and provided higher profit margins in a growing industry. As Lance would later say, DigitalGlobe gave Maxar "new legs for growth."

67.     The DigitalGlobe acquisition was complete by October 2017, at which time the Company rebranded itself "Maxar Technologies" and adopted the stock ticker "MAXR" on NYSE and TSX.  At that time, the Company also announced plans to "domesticat[e]" and become a U.S. entity "by the end of 2019."

68.     The DigitalGlobe acquisition significantly increased Maxar's intangible assets and PP&E reported on its balance sheet.  For example, prior to the acquisition, Maxar reported intangible assets of $332 million as of December 31, 2016, almost all of which related to SSL.  At that time, Maxar reported PP&E of $360 million.  After the acquisition completed, the Company's intangible assets and PP&E ballooned to $1.75 billion and $1.1 billion, respectively, as of December 31, 2017.

69.     The DigitalGlobe acquisition also came at a cost.  By significantly increasing Maxar's debt load, the Company was forced to generate greater free cash flow to service that debt and reduce leverage.  Due to the DigitalGlobe acquisition, Maxar's total debt jumped from $600 million at December 31, 2016 to $3 billion as of December 31, 2017.  This resulted in a debt-to-EBITDA[3] leverage ratio of approximately 4.0x at the start of the Class Period compared to less than 1.0x prior to the DigitalGlobe acquisition.  Defendants communicated to investors and analysts at the March 8, 2018 Investor Day that debt reduction was the "primary objective" for any free cash flow generated by the Company.

---

[3]     "EBITDA" refers to earnings before interest, tax, depreciation and amortization.

- 20 -

Case No. 1:19-cv-00124-WJM-SKC Document 143-17 filed 03/16/22 USDC Colorado
Case 1:19-cv-00124-WJM-SKC Document 44 Filed 10/07/19 USDC Colorado Page 24 of 105
pg 37 of 135

**Early Indicators of Impairment:**
**GeoComm Restructuring Project**

70.     According to Maxar's Form 6-K dated February 22, 2018 and filed with the SEC, the Company spent a total of $17.4 million in the first half of 2017 on a "restructuring project" initiated "[i]n response to changes in the geostationary communications satellite market" according to regulatory filings. Of that amount, $5.5 million was spent on management consulting fees and $11.9 million on employee severance. In contrast, in 2016, the Company reported no material GEO consulting fees, and only $3.6 million on severance in the GEO business. Unknown to investors, in 2017, the Company had retained management consulting firm Bain & Co. to advise on whether to stay in the GEO industry at all.

71.     In February 2017, the Company laid off 161 employees at SSL's Palo Alto facility– SSL's single largest headcount reduction to date. Out of the six layoffs that month reported by Silicon Valley's workforce development board, the SSL mass layoff was the largest in the region.

72.     Only four months later, in June 2017, the Company laid off a record-breaking 173 employees at SSL. Out of the seven layoffs that month reported by the local workforce development board, the SSL mass layoff was yet again the largest in Silicon Valley. This time, the media noticed. In an article titled "Lack of satellite orders triggers layoffs at Space Systems Loral," the trade journal *SpaceNews* reported that "Space Systems Loral has laid off a number of employees at its California satellite manufacturing facility" and that "SSL has not announced an order for a commercial geostationary communications satellite since July 2016." In a written statement to *SpaceNews*, SSL president John Celli ("Celli") explained that "'We have seen an extended slowdown in orders for GEO satellites across the industry . . . . With fewer satellites coming into the factory we have to make reductions to remain competitive.'"

- 21 -

73.     Taken together, the Company laid off at least 334 SSL employees in 2017.  As reflected in the chart below, that was a greater headcount reduction than the previous three years of mass layoffs, combined:



4829-0600-6183.v1

74. Data obtained from the State of California's Employment Development Department further reveals that, as part of the mass layoffs in 2017, the Company let go of an extraordinarily high number of SSL's systems engineers (66), representing an exponential loss of critical employees compared to the previous three years of layoffs:



75. Days after the June 2017 mass layoffs made the news, *SpaceNews* reported that the Company was replacing longtime SSL president Celli with Dario Zamarian ("Zamarian"), a private equity advisor and self-described "transformation specialist" who had zero background in the space business. Celli had a 36-year career at SSL, with the last 11 years at the helm. In contrast, Zamarian's specialty was companies struggling with fundamental shifts in technology and in need of a turnaround.

76. Going forward, Lance became pessimistic in his statements about the future of the GEO market. The Company was no longer counting on a rebound, and instead Lance remarked on several occasions that he did not believe that GEO orders would ever return to historical levels.

- 23 -

4829-0600-6183.v1

77.     During a July 28, 2017 earnings call, in response to an analyst's question on the outlook of GEO, Lance stated: "I think that we will see the market gradually rebound. I don't know that it will ever get back to 22 satellites a year."

78.     On August 8, 2017, Lance made a presentation at the Jeffries Global Industrials Conference in New York City. Afterwards, in response to an attendee's question regarding SSL, Lance said he was not counting on a recovery in the GEO market:

> But we're not counting on a huge rebound in the commercial communications market. Our growth is going to come from the remote sensing satellites we're going to build and from the U.S. government satellites. Now, if we get a rebound, we'll benefit from that, but I'm not counting on it. I think that we will see a recovery, but we're going to plan pretty conservatively.
>
> . . . But going forward, will that part of the business be a growth engine? I think remains to be seen.

79.     Each September, GeoComm manufacturers and customers gather in Paris, France for the World Satellite Business Week conference to meet, discuss the state of the industry and discuss business. In September 2017, the Company sent SSL representatives to the conference, including SSL president Zamarian. Whereas former head John Celli valued and cultivated longstanding customer relationships essential to securing nine-figure deals and repeat business, Zamarian had a less customer-centric attitude with clients at the conference. Unknown to investors, the Company's tenor and tone with critical satellite operators had changed from what can SSL do for you? to what can you do for SSL?

80.     During a November 2, 2017 earnings call for the third quarter, Lance abandoned all hope for a return to the historical norm in the GEO market:

> The Communications segment revenue was 18% lower than the prior-year period, highlighting the continuing weakness in the [GeoComm] sat markets.

- 24 -

4829-0600-6183.v1

\* \* \*

While we continue to forecast a modest uptick in industry awards in 2018 and 2019 due to the needs to replace aging GEO satellites, the total market is unlikely to return to historic levels.

81. Later on the call, in response to an analyst's follow-up question to the comment above, Lance confirmed his gloomy prediction:

If you looked at the historic market, about 20 to 22 awards sometimes reaching as high as CAD 4 billion, we don't see it getting back to that level. I'd like to think that the industry has kind of bottomed out. We do have a strong pipeline in 2018, but as I've said before, we are not counting on a lot of order growth in the GEO comm sat area. If we get it, great. It will be upside to our plans. So we're not counting on it.

82. On the same call, in response to an analyst's question about the Company's 2018 earnings outlook, Lance stated: "What I will say from a color perspective is we expect that the [GeoComm] sat business from our reported revenue and earnings standpoint is going to be under continued pressure."

83. On the same November 2, 2017 earnings call, newly appointed CFO William McCombe ("McCombe") – Wirasekara's replacement – stated in prepared remarks that the GEO downturn was continuing to hurt the Company's top-line growth:

I'll now review Maxar's third quarter results with a comparison to the same period last year. Consolidated revenues for the third quarter were CAD 421 million compared to CAD 496 million for the same period last year. The Communications segment contributed CAD 256 million, down from CAD 355 million for the third quarter of last year due to a low level of construction activity of geostationary communications satellites.

While the value of our geostationary satellite awards has been relatively stable this year versus 2016 and 2015, there was a step-down in award values

- 25 -

4829-0600-6183.v1

beginning in 2015, which is manifesting itself in lower revenues in the current and recent quarters.[4]

84.     By the end of 2017, all signs pointed to a structural collapse in the GEO market, not merely a temporary downturn.  In an article by *Space Intel Report* titled "Maxar struggles to adjust to a satellite market whose tables have turned," the industry publication noted that the market decline was much more severe than expected and that SSL was in a vulnerable position:

> Maxar Technologies' SSL satellite manufacturing arm rode the growth of the commercial satellite market to success in the past decade by playing up its "We're not Lockheed" credentials as a company focused squarely on the commercial market and untainted by cost-plus government program habits.
>
> The company expanded its Palo Alto, California, plant to accommodate up to nine large geostationary-orbit satellites per year. [F]or a time, it made SSL the most successful commercial satellite builder in the world.
>
> Now all that is history.  In 2017, the global commercial geostationary-orbit satellite market demand was seven or eight units, depending on who's counting, down 70% from what used to be considered a normal year.  SSL won two of these.
>
> *     *     *
>
> Maxar Chief Executive Howard L. Lance is not the only manager to have misread the severity of the geostationary-market's decline.  Just about everyone else did, too.  But as the only large satellite builder without a firm base in U.S. government orders, SSL is particularly exposed.

---

[4]     Following the third quarter of 2017 ("3Q17"), the Company began reporting its financial results in U.S. Dollars, with the exception of dividend payments that remained denominated in Canadian Dollars.  And as part of the reorganization following the DigitalGlobe acquisition, the GeoComm CGU was re-categorized from the "Communications" to "Space Systems" reporting segments.  Neither change affected the Company's accounting and disclosure requirements under IFRS.

- 26 -

4829-0600-6183.v1

85.     The chart below reflects SSL's annual GEO awards from 2000 to 2017 based on the Company's own tally:



86.     SSL's awards dropped precipitously between 2014 and 2017.  The last time SSL had seen such dramatic, year-on-year declines was in 2000-02 – a market contraction that led to SSL's bankruptcy in 2003.  Between 2005 and 2016, SSL averaged between five and six contracts a year, and had never won fewer than four contracts annually.  As *Space Intel Report* pointed out, SSL only had two GEO orders in 2017.  SSL had not had such a low order volume for 13 years.

87.     Given the GEO market crash, each new order won or lost in 2018 would take on greater significance for the Company and its GeoComm business.

- 27 -

4829-0600-6183.v1

Case 1:19-cv-00124-WJM-SKC Document 44 Filed 10/17/19 USDC Colorado Page 31 of 105
Case No. 1:19-cv-00124-WJM-SKC Document 143-1 filed 03/16/23 USDC Colorado
pg 44 of 135

**Indicators of Impairment:**
**First Quarter of 2018 (1Q18)**

88.     On January 8, 2018, and unknown to investors, SSL lost a GEO bid to build a hybrid broadcast-broadband satellite for Intelsat designated "Galaxy-30." The award instead went to competitor Orbital ATK, Inc. ("Orbital ATK"), which could offer proprietary payload technology that the Company knew Intelsat required but SSL did not possess.

89.     Unknown to investors, at the time the Company completed its internal fiscal year 2018 budget, the Company began restricting the amount of funds GeoComm proposal managers could spend on future customer proposals. Prior to 2018, this part of the sales process – compiling and finalizing customer proposals – would typically cost hundreds-of-thousands of dollars. In early 2018, however, when the fiscal year budgets were being finalized, proposal managers' proposal budgets were slashed to approximately $100,000. Furthermore, Maxar senior management had cut the proposal budgets numerous times leading up to the end of 2017.

90.     In an earnings call on February 22, 2018, Lance stated in prepared remarks that "The geocommunications satellite market remains at a low level of revenue in 2018 is expected to be negatively impacted by the lower booking rates the industry has endured across the past several years as the markets and technologies continue in transition." He also said:

> Lower industry volumes in the [GeoComm sat] market, coupled with growth opportunities in Low Earth Orbit SmallSAT constellations for communications and earth observation markets, require us to rightsize our factory footprint and invest in new capabilities and new manufacturing techniques, and I'm pleased to report all these activities are already well underway.

91.     On the same February 22, 2018 earnings call, in response to an analyst's question about the outlook of the GEO market, Lance stated that:

- 28 -

4829-0600-6183.v1

Well, I believe that 2017, which I think only had 7 or 8 GEO awards for the industry, depending on how you count those and whether you include China or not, is a low watermark. Our internal outlook for the market is a bit stronger than that, but maybe in the 10[] to 14[] range for '18 and '19. So we're not counting on a big bounce or recovery in that market. Our growth is going to come from kind of reaching the bottom point on GEO and then leveraging all of our capabilities around U.S. government and the LEO markets.

92.     On the same February 22, 2018 earnings call, CFO McCombe stated in prepared remarks that year-on-year declines in the GeoComm business were impacting the Company's revenue as a whole:

Total company revenues declined 7% year-over-year in the quarter. Our Imagery business recorded strong revenue growth year-over-year; however, this was more than offset by declines in the Space Systems segment where the step-down in award values in the GEO ComSat market since 2015 continued to flow through as lower revenue in the current quarter together with a lower level of planned activity on the RCM project for the Canadian government.

93.     On the same February 22, 2018 call, McCombe later added that "Space Systems experienced a 15% year-over-year pro forma revenue decline in Q4 as increases in our U.S. Government business were more than offset by declines in the commercial satellite revenues and on the Canadian RCM project," and forecasted a decline in company-wide revenue for 2018 due to the collapsing GEO business:

We expect total company pro forma year-over-year revenues to decline 2% to 4% in 2018, as compared to 2017, driven by declines in our Space Systems segment, in part offset by continuing solid growth in the Imagery and Services segments.

Our Space Systems business continues to feel the impact of the stepdown in [GeoComm sat] award values that began in 2015. We have seen these award value stabilize at lower levels in the last couple of years, thus providing a backdrop for a potential stabilization of the segment's revenue streams in the coming years.

94.     As part of the Company's reorganization after the DigitalGlobe acquisition, McCombe had been appointed as the Company's CFO in October 2017 to replace Wirasekara.

- 29 -

4829-0600-6183.v1

McCombe was intimately familiar with SSL's finances: in 2014-16, he served as SSL's Senior Vice President, Finance and Legal, responsible for such functions as accounting, financial forecasting, and projecting profitability estimates. And in 2016-17, he was Senior Vice President and CFO of SSL MDA Holdings, Inc., the Company's U.S. holding company based in San Francisco.

95. On February 26, 2018, McCombe abruptly resigned without any explanation, effective immediately, after less than five months in his half-million-dollar position, and only one week prior to the Company's important "Investor Days" in Toronto and New York featuring presentations from the CEO, CFO, and each group president. McCombe did not make any public statements at the time of his surprise departure, and he did not take up another job until nine months later – and that was as CFO of a smaller, private company.

96. Wirasekara became Interim CFO while the Company searched for McCombe's replacement. And despite the fact that McCombe oversaw the preparation of the Company's fourth quarter of 2017 ("4Q17")/fiscal year 2017 ("FY17") regulatory filings, discussed them on the February 22, 2018 earnings call as CFO, and did not formally separate from Maxar until March 12, 2018, McCombe never certified the Company's annual financial statements. Wirasekara finally did so on March 29, 2018, over a month after the earnings announcement and filings.

97. On March 8, 2018, Defendants laid out their true beliefs regarding the future of GEO in great detail at the New York Investor Day. As captured by an audio recording of the presentation obtained from *Bloomberg*, as well as the slide deck used that day, Lance noted that the Company's GEO business had been a "drag" on the Company's finances, and shared projections demonstrating that the GEO business would continue to negatively impact Maxar's revenue and earnings for years to come.

- 30 -

4829-0600-6183.v1

98.     On March 8, 2018, while displaying the slide below depicting the Company's revenue breakdown for 2016-18, Lance stated: "First chart I want to show you on the top line growth is to look at the magnitude of the decline for the last two years in this yellow or gold portion of the bar. That's the [GeoComm sat] and . . . RCM revenue.  Declined over 20% each year for two years":



4829-0600-6183.v1

99.     For the slide below depicting the Company's revenue projections for 2018-20, Lance stated:

When you put that into a slide that shows '16, '17, '18, and then the next couple of years, you see our view that we're at a point of inflection.  As the declines in GEO reach bottom, and then as we see the RCM program ending, we pave the way to see the underlying growth come through, which we believe is going to be positive and generate greater earnings, greater cash flow and the potential for increased margins:



4829-0600-6183.v1

100. For the slide below depicting the Company's past EBITDA for 2016-17 and expected EBITDA in 2018, Lance stated: "You know this is a kind of a good news/bad news slide looking at GeoComm sat because . . . it used to be a larger part of the business. But the point of the slide today is we've really had it marginalized, both as a result of its decline and the rest of the business growing, and the combination with DigitalGlobe, now, giving us new legs for growth as Maxar combined company":



4829-0600-6183.v1

101. On Lance's slide discussing expected earnings growth over the next five years, "GEO Comsat" growth was "-2 to -4%" – the only negative forecast across the entire Company – for which Lance admitted "We actually have negative growth in the GEO market":



102. Wirasekara, during his presentation at the New York Investor Day, stated:

> So we believe that we had a pretty stable and solid Q4 in 2017. And our guidance for 2018 is also very stable. And we say that in the light of very strong headwinds that the company has encountered in the GeoComm satellite business and the winding down of the RCM contract in Canada.

