**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00124-WJM-SKC
*Consolidated with Civil Action No. 1:19-cv-00758-WJM-SKC*

OREGON LABORERS EMPLOYERS PENSION TRUST FUND, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

v.

MAXAR TECHNOLOGIES INC.,
HOWARD L. LANCE, and
ANIL WIRASEKARA,

      Defendants.

---

**DECLARATION OF TRIG R. SMITH IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARD TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

---

4862-2678-2591.v1

I, TRIG R. SMITH, declares as follows:

1.      I, Trig R. Smith, am a partner of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), Lead Counsel representing Oregon Laborers Employers Pension Trust Fund ("Lead Plaintiff") and the Class.  I have been actively involved in the prosecution and resolution of this action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based on my active supervision of and participation in the case.

2.      I submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the September 12, 2022 Stipulation of Settlement ("Stipulation" or "Settlement"),[1] which provides for a cash settlement of $27,000,000 (the "Settlement Amount") in exchange for the release of claims against the Released Defendant Parties; (b) the proposed plan for allocating the net settlement proceeds to eligible members of the Class (the "Plan of Allocation"); and (c) Lead Counsel's application for an award of attorneys' fees and expenses incurred in prosecuting the Litigation on behalf of the Class and award to Lead Plaintiff in accordance with 15 U.S.C. §78u-4(a)(4).

## I.      PRELIMINARY STATEMENT

3.      After more than four and a half years of litigation, Lead Plaintiff and Lead Counsel have succeeded in obtaining a highly favorable result for the Class.  In obtaining this result, Lead Counsel overcame numerous hurdles, including partially defeating a motion to dismiss the complaint, certifying a class of Maxar investors, and conducting wide-ranging domestic and international merits discovery to support Lead Plaintiff's allegations.  At each stage of the case,

---

[1]   Capitalized terms not otherwise defined herein, shall have the same meanings as is set forth in the Stipulation.  ECF 178.

- 1 -

Defendants[2] aggressively advanced their interests and asserted numerous comprehensive defenses. These defenses would have continued to present risks to Lead Plaintiff's and the Class's claims had the parties not reached an agreement to settle this Litigation.

4.      As detailed below, the Settlement was achieved only after Lead Plaintiff and Lead Counsel, *inter alia*: (i) conducted a detailed and diligent pre-filing investigation of Lead Plaintiff's claims, which included conducting interviews of former Maxar employees and other persons with knowledge of relevant information; (ii) successfully overcame, in substantial part, Defendants' motion to dismiss the Consolidated Complaint; (iii) briefed and successfully moved the Court to certify the Class; (iv) negotiated and executed thorough written discovery from Defendants related to the merits of the case, ultimately serving 27 interrogatories and 59 requests for production, which resulted in the production of 469,819 pages of documents; (v) subpoenaed 37 non-parties, ultimately receiving and reviewing over 97,000 documents from them; (vi) sought discovery from individuals and entities located in Canada, which included the drafting and submission of letters rogatory to both this Court and the Supreme Court of British Columbia; (vii) prepared for and conducted depositions of various current and former Maxar employees, as well as other witnesses; (viii) coordinated discovery with Defendants and counsel for plaintiffs in a related derivative action in California state court ("State Derivative Action"), including negotiations concerning timing, scope, and procedures of joint depositions; (ix) prepared comprehensive responses to Defendants' discovery requests, which included 34 individual requests for production of documents, 27 interrogatories, and seven requests for admission; (x) retained and worked with

---

[2]    Defendants are Maxar Technologies Inc. ("Maxar" or the "Company"), Howard L. Lance, and Anil Wirasekara (collectively, "Defendants").

4862-2678-2591.v1

experts in satellite technology, accounting, market efficiency, and damages; and (xi) engaged in extensive settlement negotiations, including three mediation sessions with mediator Gregory P. Lindstrom, a nationally recognized mediator of complex cases and class actions.

5.      The substantial investigation, fact discovery, motion practice, and mediation outlined above meaningfully informed Lead Counsel of the case's strengths and weaknesses.  The Settlement is the product of hard-fought litigation and extensive arm's-length negotiations between the parties, with the assistance of Mr. Lindstrom.  The Settlement terms were negotiated by highly experienced and capable counsel for Lead Plaintiff and Defendants with a full understanding of both the strengths and weaknesses of the case and the parties' respective positions.   The $27,000,000 Settlement is a highly favorable result for the Class.

6.      Lead Plaintiff alleged Maxar, its CEO, and its CFO violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by issuing materially misleading statements from May 9, 2018 through January 6, 2019, inclusive,[3] regarding the value and trajectory of Maxar's GeoComm satellite business.  These materially misleading statements misrepresented or omitted information concerning, *inter alia*, Maxar's AMOS-8 satellite contract, the decline in demand for GeoComm satellites, and the financial impairment of Maxar's GeoComm business.  Lead Plaintiff alleged Defendants' false and misleading statements and material omissions caused the Company's stock prices to be artificially inflated during the Class Period.

---

[3]    In its Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Consolidated Complaint, the Court narrowed Lead Plaintiff's claims, such that the "Class Period" subsequently litigated is May 9, 2018 through October 30, 2018.  ECF 69.

4862-2678-2591.v1

7.      Lead Plaintiff further alleged that the truth about Maxar's GeoComm business emerged over a series of disclosures beginning on August 7, 2018 when Spruce Point Capital Management, LLC ("Spruce Point") issued a report questioning Maxar's financial status and accounting practices.  Among other observations, the report noted that "Maxar's balance sheet is inflated with goodwill and overcapitalized intangible assets."  ECF 44, ¶175.  The alleged GeoComm disclosures concluded on October 31, 2018, when Maxar issued its financial statements for the third fiscal quarter of 2018 revealing that Maxar had recognized impairment losses of $383.6 million with respect to its GeoComm business's non-financial assets and obsolete inventory.  As a result of this news, Maxar's stock price dropped by 44.9%.

8.      In response to Lead Plaintiff's allegations, Defendants zealously raised several arguments that, if successful, would dramatically limit Lead Plaintiff's ability to recover the alleged losses at trial.  For example, Defendants argued that Maxar later took an impairment charge on its GeoComm assets in due course, and that its earlier financial statements, where no impairment was taken, were not false or misleading.  Defendants also argued that Lead Plaintiff could not establish scienter because assessing for impairment requires complex accounting estimates and significant exercise of judgment, and Lead Plaintiff could not show that the failure to take an impairment was the result of fraudulent intent.  Further, Maxar's accountants had signed off on Maxar's accounting during the Class Period.

9.      Lead Plaintiff and the Class also faced the risk that the Court or a jury might find – as Defendants had asserted throughout this Litigation – that certain of the allegedly false and misleading statements were forward-looking projections, and therefore protected from liability by the Safe Harbor provision of the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

- 4 -

10.     Moreover, to meet its burden of proof at trial, Lead Plaintiff intended to rely on experts to present testimony concerning, *inter alia*, Maxar's compliance with the International Accounting Standards ("IAS") and International Financial Reporting Standards ("IFRS"), and to establish complex issues of loss causation and damages.  Reliance on this testimony, however, would provide no guarantee that Lead Plaintiff would prevail on either liability *or* damages, as Defendants would undoubtedly present competing experts to counter Lead Plaintiff's expert opinions.  Each of the experts in this action would prepare reports describing their opinions, setting the stage for a potential "battle of the experts."  Regardless of the merits, a jury's impression of any testifying expert is an inherently unknown factor that poses a meaningful risk at trial.

