IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-0124-WJM-SKC and 19-cv-0758

OREGON LABORERS EMPLOYERS PENSION
TRUST FUND, et al.,

Plaintiffs,

vs.

MAXAR TECHNOLOGIES, INC., et al.,

Defendants.

-------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Fairness Hearing)

-------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ, Judge, United States District Court for the District of Colorado, commencing at 10:07 a.m., on the 9th day of November, 2023, in Courtroom A801, United States Courthouse, Denver, Colorado.

APPEARANCES

ELLEN GUSIKOFF STEWART and SPENCER A. BURKHOLZ, Robbins Geller Rudman & Dowd, LLP, 655 West Broadway, Suite 1900, San Diego, California 92101, appearing for the plaintiff.

BRITTANY A. ROGERS, O'Melveny & Meyers, LLP, 400 South Hope Street, 18th Floor, Los Angeles, California 90071-2899, appearing for the defendants.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

P R O C E E D I N G S

(Call to order of the court at 10:07 a.m.)

THE COURT:  All right, we're on the record in civil action No. 19-cv-0124, consolidated with civil action No. 19-cv-758, the Oregon Laborers Employers Pension Trust Fund, individually and on behalf of all others similarly situated, plaintiffs, versus Maxar Technologies, Inc., Howard Lance and Anil Wirasekara, defendants.

I'll take appearances of counsel.

MS. STEWART:  Good morning, Your Honor.  Ellen Gusikoff Stewart and Spencer Burkholz of Robbins Geller Rudman & Dowd, on behalf of the lead plaintiff in the class.

THE COURT:  Good morning to the two of you.  For the defendant.

MS. ROGERS:  Good morning, Your Honor.  Brittany Rogers with O'Melveny & Meyers on behalf of defendants.

THE COURT:  Good morning to you.  All right.  We're here today for a fairness hearing on the proposed settlement agreement and specifically I have before me two motions. The first one filed at ECF 196 is the lead plaintiff's motion for final approval of class action settlement and approval of plan of allocation and memorandum of points and authorities in support thereof.  The second motion before me is -- was filed at ECF 197.  It is lead counsel's motion for

an award of attorney's fees and expenses and award to lead plaintiff pursuant to 15 United States Code Section 78u-4(a)(4), as well as memorandum of points and authorities in support thereof.

I'll call the first -- I'll refer to the first motion throughout the hearing, to the extent I have to refer to it, as the final approval motion, and the second as the fee motion.

So let me tell counsel how I generally handle these fairness hearings, which I've had a number over the years. I'm going to put on the record a summary of the general background procedural history of this litigation. I will thereafter give plantiffs' counsel an opportunity to put on the record a summary of the reasons why plaintiffs believe -- plaintiffs' counsel believe that the settlement is fair and reasonable. I'll give defense counsel an opportunity to do likewise.

We'll go on the -- we'll stay on the record, of course, and ask -- and confirm that there are no -- at least as of this moment, no objectors in the courtroom to file an objection to the proposed settlement.

All right. So let me begin with what we have prepared as a summary for this litigation. Lead plaintiff filed this securities class action on January 14th, 2019. On March 14th of that year, Howard and Jill Schwartz filed a

separate action which the Court consolidated with this action.  After consolidation, lead plaintiff filed the consolidated complaint, which is the controlling complaint pleading in this action.  In its consolidated complaint, it alleges that throughout the class period, which is May 9th, 2018, through October 30, 2018, defendants violated federal securities law, specifically Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as Rule 10(b)(5) promulgated thereunder.  And that they did so allegedly by making materially false and misleading statements and omissions regarding the award of a contract to build an advanced satellite for an Israeli company, the status and capabilities of a satellite it owned and operated, and an intangible assets impairment it took beginning third quarter 2018.

Lead plaintiff, a pension fund, purchased Maxar common stock before, during, and after the class period.

On December 6th of 2019, defendants filed a motion to dismiss the consolidated complaint.  On September 11th of 2020, I issued an order granting in part and denying in part the motion to dismiss the consolidated complaint. Specifically I found that the plaintiff had failed to plausibly allege that the statements regarding the status and capabilities of its satellite were false or misleading when made, and that the defendants' statements on

March 26th, 2018, specifically, gave rise to a strong inference of scienter.  Significantly, defendants' motion was denied in all other respects.

Subsequently defendants filed their answer to the consolidated complaint.  Defendants -- they filed their answer to the consolidated complaint, which is the operative responsive pleading in this action, and they did so on December 14th, 2020.