> When you look at 2016 to 2018, the GeoComm market declined by about 45%. That was a large segment of our business.

103. During the question and answer session following his presentation at the New York Investor Day, Lance described the GeoComm business as a "drag on the company" and remarked how the Company was making fundamental changes to SSL's satellite manufacturing facilities in a deliberate shift away from GEO production:

- 34 -

I think the other point I would make, and that I made on Tuesday [at the Toronto Investor Day], so I'll just repeat it, we are committed to every business paying their own way. I'm not going to allow the [GeoComm] product line to be a drag on the company going forward. That either bottoms out or it grows. In the meantime, Dario [Zamarian] will talk about his factory, future work and how we are reconstructing the whole facility to deal not with 25 GEO satellites, but with a combination of fewer GEO satellites and lots of SmallSats. So we're looking at lots of ways that we can take out costs to further lower our breakeven.

104. Later, in describing the Company's changes to the factory, Lance said: "And we've had such large declines [in EBITDA] that these aren't incremental steps we're taking. It's really a retooling of how we're organized in the factory and what the support and overhead costs are."

105. In a follow up question, an attendee asked Lance:

Howard, I wonder if you would expand a little bit on that fixed cost. How much has the fixed cost come down to where you are today and how much flexibility just, in rough terms, might you have if that market doesn't bottom out here in the kind of next 6, 9, 12, 18 months something like that?"

106. In response, defendant Lance admitted the Company had concluded the market would not recover at all, and based on that conclusion the Company had decided to slash its own GEO manufacturing output capacity to save money on fixed costs:

I don't know off the top of my head what the percentage is. Fixed costs have probably not come down linearly with revenue. Direct costs have. We've taken out, over the last 18 months, probably 450 people. We didn't want to do that, but obviously the volume wasn't there to support it. We have had step-function reductions in fixed costs, but I would say the next wave of that is what Dario and his team are looking at right now. Fixed costs tend to come out more like a stairstep, whereas direct labor can come out more linearly. But we were hopeful – [20/20] hindsight, which you'd always love to have, we were hopeful the market was going to rebound a little more. And I think it's only during the last 6 to 9 months that after doing a lot of external market study, we've concluded that the market is going to stay at this level, we think, or maybe slightly above it as some of these replacements come along. And so we were hesitant to go in and take out large chunks of fixed costs because if the volume goes up, you need those. But we've now made the decision to do that.

- 35 -

4829-0600-6183.v1

107.     In the presentation regarding SSL, Zamarian stated "we can look forward to anywhere between 8-12 a year" in GEO orders.  Zamarian's statement was the first time the Company had provided a numerical long-term outlook on worldwide demand.  Maxar believed that the GEO market had been cut in half from the historical benchmark of 20-22 annual orders.

108.     Lance reiterated his outlook regarding the GEO market during his March 13, 2018 presentation at the J.P. Morgan Aviation, Transportation & Industrials Conference in New York City:

> Within this market [for Space Systems], we've had one line of business which is GEO communications satellites, which has been declining significantly over the past few years.
>
> *     *     *
>
> On the commercial side, we see strong near double-digit growth for data and the analytics and products that go along with that.  And we see the changes that are now at an inflection point in the changes in the communications satellite market.  So the GEO market today is about 40% of where it was 3 years ago.  And we've mitigated this business through the growth in diversification, and we're not counting on it improving over time.  So it's been a tremendous headwind because of the difficult cost.  Going forward, as that business bottoms out, the underlying growth of the rest of the market, especially in SmallSats and U.S. government and international government growth, are going to show through.

109.     Three weeks later, and unknown to investors, SSL lost a GEO bid to build a broadband satellite for the European Organisation of Telecommunications by Satellite S.A. ("Eutelsat") designated "Konnect VHTS."  The award instead went to competitor Thales Alenia Space ("Thales").  Thales could offer digital channelizer technology that the Company knew Eutelsat required but SSL did not possess.

110.     On the May 9, 2018 earnings call for first quarter results, in response to an analyst's question about "efficiency efforts" at SSL's Palo Alto factory, Lance stated: "Again, we look at it

- 36 -

every quarter, and we also continue to look at, as I said, at Investor Day, other ways that we can better align our costs longer-term with what we believe will be a sustained, lower level of GEO market orders." In response to another GEO-related question, Lance stated: "But we remain in this view in 2018 that we're probably about 50% where this market would be, let's say, at its nominal level of around 20 awards."

111. On the same call, Wirasekara stated the following in prepared remarks:

The Imagery and Service segments recorded strong revenue growth, however, this was more than offset by declines in the space systems segment where the step down in award values and continued weakness in the [GeoComm sat] market since 2015 continued to flow through as lower revenues in the current quarter.

**Indicators of Impairment:**
**Second Quarter of 2018 (2Q18)**

112. In addition to the flurry of red flags prior to and during the 1Q18, further indicators of impairment to the Company's GeoComm assets were known to Defendants in the second quarter. These indicators included the illusory AMOS-8 contract, another mass layoff, and the pursuit of "strategic alternatives" for the GEO business.

113. On March 26, 2018, the Company announced two new GEO orders. The first was for an existing customer, the Broadcasting Satellite System Corporation of Japan ("B-SAT"). The second order was by Israel's Spacecom for a satellite designated "AMOS-8." The Company announced both awards via press releases and online social media.

114. Maxar's press release announcing the AMOS-8 award read as follows:

PALO ALTO, CA and TEL AVIV, Israel, March 26, 2018 /PRNewswire/ – Spacecom (TASE: SCC), operator of the AMOS satellite fleet, today announced it has chosen SSL, a Maxar Technologies company (formerly MacDonald, Dettwiler and Associates Ltd.), (NYSE: MAXR; TSX: MAXR) to build its AMOS-8 advanced communications satellite. The satellite will deliver state-of-the-art broadcast,

- 37 -

4829-0600-6183.v1

broadband and data services from Spacecom's 4° degrees West 'hot spot' to Europe, Africa and the Middle East.

AMOS-8 will include flexible high power Ku-band and Ka-band payloads with steerable antennas to enable customers to deliver various added value services. The satellite is designed to provide service for a minimum of 15 years, and is based on the world's most popular commercial communications satellite platform – the SSL 1300 – which has the capability to support a broad range of advanced applications and technologies.

"SSL is dedicated to delivering advanced space systems and services that inform, entertain and connect people around the globe," said Dario Zamarian, group president of SSL. "SSL will demonstrate our industry-leading technological capabilities, our legacy of expertise and our commercial mindset to meet all of Spacecom's mission requirements. We are honored to be selected to manufacture this satellite, which will enable access for underserved people in Europe, Africa and the Middle East to high-speed, reliable data – a connection essential in today's digital world to understand what is happening across the planet and participate fully in the global community."

The AMOS-8 geostationary communications satellite will be co-located with AMOS-3. A contract option has been signed between Spacecom and SpaceX for AMOS-8's scheduled launch in the second half of 2020.

"AMOS-8 will bring additional high-quality capacity to expand our offerings and provide our partners with the abilities to add new and exciting services," said David Pollack, CEO and president of Spacecom. "Spacecom is dedicated to delivering reliable and cost-effective services that are enjoyed and relied upon by millions of people and businesses. We are eager to work together with SSL to develop this new satellite."

115.     On SSL's public Facebook and Twitter accounts, the Company posted an announcement regarding the AMOS-8 award stating that "2018 is off to a great start for SSL with two contracts to build GEO satellites announced today. Thank you B-SAT and Spacecom for placing your trust in SSL!" Later that day, on SSL's public Twitter account, the Company shared a tweet by *SpaceNews* journalist Caleb Henry stating that "@sslmda gets two GEO satellite orders, both of which need to be in orbit in 2020. Those are tight deadlines, but SSL has hit them before."

- 38 -

4829-0600-6183.v1

Within two weeks of the March 26, 2018 announcement, the Company added the B-SAT and Spacecom orders to SSL's webpage titled "Award and Launch History – GEO and LEO Satellites."

116. Unknown to investors, and as the Company later admitted in a regulatory filing, the AMOS-8 contract "was not a definitive award." At the time of the March 26, 2018 announcement, Spacecom did not have financing in place to pay SSL for building AMOS-8, and Spacecom was entirely reliant on future bond offerings to fund AMOS-8. The contract between the Company and Spacecom also included a provision that allowed Spacecom to withdraw from the deal within 60 days without any penalty. In addition, the AMOS-8 contract was not effective until SSL received the first payment from Spacecom.

117. Following Spacecom's award to SSL, the fate of AMOS-8 was quickly thrown into doubt. Most of Spacecom's satellites in the existing AMOS constellation were built by Israeli Aerospace Industries ("IAI"), a state-owned manufacturer. SSL won AMOS-8 by underbidding IAI by nearly $80 million and promising a speedier production schedule. But as *DefenseNews* reported in the article "Israel's new $200 million satellite sparks controversy – and questions": "The satellite operator's decision to go with the cheaper American competitor stoked fears that it could spell doom for Israel's domestic satellite production, as Spacecom is the only customer for IAI's satellite department, which also builds the Ofek line of spy satellites."

118. In response to the March 2018 announcement, IAI immediately sought to outmaneuver Spacecom by seeking a contract directly with the Israeli government that would displace the SSL order. On April 9, 2018, the Israeli financial newspaper *Globes* reported that:

> IAI announced today that it was promoting the construction of a communications satellite to be commissioned by the government, to serve both government and

- 39 -

4829-0600-6183.v1

commercial needs, and to be stationed at point 4.0° W above the equator, a resource that belongs to the State of Israel, at the expense of Amos 8.

119.     In that article, IAI is quoted as follows: "'The satellite is planned for stationing at location 4.0° W, which is Israel's national space location, the broadcasting rights from which belong to the State of Israel.  IAI will apply to the Ministry of Communications to obtain a license and allocation of frequencies at this location in space.'"

120.     The Israeli government was receptive to IAI's offer.  On April 30, 2018, the technology journal *Calcalist* published the article "Israeli Government Intervention Likely to Void Deal with U.S. Satellite Contractor Loral":

> In a filing to the Tel Aviv Stock Exchange on Monday, Spacecom, also known as Space Communication Ltd., announced it has received a letter from a government official on Sunday, informing the company that the state intends to "work towards placing a satellite by Israel Aerospace Industries Ltd. (IAI)," a state-owned company, at the geostationary position intended for AMOS-8, which belongs to Israel.
>
> The announcement could mean that Israel plans to launch its own satellite through IAI, cutting Spacecom out of the loop.  It may also mean Spacecom can find its way back into the deal if it commissions the satellite from IAI.  In both scenarios, American Loral loses the contract.

121.     Despite these troubling developments for SSL, the Company did not acknowledge that the AMOS-8 deal was already in jeopardy after only one month of its announcement.  In fact, on the May 9, 2018 earnings call discussing first quarter results, Lance celebrated AMOS-8 as a win:

> We were very pleased to report in the quarter that we were awarded 2 new GEO communications satellites.
>
> . . . Israeli satellite operator [Spacecom] selected SSL to build the AMOS-8 satellite. This will deliver state-of-the-art broadcast, broadband and data services from its 4-degree West hot spot to Europe, Africa, and the Middle East.  AMOS-8 will include flexible, high-power Ku-band and Ka-band payloads, with steerable antennas to enable [Spacecom] to deliver a number of value-added services.

- 40 -

4829-0600-6183.v1

122. As reported by *DefenseNews* on May 22, 2018, the Israeli government's decision to intervene was based on national interest, rather than program costs or manufacturing timelines:

> Following Spacecom's decision to go with the Palo Alto-based Space Systems/Loral LLC, the Ministry of Science, Technology and Space released a statement in April saying the government had informed Spacecom it "stands by its original position in favor of a 'blue and white' [Israel-made] satellite."

> The statement quoted a parliamentary report that ruled that preserving Israel's independent satellite production capability is vital "in times of emergency" to ensure Israel "maintains the independent ability to use satellites to collect and transmit information by way of Israeli communication satellites."

123. On May 27, 2018, *Calcalist* reported in the article "Spacecom Postpones Deal With California-Based Satellite Manufacturer Loral" that Spacecom had failed to make its initial payment for AMOS-8: "According to the original agreement announced on March 25, the deal should have become void when Spacecom failed to pay within 60 days, meaning by Friday [May 25, 2018]." SSL agreed to extend the down payment deadline by 30 days.

124. Unknown to investors, as a result of Spacecom's failure to make an initial payment, Maxar's management prohibited the SSL Program Manager assigned to AMOS-8 to proceed with the project. For the same reason, Maxar's management declined to purchase the parts needed to build AMOS-8.

125. On June 19, 2018, Israeli newspaper *Haaretz* reported on Defense Minister Avigdor Lieberman's ("Lieberman") tour of an IAI facility the day before. With respect to the planned IAI satellite that would displace and foreclose the Spacecom-SSL contract, Lieberman said: "'Right now it looks like we will buy a blue-and-white satellite A to Z, and not just for the sake of IAI.'"

126. On June 25, 2018, *Calcalist* reported that Spacecom had yet again missed its payment deadline. SSL agreed to a second extension, this time of 60 days, until September 25, 2018.

- 41 -

4829-0600-6183.v1

127. Unknown to investors, at some point between June 10, 2018 and June 29, 2018, the Company quietly removed the AMOS-8 award from its webpage listing GEO awards. The Company did not issue any press releases or otherwise make any public statements at that time regarding AMOS-8.

128. In June 2018, during a closed-door meeting at Maxar's Colorado headquarters, the Company's management told BMO Capital Markets analyst Thanos Moschopoulos ("Moschopoulos") that it was not expecting a rebound in the market, that the Company expected long-term demand of 8-12 awards per year, and that "its outlook for the market has become more cautious than it had been just six months ago." The Company also told him that it was actively considering drastic measures for the GeoComm business. Moschopoulos noted that "Management said that it's considering three scenarios for mitigating its exposure to the GEO market":

(a) "right-sizing its GEO operations in Palo Alto, to bring its footprint and cost structure to a level that's better aligned with a more conservative long-term demand outlook";

(b) "partnering with another manufacturer in order to share costs and give the combined business greater scale"; or

(c) "Exiting the GEO business altogether, if it ultimately concludes that it can't remain in the business while earning an acceptable [return on invested capital]."

129. As reported in the July 24, 2018 *SpaceNews* article "Maxar considering exiting GEO satellite manufacturing business," the Company confirmed in a written statement that it was indeed considering "'strategic alternatives'" for GeoComm due to "material satellite order declines in recent years":

- 42 -

"We have experienced material satellite order declines in recent years, as a result of end market supply and demand factors and additional capacity coming on orbit from [high-throughput satellites] and [low-Earth-orbit] constellations," Maxar said in an emailed statement. "SSL has responded appropriately to manage its workforce and costs during this challenging time. As previously stated, we are continuing to review strategic alternatives for our GEO communications satellite business to improve its financial performance. No final decision has been made. At the same time, we continue to see strong growth in our US Government and LEO communications and Earth observation businesses and remain encouraged regarding the potential in these markets."

130. Inevitably, discussion that the Company was considering an exit from the GEO business was a self-fulfilling prophecy. As *SpaceNews* would later report:

By discussing the possibility of an exit, satellite industry analysts said, Maxar increased the likelihood that it won't win the additional business it needs to justify keeping its GEO operation going.

"They knew that once they raised the possibility of exiting the GEO business, they signaled their lack of commitment to it, orders would stop and the exit would be self-fulfilling," said J. Armand Musey, president of Summit Ridge Group satellite and telecom financial advisory firm.