11.     In addition, several key witnesses resided in Canada, which could potentially cause issues for a trial in the United States.  Such Canadian witnesses included several former Maxar employees and KPMG LLP (Canada) ("KPMG Canada"), Maxar's independent auditor at the time the Company issued the allegedly false and misleading financial statements.  While Lead Plaintiff successfully obtained document discovery and an agreement for a deposition of KPMG Canada's engagement partner, it remains unclear whether Lead Plaintiff could compel any of these key witnesses at trial.

12.     Finally, even if Lead Plaintiff prevailed on any or all of its claims at trial and was awarded damages by a jury, Lead Plaintiff faced the substantial risk that Defendants would file post-trial motions and/or appeal any such verdict or award.  The post-verdict appellate process, if initiated, could take years to resolve, during which time the Class would receive no compensation. Any appeal would also create the risk of reversal, in which case the Class would receive nothing.

- 5 -

4862-2678-2591.v1

13.    After considering the circumstances and risks the Class would face were they to litigate this case through summary judgment and trial, Lead Plaintiff, through its counsel, on behalf of the Class, concluded that the Settlement was in the best interests of the Class.

14.    Lead Plaintiff also seeks approval of the proposed Plan of Allocation, which Lead Counsel submits is fair and reasonable.  Lead Counsel drafted the Plan of Allocation with the assistance of Lead Plaintiff's damages and loss causation consultant.  As further described below and in the Notice, the Plan of Allocation provides formulas for calculating the recognized claim of each Class Member, based on such information as when the person purchased and sold its Maxar common stock on the open market.  Each Authorized Claimant, including Lead Plaintiff, will receive a *pro rata* distribution pursuant to the Plan of Allocation, and Lead Plaintiff will be subject to the same formula for distribution of the Net Settlement Fund.  The Plan of Allocation does not treat Lead Plaintiff or any other Class Member preferentially.

15.    Lead Counsel prosecuted the Litigation on a wholly contingent basis, advancing and incurring substantial litigation expenses and charges over the years.  Lead Counsel shouldered substantial risk in doing so, and, to this date, has not received any compensation for its efforts.  Accordingly, in consideration of its extensive efforts on behalf of the Class, Lead Counsel is applying for an award of attorneys' fees in the amount of 30% of the Settlement Amount, plus interest.  The fee request is within the range of fee percentages frequently awarded in this type of action.  Furthermore, Lead Counsel's fee request is fully justified in light of the nature of the Litigation; the substantial benefits conferred on the Class; the risks undertaken; the quality of representation by Lead Counsel; the nature and extent of legal services performed by Lead Counsel; and the significant settlement amount of $27,000,000.  To date, no objections to any

4862-2678-2591.v1

aspect of the Settlement, Plan of Allocation, or request for attorneys' fees and expenses have been filed, which suggests Class-wide support for both the Settlement and the requested fees.[4]

16.    Lead Counsel also seeks payment of litigation expenses in the amount of $825,853.33, plus interest.  Lead Counsel reasonably and necessarily incurred these expenses in order to prosecute this Litigation over the last four and one-half years on behalf of Lead Plaintiff and the Class.  The expenses include, *inter alia*: (i) the fees for investigators, experts, and consultants whose services Lead Counsel relied upon during the investigation and prosecution of this case; (ii) the costs associated with setting up and managing a database of documents that included hundreds of thousands of pages of documents produced to Lead Plaintiff by Defendants and other non-parties, and which involved technological, imaging, and shipping expenses; (iii) the fees and costs incurred in paying third party Canadian counsel to assist Lead Counsel with obtaining discovery in Canada; (iv) the cost of factual and legal research; (v) the cost of transcript and court reporter services for depositions; and (vi) fees for the mediation sessions with Mr. Lindstrom.  The vast majority of these expenses were for consultants and experts.  The excellent result in this case confirms these expenses were reasonable and necessary.  The expenses Lead Counsel requests are set forth in greater detail in the concurrently-filed declaration on behalf of Lead Counsel.[5]

---

[4]    The deadline for submitting an objection in connection with the Settlement was September 25, 2023.  Lead Counsel did not receive a single objection.

[5]    *See* Declaration of Spencer A. Burkholz Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses (the "RGRD Fee Declaration").

- 7 -

4862-2678-2591.v1

17.     The following summarizes the principal events during the Litigation and the legal services Lead Counsel provided to Lead Plaintiff and the Class.

## II.     LEAD PLAINTIFF'S AND LEAD COUNSEL'S PROSECUTION OF THIS CASE

### A.     The Commencement of the Litigation and the Filing of the Consolidated Complaint

18.     On January 14, 2019, Logan Durant filed the first class action complaint in this action against Maxar and certain of the Defendants in the United States District Court for the District of Colorado.  ECF 1.

19.     On March 15, 2019, Lead Plaintiff moved for appointment as lead plaintiff and for approval of Robbins Geller as lead counsel, pursuant to 15 U.S.C. §78u-4(a)(3)(B) of the PSLRA. ECF 25.

20.     Five other separate groups or individuals also sought appointment as lead plaintiff. On August 7, 2019, following briefing by the various movants, the Court concluded that Lead Plaintiff possessed the largest financial interest in the case, that it had adequately demonstrated it met Rule 23(a)'s typicality and adequacy requirements, and that Lead Counsel could appropriately serve as class counsel under Rule 23(g).  ECF 41.  In the same order, the Court also consolidated a related case, *Schwartz v. Maxar Tech. Inc.*, No. 19-cv-758 (D. Colo., filed Mar. 14, 2019).  *Id*.

21.     After it was appointed, Lead Plaintiff continued its extensive investigation into its claims, which consisted of, *inter alia*: (a) identifying, locating, and interviewing former Maxar employees and other knowledgeable witnesses likely to have information pertinent to the claims alleged; (b) a thorough review and analysis of Maxar's public disclosures, including: (i) transcripts of Maxar's quarterly conference calls held to discuss the Company's financial results and other

presentations made by top management at investor conferences; (ii) the Company's periodic filings with the United States Securities and Exchange Commission ("SEC") including Forms 10-K filed annually, and Forms 10-Q filed quarterly; and (iii) records reflecting the Individual Defendants' and other Company insiders' trades involving Maxar shares in Form 4s filed with the SEC; (c) an examination of industry and Company stock price reaction to Defendants' alleged misstatements and corrective disclosures, including detailed reports discussing Maxar and its public disclosures issued by industry analysts; and (d) an in-depth review and analysis of IAS, IFRS, Generally Accepted Accounting Principles ("GAAP"), and Maxar's financial statements by Lead Counsel's forensic accountants.