On February 12th, 2021, lead plaintiff filed its motion for class certification which the Court granted on July 16th, 2021.  On September 20, 2022, lead plaintiff filed an unopposed motion for order to preliminarily approve class action settlement.

To reach this settlement, the parties participated in a voluntary confidential mediation with Gregory Lindstrom, a former senior partner at Latham & Watkins, and general counsel of the Irvine Company, and current mediator with Phillips ADR.

On June 5th of this year, I granted the motion for preliminary approval of the class action settlement.  The stipulation of settlement is in the record at ECF 178. Specifically I certified a class defined as:  All persons and entities who purchased or otherwise acquired the common stock of Maxar Technologies, Inc., during the period from May 9th, 2018 through October 30, 2018 inclusive, and were

6

damaged thereby.

Excluded from the class are defendants, present or former executive officers of Maxar, and their immediate family members as otherwise defined.

In the order preliminarily approving the class action settlement, I approved the parties' proposed notice, claim form, and summary notice.  Finally, I set a settlement fairness hearing for today, November 9th, 2013 [sic] at 10:00 a.m. Mountain Time in this courtroom.

On October 2d of this year, lead plaintiffs filed a -- filed its final approval motion and the fee motion that I referenced earlier.  Both motions are unopposed by defendants who do not, however, endorse or otherwise join in either of these motions.

In addition, no objections or oppositions to either motion have been timely filed with the Court by any other person.  Among other things, lead plaintiffs underscore the significance of the lack of objections as 87 percent of the settlement class consists of sophisticated institutional investors with the resources and motivation to object if warranted.

In a declaration recently filed with the court, the third-party class action administrator -- which I will refer to as Gilardi -- represents that through October 2d, 2023 a total of 34,075 notice packets were mailed to potential

settlement class members and nominees.  Gilardi has also maintained a settlement website and a toll free number to respond to inquiries from settlement class members.

On September 25th, 2023, the deadline for objections to be filed with this Court or for requests for exclusion from the settlement class members, Gilardi had received no objections to the proposed settlement and had received three requests for exclusion from the settlement.

All right.  That is the summary I wanted to put on the record.  Ms. Stewart, are you going to be handling the hearing this morning?

MS. STEWART:  I am, Your Honor.

THE COURT:  All right.  If you'll take the lectern, please.

MS. STEWART:  I will do that, Your Honor.

THE COURT:  At this time, I'd like you to put on the record from the lead plantiffs' perspective why it is that the settlement terms -- or what the settlement terms are, first of all; and for you to explain why, in your view, the settlement is fair, reasonable, and adequate to the class.

MS. STEWART:  I will.  And thank you, Your Honor.  As you noted, we are here for final approval.  The settlement before the Court is $27 million on behalf of the class of purchasers of Maxar common stock, as you noted,

8

May 9th, 2018 through October 30th, 2018 inclusive.  The settlement was reached after 4 1/2 years of extensive litigation.  And I would refer the Court to the declaration of Trig Smith, which is at ECF 198, for a -- a more fulsom discussion of the procedural history and the efforts of counsel.

The settlement itself is an outstanding result under any metric.  It recovers approximately 28 percent of the estimated recoverable damages in this case and, as we noted in our papers, it far exceeds the mean and average recover -- the median and average recovery in securities cases of this size, and it's an outstanding result.

We also satisfy each of the elements of Rule 23(e)(2), and the substantially overlapping Tenth Circuit factors in determining whether a settlement is fair, reasonable, and adequate.

THE COURT:  Let me jump in right now, though.  How is it that the -- the full -- the potential full recovery of damages were calculated?

MS. STEWART:  That was calculated by plantiffs' counsel's damages expert who assisted us in -- throughout the litigation, and also assisted us in preparing the plan of allocation.  So the plan of allocation is based on a proposed recovery of -- maximum recovery of $96 million.

THE COURT:  All right.  96 million.

MS. STEWART: Thank you.

THE COURT: All right. Go ahead.

MS. STEWART: With respect to the Rule 23(e)(2) elements -- and this is obviously all in our papers and I don't want to -- I don't want to reread our briefs -- but to give you the elements, the lead plaintiff and lead counsel have unquestionably adequately represented the class. The lead plaintiff has no conflicts with other class members. And counsel and lead plaintiff vigorously litigated this case on behalf of the class.