Zamarian acknowledged that discussing its strategic options openly ("maybe too openly, but nevertheless that's where we are") makes it harder to bring in new GEO contracts.

"I appreciate the challenge that presents," Zamarian said.

131. On June 28, 2018, the Company executed yet another mass layoff, this time of 109 SSL employees. Out of the 12 layoffs that month reported by the local workforce development board, the SSL mass layoff was the largest in Silicon Valley. Another unusual characteristic of the June 2018 layoff was that the Company let go of five SSL employees who held the title of Vice President, more than all prior layoffs of SSL Vice Presidents combined.

132. As this point in the year, two of the few remaining GEO awards that SSL could have won were a pair of replacement satellites for the "HOTBIRD" broadcast constellation operated by

- 43 -

4829-0600-6183.v1

Eutelsat, a pan-European communications provider based in Paris, France. Unknown to investors, as part of the June 2018 layoffs, the Company let go of business development managers at SSL responsible for maintaining relationships with and submitting bids to European operators. In prior SSL layoffs spanning over the course of approximately 10 years, business development managers had not been laid off. Later in 2018, Eutelsat awarded the HOTBIRD contracts to Airbus SE ("Airbus"), an SSL competitor. And, in 2019, the Company has failed to secure any of the seven European GEO contracts awarded. British, Norwegian, and Spanish operators instead gave those orders to Airbus, Thales Alenia Space, and Northrup Grumman Corporation.

133. On the July 31, 2018 earnings call for 2Q18, Lance stated the following in prepared remarks:

> Total company revenues increased 4% sequentially from Q1 to Q2, but declined 4% year-over-year on a pro forma basis as expected due to the continued declines in our GEO communications satellite line of business and the close-to-finish Canadian RCM program.
>
> *　　*　　*
>
> We've already discussed the Telesat LEO award, which could be the first step in a multibillion-dollar production program for Maxar. So where does that leave the GEO Communications market? As we've discussed at length in the past, industry orders fell significantly in 2015 and have remained at those low levels ever since. At this point, we do not expect a significant recovery for this market, with industry orders likely to be at the low end of the 8 to 12 awards range this year 2018.
>
> From our perspective, industry growth clearly is moving in the direction of LEO and NEO [constellations], with the demand for GEO primarily driven by the replacement needs of existing satellites. As such, we are examining a range of strategic alternatives for our [GeoComm sat] line of business. We continue to align our workforce size with the operations and engineering work to be done. We continue to exit leased buildings and consolidate our footprint on the Palo Alto campus.

- 44 -

4829-0600-6183.v1

134.     Paul Steep of Scotiabank asked Lance: "Okay.  And on the GEO side, you talked about a strategic alternative process.  How should we think about the timing for that, Howard?"  In response, Lance stated:

> It's actively in process now.  It has been for a while.  I won't predict, again – and we haven't made any determination what the final outcome will be, but it's fair to say we're looking at a range of options.  All of it trying to accomplish one thing: position Maxar for growth and value-creation going forward.  We do not believe, at this point, we'll see much in the way of a market recovery for GEO.  So at a minimum, we're downsizing, continuing to cut staff to align with the workload. Cutting our footprint, making available some of our owned facilities for sale and moving into as small a footprint as possible on a go-forward basis.

135.     Audrey Preston of Credit Suisse asked Lance:

> As recently as your Investor Day, you noticed or, I guess, you observed that your – the [GeoComm sat] market was relatively close to troughing, whereas now we're not expecting a recovery anymore.  So I was hoping you could maybe explain some of the puts and takes that changed your outlook for the recovery in the GEO sat market?

Lance replied:

> Yes.  I don't think that our view has changed.  I think the words we used and have used since March is that we expected a bottoming.  And that's really referring to our revenue from this sector.  So as we launch more satellites than we book, our revenues have been coming down quarter and quarter and quarter for some time.  So the bottoming occurs when we essentially reach kind of a steady state from a revenue standpoint.  And we believe that we're just about there.
>
> The orders this year, that the industry is now – that we're expecting for the industry is very much on par with last year.  I think last year was about 7, we think it's going to be around 8 or so this year.  And that results in a limited amount of bookings.  And revenue continues to decline.  So I don't think that our view of that has really changed since the March time frame.  We continue to look at alternatives as we've discussed.  And we will, in the near future, reach a conclusion with this business on how we go forward.

136.     Lance also noted, in response to a question about profits in the Space Systems segment, that "[c]learly, we're being held down today by the margins in the GEO business . . . ."

- 45 -

137.    On the July 31, 2018 earnings call, Wirasekara stated the following in prepared remarks:

> Imagery segment recorded strong revenue growth, but this was more than offset by a slight decline in our service business and a more significant decline in our Space Systems business, with the latter impacted by a step down in award values in the GEO [Comsat] market we have experienced since 2015, the effect of which continues to flow through our revenue line.

138.    Wirasekara also stated: "Space Systems experienced a 3% year-over-year revenue decline in Q2 as growth in our U.S. Government and smallsat businesses were more than offset by the decline in the GEO Communication satellite business and our work on the Canadian RCM program that is nearing completion."

139.    During the six months ending June 30, 2018, the Company spent $12.6 million on employee severance and "enterprise improvement costs." The Company has described these as "restructuring . . . costs" that were "primarily related to employment termination within our Space Systems segment" and "undertaken in response to fluctuations in the geostationary communication market and to align with our new strategy." "Enterprise improvement costs related to consultant fees for a project to evaluate strategic alternatives for its GeoComm business."

140.    On October 31, 2018, Defendants claimed that "[t]he Company considers whether any indicators of impairment exist each quarter." Despite the numerous red flags of impairment to the GeoComm CGU that existed during the first half of 2018, Defendants falsely asserted "[f]or the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present."

- 46 -

**Summary of Impairment Indicators**

141.    As listed in the table below, throughout the Class Period, Defendants knew of numerous indicators of impairment existed with regard to the GeoComm CGU:

| Date of Existence | IFRS Indicator of Impairment to GeoComm CGU Assets |
|---|---|
| Dec. 31, 2017 | • During 2017, the Company laid off 334 SSL employees, which amounted to more layoffs at SSL than the prior three years combined, including an unusually high number of systems engineers.  *See* ¶73;¶34(f). |
| Dec. 31, 2017 | • During 2017, GeoComm only won two contracts, its worst performance in 13 years.  The last time SSL performed so poorly was in 2004, when SSL was in formal bankruptcy proceedings.  *See* ¶86; ¶34(a). |
| Feb. 22, 2018 | • The Company's former CFO William McCombe admits that Maxar's 2018 revenues were anticipated to drop between 2%-4% due to "declines in our Space Systems segment . . . [which] continues to feel the impact of the stepdown in [GeoComm sat] award values that began in 2015."  *See* ¶93; ¶34(g). |
| Feb. 22, 2018 | • Lance admits "The geocommunications satellite market remains at a low level of revenue in 2018 [and] is expected to be negatively impacted by the lower booking rates the industry has endured across the past several years as the markets and technologies continue in transition."  *See* ¶90; ¶34(b). |
| Feb. 28, 2018 | • The Company slashes the budgets for SSL proposal managers by hundreds of thousands of dollars, hampering GeoComm's ability to pursue GEO awards.  *See* ¶89; ¶34(a)/(f). |
| Feb. 28, 2018 | • *Space Intel Report* notes "Maxar struggles to adjust to a satellite market whose tables have turned" and that "as the only large satellite builder without a firm base in U.S. government orders, SSL is particularly exposed."  *See* ¶84; ¶34(b). |
| March 8, 2018 | • Lance admits GeoComm revenue had decreased by 20% over the last two years, and anticipated a 22% negative growth rate for 2018.  Maxar's revenue projections for GeoComm business predicted no recovery through 2020.  *See* ¶98; ¶34(g). |

- 47 -

4829-0600-6183.v1

| Date of Existence | IFRS Indicator of Impairment to GeoComm CGU Assets |
|---|---|
| March 8, 2018 | • Lance admits GeoComm's EBITDA contribution had "been marginalized" in 2016 and 2017, and that GeoComm was projected to contribute less than 10% ($70 million) to the Company's 2018 EBITDA estimate of approximately $700 million. *See* ¶100; ¶34(g). |
| March 8, 2018 | • Lance admits, based on the Company's own five-year internal growth projections, that GeoComm earnings would decline between 2% and 4% (the only negative forecast provided across the Company), acknowledging that "We actually have negative growth in the GEO market . . . ." *See* ¶101; ¶34(g). |
| March 8, 2018 | • Wirasekara admits Maxar faced "very strong headwinds . . . in the [GeoComm] satellite business. . . .  When you look at 2016 to 2018, the [GeoComm] market declined by about 45%.  That was a large segment of our business." *See* ¶102; ¶34(b). |
| March 8, 2018 | • Lance admits "we were hopeful the market was going to rebound a little more.  And it's only during the last 6 to 9 months that after doing a lot of external market study, we've concluded that the market is going to stay at this level . . . .  And so we were hesitant to go in and take out large chunks of [GeoComm] fixed costs because if the volume goes up, you need those.  But we've now made the decision to do that." *See* ¶106; ¶34(b)/(f). |
| March 8, 2018 | • Lance admits "I'm not going to allow the [GeoComm] product line to be a drag on the company going forward. . . .  [W]e've had such large declines [in EBITDA] that these aren't incremental steps we're taking." *See* ¶¶103-104; ¶34(g). |
| March 8, 2018 | • Zamarian provides a long-term forecast of 8-to-12 annual industry awards, admitting that the Company believed that market demand had been cut in half from historical levels.  *See* ¶107; ¶¶34(b). |
| March 13, 2018 | • Lance admits "the GEO market today is about 40% of where it was 3 years ago. . . .  [A]nd we're not counting on it improving over time." *See* ¶108; ¶34(b). |
| March 31, 2018 | • On the 1Q18 earnings call on May 9, 2018, Lance admits: "[W]e remain in this view in 2018 that we're probably about 50% where this market would be, let's say, at its nominal level of around 20 awards." *See* ¶110; ¶34(b). |

- 48 -

4829-0600-6183.v1

| Date of Existence | IFRS Indicator of Impairment to GeoComm CGU Assets |
|---|---|
| March 31, 2018 | • On the 1Q18 earnings call on May 9, 2018, Wirasekara admits SSL business's financial performance was materially impacted by "the step down in award values and continued weakness in the [GeoComm sat] market since 2015 continued to flow through as lower revenues in the current quarter." *See* ¶111; ¶34(g). |
| April 5, 2018 | • By this date, Maxar had already lost two potential GeoComm contracts to competitors. In January 2018, SSL lost the "Galaxy-30" contract to Orbital ATK. On April 5, 2018, Maxar lost the "Konnect VHTS" contract to Thales. *See* ¶¶88, 109; ¶34(a)/(e). |
| May 25, 2018 | • Spacecom postpones its initial payment for the AMOS-8 contract. *See* ¶123;¶34(a)/(e)/(f) |
| June 25, 2018 | • Spacecom again misses a payment deadline for the AMOS-8 contract. *See* ¶126; ¶34(a)/(e)/(f). |
| June 10-29, 2018 | • The Company quietly removes the AMOS-8 contract from its webpage listing GEO awards, but says nothing to the market about it. *See* ¶127; ¶34(a)/(e)/(f). |
| June 28, 2018 | • In a closed-door meeting, Maxar's management admits it was considering drastic options to address the collapse in the GeoComm business, including "right-sizing its GEO operations in Palo Alto," "partnering with another [GeoComm] manufacturer" and "[e]xiting the GEO business altogether." Also, the Company's "outlook for the market has become more cautious than it had been just six months ago." *See* ¶128; ¶34(b)/(f). |
| June 28, 2018 | • The Company lays off 109 SSL employees, including SSL's primary contacts for European GEO customers, and an unprecedented number of SSL employees in the Vice President position. *See* ¶131; ¶34(f). |
| June 30, 2018 | • In the first half of 2018, the Company spends $12.6 million on GeoComm-related employee severance and "consultant fees for a project to evaluate strategic alternatives for its GeoComm business." *See* ¶139; ¶34(f). |

- 49 -

| Date of Existence | IFRS Indicator of Impairment to GeoComm CGU Assets |
|---|---|
| June 30, 2018 | • Lance, regarding "strategic alternatives" for GeoComm, admits: "It's actively in process now. It has been for a while. . . . We do not believe, at this point, we'll see much in the way of a market recovery for GEO. So at a minimum, we're downsizing, continuing to cut staff to align with the workload. Cutting our footprint, making available some of our owned facilities for sale and moving into as small a footprint as possible on a go-forward basis." *See* ¶134; ¶34(f). |
| June 30, 2018 | • Lance admits "we do not expect a significant recovery for this market, with industry orders likely to be at the low end of the 8 to 12 awards range this year 2018." *See* ¶133; ¶34(b). |
| June 30, 2018 | • Lance admits "[GeoComm] revenues have been coming down quarter and quarter and quarter for some time," and the downturn "results in a limited amount of bookings" and "revenue continues to decline." *See* ¶135; ¶34(g). |
| June 30, 2018 | • Wirasekara admits SSL's performance was materially impacted by "a step down in award values in the [GeoComm sat] market we have experienced since 2015, the effect of which continues to flow through our revenue line." *See* ¶137; ¶34(g). |

142. Each of the factors above existed prior to July 1, 2018. Defendants, however, have claimed that "[f]or the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present." Accordingly, Maxar's decision not to test and write-down impaired assets at either March 31, 2018 or June 30, 2018 did not reasonably align with the numerous indicators of GeoComm asset impairment, all of which Defendants had direct knowledge of as of March 31, 2018 and June 30, 2018.

**THE FAILURE OF WORLDVIEW-4**

143. Launched into orbit in November 2016, the imaging satellite WorldView-4 was the flagship of the DigitalGlobe fleet. After the acquisition of DigitalGlobe in October 2017, the Company became the owner and operator of WorldView-4. The satellite cost $835 million to build,

4829-0600-6183.v1

took several years to manufacture, and generated $85 million in revenue for the Company in 2018 alone.

144.    A key component of WorldView-4 is a set of three control moment gyroscopes ("CMG"), which were "attitude control" devices that controlled the orientation of the satellite. The CMGs allowed the Company to point WorldView-4 in any direction with an extremely high degree of precision needed for the purpose of on-demand imaging. According to the Company, CMG failure leads to a loss of the stability needed for capturing usable imagery. In other words, CMG failure renders the WorldView-4 useless for high-resolution digital imaging, *i.e.*, its sole revenue-generating function.

145.    The Company employs rotating teams of trained space vehicle operators to monitor the health and status of the DigitalGlobe imaging satellites, including WorldView-4, on a 24/7/365 basis. Several times per day, the Company receives data (known as "telemetry") from each satellite concerning its precise position and orientation, as well as data regarding the performance of individual components of the satellite, including the CMGs. According to the Company, satellite operators monitoring telemetry are responsible for recognizing "anomalous spacecraft conditions," investigating "limit violations," addressing such violations if possible, and otherwise reporting them up to the engineering team.

146.    Operated by Joint Space Operations Center of the Department of Defense, the United States Space Surveillance Network detects, identifies, and tracks all artificial objects orbiting Earth, including commercial satellites such as WorldView-4. Each object's orbit can be represented by a certain set of parameters describing the orbit's shape, size, and orientation. Based on its observations, the Space Surveillance Network regularly records and updates such parameters in the

- 51 -

4829-0600-6183.v1

form of a two-line element ("TLE") dataset.  TLE data does not include the performance of individual components of a satellite, which is information known only to the Company.

147.    TLE data obtained from the Space Surveillance Network indicates that, for most of WorldView-4's operational history, its day-to-day movement was regular and predictable, demonstrating stability and control.  Changes in its orbit were smooth and gradual.

148.    On or about October 12, 2018, however, the very same TLE data abruptly became erratic and volatile compared to that of its operational history, demonstrating a loss of stability that has never been restored.  In particular, TLE parameters known as "eccentricity," "argument of perigree," "mean anomaly," and "mean motion" all began exhibiting unpredictable variability on or about October 12, 2018, and continued to do so until the end of the Class Period.