22.     On October 7, 2019, based upon the findings of its extensive investigation, Lead Plaintiff filed the Consolidated Complaint for Violations of the Federal Securities Laws (the "Consolidated Complaint"). ECF 44. The Consolidated Complaint alleged violations of §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, on behalf of a class of persons who purchased Maxar common stock from March 26, 2018 to January 6, 2019, inclusive. The Defendants were Maxar, Howard L. Lance (Maxar's former Chief Executive Officer), and Anil Wirasekara (Maxar's former Interim Chief Financial Officer).

23.     The Consolidated Complaint alleged that Defendants violated the securities laws by making materially false and misleading statements and omissions pertaining to Maxar. Specifically, the Consolidated Complaint alleged that Defendants knowingly and/or recklessly issued false and misleading statements and omissions regarding: (a) the Company's financial reporting of GeoComm's materially impaired balance sheet assets; (b) a geosynchronous satellite construction contract known as AMOS-8 that proved to be illusory; and (c) the October 2018

- 9 -

4862-2678-2591.v1

failure of the WorldView-4 imagery satellite concealed from investors.  ¶¶5, 155-206 (alleged false and misleading statements).

24.     The Consolidated Complaint alleged that in the years leading up to the Class Period, the market for large, expensive, and high orbit geosynchronous satellites had undergone structural changes and that potential customers were turning away from geosynchronous satellites in favor of smaller, cheaper, and more flexible low-earth orbit communication technologies.  As a result, Maxar's GeoComm line of business was collapsing.   Within this business environment, Defendants engaged in a fraudulent scheme to falsely and misleadingly assure Maxar investors that the GeoComm business was much more valuable than it was in reality.  At the start of the initially pled class period, March 26, 2018, Defendants reported that they had been awarded the contract to build the geosynchronous satellite known as AMOS-8, but failed to adhere to IFRS and reported inflated intangible assets, property, plant, and equipment values.  ¶¶6-9; 54-142.

25.     The Consolidated Complaint further alleged that on August 7, 2018, a report by Spruce Point questioned Maxar's financial health and the Company's accounting practices, and even though Defendants attempted to deny these reports, their scheme to oversell the GeoComm business began to unravel.  ¶¶10-12.  In September 2018, it was then publicly disclosed that the Israeli government intended to use an Israeli satellite manufacturer to build AMOS-8, and then on October 31, 2018, the Company ultimately was forced to take a $383.6 million charge in its third quarter of 2018 financial statements.  ¶¶13-14.

26.     The Consolidated Complaint also alleged that Defendants touted the capabilities of the WorldView-4 satellite, representing that it was still functioning, but did not disclose that it had

- 10 -

4862-2678-2591.v1

already suffered a technical failure on or about October 12, 2018.  ¶¶15, 143-154.  This was not disclosed until January 7, 2019.  ¶16.

27.     The Consolidated Complaint alleged that by engaging in these acts, practices, and omissions Defendants violated §10(b) of the Exchange Act and Rule 10b-5, and in addition, that Defendants Lance (CEO) and Wirasekara (CFO) were liable as control persons under §20(a) of the Exchange Act.  ¶¶257-271.

### B.     Defendants' Motion to Dismiss the Consolidated Complaint

28.     On December 6, 2019, Defendants moved to dismiss the Consolidated Complaint in its entirety, raising several challenges under the Federal Rules of Civil Procedure ("FRCP") and the PSLRA.  ECF 51.  Defendants argued, *inter alia*, that the Consolidated Complaint failed to state a §10(b) claim because: (a) it failed to meet the strict pleading standards under the PSLRA; (b) it failed to plead that any statement was false when made; (c) certain alleged misrepresentations were forward-looking statements protected by the PSLRA's safe harbor, 15 U.S.C. §78u-4, *et seq.*; (d) certain other statements were immaterial puffery; (e) the pleading did not raise a strong inference of scienter; and (f) the allegations regarding loss causation were not adequate. Defendants further argued that the claims under §20(a) of the Exchange Act against Defendants Lance and Wirasekara as control persons should be dismissed.[6]

---

[6]     Concurrent with the filing of the motion to dismiss, Defendants filed a motion requesting the Court take judicial notice of certain documents.  ECF 52.  On December 27, 2019, Lead Plaintiff opposed this motion (ECF 53), and on January 24, 2020, Defendants filed a reply (ECF 58).  On January 30, 2020, Lead Plaintiff filed a motion to strike certain arguments and documents submitted by Defendants in support of their request for judicial notice in their reply, or to in the alternative, allow Lead Plaintiff to file a sur-reply.  ECF 61.  Lead Plaintiff raised that new arguments and documents were offered for the first time in Defendants' reply (ECF 58) in support of the motion for judicial notice.  On February 14, 2020, the Court denied Lead Plaintiff's motion to strike but advised the parties that the Court will not consider new arguments in a reply in support

- 11 -

29.     On January 21, 2020, Lead Plaintiff filed its opposition to Defendants' motion to dismiss.  ECF 57.  In the opposition, Lead Plaintiff rebutted Defendants' arguments regarding falsity, scienter, and loss causation, arguing, *inter alia*, that the Consolidated Complaint sufficiently alleged: (a) the falsity of Defendants' statements and financial statements; (b) facts raising a strong inference of scienter; (c) loss causation; and (d) liability under §20(a) of the Exchange Act.  Lead Counsel spent significant time and resources performing the legal and factual research necessary to address Defendants' various arguments and draft an effective opposition.

30.     On February 20, 2020, Defendants filed their reply in support of their motion to dismiss the Consolidated Complaint.  ECF 65.

31.     On September 11, 2020, the Court issued an order that granted in part and denied in part Defendants' motion to dismiss the Consolidated Complaint (the "MTD Order").  ECF 69. The Court dismissed Lead Plaintiff's §10(b) claims, without prejudice, to the extent they related to Defendants' statements regarding Maxar's WorldView-4 satellite and Defendants' March 26, 2018 statements regarding the AMOS-8 satellite contract.  The Court denied the motion in all other respects, finding that Lead Plaintiff had adequately pled falsity, materiality, scienter, and loss causation for the statements concerning the Company's financial reporting of GeoComm's materially impaired balance sheet assets and the AMOS-8 contract.  The Court denied Defendants' motion with respect to the §20(a) Exchange Act claims.

---

of a motion that could have been, but were not, set forth and developed in the original motion. ECF 64.

4862-2678-2591.v1

**C.      Defendants' Answer to the Consolidated Complaint**

32.      On October 9, 2020, Defendants filed their answer to the Consolidated Complaint. ECF 74.  Defendants' answer spanned over 40 pages and denied each substantive allegation that Lead Plaintiff claimed in the Consolidated Complaint.  It also asserted 12 affirmative defenses.

**D.      Lead Plaintiff's Successful Motion to Certify the Class**

33.      For several months following the MTD Order, Lead Plaintiff prepared and conducted discovery to support class certification.  On February 12, 2021, Lead Plaintiff filed a motion to certify the Class.  ECF 90.  In support of that motion, Lead Counsel engaged financial economist Zachary Nye, Ph.D., who opined on whether Maxar's common stock traded in an efficient market and whether damages could be calculated using a method common to the Class.