As the Court noted, the litigation was not settled until after three mediation sessions with Greg Lindstrom of Judge Phillips' firm, Phillips ADR. A settlement that's reached after arm's length negotiation with the assistance of a mediator is presumptively fair. There's nothing in the record that would suggest that there was any collusion. And the fact that settlement negotiations went on for a year and a half should provide comfort to the Court that there was, in fact, no collusion here.

With respect to the costs and the risks of delay of litigation and trial and appeal, there were legal and factual questions that placed continuing this litigation in doubt, and whether a better recovery could be reached after further litigation. We face the risk in establishing all and each of the elements of Section 10(b). The defendants

only had to counter one element and the case would be lost.

The Court had already granted in part the motion to dismiss, cutting the class period and dismissing certain statements.  Defendants have argued that we could not establish scienter because application of the accounting rules requires the exercise of judgment, and they may have gotten it wrong for some period of time but that does not mean that there was intent.

The company's auditors had signed off on the company's financials when they did not take the asset impairment charge, and ultimately they did take the asset impairment charge.

The defendants also argue that certain of the other statements that remained were inactionable either as forward-looking statements with adequate cautionary language, or inactionable puffery.  So we faced risks going forward.

Although we believed that the evidence taken before we settled supported our claims, we had to be cognizant of the fact that there were these risks that defendants would be successful, at least in part, at summary judgment.

THE COURT:  What would you say were the strongest facts in this case that helped propel you to the final settlement amount?

MS. STEWART:  Do you want --

MR. BURKHOLZ: Your Honor, Spence Burkholz for the plaintiffs.

THE COURT: All right. You can stay at counsel table. Why don't you just pull the --

MR. BURKHOLZ: Sure. So the question was the strongest facts on our side?

THE COURT: Right.

MR. BURKHOLZ: So --

THE COURT: And just as a signal, I'm going to ask you the same question with respect to what you believe were the strongest facts that were in the defendants' favor.

MR. BURKHOLZ: Right. So the two main issues in the case: the AMOS-8 contract and then the impairment charge. The impairment charge issue was the biggest issue in the case. It covered most of the damages in the case. The best argument we had -- or the best evidence we had were -- was evidence we developed through the document review and deposition testimony that when they didn't take the impairment charge at year-end prior to the start of the class period, that there were red flags. And there was enough evidence that they should have taken the charge at that time.

And the -- the analysis is complex, so on the other side they made -- they had arguments that their accountants looked at it and signed off on it. So there was this

12

dispute.  And we did believe that we had enough to get through summary judgment and at least present it to the jury.  But there was a risk at summary judgment that the Court could find otherwise.

The AMOS-8 contract was less of an issue in the case, so it had to do whether or not the contract was -- had contingencies or not, and there were arguments both ways. But I would say the impairment issue was -- the stock drop related to when they took the impairment was the -- and when the short-sell report came out, that was the main issue in the case that we were fighting over.  And it was very complex and there were arguments on both sides.

THE COURT:  Help me understand how my ruling on the motion to dismiss that granted in part and denied in part the relief requested by defense in the protracted mediation discussions that you had, how did that factor into the negotiations?

MR. BURKHOLZ:  Well, it did reduce the damages because we lost the piece of the front end two months of the class period, those purchasers.  And then the back end we lost from October 31st to, I believe, some time in January. So there was a time period there that it would have increased our damages.

In terms of the claims -- the satellite claims, again, those were similar to the AMOS-8 contract in that

there were -- there were significant disputes about the disclosures that they made related to those two issues.  And I think there were subsidiary issues to the impairment charge issue.  I think that was still going to be the main focus of the case.

And just -- finally, just to supplement something Ms. Gusikoff Stewart said to your question about damages: The damages in the case we estimated, based on -- you know, obviously the defendants thought they were much less, but we --

THE COURT:  Right.

MR. BURKHOLZ:  -- under our assumptions came up with a number that we thought was reasonable based on the claims that were left in the case.  And one of the problems in the case for us was when the information came out, like with the impairment charge, there were other things the company was disclosing on that day.  They call it disaggregation of issues to get to the damages.

So we were fighting that as well as some of the prior disclosures that they had made.  And when the information came out about the short-sell report, which was another stock drop, there was other information in the short-sell report that had nothing to do with our case.  So there was a lot of disaggregation fights that we were going to have, and so we came up with a reasonable number for the

14

estimated recoverable damages at trial if we had proceeded.

THE COURT:  Just as a point of curiosity for myself, because I've started to hear a lot about these short-sell reports, who's the author of that report?