149.    Rather than timely disclosing WorldView-4's loss of stability, Defendants made a series of material misstatements and omissions giving investors the false and misleading impression that WorldView-4 was still operational.

150.    On October 31, 2018, in its filings with U.S. and Canadian regulators, the Company made a false and misleading risk disclosure: "The risks that could cause actual results to differ materially from current expectations include, but are not limited to:  . . . loss of, or damage to, a satellite before the end of its expected operational life . . . ."  In addition, in violation of IAS 10 under IFRS, the Company failed to disclose the WorldView-4 failure as a material subsequent event.

151.    In November 2018, CEO Lance made several statements representing that WorldView-4 was a functioning satellite and would continue to be for years to come.

152.    On January 7, 2019, the Company announced that WorldView-4 "experienced a failure in its control moment gyros ('CMGs'), preventing the satellite from collecting imagery due to

- 52 -

the loss of an axis of stability" and that "Maxar believes that WorldView-4 will likely not be recoverable and will no longer produce usable imagery." The Company did not attribute the loss of WorldView-4 to anything other than CMG failure.

153.    Defendants have been evasive and inconsistent about when WorldView-4 failed. In January 2019, a Company spokesperson declined to respond to a reporter at *The Globe and Mail* who had directly asked when the CMG failure occurred. In February 2019, Maxar's new CEO Dan Jablonsky ("Jablonsky") stated that WorldView-4 "became inoperable at the first of the quarter." In March 2019, Maxar stated in its annual report that WorldView-4 failed "[d]uring December 2018."

154.    Defendants were motivated to conceal the failure of WorldView-4 until the "domestication" of the Company as a U.S. entity, a process that concluded only five days before Maxar announced the CMG malfunction.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

155.    On March 26, 2018, Maxar issued a press release dedicated to the AMOS-8 announcement titled "***Spacecom Selects Maxar Technologies' SSL to Build AMOS-8 Communications Satellite with Advanced Capabilities***." The press release quotes SSL president Zamarian as stating "'SSL will demonstrate our industry-leading technological capabilities, our legacy of expertise and our commercial mindset to meet all of Spacecom's mission requirements.'" The press release also quotes Spacecom CEO David Pollack as stating, "'We are eager to work together with SSL to develop this new satellite.'"

156.    On March 26, 2018, on SSL's public Facebook and Twitter accounts, Defendants stated: "2018 is off to a great start for SSL with two contracts to build GEO satellites announced

4829-0600-6183.v1

today. Thank you B-SAT and Spacecom for placing your trust in SSL." These social media postings were simultaneous with the Company's press release announcing the two contracts.

157. On May 9, 2018, on the 1Q18 earnings call, defendant Lance stated:

We were very pleased to report in the quarter that we were awarded 2 new GEO communications satellites. . . .

. . . Israeli satellite operator [Spacecom] selected SSL to build the AMOS-8 satellite. This will deliver state-of-the-art broadcast, broadband and data services from its 4-degree West hot spot to Europe, Africa, and the Middle East. AMOS-8 will include flexible, high-power Ku-band and Ka-band payloads, with steerable antennas to enable [Spacecom] to deliver a number of value-added services.

158. On May 9, 2018, the Company listed AMOS-8 in its press release under the heading "***Notable bookings in the Space Systems segment announced in the first quarter of 2018***." Also on May 9, 2018, the Company listed AMOS-8 in its 1Q18 earnings slide deck under the heading "***Q1: Key accomplishments and order activity***" and again under the heading "***Space Systems – Q1 results***."

159. With respect to the above-referenced statements at ¶¶155-158, defendants Lance and Wirasekara had ultimate authority over the statements contained therein, including their contents and whether and how to communicate the contents to the investing public.

160. Defendants' statements at ¶¶155-158 were false and misleading when made because they gave the investing public the misleading impression that AMOS-8 was a definitive award. Defendants knew of and failed to disclose several facts that would have informed investors that the AMOS-8 contract was not definitive. On October 31, 2018, the Company admitted in a filing to U.S. and Canadian regulators that the AMOS-8 contract "was not a definitive award and was not included in backlog." The agreement between the Company and Spacecom was illusory because it included a provision that allowed Spacecom to withdraw from the deal within 60 days without

- 54 -

4829-0600-6183.v1

penalty. At the time of the March 26, 2018 announcement, Spacecom did not have financing in place to pay SSL for building AMOS-8, and Spacecom was reliant on future bond offerings to fund AMOS-8. In addition, the AMOS-8 contract was not effective until SSL received the first payment from Spacecom.

161. On May 9, 2018, the Company released its quarterly financial statements for 1Q18. That morning, the Company filed these financial statements on the electronic reporting systems of both the U.S. Securities and Exchange Commission (as Form 6-K) and the Canadian Securities Administrators (as a news release, interim financial statement, and interim management discussion and analysis ("MD&A")). The Company's May 9, 2018 Form 6-K was a single SEC filing integrating the news release, interim financial statement, and MD&A filed with Canadian regulators. As a result, the contents of the Company's U.S. and Canadian filings on May 9, 2018 were identical. With respect to the Company's regulatory filings submitted to the SEC and Canadian Securities Administrators, Lance and Wirasekara had ultimate authority over the statements contained therein, including the contents of the filing and whether and how to communicate the contents of the filing to the investing public.

162. Lance and Wirasekara signed and filed Form 52-109F2 (Certification of Interim Filings – Full Certificate) with Canadian regulators. Among other things, Lance's and Wirasekara's respective certifications each included the following attestations regarding the 1Q18 filings:

> **Review**: I have reviewed the interim financial report and interim MD&A, (together, the "interim filings") of Maxar Technologies Ltd. (the "issuer") for the interim period ended March 31, 2018.
>
> **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the interim filings *do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is*

- 55 -

*necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings*.

**Fair presentation**: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings *fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings*.

163.    With respect to its 1Q18 balance sheet, the Company reported the value of its:

(a)    Intangible Assets as *$1,698.2 million*;

(b)    PP&E as *$1,066.4 million*; and

(c)    Inventories as *$100.5 million*.

164.    With respect to its 1Q18 income statement, the Company reported its:

(a)    Net Earnings as *$31 million*; and

(b)    Net EPS as *$0.55*.

165.    Defendants' May 9, 2018 statements about 1Q18 intangibles, PP&E, inventories, net earnings, and net EPS were false and misleading when made because, as alleged in detail at ¶¶54-111, the Company's 1Q18 financial statements failed to disclose the impaired value of the GeoComm CGU.  As of March 31, 2018, numerous external and internal indicators of impairment existed for GeoComm CGU.  ¶¶54-111.  Had Defendants complied with IFRS standards in 1Q18, Maxar would have accrued impairment charges of at least $37.7 million to inventories, $260.3 million to intangible assets (excluding goodwill) and $85.6 million to PP&E.  Had the Company conducted an IAS 36 impairment test and accrued associated impairment charges on a timely basis, Maxar would have reported 1Q18 consolidated inventories, intangibles, and PP&E of $62.8 million, $1.4 billion, and $980.9 million, respectively.  Had the Company conducted an IAS 36 impairment

- 56 -

test and accrued associated impairment charges on a timely basis, Maxar would have reported a 1Q18 net loss and basic loss per share of -$352.6 million and -$6.25, respectively.

166. On July 31, 2018, the Company released its quarterly financial statements for 2Q18. That morning, the Company filed these financial statements on the electronic reporting systems of both the SEC (as Form 6-K) and the Canadian Securities Administrators (as a news release, interim financial statement, and interim management discussion and analysis ("MD&A")). The Company's July 31, 2018 Form 6-K was a single SEC filing integrating the news release, interim financial statement, and MD&A filed with Canadian regulators. As a result, the contents of the Company's U.S. and Canadian filings on July 31, 2018 were identical. With respect to the Company's regulatory filings submitted to the SEC and Canadian Securities Administrators, Lance and Wirasekara had ultimate authority over the statements contained therein, including the contents of the filling and whether and how to communicate the contents of the filing to the investing public.

167. Lance and Wirasekara signed and filed Form 52-109F2 (Certification of Interim Filings – Full Certificate) with Canadian regulators. Among other things, Lance's and Wirasekara's respective certifications each included the following attestations regarding the 2Q18 filings:

> **Review**: I have reviewed the interim financial report and interim MD&A, (together, the "interim filings") of Maxar Technologies Ltd. (the "issuer") for the interim period ended June 30, 2018.

> **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the interim filings ***do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings***.

> **Fair presentation**: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings ***fairly present in all material respects the financial***

- 57 -

*condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings*.

168.    With respect to its 2Q18 balance sheet the Company reported the value of its:

    (a)    Intangible Assets as *$1,673.4 million*;

    (b)    PP&E as *$1,060.5 million*; and

    (c)    Inventories as *$95.3 million*.

169.    With respect to its 2Q18 income statement, the Company reported its:

    (a)    Net Earnings as *-$18.6 million*; and

    (b)    Net EPS as *-$0.33*.

170.    Defendants' July 31, 2018 statements about 2Q18 intangibles, PP&E, inventories, net earnings, and net EPS were false and misleading when made because, as alleged in detail at ¶¶54-140, the Company's 2Q18 financial statements failed to disclose the impaired value of the GeoComm CGU.  As of June 30, 2018, numerous external and internal indicators of impairment existed for GeoComm CGU.  ¶¶54-140.  Had Defendants complied with IFRS standards in 2Q18, Maxar would have accrued impairment charges of at least $37.7 million to inventories, $260.3 million to intangible assets (excluding goodwill) and $85.6 million to PP&E.  Had the Company conducted an IAS 36 impairment test and accrued associated impairment charges on a timely basis, Maxar would have reported 2Q18 consolidated inventories, intangibles, and PP&E of $57.6 million, $1.4 billion and $975.0 million, respectively.  Had the Company conducted an IAS 36 impairment test and accrued associated impairment charges on a timely basis, Maxar would have reported a 2Q18 net loss and basic loss per share of -$402.1 million and -$7.03, respectively.

171.    On October 31, 2018, the Company filed its quarterly financial statements for 3Q18 with U.S. and Canadian securities regulators:

- 58 -

4829-0600-6183.v1

(a)     The Company's filing stated: "***The risks that could cause actual results to differ materially from current expectations include, but are not limited to: . . . . loss of, or damage to, a satellite before the end of its expected operational life*** . . . ."

(b)     The Company's filing had a "Subsequent events" section, but the only item disclosed to investors was the quarterly dividend issued on October 31, 2018.  ***Maxar failed to disclose the failure of WorldView-4 anywhere in its 3Q18 filings despite the fact that it was a material subsequent event known to Defendants, in violation of IFRS accounting standard IAS 10***.

172.    On November 6, 2018, the Company held a special call to announce an extension to the EnhancedView contract with the government.  On that call, defendant Lance made the following statements:

(a)     "There will be opportunities for us to negotiate and agree to pricing for additional capacity in the future, either from Worldview-4 or WorldView Legion once that constellation is on orbit."

(b)     "As I indicated Audrey, we think there are multiple opportunities over time with the NRO to increase contract, either current contract or have additional contracts related to things like adding RADARSAT-2 imagery, ***adding additional capacity either from WorldView-4 today or from WorldView Legion, recognizing the increased revisit we're going to be providing, finding more ways to provide analytics, and so on***."

4829-0600-6183.v1

Case 1:19-cv-00124-WJM-SKC   Document 44   Filed 10/17/19   USDC Colorado   Page 63 of 105

173.     On November 28, 2018, Lance delivered a presentation on the Company's behalf at the Credit Suisse Annual Industrials Conference in Manaplan, Florida.  During the Credit Suisse presentation, Lance displayed a slide stating: "*Opportunity for additional capacity to be supplied in the future from WorldView-4 and WorldView Legion*."  At the same presentation, Lance also displayed the slide below indicating that WorldView-4 was engaged in "on-orbit" operations and would continue to be until the year 2027:



174.     The statements alleged in ¶¶171-173 were false and misleading when made because, despite knowing that WorldView-4 had lost stability beginning no later than October 12, 2018,

- 60 -

4829-0600-6183.v1

Defendants gave investors the impression that WorldView-4 was still a fully-functioning satellite capable of supplying high-resolution imagery to customers on demand.

## THE TRUTH EMERGES

175. On August 7, 2018, before the markets opened, Spruce Point issued a report questioning Maxar's financial status and the Company's accounting practices. Among other observations, the report noted on a slide titled "Asset Impairment Likely" that "Maxar's balance sheet is inflated with goodwill and overcapitalized intangible assets." Quoting Lance's July 31, 2018 conference call statements as described in ¶134 above, the Spruce Point report estimated that Maxar's intangibles were impaired by hundreds of millions of dollars.

176. As a result of this news Maxar's share price on NYSE fell $5.34, or -13.44%, to close at $38.44 on August 7, 2018, with a reported trading volume of 2.9 million shares.

177. At 4:15 p.m. EDT that day, shortly after trading closed on NYSE the Company issued a press release on *BusinessWire* titled "Maxar Technologies Responds to Misleading Short Sell Report" with the following statement:

> The report on Maxar Technologies Ltd. ("Maxar" or the "Company", formerly MacDonald, Dettwiler and Associates Ltd.) (NYSE and TSX: MAXR) released today by Spruce Point Capital Management contains a number of inaccurate claims and misleading statements. Maxar believes it is a direct attempt by a short-seller to profit, at the expense of Maxar shareholders, by manipulating Maxar's stock price.
>
> Maxar continues to execute against its strategy, and recently reaffirmed its full year 2018 guidance for revenue and cash flow from operations, while increasing its full-year adjusted EPS outlook. Maxar believes that the Company remains positioned for future growth. Management and the Board of Directors are focused on delivering enhanced value for all Maxar shareholders.
>
> Maxar continues to be fully committed to transparency in all of its investor presentations and financial reports. Please refer to the Company's disclosure materials filed with Canadian and U.S. securities regulatory authorities, which are

- 61 -

available online under the Company's SEDAR profile at www.sedar.com, under the Company's EDGAR profile at www.sec.gov or on the Company's website at www.maxar.com, for more information.

Defendants' August 7, 2018 press release, however, failed to disclose that the Spruce Point report resulted in the opening of an investigation by the Company's Audit Committee – which would be assisted by the Company's new certified public accountants and "independent" third-party consultants – into the alleged accounting improprieties.

178.     Despite the Company's press release, the market continued to react the following day. Maxar's share price continued to fall on NYSE by $1.82, or -4.55%, to close at $36.69 on August 8, 2018, with a reported trading volume of 0.9 million shares.

179.     On August 24, 2018 at 6:00 a.m. EDT, the Company issued a press release on *PR Newswire* titled "Maxar Technologies Provides Comprehensive Response to Shareholders Following Misleading Short-Seller Campaign by Hedge Fund."  Maxar's "Comprehensive Response" came after the Audit Committee's investigation into Spruce Point's allegations was completed (or was still ongoing) and after Maxar fired its prior certified public accountant.  In relevant part, the Company for the first time acknowledged the possibility that its GeoComm assets were impaired:

> The Company is exploring strategic alternatives regarding the future of its GEO communications satellite line of business and has continuously implemented actions to right size the business to maximize near-term profitability.  Mature demand for satellite-based video distribution, falling satellite-based broadband pricing, and alternative LEO and MEO technologies have negatively impacted the Company's GEO communications satellite line of business.  The Company has discussed these market factors and has provided updated industry outlooks in each of the Company's recent quarterly filings, as well as in its quarterly investor calls and its Investor Days in March 2018.  The SSL acquisition, and the reorganization as part of its U.S. Access Plan, has also allowed the Company to begin to compete on and win attractive U.S. government space systems and commercial LEO satellite contracts that are driving growth and creating value for shareholders.

- 62 -

4829-0600-6183.v1

The Company's facilities in Palo Alto, CA are significantly over-sized for today's market and under-absorbed overhead costs have contributed to reduced profitability and negative cash flows in the Space Systems segment. The strategic alternatives under consideration include partnering with another satellite manufacturer to gain scale benefits, the sale of the GEO satellite line of business, or the exit of the GEO satellite line of business following completion of existing contracts in backlog and sale of its facilities. The monetization of the Company's real estate assets in Palo Alto are estimated to be in a range of $150 to $200 million. LEO small satellite production for commercial communications, remote-sensing and U.S. Government customers is expected to be relocated to the Company's facility in San Jose, CA. A decision on the future strategic direction of the GEO communications satellite business is expected to be made by the end of 2018. As a result, this line of business may be classified as a discontinued operation.