34.      In their effort to oppose class certification, Defendants propounded 28 requests for production of documents and 14 interrogatories on Lead Plaintiff.  Lead Plaintiff produced 1,919 pages of documents to Defendants, sat for a deposition, and defended the deposition of Dr. Nye. Following that discovery, on June 4, 2021, Defendants filed a statement of non-opposition to Lead Plaintiff's motion for class certification, reserving their rights to: (a) seek to alter the size or composition of the class or the length of the class period, and (b) move to decertify the putative class.  ECF 102.

35.      On July 16, 2021, the Court granted Lead Plaintiff's motion and certified a class defined as:

> All persons and entities who purchased or otherwise acquired the common stock of Maxar Technologies, Inc. ("Maxar" or the "Company") during the period from May 9, 2018 through October 30, 2018, inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class are Defendants, present or former executive officers of Maxar and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

- 13 -

4862-2678-2591.v1

ECF 109.

### E.    Lead Plaintiff and Lead Counsel Conducted Extensive Discovery

36.    Given the length of the Class Period, the scope of Lead Plaintiff's claims, and the complex subject matter at issue in this Litigation, factual discovery was an enormous undertaking. Among other things, Lead Plaintiff negotiated a protective order and ESI protocol, served and negotiated two sets of requests for production of documents and four sets of interrogatories to Defendants, subpoenaed documents from 37 non-parties, and deposed 8 fact witnesses. Lead Plaintiff also collected documentary evidence and testimony from Canada, coordinated depositions with the State Derivative Action, and navigated the substitution of defense counsel during fact discovery.

### 1.    Protective Order Concerning Confidential Information and ESI Protocol

37.    In connection with discovery, the parties negotiated the terms of a protective order concerning confidential information produced in discovery and a protocol concerning the production of electronically stored information. On November 11, 2020, the parties filed their Joint Motion for Entry of Protective Order and ESI Protocol, which was approved by Magistrate Judge S. Kato Crews on November 17, 2020. ECF 79-82.

### 2.    Requests for the Production of Documents

38.    On October 30, 2020, Lead Plaintiff served its first set of requests for the production of documents on Defendants. Defendants served their responses and objections to Lead Plaintiff's first set of document requests on November 30, 2020. Beginning in December 2020, the parties frequently exchanged written correspondence and held numerous meet-and-confer conferences to negotiate the appropriate scope of discovery, including active negotiations

- 14 -

4862-2678-2591.v1

regarding Defendants' use of search terms and custodians to search for and produce responsive documents. Defendants began producing documents on a rolling basis in December 2020.

39.    On December 21, 2021, Lead Plaintiff served its second set of requests for the production of documents on Defendants, targeting documents not yet produced that it understood to be relevant from its review of produced documents. On January 20, 2022, Defendants served their responses and objections to Lead Plaintiff's second set of document requests. The parties conferred and exchanged correspondence negotiating the scope of additional productions, and Defendants continued producing documents on a rolling basis.

40.    Through Lead Plaintiff's persistence via multiple conferrals, negotiations, emails, and formal letters, Defendants ultimately produced 469,819 pages of documents, which included company records and internal communications. Lead Plaintiff reviewed the documents Defendants produced, including complex company financial records and valuation reports. Lead Counsel utilized its forensic accountants and experts to analyze business records and accounting estimates. Lead Counsel also utilized translating services for certain documentary evidence produced in Hebrew.

### 3.    Interrogatories

41.    On November 17, 2020, Lead Plaintiff served its first set of interrogatories on Defendants. Defendants filed their responses and objections to the interrogatories on January 7, 2021. The parties conferred on multiple occasions and exchanged correspondence concerning Defendants' responses. On June 2, 2021, after extensive negotiations, Defendants amended their interrogatory responses to provide additional relevant information.

4862-2678-2591.v1

42.      On July 7, 2021, Lead Plaintiff served its second set of interrogatories on Defendants.  Defendants served their responses and objections to the second set of interrogatories on August 6, 2021.  On August 19, 2021, Lead Plaintiff served additional interrogatories related to ESI preservation issues that arose during discovery.  After multiple conferrals and lengthy negotiations concerning ESI preservation, Lead Plaintiff noticed a 30(b)(6) deposition of Maxar related to preservation, which Lead Plaintiff ultimately agreed to hold in abeyance.  Lead Plaintiff served its final set of interrogatories on Defendants on April 19, 2022, and Defendants served their responses and objections to the final set of interrogatories on May 19, 2022.  Over the course of discovery, Lead Plaintiff served 27 interrogatories in total.

### 4.      Depositions

43.      Depositions provided a critical component of Lead Plaintiff's efforts to develop the evidentiary record, in terms of both fact-gathering and solidifying Lead Plaintiff's legal arguments. To prepare for fact witness depositions, staff attorneys were assigned to conduct an in-depth review of the custodial files of each potential deponent and identify key documents and issues for that deponent.  During this process, staff attorneys and litigation attorneys routinely met to discuss potential candidates for deposition, review samples of relevant documents for these candidates, and discuss the relative merits of each.

44.      The deposition process was complicated and delayed by Defendants' request that Lead Plaintiff agree to a deposition protocol to coordinate depositions with the State Derivate Action.  Multiple provisions in Defendants' proposed protocol were hotly disputed, and the parties negotiated the protocol for weeks before ultimately filing a joint discovery dispute report with the Court on February 28, 2022.  ECF 137.

4862-2678-2591.v1

45.     On March 8, 2022, the Court entered an order on the parties' discovery dispute report (ECF 138), and on March 15, 2022, the Court entered the Protocol Governing Coordination of Depositions (the "Coordination Protocol"). ECF 141. The Coordination Protocol, among other things, required Lead Plaintiff to notice and coordinate depositions with the lead plaintiffs in the State Derivative Action. Depositions typically proceeded across two days, with Lead Counsel examining the witness on the first day, and counsel for the State Derivative Action conducting its examination on the second day. Depositions began on April 11, 2022.

46.     One individual Lead Plaintiff sought to depose, Maxar's former Senior Vice President of SSL Business Development, required extensive effort to serve and depose. Lead Plaintiff attempted to serve him approximately 20 separate times at 5 different addresses, sending correspondence to the witness, and conferring with defense counsel. On April 27, 2022, Lead Plaintiff filed a motion for entry of an order permitting Lead Plaintiff to serve subpoenas by alternative methods on a nonparty. ECF 149. Finally, during the pendency of that motion, Lead Plaintiff successfully served the witness at his home. Lead Plaintiff proceeded to prepare for and schedule his deposition, but the witness did not appear. Lead Plaintiff was preparing a motion to compel his attendance and for contempt when settlement was reached. On May 10, 2022, Lead Plaintiff filed a motion to exceed the presumptive deposition limit and take 20 depositions. ECF 157. On the same day, Lead Plaintiff filed a motion to extend the fact discovery deadline to provide the parties additional time to complete fact depositions in coordination with counsel in the State Derivative Action. ECF 156. On May 31, 2022, Defendants filed their oppositions (ECF 159, 160), and on June 14, 2022, Lead Plaintiff filed its replies (ECF 167, 168). These motions were

4862-2678-2591.v1

pending when settlement was reached, and on October 3, 2022, the Court denied them as moot. ECF 181.