MR. BURKHOLZ:  This -- the author of the report was a company called Spruce; it's a Spruce report.

THE COURT:  Okay.  All right.  And have they been more or less involved in the -- in your kind of -- in your type of securities litigation in the -- in terms of how they've materially affected the facts and how the facts have been perceived?

MR. BURKHOLZ:  Well, it -- there are some other short sellers that have issued reports have come up in litigations.  And it's interesting because on the one hand they're a third party and they might profit from the stock price decline; on the other hand, they bring out information that one could argue was not in the marketplace, or at least the detailed analysis they do of a lot of information that may be sitting out there.

So they do serve a purpose.  And their disclosures, and many Courts have found them, to be proper corrective disclosures of information that's been withheld from the marketplace.  But the Courts have gone both ways and --

THE COURT:  Yeah, the facts can go all over the place.  I mean, it could be short-seller authors that have a

15

material financial stake in what they're saying in their report and -- you know, it's -- I think it's a fascinating development --

MR. BURKHOLZ:  Right.

THE COURT:  -- in this whole area.  I found it interesting to read, I think earlier this week, that I think Taiwan passed a law prohibiting short-selling.  I don't know if you heard that.  I hope I'm getting the right country.  And their market went up like 10 percent in one day.

MR. BURKHOLZ:  Right.  But the other thing to think about is that they do serve a purpose in our markets.  Shorting stocks actually serve a purpose.

THE COURT:  Sure.

MR. BURKHOLZ:  And many times the information that they come out with is new material information that the market doesn't know about and wouldn't know about otherwise.

THE COURT:  Right.  I just signed a --

MR. BURKHOLZ:  -- purpose --

THE COURT:  I just find it very interesting.  So thank you for your explanation as to the facts specific to this case and negotiation.  That was helpful.

All right.  Ms. Stewart, back to you.

MS. STEWART:  Okay.  Thank you.  With respect to the 23(e)(2) element, the method for distributing relief is

16

effective.  The Court approved the notice program; claim forms have been sent out; claim forms have come in.  And the settlement plan of allocation, as I'll address, allocates some in funds to those in relation to the amount that we allege that they were harmed.

Next, the requested attorney's fees, which I will address with the fee motion, are reasonable and are not excessive.  The only agreement that the parties have was an agreement with respect to what we colloquially call a blow provision, which gave the defendants the option to settle -- to blow the -- get out of the settlement if the opt-outs exceeded a certain threshold.  Obviously --

THE COURT:  And I'm assuming you didn't come close to that.

MS. STEWART:  Without disclosing what's in the agreement --

THE COURT:  Right.

MS. STEWART:  -- the defendants have not exercised any right to --

THE COURT:  Okay.  That's good enough.  But before you go to the fee motion -- and we are sticking with the final approval motion -- what, to the extent you've calculated, is there a mean recovery for class members through your formula?

MS. STEWART:  We don't know yet what the number

17

of -- what the number of damage shares that will be claimed into the settlement fund. We do know there were tens of thousands of claims. That the claims deadline was only last week so there hasn't been any analysis. But based on the plan of allocation, that will -- if the Court approves the plan of allocation, that is the method by which claims will be calculated with respect to the valid claims. But I don't -- at this moment, given the fact that it's so close to the end of the claims period, I don't have a number for Your Honor. And I apologize.

THE COURT: Okay.

MS. STEWART: The class members are, as I noted, treated equitably. They're all subject to the same plan of allocation.

And, finally, the judgment of the settling parties: Everybody here endorses the settlement; the class agrees. As Ross Murray's supplemental declaration states, over 34,000 notices were mailed. The -- we were published in the Wall Street Journal and over the Business Wire; and the website and the toll free number were established and still exist. And there were no objections. We only received three requests for exclusion, and only two were from actual class members. One opt-out said they did not purchase any Maxar stock during the class period, so it's included, but it's not from a class period -- from a class member.

18

And so, Your Honor, I would -- I would argue that the settlement itself is substantively and procedurally fair, reasonable, and adequate given the benefits versus the risks of proceeding; given the recovery that we obtained; and the reaction of the class, which I think speaks volumes to counsel's work. And I would ask the Court to approve the settlement, and also the plan of allocation, which is held to the same standard as the settlement itself, which would be that it is fair, reasonable, and adequate.

Courts give great weight to the recommendations of experienced counsel. Here, the plan of allocation was developed with our damages consultant, and it is fair and it is reasonable based on our allegations and our theories of the case. And, again, there were no objections to the plan.