The Company expects that under certain of these scenarios, non-cash write-downs or an impairment of assets could occur as a result of lower future revenue expectations, industry outlook and overall valuation of the GEO communications satellite line of business. The Company routinely evaluates assets for impairment in the fourth quarter of each year, and in interim quarters when there is an indicator of possible impairment. As part of its preparation of its financial statements for the third quarter of 2018, the Company will, consistent with IFRS rules, estimate the recoverable amount of the GEO communications satellite line of business assets, including goodwill, other intangible assets, capitalized development, and inventory, and will recognize an impairment or non-cash write-down if the recoverable value of the assets is determined to be less than their carrying value. We believe that, given the continued decline in the GEO communications satellite business, it is possible that an impairment or write-down will be recognized in the third quarter of 2018. However, our analysis is not complete and, accordingly, we are unable to estimate the amount of the possible impairment or write-down at this time.

In addition, cash costs for certain employee severance, pension and other liabilities could be incurred. We have already implemented a series of ongoing actions to right size the business in the near term to conserve cash. During the six months ended June 30, 2018, the Company incurred employee severance and enterprise improvement costs of $12.6 million.

180. Despite Defendants' attempt to slow the continued drop in price of Maxar common stock, the market reacted negatively to the Company's more comprehensive response to the August 7, 2018 Spruce Point report, particularly to the Company's acknowledgment that SSL assets may be impaired. As a result, Maxar's share price on the NYSE dropped from $35.92 per share at the close

- 63 -

on August 22, 2018, to close at $33.92 on August 24, 2018, or by $2.00 or -5.6%, with a reported volume of 0.9 million shares.

181. On September 3, 2018, the Israeli Ministry of Science and Technology announced in Hebrew that AMOS-8 would be built in Israel and funded by the Israeli government. Israel's Minister of Science and Technology was quoted as saying:

> "The decision has long-term strategic significance and meets the vital existential needs of the State of Israel. The development and production of the satellite in Israel will enable the maintenance of complete independence in the field of satellite communications. Its construction in Israel will preserve knowledge and expertise in the field acquired over the decades in the local industry."

182. The market reacted negatively to the Israeli government's announcement that AMOS-8 would be built by an Israeli organization, not Maxar. On September 4, 2017, Maxar's stock price on the NYSE dropped from $31.05 per share at the close on August 31, 2018, to close at $29.34 on September 4, 2018, or by $1.71 or -5.5%, with a reported volume of 0.6 million shares.

183. On September 25, 2018, in a Hebrew-language filing with the Tel Aviv Stock Exchange, Spacecom announced that it would not be making its down payment to Maxar for the AMOS-8 contract.

184. The market reacted negatively to Spacecom's announcement that it would not be making any down payment for SSL to build AMOS-8. On September 26, 2018, Maxar's stock price on the NYSE dropped from $34.81 per share at the close on September 25, 2018, to close at $33.18 on September 26, 2018, or by $1.63 or -4.7%, with a reported volume of 1.3 million shares.

185. On October 9, 2018, the Company issued a press release titled "Maxar Technologies Advances Planned U.S. Domestication," in which it abruptly announced that it was significantly advancing its schedule for domestication from its previous, long-standing commitment of "no later

- 64 -

than December 31, 2019" to "January 2019." In the same announcement, the Company called a special meeting of shareholders for November 16, 2018 in order to approve the accelerated domestication schedule.

186. On October 31, 2018, before the markets opened, the Company filed its financial statements and results for 3Q18, including a press release and MD&A, with U.S. and Canadian regulators.

187. In its 3Q18 press release, the Company announced that it was taking GeoComm – related impairment and inventory charges totaling $383.6 million:

> "We recognized impairment losses of $345.9 million and an inventory obsolescence charge of $37.7 million related to the GEO Comsat business this quarter. This non-cash charge reflects the decline in the business and our decision to evaluate strategic alternatives for GEO Comsat." [quoting CFO Biggs Porter]

> \* \* \*

> The Company announced in Q1 2018 that Space Systems/Loral, LLC ("SSL"), a wholly owned subsidiary of Maxar, was selected by Spacecom to build its AMOS-8 advanced communications satellite. In September 2018, this contract became void when the customer did not make the initial payment and it became evident that the Spacecom would not achieve financing on the project. The voiding of this contract did not have an impact on the Company's backlog, as it was not a definitive award and was not included in backlog.

> During the three months ended September 30, 2018 the Company recognized impairment losses of $345.9 million and inventory obsolescence of $37.7 million related to the GeoComm business.

188. In its 3Q18 MD&A, the Company explained the rationale for the GeoComm impairment and inventory charges:

**Impairment of Non-Financial Assets**

Non-financial assets are tested annually for impairment in the fourth quarter or whenever there is an indication that an asset may be impaired. Non-financial assets that do not generate independent cash flows are grouped together into a cash generating unit ("CGU"), which represent the level at which largely independent cash flows are generated. An impairment loss is recognized in earnings to the extent that the carrying value of an asset, CGU or group of CGUs exceeds its recoverable amount. Impairment is first evaluated by management at the CGU level, absent allocated goodwill.

The Company considers whether any indicators of impairment exist each quarter. The GeoComm business, a CGU within the Space Systems segment, forecasted it would have a significantly different mix of programs at the beginning of the year. Additionally, the GeoComm business predicted it would be awarded approximately three to four contracts for geocomm satellites, or approximately thirty percent of the overall 2018 industry awards. During Q1 2018, the Company was awarded a contract to provide the B-SAT satellite, and it was also selected to build the AMOS-8 satellite, a key program with the Israeli government. By the end of Q2 2018, the Company was still confident in its prediction of three to four geocomm satellite builds. For the three months ended March 31, 2018 and six months ended June 30, 2018, the Company concluded that no indicators of impairment were present.

In the third quarter of 2018, it became clear that industry and macroeconomic factors had declined substantially from earlier forecasts. By August 2018, there were only five winnable programs across the industry for the entire year, and two to three other satellites from the total industry outlook of eight to twelve awards were delayed. In addition, in Q3 2018 it became apparent that the Israeli government intended to use an Israeli satellite manufacturer in place of SSL to build AMOS 8. The Company does not expect the long-term outlook for the GeoComm business to rebound significantly from current year award levels. Lower award volumes also contribute to reduced profitability from under-absorbed fixed indirect overhead costs, as the Company's facilities in Palo Alto, CA are significantly over-sized for today's business volume. As a result of these and other factors, the Company commenced an effort in the third quarter of 2018 to assess strategic alternatives for its GeoComm business, including a potential sale, and implemented a major restructuring initiative to right size the GeoComm business for its current environment.

The aggregation of the above factors resulted in an impairment trigger being identified as at August 31, 2018 at the GeoComm CGU. The Company first performed an impairment test of the GeoComm CGU. The impairment test of the GeoComm CGU evaluated the non-financial assets held by the Company based on an asset group level, absent allocated goodwill. Assets were aggregated to the level in

- 66 -

4829-0600-6183.v1

which independent cash flows could be generated for their respective groupings. The carrying values of these asset groups were compared against their fair value less costs of disposal for possible impairment and an impairment loss of $345.9 million related to property, plant and equipment and intangible assets was recorded for the three months ended September 30, 2018.

\* \* \*

**Inventory Obsolescence**

. . . The Company was previously holding inventory on hand in anticipation of awards to be won during the second half of 2018 and for the AMOS 8 program. The impacts from the loss of AMOS 8 and inability to obtain the forecasted awards culminated during the third quarter of 2018. These factors compelled the Company to re-evaluate its inventory reserves for inventory that was previously pegged to forecasted usage.

All GeoComm inventory subject to discernment over future use based on forecasts was assessed for possible obsolescence. The result of the re-assessment of future usage of the on-hand inventory was an incremental inventory obsolescence reserve of $37.7 million for the three months ended September 30, 2018.

189. In conjunction with the 3Q18 filings, the Company held an earnings call at 8:30 a.m. EDT, during which Lance stated in prepared remarks:

Market trends at the U.S. and international government levels remain very positive, with growing budgets to fund increased space investments. The global threat environment is persistent, and that's driving higher spending levels in key areas that we can address. All of our business segments will benefit from the trends noted on this slide.

The legacy GEO Comsat market, of course, is an exception, and it remains weak, with industry orders at the lowest level in recent history. The severity and persistence of this market downturn led us to announce the pursuit of strategic alternatives for the GEO product line at the end of July. We are in active discussions, continue to expect to announce a definitive direction for this business by the end of the year.

\* \* \*

Overall, I believe it was a very successful quarter in delivering on our strategic priorities and creating future momentum for Maxar.

- 67 -

4829-0600-6183.v1

190. On the same call, CFO Biggs Porter ("Porter") explained in prepared remarks that the Company incurred losses in 3Q18 as a direct result of the impairment and inventory charges:

IFRS EPS was a loss of $7.31 versus a gain of $0.34 in the third quarter of 2017, driven largely by the $384 million in noncash impairment inventory obsolescence charges related to the GEO Comsat business. As Howard mentioned earlier, the current state of this market, together with other factors, necessitated an analysis of the carrying value of the GEO Comsat assets on our balance sheet. This led to an impairment loss of $346 million related to property, plant and equipment and intangible assets and an inventory obsolescence reserve of $38 million during this quarter.

\*       \*       \*

On an IFRS basis, we posted a loss of $7.29 year-to-date versus a gain of $0.98 in 2017. Again, the major driver of the decline was the impairment and inventory charges I mentioned earlier.

191. Steven Arthur, an analyst with RBC Capital Markets, asked Lance: "First off, related to the – your current thinking on the review of the GEO business. Just wondering if you can elaborate any more – offer any more color on the items under consideration. What's looking most interesting?" Lance responded:

Steve, I can't be specific, but I can tell you we're in a number of discussions, and our primary path remains to sell the business. So we have multiple interested parties. We are in discussions and we're still hopeful to have an answer that we can announce between now and the end of the year.

192. When asked about the impact of GeoComm on quarterly earnings, Lance stated: "It's significantly negative. I think we can certainly say that, Thanos. . . . But I've said now for a few quarters that we are now trending in GEO toward a loss. We are trending and now having the impact of pretty significant negative cash flows."

193. Regarding the accounting disclosures for GeoComm, Robert Spingarn of Credit Suisse asked CFO Porter:

- 68 -

And then separately, Biggs, you've not been there that long either, just about 1 quarter. I wanted to ask to what extent you've had your chance to do your deep dive and maybe reset any kind of expectations. Above and beyond the charge that we saw today in GEO, do you still plan to do some kind of significant review that could result in some changes? Or has that already happened in these results?

Porter responded:

There's no plan for me to do anything beyond what we've looked at this quarter. I mean, every quarter, it's my obligation to look at everything and make sure that we're doing everything right, whether it's in accordance with IFRS or in accordance with GAAP, so that just will never change. And that's not something that is optional. But we did everything that we should do this quarter. We looked at it hard. And I think we, of course, then stand behind that from the standpoint of believing that we've captured what was supposed to be captured.

194. As a result of this news Maxar's stock price on the NYSE dropped from $27.07 per share at the close on October 30, 2018, to close at $14.91 on October 31, 2018, or by $12.16 or -44.9%, with a reported volume of 3.4 million shares.

195. In December 2018, the Company announced its sale of certain real estate in Palo Alto to Google for $70 million, a 4.5 acre property that was once home to 400 SSL satellite design and production engineers. CFO Porter noted that "'net proceeds from this transaction will be used to pay down Maxar debt.'"

196. Two weeks later, the Company announced that it had amended its credit agreement with its bank lenders to increase Maxar's "maximum consolidated debt leverage ratio," *i.e.*, the total amount the Company can borrow in proportion to its earnings.

197. On January 2, 2019, the Maxar announced that it had completed its "domestication" plan and became a U.S. entity incorporated in Delaware.

198. On January 7, 2019, Maxar issued a press release in which it disclosed that WorldView-4 experienced CMG failure, thereby preventing the satellite from collecting imagery due

- 69 -

to the loss of stability. The Company also revealed that WorldView-4 was most likely not recoverable and would no longer produce usable images.

199. The market reacted negatively to the Company disclosure about the failure of the WorldView-4 satellite. On January 7, 2019, Maxar's stock price on the NYSE dropped from $11.72 per share at the close on January 4, 2019, to close at $8.03 on January 7, 2019, or by $3.69 or -24.9%, with a reported volume of 2.8 million shares.

200. On January 8, 2019, the market continued to react to the news of the WorldView-4 failure. Maxar's stock price on the NYSE dropped another $2.00 per share on reported volume of 11.1 million shares.

201. Shortly after, Lance resigned as CEO, President, and member of the Board of Directors, with DigitalGlobe president Dan Jablonsky taking his place. According to Howard Estes, Chair of the Board of Directors, Maxar replaced Lance "[g]iven the company's performance in 2018 and the loss of over 90% of our value in the marketplace."

202. In February 2019, the Company announced the fourth quarter and fiscal year of 2018 results and took $883 million in additional impairment charges, primarily driven by "'the decline in [Maxar's] market value'" and "'the continuation of a weak GEO Comsat market.'" The $883 million in impairments included a $162 million impairment write-down for the loss of WorldView-4, $636 million impairment to goodwill, and $85 million in net impairment losses to GeoComm assets. In the same earnings release, Maxar announced a reduction of its quarterly dividend to a penny in order to preserve cash and "'strengthen Maxar's financial position.'"

- 70 -

203. In the March 2019 proxy statement filed with the SEC, the five-member Audit Committee of the Company's Board of Directors reported that Maxar's management had identified material weaknessess in Maxar's financial reporting processes:

> During 2018, management documented its internal controls and completed its testing and evaluation of internal control over financial reporting. The Audit Committee met regularly with management and the independent auditor, KPMG U.S., to discuss the progress of the evaluation. Based on the Company's internal review, management identified material weaknesses in the Company's internal control over financial reporting as of December 31, 2018 related to an insufficient complement of trained resources, ineffective continuous risk assessment, and ineffective control activities related to percentage-of-completion revenue and cost of sales, measurement and disclosure of income taxes, and commitment and contingency disclosures have been identified and included in management's assessment.

204. That same month, Jose A. Torres, Jr. – the Company's Chief Accounting Officer throughout the Class Period – resigned from Maxar. The Company did not appoint his replacement until five months later.

205. Maxar was never able to find a willing buyer for the GeoComm business, which has not won a typical GEO order since the Japanese B-SAT award a year and a half ago. In April 2019, SSL president Dario Zamarian separated from the Company. The Company has rebranded SSL as Maxar's "Space Solutions" group.

206. In June 2019, *Reuters* reported that Maxar is exploring the sale of its MDA subsidiary – the Company's only remaining operations in Canada – with the goal of raising $1 billion to pay down Maxar's long-term debts.

## LOSS CAUSATION/ECONOMIC LOSS

207. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of Maxar stock and operated as a fraud or deceit on Class Period purchasers of Maxar stock by

- 71 -

4829-0600-6183.v1

misrepresenting and omitting material information about the AMOS-8 contract, GeoComm assets, and WorldView-4 failure. When Defendants' prior misrepresentations and omissions were disclosed to the market, beginning on August 7, 2018, Maxar's stock price fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Maxar stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

208. Defendants' misleading statements and omissions, identified herein at ¶¶155-173, had the intended effect and caused Maxar's stock to trade at artificially inflated levels during the Class Period.

4829-0600-6183.v1

209.  As a direct result of the August 7, 2019 Spruce Point report disclosures detailed in

¶175, Maxar's stock price suffered a significant decline.  As set forth in the chart below, on August

7, 2018, the price of Maxar stock traded on the NYSE dropped $5.97 per share:



210.  On August 8, 2018, the price of Maxar's stock continued to decline as a direct result

of the August 7, 2018 disclosures.  Maxar stock traded on the NYSE dropped another $1.68 per

share.