47. From April 11, 2022 to June 9, 2022, Lead Counsel deposed eight witnesses, including key Maxar executives and accountants. By the time the Settlement was reached, Lead Plaintiff had scheduled and made arrangements for depositions up to the presumptive limit, including scheduling and preparing for the deposition of a witness in Canada, as well as the deposition of Maxar's head of investor relations.

### 5.    Third Party Discovery

48. During discovery, Lead Plaintiff served document subpoenas on 37 non-parties, including Maxar consultants, accountants, advisors, former employees, bankers, and stock analysts. In connection with the subpoenas, Lead Counsel engaged in numerous meet and confers regarding the proper scope of discovery, appropriate search terms, and custodians.

49. In total, Lead Plaintiff received and reviewed over 97,000 pages of documents from 25 non-parties, including Maxar's auditors, consultants, and analysts covering Maxar common stock. The documents obtained from non-parties were critical to developing and proving Lead Plaintiff's case and contained, among other things, detailed reports created by Maxar's business consultants and analyses by forensic accountants and experts concerning the relevant issue of Maxar's impairment charge.

4862-2678-2591.v1

### 6.    International Discovery

50.    Because Maxar was a Canadian company for part of the Class Period,[7] Lead Plaintiff had to collect key documentary and testimonial evidence from Canada.  To obtain evidence located in Canada, Lead Counsel engaged outside Canadian counsel and researched numerous issues concerning collecting evidence, taking depositions, and compelling witnesses in Canada.

51.    On December 14, 2020, Lead Plaintiff filed a motion for the issuance of letters rogatory to the Supreme Court of British Columbia requesting assistance in securing documents from KPMG Canada.  ECF 84-85.  KPMG Canada was Maxar's independent auditor, and had key information concerning Defendants' accounting treatment for and disclosures related to Maxar's GeoComm assets and inventory values.  On January 6, 2021, the Court granted the motion (ECF 87), and Lead Plaintiff's local Canadian counsel subsequently filed a petition with the Supreme Court of British Columbia to give effect to the letters rogatory.

52.    KPMG Canada objected to producing documents, and Lead Plaintiff, with local counsel in Canada, reviewed and researched various issues in order to successfully negotiate the production of documents.  Throughout 2021 and into 2022, Lead Plaintiff engaged in multiple conferrals with KPMG Canada, and ultimately successfully obtained 16,290 pages of documents, including accounting records, work papers, and communications.

53.    On February 4, 2022 and March 16, 2022, Lead Plaintiff filed two additional motions for the issuance of letters rogatory to the Supreme Court of British Columbia requesting

---

[7]    Maxar became a U.S. entity incorporated in Delaware in January 2019.  ¶22.

4862-2678-2591.v1

assistance in securing testimonial evidence from five witnesses: (i) KPMG Canada's lead engagement partner for Maxar's independent audits and related engagements; (ii) a key Maxar accountant and consultant; (iii) Maxar's Corporate Controller; (iv) Maxar's Senior Manager of Corporate Finance; and (v) Maxar's Senior Vice President of Finance and Corporate Strategy. ECF 130, 142-143.  The Court granted the motions on February 22, 2022 and April 12, 2022, respectively.  ECF 135, 147.  Lead Counsel worked with local Canadian counsel to prepare the letters rogatory and submit them to the Supreme Court of British Columbia.

### 7.    Change of Defense Counsel

54.    On October 25, 2021, while the parties were conducting fact discovery, Defendants filed a motion requesting that the Court allow them to substitute attorneys from the law firm O'Melveny & Meyers LLP as counsel of record in place of attorneys from the law firm Latham & Watkins, LLC.  ECF 120.  On November 9, 2021, the Court granted the motion.  ECF 122.

55.    Lead Plaintiff and Lead Counsel incurred additional time and cost because of this substitution, as prior negotiations and agreements with Latham & Watkins were required to be revisited with O'Melveny.  Further, on October 28, 2021, O'Melveny requested clarification and additional information concerning discovery responses that Lead Plaintiff had provided to Defendants earlier in the discovery process.  Lead Counsel and O'Melveny subsequently engaged in a series of conferrals and letters to address O'Melveny's inquiries.

### F.    Lead Plaintiff Engaged in and Funded Extensive Expert Discovery

56.    Lead Plaintiff hired multiple experts to support and prove its claims in this Action. In connection with class certification, Lead Plaintiff engaged Dr. Zachary Nye, an experienced financial economist and Vice President at Stanford Consulting Group, Inc.  Dr. Nye is an expert

- 20 -

4862-2678-2591.v1

in market efficiency of financial and derivative securities, volatility forecasting, risk management, financial econometrics, valuation, and corporate finance. Dr. Nye provided an opinion as to whether Maxar common stock traded in an efficient market during the Class Period. Dr. Nye also opined on whether damages under §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, could be calculated using a method common to the Class. Dr. Nye provided a report to Lead Plaintiff that was submitted to the Court (ECF 91-1) in support of Lead Plaintiff's motion to certify the Class (ECF 90).

57.    Lead Plaintiff also engaged Mr. Mark Zyla, a valuation expert and managing director of Zyla Valuation Advisors, LLC. Mr. Zyla is a Certified Public Accountant, accredited in Business Valuation, and holds other designations, such as being a Chartered Financial Analyst and certified in Financial Forensics by the AICPA. He has authored and co-authored multiple books and publications on valuation of assets and businesses. Mr. Zyla extensively consulted with Lead Counsel during fact discovery, including in preparing for depositions concerning valuation issues, and provided an expert report outline concerning, among other things, the appropriate size and timing of impairments Maxar should have taken. Mr. Zyla reviewed business records, prepared analyses, and consulted with Lead Counsel over the course of discovery, and began preparation of an expert report. The parties reached the Settlement before his expert report was finalized or filed.

58.    Lead Plaintiff also retained Bruce Elbert, a leading satellite industry expert and President of Application Technology Strategy, L.L.C. Mr. Elbert is an engineer, system architect, technology innovator, educator, and author of books about the satellite industry. Lead Plaintiff retained Mr. Elbert to provide his expert views and opinions concerning Maxar's satellite business,

4862-2678-2591.v1

the satellite industry, and satellite industrial trends.  Mr. Elbert reviewed business records, prepared analyses, and consulted with Lead Counsel in preparation for a formal expert report.  The parties reached the Settlement before his expert report was finalized or filed.

59.    Lead Plaintiff also retained Bjorn Steinholt, CFA, a financial analyst and managing director of Tasta Group (dba Caliber Advisors, Inc.).  Mr. Steinholt has more than 25 years of experience providing capital markets consulting, including financial and economic analyses relating to mergers and acquisitions, initial public offerings, fairness opinions, private placements, venture capital investments, structured finance, portfolio risk management, market structure, performance measurement, option and warrant valuations, and shareholder disputes.  Lead Plaintiff retained Mr. Steinholt to analyze issues of loss causation and damages.  Mr. Steinholt also assisted Lead Counsel in preparing the Plan of Allocation.

60.    In addition to industry experts, Lead Plaintiff retained a Canadian-based law firm, Borden Lander Gervais, LLP, to assist with discovery from Canadian entities and individuals.

61.    Lead Plaintiff was also required to pay certain deposition costs to Osler, Hoskin & Harcourt LLP, which represented certain witnesses in Canada associated with Maxar.