So with that, Your Honor, unless you have any questions, I would ask that the Court grant final approval to the settlement and to the plan of allocation finding that they are both fair, reasonable, and adequate.

THE COURT: All right. Thank you for that. But let's go -- let's go forward with the discussion of the fee motion and the cost reimbursement request.

MS. STEWART: Okay, Your Honor. We have asked for a fee of 30 percent of the $27 million settlement. As the Court is aware, vigorous litigation over the course of four-plus years against very determined, well-financed

19

adversaries spent over 13,900 hours, all on a contingent basis, facing complex issues, fights on almost all issues.

Given the exceptional result here, and our -- you know, our pressing the case when we could have settled probably earlier for less, we believe that the fee is supported.  The lead plaintiff, which is an institutional investor -- the kind that Congress wanted to lead these kinds of cases when it enacted the PSLRA 30 years ago -- supports the fee, and the Court should find that that is important.

The PSLRA codified the percentage recovery in these kinds of cases in the common fund approach.  The Tenth Circuit has generally adhered to the percentage recovery method in the *Gottlieb* case.  It's less objective, it matches the marketplace, and it provides an incentive to counsel to get the best result for the class.  And here it's important that this was a completely contingent representation.  If the Court had granted the motion to dismiss and we were unsuccessful, the case would be over.

It's also contingent -- the 30 percent is also consistent with fee awards granted in this circuit, this district, in other -- in other cases.  And we've cited those cases at ECF 197 at page 7.

In addition, Your Honor, the *Johnson* factors, which the Court uses -- courts in the Tenth Circuit use to

20

evaluate a fee, support -- support the fee. The time and labor required, as noted, 13,900 hours. And we're not done. You know, until the -- until the claims have been fully processed and the settlement funds have been fully distributed, we'll continue to work to make sure that those funds are all adequately disbursed and we're not going to come back and seek any more of a fee. So there's work still to be done.

As we've noted, the novelty and the difficulty of the issues in this case where you have an accounting -- you have accounting issues and judgment and disclosures and disaggregation of -- in the ultimate disclosures; the skill required to perform the legal services properly. I think we're very experienced securities fraud practitioners and I think it needed a team of experienced lawyers and forensic accountants to get the result that we got, and we have -- we do possess those -- those abilities.

The customary fee, as I've noted, we -- 30 percent is a customary fee in cases of this size in this district. The contingent nature of the fee; the amount involved and the results obtained. It's -- 28 percent recovery is really an outstanding result.

Our experience, reputation, and our abilities. I think if you know that our firm is the top -- one of the top practitioners in this field. And if you read our firm

21

resume, you can see the results that we've obtained for classes and individuals and investors over the last 30 years.

Here, not all of the *Johnson* factors should be weighed equally. I think it depends on the case. And I think I've hit the ones that are most important. The end result is of the primary importance, and in a case of this size we obtained an excellent result.

The lodestar also supports the settlement here. It results in a negative multiplier and so there is no windfall here to counsel. And so we would ask that the Court also take into consideration that there have been no objections in over -- you know, over 34,000 notices going out and not an objection to our fee, where that's kind of unusual. So I would ask the Court to approve our fees.

THE COURT: Let me jump in with a couple questions here. It is very valuable and helpful to me to have a cross-check with a lodestar amount when considering the 30 percent contingency. Your lodestar table that you prepared, which is Exhibit A to your motion, there are a few things on here that I wanted to ask you about.

The fee rates, to what extent do you -- did you consider that these hourly rates are well above Denver area rates? And the local hourly rates are -- as I understand Tenth Circuit law, is a factor that I must weigh heavily

when considering the -- the lodestar calculation, understanding that your lodestar's over half a million above your 30 percent.

MS. STEWART:  Well, Your Honor, we believe -- and I understand that we're -- that our rates may be higher than --

THE COURT:  Not may be, they are.

MS. STEWART:  They are higher --

THE COURT:  They are much higher than -- I've not done -- let's put it this way, I've not seen a Denver practitioner in any field submit to me a fee application with a hourly rate of -- that are north of 950, 960.  I just haven't.

MS. STEWART:  Your Honor, this is -- this is a national practice.

THE COURT:  I know, but the cases are very clear that even with national law firms, national practice, that one of the key factors -- not -- it's not dispositive by any means, but it is a factor that I have to give more than minimal weight to, which is the hourly rates for comparably experienced practitioners in the local market.