4829-0600-6183.v1

Case 1:19-cv-00124-WJM-SKC  Document 44  Filed 10/07/19  USDC Colorado  Page 77 of 105
Case No. 1:19-cv-00124-WJM-SKC   Document 143-17   filed 03/16/22   USDC Colorado
pg 90 of 135

211.    As a direct result of Maxar's August 24, 2018 6:00 a.m. EST press release containing the comprehensive response to the Spruce Point report, detailed in ¶179, Maxar's stock price suffered a significant decline.  As set forth in the chart below, on August 22, 2018, the Company's stock price traded on the NYSE closed at $35.92 per share, and on August 24, 2018 closed at $33.92, representing a drop of $2.00 per share:



4829-0600-6183.v1

212.     As a direct result of the September 3, 2018 disclosures by the Israeli Ministry of

Science regarding the AMOS-8 contract, detailed in ¶181, Maxar's stock price suffered a significant

decline.  As set forth in the chart below, on September 4, 2018, the price of Maxar stock traded on

the NYSE dropped by $1.71 per share:



4829-0600-6183.v1

213.    As a direct result of the September 25, 2018 disclosure that Spacecom had missed its final deadline to make a down payment against the AMOS-8 contract, detailed in ¶183, Maxar's stock price suffered a significant decline. As set forth in the chart below, on September 26, 2018, the price of Maxar stock traded on the NYSE dropped by $1.63 per share:



214. The disclosures on the morning of October 31, 2018, detailed in ¶¶186-193, also had a direct impact on Maxar's stock price. As set forth in the chart below, the price of Maxar stock fell $12.16 per share on October 31, 2018:



4829-0600-6183.v1

Case No. 1:19-cv-00124-WJM-SKC   Document 143-1   filed 03/16/23   USDC Colorado
pg 94 of 135

215.    As a direct result of the Company's January 7, 2019 disclosure that the WorldView-4 satellite had malfunctioned and would no long provide imagery, detailed in ¶198, Maxar's stock price suffered a significant decline.  As set forth in the chart below, on January 7, 2019, the price of Maxar stock traded on the NYSE dropped by $3.69 per share:



216.    On January 8, 2019, the markets continued to react to the Company's January 7, 2019 disclosure regarding WorldView-4.  Maxar's stock traded on the NYSE dropped by an additional $2.00 per share.

217.    The declines in Maxar's stock price on August 7-8, 2018, August 23-24, 2018, September 4, 2018, September 26, 2018, October 31, 2018, and January 7-8, 2019 were a direct

- 78 -

4829-0600-6183.v1

result of the nature and extent of Defendants' prior misrepresentations and omissions being revealed to investors and the market.

218. The timing and magnitude of Maxar's stock price declines negate any inference that the losses suffered by Lead Plaintiff and the Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct. Between August 7 and August 8, 2018, the Dow Jones Industrial Average ("Dow Jones") was up 0.3%, and the Standard & Poor's Aerospace and Defense Select Industry Index ("S&P Aerospace") was up 0.6%. Between August 23 and August 24, 2018, the Dow Jones was up 0.2%, and S&P Aerospace was relatively unchanged. On September 4, 2018, the Dow Jones and S&P Aerospace were relatively unchanged. On September 26, 2018, the Dow Jones was down 0.4%, and S&P Aerospace was down 0.4%. On October 31, 2018, the Dow Jones was up 1.0%, and S&P Aerospace was up 1.9%. Between January 7 and January 8, 2019, the Dow Jones was up 1.5%, and S&P Aerospace was up 2.7%.

219. The economic losses suffered by Lead Plaintiff and members of the Class were a direct result of Defendants' fraudulent scheme to inflate Maxar's stock price and the subsequent decline in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

### ADDITIONAL ALLEGATIONS OF SCIENTER

**CFO Turnover, Auditor Turnover and Audit Committee Investigation of the Spruce Point Report**

220. In October 2017, Maxar appointed McCombe as the Company's CFO. McCombe was intimately familiar with SSL's (and therefore GeoComm CGU's) finances. Between 2014 and 2016, McCombe served as SSL Senior Vice President, Finance and Legal, responsible for such

- 79 -

functions as accounting and financial forecasting. Between 2016 and the time of his appointment as CFO, McCombe served as Senior Vice President and CFO of SSL MDA Holdings, Inc.

221. Shortly after his appointment, McCombe participated in the Company's 3Q17 earnings conference call in November 2017. During the call, McCombe acknowledged the dire financial performance of the GeoComm business, noting that the 28% drop in communications segment revenues year-over-year was "due to a low level of construction activity in geostationary communications satellites [and] . . . there was a step-down in award values beginning in 2015, which is manifesting itself in lower revenues in the current and recent quarters."

222. During the Company's February 22, 2018 conference call to discuss FY17 results, McCombe acknowledged another 15% year-over-year drop in the Company's revenue was "driven by declines in our Space Systems segment [due to] . . . Space Systems continu[ing] to feel the impact of the stepdown in GEO Comsat award values that began in 2015."

223. Four days later, on February 26, 2018, McCombe abruptly resigned without explanation, after less than five months as CFO and mere days before the Company's 2018 annual investor days conferences in Toronto and New York. Despite McCombe's oversight and preparation of the Company's 4Q17/FY17 regulatory filings with the SEC and Canadian authorities, McCombe neither signed nor certified those financial statements. McCombe's replacement Wirasekara finally certified the Company's 4Q17 and FY17 financial statements over one month after Maxar filed them with the SEC and Canadian authorities.

224. On July 12, 2018, the Company announced that it had named Biggs Porter as the Company's new CFO, effective August 15, 2018. Because Porter's job as CFO was not effective

- 80 -

4829-0600-6183.v1

until August 15, 2018, he neither signed nor certified the Company's July 31, 2018 2Q18 regulatory filings with the SEC and the Canadian authorities.

225. On August 7, 2018, Spruce Point issued its report criticizing the Company's accounting. The Spruce Point report triggered a number of highly suspicious events. The same day, Maxar issued a press release in response to the Spruce Point report, alleging it contained a number of inaccuracies and misrepresentations. However, Maxar's response did not specifically identify them. Despite Maxar's disparagement of the Spruce Point report, and despite the fact that the Company had still not disclosed that it had terminated its independent auditor (KPMG Canada, who had been reappointed by a 97% vote during the May 11, 2018 shareholder meeting), the Company immediately began an Audit Committee investigation – assisted by the Company's new auditor KPMG LLP of Denver, Colorado and numerous third-party advisors – into the allegations of the Spruce Point report.

226. On August 15, 2018, the Company informed U.S. and Canadian regulators that KPMG Canada had resigned "effective as of July 29, 2018" and "upon the Corporation's request." KPMG Canada's effective resignation date was a little over two weeks after the Company had named Porter as the new CFO, and only two and a half months after the near-unanimous shareholders' vote to reappoint KPMG Canada "as auditors of the Corporation until the next annual meeting of shareholders." The Company did not issue a press release announcing KPMG Canada's resignation.

227. On August 24, 2018, the Company issued its "[c]omprehensive" response to the Spruce Point report, after a mere 17 days of establishing, conducting, and completing the

- 81 -

4829-0600-6183.v1

investigation, bringing new accountants up to speed on the Spruce Point allegations, and drafting the comprehensive response itself.

228. On October 31, 2018, Porter spoke during the 3Q18 conference call during which details of the $383.6 million impairment charge for SSL were discussed with analysts and investors. Porter's statements indicated that he was satisfied that the Company had appropriately applied IFRS in connection with the 3Q18 impairment charge, but made no mention of whether the write-down was timely. After a Credit Suisse analyst asked him if he had delved into the issues surrounding the impairment charge, Porter responded:

> There's no plan for me to do anything beyond what we've looked at this quarter. I mean, every quarter, it's my obligation to look at everything and make sure that we're doing everything right, whether it's in accordance with IFRS or in accordance with GAAP, so that will never change. . . . But we did everything that we should do this quarter.

229. KPMG Denver and the Audit Committee continued to investigate the SSL business after October 31, 2018, in the event additional impairment charges were necessary. Indeed, on February 28, 2019, the Company disclosed asset impairments of $1.1 billion in 2018.

230. On March 1, 2019, KPMG Denver reported to the Audit Committee that the Company suffered from a material weakness in its internal controls during 2018 due in part to "unexpected high turnover of critical accounting and finance roles."

**$3.2 Billion DigitalGlobe Acquisition Credit**
**Facility and Associated Debt Covenants**

231. The Individual Defendants[5] were highly motivated to materially misstate the financial health and status of SSL and Maxar as a result of the terms of the Company's $3.0 billion syndicated

---

[5] "Individual Defendants" refers to Lance and Wirasaekara.

- 82 -

4829-0600-6183.v1

loan, used by Maxar to finance the DigitalGlobe acquisition. In connection with the Company's October 5, 2017 acquisition of DigitalGlobe, it borrowed $3.2 billion from a syndicate of investment banks. According to the terms of the October 5, 2017 Credit Agreement ("Credit Agreement") a material adverse event ("MAE") is defined, *inter alia*, to include "any material adverse change in the assets, properties, operations or condition, financial or otherwise, of the . . . Parties taken as a whole."

232. Under the Credit Agreement, Maxar was required to notify the administrative agent for the bank syndicate of "any occurrence in respect of the assets, businesses, operations or condition, financial or otherwise of [Maxar] that has or would reasonably be expected to have an MAE." By the terms of the Credit Agreement, if Maxar failed to notify the banking syndicate of an MAE, the Company could be in default, potentially resulting in, *inter alia*, acceleration of payment of the $3.2 billion loan or Maxar and the banking syndicate re-negotiating a workout plan that could include higher interest rates and adjustments to previously agreed financial covenants.

233. Indeed, as disclosed on December 21, 2018, and after Maxar accrued a $383.6 million charge for the financial collapse of the GeoComm CGU, the Credit Agreement parties conditionally relaxed certain debt leverage ratios (excusing Maxar's bloated debt, which risked violating certain debt covenants of the Credit Agreement), and agreed that if SSL or GeoComm were sold (or portions of the SSL or GeoComm assets) by Maxar, the Company could be required to apply 100% of the proceeds from such a transaction as a pre-payment of the outstanding balance of the $3.2 billion loan.

234. Throughout the Class Period, therefore, Defendants were motivated to delay publicly announcing any impairment of GeoComm CGU because of the risks of default on the Credit

- 83 -

Agreement, potential accelerated payment of the $3.2 billion loan, further restriction of the use of

cash flow generated by the Company's ongoing business, further restriction of cash flow resulting

from the sale of the GeoComm business, and the reputational impact of re-negotiating the Credit

Agreement in the eyes of investors. These risks were known to Defendants and material because the

Company's earnings performance leading up to the October 31, 2018 $383.6 million impairment

charge had degraded significantly. Specifically, for 4Q17, 1Q18, and 2Q18, the Company reported

$85.5 million in net earnings, $31.0 million in net earnings, and a $18.6 million net loss,

respectively. As a result of the October 31, 2018 impairment charge, the Company reported a

$432.5 million net loss and was forced to re-negotiate the terms of the Credit Agreement.

235. On November 28, 2018, Robert Spingarn, an equity analyst for Credit Suisse, asked

Lance about investors' concerns regarding potential breaches of the Credit Agreement's net debt

leverage covenant. Lance responded:

> Well, we were at 4.3x last quarter. We're closely managing all the other
> CapEx in the company, having good cash flow elsewhere. And so the key to keeping
> leverage where it is and having no concerns about covenants is twofold. Number
> one, deal with the GEO product line. The GEO product line is cash flow negative.
> So you've got to get out of that business, either sell it or exit it and wind it down. So
> that stops the bleeding from that business line and allows the rest of the company's
> positive free cash flow to be seen. Second, we have to make sure that we are very
> focused on our overall debt structure. We're in conversations with our banks, as you
> would expect, such that we don't trigger any kind of covenants going forward. Our
> current credit line has the covenant step down, I think, to 4.75 at the middle of next
> year. That's 8 months away. A long time between now and then to see what
> happens with GEO as well as to engage in those discussions. And it then steps down,
> I think, the following year to around 3.5, 3.75. So clearly, we are in those
> discussions. We'll announce something when they are concluded, but right now,
> we're very pleased with what we have. From our banks, we believe they clearly
> understand we do not have a company problem. We have a one product line problem
> that we're addressing.

- 84 -

4829-0600-6183.v1

236. These risks of an MAE or default event were well-known to Defendants because external and internal indicators of GeoComm's impairment already existed at the time Defendants reported the Company's 1Q18 and 2Q18 financial results on May 9, 2018 and July 31, 2018, respectively.

**Lance's and Wirasekara's Motivation to Maintain
Their Lucrative Position and Pay Package**

237. Defendant Lance received lucrative compensation in 2017 and 2018, which motivated him to mislead investors regarding the financial status and health of SSL, the GeoComm CGU and Maxar. According to the Company's March 29, 2018 Management Proxy Circular, during 2017 Maxar paid Lance $849,038 in salary, $715,850 in cash for satisfying certain short-term cash incentive targets, and $5.1 million in long-term incentive awards (comprised of restricted stock units and stock appreciation rights).

238. According to the Company's March 28, 2019 Proxy, during 2018 Maxar paid defendant Lance $1 million in salary and $917,500 in cash for satisfying certain short-term cash incentive targets. Due to the financial collapse of the GeoComm CGU, Lance received no long-term equity awards in 2018.

239. Defendant Wirasekara received lucrative compensation in 2017 and 2018, which provided him with the motivation to mislead investors regarding the financial status and health of SSL, the GeoComm CGU and Maxar. According to the Company's March 29, 2018 Management Proxy Circular, during 2017 Maxar paid defendant Wirasekara $257,119 in salary, $92,412 in cash for satisfying certain short-term cash incentive targets, and $744,723 in long-term incentive awards (comprised of restricted stock units and stock appreciation rights).

4829-0600-6183.v1

240. According to the Company's March 28, 2019 Proxy, during 2018 Maxar paid defendant Wirasekara $258,519 in salary and $109,412 in cash for satisfying certain short-term cash incentive targets. Due to the collapse in the financial performance of the GeoComm CGU, Wiserakara received no long-term equity awards in 2018.

241. Lance and Wirasekara were motivated to mislead investors regarding the balance sheet assets of the GeoComm CGU under the terms of the Company's Long-Term Incentive Plan ("LTIP"). According to the Company's March 29, 2018 Management Proxy Circular, the amount of Lance's and Wirasekara's 2018 LTIP awards would be "directly affected by the price of [Maxar's] Shares, both positively and negatively." But for the drops in Maxar's stock price, as a direct result of the disclosure of Defendants' Class Period fraud and the Company's stock price falling from $44.41 to $6.06 (reflecting a 86.4% drop in stock price between August 6, 2018 and January 8, 2019), Lance and Wirasekara would have been eligible for valuable LTIP awards.

**Defendant Wirasekara's Experience with
IFRS Standards and Maxar Accounting**

242. Given his education, credentials, and experience as alleged herein at ¶24, Wirasekara knew, or was reckless in not knowing, of the indicators of impairment to the GeoComm business in the first half of 2018 requiring a timely material impairment write-down under IFRS. As a Chartered Accountant, he knew of and understood the impairment rules under IFRS, including IAS 2 and IAS 36, and bore ultimate responsibility for the Company's 1Q18 and 2Q18 financials as Maxar's Interim Chief Financial Officer.

243. Wirasekara participated in conference calls, analyst meetings, and investor day presentations where Lance regularly spoke about the current and expected future declines in the GeoComm business, the industry shift hurting GeoComm's ability to obtain new contracts, Maxar's

- 86 -

4829-0600-6183.v1

restructuring of the GeoComm business due to lower sales volumes and the consideration of strategic alternatives for the future of SSL.  During the Class Period, Wirasekara was aware of clear indicators of impairment that would require an impairment test and corresponding charge under IFRS, but still concluded that no impairment write-down of GeoComm assets was required in 1Q18 or 2Q18.