### G.    Lead Plaintiff Diligently Responded to Defendants' Discovery Efforts

62.    Defendants sought comprehensive merits and class certification discovery from Lead Plaintiff.  Lead Plaintiff responded to two sets of requests for the production of documents, two sets of interrogatories, one set of requests for admission, and provided deposition testimony. Lead Counsel defended the depositions of Lead Plaintiff and its expert.

4862-2678-2591.v1

### 1.      Requests for the Production of Documents

63.      On January 8, 2021 and April 15, 2022, Defendants served Lead Plaintiff with two sets of requests for documents, with a total of 34 requests for documents.  Lead Plaintiff responded and objected to both sets of requests, and searched for responsive, non-privileged documents.  Ultimately, after a thorough review of client materials, Lead Plaintiff produced 1,919 pages of documents.

### 2.      Interrogatories

64.      On January 8, 2021, Defendants served Lead Plaintiff with its first set of 14 interrogatories, and on February 15, 2021, Lead Plaintiff responded to the interrogatories and raised various objections.  Over the following months, the parties conferred and exchanged written correspondence concerning Lead Plaintiff's responses.  On April 15, 2022, Defendants served Lead Plaintiff with its second set of five interrogatories, and on May 16, 2022, Lead Plaintiff responded and raised various objections.

### 3.      Requests for Admission

65.      On April 15, 2022, Defendants served a set of seven requests for admission on Lead Plaintiff.  The requests for admission concerned the merits of the Litigation, and thus required Lead Plaintiff to analyze and weigh the evidence that had been collected.  On May 16, 2022, Lead Plaintiff provided responses and raised objections.

### 4.      Depositions

66.      On May 27, 2021, Defendants took the Rule 30(b)(6) deposition of Lead Plaintiff.  In addition to defending the deposition, Lead Counsel negotiated the scope of the deposition with Defendants and prepared Lead Plaintiff's corporate representative for deposition.

4862-2678-2591.v1

67.     On May 28, 2021, Defendants deposed Lead Plaintiff's market efficiency expert Dr. Nye.  In preparation for class certification, Dr. Nye prepared an expert report opining on whether Maxar common stock traded in an efficient market, and whether damages under §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, could be calculated using a method that was common to each Class member.  ECF 91-1.  Lead Counsel prepared Dr. Nye for his deposition and defended him during the deposition.

## III.    THE SETTLEMENT IS A FAVORABLE RESULT FOR THE CLASS

### A.    Reaching the Settlement

68.     On March 31, 2021, the parties participated in a voluntary, confidential mediation with Gregory P. Lindstrom, Esq., a neutral with Phillips ADR with a focus on resolving complex disputes.  In advance of the session, Defendants and Lead Plaintiff submitted and exchanged detailed mediation statements discussing the relevant evidence and legal analysis concerning falsity, scienter, loss causation, and damages.  During the session, Lead Plaintiff shared its positions and conveyed to the mediator its understanding of the strengths and weaknesses of the claims and defenses in this Litigation, as well as potential sources of recovery.  At the conclusion of this initial mediation session, the parties maintained highly divergent views on the strengths and weaknesses of their claims and defenses.  While the parties engaged in good faith negotiations, they did not reach a settlement and litigation continued.

69.     On May 5, 2021, the parties engaged in a second mediation session with Mr. Lindstrom, but no settlement was reached.  Following the two mediation sessions, the parties continued their discussions through Mr. Lindstrom, but Lead Plaintiff and Lead Counsel continued

4862-2678-2591.v1

to litigate this case for over a year, during which time the parties conducted comprehensive fact discovery.

70.   On June 21, 2022, the parties participated in a third mediation session with Mr. Lindstrom.  During the mediation, the parties reached an agreement-in-principle to resolve the Litigation, and on June 28, 2022, the parties executed a Settlement Term Sheet.  The agreement-in-principle contemplates full releases of liability in return for a cash payment of $27,000,000 for the benefit of the Class, subject to approval by the Court.

71.   Following the parties' settlement in principle, they engaged in extensive negotiations concerning the terms of the Stipulation.  During this time, Lead Counsel and counsel for the Defendants also conferred at length concerning the appropriate details to include in the Notice, Plan of Allocation, Proof of Claim, and proposed orders.  This process included the exchange of multiple drafts of the parties' respective proposed revisions of the Stipulation, as well as the supporting exhibits.

72.   The Settlement is the result of hard-fought litigation and extensive arm's-length negotiations with the assistance of Mr. Lindstrom.  The protracted mediation sessions demonstrate Lead Counsel's commitment to achieving a stellar result for the Class.  As a result of Lead Counsel's continued efforts in this case, the parties ultimately reached a settlement that will provide a meaningful recovery for the Class.

73.   On September 20, 2022, Lead Plaintiff submitted a motion for preliminary approval of the Settlement. ECF 177.  On June 5, 2023, the Court entered its Order Granting Lead Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement ("Preliminary Approval Order").  ECF 193.

4862-2678-2591.v1

### B.    Reasons for the Settlement

74.    As set forth in the Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation and Memorandum of Points and Authorities in Support Thereof ("Settlement Memorandum"), filed contemporaneously herewith, the Settlement is fair, reasonable, and adequate in light of the exceptional recovery; the unique risks and difficulties that the Litigation presented to Lead Plaintiff; the extensive litigation efforts undertaken by Lead Plaintiff and Lead Counsel during the four-and-a-half-year course of the case; the complexity and expense of further litigation; the arm's-length settlement negotiations conducted by the Settling Parties; and the overwhelmingly positive reaction from the Class.

75.    The Settlement value of $27,000,000 in cash plus the interest which has accrued, is an exceptional result that provides an immediate and certain benefit to the Class. Based on analysis of the parties' respective positions, the Settlement Amount reflects a recovery of approximately 28% of the reasonably estimated recoverable damages of $96 million. This result far exceeds the average recovery in cases of the same type. Cornerstone Research has reported that, in securities class actions settled in 2022, the median recovery was approximately 4.9% of the estimated "simplified tiered damages" where damages are between $75 and $149 million. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements: 2022 Review and Analysis*, at 6, Fig. 5 (Cornerstone Research 2023), attached hereto as Ex. A. The recovery here exceeds that by over five times.

76.    Although Lead Plaintiff and Lead Counsel believe that the claims asserted in this action are meritorious, continued litigation against Defendants posed significant risks that made recovery in any amount uncertain. Lead Plaintiff's ability to achieve a successful result was by no

means assured, as both sides claimed the evidence supported their positions.  Lead Counsel believes that Lead Plaintiff would have prevailed on the merits at trial.  Defendants were just as adamant that Lead Plaintiff would have failed.  Any future recovery for the Class, had the Settlement not been reached, would necessarily have depended on Lead Plaintiff's ability to win challenging arguments on each element of its claims.  Defendants have adamantly denied liability – arguing strenuously that the allegedly false statements were actually true or not materially false and misleading when made – and have been represented by some of the most capable defense counsel in this District and across the United States.  There was also a very real risk that Lead Plaintiff would not have convinced a jury that Defendants acted with scienter or that their statements were protected forward-looking statements and opinions.  Indeed, although Lead Plaintiff was initially successful in part at the motion to dismiss stage, the Court dismissed several of the alleged false statements.