Now if this were Wichita, Kansas, and we're a tiny little market, you know, I would give that -- this issue significantly less weight.  But Denver and Colorado have been growing significantly, as you know, by population.  Our

23

bar has grown significantly.  And still we're not close to these California numbers.

MS. STEWART:  Your Honor, this is -- candidly this is the -- this rate -- this hourly rate that gets set gets submitted in courts around the country:  In New York, in San Francisco, in Denver, in Chicago, in Atlanta.  Wherever we have cases, these are our hourly rates.  They are set -- and I appreciate that they're high, but they are set based on our adversaries.  I mean, we are litigating against national firms.  We are litigating against lawyers on the other side who -- I just -- I just did a study, you know, they're charging 15-, 17-, 19-, $2,000 an hour on a noncontingent basis.

We set our rates based on experience and based on years out of school, based on other firms in our field. They're not -- they're not randomly -- they're not randomly set.

THE COURT:  Right, of course.  And I don't mean to intimate as much.  But I'm just asking you:  To what extent in your view should I -- how much weight should I give to the fact that your lodestar, which is what it is and results in the negative multiplier, is calculated, at least in great -- in significant part by hourly rates that are well above the local market rates in -- for the legal profession here in Denver?

24

MS. STEWART:  I understand, Your Honor.  And I would say to the Court that if you found that these rates were too high, we're still entitled -- we would be entitled to a multiplier on our time given the result that we obtained.  So if the Court were to find that our lodestar was too high based on our hourly rates and you cut them in any way, we would still be entitled to this 30 percent fee based on a multiplier -- the lodestar plus multiplier.

And I think the -- we've -- we do a lot of -- we exercise a lot of billing judgment, and I can tell you that, like, $200,000 of this -- of our lodestar was -- we've written off based on exercises of billing judgment; looking at whether the number of hours on a particular project by a particular lawyer or staff member is reasonable.  There's a -- there's a whole lot that goes into this.

And so I would ask that the Court appreciate that the quality of the work by a national law firm litigating a case against an international law firm -- or two international law firms during the course of the litigation are reasonable based on the quality and the expertise that's required to litigate these cases.

And we've litigated with a lot of great lawyers here in Denver and I -- you know, we've partnered with lawyers a lot here and they are -- they're great lawyers. But our client retained Robbins Geller, the Court approved

25

Robbins Geller, a national law firm, as lead counsel, and I would ask that the Court accept -- without saying whether they're reasonable or not -- but accept our lodestar as a reasonable representation of the amount of work that was done during the course of the case.

THE COURT:  All right.  I just want to, you know, restate, so my comments aren't misinterpreted, that, first of all, we're talking about a -- in the lodestar number, it's a cross-check for the 30 percent figure.  And that you are -- your lodestar is half a million-plus north of your 30 percent.  So I understand.  I'm trying to get just an understanding of some of these points.

The other one is you have litigation support and document clerks.  What -- why is that an appropriate line item in a lodestar?  Why isn't that something that should be considered a firm's overhead that's included and baked into the hourly rates of the partners?

MS. STEWART:  Our litigation support are generally our IT people who were assisting with the document -- the hosting, all of the technological issues.  It's not secretarial.  It's all -- it's all our IT people we call litigation support because that's what they're doing.  They're highly trained computer scientists who assist counsel.  If we had done our document hosting by a third party, we would have paid this amount in expenses to

26

litigation support.  And here it's not being separately charged to the class as an expense, it's being subsumed by the lodestar.  And so it's our -- it's our risk, really.

The document clerks -- over half a million documents were produced in this case.  And they -- the document clerks in our firm are all college-degreed, young people who are, you know, probably headed to law school or some other thing, and they are very helpful.  They're -- they assist with deposition preparation and helping with briefing and making sure that the lawyers are supported with whatever documents and whatever support that they need in the day-to-day litigation of the case.

And so, again, it's -- here it's -- you know, it's $71,000.  You know, if the Court thinks that it's properly overhead, then, you know, we have no problem, obviously. But they do serve a very important function in our firm. And, again, they're not separately charged as an expense to the class.

THE COURT:  All right.  Speaking of expense, let's turn to your expense summary.

MS. STEWART:  Okay.

THE COURT:  I have a couple of questions for you there.  120,000 fees to outside Canadian counsel.  Tell me about that.

MS. STEWART:  I will defer to Mr. Burkholz on that.

27

THE COURT: All right.