244.    As one example, Wirasekara participated in the March 8, 2018 Investor Day where Lance presented a slide that forecasted GeoComm's expected Compounded Annual Growth Rate ("CAGR") earnings growth over the next five years was *"-2 to -4%"* – the only negative forecast across the entire Company.  Wirasekara knew, or was reckless in not knowing, a negative CAGR in earnings for GeoComm over the next five years was a death knell indicating impairment of the GeoComm CGU because he knew that a valuation properly performed under IAS 36 to determine the fair value of the GeoComm CGU would have included a five-year forecast of discounted future cash flows, and Maxar was projecting ***negative growth rates*** for GeoComm over the next five years. Wirasekara recklessly ignored this and the other impairment indicators discussed herein when falsely certifying Maxar's 1Q18 and 2Q18 financial statements were accurate.   During the same presentation, Wirasekara himself admitted that in "2016 to 2018, the GEO Com market declined by about 45%" and paused to note how "[t]hat was a large segment of our business."

245.    Wirasekara also worked closely with Lance, playing a central role in the management of the Company.  For example, when he announced the appointment of CFO McCombe on October 4, 2017, Lance stated in a Company press release that Wirasekara was his "'most trusted advisor across a multitude of issues'":

4829-0600-6183.v1

William McCombe has been appointed chief financial officer of Maxar Technologies. Anil Wirasekara, who previously served as Chief Financial Officer of MDA since 1994, will continue with the Company and serve as the senior financial executive, based in Canada. Mr. Wirasekara will continue to report to Mr. Lance, with a significant portfolio of executive responsibilities.

[S]aid Mr. Lance, "I am fortunate to have Anil continue to serve as my most trusted advisor across a multitude of issues, given his long experience and tenure with the Company."

246. Finally, the impairment charges taken after Biggs Porter became CFO in August 2018 and Porter's comments about the IFRS requirements for impairment write-downs further supports Wirasekara's scienter in approving Maxar's false financial statements for 1Q18 and 2Q18. As stated by Porter on the October 31, 2018 conference call:

There's no plan for me to do anything beyond what we've looked at this quarter. I mean, every quarter, it's my obligation to look at everything and make sure that we're doing everything right, whether it's in accordance with IFRS or in accordance with GAAP, so that just will never change. And that's not something that is optional. But we did everything that we should do this quarter. We looked at it hard. And I think we, of course, then stand behind that from the standpoint of believing that we've captured what was supposed to be captured.

247. Contrary to fulfilling his "obligation to look at everything [to] make sure that . . . everything [was done] right [and] . . . in accordance with IFRS" and to look "hard" at those requirements, as Porter put it, Wirasekara recklessly concluded that not even a single impairment indicator existed as of 1Q18 or 2Q18 that GeoComm's assets could be impaired.

## THE PRESUMPTION OF RELIANCE

248. Lead Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Maxar stock. Without knowledge of the misrepresented or omitted

- 88 -

material facts, Lead Plaintiff and other members purchased or acquired Maxar stock between the time Defendants misrepresented and failed to disclose material facts about the AMOS-8 contract, GeoComm assets, and WorldView-4 failure, and the time the true facts were disclosed. Thus, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for Maxar common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

249. Lead Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## CLASS ACTION ALLEGATIONS

250. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all Class Period purchasers of Maxar common stock on NYSE during the Class Period (the "Class"). Excluded from the Class are Defendants, all subsidiaries, business units, and consolidated entities of Maxar, and any person who was an officer or director of Maxar or any of its subsidiaries, business units, or consolidated entities (collectively, "Excluded Person" or "Excluded Persons"). Also excluded from the Class are all members of the immediate families of any Excluded Person, all legal representatives, heirs, successors, or assigns of any Excluded Person or any member of his or her immediate family, all entities in which any Excluded Person has or had a controlling interest, and any person or entity claiming under any Excluded Person.

4829-0600-6183.v1

251.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  There are over 60 million shares of Maxar common stock outstanding. The shares of Maxar common stock are owned by thousands of people.

252.     Reliance on the alleged misrepresentations and material omissions is presumed.  The market for Maxar securities is efficient, as alleged above.  Public information regarding the Company is rapidly incorporated into and reflected by the market price for Maxar securities.  The omitted information described therein was not known to, and could not have been discovered through reasonable investigation by members of the Class.  Investors who purchased Maxar securities at the prices prevailing in the market during the Class Period therefore did so in reliance upon each of the false and misleading statements and material omissions alleged herein.

253.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     with respect to the Exchange Act claims, whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether and to what extent the prices of MAXR on NYSE were affected by the alleged misrepresentation; and

4829-0600-6183.v1

(f)      the extent of damage sustained by Class members and the appropriate measure of damages.

254.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the members of the Class purchased Maxar securities at the prices prevailing in the market during the Class Period and sustained damages from Defendants' wrongful conduct.  Damages under the Exchange Act will be calculated using common and reliable methodologies that are based on the movement of Maxar's stock price during and after the Class Period, including calculations based on the price at which the Class members obtained Maxar securities, the market price of Maxar securities at the time corrective information was disclosed, and analysis of the public information that impacted the market price of Maxar securities at those times.

255.    Lead Plaintiff will adequately protect the interests of the Class and has retained Counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class as all purchasers seek to hold Defendants liable based on the same alleged misrepresentations and omissions and seek damages based on the same corrective event.

256.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

**Violations of §10(b) of the Exchange Act & Rule 10b-5**
**Against All Defendants**

257.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

- 91 -

258. By engaging in the acts, practices, and omissions previously alleged, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by:

(a) employing devices, schemes, and artifices to defraud;

(b) making untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Maxar securities during the Class Period.

259. During the Class Period, Defendants made, disseminated, and/or approved each of the statements as specified in ¶¶155-173, above.

260. Each of the statements and omissions, specified in ¶¶155-173, above, were materially false or misleading at the time they were made, in that they contained misrepresentations of fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

261. Each of the statements and omissions specified in ¶¶155-173, above, were in connection with the purchase or sale of Maxar common shares on NYSE by the members of the Class in that they affected the value or merit of those securities and the risks associated with their purchase or sale, and induced the members of the Class to purchase those securities at the prices prevailing in the market during the Class Period.

4829-0600-6183.v1

262.     The statutory safe harbor conditionally provided by 15 U.S.C. §78u-5 for certain forward-looking statements does not apply to any of the statements alleged herein to be materially false or misleading because:

(a)     the statements were not forward-looking, or identified as such when made;

(b)     the statements were not accompanied by meaningful cautionary language that sufficiently identified the specific, important factors that could cause actual results to differ materially from those in the statement;

(c)     the statements were included in a financial statement prepared in accordance with relevant accounting standards; or

(d)     the statements were made by Defendants with actual knowledge that the statements were false or misleading.

263.     Defendants made, disseminated, or approved the statements specified in ¶¶155-173, above, while knowing or recklessly disregarding that the statements were false or misleading, or omitted to disclose facts necessary to prevent the statements from misleading investors in light of the circumstances under which they were made.

264.     Lead Plaintiff purchased Maxar securities in reliance upon the truth and accuracy of the statements specified in ¶¶155-173, above, and the other information that was publicly reported by Defendants about Maxar's operations, and without knowledge of the facts, transactions, circumstances, and conditions fraudulently misrepresented to or concealed from the market during the Class Period, as specified above.

265.     Lead Plaintiff and the Class have suffered damages as a result of the material misrepresentations and omissions alleged in ¶¶155-173, above, in that they:

- 93 -

(a)    paid artificially inflated prices of Maxar common shares;

(b)    purchased their Maxar common shares on an open, developed, and efficient public market; and

(c)    incurred economic losses when the price of those securities declined as the direct and proximate result of the public dissemination of information that was inconsistent with Defendants' prior public statements or otherwise alerted the market to the facts, transactions, circumstances, risks, and conditions concealed by Defendants' misrepresentations and omissions, or the economic consequences thereof.

266.    Lead Plaintiff and the Class would not have purchased Maxar securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions specified above.

## COUNT II

### Violations of §20(a) of the Exchange Act
### Against Defendants Lance and Wirasekara

267.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

268.    Defendant Maxar and/or persons under its control violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to Lead Plaintiff and the other members of the Class.

269.    By virtue of their positions as controlling persons, defendants Lance and Wirasekara are further liable pursuant to §20(a) of the Exchange Act for the acts and omissions of defendant Maxar in violation of the Exchange Act.

- 94 -

4829-0600-6183.v1

270. Each of these Defendants acted as a controlling person, as set forth in the chart below, because they each had the capacity to control, or did actually exert control, over the actions of defendant Maxar in violation of the securities laws:

| Defendant | Controlled Defendant | By Virtue Of |
|---|---|---|
| Lance | Maxar | his positions of power and control and his executive responsibilities as Maxar's CEO, President, and Chairman; his power to hire and fire and his supervisory authority over members of Maxar's managers and employees; his day-to-day involvement in, and control over, Maxar's operations, including those related to reporting requirements and regulatory compliance; and his ability to control the contents of Maxar's press releases, financial reports, and other public statements during the Class Period. |
| Wirasekara | Maxar | his positions of power and control and his executive responsibilities as Maxar's Interim CFO; his power to hire and fire and his supervisory authority over members of Maxar's managers and employees; his day-to-day involvement in, and control over, Maxar's operations, including those related to reporting requirements and regulatory compliance; and his ability to control the contents of Maxar's press releases, financial reports, and other public statements during the Class Period. |

271. Defendants Lance and Wirasekara had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of and contractual rights with Maxar, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and

- 95 -

4829-0600-6183.v1

the Canadian Securities Administrators and disseminated to the investing public, Lance and Wirasekara had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.  Determining that this action is a proper class action, and certifying Lead Plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.  Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

4829-0600-6183.v1

**JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

DATED:  October 7, 2019                                Respectfully submitted,

                                                       ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
                                                       SPENCER A. BURKHOLZ
                                                       HENRY ROSEN
                                                       TRIG R. SMITH
                                                       DEBASHISH BAKSHI


                                                       _____s/ Trig R. Smith_____
                                                              TRIG R. SMITH

                                                       655 West Broadway, Suite 1900
                                                       San Diego, CA  92101
                                                       Telephone:  619/231-1058
                                                       619/231-7423 (fax)
                                                       spenceb@rgrdlaw.com
                                                       henryr@rgrdlaw.com
                                                       tsmith@rgrdlaw.com
                                                       dbakshi@rgrdlaw.com

                                                       Lead Counsel for Lead Plaintiff

4829-0600-6183.v1

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

OREGON LABORERS EMPLOYERS PENSION TRUST FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Branen v. J. Jill, Inc., et al.*, No. 1:17-cv-11980 (D. Mass.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

MAXAR

Case 1:19-cv-00124-WJM-SKC   Document 44   Filed 10/07/19   USDC Colorado   Page 102 of 105

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of October , 2019.

OREGON LABORERS EMPLOYERS
PENSION TRUST FUND

By: _____
Ryan Stephens, Fund Administrator

- 2 -

MAXAR

Case No. 1:19-cv-00124-WJM-SKC Document 143-1 filed 03/16/22 USDC Colorado pg 116 of 135

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/26/2018 | 331 | $43.90 |
| 05/10/2018 | 446 | $49.00 |
| 05/11/2018 | 305 | $48.50 |
| 06/18/2018 | 359 | $50.33 |
| 06/20/2018 | 714 | $49.76 |
| 07/31/2018 | 1,070 | $49.23 |
| 08/01/2018 | 366 | $47.00 |
| 08/07/2018 | 1,009 | $39.01 |
| 08/10/2018 | 493 | $38.00 |
| 08/23/2018 | 1,019 | $34.39 |
| 08/24/2018 | 2,009 | $34.09 |
| 08/31/2018 | 302 | $31.06 |
| 09/04/2018 | 1,063 | $30.66 |
| 10/24/2018 | 105 | $29.38 |
| 10/31/2018 | 5,334 | $15.66 |
| 11/01/2018 | 854 | $14.13 |
| 12/07/2018 | 2,455 | $14.87 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 08/28/2018 | 1,683 | $31.73 |
| 10/16/2018 | 1,365 | $29.82 |

Prices listed are rounded to two decimal places.

*Opening position of 4,787 shares.

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on October 7, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Trig R. Smith
TRIG R. SMITH

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: trigs@rgrdlaw.com

4829-0600-6183.v1

Case 1:19-cv-00124-WJM-SKC   Document 44   Filed 10/07/19   USDC Colorado   Page 105 of 105

CM/ECF-U.S. District Court:cod-

# Mailing Information for a Case 1:19-cv-00124-WJM-SKC Oregon Laborers Employers Pension Trust Fund et al v. Maxar Technologies Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey S. Abraham**
  jabraham@aftlaw.com

- **Jeffrey Allen Berens**
  jeff@jberenslaw.com,jeffreyberens@comcast.net

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com,kip@shumanlawfirm.com

- **Brian Thomas Glennon**
  brian.glennon@lw.com,brian-glennon-0505@ecf.pacerpro.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,sf_filings@hbsslaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Kristin Nicole Murphy**
  kristin.murphy@lw.com,kristin-murphy-2919@ecf.pacerpro.com,#ocecf@lw.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Eric C. Pettis**
  eric.pettis@lw.com

- **Jerome H. Sturhahn**
  jsturhahn@shermanhoward.com,efiling@shermanhoward.com,jbulanow@shermanhoward.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA

      Defendants.

---

## STIPULATION AND PROTECTIVE ORDER

---

WHEREAS, Rule 26(c) of the Federal Rules of Civil Procedure provides for the issuance of protective orders limiting the disclosure of discovered information in appropriate circumstances, and good cause having been shown, IT IS STIPULATED AND AGREED THAT:

1. This Stipulation and Protective Order ("Protective Order") governs the treatment of all documents, electronically stored information, testimony, tangible materials, interrogatory answers, responses to requests for admission and any other discovery authorized by the Federal Rules of Civil Procedure, as well as any other disclosed information (collectively "Discovery Material") produced by any party or non-party (each, a "Producing Party") in the above-captioned matter (collectively with any appeals, the "Action").

Cases\4818-5983-3297.v1-11/9/20

2. Any Producing Party may designate as confidential any Discovery Material that it believes in good faith contains: (a) trade secret or other confidential research, development or commercial information; or (b) information the disclosure of which would, in the good faith judgment of the Producing Party, negatively impact the business operations of the parties (collectively, "Confidential Information"), in accordance with Rule 26(c) of the Federal Rules of Civil Procedure. Confidential Information shall be designated on a document-by-document basis. All Discovery Material so designated shall be referred to in this Protective Order as "Confidential Discovery Material" and shall be handled in strict accordance with the terms of this Protective Order.

3. Confidential Discovery Material shall be designated as such by the Producing Party in one or more of the following ways: (a) information set forth in an answer to an interrogatory or response to a request for admission may be so designated by including the word "CONFIDENTIAL" in the answer or response; (b) information contained in any document or part thereof may be so designated by marking the word "CONFIDENTIAL" on the document or any copy of it delivered to the opposing party or its counsel or by giving written notice to opposing counsel, describing the document or part thereof either specifically or by category; or (c) information contained in an answer to any question asked during an oral deposition may be so designated by a statement made on the record during the course of the deposition, or sending written notice within 30 days of receiving the final version of the transcript of the deposition or testimony. Any such designation shall subject the Confidential Discovery Material to this Protective Order without any further act on the part of the Producing Party. For deposition testimony or other testimony, prior to the expiration of the 30 day period (or until a designation is made by counsel, if such a designation is made in a shorter period of time), all testimony shall

2

be treated as Confidential Discovery Material. In the case of electronically stored information produced in native format, the Producing Party shall include the word "CONFIDENTIAL" in the file or directory name, in a metadata field of a database load file or by affixing the legend "CONFIDENTIAL" to the media containing the Confidential Discovery Material *(e.g.*, CD-ROM, floppy disk, DVD).

4.      The party to which Confidential Discovery Material is produced (the "Receiving Party") shall treat such Confidential Discovery Material as strictly confidential. Confidential Discovery Material shall be used solely for the purpose of this Action, and not in any other litigation, and not for any business or other purpose whatsoever. 45 C.F.R. § 164.512(e)(1)(v)(A). Nothing in this Protective Order shall be interpreted to prohibit or prevent the Producing Party from using or discussing its own Confidential Discovery Material in any way it sees fit or to so use or discuss that material for any reason.