77.    This case also posed significant risks to recovery concerning the damages suffered by the Class.  As argued in Defendants' motion to dismiss, Defendants maintained that all of the alleged corrective disclosures "did not correct any prior misstatements."  ECF 51 at 24. Specifically, Defendants maintained that the corrective disclosures were not new information, there were no material misrepresentations corrected, and that the impairment of the GeoComm assets that were disclosed, were appropriate at the time they were disclosed, and thus, did not correct any prior statements or errors.  While Lead Counsel and Lead Plaintiff believe that the alleged false statements were corrected by the alleged disclosures, proving damages would require the opinions of experts with Defendants no doubt raising that certain extraneous market factors should be excluded from damages calculations.  The risk that Lead Plaintiff's damages would be

significantly impacted by complex calculations argued over by experts presented a significant risk to Lead Plaintiffs' claimed damages.

78. Had any of Defendants' arguments been accepted in whole or in part – at summary judgment, trial, or on appeal – any potential recovery would have been dramatically reduced or eliminated altogether. The Settlement removes these substantial risks and guarantees the Class a favorable, certain cash recovery. Settling the action with Defendants at this stage of the litigation is in the best interest of the Class.

79. And were this Settlement not achieved at this time and on the terms set forth in the Stipulation, Lead Plaintiff potentially faced additional years of risky litigation against Defendants, with ultimate success at trial being far from certain. Given that crucial discovery and witnesses were located in Canada further litigation would be extremely costly. Also, the potential for expensive fact and expert discovery was heightened as relevant documents and information was accounting-related, requiring the analysis and testimony of percipient technical accountants experienced in both international (IFRS) and United States (GAAP) accounting standards.

80. Lead Plaintiff fully endorses the Settlement. *See* Declaration of Ryan Stephens ("Stephens Decl."), submitted herewith. Court-appointed Lead Plaintiff is a sophisticated institutional investor that has actively overseen the prosecution of this Litigation for over four years and understands and has executed its fiduciary duty to act in the best interest of the Class. *Id.* at ¶¶4-7. Lead Counsel specializes in complex securities class action litigation, and is highly experienced in such litigation. *See* RGRD Fee Decl., Ex. F (Robbins Geller firm résumé). Based on their experience and knowledge of the facts and applicable law in this Litigation, Lead Plaintiff and Lead Counsel have determined that the Settlement is in the best interest of the Class.

- 28 -

4862-2678-2591.v1

C.    **Notice to the Class Meets the Requirements of Due Process and
Federal Rule of Civil Procedure 23**

81.    In accordance with the Court's June 5, 2023 Preliminary Approval Order (ECF 193), beginning on July 7, 2023, the Claims Administrator, Gilardi & Co. LLC ("Gilardi"), caused a copy of the Notice and Proof of Claim, substantially in the forms annexed to the Stipulation, to be mailed by First-Class Mail to all Class Members who could be identified with reasonable effort. Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Murray Decl."), ¶¶5-6.  ECF 194.  In total, the Claims Administrator has disseminated over 34,070 copies of the Notice and Proof of Claim to potential Class Members and their nominees.  *See* Supplemental Declaration of Ross D. Murray Regarding Notice Dissemination and Requests for Exclusion Received to Date ("Supp. Murray Decl."), ¶4, submitted herewith.

82.    On July 24, 2023, the Claims Administrator caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *Business Wire*.  Murray Decl., ¶12.

83.    In addition, the Claims Administrator caused a copy of the Notice and Proof of Claim to be posted on the case-designated website, www.MaxarSecuritiesClassLitigation.com. *Id.*, ¶14.  This multi-faceted method of providing the Class notice, previously approved by the Court, is wholly appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]."  Fed. R. Civ. P. 23(e)(1).

84.    Among other things, the Notice advises Class Members of the essential terms of the Settlement, the proposed Plan of Allocation, the general terms of the Fee and Expense Application, the procedure for objecting to the Settlement, and specifics on the date, time, and place of the Settlement Hearing.

- 29 -

85.     As set forth in the accompanying Settlement Memorandum, the Notice fairly apprises Class Members of their rights and options with respect to the Settlement, is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order (ECF 193), Federal Rule of Civil Procedure 23, the PSLRA, and due process.

### D.     The Plan of Allocation Is Fair and Reasonable

86.     The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution and who submit a valid and timely Proof of Claim.  The Plan of Allocation set forth in the Notice describes in detail the proposed plan for allocating the Net Settlement Fund among eligible Class Members.  In summary, the calculation of an Authorized Claimant's Recognized Loss is based upon a formula that takes into account such information as: (a) when an Authorized Claimant's share was purchased and sold; (b) the amount of the alleged artificial inflation per share; and (c) the purchase price of the share.  Because the alleged corrective disclosures reduced the artificial inflation in stages over the course of the Class Period, the damages suffered by any particular Authorized Claimant may vary.  The Plan of Allocation provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her, or its transactions in Maxar common stock during the Class Period.

87.     For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with economics and damages experts, and the proposed Plan of Allocation reflects an assessment of the damages that potentially could have been recovered by Class Members had Lead Plaintiff prevailed at trial.  The proposed Plan of Allocation is premised on the out-of-pocket measure of damages and is designed to measure the difference

- 30 -

between the prices Class Members paid for Maxar common stock during the Class Period and the prices had the allegedly false and misleading statements been disclosed.

88.    In sum, the Plan of Allocation represents a reliable method by which to weigh, in a fair and equitable manner, the claims of Authorized Claimants against one another for the purpose of making *pro rata* allocations of the Net Settlement Fund.  Notably, no objections to the Plan of Allocation were filed.

## IV.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A.    Application for Attorneys' Fees

#### 1.    The Requested Fee of 30% of the Settlement Amount Is Fair and Reasonable

89.    For its efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Amount on a percentage basis.  The percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, and has been recognized as appropriate for cases of this nature.

90.    Lead Counsel expended substantial effort to achieve an excellent recovery for the Class.  The prosecution of the Litigation required Lead Counsel and its paraprofessionals to perform over 13,900 hours of work resulting in a total lodestar of $8,662,461.25 and to incur $825,853.33 in expenses and charges.  Lead Counsel's time and expenses are detailed in the RGRD Fee Declaration submitted herewith.

4862-2678-2591.v1

91.    As set forth in the accompanying Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) and Memorandum of Points and Authorities in Support Thereof ("Fee Memorandum"), Lead Counsel is seeking attorneys' fees of 30% of the Settlement Amount (*i.e.*, $8,100,000), plus interest.  Numerous courts have applied the percentage-of-recovery method in awarding fees in "common fund" cases.  The percentage sought is merited in this case in light of the effort required and the results obtained.

92.    It bears noting that the Lead Plaintiff, a sophisticated institutional investor who supervised Lead Counsel and remained well informed throughout the Litigation and settlement negotiations, approves of Lead Counsel's fee request.  *See* Stephens Decl., ¶¶8-9.

### 2.    The Complexity and Risk Inherent in the Litigation

93.    The requested fee is also reasonable in light of the various risks Lead Counsel faced over the years, as well as the complexity of the Litigation.