MR. BURKHOLZ: Right. So we -- we had to pay outside counsel in Canada for a number of tasks that they performed for us. One was helping us figure out whether or not we were going to bring Canadian claims here in the U.S. In addition to that, there was discovery of KPMG that we had to do up in Canada -- KPMG Canada, that they worked with us on. And so there was a lot of assistance from them. In addition, there was a procedure -- a separate action that was brought up in Canada related to this case.

So basically we represented the U.S. investors and there was different counsel representing the Canadian investors up there. And so they assisted us with attending some of those court hearings, because those hearings had a potential effect, from the -- I think the defendants' perspective, on the issues in our case.

They wouldn't have been collateral estoppel, but they might have been used in some of the testimony that was taken up there, or experts that were submitted, was something that this law firm helped us with, you know, attending and reviewing along those lines.

THE COURT: And that arrangement you had with these two Canadian law firms was on a strict hourly basis?

MR. BURKHOLZ: Right. So just to be clear, the Borden Lander firm, I believe was the one that we -- is that

28

our firm -- yeah, the Borden Lander firm we had an arrangement with, we paid them by the hour.  The other firm is actually counsel for KPMG in Canada.  And we had to pay the costs of their production of documents in this case.  And so we -- we basically had to pay for their law firm's cost in working with KPMG to get us documents in the case.  So those were out-of-pocket costs that we paid.

THE COURT:  All right.  Stanford Consulting Group, almost 200,000 for them.  Are they experts, consultants?  What are they and what did they do for you for 200,000?

MR. BURKHOLZ:  Right.  So they did the analysis related to class certification.  They submitted a report on the class certification report which analyzes all of the factors related to Rule 23, including the damage methodology; whether the stock traded in efficient market; the way the damages would be calculated.  And then they sat for deposition that the defendants took, so there was preparation for the deposition and the actual deposition.  And they -- they just did a lot of work for us in analyzing a lot of the complex issues, you know, in this case related to class certification which was important.

THE COURT:  All right.  Thank you.

All right, Ms. Stewart.

MS. STEWART:  Yes, Your Honor.  So we have a total $825,853.33 in expenses.  The notice -- the notice provided

that we would seek expenses not to exceed $1 million.  We came in well below that.  And there were no objections.

These are the types of expenses that are typically reimbursed by paying clients and so we would ask that the Court approve these expenses, which are -- were incurred to result -- to resolve the case and to obtain this outstanding result.

Finally, Your Honor, we would ask a $3,900 award for the lead plaintiff pursuant to 15 U.S.C. Section 78u-4(a)(4), which permits an award of time and expenses to a lead plaintiff for their representation of the class.  As detailed in the declaration of Ryan Stephens, that was submitted in support of final approval and the fee at ECF 199, the lead plaintiff over- -- not only oversaw counsel's efforts and fulfilled its obligations as a -- as the lead plaintiff according to its responsibilities, but it responded to discovery, sat for deposition, was -- was part of the settlement negotiations, and ultimately approved counsel, on the plantiffs' side, entry into the settlement with the defendants.

It's a modest amount.  It's consistent with, if not much less, than other awards to lead plaintiffs for similar services.  There have been no objections and we would ask that the Court approve this modest award to the lead plaintiff.

30

THE COURT:  I agree, that's a very, very modest amount.  There's no issue there.

All right.  Anything else you want to put on the record, Ms. Stewart?

MS. STEWART:  No, Your Honor.  Thank you for your time during the course of the litigation.  And we're pleased to bring this -- what we believe is an outstanding settlement to the Court and urge that it approve the motion -- each of the motions.

THE COURT:  Thank you, ma'am.

MS. STEWART:  Thank you, Your Honor.

THE COURT:  All right, Ms. Rogers, if you'll take the lectern.  I'd like you to put on the record from the defendants' perspective the -- your opinion -- or your view, excuse me, as to the fairness, reasonableness, and adequacy of the settlement, No. 1.  And, No. 2, the attorney's fees and costs.  And, 3, the incentive award and why, from the defendants' perspective, I should be granting the two pending motions.

MS. ROGERS:  Thank you, Your Honor. Good morning.

THE COURT:  Good morning.

MS. ROGERS:  As I believe you and Ms. Gusikoff Stewart noted, defendants do not either oppose or join the motion for attorney's fees or final approval.  Defendants certainly vigorously deny any liability, but they support

31

the settlement as a fair and just outcome as a good resolution for the parties.  There was significant risk on both sides and heated negotiations for a very long time.

And so, Your Honor, for those reasons, we're -- we believe that the process was certainly fair, although we take no position as to the fairness to the class.