5.      Confidential Discovery Material may be disclosed or made available without written consent from the Producing Party *only* to the following persons for the purpose of this Action:

(a)      The parties to this Action, including Lead Plaintiff Oregon Laborers Employers Pension Trust Fund ("Lead Plaintiff") and any Class Representatives;

(b)      Counsel of record for the respective parties to this Action, including attorneys consulting with or advising any party to the above-captioned litigation, in-house attorneys, paraprofessionals, employees and agents of such law firms;

(c)      Experts or consultants retained to assist counsel for the parties, *provided that* any such experts or consultants execute an undertaking to be bound by this Protective Order in the form attached hereto as Appendix A (the "Undertaking") prior

3

to any disclosure to such expert(s) or consultant(s), and that a copy of such signed Undertaking is retained by counsel for the party making disclosure to such expert(s) or consultant(s), and further provided that any report created by such expert or consultant relying on or incorporating Confidential Discovery Material in whole or in part shall be designated as "CONFIDENTIAL" by the party responsible for its creation;

(d)     Employees, officers, and directors of each party to the extent that such person(s) are assisting in the prosecution or defense of this Action;

(e)     Any witness or potential witness in preparation for any deposition, hearing or trial and at any deposition or hearing, if advised by counsel disclosing the Confidential Discovery Materials to such witnesses of the obligations herein;

(f)     The author or recipient of the document(s);

(g)     Stenographers or court reporters who record testimony taken at any time or place in the course of this Action or persons operating video recording equipment of and at such testimony;

(h)     Outside vendors retained by or for the parties to assist in pretrial discovery, trial and/or hearings in the Action, including, but not limited to, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, if advised by counsel disclosing the Confidential Discovery Materials to such outside vendors of the obligations herein, and further provided that any report created by such outside vendor relying on or incorporating Confidential Discovery Material in whole or in part shall be designated as "CONFIDENTIAL" by the party responsible for its creation;

4

(i)     The Court, Court personnel, and any other person designated by the Court in this Action in the interest of justice, upon such terms as the Court may deem proper; and;

(j)     Any person or entity who counsel for the parties agree, after conferring in good faith, should have access to such materials or who, upon motion with good cause shown, the Court orders may have access, as long as such person or entity agrees to be bound by the terms of this Order by executing the Undertaking.

A party may designate Discovery Material "Highly Confidential" in the same manner as outlined in ¶3 if the producing party reasonably and in good faith believes disclosure could seriously harm the competitive position of the producing party or disclosure is otherwise limited by law, regulation or statute.  Any information derived from Highly Confidential information also constitutes Highly Confidential information to the extent the derived information embodies, contains or discloses any Highly Confidential information.

7.     Highly Confidential Discovery Material may be not disclosed or made available without written consent from the Producing Party ***except*** to the following persons:

(a)     The Receiving Party's outside counsel of record in this action and employees of outside counsel of record to whom it is reasonably necessary to disclose the information;

(b)     The Court and its personnel;

(c)     During their depositions, witnesses, and attorneys for witnesses, in the action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the Undertaking; and (2) they will not be permitted to keep

5

any Highly Confidential Discovery Material, unless otherwise agreed by the designator or ordered by the court.  Pages of transcribed deposition testimony or exhibits to depositions that reveal Highly Confidential Discovery Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Protective Order.  Nothing herein shall waive the right of any party or non-party to move for a protective order prohibiting the disclosure of specified Highly Confidential Discovery Material to a witness;

(d)     Outside court reporters and their staff, professional jury or trial consultants, and professional vendors to whom disclosure is reasonably necessary, and who have signed the Undertaking; and

(e)     The author or recipient of a document containing the Highly Confidential Discovery Material, a custodian or other person who already possessed or knew the information.

8.     Counsel of record shall retain throughout this Action the Undertakings executed by any person or entity receiving Confidential and/or Highly Confidential Discovery Material.  If any party has good cause to believe that another party has improperly disclosed Confidential and/or Highly Confidential Discovery Material, it may move for an order allowing it to inspect the Undertakings before the conclusion of this Action.

9.     Confidential and/or Highly Confidential Discovery Material shall be used only for the prosecution or defense of this Action (including any appeals), and may be disclosed only under the circumstances and to the persons or entities specifically provided for herein or by order of the Court, or with the prior written consent of the

6

Cases\4818-5983-3297.v1-11/9/20

Producing Party with respect to specifically identified Confidential and/or Highly Confidential Discovery Material.

10.     In the event any Receiving Party having possession, custody or control of any Confidential and/or Highly Confidential Discovery Material receives a subpoena, order or other request from a court, administrative or legislative body, or any other person or entity purporting to have authority to require the production of any Confidential and/or Highly Confidential Discovery Material (a "Third-Party Request"), the Receiving Party shall to the extent permissible by applicable law and the rules and requirements of any relevant governmental or regulatory authority promptly, and, in any event, within five business days of receipt of the Third-Party Request, give written notice to counsel for the Producing Party.  The Producing Party shall have the burden of objecting to the Third-Party Request.  The Receiving Party receiving the Third-Party Request shall be entitled to comply with it except to the extent that the Producing Party is successful in obtaining an order modifying or quashing the Third-Party Request; provided, however, that the Receiving Party receiving the Third-Party Request shall await the later of 10 business days after notice of the request to the Producing Party or the disposition of any motion to quash or motion for a protective order filed by the Producing Party within such 10 business day period before producing any Confidential and/or Highly Confidential Discovery Material in response to the Third-Party Request, to the extent that doing so does not expose such Receiving Party to sanctions, an order of contempt or the like.  Nothing in this Order shall require any Receiving Party to disregard or violate any order or direction of any governmental or regulatory authority.

11.     The inadvertent failure to mark a document or testimony, or a portion thereof, with the "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" designation in no way

7

alters or waives the protected and confidential nature of the document otherwise deserving of such a designation and does not remove it from the scope of this Protective Order, provided that the Producing Party notifies the Receiving Party, in writing, within a reasonable time after becoming aware that the confidential material was not properly designated. Such written notice shall identify with specificity the information or documents the Producing Party is then designating to be Confidential and/or Highly Confidential Discovery Material and shall promptly provide a replacement copy of such material with the appropriate "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" designation thereupon. Such Confidential and/or Highly Confidential Discovery Material shall be subject to this Protective Order as if it had been initially so designated. Treatment of inadvertently produced Confidential and/or Highly Confidential Discovery Material in a manner inconsistent with this Protective Order prior to notice of such inadvertent production is not a breach of this Protective Order. If, prior to receiving such notice, the Receiving Party has disclosed the Confidential and/or Highly Confidential Discovery Material to persons or entities not authorized to receive it hereunder, it shall make a reasonable effort to retrieve the Confidential and/or Highly Confidential Discovery Material or to otherwise assure that the recipient(s) maintain the confidentiality of the Confidential Discovery Material.

11. Pursuant to Federal Rule of Evidence 502(b) & (d), the disclosure of any Discovery Material in this Action shall be without prejudice to any claim by a Producing Party that such material is subject to the attorney-client privilege, the work product doctrine and any other applicable privilege for withholding production. Such disclosure shall not constitute or be deemed a waiver of any claim of attorney-client privilege, the work product doctrine, or any other privilege, immunity, or protection that the Producing

8

Party would otherwise be entitled to assert with respect to the Discovery Material and its subject matter. Any applicable privileges or protections shall only be waived on express written approval by the person or entity holding the privilege. The non-waiver of such privileges or protections shall apply to the Action, as well as any other federal or state proceeding.

(a) If a Producing Party informs the Receiving Party in writing that the Producing Party has disclosed privileged Discovery Material, Federal Rule of Evidence 502 and Federal Rule of Civil Procedure 26(b)(5)(B) shall apply. The Receiving Party shall not use such Discovery Material for any purpose until further order of the Court. The Receiving Party shall have 30 days to: (1) return the Discovery Material and all copies thereof to the Producing Party or certify in writing to the Producing Party that it has destroyed all records and copies of such Discovery Material; or (2) notify the Producing Party in writing of an objection to the claim of privilege or protection, along with the grounds for the objection, and/or an assertion that any privilege or protection has been waived. The parties shall meet and confer concerning the Receiving Party's objection within a reasonable time after the Producing Party receives written notice of such objection;

(b) After it reasonably appears that good faith efforts to resolve the dispute through the meet and confer process have failed, either party may move for an order on the status of the Discovery Material. Parties must provide notice to the opposing party and move for an order no later than 30 days after providing such notice. Nothing in this Protective Order shall alter or waive the standards and burden applicable to any motion concerning the privilege or protection asserted, or any waiver thereof. During the pendency of such a motion, each Receiving Party may retain the Discovery Material and

9

all copies thereof, but shall make no further use of it other than is necessary in connection with the proceedings on the motion. Any copy of such Discovery Material submitted to the Court in connection with the motion shall be filed as restricted, redacted, or submitted for *in camera review* in accordance with the terms of this Protective Order;

(c)     If the Receiving Party takes no action within 30 days of the notification of disclosed privileged or otherwise protected Discovery Material, the Receiving Party shall be deemed to have waived any objection to the claim of privilege or other protection; and

(d)     Upon a determination by the Court that the Discovery Material is privileged, protected work product or otherwise protected from disclosure, the Receiving Party shall promptly return the original and all copies of such Discovery Material to the Producing Party, or certify in writing to the Producing Party that it has destroyed all records, copies and derivative works of such Discovery Material.

12.     Absent agreement of the parties, any log prepared by a Producing Party of those documents that it has withheld or redacted on grounds of attorney-client privilege, the work product doctrine or some other applicable privilege, immunity or protection shall be done so in accordance with the Stipulated Order Regarding Discovery of Electronically Stored Information. Without waiving any rights otherwise available to them, the parties agree with respect to any such logs, the Producing Party shall have no obligation to log documents or information generated after the time the Consolidated Complaint was filed.

13.     In the event that any Confidential and/or Highly Confidential Discovery Material is used in any Court proceeding in this Action or any appeal therefrom, such Confidential Discovery Material shall not lose its status as Confidential and/or Highly Confidential Discovery Material through such use. Absent agreement of the parties,

10

Confidential and/or Highly Confidential Discovery Material submitted to the Court shall be filed as a restricted document pursuant to D.C.COLO.LCivR 7.2(e), at the "Level 1" level of restriction limiting access to the parties and the Court. D.C.COLO.LCivR 7.2(b). Any party shall then have up to 14 days to file a motion to restrict public access to that document. D.C.COLO.LCivR 7.2(e). Any motion to restrict shall comply with D.C.COLO.LCivR 7.2(c). The Confidential and/or Highly Confidential Discovery Material shall remain restricted until the Court rules upon the motion, or until 14 days have passed without any motion to restrict filed. D.C.COLO.LCivR 7.2(e). Nothing in this Protective Order shall affect the right of any party to oppose motions to restrict, or to seek greater protection than that provided for herein for any information.

14. This Protective Order shall not apply at trial. To the extent a protective order is necessary at trial, the parties will separately negotiate such protective order and submit it to the Court for approval.

15. This Protective Order shall not enlarge or affect the proper scope of discovery in this Action, nor shall this Protective Order imply that Discovery Material designated as confidential under the terms of this Protective Order is properly discoverable, relevant or admissible in this Action or in any other litigation. Discovery Material produced in this Action can only be used in conjunction with this Action, including any appeals. Nothing in this Protective Order shall be interpreted to require disclosure of materials which a party contends are protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege, immunity or protection.

16. If a party objects to another party's designation of information as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL," it shall advise the Producing Party in

11

Cases\4818-5983-3297.v1-11/9/20

writing of the reasons for the objection, and the parties shall meet and confer within 14 days in a good-faith effort to resolve the objection. All items objected to shall continue to be treated as Confidential and/or Highly Confidential pending resolution of the parties' dispute. If the parties are unable to reach an agreement as to the disputed designation with 21 days, the objecting party may invoke the Court's rules and procedures for raising discovery disputes. The Producing Party bears the burden of persuading the Court that the information is in fact Confidential and/or Highly Confidential within the definitions set forth above. For good cause shown, the objecting party may ask the Court to shorten the time periods allowed by this paragraph.

17.    Each document, testimony, material, or other thing, or portion thereof designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" shall retain that designation and shall remain subject to the terms of this Protective Order until such time as the Producing Party agrees to the contrary or the Court renders a decision that a particular document, testimony, material, or other thing, or portion thereof is not "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" as defined under this Protective Order, and any and all proceedings or interlocutory appeals challenging such decision have been concluded.

18.    The recipient of any Confidential and/or Highly Confidential Discovery Material shall maintain such material in a secure and safe area and shall exercise the same standard of due and proper care with respect to the storage, custody, use and/or dissemination of such material as is exercised by the recipient with respect to its own confidential material. Confidential and/or Highly Confidential Discovery Material shall not be copied, reproduced, summarized, extracted or abstracted, except to the extent that such copying, reproduction, summaries, extraction or abstraction is reasonably

12

necessary for the conduct of the Action. All such copies, reproductions, summaries, extractions and abstractions shall be subject to the terms of this Protective Order and labeled in the same manner as the designated material on which they are based.

19.     Within 30 days of the conclusion of this Action (meaning final judgment and exhaustion of all appeals or a final settlement of all claims), all parties in receipt of Confidential and/or Highly Confidential Discovery Materials shall use commercially reasonable efforts to either return such materials and copies thereof to the Producing Party or destroy such Confidential and/or Highly Confidential Material and certify that fact. The Receiving Party's commercially reasonable efforts shall not require the return or destruction of Confidential and/or Highly Confidential Discovery Material that: (a) is stored on backup storage media made in accordance with regular data backup procedures for disaster recovery purposes; (b) is located in the email archive system or archived electronic files of departed employees; or (c) is subject to legal hold obligations. Backup storage media will not be restored for purposes of returning or certifying destruction of Confidential and/or Highly Confidential Discovery Material but such retained information shall continue to be treated in accordance with this Protective Order. Counsel of record shall also be permitted to keep a copy of Confidential and/or Highly Confidential Discovery Material to the extent that it is incorporated into any pleadings, motions or other attorney work product. In that case, counsel of record shall continue to treat the Confidential and/or Highly Confidential Discovery Material in accordance with this Protective Order. Upon request, counsel of record shall certify in writing that they have complied with this paragraph.

13

20.     Upon execution by the parties, this Protective Order shall become effective among such parties who have executed this agreement immediately upon such execution, whether or not it has yet been approved by the Court.

21.     Nothing in this Protective Order shall be construed as prejudicing any Producing Party's right to seek an agreement or Court order providing additional confidentiality or other protections to any Confidential and/or Highly Confidential Discovery Material produced in this Action.  Until such agreement or order is obtained, however, this Protective Order shall constitute the entire agreement of the parties with respect to the matters covered herein.

22.     This Protective Order shall be binding on any future party to this Action.

23.     Any non-party may agree to be subject to and governed by the terms of this Protective Order.

24.     This Protective Order shall continue in force after the completion of this Action.

25.     In entering into this Protective Order, the parties preserve all rights and objections they may have to the use in this Action of Confidential and/or Highly Confidential Discovery Material, including, but not limited to, the rights of any party to object to the admissibility of any materials into evidence at the trial of this Action.

26.     This Court shall retain jurisdiction over all persons and entities subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

27.     This Protective Order may be changed only by agreement of the parties or by an order of this Court, and is entered into without prejudice to the right of any party or

14

Cases\4818-5983-3297.v1-11/9/20

non-party to seek relief from, or modification of, this Protective Order or any provisions thereof by motion to the Court on notice to the other parties hereto.

28.     This stipulation may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same document.


IT IS SO ORDERED.

Dated: November 17, 2020.

THE HONORABLE S. KATO CREWS
UNITED STATES MAGISTRATE JUDGE

15

Cases\4818-5983-3297.v1-11/9/20

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*


OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA

      Defendants.

## UNDERTAKING

The undersigned hereby certifies that they have received a copy of the Stipulated Protective Order (the "Protective Order") in the above-captioned case, read the Protective Order, understands its terms, agrees to be bound by all of the provisions thereof, and agrees to submit to the jurisdiction of the United States District Court for the District of Colorado, for the enforcement thereof, even if such enforcement proceedings occur after the termination of the above-captioned case. The undersigned understands that violation of the Protective Order is punishable by contempt of court.

Dated:_____      Name: _____

 

                        Title: _____

 

                        Signed: _____

16

Cases\4818-5983-3297.v1-11/9/20