94.    As discussed in greater detail above, this case had significant risks concerning liability such that Lead Plaintiff's success was by no means assured.  Defendants disputed whether Lead Plaintiff could establish liability and would no doubt contend, as the case proceeded through discovery and on to expert discovery and trial, that even if liability existed, the amount of damages was substantially lower than Lead Plaintiff alleged, or even that there were no damages.  The Court or a jury may have ultimately been persuaded by these arguments.  Even if Lead Plaintiff prevailed at trial and proved substantial damages, it faced potentially years of costly and risky appeals against Defendants, with ultimate success being far from certain.

95.    In light of the uncertain nature and prolonged extent of the litigation, the complexity of the factual and legal issues presented at all stages, the substantial risks that Lead Plaintiff

4862-2678-2591.v1

overcame at the pleading, class certification, and fact discovery phases, and the other factors described in the accompanying Fee Memorandum, Lead Counsel submits that the requested 30% fee is fair, reasonable, and should be approved.

### 3. The Contingent Nature of the Fee and the Financial Burden Carried by Lead Counsel

96.    Lead Counsel prosecuted this Litigation on an "at-risk" contingent-fee basis.  At the outset in 2019, we knew we were embarking on complex and expensive litigation with no guarantee of compensation for the time, money, and effort we poured into this case over its multi-year lifespan.  Accordingly, Lead Counsel fully assumed the risk of an unsuccessful result, and has received no compensation for services rendered or the significant expenses incurred in litigating this action.

97.    In undertaking the responsibility for prosecuting the Litigation, Lead Counsel assured that sufficient attorney resources were dedicated to advancing Lead Plaintiff's and the Class's claims over the years, and that sufficient funds were available to advance the expenses required to zealously pursue such complex litigation.  To date, Lead Counsel has received no compensation for its time and no payment for its expenses.

98.    Lead Counsel also shouldered the risk that no recovery would be achieved.  Lead Counsel knows from experience that success in contingent-fee litigation is never assured, and that the commencement of a securities class action in no way guarantees a recovery.  Instead, it takes diligence, commitment, and years of tireless work by skilled counsel to develop the facts, theories, and evidence necessary to prevail on the merits.  Lead Plaintiff's claims could have been dismissed at the pleadings stage with no recovery, or substantially limited at the class certification stage.

4862-2678-2591.v1

99.     Courts have repeatedly held it is in the public interest to have experienced and able counsel enforce the securities laws.  Vigorous private enforcement of the federal securities laws can only occur if private plaintiffs – particularly institutional investors like Lead Plaintiff – can obtain some parity in representation with that available to large corporate defendants.  If this important public policy is to be carried out, courts should award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks inherent in prosecuting securities class actions on a contingent-fee basis.

### 4.     The Standing and Expertise of Lead Counsel

100.     Lead Counsel is among the most experienced and skilled securities litigation law firms in the field, as illustrated by Lead Counsel's firm biography attached as Exhibit F to the RGRD Fee Declaration.  The attorneys who were principally responsible for leading the prosecution of this case have prosecuted scores of securities cases throughout their careers, overseen numerous litigations, and recovered billions of dollars on behalf of investors over the course of decades.  Informed by this experience, we developed and implemented strategies to overcome myriad obstacles raised by Defendants.

101.     Lead Counsel's quality of work should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented first by Latham & Watkins, LLP and later by O'Melveny & Myers, LLP, both highly respected, international law firms that have been in business for decades and have substantial experience defending securities class actions and other complex litigation.  Lead Counsel believes that all of these factors support the requested fee award.

- 34 -

### 5. The Class's Reaction to Date to the Settlement

102. The Notice advises the Class that Lead Counsel intends to request an award of attorneys' fees in an amount not to exceed 30% of the Settlement Amount, for payment of litigation expenses not to exceed $1 million, plus interest on both amounts, and for an award to Lead Plaintiff (pursuant to 15 U.S.C. §78u-4(a)(4)) not to exceed $15,000. The Notice provided Class Members until September 25, 2023 to submit objections to Lead Counsel's fee and expense application.

103. It is my understanding that to date, not a single objection was received.

### B. Application for Litigation Expenses, Charges, and Costs

104. Lead Counsel requests $825,853.33 for expenses, charges, and costs reasonably and necessarily incurred in prosecuting Lead Plaintiff's claims for the past four years. Lead Counsel respectfully submits that this amount is appropriate, fair, and reasonable, and should be approved.

105. Since 2019, Lead Counsel knew we may never recover any of the expenses incurred in prosecuting this case. Lead Counsel also understood that, even assuming the case was ultimately successful, an award of expenses would not compensate us for the lost use of the funds we had dedicated to this Litigation. Accordingly, Lead Counsel was motivated to, and did, take steps to minimize expenses where practicable without jeopardizing the vigorous and efficient prosecution of this Litigation.

106. As set forth in the RGRD Fee Declaration, the expenses, charges, and costs incurred were necessary and appropriate in light of the complex nature of the action and were associated with, among other things, hiring experts and consultants, service of process, document management, online legal and factual research, and mediation.

4862-2678-2591.v1

107.    Lead Plaintiff also seeks an award of $3,900, pursuant to 15 U.S.C. §78u-4(a)(4), for reasonable costs and expenses directly relating to its representation of the Class.  In addition to monitoring the developments in the Litigation, Lead Plaintiff dedicated time and resources to gathering documents and information responsive to Defendants' discovery requests, preparing a representative to sit for deposition in order to obtain class certification, and participating in mediations and other settlement negotiations.  *See* Stephens Decl., ¶¶4-6.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 2, 2023, at San Diego, California.

_____
TRIG R. SMITH

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on October 2, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

_s/ Spencer A. Burkholz_
SPENCER A. BURKHOLZ

655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com

## Mailing Information for a Case 1:19-cv-00124-WJM-SKC Oregon Laborers Employers Pension Trust Fund et al v. Maxar Technologies Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey S. Abraham**
  jabraham@aftlaw.com

- **Jeffrey Allen Berens**
  jeff@jberenslaw.com,jeffreyberens@comcast.net

- **Spencer A. Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew W. Close**
  mclose@omm.com,matthew-close-5511@ecf.pacerpro.com,mmena-hadyka@omm.com,mleu@omm.com

- **Nicole Gilliland**
  ngilliland@rgrdlaw.com

- **Kate Mie Ikehara**
  kikehara@omm.com,kate-ikehara-0705@ecf.pacerpro.com

- **Patton L. Johnson**
  pjohnson@rgrdlaw.com,panderson@rgrdlaw.com,TerreeD@rgrdlaw.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brittany Allison Rogers**
  brogers@omm.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,panderson@rgrdlaw.com,ChristC@rgrdlaw.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **Jeffrey J. Stein**
  jstein@rgrdlaw.com

- **Christopher Dennis Stewart**
  cstewart@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Ellen Gusikoff Anne Stewart**
  elleng@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jonathan Bryce Waxman**
  jwaxman@omm.com,jonathan-waxman-8134@ecf.pacerpro.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Phillup G  Newhope
,

Logan Durant
,

Michael W Slaunwhite
,