THE COURT:  What, in your view, were the primary reasons that motivated the defendants to come to the conclusion that it would be in their best interest to agree to the proposed settlement?

MS. ROGERS:  As Your Honor can imagine, litigation like this is an extreme disruption to business.  We had high-level executives being deposed; board members potentially deposed.  Distraction at the highest levels for the company, and severe drains on their resources.  And so recognizing the risk, albeit in our view small, that plaintiffs would recover at trial, we viewed this to be a reasonable outcome in order to avoid continued expense, burden, and distraction for the company and the individual defendants.

THE COURT:  When your clients were engaging in mediation -- and there was discussion from the plantiffs' perspective that if they had gone to trial and hit a home run, they're looking at, in terms of class recovery, approximately 100 million -- is that a number that -- tell

me how the defendants dealt with that number and how much stock you put into it, how much you disagreed with it, and -- of course, understanding that you disagreed you had any liability, but to the extent if this matter had gone to trial and there was a plantiffs' verdict.

MS. ROGERS:  Yes, Your Honor.  And as you correctly note, our position was that the number should be zero.  But if the plaintiffs were to prevail, the size of the stock drop, based -- and the number of shareholders could have resulted in substantial liability that would have exceeded $27 million significantly.

THE COURT:  Okay.  Do you agree it was in the nine-figure level?

MS. ROGERS:  I believe our calculations were below that and that was our position in mediation, but not substantially below that.

THE COURT:  Okay.  So we're in the same neighborhood, roughly.  Or at least the same solar system.

MS. ROGERS:  Same solar system assuming a knock-out victory on plaintiff's side.

THE COURT:  Okay.  All right.  Anything else you wish, counsel, to put on the record from the perspective of the defendants?

MS. ROGERS:  No, Your Honor.  We appreciate the Court's time and attention.  And respect counsels' efforts

33

throughout the case as well.

THE COURT:  All right.  Thank you, ma'am.

MS. ROGERS:  Thank you.

THE COURT:  All right.  Let me note next for the record that no objections to the proposed settlement were received by the Court by the deadline that was set for same, or indeed at any point prior to this hearing.  And also let me put on the record that currently in the courtroom are just counsel, my staff, and myself; that there's no objector in the courtroom at this time.

All right.  Regarding lead plantiffs' motion for final approval of class action settlement and plan of allocation -- again, the motion filed at ECF 178 -- I intend to enter a written order fully setting forward the basis for my decision, but at this time I will briefly state my intended ruling.

I find that the settlement negotiated by counsel is fair, reasonable, and adequate, and it will be approved. And I will grant lead plantiffs' motion for final approval of class action settlement and approval of plan of allocation.

The parties have demonstrated to me that their settlement agreement was negotiated at arm's length by counsel on both sides that are very experienced in these types of cases.  I further find that as a result of the

34

proposed settlement, plantiffs' counsel has in fact achieved an exceptional result for the members of the class. I also find that the settlement assures the class members will receive reasonable compensation in light of the uncertainties of litigating to a judgment. That compensation provides a significant and immediate benefit to the class in my view, and avoids protracted litigation over these disputes.

Finally, the fact that no class member has objected to the proposed settlement is also, in my view, a indicator, strong evidence, that the class as a whole considers the proposed settlement to be fair, reasonable, and adequate.

Together, all these factors support my finding and conclusion that the settlement agreement proposed to me by the parties is, in fact, fair, reasonable, and adequate and, as I've stated, it will be approved by the Court in my upcoming written order.

With respect to lead counsel's motion for an award of attorney's fees and expenses, and award to lead plaintiff pursuant to Section -- U.S.C. Section 78u, I intend to take that motion under further advisement at this time and I will not be stating my intended ruling at this time. I can, however, state I will be entering my written order in the near future at or near the time I enter my written order approving the parties' proposed class action settlement and

plan of allocation.

All right.  That is all I planned on covering at this fairness hearing.  Is there anything further from the plaintiffs that we need to address at this time?

MS. STEWART:  No.  Thank you, Your Honor.

THE COURT:  Thank you.  Anything further from the defendants?

MS. ROGERS:  No.  Thank you, Your Honor.

THE COURT:  All right.  Thank you, folks.  Safe travels home.  And that will be all.

(Proceedings concluded at 10:59 a.m.)

*       *       *       *       *

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 21st of November, 2023.

MARY J. GEORGE, FCRR, CRR, RMR